# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL WILDLIFE FEDERATION<br>11100 Wildlife Center Drive<br>Reston, VA 20190,<br><br>*Plaintiff,*<br><br>v.<br><br>MATTHEW LOHR, *Chief, Natural Resource*<br>*Conservation Service,*<br>1400 Independence Ave., SW, Room 5105-A<br>Washington, DC 20250,<br><br>and<br><br>SONNY PERDUE, *Secretary, U.S. Department*<br>*of Agriculture*<br>1400 Independence Ave., SW<br>Washington, DC 20250,<br><br>Defendants. | Civ. No. 19-2416 |

## SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This case challenges significant changes to of the Natural Resource Conservation Service's ("NRCS") wetland conservation compliance policies that thwart the congressional intent to preserve environmentally important wetlands. Although Congress intended to establish a system of federal benefits that encourage landowners to preserve wetlands, which provide important environmental benefits such as vital habitat for endangered species and migratory birds, NRCS's new policies instead encourage landowners to fill and destroy wetlands to permanently convert them to agricultural use. Congress intended federal benefits to be contingent on wetlands conservation, but NRCS's new policies frustrate this intent by effectively

allowing landowners to continue to receive these same benefits regardless of whether they destroy wetlands.

2.      Despite acknowledging that policy changes of this significance would require notice and comment rulemaking, NRCS first made these important policy changes in a non-public February 12, 2013 Memorandum titled "Summary of Proposed Wetland Conservation Compliance Changes and Clarifications" ("2013 Memorandum"), which was implemented in secret, and in a January 19, 2017 Amendment to the Food Security Act ("FSA") Manual § 514.1(A) ("2017 Amendment"). Only in December 2018 did NRCS promulgate an Interim Rule for the Highly Erodible Land and Wetland Conservation Compliance provisions of the Food Security Act of 1985 ("Interim Rule")—and even that Interim Rule suffers from serious procedural defects. Finally, in August 2020—after Plaintiff NWF filed its opening summary judgment brief in this action—NRCS issued a Final Rule for Highly Erodible Land and Wetland Conservation ("Final Rule"), which made the policy changes permanent without correcting any of its procedural or substantive defects.

3.      Before promulgating either the Interim Rule or the Final Rule, NRCS secretly implemented the 2013 Memorandum in three states—North Dakota, Minnesota, and Iowa—allowing the agency to accept inaccurate wetland determinations made prior to July 3, 1996 ("pre-1996 determinations") as "certified" for the purposes of the conservation compliance provisions of the 1996 Farm Bill. These inaccurate determinations fail to identify all the wetlands that are present on farmland, and thus effectively allow for the destruction of those wetlands without the loss of federal benefits. *See* 16 U.S.C. § 3822 (enacting a statutory wetlands conservation program). The 2017 Amendment then applied this policy nationwide. The Interim Rule formalized this policy in regulation, and the Final Rule made these changes permanent. All

2

four statements and their associated implementing actions significantly altered NRCS's longstanding policy regarding the certification of pre-1996 determinations and resulted in the certification of inaccurate wetland maps. The new policy allowed—and continues to allow— farmers to permanently fill those wetlands that are inaccurately delineated on their wetland determinations without fear of losing federal monetary benefits that Congress intended to be dependent on wetland conservation. NRCS's policy changes directly contravene Congress's intent to conserve wetlands and have serious adverse environmental consequences, including the loss of ecologically critical wetlands and consequent harm to federally endangered and threatened species, as well as essential habitat for listed species.

4.      The wetland conservation provisions of the Farm Bill prohibit farmers from participating in—or receiving benefits from—many United States Department of Agriculture ("USDA") programs when farmers drain wetlands for agricultural purposes, or when they grow crops on converted wetlands. By allowing the certification of inaccurate pre-1996 wetland determinations without any rigorous evidence of their accuracy, NRCS's new policies—which were first articulated and applied in limited locations through the 2013 Memorandum, implemented nationwide by the 2017 Amendment, codified by the Interim Rule, and made permanent by the Final Rule—remove the incentive to preserve wetlands that are not identified on the certified, but inaccurate wetland determination, as farmers can drain and convert those unidentified wetlands for agricultural production without risking their benefits from USDA programs. Consequently, NRCS's new policies have resulted—and will continue to result—in the destruction of wetlands and conversion into agricultural production, which in turn, has significant adverse impacts on the ecosystem and myriad species that depend on these habitats, many of which are listed under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.

3

5.     Although the rulemaking that culminated in the Final Rule purported to provide "clarity" and "transparency" to NRCS's implementation of the wetland compliance provisions, in reality the rule further obfuscates the wetland determination process and thwarts Congress's clear intent in enacting the 1996 Farm Bill. Congress amended the Food Security Act through the 1996 Farm Bill specifically to prevent NRCS from certifying inaccurate pre-1996 wetland determinations and expressly mandated that the agency add more stringent requirements to ensure the accuracy of the agency's wetlands certification program. For nearly two decades, NRCS complied and required the wetlands certification process to adhere to the rigorous requirements that Congress intended. However, by adopting a new policy that allows the agency to accept as certified the same pre-1996 wetland determinations that *inspired* Congress to add increasingly stringent requirements for accuracy, the Final Rule and its associated actions contravene Congress's clear intent and represent a significant reversal of prior agency practice.

6.     This case also challenges NRCS's failure to rationally explain its reversal of position. Although NRCS claims that its policy regarding inaccurate pre-1996 wetland determinations has remained consistent, in fact the USDA's Office of the Inspector General ("OIG") unequivocally determined that NRCS actually implemented a significant change in its certification procedures in the prairie pothole states in 2013. In the Interim Rule, NRCS failed to even acknowledge this finding. Likewise, in the Final Rule, despite the evidence to the contrary presented by the OIG and commenters, NRCS continued to insist that its rulemaking merely codified existing agency policy. NRCS thus failed to fulfill its basic obligation to rationally explain its radical shift in policy and practice.

7.     This case also challenges NRCS's failure to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, in the promulgation of the Final

Rule. NRCS's Environmental Assessment ("EA"), issued belatedly in conjunction with its Interim Rule without any opportunity for public comment before the policies codified by the rule took effect, does not adequately assess a full range of reasonable alternatives, nor does it take the requisite "hard look" at the impacts of its action. To the contrary, the document flouts NEPA's fundamental purposes by serving as nothing more than a justification for a decision the agency had already made (and was already implementing). Further, the significant impacts that this Interim Rule will have on wetlands and the wildlife that depend on them—including several species listed as threatened or endangered under the ESA—require in-depth analysis in an Environmental Impact Statement ("EIS"). In the Final Rule, NRCS repeated its view that its rulemaking did not constitute a change in policy, and as such, claimed that the EA issued with the Interim Rule was adequate and that no EIS was necessary. Thus, far from taking the legally required "hard look" at the environmental impacts of and alternatives to its action, NRCS again turned a blind eye to the effects of its action on wetlands, despite those effects having been specifically identified in comments from the public, including Plaintiff. For these reasons as well as those set forth below, NRCS has violated its obligations under NEPA.

8.  Finally, NRCS adopted these major policy changes without any legally required consultation with the United States Fish & Wildlife Service ("FWS"), thereby resulting in ongoing violations of the ESA.

9.  For all of these reasons as well as those set forth below, NRCS has acted in a manner that is "arbitrary and capricious, an abuse of discretion," "otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitation," and "without observance of procedure required by law" within the meaning of the judicial review provision of the APA, 5 U.S.C. § 706(2)(A), (C), (D). Alternatively, NRCS's failure to take certain legally required

actions constitutes agency action that has been "unlawfully withheld or unreasonably delayed." *Id.* § 706(1). In addition, NRCS's actions violate Section 7 of the ESA, its implementing regulation, and the ESA's citizen suit provision. 16 U.S.C. § 1540(g). Accordingly, NRCS's decision to codify these policy changes in the Interim Rule and the Final Rule should be vacated and remanded. *Id.*; 5 U.S.C. § 706.

## JURISDICTION

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, and 16 U.S.C. § 1540(g).

## PARTIES

11.    Plaintiff National Wildlife Federation ("NWF") is one of the nation's largest conservation organizations. NWF is a 501(c)(3) non-profit organization with six million members and affiliates in 52 states and territories, including North Dakota, South Dakota, and Iowa. NWF is dedicated to saving wildlife that are suffering declines across America, with the goal of increasing America's fish and wildlife populations and enhancing their capacity to thrive in a rapidly changing world. NWF is committed to protecting, restoring, and connecting wildlife habitat; advancing wildlife conservation; and connecting Americans with wildlife to inspire the next generation of conservationists. NWF members use and enjoy wetlands for various purposes, including to further recreational and professional interests in observing and studying wildlife that rely on wetlands such as migratory birds. NWF maintains a website specifically dedicated to advocating for the protection of wetlands in the prairie pothole states, and NWF and its members advocate for the preservation of wetland habitat throughout the United States.

12.    On behalf of its members and supporters, NWF submitted extensive comments on NRCS's proposed changes to the wetland conservation program during the scoping period for

the Interim Rule, and again in response to the issuance of the Interim Rule and its accompanying

EA. In those comments, NWF stressed that NRCS's rulemaking process suffered from several

fatal procedural and substantive flaws, including the failure to provide any data supporting the

agency's sudden reversal of position; the failure to identify and examine a range of reasonable

alternatives to the proposed rule, as well as their impacts; and the failure to acknowledge that the

Interim Rule proposed significant changes, as opposed to mere "clarifications," to existing

policy. Due to these and other flaws, NWF informed NRCS that NWF's ability to offer fully

informed comment was seriously impaired. Nevertheless, NWF offered what comments it could

based on the limited information the agency had made available. For example, NWF informed

NRCS that any action to accept as "certified" inaccurate pre-1996 wetland determinations for the

purpose of evaluating compliance with the wetland conservation provisions of the Farm Bill,

without any rigorous evidence of the accuracy of those determinations, contravened the express

intent of Congress to protect and preserve these vital habitats. Likewise, NWF suggested

alternative ways to implement the wetland conservation program without contravening

congressional intent, and explained that NRCS must, at the very least, offer an explanation for

the significant change in agency policy regarding the certification status of pre-1996 wetland

determinations. NWF also urged NRCS to take a hard look at the alternatives to and impacts of

the policy changes codified by the Interim Rule, and requested that NRCS comply with NEPA's

procedural requirements, and the substantive and procedural requirements of the ESA. After the

issuance of the Interim Rule, which is effective immediately upon publication, NWF notified

NRCS and FWS of ongoing violations of the ESA in connection with the changes to the wetland

conservation program codified therein. Specifically, NWF notified NRCS that it was in violation

of Sections 7(a)(2) and 7(d) of the ESA.

13.     NWF's members live in and/or regularly visit the prairie pothole and other agricultural regions throughout the United States to observe wildlife, including ESA-listed bird species that are known to use the interior wetlands as stopover sites during migration, such as whooping cranes, piping plovers, red knots, and least terns. NWF's members undertake recreational and professional activities in these areas, such as hiking, hunting, wildlife viewing, and wildlife photography. NWF's members have significant, concrete interests in the preservation and protection of wetlands in agricultural areas and the species that depend on them, and actively work to conserve the natural ecosystems.

14.     For example, some of NWF's members own land in the prairie pothole states, and have invested considerable resources in preserving wetlands and habitat on their land. These members regularly travel to their land to observe wildlife. Some of these members are also certified wildlife biologists, and host field trips and seminars for children on their land in order to educate the next generation about the importance of wetland habitat. These and other members have observed the accelerated destruction of wetlands on farmland adjacent to the road, and on farmlands on which they have permission to hunt waterfowl. They have also observed a reduction in biodiversity and ecosystem health that their extensive backgrounds in wildlife science allow them to directly attribute to the destruction of wetlands. These members are aware that the degradation of wetland habitat has serious, adverse impacts on their personal and professional interests in observing wildlife, including endangered and threatened species, preserving ecosystem health, and educating the next generation about these ecologically important areas.

15.     NRCS's new policy of certifying inaccurate wetland determinations harms the interests of NWF and its members by allowing farmers to drain, consolidate and otherwise alter

unmarked wetlands without risking eligibility for federal benefits, thus causing the destruction or degradation of wetlands. The removal of the economic incentives for farmers to conserve wetlands has a profound and determinative impact on the conduct of farmers resulting in the increased conversion of wetlands to agricultural lands, which harms NWF's and its members interests in preserving these wetlands and the wildlife that depend on them.

16.     The legal violations alleged in this Complaint, traceable directly to NRCS's conduct, cause concrete injury to the aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of NWF's members, including by adversely affecting the behavior and migratory patterns of migratory birds and other wildlife that members enjoy observing and otherwise benefit from, and by raising the specter of jeopardy to listed species that depend on these wetlands at important points in their lifecycle, and that Plaintiffs enjoy and otherwise benefit from. These actual, concrete interests of NWF's members have been, are currently being, and, absent relief from this Court, will continue to be adversely and irreversibly injured by NRCS's failure to comply with federal law. Relief from this Court, including vacatur of the challenged policy changes, Interim Rule and the Final Rule, and EA pending full compliance with the APA, NEPA, the ESA, and other legal requirements, will remedy Plaintiff's injuries because such relief would mean that NRCS must consider, and may implement, alternatives with less adverse environmental impacts.

17.     Defendant Matthew Lohr is the Chief of NRCS and is directly responsible for the supervision, management, and control of the agency. Accordingly, he is responsible for overseeing NRCS's decisions challenged in this action. He is sued in his official capacity.

18.     Defendant Sonny Perdue is the Secretary of Agriculture and is ultimately responsible for overseeing the work of NRCS, an agency within USDA. He is sued in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

A.     **The Farm Bill and Wetlands Conservation Compliance**

19.     Under the wetland conservation compliance provisions of the Food Security Act, as amended by subsequent Farm Bills, participation in, and payments from, most USDA benefit programs are contingent upon the conservation of wetlands. *See* Food Security Act of 1985, sec. 1221, Pub. L. 99-198, 99 Stat 1354 (Dec. 23, 1985) (codified as amended at 16 U.S.C. § 3822). Congress renewed the statutory protections for wetlands, often referred to as the "swampbuster" provisions, through consecutive Farm Bills in 1990, 1996, 2002, 2008, 2014, and 2018.

20.     The conservation compliance provisions and their implementing regulations aim "to remove certain incentives for persons to produce agricultural commodities on . . . converted wetland and to thereby . . . [a]ssist in preserving the functions and values of the Nation's wetlands." 7 C.F.R. § 12.1(b)(4). To achieve this goal, the wetlands conservation provisions require that farmers preserve wetlands to be eligible for USDA program benefits.

21.     NRCS administers the wetlands conservation program, and is responsible for making the technical determinations required to document compliance with the wetland conservation provisions. To document compliance with the wetland conservation provisions, the Food Security Act, as amended, directs NRCS to "delineate, determine, and certify all wetlands located on subject land on a farm." 16 U.S.C. § 3822.

22.     A wetland is defined as land that has three characteristics. First, the land must have a predominance of soils that are saturated, flooded, or ponded enough to support the growth

of hydrophytic vegetation (i.e., vegetation typically adapted for life in saturated soil conditions). Second, the land must be inundated or saturated by surface or groundwater at a frequency and duration that is sufficient to support a prevalence of such vegetation. Finally, the land must support a prevalence of hydrophytic vegetation under "normal circumstances." The term "normal circumstances is defined as the soil and hydrologic conditions that are normally present, without regard to whether vegetation has been removed. To determine the "normal circumstances," NRCS uses the National Oceanic and Atmospheric Administration's ("NOAA") 30-year average precipitation dataset, which NOAA slides forward every ten years and is scheduled to do so soon—i.e., moving from the 1971-2000 dataset to the 1981-2010 dataset.

23.     A wetland delineation outlines the boundaries of a wetland determination on aerial photography, digital imagery, or other graphic representation of the land. Thus, pursuant to the wetland conservation provisions, NRCS must first delineate—i.e., identify the boundaries of—wetlands on a map of the subject farm tract.

24.     A wetland determination is a technical decision regarding whether or not an area meets the definition of a wetland, including identification of wetland type and size. To make a wetland determination, NRCS reviews the map of delineated wetlands and considers whether those wetlands are subject to the wetland conservation provisions or whether an exemption applies (e.g., wetland was converted to agricultural use prior to the 1985 Food Security Act, the wetland was restored after improper conversion, the wetland was artificially created). NRCS assigns each delineated wetland a determination identifier to indicate whether its use for agricultural production is restricted. The resulting wetland determination informs farmers which wetlands must be preserved to remain eligible for USDA benefits, and which wetlands are not

subject to the wetland conservation provisions and as such, may be drained or modified without risking USDA benefits.

25.     Certification of a wetland determination means that NRCS has certified that the wetland determination is of sufficient quality to make a determination of ineligibility for program benefits. In other words, by "certifying" the determination, NRCS confirms that the delineation and determination are accurate. As a result of Congress's command in the 1996 Farm Bill to ensure the accuracy of wetland determinations, NRCS developed mapping conventions, which were promulgated in the FSA Manual. These mapping conventions ensured that wetland delineations and determinations reflected the actual location and size of wetlands on subject farms. Because all determinations made after the 1996 Farm Bill were made in accordance with these mapping conventions, all wetland determinations issued after July 3, 1996—the effective date of the 1996 Farm Bill—are "certified." This case does not challenge the certification status of post-1996 determinations. Instead, this case challenges NRCS's new policy of considering determinations made prior to 1996 "certified" without additional evidence of their accuracy.

26.     As a practical matter, to implement the wetland conservation program, NRCS requires farmers who wish to participate in USDA Farm Bill subsidy programs to complete a form documenting their compliance with the wetland conservation provisions. By completing the form, farmers agree not to produce agricultural commodities on converted wetlands. If the farmer intends to manipulate or clear land for agricultural production, the farmer must request a certified wetland determination from NRCS. By documenting the location and size of wetlands that are subject to the conservation compliance provisions, the certified determination advises the farmer on how to conduct the planned activity without destroying or degrading those wetlands,

and consequently, without risking eligibility for federal benefits under USDA Farm Bill programs.

27.     Congress first directed NRCS to establish a certification process for wetland determinations in the 1990 Farm Bill. However, due to intense controversy over the destruction of wetlands, the methods used to identify wetlands on agricultural land, and the relationship between the wetland conservation program and the wetland provisions of the Clean Water Act, NRCS never fully implemented such a process. In fact, in 1995, the certification process for wetland determinations had grown so controversial, that at Congress's request, NRCS suspended all certification activities until the passage of the 1996 Farm Bill, in which Congress intended to resolve the controversy over the implementation of the wetland conservation provisions.

28.     Between 1990 and 1996, NRCS still issued wetland determinations to assist farmers in planning manipulation or clearing activities ("pre-1996 determinations"). However, as a general matter, these determinations were not considered "certified" because they were not sufficiently accurate to determine ineligibility for program benefits. Pre-1996 determinations were based upon wetland inventory maps that NRCS developed between 1985 and 1991 as tools to predict the presence and approximate boundary of wetlands. As such, pre-1996 determinations only showed the locations of potential wetlands and therefore could not be "certified" as sufficient to determine ineligibility for program benefits unless NRCS substantively reviewed the determination to confirm its accuracy. For example, pre-1996 determinations could be considered certified where the farmer appealed the determination, which required NRCS to visit the site to make corrections to and accurately identify any wetlands on the determination. However, unless the accuracy of the pre-1996 determination was substantively reviewed and verified (e.g., in response to an appeal), the determination could not be "certified."

29.     In 1996, Congress amended the wetland conservation provisions to require greater

methodological rigor and substantive accuracy in wetlands certifications in order to correct

NRCS's prior failure to accurately identify wetlands. Specifically, Congress required that NRCS

certify all wetland determinations as sufficiently accurate to determine the actual status of

wetlands and any resulting ineligibility for program benefits.

**B.     National Environmental Policy Act**

30.     Congress enacted NEPA more than four decades ago "[t]o declare a national

policy which will encourage productive and enjoyable harmony between man and his

environment [and] to promote efforts which will prevent or eliminate damage to the

environment[.]" 42 U.S.C. § 4321. In light of this mandate, the Supreme Court has reasoned that

NEPA is "intended to reduce or eliminate environmental damage and to promote 'the

understanding of the ecological systems and natural resources important to' the United States."

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321).

31.     To meet these objectives, all agencies are required to prepare an EIS for major

federal actions that may "significantly affect" the environment. 42 U.S.C. § 4332(C). The

Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the

President—has promulgated regulations implementing NEPA that are "binding on all Federal

agencies." 40 C.F.R. § 1500.3. To aid in determining whether an EIS is required, an agency may

prepare an Environmental Assessment ("EA") that analyzes the environmental impacts of the

proposed action as well as alternatives. *Id.* §§ 1501.4(c), 1508.9. The EA must "briefly provide

sufficient evidence and analysis for determining whether" a proposed action's environmental

impacts are significant such that an EIS is required. *Id.* § 1508.9. To that end, the EA must

analyze the "direct" impacts of the proposed action, i.e., those that result directly from the

management action, the "indirect" impacts, which include those caused by the action that are later in time but are "still reasonably foreseeable," and the "cumulative" effects, which include those impacts that "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* §§ 1508.7, .8, .9.[1]

32.     Under NEPA's implementing regulations, determining the "significance" of a proposed action requires consideration of both context and intensity. *Id.* § 1508.27.  "Context" considerations include the affected region, interests, and locality, varying with the setting of the action, and include both short and long-term effects. *Id.* § 1508.27(a). "Intensity" refers to the severity of impacts, including impacts that may be both beneficial and adverse; unique characteristics of the geographic area, such as proximity to wetlands, wild and scenic rivers, or ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the ESA; and whether the action threatens a violation of federal law imposed for the protection of the environment. *Id.* § 1508.27(b).

---

[1] On July 16, 2020, the Council on Environmental Quality ("CEQ") promulgated new regulations to implement NEPA. *See* 85 Fed. Reg. 43,304 (July 16, 2020). These new regulations "apply to all NEPA processes begun after the effective date" of September 14, 2020. *Id.* at 43,339. Accordingly, all citations in this Complaint are to the regulations that were in place and effective prior to September 14, 2020.

33.    An agency must "briefly state the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." *Id.* §§ 1502.13, 1508.9.

34.    An agency must analyze reasonable alternatives to the proposed action, regardless of whether it prepares an EIS or an EA. *Id.* §§ 1502.14(a), 1508.9. The alternatives analysis is "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* § 1502.14.

35.    The alternatives analysis must include a "no action" alternative. *Id.* §§ 1502.14(a), 1508.9(b). A no action alternative allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action. Where the agency is proposing changes to an ongoing management program, "'no action' is 'no change' from current management direction or level of management intensity." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).

36.    Importantly, the NEPA process "shall serve as the means of assessing the environmental impact of proposed agency actions, *rather than justifying decisions already made*." 40 C.F.R. § 1502.2(g) (emphasis added); *see also id.* § 1502.5 (requiring that NEPA review "shall be prepared early enough *so that it can serve practically as an important contribution to the decisionmaking process* and *will not be used to rationalize or justify decisions already made*" (emphases added)).

37.    The CEQ regulations further provide that NEPA procedures "must insure that environmental information is available to public officials and citizens before decisions are made

and before actions are taken." 40 C.F.R. § 1500.1. Thus, to "the extent practicable," the agency "shall involve" the public in preparing an EA. *Id.* §§ 1501.4(b), 1508.9(a)(1).

38.     At the time of its decision, the agency must prepare and issue "a concise public record of decision." *Id.* § 1505.2. The ROD must state the agency's decision, identify the alternatives considered, and describe the means adopted to avoid or minimize environmental harm. *Id.*

## C.     Endangered Species Act

39.     The ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Congress intended the ESA to "provide a program for the conservation of … endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). Through the ESA, Congress declared its policy "that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the Act]." *Id.* § 1531(c)(1).

40.     The ESA defines "conserve" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id.* § 1532(3). Accordingly, the goal of the ESA is not only to temporarily save endangered and threatened species from extinction, but also to recover these species to the point where they are no longer in danger of extinction, and thus no longer in need of ESA protection.

41.     Pursuant to the ESA, a species is listed as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range. . . ." *Id.* § 1532(6). A species is

listed as "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

42.     Section 7(a)(2) of the ESA requires all federal agencies to consult with FWS to "insure" that activities will not be "likely to jeopardize the continued existence" of any listed species or cause "destruction or adverse modification" to any designated critical habitat for the species. 16 U.S.C. § 1536(a)(2). "If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible." *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) (citation omitted). Accordingly, before undertaking any action that may have direct or indirect effects on any listed species, the federal agency proposing the action, i.e., the "action agency," must engage in consultation with FWS in order to evaluate the impact of the proposed action. *See* 16 U.S.C. § 1536(a). FWS has defined the term "action" broadly to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," 50 C.F.R. § 402.02, "in which there is discretionary Federal involvement or control." *Id.* § 402.03. An agency may only avoid this consultation requirement for a proposed action if it determines that its action will have "no effect" on threatened or endangered species or critical habitat. *Id.* § 402.14(a).[2]

43.     An action will cause jeopardy to a listed species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of

---

[2] On August 27, 2019, FWS promulgated new regulations implementing the consultation provisions of the ESA. 84 Fed. Reg. 44,976 (Aug. 27, 2019). These regulations apply prospectively to consultations begun after the rule became effective on September 26, 2019. *Id.* at 44,976. Accordingly, the citations in this Complaint have been updated to refer to the revised ESA regulations.

that species." 50 C.F.R. § 402.02. The evaluation of the effects of the proposed action on listed

species during consultation must be based on "the best scientific . . . data available." 16 U.S.C.

§ 1536(a)(2); *see also* 50 C.F.R. § 402.14(d). FWS has defined the "effects of the action" to

include "all consequences to listed species or critical habitat that are caused by the proposed

action, including the consequences of other activities that are caused by the proposed action." 50

C.F.R. § 401.02. Effects of the action "may occur later in time and may include consequences

occurring outside the immediate area involved in the action." *Id.*

44.     To facilitate the consultation process, a federal agency proposing an action that

"may affect" a listed species must prepare a "biological assessment." *See* 16 U.S.C. § 1536(a)(2),

(c); 50 C.F.R. §§ 402.02, 402.12, 402.14. In the biological assessment, the action agency

evaluates the potential effects of the proposed action on all listed species within the "action

area." The "action area" is defined as "all areas to be affected directly or indirectly by the

Federal action and not merely the immediate area involved in the action" 50 C.F.R. § 402.02.

The biological assessment must also reflect the action agency's determination of whether the

proposed action "may affect" listed species.

45.     If the proposed action "may affect" listed species or critical habitat, then the

action agency must undertake formal consultation. 50 C.F.R. § 402.14; *see also* FWS,

Endangered Species Consultation Handbook ("Consultation Handbook") at 3-13 (1998). At the

conclusion of the formal consultation process, FWS provides the action agency with a

"biological opinion" as to whether the action is likely to jeopardize any listed species or destroy

or adversely modify critical habitat. *See* 16 U.S.C. § 1536(b)(3)(A), (4); 50 C.F.R. §§ 402.02,

402.14(g), (h).

46.     Regardless of the conclusion reached by FWS in a biological opinion, the action agency has an independent duty to meet its substantive section 7 obligation to ensure that its actions do not jeopardize listed species. 16 U.S.C. § 1536(a)(2). An action agency violates its substantive section 7 duty if it relies on an inadequate, incomplete, or flawed biological opinion in carrying out an action.

47.     Significantly, after the initiation of consultation, the action agency is prohibited from making "any irreversible or irretrievable commitment[s] of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." *Id.* § 1536(d).

**E.     Administrative Procedure Act**

48.     Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; when they are adopted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

49.     When reviewing agency action under the APA, the court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *Motor Vehicle Mfr. Ass'n*,

463 U.S. at 43. The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

**FACTS GIVING RISE TO PLAINTIFF'S CLAIMS**

**A.      The Importance of Wetlands**

50.      Wetlands are among the most dynamic habitats in the world, and provide essential ecological functions and values that significantly benefit society. These functions include nutrient cycling, water filtration and purification, nutrient sinks, and water storage. Additionally, more than one-third of threatened and endangered species live only in wetlands, and nearly half of all listed species use wetlands at some point during their lifecycles.

51.      The prairie pothole region is an area in the central United States that encompasses Iowa, Minnesota, North Dakota, South Dakota, and Montana. The region is one of the richest wetland systems on the planet, and is characterized by small landscape depressions—i.e., "potholes"—left behind as glaciers receded from the area. The potholes collect rainfall and snowmelt, forming small shallow wetlands and ponds.

52.      The prairie potholes are of regional and global importance for migratory birds and other fauna, including threatened and endangered species. According to the Prairie Pothole Joint Venture, a partnership among federal, state, and non-governmental organizations with a common interest in advancing wetland and grassland conservation for birds, these wetlands provide essential biological functions, such as breeding and stopover habitat, that support a diversity of waterfowl unparalleled anywhere else in North America. Indeed, this region supports over half of the shorebird species that regularly occur in the United States, and at least forty species of waterbirds.

53.     Among the species that the prairie potholes support are several migratory bird species that are federally protected as threatened or endangered under the ESA. For example, whooping cranes, piping plovers, red knots, and least terns are known to use the interior wetlands in the prairie pothole region as stopover sites during migration. Indeed, the last remaining wild flock of endangered whooping cranes—which has a population of only 505 members—relies on prairie wetlands in North Dakota and South Dakota as stopover and feeding habitat during seasonal migrations.

54.     Nearly 90% of the prairie pothole region is privately owned, most of which consists of farms and ranches. Because agriculture is the primary land use, the largest threat to wetland habitats in the prairie pothole region stems from changes in land use practices, and in particular, from extensive draining and conversion for agriculture. Indeed, according to the Prairie Pothole Joint Venture, since the 1980s, the prairie pothole states have lost a vast amount of wetlands, with wetland losses as high as 89% for Iowa, 49% for North Dakota, 42% for Minnesota, 35% for South Dakota, and 27% for Montana.

55.     To incentivize the preservation of these ecologically significant and sensitive areas, the USDA has implemented several programs designed to protect wetlands on private agricultural land. However, despite these programs, wetland loss continues, especially due to drainage of wetlands in crop fields, which occurs at significantly greater rates during times of high commodity prices. When crop prices are high, farmers are more likely to convert native habitat, including grasslands and wetlands, to crop fields. Thus, programs that incentivize the protection of these vital habitats are essential to ensuring their preservation.

56.     The degradation and loss of wetlands due to agricultural practices constitute a significant and ongoing threat to threatened and endangered species and their recovery. For

example, the loss of these wetlands continues to negatively impact the availability of foraging and nesting habitat for migratory birds using the region, such as the threatened piping plover and the endangered least tern. In particular, the consolidation of wetlands—where several smaller wetlands are drained into one larger wetland—is a common agricultural practice that disrupts habitat connectivity and reduces the diversity and function of wetland complexes. Because migratory birds depend on habitat linkages to reach breeding areas, staging areas, and wintering grounds, such practices can have particularly devastating effects. This is especially true for endangered whooping cranes, which use the prairie pothole wetlands as stopover habitat and are vulnerable to habitat fragmentation along their migratory route due to consolidation practices and other activities that destroy or degrade wetlands, and threatened piping plovers, which nest on the exposed shorelines of wetlands and are vulnerable to the loss of breeding habitat due to consolidation practices. In fact, the destruction of habitat was one of the primary reasons the whooping crane was originally listed as endangered. Thus, actions that degrade wetland habitat in the prairie potholes—or contribute to the continued loss of wetlands—adversely impact species protected by the ESA, as well as many non-listed species.

57.     While the prairie potholes are some of the richest wetland habitat in the United States, wetlands in agricultural areas in other states likewise provide important habitat for listed species. Three quarters of wetlands in the coterminous United States occur on private lands. These wetlands are also experiencing severe degradation and loss due to agricultural practices and programs. Indeed, between 2004 and 2009, over 100,000 acres of wetlands in the coterminous United States were lost to agricultural land uses and practices. In certain regions, the profound reductions in wetland extent have resulted in habitat loss, fragmentation, and limited opportunities for reestablishment and watershed rehabilitation. The degradation and loss of

wetlands to agricultural use are continuing threats to the existence and recovery of listed species nationwide, such as the threatened bog turtle, the endangered wood stork, the threatened massasauga rattlesnake, the endangered southwestern willow flycatcher, and the endangered reticulated salamander. Thus, the same concerns regarding wetland habitat in the prairie pothole region and its importance to species protected by the ESA also apply nationwide.

**B.**     **Congress's Intent to Preserve Wetlands Through the Farm Bill**

58.     Congress first established statutory protections for wetlands in the 1985 Food Security Act. The wetland conservation provisions prohibit participation in several USDA programs when annually tilled commodity crops are produced on wetlands that have been converted to land suitable for agricultural production (i.e., "converted wetlands"), or when land is drained to make such production possible. Thus, farmers who convert or drain wetlands are ineligible for certain USDA farm benefits. Congress has renewed these protections in subsequent Farm Bills, and these provisions are today codified at 16 U.S.C. § 3822.

59.     Between 1985 and 1991, NRCS developed "inventory maps" to help locate and classify Farm Bill wetlands. NRCS created its wetland inventory maps by reviewing various soil surveys, topographic maps, aerial slides, and National Wetland Inventory maps generated by FWS. However, due to serious limitations imposed by the source material, these maps only showed potential wetland areas and failed to accurately depict the presence or absence of wetlands.

60.     The 1990 Farm Bill amended the wetland conservation provisions to establish a certification and appeals process for wetland determinations. Specifically, the 1990 amendments called on NRCS to "delineate wetlands on wetland delineation maps," and then, after providing notice to affected owners or operators, "certify each such map as sufficient for the purpose of

making determinations of ineligibility for program benefits." Food, Agriculture, Conservation, and Trade Act of 1990, Pub. L. No. 101-624, § 1422, 104 Stat. 3359, 3573. Additionally, the law directed NRCS to provide a process for the periodic review and update of previous wetland delineations, and provided that "[n]o person shall be adversely affected because of having taken an action based on a previous determination by [NRCS]." *Id.*

61.     In 1991, NRCS promulgated regulations and updated the FSA Manual with procedures to implement the new certification process. The regulations specified that "wetland determinations w[ould] be effective for a period of five years," after which they would be reviewed and, if necessary, updated. However, the implementation of these new policies caused extreme controversy, principally because of disputes regarding the methods used to delineate wetlands, opposition to the requirement for review, and confusion between the four agencies exercising jurisdiction over wetlands under the FSA and the Clean Water Act ("CWA"), i.e., FWS, NRCS, the Environmental Protection Agency ("EPA"), and the Army Corps of Engineers.

62.     In 1994, NRCS, FWS, EPA, and the Corps entered into a Memorandum of Agreement ("MOA") to "minimize duplication and inconsistencies" between the wetland conservation program and Section 404 of the CWA. Under the MOA, certified wetland determinations would be valid both for the purposes of determining eligibility for USDA benefits, and for establishing CWA jurisdiction on agricultural lands. The MOA thus required that "all certifications done after January 6, 1994, [] use mapping conventions agreed on by the four agencies." These mapping conventions described the procedures and methods for making off-site wetland determinations on agricultural land. The MOA also specified that determinations issued prior to the effective date of the MOA would be reviewed to confirm their accuracy for the purposes of both the Food Security Act and the CWA. Specifically, with respect to

determinations issued prior to 1990, the MOA provided that NRCS would review and certify the determinations using the agreed-upon mapping conventions. With respect to determinations issued prior to the effective date of the MOA—i.e., between 1990 and 1994—the MOA directed NRCS to "establish priorities to certify [the] wetland delineations" for the purposes of the Food Security Act. The MOA further explained that priority for certifying previously issued determinations would be given to those delineations from a particular area that the MOA signatory agencies had identified as having "issues regarding their accuracy based on current guidance." Once the priority areas had been identified, the MOA directed NRCS to notify affected farmers that their determinations were in high priority areas for being certified under the FSA, and would be certified according to the agreed upon mapping conventions. The FSA Manual was updated to implement these procedures, likewise providing that NRCS would "review existing determinations" and determine if they met the quality standards provided in the mapping conventions.

63.     Although intended to quell the controversy over wetland determinations, the 1994 MOA only contributed to the frustration among farmers over wetland determinations. Accordingly, in 1995, under pressure from the Senate, NRCS voluntarily stopped issuing certified wetland determinations except upon written request, until Congress could clarify matters in the next Farm Bill. In official agency guidance explaining the moratorium, NRCS specified that "[a]ll previously issued determinations [were] frozen"—i.e., were not "certified"— "unless the [farmer] specifically request[ed]" that the determination be certified. Thus, while NRCS issued wetland determinations to assist farmers in complying with the wetland conservation provisions, such determinations were not considered "certified" unless they were conducted using approved mapping conventions.

64.     According to the 1994 FSA Manual, only those determinations that had been reviewed by NRCS and determined to have been conducted using the mapping conventions (or equivalent methods) were considered certified. Accordingly, many determinations issued prior to 1994 were not considered certified under NRCS's own policies and procedures. Moreover, the 1995 moratorium prevented NRCS from certifying wetland determinations except upon request. Consequently, although some pre-1996 wetland determinations certified by the agency, many pre-1996 were never considered certified.

65.     In response to the growing controversy over the wetland conservation program, in 1996, Congress amended the wetland conservation provisions to increase the rigor of the wetland certification process. Specifically, Congress directed NRCS to delineate, determine, *and certify* all wetlands located on subject farms. Congress thus required NRCS to certify all wetlands determinations as sufficient for the purpose of making determinations of ineligibility for program benefits. As NRCS itself acknowledged in contemporaneous documents explaining the changes enacted by the 1996 Farm Bill, Congress recognized that the inventory maps NRCS had been relying upon to make wetlands determinations, while providing good information, were not accurate, and that as a result, wetlands were in fact being improperly converted to agricultural land, and the administration of the wetland conservation program was becoming increasingly controversial. Accordingly, Congress required that all wetland determinations be "certified" through a rigorous process involving on-site visits and the use of modern technologies for any off-site review.

66.     At NRCS's request, Congress also established a safe harbor provision which provided that no farmer would lose benefits due to an action taken based on a previous *certified* determination. In other words, if a farmer drained or manipulated a wetland that was not listed as

subject to the wetland conservation provisions on a certified determination, the farmer would still be eligible for USDA benefits. Significantly, only those actions taken based on a *certified* determination were exempted. Actions taken based on determinations that were not certified could still result in a loss of USDA benefits if those actions resulted in the draining of wetlands that were in fact subject to the wetlands conservation provisions. Thus, Congress again signaled its intent that only accurate, certified wetland determinations would satisfy the requirements of the wetland conservation provisions.

67.     NRCS promulgated regulations implementing this shift, providing that "[a]ll wetland determinations made after July 3, 1996, will be done on a tract basis and will be considered certified wetland determinations." 61 Fed. Reg. 47,019, 47,025 (Sept. 6, 1996). The regulations define "certification of a wetland determination" to mean that the "wetland determination is of sufficient quality to make a determination of ineligibility" for USDA benefits. Under the regulations, certified wetland determinations can be made using "off-site" or "on-site" methods. The use of off-site methods allows NRCS to issue certified wetland determinations without collecting field data. The regulations provide that off-site methods can include the review of existing records, including previously issued determinations, but require that NRCS ensure that the new certified determination be made in accordance with current Federal wetland delineation methodology, and be consistent with current wetland mapping conventions. If adequate information is not otherwise available to make a determination that meets these quality criteria, the regulations direct NRCS to make the determination using on-site methods.

68.     The regulations did not provide that previously issued determinations would be certified without substantive review to ensure their accuracy. NRCS generally provided that

"[a]ctions taken and determinations made prior" to the effective date of the 1996 regulations

would be subject to the 1991 regulations, "*except as otherwise provided*" in the 1996 regulations.

Thus, with respect to those determinations that NRCS had certified prior to 1996 under the

procedures set forth in the 1991 regulations and FSA Manual, the certification would remain

valid. However, with respect to those pre-1996 determinations that had never been certified by

NRCS, the 1996 regulations specified that to be considered certified, such determinations must

"meet current Federal mapping conventions." "[R]ecogniz[ing] the importance of providing

certainty for the agricultural community as to the status of their wetland determinations which

have not been certified," NRCS informed farmers that would "evaluat[e] the accuracy of existing

non-certified wetland determinations." As a "first step," NRCS pledged "to make an assessment

of the quality of previous determinations" issued within given geographic areas. As part of these

"evaluation[s] of existing wetland determinations," NRCS would assess their "accuracy" and

thus, their "acceptab[ility]" for the purposes of the wetland conservation program. Based on the

results of the evaluations, "landowners would be notified whether their current wetland

determinations are acceptable for [] the [wetland conservation] provisions."

69.     In an EA accompanying the 1996 regulations, NRCS reported that the 1996 Farm

Bill changed the agency's wetland conservation policies by, *inter alia*, "[r]equir[ing] wetland

determinations to be certified by NRCS," and again stated that "[p]revious wetland

determinations will be certified to verify their accuracy." Likewise, NRCS updated its FSA

Manual to state that the agency aimed "to have all wetland determinations certified to the quality

standards set forth in the jointly agreed upon (MOA) wetland mapping conventions."

70.     As a part of the agency's evaluation of the accuracy of pre-1996 wetland

determinations, NRCS conducted internal studies of its wetland conservation program. These

studies confirmed that pre-1996 determinations were not sufficiently accurate to be considered certified. Thus, NRCS's own studies confirmed that pre-1996 determinations failed to comply with the statutory requirement that wetland delineation maps be sufficiently accurate for the purpose of making determinations of ineligibility for program benefits. Additionally, NRCS found that files often lacked evidence that farmers had been notified of their appeal rights, which was a required element of "certification."

71.     Pursuant to the 1996 Farm Bill and its implementing regulations, and in light of the results of the internal studies, NRCS increased the rigor of its wetlands certification process, relying on a system of internal controls designed to ensure the quality and accuracy of wetland determinations, including the use of new technologies and both off-site and on-site evaluations. These procedures were published in the FSA Manual, and utilized methods found in the 1987 Army Corps of Engineers Wetland Delineation Manual and Regional Supplements, as well as variances based on statutory and regulatory authorities provided by the Food Security Act, as amended. These quality control criteria ensure that wetland determinations conducted after 1996 can be certified as sufficient to determine ineligibility for USDA program benefits.

72.     Although statutory changes that made compliance with both the interagency MOA and the FSA impossible prompted NRCS to withdraw from the MOA in 2005, that withdrawal did not meaningfully alter the procedures for certifying existing wetland determinations. Instead, NRCS continued to require that certified wetland determinations adhere to quality criteria provided in the FSA Manual and state mapping conventions.

73.     Between 1996 and 2013, NRCS's policy with respect to pre-1996 wetlands determinations was that such determinations were only considered certified if they met *both* the procedural *and* quality mandates that Congress mandated and NRCS promulgated in 7 C.F.R.

Section 12. *See, e.g.*, FSA Manual § 514.51(b) (3d ed., Amend. 2, Nov. 1996); FSA Manual § 514.1(a)(1) (5th ed., Jan. 2010). In other words, a pre-1996 determination could only be "certified" if NRCS determined that it had been made in accordance with current mapping conventions. As a practical matter, this meant that only those pre-1996 determinations that had been appealed were considered certified, as the appeals process required NRCS to make a site visit to ensure the accuracy of the wetland determination. The majority of pre-1996 wetland determinations were not appealed and as a result, were based on inaccurate wetland inventory maps that are not in accordance with post-1996 mapping conventions and identification procedures. Accordingly, most pre-1996 determinations fail to meet the quality criteria required to be considered certified.

74.     Contemporaneous statements issued by NRCS concerning the 1996 amendments confirmed that the 1996 amendments to the wetland conservation provisions were intended to require greater methodological rigor and substantive accuracy in wetlands certifications in order to correct NRCS's prior failure to accurately identify wetlands. Indeed, official agency fact sheets alerted farmers that "most wetland determinations completed prior to July 3, 1996 [were] not considered certified and therefore may not be valid for determining compliance with wetland conservation provisions."

75.     Before the actions challenged in this lawsuit, NRCS had never previously proposed to accept pre-1996 wetland determinations as certified without rigorous evidence of accuracy. Nor would Congress have countenanced such a change in NRCS's approach to wetland certification; in fact, Congress *specifically rejected* proposed amendments to *both* the 2014 and 2018 Farm Bills that would have allowed NRCS to certify pre-1996 wetland determinations without additional evidence of accuracy.

1.     **The 2013 Decision Memorandum and 2017 Amendment**

76.     NRCS's published policy with respect to wetland determinations issued between 1990 and 1996 remained consistent until 2013, when it issued secret instructions to staff in Minnesota, South Dakota, North Dakota, and Iowa—i.e., the "prairie pothole" states—to begin accepting as certified pre-1996 wetland determinations, even without evidence that procedural appeal rights and the quality mandates set forth in the 1996 regulations and FSA Manual had been met.

77.     In 2013, despite Congress's specific requirement for accuracy in wetland determination certification and despite its own findings regarding the inaccuracy of pre-1996 wetland determinations, NRCS began considering responding to a growing backlog of wetland certification requests by certifying pre-1996 wetlands determinations *without any supporting evidence of their accuracy*. NRCS proposed this change and other significant changes to its wetland determination and certification policies in the 2013 Memorandum.

78.     The 2013 Memorandum was signed by the Secretary of Agriculture, authorizing NRCS to proceed with a rulemaking to implement the changes proposed therein, including allowing NRCS to accept pre-1996 determinations as certified, even without evidence that the delineation maps met the quality mandates required by Congress and implemented in the 1996 regulations and FSA Manual.

79.     The 2013 Memorandum found that aspects of the proposed policy changes would require formal notice-and-comment rulemaking, while others may be implemented through less formal means such as updates to the agency's FSA Manual. However, shortly after the passage of the 2014 Farm Bill, NRCS determined that accepting inaccurate pre-1996 wetland

determinations as certified would be extremely controversial and abandoned efforts to undertake notice-and-comment rulemaking.

80.    On information and belief, NRCS never shared the 2013 Memorandum with the public through its website or any other means, nor did NRCS inform Congress that it was taking this action that was inconsistent with Congress's intent in requiring NRCS to certify all pre-1996 determinations through contemporary methods.

81.    In 2017, the USDA's OIG issued a scathing report regarding NRCS's implementation of the wetland conservation provisions. This is the first time that NWF—and the public at large—learned of the 2013 Memorandum and NRCS's actions over the past four years to implement the Memorandum. As the OIG reported, shortly after abandoning efforts to implement the 2013 Memorandum through formal rulemaking, NRCS instead held a summit with agency officials from the four prairie pothole region states—Iowa, Minnesota, North Dakota, and South Dakota—as well as NRCS's Regional Conservationist. Through meeting notes distributed to all attendees, NRCS instructed the States to implement the changes in the 2013 Memorandum even though the agency was still developing new regulations and policies. The notes also specifically instructed states to *not issue any written guidance* regarding the new policy.

82.    Thus, as the OIG reported, NRCS officials in three of the prairie pothole states—North Dakota, South Dakota, and Minnesota—implemented the changes proposed by the 2013 Memorandum, including accepting pre-1996 determinations as certified without rigorous evidence of their accuracy. Officials in Iowa declined to implement the changes at that time out of fear of litigation. The OIG found that the implementation of these policies led to the certification of inaccurate pre-1996 wetland determinations—even where more recent, accurate

determinations were available—which in turn led to the loss of large areas of wetlands despite the fact that farmers continued to receive USDA program benefits. In fact, as part of its investigation, the OIG found that NRCS certified a pre-1996 determination that showed 2.5 acres of wetland on a farm tract, even though a 2010 determination for the same tract that showed 34 acres of wetland. As a result, the farmer drained 31.5 acres of wetland, or 93%, without the loss of federal benefits that Congress intended to apply in such circumstances. The OIG found that this was not an isolated incident. In a review of 13 farm tracts where NRCS rescinded current determinations and instead certified pre-1996 determinations, the OIG found that, in total, 341.8 out of 456.9 acres, or *75%*, of wetlands that existed, were no longer protected and as such, were subject to being drained without risking eligibility for USDA benefits.

83.     As further reported by the OIG, officials in NRCS's sister agency, the Farm Services Agency, were unaware of the shift in policy, and were shocked that NRCS would use the determinations from the 1990s, as they regarded the older maps as of poor quality and not sufficiently accurate to be "certified." The Farm Services Agency is responsible for making the actual eligibility determinations, including whether a producer is ineligible for benefits based on NRCS's technical determinations of wetland conservation provisions.

84.     On information and belief, senior-level NRCS officials were aware that state officials in the prairie pothole states were implementing the policy changes articulated in the 2013 Memorandum despite the fact that NRCS had previously acknowledged that those changes could only be implemented through notice-and-comment rulemaking. According to the OIG, senior agency officials insisted NRCS's policy with respect to the certification of pre-1996 determinations had remained consistent, despite overwhelming evidence to the contrary.

85.     NRCS's continued reliance on inventory maps as the primary source material for wetland determinations led to the certification of inaccurate wetland determinations, even after the 1996 Farm Bill amended the wetland conservation provisions to require that the agency "certify" wetland determinations to ensure that such maps were sufficient for the purposes of determining ineligibility for USDA program benefits. Consequently, NRCS's use of the inventory maps has in fact allowed for the destruction of large areas of wetlands without the loss of any federal benefits, and thereby flouted the Congressional intent to preserve those wetlands by making federal benefits contingent on their conservation.

86.     In March 2014, the OIG received a complaint alleging that the wetland determinations resulting from the 2013 change in policy were "unethical," "fraudulent," "illegal," and "against the appeals of the National Appeals Division." The OIG's report, issued in January 2017, concluded that the agency's shift in the implementation of its policy merely replaced its backlog of pending determinations with inaccurate determinations, and recommended that NRCS issue "official guidance reinforcing current rules and clarifying procedures for making wetlands determinations and certifications." However, far from rectifying the inconsistencies in policy, two days after the report was published, NRCS issued an "Amendment" to the FSA Manual formalizing, without explanation, the post-2013 approach to addressing pre-1996 determinations and applying that policy nationwide ("2017 Amendment"). In short, rather than correcting its failure to rigorously evaluate wetlands certifications in the prairie pothole states, NRCS adopted a revision to its manual that expanded its unlawful and inaccurate wetlands certification process nationwide.

## 2. __The Interim Rule__

87.     On July 19, 2018, NRCS notified selected stakeholders of its intent to implement

significant changes to its wetland conservation program and policies by way of an email inviting

their participation in a stakeholder meeting scheduled to take place *only one week* after the email

was received, on July 27, 2018. The invitation did not contain any draft language that would

have been useful to developing robust comments and fostering meaningful public participation

*before* the publication of the Interim Rule. Instead, in a presentation accompanying the emailed

invitation, NRCS summarized the changes that the Interim Rule would formalize. Several of

those changes—particularly those proposing to allow farmers to rely on pre-1996 determinations

to demonstrate compliance with the wetland conservation provisions—are precisely the changes

that NRCS issued as secret instructions in 2013 and implemented nationwide in the 2017

Amendment.

88.     One week later, at the stakeholder meeting held on July 27, 2018, NWF submitted

written and oral comments on the changes outlined in the email and attached presentation,

explaining that the proposed Interim Rule violated Congressional intent as expressed in the

wetland conservation provisions of the 1996 Farm Bill, represented a significant and unexplained

departure from prior agency policy regarding the certification status of pre-1996 wetland

determinations, and must be subjected to environmental review in accordance with NEPA and

the ESA. NWF also explained that NRCS's procedure in notifying stakeholders of the proposed

changes was seriously flawed in that the agency failed to give interested parties either

appropriate time, or sufficient information to enable meaningful comment on the significant

changes NRCS proposed to make to the administration of the wetland conservation program.

89.     On December 7, 2018, NRCS published the proposed changes to the wetland conservation provisions as an Interim Rule—which became effective on that date—with a request for comments. *See* Highly Erodible Land and Wetland Conservation, 83 Fed. Reg. 63,046 (Dec. 7, 2018).

90.     The Interim Rule represents a significant departure from NRCS's prior policy. The agency's prior policy required NRCS to substantively review the accuracy of pre-1996 wetland determinations and ensure that such determinations met *current* quality criteria before they could be considered certified. However, the Interim Rule provides that pre-1996 wetland determinations are considered legally "certified" if "the person was notified that the determination had been certified, and the map document was of sufficient quality to determine ineligibility for program benefits," which the Interim Rule defined to mean merely that the map document "be legible to the extent that areas that are determined wetland[s] can be discerned in relation to other ground features." Thus, the Interim Rule allows NRCS to accept pre-1996 wetland determinations as certified without any additional evidence of their accuracy, so long as the delineation maps are *legible*, as opposed to substantively *accurate*, as was previously required under the agency's longstanding policy and practice.  Likewise, when setting forth the procedures for identifying the presence of wetland hydrology—one of the three essential characteristics of a wetland—the Interim Rule provides that the "determination of wetland hydrology will be made in accordance with the current Federal wetland delineation methodology in use by NRCS *at the time of the determination*." In other words, under the Interim Rule, to be considered "certified," pre-1996 determinations must only meet the far less rigorous quality mandates that were in place when those determinations were *initially* issued in the early 1990s.

91.     The Interim Rule also implements a new definition of "normal circumstances," a standard used to determine whether an area is properly classified as a wetland subject to the wetland conservation program. As explained above, the definition of wetland requires NRCS to determine whether under "normal circumstances" the land supports a prevalence of hydrophytic vegetation. Normal circumstances are the soil and hydrologic conditions that are normally present, without regard to whether the vegetation has been removed. To determine the "normal circumstances," NRCS uses NOAA's 30-year average precipitation dataset. This dataset is scheduled to slide forward soon—i.e., moving from the 1971-2000 dataset to the 1981-2010 dataset. The Interim Rule demands that NRCS continue to use the old, static 30-year average precipitation dataset (1971-2000). As the EA acknowledges, under the 1981-2010 dataset, more acres of wetlands would be identified than under the 1971-2000 dataset due to an overall increase in precipitation across the nation. Thus, the use of the older static dataset will result in fewer acres of wetland being identified as subject to the wetland conservation provisions. As such, by retaining the outdated 1971-2000 dataset, the Interim Rule makes it less likely that NRCS will identify wetlands that do, in fact, exist, thereby allowing these wetlands to be filled without risking the loss of federal benefits.

92.     By excluding wetlands that would otherwise have been identified using the most up-to-date climactic information, the use of a static, outdated dataset to determine normal circumstances will result in the certification of inaccurate wetland determinations. The draining of wetlands that would otherwise have been identified—and thus would have resulted in the loss of federal benefits—had the dataset shifted forward will unquestionably result in ecological, aesthetic, cultural, economic, and social effects on the natural and physical environment. NRCS did not attempt to meaningfully assess those impacts. Instead, NRCS concluded without

meaningful analysis that "[t]he overall impact of maintaining use of the 1971-2000 dataset is expected to be negligible over time."

93.    The Interim Rule became effective immediately upon publication. *See* 16 U.S.C. § 3846(b)(2). In other words, NRCS promulgated and implemented the rule without the benefit of first receiving and evaluating public comments.

94.    On information and belief, NRCS is continuing to implement the policy change respecting the certification of pre-1996 wetland determinations that was first articulated in the 2013 Memorandum, implemented nationwide by the 2017 Amendment, and codified by the 2018 Interim Rule. As a result, NRCS is certifying inaccurate pre-1996 wetland determinations, leaving many acres of wetlands without the protections mandated by the wetland conservation provisions of the Farm Bill and thus vulnerable to permanent draining or filling for agricultural use. As documented by the OIG, farmers are seeking to have the agency certify inaccurate pre-1996 determinations and then proceeding to drain those wetlands that are not marked on the delineation without risking their eligibility for USDA farm benefits. This is resulting in serious damage to ecologically critical wetlands and essential wildlife habitat.

**B.    Environmental Review of the Interim Rule**

95.    NRCS prepared an EA to accompany the Interim Rule. In the EA, NRCS asserted that the Interim Rule is merely "administrative" and is exempt from a full environmental review. However, the Interim Rule makes significant changes to NRCS's wetlands determination policy in response to a growing backlog of determination requests. These changes have led to significant impacts on wetlands, as exhaustively detailed in the OIG Report. Thus, it is indisputable that the Interim Rule is a major federal action with significant environmental impacts because it adopted new procedures for making and evaluating wetland determinations

that are, in fact, allowing the mass destruction of wetlands that otherwise would not have occurred.

96.     The EA does not mention NEPA's significance factors, much less analyze whether the Interim Rule rises to the level of significance under any of these factors. However, NRCS's policy change indisputably implicates several of NEPA's significance factors, including where: there are "unique characteristics . . . such as proximity to . . . prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," 40 C.F.R. § 1508.27(b)(3); "the effects on the quality of the human environment are likely to be highly controversial," *id.* § 1508.27(b)(4); "the possible effects on the human environment are highly uncertain or involve unique or unknown risks," *id.* § 1508.27(b)(5); "the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," *id.* § 1508.27(b)(6); "the action is related to other actions with individually insignificant but cumulatively significant impacts," *id.* § 1508.27(b)(7); "the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the [ESA]," *id.* § 1508.27(b)(9); and "the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment," *id.* § 1508.27(b)(10).

97.     The EA does not acknowledge that NRCS significantly changed its policy with regards to the administration of the wetlands conservation program. To the contrary, NRCS framed the purpose and need for the Interim Rule as merely codifying existing policies.

98.     The EA purported to consider two alternatives: a No Action Alternative, under which NRCS would not issue the Interim Rule; and the Proposed Action Alternative, under which NRCS would do so. According to NRCS, the Interim Rule "merely clarifies some aspects of the technical procedures already being used by [NRCS]." NRCS therefore maintained that

there is no practical difference between the No Action Alternative and the Proposed Action Alternative.

99.     With respect to the No Action Alternative, NRCS defined the status quo as the implementation of the Interim Rule because the Interim Rule merely "clarifies" existing policy and does not change the agency's procedures. However, this assertion is directly contradicted by the agency's own statements in the 2013 Memorandum, where it acknowledged that many of the Interim Rule's proposed changes required the agency to undergo a rulemaking, and by the OIG Report finding that NRCS did change its policy with respect to its policy regarding the certification of pre-1996 wetland determinations, with serious consequences for the environment.

100.    Plaintiff NWF filed extensive comments on the EA, explaining that NRCS's characterization of the Interim Rule as merely "administrative" in nature is contrary to the overwhelming evidence demonstrating that the Interim Rule constitutes a major policy change that will impact NRCS's effectiveness in fulfilling its statutory mandate to preserve wetlands. NWF explained that it was disingenuous for NRCS to avoid public scrutiny by attempting to mischaracterize major policy changes as mere "clarifications" of existing policy, particularly when the OIG Report faulted NRCS for making those very changes outside of the lawful rulemaking process. NWF further explained that the Interim Rule represents a major federal action that will have significant impacts on the environment. As such, full NEPA compliance through an EIS is required.

101.    To that end, NWF explained that the EA suffered from multiple fatal flaws. For example, NWF observed that the Interim Rule triggered several significance factors under NEPA, thus requiring the preparation of an EIS. NWF also objected to NRCS's purpose and need statement, observing that the statement was unreasonably narrow and as such,

impermissibly constrained the range of reasonable alternatives, rendering the EA a foreordained formality. Relatedly, with respect to the alternatives analysis, NWF observed that by assuming the existence of the very rule under analysis, the EA failed to include a true No Action Alternative. NWF further observed that, as NRCS acknowledged, the two ostensible alternatives that the EA purported to evaluate were functionally identical and that, as a result, NRCS's analysis is devoid of any meaningful consideration of alternatives. NWF suggested several alternatives that NRCS should consider in a full NEPA analysis, including establishing a certification standard that reflects Congressional intent, and quality control methods to ensure the accuracy of wetland determinations.

102.    With respect to the EA's purported analysis of environmental impacts, NWF explained that the EA also failed to adequately evaluate the impacts of its action as required by NEPA and its implementing regulations. For example, the EA did not mention the significant environmental impacts that were already occurring as a result of the policy changes implemented by NRCS's 2013 Memorandum and 2017 Amendment. NWF also observed that even for the impacts that were mentioned—e.g., the fact that fewer wetlands subject to the conservation provisions would be identified using the static dataset to determine "normal circumstances"—the EA failed to offer a meaningful explanation for why its use of the static dataset was preferable, and did not even attempt to quantify the impact of lost wetlands under either decadal dataset.

103.    In fact, as NWF observed, the EA's impacts discussion was devoid not only of any analysis of the environmental effects of the Interim Rule, but of any acknowledgement that NRCS's actions will impact the environment at all. Rather, aside from a few general and conclusory statements that the Interim Rule would have "negligible" impacts on the number of wetland acres identified as subject to the wetlands conservation provisions, the EA's impacts

analysis focused not on the actual impacts of the policy changes, but on the political and administrative difficulties the agency purportedly faces in administering the program. As a result, the EA failed to provide the meaningful comparison of alternatives and their impacts that NEPA requires. Instead, the EA appeared to rationalize a decision already made—which NEPA's implementing regulations specifically forbid.

104.    NWF also explained that information concerning the environmental impacts of a proposed action and its alternatives is essential to an informed evaluation of the Interim Rule as compared to alternatives, and, thus, is critical to meaningful public participation. NWF explained that NRCS's failure to adequately describe and evaluate either the proposed action and its alternatives, or the scope and scale of the associated impacts deprived the public of any meaningful opportunity to participate in the agency's decisionmaking process.

## C.    Events Post-Dating Plaintiff's Original Complaint

105.    NWF originally filed this action on August 9, 2019. In its original complaint, NWF raised claims arising under the APA, ESA, and NEPA against NRCS regarding its implementation of these policy changes.

106.    NWF filed its opening summary judgment brief on May 27, 2020. In its brief, NWF argued that through the 2013 Memorandum, 2017 Amendment, and 2018 Interim Final Rule, NRCS implemented a new policy that accepts as "certified" many pre-1996 wetland determinations, despite the agency's policy—in place for over fifteen years—that such determinations were not sufficiently accurate or reliable to accept as "certified." NWF further argued that by changing its policies implementing the wetland conservation program without even acknowledging that it changed its approach—much less providing any reasoned basis for

this new approach—and without evaluating the new policies' impacts on listed species or the environment more broadly, NRCS violated the APA, ESA, and NEPA.

107.    On July 6, 2020, approximately ten days before Federal Defendants' deadline for their combined cross-motion for summary judgment and opposition to NWF's motion for summary judgment, counsel for Federal Defendants emailed counsel for NWF to advise that NRCS intended to issue a Final Rule on the Highly Erodible Land and Wetland Conservation provisions of the FSA no later than August 31, 2020. Federal Defendants informed NWF that it intended to seek a stay of the briefing schedule pending the issuance of the Final Rule.

108.    On July 10, 2020, Federal Defendants moved to stay briefing in the case until the earlier of either the Final Rule, or August 31, 2020. ECF No. 19. NWF advised Federal Defendants of its position on such a motion: "Plaintiff National Wildlife Federation ("NWF") has serious concerns about the timing of the National Resource Conservation Service's ("NRCS") issuance of a final rule only after the filing of NWF's opening summary judgment brief in this litigation – which appears to be an effort to further support the agency's litigating position – but nevertheless does not object to the stay given the agency's decision to issue a final rule." Id. On July 15, 2020, this Court granted Federal Defendants' motion. July 15, 2020 Minute Order.

      **1.**    ***NRCS's Final Rule on the Highly Erodible Land and Wetland Conservation Provisions.***

109.    On August 28, 2020, NRCS issued its Final Rule on the Highly Erodible Land and Wetland Conservation provisions, which "makes permanent many of the changes made in the [December 2018] interim rule." 85 Fed. Reg. 53,137, 53,137 (Aug. 28, 2020). As reported by NRCS officials in a stakeholder information session held the day before the Final Rule was issued, the Final Rule made only three changes to the Interim Rule: (1) the Final Rule further

clarified the difference between "farmed wetland" and "farmed wetland pasture"; (2) the Final

Rule clarified that wetland determinations, delineations, and certifications will be done on a tract

field or sub-field basis, and added the 2018 Farm Bill requirement that NRCS make reasonable

efforts to include the affected person when conducting on-site wetland investigations; and (3)

added language to clarify that consideration of best-drained condition will not occur when a

wetland supported woody vegetation on December 23, 1985, such that production of an

agricultural commodity was not possible on that date.

110.    The Final Rule confirmed NRCS's view that that *all* determinations conducted

between 1990 and 1996 are considered certified, regardless of whether they had been

substantively reviewed to ensure their accuracy and conformance to approved mapping

conventions. The Final Rule thus makes permanent the significant departures from NRCS's prior

policy respecting the certification of pre-1996 wetland determinations that was first articulated in

the 2013 Decision Memorandum, implemented by the 2017 Amendment to the FSA Manual, and

codified by the Interim Rule. Consequently, the Final Rule continues to allow NRCS to certify

inaccurate pre-1996 wetland determinations, leaving many acres of wetlands without the

protections mandated by the wetland conservation provisions of the Farm Bill and thus

vulnerable to permanent draining or filling for agricultural use. As documented by the Office of

Inspector General ("OIG"), this policy has resulted, and is currently resulting in serious damage

to ecologically critical wetlands and wildlife habitat

111.    In the Federal Register notice for the Final Rule, NRCS included an extensive

preamble that purported to respond to stakeholder comments submitted in response to the Interim

Rule, including comments submitted by NWF. The preamble also articulated new and updated

rationales for the policies made permanent by the Final Rule.

45

112.     Throughout the preamble, NRCS insisted that the rulemaking constituted a mere "codification and clarification of existing practice rather than a substantive change of overall regulatory framework or policy." According to NRCS, its policy had always been that pre-1996 wetland determinations are considered certified if they were "completed using the methods and data required at the time of issuance, and any subsequent judgment as to their sufficiency as certified wetland determinations solely based on these methods or data is not authorized" under the Food Security Act. NRCS therefore maintained that the policies made permanent by the Final Rule did not certify any pre-1996 determinations that had not already been certified under the procedures in place at the time of their issuance. However, myriad contemporaneous documents—including the FSA Manual—demonstrate that most pre-1996 determinations were not considered certified unless NRCS had reviewed the accuracy of such determinations and ensured that they met current quality criteria. For example, in 1994, NRCS implemented a procedure requiring the agency to review previously issued determinations, and specified that only those determinations conducted using approved mapping conventions (or their equivalent) would be considered certified. This procedure was carried forward and expanded upon in response to Congress's command in the 1996 Farm Bill to improve the administration of the certification process. Likewise, the OIG Report, which exhaustively detailed historical agency policy, the impetus for the adoption of the new policy, and the impacts from the new policy, further confirmed that the Interim Rule and Final Rule constitute a significant departure from NRCS's prior wetland determination policy. In the Final Rule, NRCS again failed to acknowledge—much less offer a reasoned explanation for—its change in policy. NRCS's refusal to acknowledge that the rulemaking changed its wetland determination policy—and indeed, its

insistence that the opposite occurred—tainted its entire analysis of the rule, its environmental impacts, and its effects on ESA-listed species and their critical habitat.

113.    The Final Rule affirmed the Interim Rule's position that pre-1996 determinations are considered certified if the farmer had been notified of his or her appeal rights, and if the determination was of sufficient quality to determine ineligibility for program benefits, which the Interim Rule and Final Rule defined to require that the map document merely be *legible*. Not only is this a significant—and unexplained—departure from the agency's longstanding policy and practice, but the requirement that map documents be "legible" also constitutes a new quality mandate that governs the certification of previously issued determinations. However, NRCS has not explained why it has exercised its discretion in this manner. Moreover, as a practical matter, the policy continues to allow NRCS to accept pre-1996 wetland determinations as certified without any additional evidence of their accuracy, so long as the delineation maps are *legible*, as opposed to substantively *accurate*, which is contrary to congressional intent and, as documented by the OIG, has resulted—and is currently resulting—in the destruction and degradation of wetlands to allow for increased crop production.

114.    To shore up its narrative that pre-1996 determinations were *always* considered certified, NRCS relied heavily on a revisionist retelling of the legislative history of the 1990 and 1996 Farm Bills. For example, NRCS maintained that the changes made to the wetland conservation program by the 1996 Farm Bill—e.g., the safe harbor provision for actions taken in reliance on a previously issued *certified* determination and the removal of the requirement to review and update certified wetland determinations—signaled Congress's support for the agency's wetland certification process. However, these statements once again ignore the fact that according to the policies in place until the agency first implemented the 2013 Memorandum,

most pre-1996 wetland determinations were never considered certified without first being substantively reviewed for their accuracy. Indeed, both the 1994 and 1996 editions of the FSA Manual provided that NRCS only considered pre-1996 wetland determinations to be certified if they met the quality criteria set forth in agreed-upon mapping conventions developed and implemented after the 1994 MOA. When enacting the 1996 Farm Bill, Congress was aware of this certification process, including the fact that most pre-1996 wetland determinations were not considered certified. In fact, in 1995, NRCS placed a moratorium on the issuing of certified wetland determinations *under pressure from Congress*. While Congress provided that a certified determination would not be subject to subsequent review or update outside of limited circumstances, the 1996 Farm Bill did not alter (and thus approved) NRCS's process—begun in 1994, well before the passage of the 1996 Farm Bill—of reviewing previously issued non-certified determinations to ensure their accuracy before they could be considered certified. Moreover, at NRCS's request, Congress limited the 1996 Farm Bill's safe harbor provision to exempt only those actions taken based upon a previously issued *certified* determination; Congress did not exempt actions taken based on previously issued determinations that were not certified. Accordingly, far from displacing NRCS's policy that most pre-1996 determinations were not considered certified without additional review, the 1996 Farm Bill confirmed Congress's intent that only accurate determinations created using modern mapping methods would satisfy the requirements of the wetland conservation program.

115.    Throughout the Final Rule, NRCS emphasized that under the 1996 regulations, determinations issued prior to the effective date of the regulations were subject to the 1991 regulations. However, NRCS failed to acknowledge the caveat to this limitation—that pre-1996 determinations were generally subject to the 1991 regulations "except as otherwise provided."

NRCS's statements in the 1996 regulations demonstrated its intent that to be considered certified, all non-certified pre-1996 determinations must meet current mapping conventions. For example, the provision concerning certification specified that "[c]ertification of a wetland determination *shall* be completed according to delineation procedures" agreed to pursuant to the 1994 MOA (i.e., the mapping conventions). Likewise, in the preamble to the 1996 regulations, NRCS explained that to be certified, wetland determinations must "meet current Federal mapping conventions." Further supporting this point, the regulations provided that all determinations conducted after July 3, 1996—i.e., the effective date of the regulations—"will be considered certified wetland determinations." NRCS has never explained why, if it considered all determinations issued between 1990 and 1996 to be certified, the regulation only specified that determinations conducted after 1996 would automatically receive that status.

116.    NRCS's insistence that pre-1996 determinations are subject to certification pursuant to the 1991 regulations makes even less sense when considered within the context of the 1994 MOA. As explained, pursuant to the 1994 MOA, NRCS undertook a review of previously issued determinations to ensure their accuracy and compliance with the agreed-upon mapping conventions. NRCS updated the FSA Manual to explain that determinations issued prior to the adoption of the mapping conventions were not considered certified unless NRCS had ensured that they were sufficiently accurate. This policy and practice continued after the promulgation of the 1996 regulations. Indeed, the 1996 FSA Manual also provided that pre-1996 determinations could be accepted as certified wetland determinations if they: (1) "me[t] quality criteria in [the] MOA mapping conventions"; (2) "reflect[ed] up-to-date and current situation on the landscape"; *and* (3) either (a) were "appealed at least one level," or (b) if not appealed, "appeal rights [had] expired or upon final decision" by NRCS. Accordingly, as a practical

49

matter, it makes no difference whether the pre-1996 determinations are considered to be subject to the 1991 regulations and procedure, or the 1996 regulations and procedure. NRCS's policy under either required confirmation that the pre-1996 determination accurately depicted the size and location of wetlands.

117.    In response to comments by NWF and others explaining that the 1996 regulations implementing the 1996 Farm Bill made clear that NRCS had never considered pre-1996 determinations to be certified unless they had been reviewed to ensure their accuracy, NRCS insisted that commenters failed to "provide the full context under which such statements were made in the 1996 [] rule." The 1996 regulations provided that as contemplated by the 1994 MOA and in coordination and collaboration with the other signatory agencies, NRCS would "evaluat[e] the accuracy of *existing non-certified wetland determinations*" to determine their "acceptab[ility]" for the purposes of the wetland conservation program. In the Final Rule, NRCS argued that the 1994 MOA "aimed to ensure the accuracy of wetland delineations conducted prior to [] 1990 for the purposes of the [wetland conservation] provisions." NRCS also observed that the 1996 regulations provided that previously certified determinations would remain valid. In light of this context, NRCS concluded that "it is clear that the evaluation" contemplated by the 1996 rule "applied to wetland determinations conducted prior to 1990." However, in reaching this conclusion, NRCS failed to acknowledge that both the MOA and the FSA Manual update implementing the MOA's policies specifically directed NRCS to review *all* determinations issued prior to 1994 (i.e., the effective date of the MOA) to ensure their accuracy for the purposes of the wetland conservation program, not just those issued prior to 1990. NRCS similarly ignored the fact that under its own policies and procedures, most pre-1996 determinations were not considered "certified" unless they had been reviewed and the methods

used to create them determined to be sufficiently accurate for the purposes of the wetland conservation program. When placed within this context, it is clear that contrary to NRCS's self-serving, post-hoc narrative, the evaluation of previously issued non-certified wetland determinations contemplated by the 1996 regulations encompassed a review of those determinations that had been issued between 1990 and 1996 that had not yet been reviewed and certified. Indeed, the 1997 Informational Memorandum to the Secretary reporting the results from the evaluation confirms that NRCS reviewed the accuracy of *all* existing determinations, not just those issued prior to 1990.

118.    For the first time, NRCS responded to comments insisting that the rulemaking failed to address the findings of the OIG Report. NRCS reiterated the points made in its response to the OIG Report, i.e., that it "disagree[d]" with the OIG Report's conclusion that the agency changed its policy, and insisted that officials in the prairie pothole states were correct to accept pre-1996 determinations as certified without additional evidence of their accuracy. However, NRCS did not offer any evidence to rebut the OIG's conclusions. Instead, NRCS explained that although it disputed the OIG's characterization of its wetland determination policy, it accepted the OIG's recommendation to issue clarifying guidance to eliminate the confusion surrounding the certification status of pre-1996 determinations. NRCS emphasized the fact that the OIG's recommendation did not direct the agency to "correct erroneous agency policy, or to change agency policy." However, the OIG specified that its audit was narrowly focused on the issue of whether NRCS "change[d] its practice of making wetland determinations in the prairie pothole States"; its work did not opine on whether the policy change was made in accordance with underlying laws and regulations. Accordingly, the issue of whether the policy change was "erroneous" fell outside the scope of the OIG's investigation. Significantly, with respect to the

question at issue in the OIG's investigation—i.e., whether NRCS changed its policy with respect

to the certification of pre-1996 wetland determinations—the OIG concluded that NRCS's

decision to accept pre-1996 wetland determinations as certified without additional evidence of

their accuracy amounted to "a reversal of almost 20 years of history" that was unexplained and

"undocumented." The Final Rule does not correct this problem.

### 2. *NRCS's Failure to Correct the Deficiencies in its Environmental Review of this Rulemaking*

119.     NRCS did not issue a new or updated EA in connection with the Final Rule.

NRCS thus failed to correct the fatal deficiencies in its environmental analysis for this

rulemaking. These flaws, identified above, include a failure to offer a meaningful consideration

of alternatives, and a failure to offer a meaningful analysis of the environmental impacts of the

action.

120.     In the preamble to the Final Rule, NRCS briefly responded to comments alleging

that the EA prepared in connection with the Interim Rule was deficient under NEPA. However,

far from offering a meaningful consideration of the issues and concerns raised by NWF and other

commenters, NRCS's response merely repackaged the same flawed justifications for its failure to

comply with NEPA's requirements that plagued its EA and Interim Rule. For example, NRCS

insisted that its environmental review was adequate because the Interim Rule clarified and

codified existing agency policy. This characterization of the rulemaking is contrary to the

overwhelming evidence demonstrating that the rulemaking implemented major policy changes

that will impact NRCS's effectiveness in fulfilling its statutory mandate to preserve wetlands.

121.     NRCS insisted that an EIS was not required for its rulemaking "because the

interim rule only clarified and did not change existing NRCS policy and procedures and because

NRCS lacks discretion to change policy in a manner that would revisit certifications made

between 1990 and 1996." However, as exhaustively detailed in the OIG Report, the policies

made permanent by the Final Rule constituted significant changes to NRCS's wetland

determination policy. As NWF explained in its comments on the EA, it continues to be

disingenuous for NRCS to avoid public scrutiny by attempting to mischaracterize major policy

changes as mere "clarifications" of existing policy. Relatedly, as demonstrated by

contemporaneous documents detailing the wetland determination policies and procedures in

place prior to the adoption of the policies made permanent by this rulemaking, determinations

issued between 1990 and 1996 have never been considered certified without additional review to

ensure their accuracy. Under the Food Security Act, NRCS has considerable discretion to adopt

and implement policies and procedures regarding methods for conducting and certifying wetland

determinations. In the past, NRCS exercised this discretion to implement a process for reviewing

and certifying previously issued non-certified wetland determinations. NRCS failed to explain

why in this case, its discretion was so constrained that NEPA compliance was not necessary.

122.    NRCS issued an updated FONSI in which it insisted that the EA issued with the

Interim Rule "provided the analysis needed to assess the significance of the impacts of the

proposed action," and determined that "neither an EIS nor an additional EA is required" for the

Final Rule. In the FONSI, NRCS insisted that the Final Rule did not implicate any of NEPA's

significance factors because in its view, the Final Rule did not alter the agency's wetland

determination policy and the impacts of the Final Rule were largely beneficial. NRCS did not

acknowledge that "[a] significant effect may exist even if the Federal agency believes that on

balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1). Nor did NRCS acknowledge

that the Final Rule, as the Interim Rule before it, constituted a significant departure from the

agency's previous wetland determination policy that indisputably implicates several of NEPA's

significance factors, including where: there will be impacts to "unique characteristics . . . such as proximity to . . . prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," 40 C.F.R. § 1508.27(b)(3); "the effects on the quality of the human environment are likely to be highly controversial," *id.* § 1508.27(b)(4); "the possible effects on the human environment are highly uncertain or involve unique or unknown risks," *id.* § 1508.27(b)(5); "the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration," *id.* § 1508.27(b)(6); "the action is related to other actions with individually insignificant but cumulatively significant impacts," *id.* § 1508.27(b)(7); "the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the [ESA]," *id.* § 1508.27(b)(9); and "the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment," *id.* § 1508.27(b)(10).

123.    Finally, NRCS acknowledged that the rulemaking made at least one discretionary policy choice—the use of the static decadal precipitation dataset to determine "normal circumstances"—but offered a convoluted explanation for why additional analysis of the environmental impacts of and alternatives to that choice was not required. For example, NRCS insisted that an alternative that considered decadal updates to the dataset "would have substantially similar environmental consequences" to the proposed alternative using the static dataset. Therefore, NRCS argued that consideration of such an alternative was not required. To support its claim, NRCS asserted that because that agricultural practices are not the "primary cause" of wetland losses, it "did not expect the precipitation dataset used to help make determinations o the presence or absence of wetland hydrology to make a significant difference in the amount of wetlands identified as subject to the wetland conservation provisions." This

explanation does not satisfy NRCS's obligation to take a "hard look" at the environmental impacts of and alternatives to its action. NRCS offered no evidence for its conclusory assertion that the impacts from the use of either dataset would be similar. Relatedly, at no point did NRCS attempt to quantify the impact of lost wetlands under either decadal dataset. Accordingly, the meaningful comparison of the alternatives and their impacts that NEPA requires is impossible. NRCS did not respond to any of NWF's other substantive NEPA comments.

## D.    NRCS's Rulemaking and the Lack of ESA Compliance

### 1.    *NRCS's Failure to Consult on the Interim Rule and Associated Actions*

124.    The best available scientific evidence demonstrates that listed species, including threatened and endangered migratory birds, inhabit or utilize the wetlands that are the subject of NRCS's wetlands conservation program. Indeed, NRCS has acknowledged that the conservation of wintering and staging areas for migrating shorebirds is a growing concern.

125.    By permitting farmers to certify inaccurate wetland determinations and convert improperly delineated wetlands to agricultural use without penalty, NRCS's actions in implementing the policy changes codified by the Interim Rule and made permanent by the Final Rule not only "may affect," but are presently affecting listed species through the destruction of important habitat for endangered migratory birds that frequent the prairie pothole states. Examples of such listed species that are affected by the destruction and degradation of wetland habitat include the whooping crane, the piping plover, and the least tern. Accordingly, prior to implementing the policy changes in the 2013 Memorandum, 2017 Amendment, Interim Rule, and Final Rule, NRCS was obligated to consult with the FWS to "insure" that the implementation of its new policies will avoid jeopardy to those species.

126.    NRCS's adoption and implementation of the policy first articulated in the 2013

Memorandum, implemented nationwide by the 2017 Amendment, codified by the Interim Rule,

and made permanent by the Final Rule has in fact led to the destruction of wetlands that provide

important habitat for listed species. Thus, NRCS is responsible for the destruction and

degradation of many wetland habitats that are essential to the survival of listed species.

127.    NRCS has never undertaken any consultation under the ESA, formally or

informally, in connection with the significant changes in the wetland conservation program

implemented by the Interim Rule and its associated actions.

128.    Because NRCS has failed to undertake any consultation, NRCS has likewise

failed to obtain the necessary determinations from the FWS that would enable the agency to

avoid jeopardy or avoid adversely modifying designated critical habitat, let alone authorization

from the FWS for the incidental take of listed species in connection with NRCS's policies and

programs related to wetland certifications.

129.    On information and belief, NRCS is continuing to issue certified wetland

determinations in accordance with the policy changes first articulated in the 2013 Memorandum,

implemented nationwide by the 2017 Amendment, codified by the Interim Rule, and made

permanent by the Final Rule, despite not having undertaken any legally required consultation

with FWS.

130.    On May 2, 2019, NWF sent a notice of intent to sue for violations of the ESA in

connection with major policy changes to the wetlands conservation compliance program, as

implemented by the 2013 Memorandum, 2017 Amendment, and the Interim Rule. NWF

explained that the policy changes were adopted without any legally required consultation with

FWS, thereby resulting in ongoing violations of the ESA. NRCS did not respond to NWF's notice letter.

131.    On August 9, 2019, after the statutory 60-day notice period, NRCS filed its original Complaint in which it alleged, *inter alia*, that NRCS had not taken any action to correct the above violations of the ESA.

## 2.    *NRCS's Failure to Correct its ESA Violations in the Final Rule*

132.    In the preamble to the Final Rule, NRCS addressed for the first time its failure to engage in any consultation under the ESA in connection with the major policy changes to the wetlands conservation compliance program, as implemented by the 2013 Memorandum, 2017 Amendment, Interim Rule, and Final Rule. NRCS voiced its "disagree[ment]" with commenters that "consultation under section 7 of the ESA was required for its rulemaking action." NRCS advanced multiple rationales for its conclusion that its obligation to comply with the procedural and substantive requirements of the ESA had not been triggered.

133.    NRCS argued that because individual wetland determinations "neither prohibit nor permit . . . participants from converting wetlands potentially used by ESA-listed species for agricultural production," NRCS's issuance of such determinations does not constitute an "agency action" that triggers the consultation requirement of the ESA. In support of its assertion, the agency cited to a 2001 memorandum providing that ESA consultation was not required for individual "wetland determinations or delineations." However, NRCS disregarded the fact that the portion of the memorandum it cited in the preamble did not address whether consultation is necessary for wetland *certifications*. Moreover, NRCS's argument mischaracterized the relevant agency action that triggered its ESA obligations. While the issuance of *individual wetland determinations* may not constitute an "agency action" as defined by the ESA, the relevant action

here is NRCS's promulgation of discretionary policies, guidance, and regulations to implement the wetland conservation program. The rulemaking adopting such policies indisputably falls within the ESA's broad definition of "action" under the ESA, i.e., an "activit[y] or program[] of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02.

134.    NRCS also insisted that Congress's decision in the 1996 Farm Bill to remove the requirement that NRCS consult with FWS on the identification of wetlands signaled that Congress "did not believe [that] consultation with [FWS] was needed on any wetland determination related concerns." However, NRCS also recognized in the preamble that this action "was not specific to ESA consultation." Moreover, contrary to NRCS's reasoning, Congress's removal of a requirement for general consultation over wetland identification— without removing any requirement for ESA consultation—signals that Congress understood how to exempt the wetlands conservation program from ESA consultation but chose not to do so. NRCS's argument fails to give effect to Congress's decision to leave NRCS's obligations under the ESA intact.

135.    NRCS insisted that the rulemaking did not constitute an "affirmative 'agency action' for the purposes of the ESA, only a clarification of long-standing policy." NRCS concluded that the ESA's "consultation requirements are not triggered" because the rulemaking "would have no effect on any listed species." To reach its "no effect" determination, NRCS insisted that the rulemaking "codif[ies] long-standing policy" and thus "does not alter the status quo." However, as explained above and exhaustively detailed in the OIG Report, the rulemaking made permanent significant policy changes that have resulted—and is currently resulting—in the destruction of wetlands that provide important habitat for listed species. The destruction of these

wetlands indisputably "may affect"—and in fact, *are presently affecting*—listed species and their critical habitat. For example, as part of its audit of NRCS's administration of the wetland conservation program, the OIG reviewed tracts where NRCS rescinded more accurate, post-1996 determinations and instead certified less accurate pre-1996 determinations. The OIG found that the pre-1996 determinations failed to document 75% of the wetlands that existed on the tracts (according to field data), leaving them unprotected and subject to destruction. In one case, the OIG found that NRCS rescinded a 2010 determination that identified at least 34 acres of wetlands on a farm tract and instead—following its changed policy—certified a 1995 determination that identified only 2.5 acres of wetlands. Without the economic incentive to protect the wetlands, the farmer drained the 31.5 acres, or 93 percent, of wetlands that the 1995 determination failed to identify. NRCS's insistence in the Final Rule that the rulemaking does not have "the potential to adversely impact species or critical habitat" is simply not borne out by the facts. To the contrary, it is clear that the rulemaking and the discretionary decisions regarding the technical methods and guidance used to conduct and certify wetland determinations have profound effects on the wetland habitats upon with listed species depend for various life history needs. Accordingly, NRCS was obligated to consult with FWS to "insure" that the implementation of its new policies will avoid jeopardy to those species.

136.    NRCS argued that consultation was not necessary because even if either rule constituted an affirmative agency action, NRCS "does not have discretion to deviate from the requirements set forth by Congress." NRCS insisted that "most of the rule implements statutory requirements prescribed by Congress," over which the agency has no discretionary control. However, again, in making this assertion, NRCS relied on its continued mischaracterization of rulemaking as a mere codification of existing policy. In fact, the rulemaking makes permanent

discretionary policies that not only constitute significant departures from prior agency practice, but also conflict with congressional intent as clearly expressed in the 1996 Farm Bill. As detailed by the OIG, such discretionary policy revisions can alter the wetland conservation program's impacts on wetlands and the wildlife that depend on them. Accordingly, section 7 consultation with FWS under the ESA was necessary prior to implementing the policy changes.

137.    NRCS also insisted that "its provision of technical assistance to agricultural producers in the form of a wetland determination carries no authority to prevent producers [from] converting wetlands to agricultural production." However, although conservation compliance is nominally "voluntary," the weighty economic incentives Congress established do in fact determine farmers' land use decisions. Indeed, farmers themselves asserted in comments on the Interim Rule that "conservation compliance programs operate fundamentally as regulatory programs." Because farmers' ostensibly voluntary behavior is driven directly by NRCS's policies, those policies are sufficiently influential that they at least "may affect" listed species. Accordingly, NRCS is not absolved of its obligation to consult on these policies.

138.    In the parties' September 27, 2020 Joint Status Report, NWF and Federal Defendants stipulated that:

> "[U]nder the circumstances of this case, [NWF] does not need to send a new or renewed sixty-day notice letter under the Endangered Species Act to pursue its claim that NRCS failed to undertake section 7 consultation on NRCS's Final Rule because [NWF's] May 2, 2019 notice letter was adequate to place Defendants on notice that [NWF] would pursue such a claim in connection with the Final Rule, as it had regarding the Interim Rule."

139.    As of the date of this supplemental Complaint, on information and belief, NRCS has not taken any action to correct the violations of the ESA identified above.

## PLAINTIFF'S CLAIMS FOR RELIEF

### Claim 1 – Violations of the Farm Bill and the APA

140.     All allegations set forth above in this Complaint are incorporated here by reference.

141.     By deciding to implement policies allowing the certification of the same pre-1996 inventory maps that inspired Congress to amend the wetland conservation provisions to strengthen the certification process, NRCS acted contrary to the clearly-expressed intent of Congress, and its decision is therefore in excess of statutory jurisdiction, authority, or limitations, and otherwise not in accordance with law.

142.     By insisting that the significant policy changes implemented by the 2013 Memorandum, 2017 Amendment, Interim Rule, and Final Rule are mere "clarifications" of existing policies, despite overwhelming evidence that the policies represent significant reversals of prior agency policy, NRCS failed to display an awareness that it changed its policy, and therefore acted arbitrarily, capriciously, and otherwise not in accordance with law, in violation of the APA.

143.     By failing to provide any explanation for the significant changes to the wetland conservation program implemented by the Interim Rule and Final Rule and associated actions, NRCS acted arbitrarily, capriciously, and otherwise not in accordance with law, in violation of the APA.

### Claim 2 – Violations of NEPA and the APA

144.     All allegations set forth above in this Complaint are incorporated here by reference.

145.    By failing to prepare an EIS in connection with its policy changes implemented through the 2013 Memorandum, the 2017 Amendment, the Interim Rule, and the Final Rule, despite the fact that such changes constituted a major federal action that will have significant impacts on the environment, and further, that such changes implicated several of NEPA's significance factors, NRCS violated NEPA and its implementing regulations.

146.    By issuing a FONSI in which NRCS determined that the impacts of the Final Rule were not significant because, in NRCS's view, the effects of the Final Rule are largely beneficial and the Final Rule does not alter the agency's wetland determination policy, NRCS violated NEPA and its implementing regulations, and acted arbitrarily and capriciously. For example, NRCS violated NEPA's obligation to consider whether even the beneficial impacts of its actions are significant. Additionally, NRCS arbitrarily and capriciously dismissed evidence that the policies made permanent by the Final Rule have resulted—and are currently resulting—in significant adverse impacts to wetlands.

147.    By mischaracterizing the purpose and need for the rulemaking in the EA as merely codifying NRCS's existing policies when the rulemaking in fact constituted a major policy change that will impact NRCS's effectiveness in fulfilling its statutory mandate to preserve wetlands from agricultural conversion, NRCS violated NEPA and its implementing regulations. Moreover, because the purpose and need statement inaccurately describes the action and ignores the facts before the agency, it is arbitrary and capricious.

148.    By failing to consider the statutory context of its action in the formulation of its purpose and need statement, which required the agency to consider whether regulatory and policy changes would better achieve the goal of the wetland conservation provisions—i.e., the removal of incentives for farmers to convert wetlands to agricultural use and preservation of

wetlands—NRCS violated NEPA and its implementing regulations, and acted arbitrarily and capriciously.

149.    By defining the objectives of the proposed action in unreasonably narrow terms, such that only one alternative would accomplish their goals and the EA becomes a foreordained formality, NRCS violated NEPA and its implementing regulations, and acted arbitrarily and capriciously.

150.    By narrowly formulating the purpose and need statement and failing to consider the statutory context of its action, NRCS impermissibly constrained the range of reasonable alternatives and ensured that the changes implemented by the Interim Rule would purportedly be the only solution to the various technical and practical challenges faced by the agency in administering the wetlands conservation provisions, thus rendering a regional project a "foregone conclusion" in violation of NEPA, its implementing regulations, and the APA.

151.    By providing a no action alternative that illogically assumes the existence of the very policy changes that the agency purports to analyze as the proposed action, NRCS failed to provide a true no action alternative in its EA, in violation of NEPA, its implementing regulations, and the APA.

152.    By considering two alternatives that were functionally identical, NRCS failed to consider a reasonable range of alternatives and failed to take a legally adequate "hard look" at the environmental impacts of alternatives, in violation of NEPA, its implementing regulations, and the APA.

153.    By failing to explore even a single action alternative (or more than one) that would be more protective of wetlands—e.g., alternatives that would resolve the certification issue by requiring rigor and accuracy in certifying pre-1996 determinations—NRCS failed to

consider a reasonable range of alternatives, in violation of NEPA, its implementing regulations, and the APA.

154.    By omitting discussion of several significant impacts from its analysis, including the environmental impacts that are likely to occur due to wetland loss that will result from NRCS's policy changes, NRCS failed to satisfy NEPA's most basic command to consider every significant aspect of the environmental impact of a proposed action, thus violating NEPA and the APA.

155.    By failing to take a hard look at significant environmental impacts that not only will occur, but are already occurring, as a result of the policy changes implemented by the Final Rule and its associated actions—e.g., the impacts from the wetlands losses resulting from the certification of pre-1996 wetland determinations, or wetland losses that NRCS acknowledged will occur as a result of adopting a static precipitation data set—and instead, making only general statements about possible effects, NRCS violated NEPA, its implementing regulations, and the APA.

156.    By failing to explain why the agency could not obtain the data necessary to quantify the wetlands losses expected from these policy changes, or offer a more robust analysis of the impacts associated with such losses, NRCS has violated NEPA, its implementing regulations, and the APA.

157.    By failing to provide the public with the scientific data and information necessary to allow for substantive public consideration and input on the proposed action and its potential environmental impacts in the scoping notice, NRCS failed to give the public an adequate pre-decisional opportunity for informed comment; precluded the public from providing input on the rulemaking, its impacts, and any alternatives before the rule went into effect; and thus violated

NEPA's command to begin the environmental review process early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made. These failures violate NEPA, its implementing regulations, and the APA.

158.    After the Interim Rule was issued, the serious deficiencies in the EA described herein rendered informed public comment impossible. Consequently, by failing to adequately describe and evaluate the purpose and need for the Interim Rule, the alternatives, or their impacts in the EA, NRCS deprived the public of any meaningful opportunity to participate in the agency's decisionmaking process in violation of NEPA, its implementing regulations, and the APA.

159.    By evaluating only a single alternative and failing to take a hard look at the impacts, NRCS impermissibly used the NEPA process to justify the decision the agency already made when it began taking actions in 2014 to implement the regulatory and policy changes detailed in the 2013 Decision Memorandum ostensibly to reduce the backlog of wetland determination requests, in violation of NEPA, its implementing regulations, and the APA.

### Claim 3 – Violation of the ESA

160.    All allegations set forth above in this Complaint are incorporated here by reference.

161.    By failing to undertake the legally mandated consultation process for analyzing and addressing the impacts to listed species and their habitat that not only will result from the policy changes implemented by the Interim Rule and Final Rule and associated actions, but that are already occurring as a result of those policy changes, NRCS has violated, and is in ongoing violation of, the ESA. NRCS is violating and will continue to violate its substantive Section

7(a)(2) duties until such time that the agency: (a) prepares a Biological Assessment and submits it to FWS; (b) completes consultation on the policy changes implemented by the 2013 Decision Memorandum, 2017 Amendment, Interim Rule, and Final Rule; (c) implements any actions necessary to avoid species jeopardy or destruction or adverse modification of critical habitat; and (d) implements any actions necessary to avoid the unlawful take of listed species. The failure to undertake any of these actions violates Section 7 of the ESA, its implementing regulations, and is also arbitrary and capricious.

162.    By continuing to issue certified wetlands determinations in accordance with a policy that permits the destruction of wetland habitat and, by extension, adversely affects the listed species that inhabit and utilize such wetlands without obtaining the necessary review and authorization from FWS, NRCS is committing resources in a manner that forecloses the implementation of other alternatives, in violation of its duties under Section 7(d). NRCS is violating and will continue to violate the prohibition of Section 7(d) until such time that the agency suspends all wetland certification activities related to the implementation of the policy changes in the 2013 Memorandum, 2017 Amendment, and Interim Rule so that the consultation deficiencies can be remedied to prevent the irreversible or irretrievable commitment of resources foreclosing implementation of alternatives during the consultation process. These actions and omissions violate the ESA, its implementing regulations, and are arbitrary and capricious.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(1)    Declare that NRCS's policies regarding the certification of pre-1996 wetlands determinations first articulated in the 2013 Memorandum, implemented nationwide in the 2017 Amendment, codified in the Interim Rule, and made permanent by the Final Rule contravene the

clearly expressed intent of Congress, and is therefore in excess of statutory jurisdiction and otherwise not in accordance with law, in violation of the APA;

(2)      Declare that by implementing significant changes to its policies regarding the certification of pre-1996 wetlands determinations while, at the same time, characterizing such changes as mere "clarifications" of existing policy, NRCS both failed to display awareness that it was changing its policies, and failed to offer a legally adequate explanation for the significant changes in its policies, and therefore took actions that are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the APA;

(3)      Enjoin NRCS from certifying pre-1996 wetland determinations without rigorous evidence of their accuracy, consistent with the wetland conservation provisions of the Food Security Act, as amended;

(4)      Declare that NRCS violated NEPA and its implementing regulations by: a) failing to prepare an EIS to analyze its policy changes; b) arbitrarily and capriciously mischaracterizing the nature and scope of the rulemaking by inaccurately describing the purpose and need for the action; c) narrowly construing the purpose and need statement so as to preclude the consideration of reasonable alternatives; d) failing to include a true no action alternative; e) failing to consider a reasonable range of alternatives; f) failing to take the required "hard look" at the proposed action, alternatives, and their impacts; g) failing to obtain the data necessary to make an informed decision, or explain why those data could not be obtained; h) failing to provide the public with adequate information to provide informed comment at the predecisional stage; i) precluding meaningful public participation in the decisionmaking process due to the failure to adequately describe and disclose the Interim Rule, its alternatives, and their impacts; and j) using the NEPA process primarily to justify a decision already made.

(5)     Set aside and remand the EA, FONSI, and the 2013 Memorandum, 2017 Amendment, Interim Rule, and Final Rule to NRCS pending completion of an environmental review process consistent with the requirements of NEPA and the APA;

(6)     Declare that NRCS is in violation of Section 7(a)(2) of the ESA by failing to complete consultation to ensure that the policy changes first articulated in the 2013 Memorandum, implemented nationwide in the 2017 Amendment, codified in the Interim Rule, and made permanent by the Final Rule, as well as its continued and ongoing administration of the wetland conservation program, are not likely to jeopardize the continued existence of listed species or adversely modify their habitat;

(7)     Declare that NRCS is in violation of Section 7(d) of the ESA by continuing to certify pre-1996 wetland determinations under its new policy codified in the Interim Rule and Final Rule;

(8)     Order NRCS to comply with the ESA by a date certain on a schedule set by the Court and to avoid or remediate harm to listed species until such time as consultation is complete and NRCS has implemented any permanent measures necessary to ensure against jeopardy or adverse modification of critical habitat, and to minimize incidental take;

(9)     Award Plaintiff its attorneys' fees and costs under the ESA's citizen suit provision, 16 U.S.C. § 1540(g); the Equal Access to Justice Act, 28 U.S.C. § 2412; and/or any other applicable statutory provision; and

(10)    Grant Plaintiff such other and further relief that the Court may deem is just and proper.

Respectfully submitted this 14th day of October, 2020.

/s/Elizabeth L. Lewis
Elizabeth L. Lewis

DC Bar No. 229702

*/s/William N. Lawton*
William N. Lawton
DC Bar No. 1046604

*/s/William S. Eubanks, II*
William S. Eubanks, II
DC Bar No. 987036

Eubanks & Associates, LLC
1331 H St. NW Ste. 902
Washington, DC 20015
202-556-1243
lizzie@eubankslegal.com
nick@eubankslegal.com
bill@eubankslegal.com

*Counsel for Plaintiff*