# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL WILDLIFE FEDERATION,     )
                                       )
               *Plaintiff,*       )
                                       )
        v.                     )       Civil Action No. 1:19-cv-02416 (TSC)
                                       )
LOHR, *et al.*,                    )
                                       )
              *Defendants.*     )
_____)

---

## JOINT APPENDIX OF ADMINISTRATIVE RECORD

## VOLUME 1

---

99 STAT. 1354          PUBLIC LAW 99-198—DEC. 23, 1985

\*Public Law 99-198
99th Congress

## An Act

Dec. 23, 1985
[H.R. 2100]

To extend and revise agricultural price support and related programs, to provide for
agricultural export, resource conservation, farm credit, and agricultural research
and related programs, to continue food assistance to low-income persons, to ensure
consumers an abundance of food and fiber at reasonable prices, and for other
purposes.

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,*

Food Security
Act of 1985.
Farms and
farming.
Agriculture and
agricultural
commodities.
7 USC 1281 note.

### SHORT TITLE

Section 1. This Act may be cited as the "Food Security Act of
1985".

### TABLE OF CONTENTS

Sec. 2. The table of contents is as follows:

Sec. 1. Short title.
Sec. 2. Table of contents.

TITLE I—DAIRY

Subtitle A—Milk Price Support and Producer-Supported Dairy Program

Sec. 101. Milk price support, price reduction, and milk production termination pro-
grams for calendar years 1986 through 1990.
Sec. 102. Administrative procedures.
Sec. 103. Application of support price for milk.
Sec. 104. Avoidance of adverse effect of milk production termination program on
beef, pork, and lamb producers.
Sec. 105. Domestic casein industry.
Sec. 106. Study relating to casein.
Sec. 107. Circumvention of historical distribution of milk.
Sec. 108. Application of amendments.

Subtitle B—Dairy Research and Promotion

Sec. 121. National Dairy Research Endowment Institute.

Subtitle C—Milk Marketing Orders

Sec. 131. Minimum adjustments to prices for fluid milk under marketing orders.
Sec. 132. Adjustments for seasonal production; hearings on amendments; determi-
nation of milk prices.
Sec. 133. Marketwide service payments.
Sec. 134. Status of producer handlers.

Subtitle D—National Commission on Dairy Policy

Sec. 141. Findings and declaration of policy.
Sec. 142. Establishment of commission.
Sec. 143. Study and recommendations.
Sec. 144. Administration.
Sec. 145. Financial support.
Sec. 146. Termination of commission.

Subtitle E—Miscellaneous

Sec. 151. Transfer of dairy products to the military and veterans hospitals.
Sec. 152. Extension of the dairy indemnity program.
Sec. 153. Dairy export incentive program.

\*Note: The printed text of Public Law 99-198 is a reprint of the hand enrollment,
signed by the President on December 23, 1985.



99 STAT. 1504        PUBLIC LAW 99–198—DEC. 23, 1985

## TITLE XII—CONSERVATION

### Subtitle A—Definitions

#### DEFINITIONS

*Post*, pp. 1506–1514.
16 USC 3801.

SEC. 1201. (a) For purposes of subtitles A through E:

(1) The term "agricultural commodity" means—

(A) any agricultural commodity planted and produced in a State by annual tilling of the soil, including tilling by one-trip planters; or

(B) sugarcane planted and produced in a State.

(2) The term "conservation district" means any district or unit of State or local government formed under State or territorial law for the express purpose of developing and carrying out a local soil and water conservation program. Such district or unit of government may be referred to as a "conservation district", "soil conservation district", "soil and water conservation district", "resource conservation district", "natural resource district", "land conservation committee", or a similar name.

(3) The term "cost sharing payment" means a payment made by the Secretary to an owner or operator of a farm or ranch containing highly erodible cropland under the provisions of section 1234 (b) of this Act.

(4)(A) The term "converted wetland" means wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including any activity that results in impairing or reducing the flow, circulation, or reach of water) for the purpose or to have the effect of making the production of an agricultural commodity possible if—

(i) such production would not have been possible but for such action; and

(ii) before such action—

(I) such land was wetland; and

(II) such land was neither highly erodible land nor highly erodible cropland.

Prohibition.

(B) Wetland shall not be considered converted wetland if production of an agricultural commodity on such land during a crop year—

(i) is possible as a result of a natural condition, such as drought; and

(ii) is not assisted by an action of the producer that destroys natural wetland characteristics.

(5) The term "field" means such term as is defined in section 718.2(b)(9) of title 7 of the Code of Federal Regulations (as of January 1, 1985), except that any highly erodible land on which an agricultural commodity is produced after the date of enactment of this Act and that is not exempt under section 1212 shall be considered as part of the field in which such land was included on such date, unless the Secretary permits modification of the boundaries of the field to carry out subtitles A through E.

*Post*, p. 1506.

(6) The term "highly erodible cropland" means highly erodible land that is in cropland use, as determined by the Secretary.

(7)(A) The term "highly erodible land" means land—

PUBLIC LAW 99–198—DEC. 23, 1985          99 STAT. 1505

(i) that is classified by the Soil Conservation Service as class IV, VI, VII, or VIII land under the land capability classification system in effect on the date of the enactment of this Act; or

(ii) that has, or that if used to produce an agricultural commodity, would have an excessive average annual rate of erosion in relation to the soil loss tolerance level, as established by the Secretary, and as determined by the Secretary through application of factors from the universal soil loss equation and the wind erosion equation, including factors for climate, soil erodibility, and field slope.

(B) For purposes of this paragraph, the land capability class or rate of erosion for a field shall be that determined by the Secretary to be the predominant class or rate of erosion under regulations issued by the Secretary.    *Regulations.*

(8) The term "hydric soil" means soil that, in its undrained condition, is saturated, flooded, or ponded long enough during a growing season to develop an anaerobic condition that supports the growth and regeneration of hydrophytic vegetation.

(9) The term "hydrophytic vegetation" means a plant growing in—

(A) water; or

(B) a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content.

(10) The term "in-kind commodities" means commodities that are normally produced on land that is the subject of an agreement entered into under subtitle D.    *Post,* p. 1509.

(11) The term "rental payment" means a payment made by the Secretary to an owner or operator of a farm or ranch containing highly erodible cropland to compensate the owner or operator for retiring such land from crop production and placing such land in the conservation reserve in accordance with subtitle D.

(12) The term "Secretary" means the Secretary of Agriculture.

(13) The term "shelterbelt" means a vegetative barrier with a linear configuration composed of trees, shrubs, and other approved perennial vegetation.

(14) The term "State" means each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands of the United States, American Samoa, the Commonwealth of the Northern Mariana Islands, or the Trust Territory of the Pacific Islands.

(15) The term "vegetative cover" means—

(A) perennial grasses, legumes, forbs, or shrubs with an expected life span of 5 or more years; or

(B) trees.

(16) The term "wetland", except when such term is part of the term "converted wetland", means land that has a predominance of hydric soils and that is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions.

(b) The Secretary shall develop—

**99 STAT. 1506**          PUBLIC LAW 99–198—DEC. 23, 1985

(1) criteria for the identification of hydric soils and hydrophytic vegetation; and

(2) lists of such soils and such vegetation.

SUBTITLE B—HIGHLY ERODIBLE LAND CONSERVATION

PROGRAM INELIGIBILITY

16 USC 3811.
*Infra.*

SEC. 1211. Except as provided in section 1212, and notwithstanding any other provision of law, following the date of enactment of this Act, any person who in any crop year produces an agricultural commodity on a field on which highly erodible land is predominate shall be ineligible for—

(1) as to any commodity produced during that crop year by such person—

(A) any type of price support or payment made available under the Agricultural Act of 1949 (7 U.S.C. 1421 et seq.), the Commodity Credit Corporation Charter Act (15 U.S.C. 714 et seq.), or any other Act;

Loans.

(B) a farm storage facility loan made under section 4(h) of the Commodity Credit Corporation Charter Act (15 U.S.C. 714b(h));

*Ante,* p. 1503.

(C) crop insurance under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.);

Disaster assistance.

(D) a disaster payment made under the Agricultural Act of 1949 (7 U.S.C. 1421 et seq.); or

Loans.

(E) a loan made, insured, or guaranteed under the Consolidated Farm and Rural Development Act (7 U.S.C. 1921 et seq.) or any other provision of law administered by the Farmers Home Administration, if the Secretary determines that the proceeds of such loan will be used for a purpose that will contribute to excessive erosion of highly erodible land; or

(2) a payment made under section 4 or 5 of the Commodity Credit Corporation Charter Act (15 U.S.C. 714b or 714c) during such crop year for the storage of an agricultural commodity acquired by the Commodity Credit Corporation.

EXEMPTIONS

Prohibitions.
Loans.
16 USC 3812.

SEC. 1212. (a)(1) During the period beginning on the date of the enactment of this Act and ending on the later of January 1, 1990, or the date that is 2 years after the date land on which a crop of an agricultural commodity is produced was mapped by the Soil Conservation Service for purposes of classifying such land under the land capability classification system in effect on the date of enactment of this Act, except as provided in paragraph (2), no person shall become ineligible under section 1211 for program loans, payments, and benefits as the result of the production of a crop of an agricultural commodity on any land that was—

*Supra.*

(A) cultivated to produce any of the 1981 through 1985 crops of an agricultural commodity; or

(B) set aside, diverted or otherwise not cultivated under a program administered by the Secretary for any such crops to reduce production of an agricultural commodity.

(2) If, as of January 1, 1990, or 2 years after the Soil Conservation Service has completed a soil survey for the farm, whichever is later,

PUBLIC LAW 99-198—DEC. 23, 1985          99 STAT. 1507

a person is actively applying a conservation plan based on the local Soil Conservation Service technical guide and approved by the local soil conservation district, in consultation with the local committees established under section 8(b) of the Soil Conservation and Domestic Allotment Act (16 U.S.C. 590h(b)) and the Secretary, or by the Secretary, such person shall have until January 1, 1995, to comply with the plan without being subject to program ineligibility.

(b) No person shall become ineligible under section 1211 for program loans, payments, and benefits as the result of the production of a crop of an agricultural commodity—

    (1) planted before the date of enactment of this Act;

    (2) planted during any crop year beginning before the date of enactment of this Act;

    (3) on highly erodible land in an area—

        (A) within a conservation district, under a conservation system that has been approved by a conservation district after the district has determined that the conservation system is in conformity with technical standards set forth in the Soil Conservation Service technical guide for such district; or

        (B) not within a conservation district, under a conservation system determined by the Secretary to be adequate for the production of such agricultural commodity on any highly erodible land subject to this title; or

    (4) on highly erodible land that is planted in reliance on a determination by the Soil Conservation Service that such land was not highly erodible land, except that this paragraph shall not apply to any agricultural commodity that was planted on any land after the Soil Conservation Service determines that such land is highly erodible land.

(c) Section 1211 shall not apply to a loan described in section 1211 made before the date of enactment of this Act.

*Ante,* p. 1506.

#### SOIL SURVEYS

SEC. 1213. The Secretary shall, as soon as is practicable after the date of enactment of this Act, complete soil surveys on those private lands that do not have a soil survey suitable for use in determining the land capability class for purposes of this subtitle. In carrying out this section, the Secretary shall, insofar as possible, concentrate on those localities where significant amounts of highly erodible land are being converted to the production of agricultural commodities.

16 USC 3813.

### Subtitle C—Wetland Conservation

#### PROGRAM INELIGIBILITY

SEC. 1221. Except as provided in section 1222 and notwithstanding any other provision of law, following the date of enactment of this Act, any person who in any crop year produces an agricultural commodity on converted wetland shall be ineligible for—

    (1) as to any commodity produced during that crop year by such person—

        (A) any type of price support or payment made available under the Agricultural Act of 1949 (7 U.S.C. 1421 et seq.), the Commodity Credit Corporation Charter Act (15 U.S.C. 714 et seq.), or any other Act;

16 USC 3821.
*Post,* p. 1508.

| 101st Congress 2d Session | HOUSE OF REPRESENTATIVES | Report 101-916 |
| --- | --- | --- |

# FOOD, AGRICULTURE, CONSERVATION, AND TRADE ACT OF 1990

## CONFERENCE REPORT

TO ACCOMPANY

## S. 2830



October 22, 1990.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1990

36-253

911

wetland delineations to ensure that wetland on such lands have been accurately delineated. The Secretary must provide by regulation a process for the periodic review and update of wetland delineations, as determined appropriate by the Secretary.

Persons are exempted from being adversely affected because of having taken an action based on a previous determination by the Secretary.

The Senate bill has no comparable provision.

The Conference substitute adopts the House provision with amendments. The House requirement for the review of all lands mapped for wetland delineation purposes prior to enactment of this Act is deleted. All maps will be certified, as required in the House provision, and such maps may be appealed, but no appeal will be allowed on maps completed prior to the date of enactment of this Act that had not been changed, and where such maps had already been appealed and for which an on-site visit had been conducted. (Section 1602)

The Managers agree that the certification process is to provide farmers with certainty as to which of their lands are to be considered wetlands for purposes of Swampbuster. The Managers note that the current USDA wetland delineation process involves the use of substantial materials to make an initial determination in the field office, developed in consultation with other appropriate Federal and State agencies. Wetlands identified in this process are delineated on maps which are then mailed to producers for review. If the producer finds such map to be in error, and the USDA agrees that an error has been made, then the map is corrected. If the USDA does not agree that there is an error in the map, and the producer continues to believe so, then the producer may appeal such determination.

The Managers find that this process is adequate for certification of any new maps delineated after the date of enactment of this Act. For maps completed prior to the date of enactment of this Act, the Managers intend for producers to be notified that their maps are to be certified and that they have some appropriate time for appeal. In this circumstance, producers who had not already been mailed their maps should be given a map for their review. As stated in the Conference substitute, the Secretary shall not be required to provide an opportunity for an appeal on maps completed prior to the date of enactment of this Act where such maps have not been changed, and had already been appealed and for which an on-site visit had been conducted. After the appropriate length of time for allowing an appeal has expired, the Managers intend for the Department to certify such maps.

The Managers note also that the Conference substitute has adopted a provision which specifies that no person shall be adversely affected because of having taken an action based on a previous determination by the Secretary. It is the intent of the Managers that a person shall not be considered to have been adversely affected except to the extent that, consistent with customary USDA practice for granting relief of that kind, the person involved was acting in good faith reliance on the mis-determination made on behalf of the Secretary.

PUBLIC LAW 101–624—NOV. 28, 1990          104 STAT. 3359

Public Law 101–624
101st Congress

## An Act

To extend and revise agricultural price support and related programs, to provide for
agricultural export, resource conservation, farm credit, and agricultural research
and related programs, to ensure consumers an abundance of food and fiber at
reasonable prices, and for other purposes.

<div style="float:right">

Nov. 28, 1990
[S. 2830]

</div>

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Food, Agriculture,
Conservation, and Trade Act of 1990".

(b) TABLE OF CONTENTS.—The table of contents is as follows:

<div style="float:right">

Food,
Agriculture,
Conservation,
and Trade Act of
1990.
7 USC 1421 note.

</div>

### TITLE I—DAIRY

Sec. 101. Milk price support and milk inventory management program for calendar
          years 1991 through 1995.
Sec. 102. Milk manufacturing margin adjustment.
Sec. 103. Minnesota-Wisconsin price series reform.
Sec. 104. Hearings on Federal milk marketing orders.
Sec. 105. Report of dairy product purchases.
Sec. 106. Application of support price for milk.
Sec. 107. Application of amendments.
Sec. 108. Adjustments for seasonal production; hearings on amendments; determi-
          nation of milk prices.
Sec. 109. Transfer of dairy products to the military and veterans hospitals.
Sec. 110. Extension of the dairy indemnity program.
Sec. 111. Export sales of dairy products.
Sec. 112. Component pricing of milk.
Sec. 113. Adjustments in payments by handlers.
Sec. 114. Dairy export incentive program.
Sec. 115. Status of producer handlers.
Sec. 116. Multiple component pricing study.

### TITLE II—WOOL AND MOHAIR

Sec. 201. Wool and mohair price support program.

### TITLE III—WHEAT

Sec. 301. Loans, payments, and acreage reduction programs for the 1991 through
          1995 crops of wheat.
Sec. 302. Nonapplicability of certificate requirements.
Sec. 303. Suspension of land use, wheat marketing allocation, and producer certifi-
          cate provisions.
Sec. 304. Suspension of certain quota provisions.
Sec. 305. Nonapplicability of section 107 of the Agricultural Act of 1949 to the 1991
          through 1995 crops of wheat.

### TITLE IV—FEED GRAINS

Sec. 401. Loans, payments, and acreage reduction programs for the 1991 through
          1995 crops of feed grains.
Sec. 402. Nonapplicability of section 105 of the Agricultural Act of 1949 to the 1991
          through 1995 crops of feed grains.
Sec. 403. Recourse loan program for silage.
Sec. 404. Price support for high moisture feed grains.
Sec. 405. Calculation of refunds of advance established price payments by producers
          of the 1988 or 1989 crops of feed barley.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

104 STAT. 3572          PUBLIC LAW 101–624—NOV. 28, 1990

to two acres or less and if the Secretary determines that such production is not intended to circumvent the conservation requirements otherwise applicable to lands under this subtitle.''.

## Subtitle B—Wetland Conservation

### SEC. 1421. WETLAND PROGRAM IMPROVEMENTS.

(a) DEFINITION.—Section 1201(a)(16) of the Food Security Act of 1985 (16 U.S.C. 3801(a)(16)) is amended by amending the first sentence to read as follows:

"(16) The term 'wetland', except when such term is part of the term 'converted wetland', means land that—

"(A) has a predominance of hydric soils;

"(B) is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions; and

"(C) under normal circumstances does support a prevalence of such vegetation.''.

(b) WETLAND.—Section 1221 of the Food Security Act of 1985 (16 U.S.C. 3821) is amended—

(1) by striking "Except as provided" and inserting "(a) Except as provided";

(2) in paragraph (1)(D), by inserting before the semicolon ", under section 132 of the Disaster Assistance Act of 1989 (16 U.S.C. 1421 note), or under any similar provision enacted subsequent to August 14, 1989";

(3) in paragraph (1)(E), by striking the final "or";

(4) in paragraph (2), by striking the period at the end and inserting a "; or";

(5) by adding at the end the following:

"(3) during such crop year—

"(A) a payment made under section 8, section 12, or section 16(b) of the Soil Conservation and Domestic Allotment Act (16 U.S.C. 590h, 590l or 590p(b));

"(B) a payment made under section 401 or section 402 of the Agricultural Credit Act of 1978 (16 U.S.C. 2201 or 2202);

"(C) a payment under any contract entered into pursuant to section 1231;

"(D) a payment under chapter 2;

"(E) a payment under chapter 3; or

"(F) a payment, loan or other assistance under section 3 or section 8 of the Watershed Protection and Flood Prevention Act (16 U.S.C. 1003 or 1006a).''; and

(6) by adding after subsection (a) (as designated by paragraph (1)), a new subsection (b) as follows:

"(b) Except as provided in section 1222 and notwithstanding any other provision of law, any person who in any crop year subsequent to the date of enactment of the Food, Agriculture, Conservation, and Trade Act of 1990 converts a wetland by draining, dredging, filling, leveling, or any other means for the purpose, or to have the effect, of making the production of an agricultural commodity possible on such converted wetland shall be ineligible for those payments, loans, or programs specified in subsections (a) (1) through (3) for that crop year and all subsequent crop years.''.

PUBLIC LAW 101–624—NOV. 28, 1990        104 STAT. 3573

SEC. 1422. DELINEATION OF WETLAND; EXEMPTIONS.

Section 1222 of the Food Security Act of 1985 (16 U.S.C. 3822) is amended to read as follows:

"SEC. 1222. DELINEATION OF WETLANDS; EXEMPTIONS.

"(a) DELINEATION OF WETLANDS.—

"(1) WETLAND DELINEATION MAPS.—The Secretary shall delineate wetlands on wetland delineation maps. The Secretary shall make a reasonable effort to make an on-site wetland determination whenever requested by an owner or operator, prior to such delineation.

"(2) CERTIFICATION.—Upon providing notice to affected owners or operators, the Secretary shall certify each such map as sufficient for the purpose of making determinations of ineligibility for program benefits under section 1221 and shall, in accordance with section 1243, provide an opportunity to appeal such delineations to the Secretary prior to making such certification final. In the case of an appeal, the Secretary shall review and certify the accuracy of the mapping of all lands subject to the appeal mapped prior to the date of enactment of the Food, Agriculture, Conservation, and Trade Act of 1990 for the purpose of wetland delineations to ensure that wetland on such lands has been accurately delineated. Prior to rendering a decision on any such appeal, the Secretary shall conduct an on-site inspection of the subject land. The Secretary shall not be required to provide an opportunity for an appeal of delineations completed prior to the enactment of this subsection that are not changed, and for which an appeal had already occurred and, in connection with such previous appeal, an on-site determination had been conducted.

"(3) PUBLIC LIST.—The Secretary shall maintain a public listing of all such certifications that have been completed.

"(4) PERIODIC REVIEW AND UPDATE.—The Secretary shall provide by regulation a process for the periodic review and update of such wetland delineations as the Secretary deems appropriate. No person shall be adversely affected because of having taken an action based on a previous determination by the Secretary.    Regulations.

"(b) EXEMPTIONS.—No person shall become ineligible under section 1221 for program loans, payments, and benefits—

"(1) as the result of the production of an agricultural commodity on—

"(A) converted wetland if the conversion of such wetland was commenced before December 23, 1985;

"(B) an artificial lake, pond, or wetland created by excavating or diking nonwetland to collect and retain water for purposes such as water for livestock, fish production, irrigation (including subsurface irrigation), a settling basin, cooling, rice production, or flood control;

"(C) a wet area created by a water delivery system, irrigation, irrigation system, or application of water for irrigation; or

"(D) wetland on which the owner or operator of a farm or ranch uses normal cropping or ranching practices to produce an agricultural commodity in a manner that is consistent for the area where such production is possible as a result of a natural condition, such as drought, and is



Tuesday
April 23, 1991



Part III

# Department of Agriculture

Office of the Secretary

7 CFR Part 12
Highly Erodible Land and Wetland
Conservation; Final Rule

Case 1:19-cv-02416-TSG   Document 35-1   Filed 06/18/21   Page 13 of 211    000217

**DEPARTMENT OF AGRICULTURE**

**Office of the Secretary**

**7 CFR Part 12**

**Highly Erodible Land and Wetland Conservation**

**AGENCY:** Office of the Secretary, USDA.

**ACTION:** Final rule.

**SUMMARY:** This final rule sets out revisions to the highly erodible land and wetland conservation provisions of part 12 in order to implement amendments to title XII of the Food Security Act of 1985 enacted by the Food, Agriculture, Conservation, and Trade Act of 1990.

**EFFECTIVE DATE:** The provisions of this rule are effective as of November 28, 1990, and as otherwise stated in the regulations.

**FOR FURTHER INFORMATION CONTACT:** Ms. Sandra J. Nelson, Deputy Director, Cotton, Grain, and Rice Price Support Division, Agricultural Stabilization and Conservation Service, United States Department of Agriculture, P.O. Box 2415, Washington, DC 20013, telephone (202) 447–3463. Request for copies of the regulatory impact analysis, the environmental assessment, and the finding of no significant impact, as described below, may be sent to this office.

**SUPPLEMENTARY INFORMATION:** This rule has been reviewed under United States Department of Agriculture (the "Department" or "USDA") procedures established in accordance with provisions of Departmental Regulation 1512–1 and Executive Order 12291 and has been classified as "major." During promulgation of the current provisions of part 12 in 1987, a similar review was conducted and it was determined that the current regulations will have an annual effect on the economy of $100 million or more. At that time, a regulatory impact analysis was prepared for the current regulations. A review of the previously prepared regulatory impact analysis was conducted and an updated analysis was prepared for this rule. Copies of the updated regulatory impact analysis of this final rule are available upon request from the previously mentioned contact.

The collection of information requirements contained in this rule have been submitted to the Office of Management and Budget for emergency review under the Paperwork Reduction Act of 1980 and have been granted emergency clearance. That clearance will expire on May 31, 1991. ASCS will request OMB to extend approval for information collection for three years.

The paperwork requirements which would be imposed by this final rule entail minor revisions of the paperwork requirements under the current regulations. Public reporting burden for these collections is estimated to vary from 5 to 15 minutes per response, including time for reviewing instructions, searching existing sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

The titles and numbers of the Federal assistance programs, as found in the Catalog of Federal Domestic Assistance, to which this rule applies are: Commodity Loans and Purchases—10.051; Cotton Production Stabilization—10.052, Emergency Conservation Program—10.054; Emergency Loans—10.404; Farm Operating Loans—10.406; Farm Ownership Loans—10.407; Feed Grain Production Stabilization—10.055; Storage Facilities Equipment Loans—10.056; Wheat Production Stabilization—10.058; National Wool Act payments—10.059; Rice Production Stabilization—10.065; Federal Crop Insurance—10.450; Soil and Water Loans—10.416; Loans to Indian Tribes and Tribal Corporations—10.421; Watershed Protection and Flood Prevention loans and cost share payments—10.904; Great Plains Conservation Program cost share payments—10.900; Agricultural Conservation Program cost share payments—10.063; Disaster Assistance payments—10.052, 10.058, 10.065, and 10.440; and Conservation Reserve Program payments—10.069. This rule also applies to payments under the Agricultural Credit Act—10.054; and payments under the Agricultural Water Quality Incentives Program and the Environmental Easement Program authorized by the Food Security Act of 1985, as amended (these programs have not been assigned catalog numbers as of this time).

This rule is not subject to the provisions of Executive Order 12372, which requires intergovernmental consultation with State and local officials. See notice related to 7 CFR part 3015, subpart V, published at 48 FR 29115 (June 24, 1981).

In order to assist agency planning and in compliance with the National Environmental Policy Act (NEPA), the Department has conducted an interagency and interdisciplinary environmental assessment of the potential effects of implementing the conservation provisions of the 1990 Act. Representatives of several Federal agencies, including the United States Army Corps of Engineers, the

Environmental Protection Agency, and the United States Fish and Wildlife Service, have been consulted in this assessment during the development of the proposed rule and this final rule. On the basis of the environmental assessment, it has been determined that this rule does not constitute a major federal action significantly affecting the quality of the human environment and a finding of no significant impact (FONSI) has been prepared. The environmental assessment that was prepared during the promulgation of the current regulations in 7 CFR part 12 has been reviewed to assess the effect of the changes in the regulations required by the 1990 statutory amendments that are the subject of this final rule. The Department has determined that the implementation of this rule by the agencies of the Department will: (a) Not cause any measurable adverse environmental effects; (b) not diminish the long term environmental productivity of the Nation's resources; and (c) not cause any irretrievable commitments of natural resources. To the contrary, the conservation provisions of the 1990 Act and of this implementing rule are expected to maintain or enhance environmental values in rural agricultural areas. Therefore, under the provisions of NEPA are related regulations, a detailed environmental impact statement is not required. Requests for copies of the environmental assessment and the FONSI may be sent to the previously mentioned contact.

**Discussion of Comments**

On March 5, 1991, the Department published a proposed rule to implement amendments to the highly erodible land conservation (HELC) and wetland conservation (WC) provisions of title XII of the Food Security Act of 1985 ("FSA"), Public Law No. 99–198, 16 U.S.C. 3801 *et seq.* The amendments to those provisions of the FSA are contained in title XIV of the Food, Agriculture, Conservation, and Trade Act of 1990 ("1990 Act"), Public Law 101–624. In response to the proposed rule, USDA received 164 letters containing 323 comments. Entities responding included farm organizations, land associations, wildlife groups, individuals, units of government, and others from twenty states and the District of Columbia. USDA has consulted with the United States Army Corps of Engineers, the Environmental Protection Agency (EPA) and the United States Fish and Wildlife Service (FWS) in preparing this final rule. Comments are discussed below in order of the

related section for which revisions of 7 CFR part 12 were set out in the proposed rule. The discussion indicates where a change in the rule was determined to be appropriate based on the public comments. Those proposed amendments to part 12 on which only affirmative comments were received or on which comments were not received are not discussed and are adopted as set forth in this rule.

### Section 12.1   General

Several respondents objected to the overall approach of the conservation provisions of the FSA, the 1990 amendments, and the Department's regulations. They stated that these provisions place an undue economic hardship on the producers and that the proposed rule results in an unfair reversal of well-intentioned policy and do not assign enough authority to local USDA officials. These comments did not suggest specific modification for the regulations. Implementation of the HELC and WC provision of the FSA, as amended, is required by law, and except as indicated below, USDA has determined that revisions of the proposed rule to address these concerns are not warranted.

Ninety comments suggested that the wetland conservation rules involved a taking of private property and that a takings assessment is required under the provisions of Executive Order No. 12630. USDA has determined this final rule does not present implications relating to the taking of private property since the provisions of this rule do not prohibit or restrict land uses. Rather, this rule implements statutory requirements for eligibility for USDA benefits. Participation in the USDA programs covered by this rule is voluntary and the requirements of part 12 apply only to those producers who choose to participate in those programs.

Eighteen comments suggested that the comment period for the proposed rule should have been extended beyond 15 days. However, such an extension would have made it impossible to assure completion of the final rule by the end of the spring sign-up period for a number of USDA commodity programs and the Conservation Reserve Program. Because of the relatively limited scope of the proposed regulations, which for the most part only modifies current rules, USDA determined that a longer period would have been contrary to the public interest by preventing agricultural producers from making timely plans to adjust to new provisions in the rules.

### Section 12.2   Definitions

Because the 1990 Act extended the coverage of the HELC provisions to land set aside or otherwise diverted from production under USDA programs, the proposed rule added a definition of the term "conservation use" to describe the additional land covered by those new provisions. One comment suggested that USDA change the term "conservation use" to "non-crop production." The comment was not adopted as the suggested term would not accurately describe land that is designated as acreage conservation reserve (ACR) or conservation use (CU) acreage for payment under USDA programs and because the term used in the proposed rule is more descriptive of the scope of coverage.

Seventeen comments were received concerning the definition in part 12 of "active pursuit" and "commenced conversion". No changes in those definitions have been made as no changes in those definitions are needed to implement the 1990 amendments and no changes in those definitions were proposed in the proposed rule.

The proposed rule contained a definition of "wetland" to reflect that the 1990 amendments restated the statutory definition slightly to clarify that three distinct criteria must be present in order for land to be classified as wetland. Those criteria are: (1) A predominance of hydric soils; (2) the inundation or saturation by surface or ground water at a frequency and duration to support a prevalence of hydrophytic vegetation; and (3) a prevalence, under normal circumstances, of hydrophytic vegetation. Thirty-three comments suggested that USDA change the definition to include only lands that were obviously "wet" as of December 23, 1985. Many of these comments suggested, more generally, that the agency's construction of the definition of wetland in the past was overly expansive. No change in the definition of "wetlands" has been made in the final rule as the definition is the same as that which is explicitly provided in the legislation. Those producers who believe that the definition is incorrectly applied in individual cases can seek administrative review of those determinations.

Four comments suggested a change in the producers and the technical criteria used to determine when the conditions set forth in the wetland definition apply. One comment suggested that land should not be considered to be a wetland unless water is present at the surface of the land for at least 21

consecutive days during the growing season, if the land is planted more often than not. However, research indicates that the anaerobic conditions of hydric soils and a prevalence of hydrophytic vegetation develop in areas that are normally exposed to a 7–15 day period of inundation or saturation. The suggested 21-day period would be longer than that normally required to develop characteristics typically associated with a wetland. Use of a 21-day hydrology requirements would, in addition, have the effect of excluding many wetlands and certain regions from wetland protection under the FSA. For example, many prairie potholes, vernal pools, and playas do not pond, more often than not, for more than 21 consecutive days during the growing season, yet these wetlands provide important wetland benefits. Therefore, it has been determined that there is not an adequate technical basis to include the suggested criterion in the amendment of the regulations adopted in this rule.

Also, several comments suggested that all wetland determinations should be completed on-site. These concerns are addressed in § 12.30 (c) and (d) of the proposed regulations which provide in accordance with the 1990 Act, that on-site investigations will be made before any USDA benefits are withheld.

One comment suggested that with respect to determinations of wetland status made by the Soil Conservation Service (SCS), SCS should only consider whether hydrophytic vegetation is present on the site and that SCS should not review similar hydric soils in the area to ascertain whether hydrophytic vegetation could grow in that soil type. This comment relates to the off-site comparison procedure which is set forth in § 12.31(b)(2)(ii) and was not proposed to be changed. This procedure is necessary to identify wetland vegetation characteristics of an area when the vegetation has been removed by cultivation or other land altering activities. Accordingly, the change recommended in the comment is not adopted.

### Section 12.4   Determination of Ineligibility

The proposed rule contained provisions to amend § 12.4 to include: (1) The designation of highly erodible land as land for conservation use, and (2) the conversion of wetland as actions that may cause a producer to be ineligible for USDA benefits. The proposed rule also contained provisions which clarified the period of ineligibility and which, in accordance with the 1990 Act, added to the list of USDA benefits

that are covered by the ineligibility provisions.

One comment suggested that USDA consider the conversion of native plant communities to be a violation of the HELC provisions regardless of whether an agricultural commodity was planted on the highly erodible land. Another comment suggested that a producer be determined ineligible when an agricultural commodity is planted or land is designated as ACR or CU on a field that is predominantly converted wetland, where "predominant" is defined as greater than 50% of the field. These suggestions were not adopted as the modifications that they seek are not authorized by the FSA.

One comment suggested that the regulations should be amended to exempt a producer from loss of benefits for wetland alterations caused by the drainage of land that is required or otherwise caused by a mosquito control board or other local regulatory authority. There are already two provisions in the regulations allowing for, in appropriate cases, exempting a producer for wetland alterations caused by actions of unaffiliated third parties. One of those is the so-called "third party" exemption in § 12.5(b)(1)(iv)(D), as redesignated in this rule, which applies to alterations or conversions by persons, organizations, or units of government other than the person applying for USDA benefits or the person's predecessors in interest. However, even where the exemption is approved, drainage improvement beyond that required or caused by the third party is not permitted without loss of USDA benefits. There is also "minimal effects" and "mitigation" exemptions provided in the regulations which will permit alterations if the effects on wetland functions and values are minimal or otherwise mitigated.

One comment suggested that, for any violations of the WC provisions, USDA withhold all loans to the person involved that would otherwise be available from the Farmers Home Administration (FmHA). This comment was not adopted as the FSA, with respect to FmHA loans, limits ineligibility to cases where the Secretary determines that the proceeds of such loan will be used for a purpose that will contribute to excessive erosion of highly erodible land or conversion of wetlands.

Three comments addressed whether certain benefits administered by the Agricultural Stabilization and Conservation Service (ASCS) and/or the Commodity Credit Corporation (CCC) should be covered by part 12. Specifically these comments questioned whether "dairy refund" payments and

payments under the Agricultural Conservation Program (ACP) should be covered. Dairy refund payments are those payments which, in certain instances, can be made to milk producers in connection with the recently implemented dairy assessment program (7 CFR part 1430) required by amendments to the Agricultural Act of 1949 ("1949 Act") that were enacted by the Omnibus Budget Reconciliation Act of 1990 (Pub. L. 101–508). Dairy refund payments were not specifically addressed in the proposed rules; however, the current regulations in part 12 provide that coverage of the ineligibility provisions extends, as to any commodity, to any payment under the 1949 Act. Since dairy refund payments are 1949 Act payments made with respect to a commodity, such payments are subject to part 12. With respect to the ACP, which is administered under rules in 7 CFR part 701, coverage of such payments was specifically added by the 1990 Act amendments to the FSA and, accordingly, part 12 applies to all ACP obligations incurred after the effective date of the 1990 Act (November 28, 1990).

### Section 12.5  Exemptions

The proposed rule contained provisions allowing a producer, in appropriate cases, to be granted a variance from the application of the HELC provisions of part 12. Three comments suggested that the rule be modified to specify that variances may only be temporary. As it is the intent of USDA that such variances from the conservation compliance requirement of the rule will be granted for one-year periods only, this comment has been adopted and the rule has been modified accordingly. Specifically, it is anticipated that the modification to the HEL conservation plan, as a result of a variance, will permit the conservation practices to be postponed until the following year during which time those practices must be completed along with those practices originally scheduled for the following year. However, in appropriate cases, another variance may be granted for cause in subsequent years.

Fifty-four responses suggested that drainage districts projects should not, under any circumstance, affect an individual's eligibility for USDA benefits. Such an exemption is not provided for in the FSA and would undermine the purpose of the WC provisions of the FSA by condoning large-scale uses of recently or soon-to-be converted wetlands for agricultural commodity production.

Under the FSA, prior to the 1990 Act amendments and under the current regulations, a producer who is within the jurisdiction of a drainage district or other similar entity would be considered to have participated in the wetland conversion activities of the district or other entity, but could have avoided any ineligibility simply by not producing an agricultural commodity on wetlands converted by the district. However, the 1990 Act amendments provide that, in addition to the "planting" trigger, the conversion of a wetland for the purpose, or to have the effect, of making the production of agricultural commodities possible will also trigger a WC violation. Because of this new "conversion" trigger and the current regulations' attribution of drainage district conversion activities to all producers within the district's jurisdiction, a producer could be determined to be in violation of the new "conversion" trigger for conversions completely unrelated to the producer's lands and agricultural production activities. In fact, persons who did not produce any agricultural commodities but did participate in USDA programs could be affected. In the proposed rule, a provision was added to specify that while the "planting" trigger would be maintained, a producer would not be considered to have "converted" the wetland for purpose of applying the new "conversion" trigger in such a situation. Under the final rule, as in the proposed rule, the drainage of a wetland by a drainage district will not, absent a scheme or device, subject the producer to an ineligibility for USDA benefits unless the producer then produces an agricultural commodity or forage for harvest by mechanical means on the converted land.

Another comment suggested that the new "conversion" trigger may unfairly affect producers where the actions of the drainage district result in the drainage of a farmed wetland, since producers have been permitted under part 12 to produce an agricultural commodity on that land in certain circumstances. In addition, thirty-one comments suggested that farmed wetlands should be exempt entirely from the WC provisions. Provision is already made in the regulations to allow for continued use of those lands for agricultural production so long as the hydrology is not diminished or if the effects of their conversion are found to be minimal or otherwise mitigated. There is no other specific exemption in the statute for the conversion of such wetlands. The legislative history of the 1990 Act indicates that Congress was aware of the protection provided under

part 12 for farmed wetlands and wanted such protection to continue.

The proposed rule contained provisions to amend § 12.11 to specifically allow for relief from actions resulting from the misaction or misinformation of any authorized representative of the Secretary. In addition, a specific provision was proposed to be added to § 12.5 of the regulations to cover instances of reliance on an incorrect determination of wetland status by SCS. A number of comments suggested that relief should not be permitted where SCS informed the person that the area was not a wetland, if it was clear to the person that the area, in fact, was a wetland. Others stated that the exemption should not be used retroactively to exempt persons from prior violations caused by such reliance. It has been determined that no material change to § 12.5, as proposed, is needed. The 1990 Act explicitly provided that no person shall be adversely affected because of having taken an action based on an erroneous wetland determination and the rules would permit a determination on a case-by-case basis of whether there was, in fact, reasonable reliance on the SCS determination. However, this portion of the rule has, as a result of these comments, been clarified. With respect to retroactivity, there is nothing in the statutory amendments which provides for or would justify an exclusion for consideration of misinformation or misaction occurring prior to the enactment of the 1990 amendments.

The proposed rule included a number of additional relief provisions required or authorized by the 1990 Act. These included provisions for relief in the case of "good faith" violations and provisions for relief in cases involving the mitigation of the effects of the conversion of frequently-cropped wetlands. As does the 1990 Act, the proposed rule provided for continuing the authority of the USDA to grant relief in cases of conversions having a "minimal effect" on the functional hydrological and biological value of the wetland, including value to waterfowl and wildlife. Several comments suggested the USDA did not have the legal authority to continue to make a minimal effect finding that included mitigation and restoration unless the land had been farmed more often than not. With respect to those comments, it has been determined that the rule should not be changed. As has been the practice of USDA under the current regulations, a minimal effects determination may in some limited cases be based upon the mitigation of

the effects of wetland conversion, including the restoration of converted wetlands. USDA plans to use the following guidelines when determining whether a minimal effects finding with mitigation or restoration of wetland value is appropriate: (1) Minimal effect for replacement of wetlands not frequently-cropped will be used only where the purpose of the conversion is not solely the increase of production of an agricultural commodity on the converted wetland, such as cases where removal of woody vegetation will allow center pivot systems to function, or the squaring-off of corners of fields; (2) Replacement will require replacement for the functional values lost; (3) Minimal-effect with mitigation or restoration must be granted in advance of the conversion, and never after the conversion if the wetland to be converted was not frequently cropped; (4) Replacement must take place on prior converted cropland; (5) The producer will be advised that all necessary Federal, State, and local permits should be secured prior to approval of the plan to replace lost values; (6) The plan to replace lost values must be concurred with by SCS and agreed to by FWS at the local level with consultation at the State level; (7) The plan shall include language to the effect that the plan does not exempt the producer from any other wetland protection rules and regulations outside the purview of part 12; (8) USDA shall require an easement for the mitigated land; (9) A copy of the signed restoration agreement will be forwarded to the national office of SCS and USFWS for their review. The authority to use minimal effects exemptions was continued in the 1990 Act essentially unchanged. Those provisions dealing with mitigation of frequently-cropped wetlands are additional provisions under which Congress directed that relief in appropriate cases will be provided. The legislative history of the 1990 Act indicates that the Congress was satisfied with USDA's current minimal effect exemption policies and procedures. Relief in all instances will be determined on a case-by-case basis and the relief provisions can be administered as determined to be needed to avoid conflict among the several relief provisions added to part 12.

With respect to the restoration requirements contained in the proposed rule concerning the use of mitigation in cases of the conversion of frequently-cropped wetland, one comment suggested that the proposed rule did not comport with the legislative intent that

the amount of acreage replacement be not less than, and generally not greater than a one-for-one acreage basis unless more acreage is needed to provide equivalent functions and values that will be lost as a result of the conversion to be mitigated. This final rule modifies the proposed rule to clarify that mitigation in those instances on a greater than a one-for-one acreage basis will not be required unless SCS specifically determines that more acreage is needed.

The proposed rule, in accordance with the 1990 Act, contained requirements concerning the location of the land to be used for the specific mitigation provisions of the regulations. The 1990 Act amendments specify that the land to be used for mitigation must be "in the same general area of the local watershed" as the land to be converted. The proposed rules also contained a provision allowing the use of mitigation banks for the specific mitigation provisions of part 12. One comment expressed concern that § 12.5(b)(6)(i)(D), as proposed, implied that land in mitigation banks used for this purpose could be located in areas other than the same hydrological unit or watershed as the land to be converted. Other comments recommended that the words permitting the land to be used for mitigation to be "near" the same watershed be omitted. In this final rule, the regulations have been clarified to specify that land from mitigation banks are subject to the same location requirements. With respect to the latter comment, the allowance of mitigation near but outside of the watershed is, as indicated, specifically permitted by the 1990 Act. The regulations, as proposed and as adopted in this rule, require that in all cases the land to be used for mitigation must be as close as practicable to the wetland that is to be converted.

Two comments suggested that for purposes of the mitigation provisions of the rule, the rule should allow the restoration of farmed wetland. The 1990 Act and its legislative history make a clear distinction between farmed wetland and converted wetlands, and the statute specifically requires that an exemption under the explicit mitigation provisions in the 1990 Act amendments will require the restoration of a converted wetland. The statute, does not permit the suggestion revision. Likewise, limiting the converted wetlands that can be used for this purpose to wetlands converted prior to December 23, 1985, is required by the provisions of the 1990 Act and comments suggesting an expansion of the proposed rule to include that use of recently converted

000221

wetlands for mitigation have not been adopted.

Three comments were received suggesting that exemptions for non-agricultural production should be clarified because of possible conflict with requirements of the Clean Water Act, which is administered by the United States Army Corps of Engineers. Efforts have been and will continue to be made to coordinate the activities of the various federal agencies with jurisdiction over matters relating to wetlands. In addition, SCS will endeavor to inform producers that determinations made under part 12 will not relieve producers from complying with other environmental laws and regulations. No change is warranted in the provisions adopted in this final rule to provide this information.

One comment expressed concern that the burden of establishing eligibility for an exemption is on the producer seeking the exemption. However, this requirement is reasonable and necessary, particularly as the information relating to the exemption will, in most cases, be in the possession of the producer.

With respect to the new conversion trigger in the 1990 Act, which provides that a WC violation will be considered to have occurred when a wetland is converted so as to make possible the production of an agricultural commodity, the proposed rule set out certain conversion purposes that would not be considered to make the production of an agricultural commodity, as defined in the regulations, possible. In response to comments suggesting that the production of cranberries be specifically addressed, it has been determined, based on data supplied in the comments, to modify the rule to specifically include the conversion of land for cranberry production, which is similar to the conversion of the land for vineyards or shrubs.

One comment suggested that conversion to pasture should be included in the list of conversion purposes that would not be considered to be a WC violation. This may not be done since such a conversion would make the production of an agricultural commodity possible and, under the 1990 Act amendment, would be considered to be a WC violation.

With regard to the graduated sanctions for "good faith" violations, one comment suggested that tables for establishing the amount of payment reductions for various kinds of cases be set out in the rule. It has been determined that adding payment reduction tables to the rule is

unnecessary and would unduly limit the ability of ASCS to tailor relief to individual cases. Other comments suggested that some limitation should be placed on the ability of ASCS personnel to grant "good faith" relief. To avoid the granting of relief in inappropriate cases, specific provisions were included in the administrative procedures for internal USDA review to ensure that relief pursuant to the specific criteria of § 12.6(b)(3)(ix), as proposed, will be rarely granted.

Under the proposed rule and the 1990 Act amendments, the granting of "good faith" relief requires that the converted wetland be restored. One comment suggested that farmed wetlands which are converted should only be required to be restored to farmed wetland status. No change in regulation is needed to address this concern. In administering the final rule, it is intended that restoration will be required to the status that existed as of December 23, 1985, the date the WC provisions were first enacted. This is considered to be an appropriate standard for implementing the permissive good faith provisions of the 1990 Act in that it will preserve the standards of wetland conservation established by the FSA in 1985 and avoid the sanctioning of incremental degradations of the wetland condition that may have occurred since then.

### Section 12.6   Administration

Two comments opposed the provision of § 12.6 of the proposed rule which requires a public listing of wetland determinations. However, that provision is authorized by the 1990 Act. Another comment suggested that HEL lands be similarly listed. The FSA does not require such a listing. Because of the administrative burden entailed, this comment has not been adopted.

### Section 12.12   Appeals

One comment suggested that with respect to § 12.12 of the regulations, appeals under part 12 should not be completed pending the creation of a National Appeals Division in ASCS. Provisions for the creation of such a Division are contained in the 1990 Act. The comment regarding § 12.12 goes beyond the scope of the proposed rule as no modification of that section was proposed. Further, suspending appeals would place an unfair burden on producers with a legitimate ground for relief. Should amendments to the part 12 be needed upon a change in ASCS's organizational structure, such an amendment will be proposed at that time.

### Section 12.23   Conservation Plans and Conservation Systems

The proposed rules set out amendments for § 12.23 to provide that, in providing assistance to a person for the preparation or revision of a conservation plan to meet HELC requirements, SCS will provide such person with information concerning cost-effective and applicable erosion control alternatives, crop flexibility, base adjustment or other conservation options that may be available. Five comments were received regarding alternate conservation systems. The respondents noted that the legislative history indicates the intent of Congress to be that, as producers seek to modify their plans, the Secretary should encourage producers to adopt other cost-effective erosion control practices, including contour farming and strip-cropping. The comments further stated that it was Congress' intent that the Secretary utilize the potential of crop-rotations to further help producers economically achieve erosion control objectives on their farms. The respondents objected that the proposed rule is silent on how the Department intends to encourage wider adoption of alternative agricultural practices and recommended that the final rule incorporate specific guidelines and procedures to fulfill Congressional intent.

This suggestion has not been adopted as it is not practicable to establish specific guidelines for a myriad of individual circumstances within the context of these regulations and such specificity could ultimately inhibit the ability of the SCS to address particular cases as the need arises or becomes apparent through experience. Furthermore, the suggested modification in the rule is not needed to achieve Congress' objectives. Conservation plans are developed through the use of technical guidelines for crop rotations, conservation practices, and treatments for erosion control contained in SCS' Field Office Technical Guide (FOTG). The FOTG is developed at the county level to set out locally accepted, economically sound and practical conservation systems that producers can use on their farms and include in their conservation plans. These conservation systems are intended to include all practical combinations known to SCS of crop rotations, conservation practices, and treatments that are cost-effective and generally accepted in that locality. Some practices that are not yet generally used in that locality are also included to give

producers the option of using new practices and new technology, where it is determined in the individual case to be appropriate. USDA intends that the FOTG will continue to be used as the source of technical guidelines for this purpose. SCS will continue to encourage farmers to consider all reasonable options and to work with farmers to develop such options.

Another comment objected to the provision in § 12.23 concerning information to be supplied by SCS to producers, stating that the proposed paragraph merged, and thus blurred, the requirements of two separate sections of the 1990 Act amendments. The proposed paragraph does merge two similar requirements for SCS to provide information to producers, as SCS normally provides such information in its technical assistance programs. As this provision of the rule is consistent with the 1990 Act, no modification of the rule is needed.

Another comment suggested that the HELC requirements of part 12 could cause a conflict with the acreage reduction (ACR) provisions of USDA price support program which may require the planting of a cover crop. Because the conservation plans prepared under part 12 may also require cover crops, no conflict is perceived. Should such a conflict arise it can be addressed through established procedures for USDA programs.

One coment was received concerning the need to amend the regulations to allow tile, that was installed by hand and placed deep enough for farming with horses, to be placed deeper to facilitate the use of new equipment without causing a WC violation. The 1990 Act does not change the FSA with respect to this issue. If land is designated "prior converted cropland" or is non-wetland, tile can be installed at any depth at any spacing as long as the activity does not result in the drainage of additional wetlands. However, for areas designated as "farmed wetland", only maintenance of draining systems can be performed. Such maintenance is allowed to the extent that it does not increase the scope and effect of previous drainage. If new tile lines can be installed on farmed wetland at a lower depth without changing the scope and effect of the previous drainage, then such maintenance would be allowed. In addition, the installation of drainage tile at a lower depth would not cause a producer to be ineligible if the effects of the change on wetland values are determined to be minimal or are mitigated. As the proposed rule on this

question is consistent with the authorizing legislation, no adjustment of the rule has been made.

### Section 12.30   SCS Responsibilities Regarding Wetlands

One comment recommended a change that would allow interested third parties to appeal any determination made under the regulations. It has been determined that it is not necessary or appropriate to expand the appeal procedures to allow for third party representation. Such participation is not provided in the FSA; furthermore, the only determination made under part 12 is the eligibility of producers for benefits; therefore, the only adversely affected parties under part 12 are producers. Additional representation by outside parties would inhibit the administration of the various programs covered by part 12. Two comments suggested that state natural resource agencies be included in making technical determinations, specifically minimal effect determinations, under § 12.5 and § 12.30 of the regulations. Another comment suggested that the State Technical Committees, which are provided for in title XIV of the 1990 Act, participate in such determinations. The FSA, as amended, makes specific provisions for consultation with FWS and there is not perceived to be any need to extend formal consultation on these matters to additional agencies. Of course, informal consultation with other agencies can be and will be undertaken when needed. The State Technical Committees have not been formally established at this time, but they will provide advice to the Secretary of Agriculture on matters relating to the conservation provisions of the 1990 Act. Another comment objected that the proposed rule does not cover statutory requirements for the periodic review and update of wetland delineations by SCS. As this is an administrative requirement for SCS, and not a requirement of procedures, the provision was not set forth in the rule but will be included in the SCS Manual.

One comment suggested that the 45 day appeal period for certification of wetland determinations be extended. Based on the experience of SCS in administering the WC provisions of part 12, it has been determined that the 45 day period provides adequate opportunity for producers to notify SCS of their objections.

Two comments suggested that USDA implement a joint appeal system for SCS and ASCS. Because these agencies operate under differing sets of responsibilities and differing organizational structures, use of a joint appeal system would be unwieldy and

inefficient. No change in the part 12 has been made in response to this comment.

### Section 12.33   Use of Wetland and Converted Wetland

The proposed rule would revise this section to clarify that for wetlands cropped prior to December 23, 1985, maintenance of existing alternatives on the land will not result in a WC violation if the maintenance does not exceed the scope and effect of the original alteration or manipulation. One comment was received suggesting that § 12.33 should define "scope and effect" and not leave the determination to the judgment of SCS. The determination of scope and effect is a technical hydrologic determination based on generally accepted engineering principles and computations which guide and control the decisions of SCS officials. The FSA commits these determinations to the professional judgment of SCS. No change is made as the establishment of additional specific requirements could inhibit the proper exercise of discretion by SCS.

### List of Subjects in 7 CFR Part 12

Highly erodible land, Wetland, Conservation, Price support programs, Federal crop insurance, Farmers Home Administration loans, Incorporation by reference, Loan programs, Agriculture, Environmental protection.

Accordingly, title 7, part 12 of the Code of Federal Regulations is amended as follows:

### PART 12—HIGHLY ERODIBLE LAND AND WETLAND CONSERVATION

1. The authority citation for part 12 is revised to read as follows:

**Authority:** 16 U.S.C. 3801 *et seq.*

2. Section 12.1 is amended by revising paragraph (a) to read as follows:

### § 12.1   General.

(a) This part sets forth the terms and conditions under which a person who produces an agricultural commodity on highly erodible land or designates such land for conservation use, plants an agricultural commodity on a converted wetland, or converts a wetland shall be determined to be eligible for certain benefits provided by the United States Department of Agriculture and agencies and instrumentalities of the Department.

\* \* \* \* \*

3. Section 12.2 is amended by adding a comma after the word "planted" in paragraph (a)(1), redesignating paragraphs (a)(7) through (a)(28) as paragraphs (a)(8) through (a)(29)

Case 1:19-cv-02416-TSC   Document 35-1   Filed 06/18/21   Page 19 of 211
000223

respectively, adding new paragraph (a)(7), and revising newly redesignated paragraph (a)(29), to read as follows:

## § 12.2 Definitions.

(a) * * *

(7) *Conservation use* or set aside means cropland that is designated as conservation use acreage, set aside or other similar designation for the purpose of fulfilling any provisions under any acreage limitation or land diversion program administered by the Secretary of Agriculture, requiring that the producer devote a specified acreage to conservation or other non-crop production uses.

* * * * *

(29) *Wetland*, except when such term is a part of the term "converted wetland", means land that

(i) Has a predominance of hydric soils;

(ii) Is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions;

(iii) And under normal circumstances does support a prevalence of such vegetation, except that this term does not include lands in Alaska identified as having a high potential for agricultural development and a predominance of permafrost soils.

* * * * *

4. Section 12.3 is amended by revising paragraph (b) as follows:

## § 12.3 Applicability.

* * * * *

(b) The provisions of this part apply to all actions taken after or pending on November 28, 1990, except to the extent that § 12.5(b)(6) through (b)(8) have retroactive application to December 23, 1985 for certain actions and determinations regarding wetlands and converted wetlands. Actions taken or determinations made prior to November 28, 1990 are subject to regulations set forth in this part as of November 27, 1990.

5. Section 12.4 is revised to read as follows:

## § 12.4 Determination of ineligibility.

(a) Except as provided in § 12.5, a person shall be ineligible for all USDA program benefits listed in paragraph (c) of this section if:

(1) The person produces an agricultural commodity on a field in which highly erodible land is predominant, or designates such a field as conservation use;

(2) The person produces an agricultural commodity on wetland that was converted after December 23, 1985; or

(3) After November 28, 1990, the person converts a wetland by draining, dredging, filling, leveling or other means for the purpose, or to have the effect, of making the production of an agricultural commodity possible.

(b) A person determined to be ineligible under paragraphs (a)(1) or (a)(2) of this section shall be ineligible for all of the USDA program benefits listed in paragraph (c) of this section for which the person otherwise would have been eligible during the crop year for which the determination applies. A person determined to be ineligible under paragraph (a)(3) of this section for the conversion of a wetland shall be ineligible for all of the USDA program benefits listed in paragraph (c) of this section for which the person otherwise would have been eligible during the calendar year for which the determination applies and each subsequent calendar year until the converted wetland is restored.

(c) USDA program benefits covered by a determination of ineligibility under this rule are:

(1) Any type of price support or payment made available under the Agricultural Act of 1949, 7 U.S.C. *et seq.*), the Commodity Credit Corporation Charter Act (15 U.S.C. 714 *et seq.*), or any other Act;

(2) A farm storage facility loan made under section 4(h) of the Commodity Credit Corporation Charter Act (15 U.S.C. 714b(h));

(3) Benefits under the Federal Crop Insurance Act (7 U.S.C. 1501 *et seq.*);

(4) A disaster payment made under the Agricultural Act of 1949. (7 U.S.C. 1421 *et seq.*); or under section 132 of the Disaster Assistance Act of 1989 (16 U.S.C. 1421 *et seq.*) or any similar provisions enacted subsequent to August 14, 1989;

(5) A farm loan made, insured, or guaranteed under the Consolidated Farm and Rural Development Act (7 U.S.C. 1921 *et seq.*) or any other provision of law administered by the Farmers Home Administration if the Secretary determines that the proceeds of such loan will be used for a purpose that contributes to the conversion of wetlands that would make production of an agricultural commodity possible or for a purpose that contributes to excessive erosion of highly erodible land (i.e., production of an agricultural commodity or highly erodible land without a conversion plan or conservation system as required by this part);

(6) A payment made under section 4 or 5 of the Commodity Credit Corporation Charter Act (15 U.S.C. 714b or 714c) for the storage of an agricultural commodity acquired by the Commodity Credit Corporation;

(7) A payment made under section 8, 12, or 16(b) of the Soil Conservation and Domestic Allotment Act (16 U.S.C. 590h, 590(1), or 590p(b));

(8) A payment made under section 401 or 402 of the Agricultural Credit Act of 1978 (16 U.S.C. 2201 or 2202);

(9) A payment made under any contract entered into pursuant to section 1231 of the Food Security Act of 1985, as amended (16 U.S.C. 3831);

(10) A payment made under chapter 2, Agricultural Water Quality Incentives Program, or chapter 3, Environmental Easement Program, of subtitle D, Title XII of the Food Security Act of 1985, as amended; and

(11) A payment, loan, or other assistance under section 3 or 8 of the Watershed Protection and Flood Prevention Act (16 U.S.C. 1003 or 1006a).

(d) The provisions of paragraphs (a) and (b) of this section do not apply to any loan described in paragraph (c) of this section that was made prior to December 23, 1985.

(e) For the purposes of paragraph (a) of this section, a person shall be determined to have produced an agricultural commodity on a field in which highly erodible land is predominant or to have designated such a field as conservation use, to have produced an agricultural commodity on converted wetland, or to have converted a wetland if:

(1) SCS has determined that—

(i) Highly erodible land is predominant in such field, or

(ii) All or a portion of the field is converted wetland; and

(2) ASCS has determined that the person is or was the owner or operator of the land, or entitled to share in the crops available from the land, or in the proceeds thereof; and

(3) With regard to the provisions of paragraphs (a)(1) and (a)(2) of this section, ASCS has determined that the land is or was planted to an agricultural commodity or was designated as conservation use during the year for which the person is requesting benefits.

(f) Persons who wish to participate in any of the USDA programs described in paragraph (c) of this section are responsible for contacting the appropriate agency of the Department well in advance of the intended participation date so that Form AD–1026 can be completed. This contact will help assure that the appropriate

determinations regarding highly erodible land or wetland, and conservation plans or conservation systems are scheduled in a timely manner. A late contact may not allow sufficient time for USDA to service the request and could result in a substantial delay in receiving a USDA determination of eligibility or ineligibility.

6. Paragraph (b)(2) of § 12.5 is removed, paragraphs (a) through (c) are redesignated as paragraphs (a)(1) through (a)(3) and revised, and new paragraphs (a)(4) through (a)(6) are added to read as follows:

### § 12.5 Exemptions.

(a) *Exemptions regarding highly erodible land.—(1) Highly erodible cropland in production or in Department programs during 1981 through 1985 crop years.* During the period beginning on December 23, 1985, and ending on the later of January 1,1990, or the date that is two years after the date the cropland on which an agricultural commodity is produced was surveyed by the SCS to determine if such land is highly erodible, no person shall be determined to be ineligible for benefits as provided in § 12.4 as the result of the production of a crop of an agricultural commodity on any highly erodible land:

(i) That was planted to an agricultural commodity in any year 1981 through 1985; or

(ii) That was set aside, diverted or otherwise not cultivated in any such crop years under a program administered by the Secretary for any such crops to reduce production of an agricultural commodity.

(2) *Compliance with a conservation plan or conservation system.* As further specified in this part, no person shall be ineligible for the program benefits described in § 12.4 as the result of production of an agricultural commodity on highly erodible land or the designation of such land as conservation use if such production or designation is in compliance with an approved conservation plan or conservation system.

(i) With respect to the production of an agricultural commodity on any land identified under paragraph (a)(1) of this section, if, as of January 1, 1990, or the date that is 2 years after the date SCS has completed a soil survey of the cropland on the tract or farm, whichever is later, a person is actively applying a conservation plan based on the local SCVS field office technical guide and approved by the CD, in consultation with the local ASC committees and SCS, such person shall have until January 1, 1995, to fully comply with the plan

without being determined to be ineligible for benefits under § 12.4.

(ii) A person shall not be ineligible for program benefits under § 12.4 as the result of the production of an agricultural commodity on highly erodible land or as the result of designation of such land as conservation use if the production or designation is:

(A) In an area within a CD, under a conservation system that has been approved by the CD after the CD determines that the conservation system is in conformity with technical standards set forth in the SCS field office technical guide for such district; or

(B) In an area not within a CD, under a conservation system that has been approved by SCS to be adequate for the production of such agricultural commodity on highly erodible land or for the designation of such land as conservation use.

(3) *Reliance upon SCS determination for highly erodible land.* A person may be relieved from ineligibility for program benefits as the result of the production of an agricultural commodity which was produced on highly erodible land or for the designation of such land as conservation use in reliance on a determination by SCS that such land was not highly erodible land, except that this paragraph shall not apply to any agricultural commodity that was planted on highly erodible land, or for the designation of highly erodible land as conservation use after SCS determines that such land is highly erodible land, and the person is notified of such determinations.

(4) *Areas of 2 acres or less.* No person shall be determined to be ineligible under § 12.4 for noncommericial production of agricultural commodities on an area of 2 acres or less if it is determined by ASCS that such production is not intended to circumvent the conservation requirements otherwise applicable under this part.

(5) *Graduated sanctions.* (i) After November 28, 1990, no person shall become ineligible under § 12.4 as a result of the failure of such person to actively apply a conservation plan that documents the decisions of such person with respect to location, land use, tillage systems, conservation treatment measures and schedules if ASCS determines such person has—

(A) Not violated the highly erodible land provisions of this part within the past 5 years; and

(B) Acted in good faith and without the intent to violate the provisions of this part.

(ii) A person who is determined to meet the requirements of paragraph (a)(5)(i) of this section shall be subject,

in lieu of the loss of all benefits specified under § 12.4(c) for such crop year, to a reduction in benefits of not less than $500 nor more than $5,000 depending upon the seriousness of the violation, as determined by ASCS. The dollar amount of the reduction will be determined by ASCS and may be based on the number of acres and the degree of erosion hazard for the area in violation, as determined by SCS, or upon such other factors as ASCS deems appropriate.

(iii) Any person whose benefits are reduced in a crop year under paragraph (a)(5) of this section may be eligible for all of the benefits specified under § 12.4(c) for any following crop year if SCS determines that such person is actively applying a conservation plan according to the schedule set forth in the plan on all highly erodible land planted to an agricultural commodity or designated as conservation use.

(6) *Allowable variances.* (i) Notwithstanding any other provisions of this part, no person shall be determined to be ineligible for benefits as a result of the failure of such person to actively apply a conservation plan if SCS determines that—

(A) The failure is technical and minor in nature and that such violation has little effect on the erosion control purposes of the conservation plan applicable to the land on which the violation has occurred; or

(B) The failure is due to circumstances beyond the control of the person; or

(C) SCS grants a temporary variance from the practices specified in the plan for the purpose of handling a specific problem with SCS determines cannot reasonably be addressed except through such variance.

(ii) A variance granted under this paragraph shall apply for oe crop year and shall not be counted as a violation for purposes of paragraph (a)(5)(i)(A) of this section.

\* \* \* \* \*

7. Paragraph (d) of § 12.5 is redesignated as paragraph (b), and paragraphs (d)(1) through (d)(1)(v) are redesignated as paragraph (b)(1) through (b)(1)(iv)(C) and revised as follows:

### § 12.5 Exemptions.

\* \* \* \* \*

(b) *Exemptions for wetland and converted wetland.* (1) A person shall not be determined to be ineligible for program benefits under § 12.4 as the result of the production of an agricultural commodity on converted wetland or the conversion of wetland:

(i) If the conversion of such wetland was commenced or completed before December 23, 1985; or

(ii) If the conversion is for a purpose that does not make the production of an agricultural commodity possible, such as conversions for fish production, trees, vineyards, shrubs, cranberries, or building and road construction and no agricultural commodity is produced on such land; or

(iii) If SCS has determined that the actions of the person with respect to the conversion of the wetland, or the production of an agricultural commodity on the converted wetland, individually and in connection with all other similar actions authorized by SCS in the area, would have only a minimal impact on the functional hydrological and biological aspect of wetlands; or

(iv) If the area is:

(A) An artificial lake, pond or wetland created by excavating or diking non-wetland to collect and retain water for purposes such as water for livestock, fish production, irrigation (including subsurface irrigation), a settling basin, cooling, rice production, or flood control; or

(B) A wet area created by a water delivery system, irrigation, irrigation system, or application of water for irrigation; or

(C) Wetland on which the owner or operator of a farm or ranch uses normal cropping or ranching practices to produce agricultural commodities in a manner that is consistent for the area, where such production is possible as a result of natural conditions, such as drought, and is without action by the producer that destroys a natural wetland characteristic.

*     *     *     *     *

8. Paragraph (d)(1)(vi) of § 12.5 is redesignated as paragraph (b)(1)(iv)(D) and is amended by revising the reference to "paragraph (d)(1)(v)" in the second sentence to read "(b)(1)(iii)", and by adding a sentence at the end of the paragraph to read as follows:

§ 12.5  Exemptions.

*     *     *     *     *

(b) * * *
(1) * * *
(iv) * * *

(D) * * * Notwithstanding the provisions of the preceding sentences and as determined by ASCS to be consistent with the purposes of this part, the activities of a drainage district or other similar entity will not be attributed to a person to the extent that the activities of the district or entity were beyond the control of the person and the wetlands converted are not used by the person for the production of an

agricultural commodity or a forage crop for harvest by mechanical means.

9. Paragraphs (d)(2) through (d)(5)(iv) in § 12.5 are redesignated as paragraphs (b)(2) through (b)(5)(iv), respectively, and are amended by revising the references to "(d)(3)" and "(d)(4)" wherever they appear in the redesignated paragraphs to read "(b)(3)" and "(b)(4)", respectively, and by revising the reference to "§ 12.4(d)(1)(i)" in redesignated paragraph (b)(5)(i) to read "this section".

10. Paragraphs (e) and (f) of § 12.5 are removed, new paragraphs (b)(6) through (b)(8) are added, and paragraph (g) is redesignated as paragraph (b)(9) to read as follows:

§ 12.5  Exemptions.

*     *     *     *     *

(b) * * *

(6) *Mitigation through restoration of another converted wetland.* (i) No person shall be determined to be eligible under § 12.4 as the result of the conversion of a wetland that is frequently cropped (a wetland farmed more often than not, as determined from ASCS crop history data) or for the production of an agricultural commodity on a converted wetland that was converted between December 23, 1985 and November 28, 1990, if the wetland values and functions are mitigated through the restoration of a converted wetland, that was converted prior to December 23, 1985. Such mitigation will allow a person to produce agricultural commodities on the converted wetland without being ineligible for future benefits if such restoration:

(A) Is in accordance with a restoration plan approved by SCS with the agreement of the U.S. Fish and Wildlife Service, as described in § 12.30(b);

(B) Is in advance of, or concurrent with, the wetland conversion or the production of an agricultural commodity, as applicable;

(C) Is not at the expense of the federal government, in either supporting the direct or indirect costs of the restoration activity or costs associated with acquiring or securing mitigation sites;

(D) Occurs on lands in the same general area of the local watershed as the converted wetlands, provided that for purposes of this paragraph, lands in the same general area of the local watershed may include regional mitigation banks;

(E) Is on lands for which the owner has agreed to grant an easement to USDA, recorded on public land records, for the maintenance of the restored wetland for as long as the converted wetland for which the mitigation

occurred remains in agricultural use or is not returned to its original wetland classification with equivalent functions and values; and

(F) Provides the equivalent functions and values that will be lost as a result of the wetland conversion. Mitigation acreage will be determined by the SCS State Conservationist, in consultation with the U.S. Fish and Wildlife Service, to replace functional wetland values and may either be less than or more than the converted wetland acreage, but generally not greater than on a one for one acreage basis unless needed to provide equivalent functions and value.

(ii) Mitigation agreements required under paragraph (b)(6)(i) of this section involving greater than a one to one acreage restoration are appealable to SCS under § 12.12.

(7) *Graduated sanctions.* (i) A person who is determined under § 12.4 to be ineligible for benefits as the result of the production of an agricultural commodity on a wetland converted after December 23, 1985, or as the result of the conversion of a wetland after November 28, 1990, may regain eligibility for reduced benefits if—

(A) ASCS determines that the person has not otherwise violated the wetland provisions of this part in the previous 10-year period on any tract or farm owned, operated, or leased by such person, and that such person acted in good faith, without the intent to violate the wetland provisions of this part; and

(B) SCS determines that the person is actively retoring or has restored the converted wetland to the wetland conditions that existed prior to conversion according to a restoration plan and schedule approved by SCS in agreement with the U.S. Fish and Wildlife Service, as described in § 12.30(b).

(ii) After the requirements of paragraph (b)(7)(i) of this section are met, USDA may, in lieu of applying the ineligibility provisions of § 12.4, reduce program benefits by not less than $750 nor more than $10,000 for that crop year depending upon the seriousness of the violation, as determined by ASCS in consideration of relevant factors, such as the information available to the producer prior to the violation, previous land use patterns, the number of wetland acres affected, and the recovery time for full restoration of the wetland values.

(iii) The relief allowed by paragraphs (b)(7) (i) and (ii) of this section may apply retroactively to include the restoration of portions of benefits withheld for violations of the wetland

conservation provisions of this part that occurred after December 23, 1985.

(8) *Reliance upon SCS determination for wetland or converted wetland.* A person shall not be ineligible for program benefits as the result of the production of an agricultural commodity on converted wetland or for the conversion of a wetland if such action was taken in reliance on an incorrect determination by SCS as to the status of such land. If the error caused the person to make a substantial financial investment, as determined by the appropriate agency of USDA, for the conversion of a wetland, the person may be relieved of ineligibility for actions related to that portion of the converted wetland for which the substantial financial investment was expended in conversion activities. The relief available under this paragraph shall not apply to the production of an agricultural commodity or to actions related to the conversion of wetland that take place after SCS informs the person of the error, or to situations in which the person knew or reasonably should have known that the determination was in error.

(9) It is the responsibility of the person seeking an exemption related to converted wetlands under this section to provide evidence, such as receipts, crop history data, drawings, plans or similar information, for purposes of determining whether the conversion or other action is exempt in accordance with this section.

§ 12.6 [Amended]

11. Section 12.6 is amended by removing, in each paragraph listed below in the left column, the reference indicated in the middle column from where it appears in the paragraph, and adding in its place the reference indicated in the right column:

| Paragraph | Remove (section) | Add (section) |
|---|---|---|
| (b)(3)(i) ............... | 12.4(b) .......... | 12.4(e). |
| (b)(3)(iii) ............. | 12.2(a)(3)....... | 12.2(a)(14). |
| (b)(3)(v) .............. | 12.5(a)(2)....... | 12.4(e) and § 12.5(a)(1). |
| (b)(3)(viii)............ | 12.5(d) (3) or (4). | 12.5(b) (3) or (4). |
| (b)(3)(ix).............. | 12.5(d)(1)(vi).... | 12.5(b)(iv)(D). |
| (c)(2)(vi).............. | 12.5(b)(3) ....... | 12.5(a)(3). |

12. Section 12.6 is amended by revising the word "determination" in paragraph (b)(3) to read "determinations", removing paragraph (b)(3)(vi), redesignating paragraphs (b)(3)(vii) through (b)(3)(ix) as paragraphs (b)(3)(vi) through (b)(3)(viii), revising paragraph (c)(1), and by adding paragraphs (b)(3)(ix), (b)(3)(x), (b)(6),

and (c)(2)(vii) through (xiv) to read as follows:

§ 12.6   Administration.
* * * * *
(b) * * *
(3) ASCS shall make the following determinations which are required to be made in accordance with this part:
* * * * *
(ix) Whether certain violations were made in good faith. County Office good faith determinations shall be reviewed by the ASCS District Director if any of the following conditions apply to the case:

(A) The wetland was officially certified by SCS,

(B) USDA met with the producer to discuss the location of the wetland,

(C) The producer was involved in a previous swampbuster violation issue, or

(D) The wetland is in an uncropped field, and conversion brought new land into production through extensive modification of vegetation and hydrology.

(x) The determination of the amount of reduction in benefits based on the seriousness of the violation, based on technical information provided by SCS and FWS.
* * * * *
(6) ASCS shall maintain in its county offices a public listing of the farms or tracts that have a certified determination of wetland or converted wetland status.

(c) * * *
(1) The provisions of this part that are applicable to SCS shall be administered under the general supervision of the Deputy Chief for Programs, and shall be carried out in the field by the state conservationist, area conservationist, and district conservationist.

(2) * * *
(vii) Whether an approved conservation plan is being actively applied on highly erodible fields in accordance with the schedule specified therein or whether a failure to apply the plan is technical and minor in nature, due to circumstances beyond the control of the person, or whether a temporary variance from the requirements of the plan should be granted.

(viii) Whether an approved conservation system is being used on a highly erodible field.

(ix) Whether the conversion of a wetland is for the purpose or has the effect of making the production of an agricultural commodity possible.

(x) Whether a converted wetland is abandoned.

(xi) Whether the planting of an agricultural commodity on a wetland is possible under natural conditions.

(xii) Whether maintenance of existing drainage of a wetland described in § 12.32(a)(3) exceeds the scope and effect of the original drainage.

(xiii) Whether a plan and schedule for the restoration of a converted wetland will be approved and whether the restoration of a converted wetland is accomplished according to the approved restoration plan and schedule.

(xiv) Whether all pertinent data relating to the determination of a violation and severity of a violation has been provided to ASCS for making graduated sanctions determinations.
* * * * *
13. Section 12.7 is amended by revising paragraphs (a)(2) and (a)(3) to read as follows:

§ 12.7   Certification.
(a) * * *
(2) The person applying for the benefits must certify in writing on Form AD–1026 that such person will not produce an agricultural commodity on highly erodible land, or designate such land as conservation use; or plant an agricultural commodity on a converted wetland; or convert a wetland in order to make possible the production of an agricultural commodity during the crop year in which the person is seeking such benefits, unless such actions are exempt, under § 12.5, from the provisions of § 12.4 of this part;

(3) The person applying for a FmHA insured or guaranteed farm loan must certify that such person shall not use the proceeds of the loan for a purpose that will contribute to excessive erosion on highly erodible land or to conversion of wetlands for the purpose, or to have the effect, of making the production of an agricultural commodity possible; and
* * * * *
14. Section 12.9 is amended by redesignating paragraphs (a) and (b) as (a)(1) and (a)(2) respectively, revising redesignated paragraph (a)(1), revising the reference to "paragraph (a)" in redesignated paragraph (a)(2) to read "paragraph (a)(1)", adding a heading for paragraph (a) and adding a new paragraph (b) to read as follows:

§ 12.9   Landlords and tenants.

(a) *Landlord eligiblity.* (1) Except as provided in paragraph (a)(2) of this section, the ineligibility of a tenant or sharecropper for benefits (as determined under § 12.4) shall not cause a landlord to be ineligible for USDA program benefits accruing with respect to land

000227

other than those in which the tenant or sharecropper has an interest.

(2) * * *

(b) *Tenant or renter eligibility.* (1) The ineligibility of a tenant or renter may be limited to the program benefits listed in § 12.4(c) accruing with respect to only the farm on which the violation occurred:

(i) The tenant or renter shows that a good faith effort was made to comply by developing an approved conservation plan for the highly erodible land in a timely manner and prior to any violation of the provisions of this part; and

(ii) The owner of such farm refuses to apply such a plan and prevents the tenant or renter from implementing certain practices that are a part of the approved conservation plan; and

(iii) ASCS determines that the lack of compliance is not a part of a scheme or device as described in § 12.10.

(2) If relief is granted under paragraph (b)(1) of this section, the tenant or renter must actively apply those conservation treatment measures that are determined to be within the control of the tenant or renter.

§ 12.10  [Amended]

15. Section 12.10 is amended by removing the phrase "for the production of an agricultural commodity" at the end of the section.

16. Section 12.11 is amended by adding a sentence at the end to read as follows:

§ 12.11  Action based upon advice or action of the Department

* * * In addition, if it is determined by the appropriate USDA agency that the action of a person which would form the basis of any ineligibility under this part was taken by such person in good faith reliance on erroneous advice, information, or action of any other authorized representative of USDA, the appropriate agency may make such benefits available to the extent that similar relief would be allowed under 7 CFR part 790.

§ 12.22  [Amended]

17. Section 12.22 is amended by revising the reference to "§ 12.5(c)" in paragraph (c) to read "§ 12.5(a)(2)."

18. Section 12.23 is amended by removing the references to "§ 12.5(b)" in the first sentences of paragraphs (a) and (d), and adding in their place "§ 12.5(a)", redesignating paragraphs (b) through (e) as paragraphs (d) through (g), respectively, and by adding new paragraphs (b) and (c) to read as follows:

§ 12.23  Conservation plans and conservation systems.

(a) * * *

(b) Any person who owns or operates highly erodible land that was under a Conservation Reserve Program contract as authorized by section 1231 of the Food Security Act of 1985, as amended, shall have 2 years after the expiration or termination of the contract to fully apply a conservation system if the conservation plan for such land requires the installation of structural measures for the production of an agricultural commodity. SCS officials may extend this period one additional year for circumstances beyond the control of the person.

(c) SCS, in providing assistance to a person for the preparation or revision of a conservation plan under this part, will provide such person with information concerning cost effective and applicable erosion control alternatives, crop flexibility, base adjustment or other conservation assistance options that may be available.

*    *    *    *    *

19. Section 12.30 is amended by redesignating paragraphs (a) through (e) as paragraphs (a)(1) through (a)(5), redesignating the introductory text of the section as the introductory text of paragraph (a), by removing the reference to "§ 12.5 (d)(1) and (d)(2)" in redesignated paragraph (a)(3) and adding in its place "§ 12.5(b)", and by adding new paragraphs (b), (c), and (d) to read as follows:

§ 12.30  SCS responsibilities regarding wetlands.

*    *    *    *    *

(b) Technical determinations regarding the restoration of converted wetlands and the development of restoration plans under this part will be made through the agreement of the local representative of SCS and a representative of the U.S. Fish and Wildlife Service. If agreement cannot be reached at the local level, such determinations will be referred to the SCS state conservationist who will, in making such determinations, consult with the U.S. Fish and Wildlife Service. All determinations made by SCS state conservationists under this paragraph will be reported by the state conservationists and the representatives of the U.S. Fish and Wildlife Service to their respective national offices.

(c) SCS determinations of wetland status and any applicable exemptions granted under this part shall be delineated on a map of the farm or tract. Notification of the wetland determination, a copy of the wetland delineation and the SCS appeal

procedures shall be provided to each person who completes a Form AD-1026. The wetland determination and wetland delineation shall be certified as final by the SCS official 45 days after providing the person notice or, if appeal is filed with SCS, after a final appeal decision is made by SCS.

(d) An on-site investigation of a wetland or converted wetland site will be made by SCS before any benefits are withheld and the person shall be provided an opportunity to appeal the on-site determination to SCS if the on site determination differs from the original determination, or the person was not provided an opportunity to appeal the original determination. Such action by SCS shall be considered a review of prior determinations and official certification of the delineation. A copy of the certified final determination and the wetland delineation shall be provided to ASCS, who will record the information on the official USDA farm map and on a public list. Wetland determinations made prior to November 28, 1990 shall be considered to be final and certified if they meet the criteria of § 12.31.

20. Section 12.31 is amended by revising the reference to "§ 12.2(a)(28)" in paragraph (b)(2) to read "§ 12.2(a)(29)", revising the reference to "§ 12.5(d)(1) (ii) and (iii)" in paragraphs (c)(1) and (c)(2) to read "§ 12.5(b)(1)(iv) (A) and (B)", revising the reference to "§ 12.5(d)(1)(v)" and "12.5(d)" in paragraph (d) to read "§ 12.5(b)(1)(iii)" and "§ 12.5(b)" respectively, and adding a sentence at the end of paragraph (d) to read as follows:

§ 12.31  Wetland identification criteria.

*    *    *    *    *

(d) * * * In situations where the wetland values and functions are replaced by the restoration of a converted wetland that was converted prior to December 23, 1985, or other mitigation in accordance with a restoration or mitigation plan and schedule approved by SCS in agreement with the U.S. Fish and Wildlife Service, as described in § 12.30(b), the exemption provided by the determination will be effective after approval of the plan and as set forth in the plan.

21. Section 12.33 is amended by revising the reference to "§ 12.5(d)(1)(v)" in paragraph (a) to read "§ 12.5(b)(1)(iii)", and adding a sentence at the end of paragraph (b) to read as follows:

§ 12.33  Use of wetland and converted wetland.

*    *    *    *    *

000228

(b) * * * Furthermore, the maintenance of any alteration or manipulation that affects the reach or flow of water made to a wetland that was cropped before December 23, 1985, would not cause a person to be determined to be ineligible under this part, provided that the maintenance does not exceed the scope and effect of the original alteration or manipulation, as determined by SCS, and provided that the area is not abandoned.

22. A new § 12.34 is added to read as follows:

### § 12.34  Paperwork Reduction Act assigned number.

The information collection requirements contained in this regulation (7 CFR part 12) have been approved by the Office of Management and Budget under provisions of 44 U.S.C. chaper 35 and have been assigned OMB Number 0560-0004.

Signed this 15th day of April 1991 in Washington, DC.

**Edward Madigan,**

*Secretary of Agriculture.*

[FR Doc. 91-9146 Filed 4-17-91; 4:47 pm]

**BILLING CODE 3410-05-M**

Part 512 - Wetland Conservation

512.04

(512.04   Wetland certification.

(a)  Documentation.  SCS will delineate all wetlands on a photocopy of the ASCS official aerial photography.  Label the delineated areas according to 510.49(a)(4) and appendix 516.21.  If requested by the person, SCS will make a field visit prior to delineating the wetlands on the map.

(b)  Procedure for certification.  SCS will certify that the wetland delineations on each tract are sufficient to make determinations of eligibility for USDA program benefits, and are in accordance with 510.49 and 510.50.

(1)  Notify the person that a wetland determination has been made, and that the determination has been certified as correct and sufficient for determining eligibility for USDA programs.

(2)  Provide Form SCS-CPA-026 to the person along with the map showing the location of wetlands.

(3)  SCS will certify the determination after a final appeal decision is issued or 45 days after notification if not appealed.

(c)  Requirements for certification.

(1)  The area must meet all criteria for wetlands.

(2)  Determination must be made for the entire tract, with this exception: If a large part of a tract is in woodland or rangeland with a low potential for conversion to cropland, the district conservationist may make a wetland determination for all cropland, hayland, pasture, and rangeland that has high potential for wetland conversion, and potential cropland adjacent to cropland fields on the tract.  If a decision is made not to make a wetland determination on the remainder of the woodland or rangeland area, the following items must be done:

(i)  Make a determination for all cropland, hayland, pasture, rangeland, woodland, and potential cropland adjacent to the cropland on the tract that has a high potential for wetland conversion;

(ii)  Outline the area to be excluded from the wetland determination on the aerial photo and write, "Wetland determination not made for this area";

(180-V-NFSAM, Second Ed., Amend. 6, May 1991)

Subpart A - General

512.04(f)

(iii)  Note in the remarks section on Form SCS-CPA-026 that a wetland determination was not made for the area outlined on the aerial photo; and

(iv)  Inform the farmer that a request for a wetland determination should be made for any wet area that is being manipulated on which a wetland determination was not previously made.

(3)  Hydric soils are present on all wetland sites.

(4)  Hydrophytic vegetation is prevalent on the site or would have been prevalent had it not been removed.

(5)  Wetland hydrology exists on the site.

(6)  All wetland (W), converted wetlands (CW), farmed wetlands (FW), and minimal effects wetland (MW) are outlined on the ASCS photos, and prior converted cropland (PC) is outlined or noted for each field.

(d)  <u>Certification of prior determination</u>.  SCS will certify all wetland determinations made prior to November 28, 1990, if they were made according to SCS policy in Section 512.04(c).  If the determination was made prior to November 28, 1990, it may be certified for all cropland and potential cropland adjacent to cropland on the tract.

(1)  Notify the person by letter that his or her prior wetland determination is certified and is sufficient for determining eligibility for USDA program benefits under FSA.

(2)  If the person does not appeal the determination within 45 days of the notice, SCS will certify the determination and provide the needed information to ASCS.

(3)  If the person appeals the determination, certification will be made after a final decision is issued on the appeal.

(e)  <u>Notification to other agencies</u>.  FWS, EPA, and COE must be notified of wetland certifications upon request.

(f)  <u>Public list</u>.  ASCS maintains a public list of certified wetland determinations.  The ASCS list is limited to those certified determinations that are provided by SCS after following the procedures in this section.  Maps and other information on determinations are available to the public on request.

| U.S.D.A.<br>Soil Conservation Service | SCS-CPA-026<br>(June 91) | 1. Name and Address of Person | 2. Date of Request | 000234 |
|---|---|---|---|---|

**HIGHLY ERODIBLE LAND AND WETLAND<br>CONSERVATION DETERMINATION**

| | 3. County |
|---|---|

| 4. Name of USDA Agency or Person Requesting Determination | 5. Farm No. and Tract No. |
|---|---|

## SECTION I - HIGHLY ERODIBLE LAND

| | FIELD NO.(s) | TOTAL ACRES |
|---|---|---|
| 6. Is soil survey now available for making a highly erodible land determination?  Yes ☐  No ☐ | | |
| 7. Are there highly erodible soil map units on this farm?  Yes ☐  No ☐ | | |
| 8. List highly erodible fields that, according to ASCS records, were used to produce an agricultural commodity in any crop year during 1981-1985. | | |
| 9. List highly erodible fields that have been or will be converted for the production of agricultural commodities and, according to ASCS records, were not used for this purpose in any crop year during 1981-1985; and were not enrolled in a USDA set-aside or diversion program. | | |
| 10. This Highly Erodible Land determination was completed in the:  Office ☐  Field ☐ | | |

## SECTION II - WETLAND

| | FIELD NO.(s) | TOTAL ACRES |
|---|---|---|
| 11. Are there hydric soils on this farm?  Yes ☐  No ☐ | | |
| 12. Wetlands (W), including abandoned wetlands, or Farmed Wetlands (FW) or Farmed Wetlands Pasture (FWP). Wetlands may be farmed under natural conditions. Farmed Wetlands and Farmed Wetlands Pasture may be farmed and maintained in the same manner as they were prior to December 23, 1985, as long as they are not abandoned. | | |
| 13. Prior Converted Cropland (PC). Wetlands that were converted prior to December 23, 1985. The use, management, drainage, and alteration of prior converted cropland (PC) are not subject to the wetland conservation provisions unless the area reverts to wetland as a result of abandonment. | | |
| 14. Artificial Wetlands (AW). Artificial wetlands includes irrigation-induced wetlands. These wetlands are not subject to the wetland conservation provisions. | | |
| 15. Minimal Effect Wetlands (MW). These wetlands are to be farmed according to the minimal-effect agreement signed at the time the minimal-effect determination was made. | | |
| 16. Mitigation Wetlands (MIW). Wetlands on which a person is actively mitigating a frequently cropped area or a wetland converted between December 23, 1985 and November 28, 1990. | | |
| 17. Restoration with Violation (RVW-year). A restored wetland that was in violation as a result of conversion after November 28, 1990, or the planting of an agricultural commodity or forage crop. | | |
| 18. Restoration without Violation (RSW). A restored wetland converted between December 23, 1985 and November 28, 1990, on which an agricultural commodity has not been planted. | | |
| 19. Replacement Wetlands (RPW). Wetlands which are converted for purposes other than to increase production, where the wetland values are being replaced at a second site. | | |
| 20. Good Faith Wetlands (GFW+year). Wetlands on which ASCS has determined a violation to be in good faith and the wetland has been restored. | | |
| 21. Converted Wetlands (CW). Wetlands converted after December 23, 1985 and prior to November 28, 1990. In any year that an agricultural commodity is planted on these Converted Wetlands, you will be ineligible for USDA benefits. | | |
| 22. Converted Wetland (CW+year). Wetlands converted after November 28, 1990. You will be ineligible for USDA program benefits until this wetland is restored. | | |
| 23. Converted Wetland Non-Agricultural use (CWNA). Wetlands that are converted for trees, fish production, shrubs, cranberries, vineyards or building and road construction. | | |
| 24. Converted Wetland Technical Error (CWTE). Wetlands that were converted as a result of incorrect determination by SCS. | | |

25. The planned alteration measures on wetlands in fields _____ are considered maintenance and are in compliance with FSA.

26. The planned alteration measures on wetlands in fields _____ are not considered to be maintenance and if installed will cause the area to become a Converted Wetland (CW). See item 22 for information on CW+year.

27. The wetland determination was completed in the office ☐  field ☐  and was delivered ☐  mailed ☐  to the person on _____.

28. Remarks.

| 29. *I certify that the above determination is correct and adequate for use in determining eligibility for USDA program benefits, and that wetland hydrology, hydric soils, and hydrophytic vegetation under normal circumstances exist on all areas outlined as Wetlands, Farmed Wetlands, and Farmed Wetlands Pasture.* | 30. Signature of SCS District Conservationist | 31. Date |
|---|---|---|

*Assistance and programs of the Soil Conservation Service available without regard to race, religion, color, sex, age, or handicap.*

Person Copy

# Appeals

The conservation provisions of the Food Security Act of 1985 place responsibility on U.S. Department of Agriculture (USDA) agencies for making determinations which may have significant economic impact on farm operations. These determinations are made as accurately as possible. However, there will be situations when persons believe the rules have not been properly applied in their case resulting in the denial of USDA program benefit.

Each agency—the Agricultural Stabilization and Conservation Service (ASCS), Farmers Home Administration (FmHA), Federal Crop Insurance Corporation (FCIC), and Soil Conservation Service (SCS)—has an appeals procedure for the purpose of allowing producers to furnish evidence to support their claims that the rules have not been properly applied.

| | |
|---|---|
| **Items Appealed To ASCS** | ASCS is responsible for determining:<br>● whether a person is a producer on a field;<br>● establishment of field boundaries;<br>● whether land was planted to an agricultural commodity any of the years 1981 through 1985;<br>● whether land was set aside, diverted, or otherwise not cultivated under a program administered by the Secretary of Agriculture;<br>● whether the production of an agricultural commodity on highly erodible land or converted wetland by a tenant is required under terms and conditions of the agreement between the landlord and tenant;<br>● whether the agricultural commodity planted on a field was planted before December 23, 1985, or during any crop year which began before December 23, 1985; and<br>● whether the conversion of a particular wetland was commenced before December 23, 1985, or converted since December 23, 1985 by third party. |
| **Items Appealed To FmHA** | FmHA is responsible for determining whether the proceeds of any loan made, insured, or guaranteed under any provision of law administered by FmHA will be used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetland. |
| **Items Appealed To FCIC** | FCIC is responsible for determining if insured producers or those applying for crop insurance are in compliance with the Food Security Act of 1985. |
| **Items Appealed To SCS** | SCS is responsible for appeals regarding:<br>A. Highly erodible land determinations:<br>● determination of the land capability classification of a field or a portion of a field;<br>● determination of a predicted average annual rate of erosion for a field or a portion of a field;<br>● determination of the potential average annual rate of erosion for a field or a portion of a field.<br>● determination by a conservation district, or by a designated conservationist in those areas where no conservation district exists, that a conservation system or a conservation plan should not be approved.<br>B. Wetland determinations:<br>● determination that certain land is a "wetland" as defined by the act;<br>● determination that certain land is a "converted wetland" as defined by the act;<br>● determination of whether the conversion of wetland for the production of an agricultural commodity on such converted wetland will have minimal effect on the hydrological and biological aspects of wetland.<br>● determination of whether wetlands are exempted as result of being prior converted, artificial, or irrigation-induced wetlands, or wetlands farmed under natural conditions.<br>C. Whether SCS followed its policies and procedures. |
| **How To Appeal** | You should request reconsideration by the person or committee of the agency making the initial determination within 15 days (30 days for FmHA, and 45 days for SCS) of the mailing of the determination.<br><br>Appeals of adverse decisions may be made to the next level of appeal within 15 days (30 for FmHA, and 45 days for SCS) of the mailing of the decision. Decisions by the highest listed authority in each agency are final and there are no further administrative appeal rights. The succession of levels for appeal following reconsideration by the person or committee making the initial determination are: |

**For ASCS**
1st — County ASC Committee
2nd — State ASCS Committee
3rd — Deputy Administrator for State and County Operations

**For FmHA:**
1st — County Supervisor
2nd — District Director
3rd — State Director
4th — Administrator

**For FCIC:***
1st — Field Operations
2nd — Kansas City Appeals
    Board: Claims Division
3rd — Assistant Manager, FCIC Washington, DC

**For SCS:**
1st — District Conservationist
2nd — Area Conservationist
3rd — State Conservationist
4th — Deputy Chief for Programs

*Companies reinsured by FCIC will utilize their own appeal process.*

This sheet provides general information on the appeals procedure of the Food Security Act of 1985. Published rules and regulations are available at local USDA offices.

All USDA programs and services are available without regard to race, color, national origin, religion, sex, age, marital status, or handicap.



United States
Department of
Agriculture

April 1991

# Environmental Assessment

## Selected Provisions of the Conservation Program Improvements Act of 1990

## Progress

In the five years since the passage of the FSA, the SCS and the Agricultural Conservation and Stabilization Service (ASCS) have dealt with the procedural logistics and policy implications of the Act. The conservation provisions of the Act, to achieve a substantial reduction in soil erosion and to prevent the loss of additional valued wetlands, have been addressed in the SCS's efforts to complete conservation plans on 1.8 million farms and to identify wetland areas covered by the provisions of the Act.

To date, the SCS has assisted in developing plans for 1.27 million farms covering 135 million acres of highly erodible land. Nearly one-third of these plans have already been implemented. When all plans are implemented, erosion on highly erodible lands will be reduced by about 50 percent annually. The plans call for installing more than 215,000 miles of terraces, 1.3 million acres of grassed waterways, 4,700 miles of diversions, 25 million acres of contouring, and more than 100 million acres of conservation tillage. Fewer than 450 producers have had program benefits denied because of conservation compliance violations. More important than the actual number of program benefit denials, however, is the fact that producers are aware that the provisions will be enforced. As a result, they will be less likely to bring new highly erodible land into production.

Implementation of the Swampbuster provision has slowed the rate of wetland conversion. To date, just under 11 million acres of wetlands have been identified and classified on farms. Determinations for legal classification of wetlands have been made for about one-half the acreage.

The areas classified so far include about 91,000 acres of recently converted wetlands. Minimal effects exemptions have been granted for about 4,000 of these acres. Presumably, any producers who are using these lands to produce agricultural commodities have decided to forego USDA program benefits in order to use their converted lands. Less than 3 percent of farmers for whom wetland classification determinations have been made have officially appealed USDA certifications.

It is believed, however, that there are cases of unreported conversions. If so, some would be cases of minor conversions where the severity of the potential penalties have hampered administration, enforcement, and compliance.

Conversions to non-agricultural uses continue, as do other kinds of wetland losses. An example is the major losses of wetland in the Mississippi Delta caused by coastal delta subsidence and by oxidation of coastal wetland soils due to salinity from coastal waterways.

Nearly 34 million acres of land have been enrolled in nine CRP signups. It is estimated that withdrawing these acres from production and establishing cover on them will reduce erosion by 655 million tons annually. This is a significant reduction in erosion and water quality degradation, since these fragile lands contribute a disproportionate share of total erosion when untreated. More than 2.1 million acres of this land have been planted or scheduled for planting to trees. CRP plans for filter strips will protect over 6,100 miles of streams and water bodies from sediment and other nonpoint source pollutants.

## Implementation Problems

These accomplishments notwithstanding, implementation of the program has underscored a number of procedural and policy issues which need to be resolved and has identified new opportunities for enhancing conservation through new legislation. Some examples follow:

- The FSA put a tenant in jeopardy of losing benefits if the landowner refused to allow implementation of an acceptable conservation plan.

II-4



[Federal Register Volume 59, Number 12 (Wednesday, January 19, 1994)]
[Unknown Section]
[Page 0]
From the Federal Register Online via the Government Publishing Office [www.gpo.gov]
[FR Doc No: 94-1311]


[[Page Unknown]]

[Federal Register: January 19, 1994]

_____

Part IV



Environmental Protection Agency



Department of Agriculture



Soil Conservation Service



Department of Defense



Corps of Engineers, Department of the Army

Department of the Interior

Fish and Wildlife Service

---

Memorandum of Agreement Concerning Wetlands Determinations on
Agricultural Lands; Notice
ENVIRONMENTAL PROTECTION AGENCY

DEPARTMENT OF AGRICULTURE

Soil Conservation Service

DEPARTMENT OF DEFENSE

Corps of Engineers, Department of the Army

DEPARTMENT OF THE INTERIOR

Fish and Wildlife Service

Interagency Memorandum of Agreement Concerning Wetlands
Determinations for Purposes of Section 404 of the Clean Water Act and
Subtitle B of the Food Security Act

AGENCIES: Environmental Protection Agency; Soil Conservation Service,
USDA; Army Corps of Engineers, DoD; Fish and Wildlife Service, DoI.

ACTION: Notice.

-----------------------------------------------------------------------

SUMMARY: On January 6, 1994, the Departments of the Army, Agriculture,
the Interior, and the Environmental Protection Agency signed a
Memorandum of Agreement (MOA) that recognizes the Soil Conservation
Service (SCS) as the lead Federal agency for wetlands delineations on
agricultural lands. Specifically, the MOA articulates the policy and
procedures to be used in the determination of wetlands jurisdiction for
purposes of both Section 404 of the Clean Water Act and Subtitle B of
the Food Security Act (also known as the Swampbuster program). The MOA,
which establishes minimum training requirements and requires the use of
standard interagency approved methods, will improve the quality and
consistency of wetlands determinations on agricultural lands. The
actual text of the MOA is published as part of this notice.

DATES: The effective date of this MOA is January 6, 1994.

ADDRESSES: Copies of this MOA are available from:

EPA Wetlands Hotline, (800) 832-7828.
U.S. Soil Conservation Service Conservation Planning Division,
Washington, DC 20013.

U.S. Army Corps of Engineers CECW-OR, 20 Massachusetts Ave., NW,
Washington, DC 20314-1000.
U.S. Fish and Wildlife Service Division of Habitat Conservation
(400ARLSQ), 1849 C. St., NW, Washington, DC 20240

FOR FURTHER INFORMATION CONTACT: The EPA Wetlands Hotline, (800) 832-
7828; Gregory Peck of the Environmental Protection Agency, 202/260-
8794; Michael Davis of the Office of the Assistant Secretary of the
Army (Civil Works), 703/695-1376; Warren Lee of the Soil Conservation
Service, 202/720-1845; or Stephen Forsythe of the Fish and Wildlife
Service, (703) 358-2161.

SUPPLEMENTARY INFORMATION: On August 24, 1993, the Clinton
Administration announced a comprehensive package of wetlands policy
reforms that will improve the protection of wetlands and make wetlands
programs more fair and flexible for landowners. The MOA signed on
January 6, 1994, implements one of the more than 40 initiatives in the
Administrations's Wetlands Plan. The MOA signatory agencies recognize
the important contribution of agricultural producers to society, our
economy, and our environment. The agencies are committed to ensuring
that Federal wetlands programs are administered in a manner that
minimizes the impacts on affected landowners to the extent possible
consistent with the important goal of protecting wetlands. The MOA was
developed in response to concerns that previous practices may have led
to confusion and inconsistent application of Federal wetlands programs
and policies on agricultural lands.

    The MOA will minimize duplication and inconsistencies between
Swampbuster and the Clean Water Act wetlands programs and articulate
clearly the procedures by which the Nation's farmers can rely on SCS
wetlands jurisdictional determinations on agricultural land for
purposes of both the Clean Water Act and Swampbuster programs. The MOA
includes provisions to ensure that agency personnel are properly
trained, that standard agreed-upon methods are utilized in making
wetlands determinations, and that appropriate monitoring and oversight
is undertaken. The MOA also places emphasis on local cooperation
between the signatory agencies and the improvement of analytical
methods for making wetland determinations.
    While the MOA became effective on January 6, 1994, full
implementation will vary from state to state depending on the level of
training required and the development of state wetlands mapping
conventions. The signatory agencies will take appropriate action to
expedite implementation of the MOA consistent with such prerequisites.
    The full text of the MOA follows.

    Dated: January 7, 1994.

    Approved:
James R. Lyons,
Assistant Secretary for Natural Resources and Environment, Department
of Agriculture.
    Dated: January 12, 1994.

    Approved:
Robert Perciasepe,
Assistant Administrator for Water Environmental Protection Agency.
    Dated: January 7, 1994.

    Approved:
G. Edward Dickey,

Acting Assistant Secretary of the Army for Civil Works, Department of
the Army.
    Dated: January 7, 1994.

    Approved:
George T. Frampton, Jr.,
Assistant Secretary for Fish and Wildlife and Parks, Department of the
Interior.
    Memorandum of Agreement Among the Department of Agriculture, the
Environmental Protection Agency, the Department of the Interior, and
the Department of the Army Concerning the Delineation of Wetlands for
Purposes of Section 404 of the Clean Water Act and Subtitle B of the
Food Security Act.

I. Background

    The Departments of the Army, Agriculture, and the Interior, and the
Environmental Protection Agency (EPA) recognize fully that the
protection of the Nation's remaining wetlands is an important objective
that will be supported through the implementation of the Wetland
Conservation (Swampbuster) provision of the Food Security Act (FSA) and
Section 404 of the Clean Water Act (CWA). The agencies further
recognize and value the important contribution of agricultural
producers to our society, our economy, and our environment. We are
committed to ensuring that Federal wetlands programs are administered
in a manner that minimizes the impacts on affected landowners to the
fullest possible extent consistent with the important goal of
protecting wetlands. We are also committed to minimizing duplication
and inconsistencies between Swampbuster and the CWA Section 404
program. On August 24, 1993, the Administration announced a
comprehensive package of reforms that will improve both the protection
of wetlands and make wetlands programs more fair and flexible for
landowners, including the Nations's agriculture producers. This
Memorandum of Agreement (MOA) implements one of over 40 components of
the Administration's Wetland Plan.

II. Purpose and Applicability

A. Purpose

    The purpose of this MOA is to specify the manner in which wetland
delineations and certain other determinations of waters of the United
States made by the U.S. Department of Agriculture (USDA) under the FSA
will be relied upon for purposes of CWA Section 404. While this MOA
will promote consistency between CWA and FSA wetlands programs, it is
not intended in any way to diminish the protection of these important
aquatic resources. In this regard, all signatory agencies to this MOA
will ensure that wetlands programs are administered in a manner
consistent with the objectives and requirements of applicable laws,
implementing regulations, and guidance.

B. Applicability

    1. The Administrator of EPA has the ultimate authority to determine
the geographic scope of waters of the United States subject to
jurisdiction under the CWA, including the Section 404 regulatory
program. Consistent with a current MOA between EPA and the Department
of the Army, the Army Corps of Engineers (Corps) conducts
jurisdictional delineations associated with the day-to-day
administration of the Section 404 program.

2. The Secretary of the USDA, acting through the Chief of the Soil Conservation Service (SCS), has the ultimate authority to determine the geographic scope of wetlands for FSA purposes and to make delineations relative to the FSA, in consultation with the Department of the Interior, Fish and Wildlife Service (FWS).

III. Definition of Agricultural Lands

For the purposes of this MOA, the term ``agricultural lands'' means those lands intensively used and managed for the production of food or fiber to the extent that the natural vegetation has been removed and cannot be used to determine whether the area meets applicable hydrophytic vegetation criteria in making a wetland delineation.

A. Areas that meet the above definition may include intensively used and managed cropland, hayland, pasture land, orchards, vineyards, and areas which support wetland crops (e.g., cranberries, taro, watercress, rice). For example, lands intensively used and managed for pasture or hayland where the natural vegetation has been removed and replaced with planted grasses or legumes such as ryegrass, bluegrass, or alfalfa, are considered agricultural lands for the purposes of this MOA.

B. ``Agricultural lands'' do not include range lands, forest lands, wood lots, or tree farms. Further, lands where the natural vegetation has not been removed, even though that vegetation may be regularly grazed or mowed and collected as forage or fodder (e.g., uncultivated meadows and prairies, salt hay), are not considered agricultural lands for the purposes of this MOA.

Other definitions for the purposes of this MOA are listed below in section VI.

IV. Allocation of Responsibility

A. In accordance with the terms and procedures of this MOA, wetland delineations made by SCS on agricultural lands, in consultation with FWS, will be accepted by EPA and the Corps for the purposes of determining Section 404 wetland jurisdiction. In addition, EPA and the Corps will accept SCS wetland delineations on non-agricultural lands that are either narrow bands immediately adjacent to, or small pockets interspersed among, agricultural lands. SCS is responsible for making wetland delineations for agricultural lands whether or not the person who owns, manages, or operates the land is a participant in USDA programs.

B. Lands owned or operated by a USDA program participant that are not agricultural lands and for which a USDA program participant requests a wetland delineation, will be delineated by SCS in coordination with the Corps, or EPA as appropriate, and in consultation with FWS. Final wetland delineations conducted by SCS pursuant to the requirements of this paragraph shall not be revised by SCS except where an opportunity for coordination and consultation is provided to the other signatory agencies.

C. SCS may conduct delineations of other waters for the purposes of Section 404 of the CWA, such as lakes, ponds, and streams, in coordination with the Corps, or EPA as appropriate, on lands on which SCS is otherwise engaged in wetland delineations pursuant to paragraphs IV.A or IV.B of this MOA. Delineations of ``other waters'' will not be made until the interagency oversight team convened pursuant to Section V.B.2 has agreed on appropriate local procedures and guidance for making such delineations.

D. For agricultural lands, the signatory agencies will use the procedures for delineating wetlands as described in the National Food

Security Act Manual, Third Edition (NFSAM). For areas that are not
agricultural lands, SCS will use the 1987 Corps Wetland Delineation
Manual, with current national Corps guidance, to make wetland
delineations applicable to Section 404.

    E. Delineations on ``agricultural lands'' must be performed by
personnel who are trained in the use of the NFSAM. Delineations on
other lands and waters must be performed by personnel who are trained
in the use of the 1987 Corps Wetland Delineation Manual. This MOA
includes provisions for the appropriate interagency delineation
training below in Section V.E.

    F. In the spirit of the agencies' commitment to develop agreed upon
methods for use in making wetland delineations, subsequent revisions or
amendments to the Corps 1987 manual or portions of the NFSAM affecting
the wetland delineation procedures upon which this agreement is based
will require the concurrence of the four signatory agencies.

    G. A final written wetland delineation made by SCS pursuant to the
terms of this MOA will be adhered to by all the signatory agencies and
will be effective for a period of five years from the date the
delineation is made final, unless new information warrants revision of
the delineation before the expiration date. Such new information may
include, for example, data on landscape changes caused by a major
flood, or a landowner's notification of intent to abandon agricultural
use and the return of wetland conditions on a prior converted cropland.
In accordance with Section 1222 of the FSA, SCS will update wetland
delineations on this five-year cycle. Circumstances under which SCS
wetland delineations made prior to the effective date of this agreement
will be considered as final for Section 404 purposes are addressed in
Paragraph V.C.

    H. Within the course of administering their Swampbuster
responsibilities, SCS and FWS will provide landowners/operators general
written information (i.e., EPA/Corps fact sheets) regarding the CWA
Section 404 program permit requirements, general permits, and
exemptions. The SCS and FWS will not, however, provide opinions
regarding the applicability of CWA Section 404 permit requirements or
exemptions.

    I. USDA will maintain documentation of all final written SCS
wetland delineations and record the appropriate label and boundary
information on an official wetland delineation map. USDA will make this
information available to the signatory agencies upon request.

    J. In pursuing enforcement activities, the signatory agencies will
rely upon delineations made by the lead agency, as clarified below,
providing a single Federal delineation for potential violations of
Section 404 or Swampbuster. Nothing in this MOA will diminish, modify,
or otherwise affect existing EPA and Corps enforcement authorities
under the CWA and clarified in the 1989 ``EPA/Army MOA Concerning
Federal Enforcement for the Section 404 Program of the Clean Water
Act.'' EPA, the Corps, and SCS may gather information based on site
visits or other means to provide additional evidentiary support for a
wetland delineation which is the subject of a potential or ongoing CWA
Section 404 or Swampbuster enforcement action.

    K. For those lands where SCS has not made a final written wetland
delineation, and where the Corps or EPA is pursuing, a potential CWA
violation, the lead agency for the CWA enforcement action will conduct
a jurisdictional delineation for the purposes of Section 404 and such
delineations will be used by SCS for determining Swampbuster
jurisdiction and potential Swampbuster violations. For those lands
where the Corps has not made a final written wetland delineation, and
where SCS is pursuing a potential Swampbuster violation, SCS will make
a final written wetland delineation consistent with Sections IV.A,
IV.B, and IV.C of this MOA and provide copies to the Corps and EPA.

Such delineations will be used by the Corps and EPA for the purpose of
determining potential violations of the CWA. In circumstances in which
either the Corps or EPA is pursuing a potential CWA violation on land
that is subject to an ongoing SCS appeal, a wetland delineation will be
conducted by the Corps or EPA in consultation with SCS and FWS.

    L. In making wetland delineations, the agencies recognize that
discharges of dredged or fill material that are not authorized under
Section 404 cannot eliminate Section 404 jurisdiction, and that
wetlands that were converted as a result of unauthorized discharges
remain subject to Section 404 regulation.

V. Procedures

    Accurate and consistent wetland delineations are critical to the
success of this MOA. For this reason, the signatory agencies will work
cooperatively at the field level to:
    (1) Achieve interagency concurrence on mapping conventions used by
SCS for wetland delineations on agricultural lands, (2) provide EPA and
Corps programmatic review of SCS delineations, and (3) certify wetland
delineations in accordance with Section 1222(a)(2) of the FSA, as
amended. The following sections describe the procedures that will be
followed to accomplish these objectives.

A. Mapping Conventions

    1. Each SCS State Conservationist will take the lead in convening
representatives of the Corps, EPA, FWS, and SCS to obtain the written
concurrence of each of the signatory agencies, within 120 calendar days
of the effective date of this MOA, on a set of mapping conventions for
use in making wetland delineations. Only mapping conventions concurred
upon by all signatory agencies will be used by SCS for wetland
delineations.
    2. If interagency consensus on mapping conventions is not reached
within 120 days of the date of this MOA, the State Conservationist will
refer documentation of the unresolved issues to the Chief of SCS. The
Chief of SCS will immediately forward copies of the State
Conservationist's documentation of unresolved issues to the Corps
Director of Civil Works; the EPA Director of the Office of Wetlands,
Oceans, and Watersheds; and the FWS Director. Immediately thereafter,
the Chief of SCS or an appropriate designee will lead necessary
discussions to achieve interagency concurrence on resolution of
outstanding issues, and will forward documentation of the resolution to
the State Conservationist and the appropriate Headquarters offices of
the signatory agencies.
    3. Once interagency concurrence on mapping conventions is obtained,
such mapping conventions will be used immediately in place of the
earlier mapping conventions.
    4. Agreed-upon mapping conventions developed at the state level
will be documented and submitted, for each state, through the Chief of
SCS to the Headquarters of each of the signatory agencies. State-level
agreements will be reviewed by the Headquarters of the signatory
agencies for the purpose of ensuring national consistency.

B. Delineation Process Review and Oversight

    1. This MOA emphasizes the need to ensure consistency in the manner
in which wetlands are identified for CWA and FSA purposes, and provides
a number of mechanisms to increase meaningful interagency coordination
and consultation in order for the agencies to work toward meeting this
goal. In this regard, the agencies believe it is critical that efforts

for achieving consistency be carefully monitored and evaluated. Consequently, this MOA establishes a monitoring and review process that will be used to provide for continuous improvement in the wetland delineation process specified in this MOA.

  2. EPA will lead the signatory agencies in establishing interagency oversight teams at the state level to conduct periodic review of wetland delineations conducted under the provisions of this MOA. These reviews will include delineations done by SCS pursuant to Sections IV.A, IV.B, and IV.C of this MOA and delineations done by EPA or the Corps pursuant to Section IV.K. of this MOA. These reviews also will include changes to wetland delineations resulting from the SCS appeals process, as well as disagreements regarding allocation of responsibility. These reviews will occur, at a minimum, on a quarterly basis for the first year, on a semi-annual basis for the second year, and annually thereafter. In addition, a review will be initiated whenever one or more of the signatory agencies believes a significant issue needs to be addressed. The purpose of each review will be to evaluate the accuracy of an appropriate sample of wetland delineations. When feasible, this will include actual field verifications of wetland delineations. Should the interagency oversight team identify issues regarding implementation of this MOA or wetland delineations conducted under the provisions of this MOA, the team will work to resolve those issues and reach agreement on any necessary corrective actions. Each review, and any necessary corrective action, will be documented in a report to be distributed to the signatory agencies' appropriate field and Headquarters offices.

  3. In situations in which the interagency oversight team identifies and reports unresolved issues concerning wetland delineations conducted under the provisions of this MOA, including changes to wetland delineations resulting from the SCS appeals process, the Headquarters offices of the signatory agencies will informally review the issue and work to reach agreement on any necessary corrective actions. This informal process notwithstanding, the EPA Regional Administrator or the Corps District Engineer may, at any time, propose to designate a geographic area as a ``special case''.

  4. Similar to the terms of the current Memorandum of Agreement between the Department of the Army and the EPA Concerning the Determination of the Geographic Jurisdiction of the Section 404 Program and the Application of the Exemptions under Section 404(f) of the CWA, the EPA Regional Administrator or the Corps District Engineer may propose to designate a geographic area, or a particular wetland type within a designated geographic area, as a special case. A special case may be designated only after the interagency oversight team (EPA, Corps, SCS, and FWS) has reviewed the relevant issues and been unable to reach a consensus on an appropriate resolution. Special cases will be designated by an easily identifiable political or geographic subdivision, such as a township, county, parish, state, EPA Region, or Corps division or district, and will be marked on maps or using some other clear format and provided to the appropriate EPA, Corps, FWS, and SCS field offices. Proposed designations of special cases will not be effective until approved by EPA or Corps Headquarters, as appropriate.

  5. Upon proposing a special case, the EPA Regional Administrator or Corps District Engineer, as appropriate, will notify the appropriate SCS State Conservationist in writing. Following notification of the proposed designation, SCS will not make wetland delineations for the purposes of CWA jurisdiction within the proposed special case for a period of 20 working days from the date of the notification. SCS may proceed to make wetland delineations for CWA purposes in the proposed special case after the 20-day period if the SCS State Conservationist has not been notified by the EPA Regional Administrator or Corps

District Engineer of approval of the proposed special case designation
by EPA Headquarters or the Corps Director of Civil Works, as
appropriate.

6. Following approval of the proposed special case, the Corps, or
EPA as appropriate, will make final CWA wetland delineations in the
special case area, rather than SCS. In addition, the referring field
office (i.e., either the EPA Regional Administrator or Corps District
Engineer) will develop draft guidance relevant to the specific issues
raised by the special case and forward the draft guidance to its
Headquarters office. The Headquarters office of the agency which
designated the special case will develop final guidance after
consulting with the signatory agencies' Headquarters offices. EPA
concurrence will be required for final guidance for any special case
designated by the Corps. Special cases remain in effect until final
guidance is issued by the Headquarters office of the agency which
designated the special case or the designation is withdrawn by the EPA
Regional Administrator or Corps District Engineer, as appropriate.

C. Reliance on Previous SCS Wetland Delineations for CWA Purposes

1. Section 1222 of the FSA, as amended by the Food Agriculture
Conservation and Trade Act, provides that SCS will certify SCS wetland
delineations made prior to November 28, 1990. The intent of this
process is to ensure the accuracy of wetland delineations conducted
prior to November 28, 1990, for the purposes of the FSA. This
certification process also will provide a useful basis for establishing
reliance on wetland delineations for CWA purposes. All certifications
done after the effective date of this MOA that are done using mapping
conventions will use the agreed-upon mapping conventions pursuant to
Section V.A of this MOA.

2. Written SCS wetland delineations for lands identified in section
IV.A of his MOA conducted prior to the effective date of this MOA will
be used for purposes of establishing CWA jurisdiction, subject to the
provisions of section V.C.3 below. If such SCS wetland delineations are
subsequently modified or revised through updated certification, these
modifications or revisions will supersede the previous delineations for
purposes of establishing CWA jurisdiction. Written SCS wetland
delineations for lands identified in sections IV.B and IV.C of this MOA
conducted prior to the effective date of this MOA will require
coordination with the Corps, or EPA as appropriate, before being used
for purposes of determining CWA jurisdiction.

3. As part of the certification effort, SCS will establish
priorities to certify SCS wetland delineations. In addition to
responding to requests from individual landowners who feel their
original wetland determinations were made in error, SCS will give
priority to certifying those wetland delineations where at least two of
the four signatory agencies represented on the interagency oversight
team convened pursuant to section V.B.2 of this MOA agree that SCS
wetland delineations in a particular area, or a generic class of SCS
wetland delineations in a particular area, raise issues regarding their
accuracy based on current guidance. These priority areas will be
identified only after mapping conventions are agreed upon pursuant to
section V.A of this MOA. Identification of these high priority
certification needs shall be made at the level of the SCS State
Conservationist, FWS Regional Director, EPA Regional Administrator, and
the Corps District Engineer. Following identification of these high
priority certification needs, the SCS State Conservationist will
immediately notify the affected landowner(s), by letter, that the
relevant SCS wetland delineations have been identified as a high
priority for being certified under Section 1222 of the FSA. In

addition, the notification will inform the landowner that while
previous wetland delineations remain valid for purposes of the FSA
until certification or certification update is completed, the landowner
will need to contact the Corps before proceeding with discharges of
dredged or fill material. This communication by the landowner will
enable the Corps to review the wetland delineation to establish whether
it can be used for purposes of CWA jurisdiction. The SCS State
Conservationist will initiate, within 30 calendar days of landowner
notification, corrective measures to resolve the wetland delineation
accuracy problem.

D. Appeals

    Landowners for whom SCS makes wetland delineations for either
Swampbuster or Section 404 will be afforded the opportunity to appeal
such wetland delineations through the SCS appeals process. In
circumstances where an appeal is made and the State Conservationist is
considering a change in the original delineation, the State
Conservationist will notify the Corps District Engineer and the EPA
Regional Administrator to provide the opportunity for their
participation and input on the appeal. FWS also will be consulted
consistent with the requirements of current regulations. The Corps and
EPA reserve the right, on a case-by-case basis, to determine that a
revised delineation resulting from an appeal is not valid for purposes
of Section 404 jurisdiction.

E. Training

    1. SCS, in addition to FWS and EPA, will continue to participate in
the interagency wetland delineation training sponsored by the Corps,
which is based on the most current manual used to delineate wetlands
for purposes of Section 404. Completion of this training will be a
prerequisite for field staff of all signatory agencies who delineate
wetlands on non-agricultural lands using the 1987 Corps Wetland
Delineation Manual.
    2. The interagency wetland delineation training will address agency
wetland delineation responsibilities as defined by this MOA, including
SCS NFSAM wetland delineation procedures.
    3. Field offices of the signatory agencies are encouraged to
provide supplemental interagency wetland delineation training (i.e., in
addition to that required in paragraph IV.E), as necessary, to prepare
SCS field staff for making Section 404 wetland delineations. For
training on the use of the 1987 Corps Wetland Delineation Manual, such
supplemental training will rely on the training materials used for the
Corps delineation training program and will provide an equivalent level
of instruction.

VI. Definitions

    A. Coordination means that SCS will contact the Corps, or EPA as
appropriate, and provide an opportunity for review, comment, and
approval of the findings of SCS prior to making a final delineation.
The Corps, or EPA as appropriate, will review the proposed delineation
and respond to SCS regarding its acceptability for CWA Section 404
purposes within 45 days of receipt of all necessary information. SCS
will not issue a final delineation until agreement is reached between
SCS and the Corps or EPA, as appropriate.
    B. Consultation means that SCS, consistent with current provisions
of the FSA, will provide FWS opportunity for full participation in the
action being taken and for timely review and comment on the findings of

SCS prior to a final wetland delineation pursuant to the requirements of the FSA.

C. A wetland delineation is any determination of the presence of wetlands and their boundaries.

D. A special case for the purposes of this MOA refers to those geographic areas or wetland types where the Corps or EPA will make final CWA wetland delineations.

E. Signatory agencies means the EPA and the Departments of Army (acting through the Corps), Agriculture (acting through SCS), and Interior (acting through FWS).

F. USDA program participant means individual landowners/operators eligible to receive USDA program benefits covered under Title XII of the Food Security Act of 1985, as amended by the Food, Agriculture, Conservation and Trade Act of 1990.

VII. General

A. The policy and procedures contained within this MOA do not create any rights, either substantive or procedural, enforceable by any party regarding an enforcement action brought by the United States. Deviation or variance from the administrative procedures included in this MOA will not constitute a defense for violators or others concerned with any Section 404 enforcement action.

B. Nothing in this MOA is intended to diminish, modify, or otherwise affect statutory or regulatory authorities of any of the signatory agencies. All formal guidance interpreting this MOA and background materials upon which this MOA is based will be issued jointly by the agencies.

C. Nothing in this MOA will be construed as indicating a financial commitment by SCS, the Corps, EPA, or FWS for the expenditure of funds except as authorized in specific appropriations.

D. This MOA will take effect on the date of the last signature below and will continue in effect until modified or revoked by agreement of all signatory agencies, or revoked by any of the signatory agencies alone upon 90 days written notice. Modifications to this MOA may be made by mutual agreement and Headquarters level approval by all the signatory agencies. Such modifications will take effect upon signature of the modified document by all the signatory agencies.

E. The signatory agencies will refer delineation requests to the appropriate agency pursuant to this MOA.

Dated: January 6, 1994.
James R. Lyons,
Assistant Secretary for Natural Resources and Environment, Department of Agriculture.
Robert Perciasepe,
Assistant Administrator for Water, Environmental Protection Agency.
G. Edward Dickey,
Acting Assistant Secretary of the Army for Civil Works, Department of the Army.
George T. Frampton, Jr.,
Assistant Secretary for Fish, Wildlife and Parks, Department of the Interior.

[FR Doc. 94-1311 Filed 1-18-94; 8:45 am]
BILLING CODE 3710-92-M

## Subpart A    General Provisions For Making Wetland Determinations

### 514.10        Overview

**a**
**Land to be**
**Identified as**
**Wetland**

In order for land to be identified as wetland according to this part, it must meet the wetland criteria described in Part 513.11, and Appendix 527.4.

**b**
**Wetland**
**Provision by Statute**

FSA provided that any person who in any crop year plants an agricultural commodity on wetland that was converted after December 23, 1985, shall be ineligible for applicable USDA benefits unless one of the exemptions or exceptions to FSA applies.

FACTA amended FSA to provide that in addition to the planting rule, any person who in any crop year after November 28, 1990, converts a wetland by draining, dredging, filling, leveling, or any other means for the purpose, or to have the effect of making the production of an agricultural commodity possible, shall be ineligible for USDA benefits for that crop year and all subsequent crop years until the wetland is or restored, unless one of the exemptions or exceptions to FSA applies.

**c**
**Other Wetland**
**Provisions**

The statute provides for FSA exemptions from the wetland provisions. The specific requirements for exemptions and determinations are found in this part and Parts 516 and 517.

(180-V-NFSAM, Third Ed., March 1994)

## 514.12    Off-site and On-Site Determinations

**a**
**Off-Site**
**Determinations**

Offsite determinations are wetland determinations made without a visit to the site, which are completed in the office using approved wetland mapping conventions and inventories.

Off-site determinations will be made using the off-site procedures in 513.30 and Appendix 527.4.

**b**
**On-Site**
**Determination**

On-site determinations are wetland determinations made by visiting the wetland site and/or comparison site, if appropriate. Make on-site wetland determinations according to on-site procedures in Appendix 527.4 under the following circumstances:

- to verify person's records of prior hydrologic manipulations

- if person requests reconsideration, or appeals the wetland determination

- to assess scope and effect of existing hydrologic manipulation

- if adequate interpretations cannot be made from data available in the office.

**c**
**Comparison**
**Site Procedure**

Comparison sites may be used to make determinations on disturbed sites where evidence required for making a determination including soils, vegetation, or hydrology has been altered or destroyed. Using comparison site procedures, a wetland determination is made on a natural or undisturbed site that has the same soils, landscape position, and general features, as the disturbed site. The wetland determination on the comparison site is then applied to the disturbed site. Comparison sites should as close as possible to the disturbed site. This procedure should not be used where correlation between the sites cannot be adequately supported.

(180-V-NFSAM, Third Ed., March 1994)

**514.52    Certifying Wetland Determinations**

**a**
**Purpose**

FACTA amended the wetland provisions of FSA to include a certification requirement for all wetland determinations. Since wetland determinations made before the effective date of FACTA (11/28/90) did not require certification, a post certification process must be used.

The certification procedures to be used on wetland determinations completed before November 28, 1990, and the certification procedures to be used on wetland determinations completed after November 28, 1990, are both described in this part.

The MOA with FWS, COE, and EPA provides that all certifications done after January 6, 1994, will use mapping conventions agreed on by the four agencies (see 513.20). These certified determinations will be used for FSA and CWA purposes.

**514.52
b
Applicability of
Certified Wetland
Delineations**

Follow this table to determine if delineations are accepted for both FSA and CWA purposes.

| Initial Determination done (date) | Determination Certified if | Accepted for FSA | Accepted for CWA |
|---|---|---|---|
| a. Before 11/28/90 on agricultural land | Decision was appealed at least one level (DC) | YES | YES, unless questions about determinations were raised by two or more of the MOA signatory agencies |
| | STC determines that: - inventories and mapping conventions were adequate - sample of determination in each field office finds to be sufficient | YES | |
| b. Between 11/28/90 and 1/6/94 on agricultural lands | Decision was appealed at least one level (DC) | YES | YES, unless questions about determinations were raised by two or more of the MOA signatory agencies |
| | Decision was not appealed and STC determines that inventories and mapping conventions are adequate and person is notified and given appeal rights | YES | |
| c. After 1/6/94 on agricultural land | If agreed upon mapping conventions were used (see 513.20) | YES | YES |
| d. After 1/6/94 on non-agricultural land | COE/EPA makes final wetland determination | YES | YES |
| | SCS makes determinations on narrow bands immediately adjacent to or small pockets interspersed among agricultural land | YES | YES |
| | SCS makes determination on non-agricultural lands owned or operated by a USDA program participant at their request | YES | yes, if done in coordination and agreement with COE/EPA/FWS |

(180-V-NFSAM, Third Ed., March 1994)

**514.52**

**c**
**Priority Setting for Certification**

SCS will give priority to certifying those wetland determinations where at least two of the four signatory agencies agree that SCS determinations in a given area, or a generic class of SCS wetland determinations in a particular area, raise issues regarding their accuracy.

Identification of high priority certification needs will be done at the level of the State Conservationist, FWS Regional Director, EPA Regional Administrator, and the COE District Engineer.

After these high priority certification needs have been identified, the State Conservationist will notify the affected landowner(s) by letter that, while the SCS determinations remain valid for FSA purposes until certification update is completed, the determinations are not valid for CWA and the landowner will need to contact the COE before proceeding with dredge or fill activities.

**d**
**Procedures for Certification of Agricultural land \***

SCS will certify all wetland determinations for FSA and CWA purposes using the following procedures:

1. review existing determinations to determine if they were made according to mapping conventions approved by interagency oversight Team. (513.20)

2. notify the person that the wetland determination has been made

3. notify the person by certified mail or return-receipt requested that the determination has been certified as correct

4. notify the person that the determination is sufficient for determining eligibility for USDA programs and:

   • whether determination is valid for CWA purposes (see table 514.52(b)

   • that determinations will be certified and added to public list of certified determinations

*Continued on next page*

(180-V-NFSAM, Third Ed., March 1994)

**514.52**
**d**
**Procedures for**
**Certification of**
**Agricultural land**
**(Cont'd)**

- that delineation will be valid for a period of 5 years after date of certification.

5. provide form SCS-CPA-026 with ASCS aerial photocopy showing the location of all wetlands on the tract

6. If the initial determination was given to the person between 11/28/90 and the date of the certification letter and was not appealed, or if the decision (either before or after 11/28/90) was appealed to at least one level, the person does not have additional appeal rights unless the decision is changed. For all others offer appeal rights.

**NOTE:** Agricultural land includes narrow bands immediately adjacent to agricultural lands and small pockets interspersed among agricultural lands.

**e**
**Procedures for**
**Certification of**
**Non-Agricultural**
**land**

SCS will certify wetland determinations made on non-agricultural land for FSA and CWA purposes using the following procedures:

1. review existing determinations and coordinate with COE and EPA as appropriate to verify acceptability for use in CWA. SCS will not certify determinations on these lands until an agreement is reached between SCS and COE, or EPA as appropriate

2. notify the person that the wetland determination has been made

3. notify the person by certified mail or return-receipt requested that the determination has been certified as correct

4. notify the person that the determination is sufficient for determining eligibility for USDA programs and:

   - whether determination is valid for CWA purpose (see table 514.52(b)

   - that determinations will be certified and added to public list of certified determinations

*Continued on next page*

(180-V-NFSAM, Third Ed., March 1994)

II

**104TH CONGRESS**
**1ST SESSION**

# S. 275

To establish a temporary moratorium on the Interagency Memorandum of
Agreement Concerning Wetlands Determinations until enactment of a
law that is the successor to the Food, Agriculture, Conservation, and
Trade Act of 1990, and for other purposes.

───────────────

## IN THE SENATE OF THE UNITED STATES

JANUARY 25 (legislative day, JANUARY 10), 1995

Mr. GRASSLEY (for himself, Mr. BOND, Mr. BURNS, Mr. HELMS, Mr. MCCON-
NELL, Mr. PRESSLER, and Mr. NICKLES) introduced the following bill;
which was read twice and referred to the Committee on Agriculture, Nu-
trition, and Forestry

───────────────

# A BILL

To establish a temporary moratorium on the Interagency
Memorandum of Agreement Concerning Wetlands Deter-
minations until enactment of a law that is the successor
to the Food, Agriculture, Conservation, and Trade Act
of 1990, and for other purposes.

1    Be it enacted by the Senate and House of Representa-

2 tives of the United States of America in Congress assembled,

2

SECTION 1. TEMPORARY MORATORIUM ON THE INTER-

AGENCY MEMORANDUM OF AGREEMENT

CONCERNING WETLANDS DETERMINATIONS.

(a) IN GENERAL.—Notwithstanding any other provi-
sion of law, during the period beginning on the date of
enactment of this Act and ending on the date of enactment
of a law that is the successor to the Food, Agriculture,
Conservation, and Trade Act of 1990 (Public Law 101–
624), the Secretary of Agriculture, the Secretary of the
Army, the Secretary of the Interior, and the Administrator
of the Environmental Protection Agency may not carry
out—

(1) the Interagency Memorandum of Agreement
Concerning Wetlands Determinations for Purposes
of Section 404 of the Clean Water Act and Subtitle
B of the Food Security Act (59 Fed. Reg. 2920) (re-
ferred to in this section as the ''Memorandum of
Agreement''); or

(2) any method of delineating wetlands based
on the Memorandum of Agreement for purposes of
carrying out subtitle C of title XII of the Food Secu-
rity Act of 1985 (16 U.S.C. 3821 et seq.) or section
404 of the Federal Water Pollution Control Act (33
U.S.C. 1344).

(b) SAVINGS PROVISION.—Wetlands may be delin-
eated based on a policy or practice in effect prior to the

3

1  proposed effective date of the Memorandum of Agreement.

2  This Act shall not constitute acceptance or approval of the

3  policy or practice.

○

Case 1:19-cv-02416-TSC Document 35-1 Filed 06/18/21 Page 51 of 211 000397

as Governor from 1954 through 1958, and accompanied him to Washington during his service as a United States Senator from 1962 through 1966 after he won an election to complete the unexpired term of the late Senator Keith Thomson, during which the elder Senator Simpson was diagnosed with Parkinson's disease, forcing his retirement from the Senate.

On once being nominated ''Wyoming Woman of the Year,'' Mrs. Simpson said, ''The Bible does say, 'Let your light so shine before men that may see your good works, and glorify your Father which is in Heaven.' ''

Certainly, Lorna Kooi Simpson carried with her throughout her life a brilliant, far-reaching light. She was a genuine ''Renaissance Lady.'' To reflect on her life is to marvel at the capacity of some men and women to live selflessly and abundantly beyond the imaginations of most of us, and we are all diminished by the death of this great Wyoming lady, as we are diminished by the death of any great person.

I trust that Senator SIMPSON, whom we admire, and for whom we have great affection, will find a rich and undiminishing solace in the memories of Mrs. Simpson, and in the assurance of the love of God that so infused and defined her life. To be sure, Lorna Kooi Simpson was, and is, a genuine reflection of the workmanship of a Loving Heavenly Father, and she is now at rest in an Eternal Home, not made with hands, in our Father's house, near at hand to the Lord whom she so dearly served throughout her life with every talent with which He had entrusted her.

My wife, Erma, and I extend our sympathy and our condolences to ALAN SIMPSON and all of his family in this hour of trial.

Mr. President, I yield the floor.

## MORATORIUM ON NEW WETLAND DELINEATIONS

Mr. GRASSLEY. Mr. President, I introduced this week, with 10 cosponsors, a bill to safeguard the property rights of our Nation's farmers. The bill will establish a moratorium on new wetland delineations, until Congress has time to enact a new farm bill and to consider the wetlands issue on agricultural land in conjunction with that bill. This corresponds with the policy set here by this body in 1985 when we passed the antisodbusting and antiswampbusting provisions that are on the books and are generally good pieces of legislation—now being abused, though, by faceless bureaucrats, who are trying to redetermine additional wetlands. Even though the prior determinations have fit into the farming patterns of individual farmers around the United States.

As you know, Mr. President, no less than four Federal agencies claim jurisdiction over the regulation of wetlands. Just think of how impossible it is for the family farmer of America to try to understand what four different Federal

agencies want him to do in regard to wetlands on his personal property and how that confounds him in making business decisions on the operation of his farm.

Those four agencies last year entered into a memorandum of agreement concerning wetlands delineation on agricultural land. Although the memorandum of agreement was intended to streamline the regulatory process, and it was meant to clarify the role of each agency, it has, however, increased the level of confusion and the level of frustration among the farmers affected by it. It has not made their life any easier. It may have well been the intention of the faceless bureaucrat, through that agreement, to make life easier, but it has not.

The delineation of wetlands on agricultural land has been, for a long period of time, a confusing proposition. On the other hand, the consequences of the delineations are very clear. The farmer, for instance, might alter a wetland without authorization from the Federal Government, and could potentially face civil penalties, criminal action, and loss of farm program benefits. Because the stakes are so very high, I think we have a responsibility in this Congress, as representatives of the people, representing a major industry in America, because the food and fiber chain, from producer to consumer, is 20 percent of our gross national product, and considering the importance of this industry and the millions of family farmers, independent entrepreneurs that make their living this way, because of all these reasons, we must ensure that the delineation process is accurate and that it is reasonable.

As I speak, Mr. President, new wetlands delineation are being conducted in the State of Iowa pursuant to the memorandum of agreement. It is just starting in the State of Iowa, but is going to cover every other State affected by agricultural wetlands. So even though it is of immediate impact in my State, in just a few months, this process will be going on throughout the country.

This is a process whereby these people, unknown to the individual farmers, take the individual soil survey maps and aerial photos of vegetation topography. From these they attempt to find, in areas where they have not already said there are wetlands, some other little bit of evidence of wetlands, in order to get more farmers under the regulatory umbrella and get more land within each farm under that umbrella of wetlands? Because the more wetlands determinations and the more of an opportunity for the bureaucrats to have some jurisdiction over private property they would not otherwise have jurisdiction over.

This is being done not with on-site farm inspections, not with the individual farmer right alongside the soil conservation personnel—remember, historically, for 60 or 70 years, there has been a very close relationship and

friendly relationship between the soil conservation people who are educating farmers to be better caretakers of our natural resources and the farmer wanting to do that and learning from that process.

That sort of consultation has promoted more benefit to the environment than any other one process I know from the U.S. Department of Agriculture. In this current process, it has not been the usual close relationship, but it is in the back rooms, or in the laboratories around the individual States, where bureaucrats are going over these soil maps with this aerial photography to find other wetlands. And then send out a new map to the individual farmers with additional delineation of wetlands on it. At that point, you have wetlands whether you think they are wetlands or not and it is your job, as an individual farmer, then, at the appeals process to show that these really are not wetlands. And the burden of proof is on the back of the farmer.

This is kind of a way of saying, ''You are guilty of having something that you did not even know you had,'' particularly if you have been farming this very land for a long period of time.

Well, we ought to inform the farmer of this process. The bureaucracy has not informed the farmer of the process. In fact, in my State, in Story County, IA, there was a meeting to discuss this whole process, but it was by invitation only.

Although it may be legitimate to have some further determination, it ought to involve the farmer and it ought to require that the bureaucrat making that determination at least visit the area and see with their own eyes what the situation might be. This would reinforce the close relationship we have had for six or seven decades between the soil conservation consultant, engineer, and the individual family farmer. I am talking about the family farm, not the big corporate farmer with the absentee landownership and some foreign manager taking care of the land.

This process is currently going on, so that farmers will soon be deprived of the right to farm their land or improve their property because a Federal bureaucrat decides that such activity interferes with a protected wetland.

Remember, we went through this process after we passed the antiswampbusting and antisodbusting legislation in the 1985 farm bill. I do not, for the most part—not completely, but for the most part—I do not hear any individual farmers complain about that determination or the regulations that have followed that determination. That is because there was an open effort on the part of the bureaucracy to work with the farmers, to understand what the process is, to have input. But not now. The meetings in my State are by invitation only.

Case 1:19-cv-02416-TSC　　Document 35-1　　Filed 06/18/21　　Page 52 of 211
000398

Now, I suppose it sounds like we are opposed to protecting valuable wetlands. Well, I think the litmus test of that is our vote for the antiswampbusting, antisodbusting provisions in the 1985 farm bill. There were no efforts to repeal those provisions. In fact, even in the 1990 farm bill, there was some expansion in this area.

But I think we ought to be cognizant of the fact that it is not good for agriculture, it is not good for our general economy, and it surely is not conducive to the family farmer. He should not be expected to confront a faceless bureaucrat every so often, with changes in the rules every few years, so that farmers can never be certain if their conduct is allowed under the current regulatory scheme.

I am also opposed to the promulgation of a memorandum of agreement by four Federal agencies that will significantly affect the ability of private property owners to improve their land without the benefit of input from the people affected by the agreement.

My bill basically accomplishes two things. First, it will allow those property owners affected by the memorandum of agreement to have some input through congressional hearings on the wetlands policy. At the very least, Congress should ensure that the concerns of the private owners are heard before they are deprived of the use of their land.

The second purpose of the bill is to stop the bureaucracy from acting based upon the flawed memorandum of agreement. It is my sincere hope that this Congress will reform Federal wetlands policy. This policy should be based upon sound science, recognize the constitutionally protected right of private property, and, above all, institute a large dose of common sense into the program.

And where a real opportunity to instill common sense into this program was missed by the bureaucracy, is when the agreement was not promulgated under the Administrative Procedures Act. That process allows the publishing of whatever the bureaucrat wants to regulate, but it institutes upon them a discipline and a hearing process to make sure that there is input from all segments of the regulated community.

Now, in my State, we do not try to sneak things over on the people. This process of ignoring public input is foreign to the thinking of the commonsense approach of mid-Americans who are law-abiding citizens, who want to work with their Government, who want to keep the economy or the environment sound.

And so I beg for 6 months to slow the process down, to alert the family farmers of America to what is going on. That it is affecting their right to farm, and to do it in a businesslike fashion, and to allow the Agriculture Committee, under the extremely capable leadership of Senator LUGAR, to review this whole process and to work it into the farm bill. That is just 6 months. Surely there is nothing wrong with that. Nothing is going to happen in the next 6 months that is going to be catastrophic to this whole process. I think that it is a commonsense approach.

So this bill stops the Government from finding new wetlands on farms until this reform can be put in place.

Mr. President, I yield the floor.

---

## MORNING BUSINESS

---

## DEMOCRATS, GET REAL

Mrs. MURRAY. Mr. President, I am pleased today to bring to the attention of my colleagues a thoughtful opinion piece by our colleague, the Senator from Maryland, which appeared in the Washington Post on Sunday, January 22. She presents a road map that I believe can help all Senators, on both sides of the aisle, as we develop our priorities in this new Congress. I ask unanimous consent that Senator MIKULSKI's column be printed in the RECORD at this point.

There being no objection, the column was ordered to be printed in the RECORD, as follows:

[From the Washington Post, Jan. 22, 1995]

DEMOCRATS, GET REAL

(By Barbara A. Mikulski)

Democrats need a new attitude and action plan to focus on solving real problems. This attitude and plan must promote a shared national vision to create good jobs and give help to those who work hard, play by the rules and practice self-help. We need to create a new state of mind that—as Americans—we can solve our nation's problems together.

Democrats must stop being angst-addicted. We have too often substituted agonizing for action, and it has paralyzed us. To connect with middle-class Americans, we must think clearly and act decisively. Democrats must focus on the day-to-day needs of everyday Americans—their jobs, families and opportunities. We also need to look at our country's long-term needs. We need to generate jobs with pay worth the effort and education. We need to create a national readiness that is based on competence and character.

Democrats must focus on being politically effective, not necessarily politically correct. We cannot use words from a dated vocabulary. Political labels such as ''right,'' ''left,'' ''liberal'' and ''conservative'' have become cliches. Labels and stereotypes that go with them have little meaning.

Being politically effective means helping those who are middle class stay there or do better. Being politically effective means helping those who are not middle class get there through hard work and practicing self-help. Worn-out sound bites about the economy and crime weaken our credibility and play into the hands of those who demonize our ideas by blaming the victim, the government or both.

Democrats must figure out what works. We must be advocates for people and not automatically defend every government program. Let's look at the mission of these programs. When they serve their mission and help people, great. When they don't, let's get rid of them. We cannot be a rescue squad for every line item. Often, the good intentions of good people have gone astray. Tinker Toy reforms ultimately created other problems.

One example is federal housing policy. We thought that if we gave people housing, we would give them opportunity. Begun during the New Deal, most federal housing programs were meant to provide short-term shelter for people temporarily out of work. But a series of complicated rules and boutique programs has rewarded the wrong kind of behavior and made housing projects Zip codes of pathology. Few residents can find work. Crime and substance abuse are high.

Some blame the victim. Some identify with the victim. But Democrat's addition to other people's misery does not solve their problems or substitute for national policy. While we must acknowledge the pain of the impoverished, we must also require them to take charge of their own lives. We must find ways to reward those who work or get into a program for self-sufficiency.

We must ensure that welfare rules do not destroy the family. Democrats should stand up for the family—and that includes men. We need to end the ''get the man out of the house'' rule, which has pushed men out of the house so a family can qualify for public benefits. Shortsighted intentions have created rules that dismantle families, emasculate men and deny their children a full-time father. Being a dad is more than writing a child-support check.

We've heard a lot about angry voters. Actually, I think voters' anger stems from bewilderment and disillusionment. This bewilderment and disillusionment is based on the fact that their personal experience does not reflect what statistics tell them. People are told that they are fortunate to live in an economy of low unemployment, low inflation and rapid growth. Yet, people are one downsizing away from unemployment, their friends have been laid off, and their standard of living continues to decline. At the same time, people feel less secure in their homes, neighborhoods and workplaces. Children are killing children with guns carried around in school backpacks.

America's future deserves more thought and effort than partisan bidding wars over tax cuts. It deserves more than the pursuit of ''faddish'' ideas floated by think tanks. Americans deserve real solutions to the complex problems of an increasingly complex world.

Democrats must join together to create this new attitude, both within the Democratic Party and within the country—to reward hard work, family stability and playing by the rules. Together, we can begin to address the very valid concerns Americans have about their futures, the futures of their families and the future of their country.

---

## AUSCHWITZ IS SYNONYMOUS WITH EVIL

Ms. MIKULSKI. Mr. President, perhaps more than any other word, Auschwitz is synonymous with evil.

Fifty years ago today, Russian soldiers liberated Auschwitz.

The horrors of Auschwitz are incomprehensible and undescribable.

Over 1 million people lost their lives at Auschwitz—the largest of the Nazi death camps. Ninety percent were Jews. Hundreds of thousands were children.

Auschwitz represented the German's campaign to exterminate a people—the Jews. They almost succeeded—killing two out of three Jews in Europe.

As a Polish-American, I carry the images of Auschwitz in my heart.

I

104TH CONGRESS
1ST SESSION

# H. R. 1220

To establish a temporary moratorium on the delineation of new wetlands
until enactment of a law that is the successor to the Food, Agriculture,
Conservation, and Trade Act of 1990, and for other purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

MARCH 13, 1995

Mr. LATHAM introduced the following bill; which was referred to the Commit-
tee on Agriculture, and in addition to the Committee on Transportation
and Infrastructure, for a period to be subsequently determined by the
Speaker, in each case for consideration of such provisions as fall within
the jurisdiction of the committee concerned

---

# A BILL

To establish a temporary moratorium on the delineation of
new wetlands until enactment of a law that is the succes-
sor to the Food, Agriculture, Conservation, and Trade
Act of 1990, and for other purposes.

1      Be it enacted by the Senate and House of Representa-

2  tives of the United States of America in Congress assembled,

3  SECTION 1. TEMPORARY MORATORIUM ON THE DELINEA-

4          TION OF NEW WETLANDS.

5      Notwithstanding any other provision of law, during

6  the period beginning on the date of the enactment of this

7  Act and ending on the date of the enactment of a law

2

1 that is the successor to the Food, Agriculture, Conserva-

2 tion, and Trade Act of 1990, the Secretary of Agriculture,

3 the Secretary of the Army, and the Administrator of the

4 Environmental Protection Agency may not delineate wet-

5 lands for purposes of carrying out subtitle C of title XII

6 of the Food Security Act of 1985 (16 U.S.C. 3821 et seq.)

7 and section 404 of the Federal Water Pollution Control

8 Act (33 U.S.C. 1344).

○

000401

# NEWS

| | | |
|---|---|---|
| **United States Department of Agriculture** | **Office of Communications** | **News Distribution** Room 506-A Washington, D.C. 20250 |

Release No. 0296.95

Jim Petterson    (202) 720-4623
Warren Lee     (202) 690-4614

USDA TO MAKE WETLANDS DELINEATIONS AND CERTIFICATIONS ONLY ON REQUEST

WASHINGTON, April 6, 1995 -- Secretary of Agriculture Dan Glickman today announced the U.S. Department of Agriculture will make agricultural wetlands delineations and certifications only on request until the Congress completes action on the 1995 farm bill and the National Academy of Science completes work on a wetlands study.

"President Clinton has directed all federal agencies to review and change regulations so that they are focused on results, not rules, and eliminate all unnecessary intrusion into the lives of ordinary Americans," Glickman said.  "This change is good for farmers and it supports the president's policy.

"It is our intent to work with Congress to get the wetlands issues in agriculture resolved in the 1995 Farm Bill.  We want to avoid causing farmers the confusion and uncertainty that would occur if USDA made a delineation now with the possibility of having to be back in the field next year with a new delineation."

"Current wetlands determinations by USDA's Natural Resources Conservation Service (NRCS) are still valid," said Jim Lyons, under secretary for natural resources and environment.  "Any new delineations also will be valid.  What we're saying is that we are not going to make delineations in advance until we and Congress have had a chance to review and, if appropriate, revise current policy."

The National Academy of Science has been conducting for more than a year a study of wetlands and wetlands delineations.  Their report is expected in the next few months.  The delay in certifications and advance delineations announced today will give the administration and Congress the opportunity to review this study and its findings before changes are made to the Swampbuster program in the 1995 farm bill.

Under a memorandum of agreement, NRCS, the U.S. Environmental Protection Agency, the U.S. Fish and Wildlife Service, and the U.S. Army Corps of Engineers are cooperating to streamline and simplify wetlands regulations.

Under that agreement, NRCS is responsible for making wetlands delineations on agricultural land for both agricultural programs and for Section 404 permits required by the Clean Water Act.  The decision to place advance delineations on hold does not affect these responsibilities or the interagency agreement.

"We are still committed to helping people understand the unique functions and values of wetlands and working cooperatively to protect and restore them, " Glickman said.

#

000402



| United States | Soil | P.O. Box 2890 |
|---|---|---|
| Department of | Conservation | Washington, D.C. |
| Agriculture | Service | 20013 |

April 13, 1995

Subject: WET-Wetland Determination Guidance

To: All State Conservationists

In response to Secretary Glickman's announcement last week regarding wetlands determinations, the Wetlands Team is providing you with the following items for necessary actions you need to take in the state to inform our staffs and our clients of the decision.

Certified Wetland Determinations-Decision Table
                               -Five statements of clarification (bullets)
                               -Request Form for Certified
                                    Determination/Delineation's
                               -Copy of guidance letter to Regional Conservationists

The request Form-*Interim* is to be used for all future requests for certified wetland determinations/delineation's. Additionally, the Wetlands White House Working Group is finalizing Q & A's that will provide you guidance to procedures and adjustments for implementation of the Wetlands MOA.

As we make this transition, certainly feel free to contact me or Bruce A. Julian if you have additional questions.

*Bruce C. Julian* For

Warren M. Lee, Team Leader
National Wetlands Staff

w/attachments

cc:Interwet Working Group
    :Regional Conservationists
    :NTC Directors

## CERTIFIED WETLAND DETERMINATIONS

Effective 4/6/95
FINAL

- REMINDER:  <u>All</u> persons participating in USDA programs are required to comply with the wetland conservation provisions of the 1985 and 1990 Farm Bills.  This includes notification of proposed manipulations via execution of a revised AD-1026 by the person.

- <u>All</u> requests for certified wetland determinations will be submitted in writing.
  *-Clients requesting certified determinations or delineation's will use only FORM-Interim or equivalent.*

- Certified wetland determinations will <u>only</u> be conducted upon written request.

- <u>All</u> previously delivered determinations are frozen, unless the client specifically requests a certified determination.

- <u>All</u> wetland determinations conducted hence forth will use the wetland mapping conventions approved by NRCS, COE, FWS and EPA and are considered certified.

wcdapr6.doc

03/15/2006 21:39 FAX  202 7202898        NRCS CPTAD                    ☑003/023
000407



United States
Department of
Agriculture

Soil
Conservation
Service

P.O. Box 2890
Washington, D.C.
20013



April 12, 1995

Subject:   WET-Wetland Determinations/Certifications

   To:    Regional Conservationists


On April 7th, Secretary Glickman announced that USDA will make
certified wetland determinations only on a request basis pending
the passage of the 1995 Farm Bill.  Consequently, all NRCS
offices will only provide certified wetland determinations or
delineation's at the written request of our clients.  Under the
Memorandum of Agreement (MOA) with the Environmental Protection
Agency, the Fish and Wildlife Service, and the Army Corps of
Engineers, NRCS will remain responsible for the lead on wetland
determinations on all agricultural land as well as non-
agricultural land for USDA program participants.  Guidance on the
new procedures will be forthcoming by amendment to the NFSAM.

I do want to emphasize that it is paramount that we vigorously
work on comprehensive education/information activities so that
our clients fully understand their responsibilities regarding
planned activities affecting wetlands.  Additionally, we need to
double our efforts to help our staffs and our clients understand
the full array of wetlands functions and values in the ecosystem.

This policy change, in part, came as a result of the announcement
by the National Academy of Science that it will be releasing its
report on wetlands later this year.  The Academy is developing
recommendations on wetlands for Congress, and its report will
provide guidance on wetland definition.  Congress will also
likely be providing additional direction on wetland conservation
in the 1995 Farm Bill and the reauthorization of the Clean Water
Act.  Once technical and legislative actions have been completed,
we will provide further guidance.

Additionally, during our recent field tour of wetlands in the
prairie pothole region and the discussions with our clients along
the way, we became concerned that NRCS was not fully availing
itself of the minimal effects and mitigation provisions where
such use would be appropriate and consistent with Congressional



The Soil Conservation Service
is an agency of the
Department of Agriculture

AN EQUAL OPPORTUNITY EMPLOYER

Case 1:19-cv-02416-TSC    Document 35-1    Filed 06/18/21    Page 59 of 211    000422

| 104TH CONGRESS<br>*2d Session* | HOUSE OF REPRESENTATIVES | REPORT<br>104–494 |
|---|---|---|

# FEDERAL AGRICULTURE IMPROVEMENT AND REFORM ACT OF 1996

———————

## CONFERENCE REPORT

TO ACCOMPANY

## H.R. 2854



MARCH 25, 1996.—Ordered to be printed

5

Sec.  384.  Repeal of report requirement.
Sec.  385.  Flood risk reduction.
Sec.  386.  Conservation of private grazing land.
Sec.  387.  Wildlife habitat incentives program.
Sec.  388.  Farmland protection program.
Sec.  389.  Interim moratorium on bypass flows.
Sec.  390.  Everglades ecosystem restoration.
Sec.  391.  Agricultural air quality research oversight.

TITLE IV—NUTRITION ASSISTANCE

Sec.  401.  Food stamp program.
Sec.  402.  Commodity distribution program; commodity supplemental food program.
Sec.  403.  Emergency food assistance program.
Sec.  404.  Soup kitchen and food bank program.
Sec.  405.  National commodity processing.

TITLE V—AGRICULTURAL PROMOTION

Subtitle A—Commodity Promotion and Evaluation

Sec.  501.  Commodity promotion and evaluation.

Subtitle B—Issuance of Orders for Promotion, Research, and Information Activities
Regarding Agricultural Commodities

Sec.  511.  Short title.
Sec.  512.  Findings and purpose.
Sec.  513.  Definitions.
Sec.  514.  Issuance of orders.
Sec.  515.  Required terms in orders.
Sec.  516.  Permissive terms in orders.
Sec.  517.  Assessments.
Sec.  518.  Referenda.
Sec.  519.  Petition and review of orders.
Sec.  520.  Enforcement.
Sec.  521.  Investigations and power to subpoena.
Sec.  522.  Suspension or termination.
Sec.  523.  Amendments to orders.
Sec.  524.  Effect on other laws.
Sec.  525.  Regulations.
Sec.  526.  Authorization of appropriations.

Subtitle C—Canola and Rapeseed

Sec.  531.  Short title.
Sec.  532.  Findings and declaration of policy.
Sec.  533.  Definitions.
Sec.  534.  Issuance and amendment of orders.
Sec.  535.  Required terms in orders.
Sec.  536.  Assessments.
Sec.  537.  Referenda.
Sec.  538.  Petition and review.
Sec.  539.  Enforcement.
Sec.  540.  Investigations and power to subpoena.
Sec.  541.  Suspension or termination.
Sec.  542.  Regulations.
Sec.  543.  Authorization of appropriations.

Subtitle D—Kiwifruit

Sec.  551.  Short title.
Sec.  552.  Findings and purposes.
Sec.  553.  Definitions.
Sec.  554.  Issuance of orders.
Sec.  555.  National Kiwifruit Board.
Sec.  556.  Required terms in order.
Sec.  557.  Permissive terms in order.
Sec.  558.  Petition and review.
Sec.  559.  Enforcement.
Sec.  560.  Investigations and power to subpoena.
Sec.  561.  Referenda.


PUBLIC LAW 104–127—APR. 4, 1996

# FEDERAL AGRICULTURE IMPROVEMENT AND REFORM ACT OF 1996

PUBLIC LAW 104–127—APR. 4, 1996          110 STAT. 987

Transition Act, the Commodity Credit Corporation Charter Act (15 U.S.C. 714 et seq.), or any other Act.

"(2) A loan made or guaranteed under the Consolidated Farm and Rural Development Act (7 U.S.C. 1921 et seq.) or any other provision of law administered by the Consolidated Farm Service Agency, if the Secretary determines that the proceeds of the loan will be used for a purpose that will contribute to conversion of a wetland (other than as provided in this subtitle) to produce an agricultural commodity.

"(3) During the crop year:
    "(A) A payment made pursuant to a contract entered into under the environmental quality incentives program under chapter 4 of subtitle D.
    "(B) A payment under any other provision of subtitle D.
    "(C) A payment under section 401 or 402 of the Agricultural Credit Act of 1978 (16 U.S.C. 2201 and 2202).
    "(D) A payment, loan, or other assistance under section 3 or 8 of the Watershed Protection and Flood Prevention Act (16 U.S.C. 1003 and 1006a).".

(b) CONFORMING AMENDMENTS.—
    (1) Section 1221(c) of the Food Security Act of 1985 (as redesignated by subsection (a)(1)) is amended—          16 USC 3821.
        (A) by striking "Except" and inserting "WETLAND CONVERSION.—Except";
        (B) by striking "subsequent to the date of enactment of the Food, Agriculture, Conservation, and Trade Act of 1990" and inserting "beginning after November 28, 1990,"; and
        (C) by striking "subsections (a) (1) through (3)" and inserting "subsection (b)".
    (2) Section 1221 of the Food Security Act of 1985 (as amended by subsection (a)) is amended by adding at the end the following:
"(d) PRIOR LOANS.—This section shall not apply to a loan described in subsection (b) made before December 23, 1985.".

## SEC. 322. DELINEATION OF WETLANDS; EXEMPTIONS TO PROGRAM INELIGIBILITY.

(a) DELINEATION OF WETLANDS.—Section 1222 of the Food Security Act of 1985 (16 U.S.C. 3822) is amended by striking subsection (a) and inserting the following:
"(a) DELINEATION BY THE SECRETARY.—
    "(1) IN GENERAL.—Subject to subsection (b) and paragraph (6), the Secretary shall delineate, determine, and certify all wetlands located on subject land on a farm.
    "(2) WETLAND DELINEATION MAPS.—The Secretary shall delineate wetlands on wetland delineation maps. On the request of a person, the Secretary shall make a reasonable effort to make an on-site wetland determination prior to delineation.
    "(3) CERTIFICATION.—On providing notice to affected persons, the Secretary shall—
        "(A) certify whether a map is sufficient for the purpose of making a determination of ineligibility for program benefits under section 1221; and
        "(B) provide an opportunity to appeal the certification prior to the certification becoming final.

"(4) DURATION OF CERTIFICATION.—A final certification made under paragraph (3) shall remain valid and in effect as long as the area is devoted to an agricultural use or until such time as the person affected by the certification requests review of the certification by the Secretary.

"(5) REVIEW OF MAPPING ON APPEAL.—In the case of an appeal of the Secretary's certification, the Secretary shall review and certify the accuracy of the mapping of all land subject to the appeal to ensure that the subject land has been accurately delineated. Prior to rendering a decision on the appeal, the Secretary shall conduct an on-site inspection of the subject land on a farm.

"(6) RELIANCE ON PRIOR CERTIFIED DELINEATION.—No person shall be adversely affected because of having taken an action based on a previous certified wetland delineation by the Secretary. The delineation shall not be subject to a subsequent wetland certification or delineation by the Secretary, unless requested by the person under paragraph (4).".

(b) EXEMPTIONS.—Section 1222 of the Food Security Act of 1985 (16 U.S.C. 3822) is amended by striking subsection (b) and inserting the following:

"(b) EXEMPTIONS.—No person shall become ineligible under section 1221 for program loans or payments under the following circumstances:

"(1) As the result of the production of an agricultural commodity on the following lands:

"(A) A converted wetland if the conversion of the wetland was commenced before December 23, 1985.

"(B) Land that is a nontidal drainage or irrigation ditch excavated in upland.

"(C) A wet area created by a water delivery system, irrigation, irrigation system, or application of water for irrigation.

"(D) A wetland on which the owner or operator of a farm or ranch uses normal cropping or ranching practices to produce an agricultural commodity in a manner that is consistent for the area where the production is possible as a result of a natural condition, such as drought, and is without action by the producer that destroys a natural wetland characteristic.

"(E) Land that is an artificial lake or pond created by excavating or diking land (that is not a wetland) to collect and retain water and that is used primarily for livestock watering, fish production, irrigation, wildlife, fire control, flood control, cranberry growing, or rice production, or as a settling pond.

"(F) A wetland that is temporarily or incidentally created as a result of adjacent development activity.

"(G) A converted wetland if the original conversion of the wetland was commenced before December 23, 1985, and the Secretary determines the wetland characteristics returned after that date as a result of—

"(i) the lack of maintenance of drainage, dikes, levees, or similar structures;

"(ii) a lack of management of the lands containing the wetland; or

110 STAT. 992          PUBLIC LAW 104–127—APR. 4, 1996

(i) MITIGATION BANKING.—Section 1222 of the Food Security Act of 1985 (16 U.S.C. 3822) is amended by adding at the end the following:

"(k) MITIGATION BANKING PROGRAM.—Using authorities available to the Secretary, the Secretary may operate a pilot program for mitigation banking of wetlands to assist persons to increase the efficiency of agricultural operations while protecting wetland functions and values. Subsection (f)(2)(C) shall not apply to this subsection.".

**SEC. 323. CONSULTATION AND COOPERATION REQUIREMENTS.**

Section 1223 of the Food Security Act of 1985 (16 U.S.C. 3823) is repealed.

**SEC. 324. APPLICATION OF PROGRAM INELIGIBILITY TO AFFILIATED PERSONS.**

The Food Security Act of 1985 (as amended by section 323) is amended by inserting after section 1222 (16 U.S.C. 3822) the following:

16 USC 3823.    **"SEC. 1223. AFFILIATED PERSONS.**

"If a person is affected by a reduction in benefits under section 1221 and the affected person is affiliated with other persons for the purpose of receiving the benefits, the benefits of each affiliated person shall be reduced under section 1221 in proportion to the interest held by the affiliated person.".

**SEC. 325. CLARIFICATION OF DEFINITION OF AGRICULTURAL LANDS IN MEMORANDUM OF AGREEMENT.**

(a) AGRICULTURAL LANDS.—For purposes of implementing the memorandum of agreement entered into between the Department of Agriculture, the Environmental Protection Agency, the Department of the Interior, and the Department of the Army on January 6, 1994, relating to the delineation of wetlands, the term "agricultural lands" shall include—

(1) native pasture, rangelands, and other lands used to produce or support the production of livestock; and

(2) tree farms.

(b) WETLAND CONSERVATION.—Subsection (a) shall not apply with respect to the delineation of wetlands under subtitle C of title XII of the Food Security Act of 1985 (16 U.S.C. 3821 et seq.) or to the enforcement of the subtitle.

(c) SUCCESSOR MEMORANDUM.—Subsection (a) shall apply to any amendment to or successor of the memorandum of agreement described in subsection (a).

16 USC 3821 note.    **SEC. 326. EFFECTIVE DATE.**

This subtitle and the amendments made by this subtitle shall become effective 90 days after the date of enactment of this Act.

# Subtitle D—Environmental Conservation Acreage Reserve Program

**SEC. 331. ENVIRONMENTAL CONSERVATION ACREAGE RESERVE PROGRAM.**

Section 1230 of the Food Security Act of 1985 (16 U.S.C. 3830) is amended to read as follows:

000466

[Congressional Record Volume 142, Number 57 (Tuesday, April 30, 1996)]
[Senate]
[Page S4420]
From the Congressional Record Online through the Government Printing Office [www.gpo.gov]


WETLANDS AND THE NEW FARM BILL

  Mr. GRASSLEY. Mr. President, I would like to enter into a colloquy
with the Senator from Indiana, Senator Lugar, who is the chairman of
the Committee on Agriculture, Nutrition, and Forestry and who was a
manager of the recent conference on H.R. 2854, the 1996 farm bill.

1

carrying out the various agreements was being
finalized, the Department
of Agriculture suggested a technical correction to this
provision.
Section 322 of the bill amends section 1222 of the 1985
farm bill to
say that ``No person shall be adversely affected
because of having
taken an action based on a previous certified wetland
delineation by
the Secretary. The delineation shall not be subject to
a subsequent
wetland certification or delineation by the Secretary,
unless requested
by the person * * *. ''
   My concern is that this could read to allow the
Department to change
delineations that have not yet been certified. I don't
argue with this,
per se. I am sure there is a need for granting NRCS
this authority in
some specific situations.

   But again, I do not want a repeat of this situation
in Iowa in 1994
and 1995. Specifically, I do not want the NRCS to use
this language to
conduct a massive review of wetland delineations. This
will just cause
further uncertainty and confusion in the farm
community. It can only
lead to ill will between our farmers and the NRCS and
should be avoided
at all cost.
   Under the able leadership of Chairman Lugar, we have
made some very
positive changes in the 1996 farm bill that will lead
to a more
cooperative relationship between farmers and the NRCS.
I hope this
progress will not be undermined by the provision I
mentioned.

000469

Mr. LUGAR. Mr. President, we expect that the Department of
Agriculture will be mindful of the need to balance the very legitimate
concerns that the Senator from Iowa raises today with the desires of
producers for certainty in the identification of wetlands. In addition,
the rights of producers to appeal decisions should be protected. The
Agriculture Committee will monitor developments as the Department
develops regulations to carry out the provisions of the newly enacted
farm bill, Public Law 104-127. I also encourage my colleague from Iowa
and all concerned parties to contribute their input when the
regulations are put out for comment.

In summary, while we realize that some administrative formalities
will be necessary to give producers certainty regarding the boundaries
of wetlands, we do not expect large-scale, wholesale reviews of
existing wetland determinations as a result of the new legislation.

---

# Highly Erodible Lands Conservation Compliance and Wetlands Conservation Provisions - 1996

**Supplement to the Environmental Assessment: Highly Erodible Lands Conservation Compliance and Wetlands Conservation Provisions of the Conservation Program Improvements Act of 1990**

**June 4, 1996**

- Stipulates that wetland conversion activities, authorized by a permit issued under Section 404 of the Clean Water Act, which make agricultural production possible, will be accepted for farm bill purposes if they were adequately mitigated.

- Revises the concept of "abandonment" to ensure that as long as land is used for agriculture, a certified Prior Converted (PC) cropland designation remains in effect. When done under an approved plan, landowners with Farmed Wetlands (FW) and Farmed Wetlands Pasture (FWP) may allow an area to revert to wetland status, and convert it back to an FW or FWP for agricultural purposes without violating the Swampbuster provision.

- Requires wetland determinations to be certified by NRCS. Previous wetland determinations will be certified to verify their accuracy. A certified wetland determination will remain in effect as long as the land is used for agricultural purposes or until the owner or operator requests a review from the Secretary.

- Provides the Secretary with the discretion to waive penalties for ineligibility and to grant time to restore converted wetlands.

- Provides the Secretary with authority to identify for individual producers which programs are affected by Swampbuster violations and how much the penalty is.

- Establishes a pilot program for wetland mitigation banking in order to allow USDA to assess how well mitigation banking works for agriculture.

## III. Reconsideration of Concerns and Alternatives

The Department published the National Program for Soil and Water Conservation, 1982 Final Program Report and Environmental Impact Statement, in compliance with Section 6 of the Soil and Water Resources Conservation Act of 1977 (RCA) (Public Law 95-192). This report was the first level of the National Environmental Policy Act (NEPA) compliance under "tiering". Tiering refers to the coverage of general matters in broader environmental impact statements, such as national program or policy statements, with narrower statements or environmental analyses concentrating on specific issues.

The Food Security Act (FSA) of 1985 made programmatic changes that were important enough for USDA to reevaluate portions of the National Conservation Priorities established by the 1982 report. Accordingly, USDA undertook a second level of tiering. Between January 1986 and July 1987, USDA conducted three environmental assessments evaluating the changes brought about by the new Conservation Title. These assessments led to Findings of No Significant Impact (FONSI), which were made available when final rules and regulations were published for implementation of the Conservation Title. Likewise, Environmental Assessments leading to FONSI's were prepared to evaluate changes made by Title XIV, the Conservation Program Improvements Act (CPIA) of 1990. This assessment then, prepared to assess changes made by Title XII - Conservation - The Food Security Act of 1985 As Amended by the Federal

# Rules and Regulations

Federal Register

Vol. 61, No. 174

Friday, September 6, 1996

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each week.

## DEPARTMENT OF AGRICULTURE

### Office of the Secretary

### 7 CFR Part 12

**RIN 0578–AA17**

### Highly Erodible Land and Wetland Conservation

**AGENCY:** Office of the Secretary, USDA.

**ACTION:** Interim final rule with request for comments.

**SUMMARY:** The United States Department of Agriculture (USDA) is issuing an interim final rule for the Highly Erodible Land and Wetland Conservation provisions of the Food Security Act of 1985, as amended. This interim final rule incorporates specific changes required by the Federal Agriculture Improvement and Reform Act of 1996 and makes other changes to improve the administration of these provisions. USDA is seeking comments from the public which will be considered prior to issuing a final rule.

**DATES:** *Effective Dates:* September 6, 1996.

Comments must be received by November 5, 1996.

**ADDRESSES:** All comments concerning this interim final rule should be addressed to Lloyd E. Wright, Director, Conservation Ecosystems Assistance Division, Natural Resources Conservation service, P.O. Box 2890, Washington, D.C. 20013–2890. Attention: HELWC. Fax: 202–720–1838. This rule may also be accessed, and comments submitted, via Internet. Users can access the NRCS Federal Register homepage and submit comments at http://astro.itc.nrcs.usda.gov:6500.

**FOR FURTHER INFORMATION CONTACT:** Sandra N. Penn, Conservation Ecosystems Assistance Division, Natural Resources Conservation Service, 202–720–1845.

**SUPPLEMENTARY INFORMATION:**

### Executive Order 12866

This rule has been determined to be significant and was reviewed by the Office of Management and Budget (OMB) under Executive Order 12866. Pursuant to § 6(a)(3) of Executive Order 12866, CCC and NRCS have conducted an economic analysis of the potential impacts associated with this interim final rule. The economic analysis concluded that the past ten years of experience in implementing these provisions demonstrates that the provisions are an effective incentive to implementing conservation practices. Changes in the 1985 Act and the implementing regulations will help to increase that incentive by making compliance achievable by more producers, providing more liberal technical assistance, and increasing flexibility in farm operations that deterred some producers from participation in USDA programs in the past. A copy of this cost-benefit analysis is available upon request from Sandra N. Penn, Conservation Ecosystems Assistance Division, Natural Resources Conservation Service, P.O. Box 1890, Washington, D.C. 20013–1890.

### Regulatory Flexibility Act

The Regulatory Flexibility Act is not applicable to this rule because USDA is not required by 5 U.S.C. 533 or any other provisions of law to publish a notice of proposed rulemaking with respect to the subject matter of this rule.

### Environmental Evaluation

It has been determined through an environmental assessment that the issuance of this interim final rule will not have a significant impact upon the human environment. Copies of the environmental assessment may be obtained from Sandra N. Penn, Conservation Ecosystems Assistance Division, Natural Resources Conservation Service, P.O. Box 2890, Washington, D.C. 20013–2890.

### Paperwork Reduction Act

No substantive changes have been made in this interim final rule that affect the recordkeeping requirements and estimated burdens previously reviewed and approved under OMB control number 0560–0004.

### Executive Order 12788

This interim final rule has been reviewed in accordance with Executive Order 12778. The provisions of this interim final rule are not retroactive except for § 12.5(b)(4)–(8) in relation to certain actions or determinations that occurred after December 23, 1985, relative to the conversion of wetlands or the production of an agricultural commodity upon a converted wetland. Furthermore, the provisions of this final interim rule preempt State and local laws to the extent such laws are inconsistent with this interim final rule. Before an action may be brought in a Federal court of competent jurisdiction, the administrative appeal rights afforded persons at CFR parts 11,614,780 and 1900 Subpart B of this title, as appropriate, must be exercised and exhausted.

### Unfunded Mandates Reform Act of 1995

Pursuant to Title II of the unfunded Mandates Reform Act of 1995, Pub. L. 104–4, the effects of this rulemaking action on State, local, and tribal governments, and the public have been assessed. This action does not compel the expenditure of $100 million or more by any State, local, or tribal governments, or anyone in the private sector; therefore a statement under § 202 of the Unfunded Mandates Reform Act of 1995 is not required.

### Discussion of Provisions

Title XII of the Food Security Act of 1985, as amended (the 1985 Act), encourages participants in United States Department of Agriculture (USDA) programs to adopt land management measures by linking eligibility for USDA program benefits to farming practices on highly erodible land and converted wetlands. In particular, the highly erodible land provisions (HEL) of the 1985 Act provide that after December 23, 1985, a program participant is ineligible for certain USDA program benefits for the production of an agricultural commodity on a field in which highly erodible land is predominant. Additionally, the wetland conservation (WC) provisions of the 1985 Act provide that after December 23, 1985, a program participant is ineligible for certain USDA program benefits for the production of an agricultural commodity on a converted

**47020** **Federal Register** / Vol. 61, No. 174 / Friday, September 6, 1996 / Rules and Regulations

wetland, or after November 28, 1990, for the conversion of a wetland that makes the production of an agriculture commodity possible. The 1985 Act, however, affords relief to program participants who meet certain conditions identified under the 1985 Act by exempting such actions from the ineligibility provisions.

The USDA issued a final rule implementing the HEL and WC provisions of the 1985 Act on September 17, 1987. These regulations, found at 7 CFR part 12, provided the terms of program ineligibility, described the several exemptions from ineligibility, outlined the responsibilities of the several USDA agencies involved in implementing the provisions, and generally established the framework for administration of the provisions.

The Food, Agriculture, Conservation, and Trade Act of 1990 (the 1990 Act), amended the 1985 Act and made some significant modifications to the HEL and WC conservation provisions. These statutory changes were incorporated into part 12 through amendments issued April 23, 1991, and May 23, 1991.

The implementing regulations mirror the 1985 Act's structure by listing the activities that will cause a person to lose program benefits, the program benefits that are at risk, and the conditions under which these activities can occur without losing program eligibility. The current regulations are divided into three subparts. Subpart A describes the terms of ineligibility, USDA programs encompassed by its terms, the list of exemptions from ineligibility, the agency responsibilities, and the appeal provisions for persons adversely affected by an agency determination. Subpart B describes in greater detail the technical aspects of the highly erodible land provisions, including the criteria for identification of highly erodible lands, criteria for highly erodible field determinations, and requirements for the development of conservation plans and conservation systems. Subpart C describes in greater detail the technical aspects of the wetland conservation provisions, including the criteria for determining a wetland, the criteria for determining a converted wetland, and the uses of wetlands and converted wetlands that can be made without losing program eligibility.

Since December 23, 1985, program participants have farmed in a more sustainable manner, resulting in more soil remaining on the field and more wetlands remaining available to wildlife and migratory fowl. Meeting the objectives of the HEL and WC provisions, however, has been difficult

for some producers. Wherever possible, USDA helps individual program participants address their unique resources concerns in a manner that meets the requirements of the HEL and WC provisions. The Federal Agriculture Improvement and Reform Act (the 1996 Act), enacted April 4, 1996, made several modifications to the HEL and WC provisions which will increase USDA's ability to meet these individual situations in a more flexible manner.

**The Federal Agriculture Improvement and Reform Act**

The 1996 Act amendments to the HEL and WC provisions became effective 90 days after the date of enactment, *i.e.*, July 3, 1996. Accordingly, delaying implementation of this rule would be contrary to the public interest and it has been determined that this rule should, therefore, be effective when issued but subject to further review based on comments submitted in response to this interim final rule.

The 1996 Act made the following changes to the implementation of the HEL and WC provisions:
• Adds new programs to the list of USDA program benefits covered.
• Deletes some programs from the list of USDA program benefits covered.
• Under certain conditions, allows a person who is determined to be ineligible for USDA program benefits because of failure to apply a conservation system up to 1 year to implement the necessary practices without loss of benefits.
• Provides for expedited variances related to weather, pest, and disease problems and establishes a time period to render a decision on whether to grant those variances.
• Requires a measurement of soil erosion on a highly erodible field prior to the implementation of a conservation system, based on estimated average annual soil erosion rates.
• Provides for self-certification of compliance for HEL and authorizes the Natural Resources Conservation Service (NRCS) to exclude that person from status review on the basis of that certification of compliance.
• Provides for revision or modification of a conservation plan by a person if the same level of treatment is maintained.
• Permits a person to use, on a field-trial basis, conservation practices other than those currently approved if NRCS determines in advance that the practices have a reasonable likelihood of success.
• Provides for a review, and relief to a person, by the local county committee if applying a conservation system would

cause the person undue economic hardship.
• Requires that an employee of USDA who notices a conservation compliance deficiency on a person's farm while providing technical assistance on other land inform the person of the deficiency and actions necessary to come into compliance, and allow up to 1 year for the person to fully implement corrective action before reporting the observation as a compliance violation.
• Requires that highly erodible land exiting the Conservation Reserve Program not be held to a higher conservation compliance standard than similar cropland in the same area.
• Permits a person to cease using farmed wetlands, or farmed-wetland pastures, as identified by NRCS, for cropping or forage production, and allows the lands to return to wetland conditions, and subsequently bring these lands back into agricultural production after any length of time without loss of eligibility for USDA program benefits, given certain conditions.
• Allows flexibility in determining the programs for which a person who violates wetland conservation provisions will become ineligible.
• Ensures that persons the right to request and appeal a certified wetland determination.
• Provides that a certified wetland delineation will remain in effect until the person requests a new determination and certification.
• Ensures that wetlands that were certified as prior-converted cropland will continue to be considered prior-converted cropland even if wetland characteristics return as a result of lack of maintenance of the land or other circumstances beyond the person's control provided the prior-converted cropland continues to be used for agricultural purposes.
• Requires USDA to identify on a regional basis which categories of activities constitute a minimal effect on wetland functions and values.
• Provides persons who convert a wetland greater flexibility to mitigate the loss of wetland functions and values through restoration, enhancement, or creation of wetlands.
• Allows the Farm Service Agency (FSA) to waive a person's ineligibility for benefits if FSA believes the person acted in good faith and without intent to violate the wetland provisions.
• Provides for a pilot program for wetland mitigation banking.
• Repeals the requirements for consultation with the Fish and Wildlife Service (FWS).

• Provides that benefits of affiliates of a business enterprise who violate HEL or WC provisions will be reduced in proportion to the interest held by the affiliate in the business enterprise.

• Defines "agricultural lands" for the purpose of implementing the January 6, 1994, interagency memorandum of agreement on Federal wetland delineations on agricultural lands.

**Public Listing Forums**

In April 1996, USDA held nine forums to provide opportunities for public comment in advance of this rulemaking action. These forums were held at Sacramento, California; Longmont, Colorado; Columbus, Georgia; Springfield, Illinois; Wyomissing, Pennsylvania; Sioux Falls, South Dakota; Abilene, Texas, Spokane, Washington; and, Washington, D.C. More than 850 people, including 206 speakers, attended these forums. In addition, USDA accepted written comments. The USDA considered the public comments provided at these forums in the preparation of this interim final rule. The documents relating to these forums are available for public inspection at Room 6029 South Building, USDA, 14th and Independence Ave. SW, Washington, D.C. The following discussion is a brief 3summary of how USDA responded to the issues generated by the comments:

USDA received seven comments related to the granting of variance for persons who fail to meet the highly erodible land conservation requirements. Section 12.5(a)(6)(ii) addresses procedures for granting variances for weather, pest, and disease problems, and the factors that NRCS will consider in granting those variances.

USDA received three comments related to procedures for determining whether a conservation system results in a substantial reduction in erosion. Section 12.23 addresses procedures for evaluating conservation systems for land with and without cropping history.

USDA received 25 comments related to policies regarding when a violation is in good faith. Sections 12.5(a)(5) and (b)(5) address procedures for determining when a violation is in good faith.

USDA received 16 comments related to procedures for conducting status reviews. Although procedures for conducting status reviews are not addressed in the rule, the NRCS will consider these comments in preparing its internal operating procedures.

USDA received 46 comments related to procedures on wetland mitigation; these included the suggestion that

mitigation always be in the same watershed; that mitigation should place priority on restoration or enhancement rather than creation of wetlands; that mitigation should be flexible; and, that mitigation should meet the requirements of the WC provision. Section 12.5(b)(4) sets forth procedures to be used for wetland mitigation, and adds that the State Conservationist may determine that mitigation for certain types or classes of wetlands will not be considered because it is not possible to achieve equivalent replacement of wetland functions and values within a reasonable time frame. USDA received another 28 comments related to mitigation banking.

USDA received 68 comments related to certification of wetland determinations. Some commenters favored reviewing all wetland determinations and correcting errors; other commenters favored not reviewing existing wetland determinations. Some commenters suggested that landowners should be formally notified of the certification of wetland determinations. Some commenters suggested that NRCS should be the lead agency for wetland determinations. Section 12.30(c) describes the proposed approach to certification of wetland determinations. It also specifies that a certified wetland determination will remain valid and in effect until the person affected by the certification requests review of the certification by NRCS.

USDA received 17 comments related to the role of FWS in carrying out the wetland conservation provisions. Of these, four commenters expressed support for FWS involvement and eight commenters favored decreasing the role of the FWS. Five commenters made no specific recommendation. The 1996 Act removed the requirement for consultation with FWS, and that requirement has been removed from the rule. In addition, § 12.30 defines the role of the FWS in carrying out the wetland conservation provisions.

USDA received 36 comments related to prior-converted cropland issues and abandonment of wetlands. Of these, 19 commenters expressed support for the "once a PC, always a PC" change made by the 1996 Act; three commenters expressed concern over that change. Section 12.33 incorporates changes made by the 1996 Act amendments.

USDA received four comments stating that NRCS should withdraw from the Interagency Memorandum of Agreement on Wetlands (MOA) with FWS, Environmental Protection Agency (EPA), and the U.S. Army Corps of Engineers (Corps). This comment is outside the scope of this rule, but as

discussed in greater detail below, NRCS is dedicated to continued coordination with the other Federal agencies with wetland responsibilities. Currently, the MOA provides a useful and available framework for this coordination.

**Description of Amendments**

As the summary of the forum comments indicates, the statutory changes affect provisions throughout 7 CFR part 12. Because of these numerous changes, USDA will republish part 12 in its entirety to help the public form opinions and offer comments. When USDA reviews the comments received from the public, those comments concerning new regulatory provisions will receive greater consideration.

In addition to revisions necessary to accommodate changes in the Act, USDA makes several changes to interpret, clarify, or specify procedures followed in the implementation for the HEL and WC provisions. USDA invites public comment on these changes.

**Amendments to the HEL Provisions**

USDA finds that the following regulatory changes will improve the quality of implementation of the HEL provisions of the 1985 Act:

• Section 12.5(a)(6)(ii) is amended to list factors that NRCS will consider when a landowner requests a variance related to weather, pest, or disease problems.

• Section 12.22(c) is added to clarify that when fields are combined, the part of the new field that was previously a highly erodible field shall continue to be subject to the highly erodible land requirements.

• Section 12.23(a) is amended to clarify that the adequacy of a conservation system will be evaluated according to whether it conforms to the NRCS field office technical guide in use at the time that the plan or system is developed or revised.

• Section 12.23(b) is added to clarify procedures to be used to evaluate the adequacy of conservation systems for achieving substantial reduction in soil erosion on land with and without cropping history.

• Section 12.23(c) is added to specify that conservation field trials included in a person's conservation plan must have prior approval by NRCS and must be documented in the person's conservation plan specifying the limited time period during which the field trial is in effect.

• Section 12.23(j) sets forth the factors to be considered by the FSA State Committee in determining whether to grant a person's request for relief based on undue economic

**47022**    **Federal Register** / Vol. 61, No. 174 / Friday, September 6, 1996 / Rules and Regulations

hardship in implementing a conservation system.

## Amendments to the WC Provisions

USDA finds that the following changes will improve the implementation of the WC provisions of the 1985 Act (WC provisions):

*Identification of wetland types:* The WC provisions clearly limit the conversion of wetlands and the planting of an agricultural commodity on a converted wetland, yet the technical identification of when these provisions are triggered can prove complex. Even though the 1985 Act implicitly identifies three distinct land types (wetlands, converted wetlands, and non-wetlands), the inherent complexity of natural systems and the diversity of land management methods available to an agricultural producer require that greater sophistication be used in application of broad national standards to local conditions. Some areas of land have been planted to an agricultural commodity but still exhibit the characteristic of a natural wetland if cropping ceases for even a short period of time. Likewise, areas managed for hay or pasture can exhibit the characteristics of a natural wetland if the management of the area ceases. Some activities can permanently remove most of the water from an area without making the production of an agricultural commodity possible while natural events can make the production of an agricultural commodity possible without permanently removing water from an area.

Since 1987, USDA has identified in policy the threshold characteristics that define when: a wetland has been manipulated sufficiently to make the production of an agricultural commodity possible; a wetland is ''converted;'' conditions meet a particular exemption identified under the 1985 Act; and a producer has expanded the drainage system beyond what existed prior to December 23, 1985. The USDA is adding definitions to § 12.2 to state more precisely the variety of wetland types found in the agricultural landscape. Section 12.5 and §§ 12.30–12.33 are amended to describe how these wetland types relate to particular exemptions from ineligibility. In this manner, agricultural producers are provided the maximum flexibility to manage their lands in a manner that will not trigger the ineligibility provisions of the 1985 Act.

*Coordination with other Federal agencies:* Consistent with the intent expressed in the Manager's Report accompanying the 1996 Act amendments, the changes made in this rule ''do not supersede the wetland protection authorities and responsibilities of the Environmental Protection Agency [EPA] or the Corps of Engineers [the Corps] under Section 404 of the Clean Water Act.'' This rule is promulgated under the authority of the 1985 Act, as amended, and therefore does not affect the obligations of any person under other Federal statutes, or the legal authorities of any other Federal agency including, for example, EPA's authority to determine the geographic scope of Clean Water Act jurisdiction. Nonetheless, NRCS, the Corps, and EPA place a high priority on adopting procedures and policies that minimize duplication and inconsistencies between the wetland conservation provisions of the 1985 Act and the Clean Water Act section 404 programs. To help achieve these important policy objectives, on January 6, 1994, four Federal agencies with wetland responsibilities (USDA, EPA, the Department of the Interior, the Department of the Army) entered into a Memorandum of Agreement (MOA), regarding the delineation of wetlands for purposes of section 404 of the Clean Water Act and the WC provisions. This MOA provides a framework for continuing cooperation between the Federal agencies regarding the administration of Federal wetland laws. Consistent with the objectives of the MOA, the NRCS will continue to coordinate with the other Federal agencies in the development of its policies and procedures related to the implementation of these regulations.

More specifically, the agencies will coordinate to develop policies and procedures for evaluating the accuracy of existing non-certified wetland determinations made by NRCS. The necessary first step in these procedures will be to make an assessment of the quality of previous determinations. After completing the quality assessment, in order to provide certainty for the agricultural community, the Federal agencies will complete the process of validating prior determinations in an expeditious manner.

It is also the goal of the agencies to minimize duplication and inconsistencies between the WC provisions and the Clean Water Act. The agencies will coordinate to develop policies and procedures to minimize duplication and inconsistencies between the WC provisions and the Clean Water Act programs regarding other issues; in particular, conversion for non-agricultural use, minimal effects determinations (including categorical minimal effects exemptions), mitigation determination, or other written agreements between persons and NRCS, the re-establishment of agriculture use on abandoned farmed wetlands and farmed-wetland pasture, conversions due to NRCS wetland determination errors, and drainage maintenance. As part of this effort, the Corps intends to develop a new Clean Water Act nationwide permit that addresses NRCS minimal effects determinations, NRCS mitigation requirements, and modify the existing nationwide permit that addresses voluntary wetland restoration (See 61 FR part VII (June 17, 1996)).

In the MOA, the agencies agreed to follow certain guidelines for delineating wetlands. The MOA agencies currently use the 1987 Corps of Engineers Wetland Delineation Manual (1987 Corps Manual) for delineating wetlands on areas where the native vegetation is intact (*i.e.,* non-agricultural lands) and use the National Food Security Act Manual, Third ed. (NFSAM), for delineating wetlands on areas where the native vegetation has been removed due to ongoing agricultural activities (*i.e.,* agricultural lands).

Copies of the NFSAM and the MOA are available from the NRCS, P.O. Box 2890, Washington, D.C., 20013. Copies of the 1987 Corps Manual are available from the National Technical Information Service (NTIS), 5285 Port Royal Road, Attn: Order Department, Springfield, Virginia, 22171. Copies of the Supplemental guidance issued by the Corps concerning use of the 1987 Manual (*i.e.,* the October 7, 1991, Questions and Answers, and the March 6, 1992, Clarification and Interpretation Memorandum) may be obtained by contacting the Regulatory Branch of the local Corps district, the EPA Wetlands Hotline at (800) 832–7828, or the Regulatory Branch of Corps headquarters (Office of the Chief of Engineers) at (202) 272–0199. NRCS will publish notice in the **Federal Register** concerning a change in the Federal wetland delineation criteria that may be used in implementation of the WC provisions.

This interim final rule, however, only applies to administration of Title XII of the 1985 Act. As discussed earlier, the four agencies have identified a need to expand and revise the MOA to assure consistency and fairness in the implementation of these acts. The current MOA will remain in effect until it is amended or rescinded by the four agencies.

A goal of the Administration's 1993 Wetlands Plan is to harmonize the WC provisions and the Clean Water Act to the extent practicable. These regulations are modified in several ways to further the President's Wetlands Plan. In

particular, § 12.5(b)(5) provides that when a person requests relief on the basis that an action was conducted in good faith, USDA may consider whether the person has a record of violating the wetland provisions of these regulations or other Federal, State, or local wetland provisions.

Additionally, § 12.6(e) is added to state that NRCS may accept the assistance of other Federal agencies to carry out the wetland responsibilities of these regulations. Sections 12.30(a) and (b) provide that NRCS will consult with FWS at the State level to develop a process for implementation of the WC provisions.

Section 12.30(c) describes the procedure for certification of wetland determinations and specifies that certified wetland determinations will meet current Federal mapping conventions.

A certified wetland determination will remain in effect unless the person affected by the certification requests a review under certain circumstances or the wetland characteristics are changed as a result of human activities.

Section 12.31(b)(3) is amended to provide that the determination of prevalence of hydrophytic vegetation will be made in accordance with the current Federal wetland delineation methodology in use at the time of the determination. This change assures that the four agencies will utilize consistent and up-to-date technical standards and criteria.

**Summary of Rule Modifications**

Based on the changes in the 1996 Act and the other considerations set forth above, the changes to 7 CFR part 12 adopted in this notice are as follows:

*Subpart A*

This interim final rule adds several new definitions to § 12.2. The Department of Agriculture Reorganization Act of 1994 abolished several agencies and established new agencies to assume Department responsibilities. Therefore, § 12.2 is amended to reflect the new agencies with responsibilities for implementation of these regulations.

*Section 12.2:* This interim final rule adds new definitions for "conservation plan," "conservation system," and "field" as stated in the statute. It also adds several new definitions related to types of wetlands and management actions related to wetlands that have previously only been identified in policy. Definitions for "prior-converted cropland," "farmed wetland," "farmed-wetland pasture," and "commenced-conversion wetland" have been added.

Other provisions of the rule have been amended, including § 12.5 and §§ 12.31–.33, to incorporate these new definitions where applicable.

The 1996 Act amendments provide that a person who converts a wetland may remain eligible for USDA program benefits if the loss of wetland functions and values are mitigated through the restoration, enhancement, or creation of a wetland. Therefore, definitions for "creation", "enhancement", and "restoration", have been added to clarify this new flexibility.

*Section 12.3:* This interim final rule applies to all actions taken after July 3, 1996, and to determinations made after, or pending on, July 3, 1996, the date on which the HEL and WC statutory amendments become effective. This section is amended to reflect the passage of the 1996 Act and the scope of these new provisions.

*Section 12.4:* Section 12.4 describes the actions that will cause a person to lose eligibility for USDA program benefits and the program benefits that are subject to reduction or loss. The 1996 Act treats HEL and WC differently regarding the programs encompassed by each provision and the extent of the sanctions if the provisions are violated. Section 12.4 deletes applicability to some programs, such as crop insurance and obsolete programs. A person who violates the WC provisions may lose all or only a portion of certain USDA benefits, but a person who violates HEL could lose all of of these same benefits and additional program benefits. Sections 12.4(c) is amended to include an interpretation of which crop year's benefits are affected by a violation decision, and sets forth the factors that FSA will consider in determining the extent of benefits to be lost based on the seriousness of the violation.

*Section 12.5:* The 1996 Act amendments modify the provisions of § 12.5 regarding the exemptions from ineligibility for USDA program benefits. Section 12.5(a) addresses the exemptions that apply to HEL and § 12.5(b) addresses the exemptions that apply to WC.

Section 12.5(a)(5) specifies that HEL violations that are determined to have been made in good-faith are eligible for graduated sanctions if they were on land that was converted from native vegetation, *i.e.*, rangeland or woodland, to crop production after December 23, 1985. For good faith violations on land that was converted from native vegetation, *i.e.*, rangeland or woodland, to crop production before December 23, 1985, the person will be allowed up to one year to correct the problem before being found ineligible. After one year, if

the problem is not corrected, the ineligibility provisions of § 12.4 will apply. Section 12.5(a)(6) grants an automatic variance if within 30 days NRCS fails to respond to a persons request for a variance because of weather, pest, or disease. It describes criteria that NRCS will consider when determining whether to grant a variance for a natural disaster such as weather, pest, or disease. NRCS is especially soliciting comments on how these criteria may be specified to ensure that variances are granted where appropriate.

Under § 12.5(b), the exemptions from ineligibility relative to wetland conservation, there exists a new exemption for land that was certified as having been converted prior to December 23, 1985, (prior-converted croplands), but had returned to wetland characteristics after that date. This exemption provides that if certain requirements are met, a prior-converted cropland will not be considered abandoned for purposes of implementation of these regulations. Likewise, there exists another new exemption for areas that NRCS determined were manipulated but were not completely converted prior to December 23, 1985, (farmed wetlands and farmed-wetland pastures), but may revert to wetland status through a voluntary restoration, enhancement, or creation action. This exemption provides that if certain requirements are met, the area will not be considered abandoned for purposes of implementation of these regulations.

These exemptions do not address how the Corps may treat these wetland types for purposes of section 404 of the Clean Water Act. The Corps has a notice in 61 FR part VII (June 17, 1996) to issue, reissue, and modify the nationwide permits for section 404 of the Clean Water Act that addresses these issues.

The 1996 Act provides that certain wetland conversion activities that were conducted pursuant to a permit issued under section 404 of the Clean Water Act may be exempt from ineligibility under the WC provisions, if the conversion activity was adequately mitigated for purposes of these provisions. This rule provides that a person who received an individual permit under section 404 of the Clean Water Act after December 23, 1985, and met certain sequencing requirements, is exempt from the ineligibility provisions of these regulations.

This rule, however, provides that a person whose conversion activity is encompassed by a nationwide or regional general permit issued pursuant to section 404 of the Clean Water Act

may not be exempt under these regulations. USDA will evaluate whether any mitigation was required, and whether the wetland functions and values lost by the conversion activity were adequately replaced before USDA decides whether the conversion activity is exempt from ineligibility under these regulations.

The regulations that existed prior to this interim final rule described a detailed procedure by which a person could receive a commenced conversion determination from FSA. Persons who believed that they qualified for such a determination had to request one from FSA by September 19, 1988. The purpose of the determination was to minimize any unnecessary economic hardship to someone who had incurred substantial financial obligations related to the conversion of a wetland prior to December 23, 1985, but had not actually converted the wetland by that date. Any person who received a commenced-conversion wetland determination had to complete the conversion activity by January 1, 1995, to retain the exemption status. Because the commenced conversion determination had to be received by 1988 and the conversion had to be completed by the end of 1994, the references in the rule related to the process to obtain a determination have been removed. If a person completed conversion activity by January 1, 1995, the land will qualify for the same exemptions from ineligibility as prior-converted cropland. If, however, a person did not complete the conversion activity by that date, the land will be subject to the same requirements under this rule as farmed wetlands.

The 1996 Act provides that a person may remain eligible for an action resulting in the conversion of a wetland if the wetland functions and values are adequately mitigated through the restoration of a converted wetland, the enhancement of an existing wetland, or the creation of a new wetland. Section 12.5(b)(4) provides that this exemption applies if the mitigation is completed in accordance with several requirements, including that the person implement a mitigation plan approved by NRCS. The mitigation plan may be a single document or it may be a component of a larger conservation plan created voluntarily by the program participant. The requirements for this exemption are similar to the requirements for restoration of a converted wetland under the current regulations, such as the granting of an easement to USDA, recording an easement on the public land records, and that such mitigation not be at the expense of the Federal government.

The 1996 Act provides that USDA may expend Federal funds for the establishment of a pilot program for mitigation banking. USDA has not yet decided whether it will establish such a pilot program or what the particulars of such a program would be. During the public comment period, USDA is especially soliciting comments from the public regarding this subject.

The 1996 Act removes the requirement for graduated sanctions if the FSA determines that a wetland violation was committed in good faith. Central to the determination about whether a person acted in good faith is the knowledge available to the person concerning the existence of a wetland on the subject land. This knowledge can either be direct, such as information received from NRCS in the form of a wetland determination, or can be inferred from a person's past experience with violating wetland laws or regulations. This interim final rule provides that if a person is considered to have acted in good faith and the person agrees to implement a mitigation plan, then USDA may waive applying the ineligibility provisions of § 12.4.

*Section 12.6:* Section 12.6 concerns the respective responsibilities of USDA agencies; the new responsibilities created by the 1996 Act have been added. Section 12.6(b) is amended to specify that FSA is responsible for determining the extent of reduction in benefits for wetland violations based on the seriousness of the violation, and for determining whether a person should receive relief because application of a conservation system would result in undue economic hardship. Section 12.6(c) is amended to reflect that NRCS is responsible for providing information to FSA relating to the seriousness of a violation.

In response to the need to coordinate with the MOA agencies regarding wetland determinations, a new paragraph has been added to § 12.6 New paragraph (f) provides that NRCS may accept the assistance of the MOA agencies in implementing these regulations. This paragraph also confirms that NRCS will continue to seek the coordination of the other agencies on wetland matters to increase the public's understanding of the importance of wetland functions and values and the objectives of the WC provisions and the Clean Water Act.

*Section 12.7:* Section 12.7 addresses certification by a program participant that such participant is in compliance with the HEL and WC provisions. Section 12.7 is amended to allow a person to certify application of practices in a plan or measurement of residue required by a plan.

*Section 12.8:* Section 12.8 is amended to revise the definition of affiliated persons for the purpose of determining whose benefits may be affected by a decision and to what extent. In particular, § 12.8(b) is amended to provide that spouses who provide sufficient evidence of separate operations shall not be considered affiliates, and partnerships, trusts, and joint ventures are not considered affiliates if the interest is held indirectly through another business enterprise. Section 12.8(d) limits the reduction in payments for partnerships, joint ventures, trust, or other enterprises to the extent of interest held by the person responsible for the violation. Section 12.8(e) states that limitations on affiliations if action has been taken to avoid payment reductions for partnerships, joint ventures, trusts, or the application of the sanctions provided for in the regulations.

*Subpart B*

*Section 12.21:* Section 12.21 is amended to include a reference to publication of soil loss equations at 7 CFR part 610.

*Section 12.22:* Section 12.22 is amended to allow combining HEL and non-HEL fields, but the requirements of these regulations continue to apply to the previous HEL portion only.

*Section 12.23:* Section 12.23 is amended to specify that: conservation systems shall be technically and economically feasible (based on local resource conditions and available technology), cost effective, and shall not cause undue economic hardship; the standard for determining whether a plan provides a substantial reduction in erosion is the estimated annual level of erosion compared to the level before the system is applied; for new land brought into production, in no case will the required conservation system permit a substantial increase in erosion; procedures for conducting field trials as on-farm reseach; and procedures and criteria used by FSA when a person requests relief based on undue economic hardship.

*Subpart C*

Subpart C addresses the technical responsibilities of NRCS and the technical criteria used to make the necessary determinations for wetland conservation under these regulations.

*Section 12.30:* Section 12.30 is amended to reflect that NRCS will continue to work with the Corps, EPA, and FWS to improve the quality of wetland determinations and other

processes that affect the implementation of the WC provisions.

The 1996 Act repealed the requirement for consultation with FWS, thus allowing the Secretary to determine under what circumstances FWS should be utilized in the implementation of the WC provisions. Section 12.30 is amended to reflect that NRCS will develop a process at the State level, in coordination with FWS, for implementing the WC provisions and review such implementation on an annual basis. The technical expertise of FWS may be utilized whenever NRCS determines that such expertise is needed to address adequately the requirements of the WC provisions or to enhance the quality of implementation.

Under the new mitigation flexibility provided by the 1996 Act, the expertise of FWS will be valuable for conducting wetland functional assessments associated with minimal effects determinations and formulation of mitigation plans. The State-level process is intended, in part, to identify any geographic or programmatic areas where NRCS may need additional technical expertise to assess biological impacts of proposed wetland conversions.

Section 12.30 is also amended to address the process for certification of wetland determinations for the implementation of the WC provisions of the 1985 Act. If NRCS certified a wetland determination prior to July 3, 1996, the certification will remain valid. Upon request, a person may obtain certification of a wetland determination. A certified wetland determination means that the determination is of sufficient quality to make a determination of ineligibility for program benefits under these regulations. As indicated above, NRCS will continue to work with the other MOA agencies to coordinate the identification and certification of wetlands for the purposes of these regulations and for the Clean Water Act. The agencies recognize the importance of providing certainty for the agricultural community as to the status of their wetland determinations which have not been certified. The Federal agencies are therefore considering establishing a specific time frame for completing the evaluation of existing wetland determinations. During this time frame, an evaluation would be made as to the accuracy of wetland determinations within a given geographic area or of a specific type of wetland. Based on the evaluation, landowners would be notified whether their current wetland determinations are acceptable for both the WC provisions and the Clean Water Act. USDA is

especially seeking comments regarding implementation of this process.

*Section 12.31:* Section 12.31 is amended to reflect that NRCS will utilize the 1987 Corps Manual for determining the prevalence of hydrophytic vegetation. Section 12.31 is also amended to add the criteria for determining "categorical minimal effect exemptions." If NRCS identifies any categories of conversion activities and conditions which would only have a minimal effect on wetland functions and values, then such activities and conditions will be placed on a list of "categorical minimal effect exemptions" and such conversion activities and conditions will be considered exempt from the ineligibility provisions of these regulations. NRCS will incorporate such activities and conditions in the provisions of these regulations USDA is especially seeking comments regarding implementation of this new exemption. For purposes of the Clean Water Act, the Corps intends to address this provision as part of its reissuance of the Clean Water Act section 404 nationwide permits (See 61 FR part VII (June 17, 1996)).

*Sections 12.32 and 12.33:* Sections 12.32 and 12.33 have been amended to incorporate the definitions for farmed wetland, farmed-wetland pasture, commenced-conversion wetland, and prior-converted cropland, where appropriate.

*Section 12.33:* Section 12.33 has also been amended to modify the conditions under which NRCS will consider a particular site to be abandoned for purposes of these regulations. A person who wishes to allow a particular site to revert to wetland conditions should contact NRCS to ascertain what documentation is necessary to prevent such land from being considered abandoned for purposes of the WC provisions of these regulations. For purposes of the Clean Water Act, the Corps intends to address this provision as part of its re-issuance of the Clean Water Act section 404 nationwide permits (See 61 FR part VII (June 17, 1996)).

The amendments to part 12 do not affect the recordkeeping requirements and estimated burdens previously reviewed and approved under Office of Management and Budget control number 0560–0004.

## List of Subjects in 7 CFR Part 12

Administrative practices and procedures, Soil Conservation, Wetlands.

Accordingly, Title 7 of the Code of Federal Regulations is amended by revising Part 12 as follows:

## PART 12—HIGHLY ERODIBLE LAND AND WETLAND CONSERVATION

**Subpart A—General Provisions**

Sec.
12.1    General.
12.2    Definitions.
12.3    Applicability.
12.4    Determination of ineligibility.
12.5    Exemptions.
12.6    Administration.
12.7    Certification of compliance.
12.8    Affiliated persons.
12.9    Landlords and tenants.
12.10    Scheme or device.
12.11    Action based upon advice or action of USDA.
12.12    Appeals.

**Subpart B—Highly Erodible Land Conservation**

12.20    NRCS responsibilities regarding highly erodible land.
12.21    Identification of highly erodible lands criteria.
12.22    Highly erodible field determination criteria.
12.23    Conservation plans and conservation systems.

**Subpart C—Wetland Conservation**

12.30    NRCS responsibilities regarding wetlands.
12.31    Onn-site wetland identification criteria.
12.32    Converted wetland identification criteria.
12.33    Use of wetland and converted wetland.
12.34    Paperwork Reduction Act assigned number.

**Authority:** 16 U.S.C. 3801 *et seq.*

**Subpart A—General Provisions**

**§ 12.1   General.**

(a) *Scope.* This part sets forth the terms and conditions under which a person who produces an agricultural commodity on highly erodible land or designates such land for conservation use, plants an agricultural commodity on a converted wetland, or converts a wetland shall be determined to be ineligible for certain benefits provided by the United States Department of Agriculture (USDA) and agencies and instrumentalities of USDA.

(b) *Purpose.* The purpose of the provisions of this part are to remove certain incentives for persons to produce agricultural commodities on highly erodible land or converted wetland and to thereby—

(1) Reduce soil loss due to wind and water erosion;

(2) Protect the Nation's long-term capability to produce food and fiber;

(3) Reduce sedimentation and improve water quality; and

(4) Assist in preserving the functions and values of the Nation's wetlands.

**47026** **Federal Register** / Vol. 61, No. 174 / Friday, September 6, 1996 / Rules and Regulations

**§ 12.2  Definitions.**

(a) *General.* The following definitions shall be applicable for the purposes of this part:

*Agricultural commodity* means any crop planted and produced by annual tilling of the soil, including tilling by one-trip planters, or sugarcane.

*CCC* means the Commodity Credit Corporation, wholly-owned government corporation within USDA organized under the provisions of 15 U.S.C. 714 *et seq.*

*Conservation District (CD)* means a subdivision of a State or local government organized pursuant to the applicable law to develop and implement soil and water conservation activities or programs.

*Conservation plan* means the document that—

(1) Applies to highly erodible cropland;

(2) Describes the conservation system applicable to the highly erodible cropland and describes the decisions of the person with respect to location, land use, tillage systems, and conservation treatment measures and schedules; and

(3) Is approved by the local soil conservation district in consultation with the local committees established under section 8(b)(5) of the Soil Conservation and Domestic Allotment Act (16 U.S.C. 590h(b)(5)) and the Natural Resources Conservation Service (NRCS) for purposes of compliance with this part.

*Conservation system* means a combination of one or more conservation measures or management practices that are—

(1) Based on local resource conditions, available conservation technology, and the standards and guidelines contained in the NRCS field office technical guides (available from NRCS State offices); and

(2) Designed for purposes of this part to achieve, in a cost-effective and technically practicable manner, a substantial reduction in soil erosion or a substantial improvement in soil conditions on a field or group of fields containing highly erodible cropland when compared to the level of erosion or soil conditions that existed before the application of the conservation measures and management practices.

*Conservation use or set aside* means cropland that is designated as conservation-use acreage, set aside, or other similar designation for the purpose of fulfilling provisions under any acreage-limitation or land-diversion program administered by the Secretary of Agriculture requiring that the producer devote a specified acreage to conservation or other non-crop production uses.

*Creation of a wetland* means the development of the hydrologic, geochemical, and biological components necessary to support and maintain a wetland where a wetland did not previously exist. Any wetland established on a non-hydric soil will be considered a created wetland.

*CSREES* means the Cooperative State Research, Education, and Extension Service, an agency of USDA which is generally responsible for coordinating the information and educational programs of USDA.

*Department* means the United States Department of Agriculture (USDA).

*Enhancement of a wetland* means the alteration of an existing wetland to increase its specific functions and values. Enhancement actions include new capabilities, management options, structures, or other actions to influence one or several functions and values.

*Erodibility index* means a numerical value that expresses the potential erodibility of a soil in relation to its soil loss tolerance value without consideration of applied conservation practices or management.

*FSA* means the Farm Service Agency, an agency of USDA which is generally responsible for administering commodity production adjustment and certain conservation programs of USDA.

*Field* means a part of a farm that is separated from the balance of the farm by permanent boundaries such as fences, roads, permanent waterways, or other similar features. At the option of the owner or operator of the farm, croplines may also be used to delineate a field if farming practices make it probable that the croplines are not subject to change. Any highly erodible land on which an agricultural commodity is produced after December 23, 1985, and is not exempt under § 12.5(a), shall be considered part of the field in which the land was included on December 23, 1985, unless, to carry out this title, the owner and FSA agree to modify the boundaries of the field.

*Highly erodible land* means land that has an erodibility index of 8 or more.

*Hydric soils* means soils that, in an undrained condition, are saturated, flooded, or ponded long enough during a growing season to develop an anaerobic condition that supports the growth and regeneration of hydrophytic vegetation.

*Hydrophytic vegetation* means plants growing in water or in a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content.

*Landlord* means a person who rents or leases farmland to another person.

*Local FSA office* means the county office of the Farm Service Agency serving the county or a combination of counties in the area in which a person's land is located for administrative purposes.

*NRCS* means the Natural Resources Conservation Service, an agency within USDA which is generally responsible for providing technical assistance in matters of natural resources conservation and for administering certain conservation programs of USDA.

*Operator* means the person who is in general control of the farming operations on the farm during the crop year.

*Owner* means a person who is determined to have legal ownership of farmland and shall include a person who is purchasing farmland under contract.

*Person* means an individual, partnership, association, corporation, cooperative, estate, trust, joint venture, joint operation, or other business enterprise or other legal entity and, whenever applicable, a State, a political subdivision of a State, or any agency thereof, and such person's affiliates as provided in § 12.8 of this part.

*Restoration of a wetland* means the re-establishment of wetland conditions, including hydrologic condition or native hydrophytic vegetation, to an area where a wetland had previously existed.

*Secretary* means the Secretary of USDA.

*Sharecropper* means a person who performs work in connection with the production of a crop under the supervision of the operator and who receives a share of such crop for such labor.

*Soil map unit* means an area of the landscape shown on a soil map which consists of one or more soils.

*State* means each of the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands of the United States, American Samoa, the Commonwealth of the Northern Mariana Islands, or the Trust Territory of the Pacific Islands.

*Tenant* means a person usually called a ''cash tenant'', ''fixed-rent tenant'', or ''standing rent tenant'' who rents land from another for a fixed amount of cash or a fixed amount of a commodity to be paid as rent; or a person (other than a sharecropper) usually called a ''share tenant'' who rents land from another person and pays as rent a share of the crops or proceeds therefrom. A tenant shall not be considered the farm operator unless the tenant is determined

to be the operator pursuant to this part and 7 CFR part 718.

*Wetland,* except when such term is a part of the term ''converted wetland'', means land that—

(1) Has predominance of hydric soils;

(2) Is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions; and

(3) Under normal circumstances does not support a prevalence of such vegetation, except that this term does not include lands in Alaska identified as having a high potential for agricultural development and a predominance of permafrost soils.

*Wetland determination* means a decision regarding whether or not an area is a wetland, including identification of wetland type and size. A wetland determination may include identification of an area as one of the following types of wetland—

(1) *Artificial wetland* is an area that was formerly non-wetland, but now meets wetland criteria due to human activities, such as:

(i) An artificial lake or pond created by excavating or diking land that is not a wetland to collect and retain water that is used primarily for livestock, fish production, irrigation, wildlife, fire control, flood control, cranberry growing, or rice production, or as a settling pond; or

(ii) A wetland that is temporarily or incidentally created as a result of adjacent development activity;

(2) *Commenced-conversion wetland* is a wetland, farmed wetland, farmed-wetland pasture, or a converted wetland on which conversion began, but was not completed, prior to December 23, 1985.

(3) *Converted wetland* is a wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including the removal of woody vegetation or any activity that results in impairing or reducing the flow and circulation of water) for the purpose of or to have the effect of making possible the production of an agricultural commodity without further application of the manipulations described herein if:

(i) Such production would not have been possible but for such action, and

(ii) Before such action such land was wetland, farmed wetland, or farmed-wetland pasture and was neither highly erodible land nor highly erodible cropland;

(4) *Farmed wetland* is a wetland that prior to December 23, 1985, was manipulated and used to produce an agricultural commodity, and on

December 23, 1985, did not support woody vegetation and met the following hydrologic criteria:

(i) Is inundated for 15 consecutive days or more during the growing season or 10 percent of the growing season, whichever is less, in most years (50 percent chance or more), or

(ii) If a pothole, playa, or pocosion, is ponded for 7 or more consecutive days during the growing season in most years (50 percent chance of more) or is saturated for 14 or more consecutive days during the growing season in most years (50 percent chance or more);

(5) *Farmed-wetland pasture* is wetland that was manipulated and managed for pasture or hayland prior to December 23, 1985, and on December 23, 1985, met the following hydrologic criteria:

(i) Inundated or ponded for 7 or more consecutive days during the growing season in most years (5) percent chance or more), or

(ii) Saturated for 14 or more consecutive days during the growing season in most years (50 percent chance or more);

(6) *Not-inventoried land,* is an area for which no evaluation of soils, vegetation, or hydrology has been conducted to determine if wetland criteria are met;

(7) *Non-wetland* is;

(i) Land that under natural conditions does not meet wetland criteria, or

(ii) Is converted wetland the conversion of which occurred prior to December 23, 1985, and on that date, the land did not meet wetland criteria but and agricultural commodity was not produced and the area was not managed for pasture or hay;

(8) *Prior-converted cropland* is a converted wetland where the conversion occurred prior to December 23, 1985, an agricultural commodity had been produced at least once before December 23, 1985, and as of December 23, 1985, the converted wetland did not support woody vegetation and met the following hydrologic criteria:

(i) Inundation was less than 15 consecutive days during the growing season or 10 percent of the growing season, whichever is less, in most years (50 percent chance or more); and

(ii) If a pothole, playa or pocosin, ponding was less than 7 consecutive days during the growing season in most years (50 percent chance or more) and saturation was less than 14 consecutive days during the growing season most years (50 percent chance or more); or

(9) *Wetland,* as defined above in this section.

*Wetland delineation* means outlining the boundaries of a wetland determination on aerial photography,

digital imagery, other graphic representation of the area, or on the land.

(b) *Terms for FSA operations.* In the regulations in this part, and in all instructions, forms, and documents in connection therewith, all other words and phrases specifically relating to FSA operations shall, unless required by the subject matter or the specific provisions of this part, have the meanings assigned to them in the regulations at part 718 of this title that govern reconstitutions of farms, allotments, and bases and any subsequent amendment thereto.

**§ 12.3    Applicability.**

(a) *Geographic scope.* The provisions of this part shall apply to all land, including Indian tribal land, in the fifty States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Island of the United States, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Federated States of Micronesia, the Republic of Palau, and the Republic of the Marshall Islands.

(b) *Effective date.* The provisions of this part apply to all actions taken after July 3, 1996, and to determinations made after or pending on July 3, 1996, except to the extent that § 12.5(a)(5) and 12.5 (b)(4) through (b)(8) specify retroactive application on December 23, 1985, and November 28, 1990, for certain actions and determinations regarding wetlands and converted wetlands. Actions taken and determinations made prior to July 3, 1996, are subject to regulations set forth in this part as of July 2, 1996, except as otherwise provided in this part. Further, to the extent that a person may be eligible for an exemption for an action taken before July 3, 1996, the action is subject to the provisions of this part.

**§ 12.4    Determination of ineligibility.**

(a) *Actions.* Except as provided in § 12.5, a person shall be ineligible for all or a portion of USDA program benefits listed in this section if:

(1) The person produces an agricultural commodity on a field in which highly erodible land is predominant, or designates such a field for conservation use;

(2) The person produces an agricultural commodity on wetland that was converted after December 23, 1995; or

(3) After November 28, 1990, the person converts a wetland by draining, dredging, filling, leveling, removing woody vegetation, or other means for the purpose, or to have the effect, of making the production of an agricultural commodity possible.

(b) *Highly erodible land.* A person determined to be ineligible under paragraph (a)(1) of this section may be ineligible for all program benefits listed in (d) and (e) of this section.

(c) *Wetland conservation.* A person determined to be ineligible under paragraph (a)(2) of this section shall be ineligible for all or a portion of the USDA program benefits listed in paragraph (d) of this section for which the person otherwise would have been eligible during the crop year of the commodity that was planted on the converted wetland. A person determined to be ineligible under paragraph (a)(3) of this section for the conversion of a wetland shall be ineligible for all or a portion of the USDA program benefits listed in paragraph (d) of this section for which the person otherwise would have been eligible during the crop year which is equal to the calendar year during which the violation occurred and each subsequent crop year until the converted wetland is restored or the loss of wetland functions and values have been mitigated prior to the beginning of such calendar year in accordance with § 12.5(b)(4)(i) (A) and (C) through (F) of this part. Ineligibility under paragraph (a)(2) or (a)(3) of this section may be reduced, in lieu of the loss of all benefits specified under paragraph (d) of this section for such crop year, based on the seriousness of the violation, as determined by the FSA Deputy Administrator for Farm Programs or designee upon recommendation by the FSA County Committee. Factors such as the information that was available to the affected person prior to the violation, previous land use patterns, the existence of previous wetland violations under this part or under other Federal, State, or local wetland provisions, the wetland functions and values affected, the recovery time for full mitigation of the wetland functions and values, and the impact that a reduction in payments would have on the person's ability to repay a USDA farm loan shall be considered to making this determination.

(d) *Programs subject to either highly erodible land or wetland conservation.* USDA program benefits covered by a determination of ineligibility under this rule are:

(1) Contract payments under a production flexibility contract, marketing assistance loans, and any type of price support or payment made available under the Agricultural Market Transition Act, the Commodity Credit Corporation Charter Act (15 U.S.C. 714 et seq.), or any other Act;

(2) A farm credit program loan made or guaranteed under the Consolidated Farm and Rural Development Act (7 U.S.C. 1921 *et seq.*) or any other provision of law administered by FSA if the Secretary determines that the proceeds of such loan will be used for a purpose that contributes to the conversion of wetlands that would make production of an agricultural commodity possible or for a purpose that contributes to excessive erosion of highly erodible land (*i.e.*, production of an agricultural commodity or highly erodible land without a conservation plan or conservation system as required by this part);

(3) A payment made pursuant to a contract entered into under the Environmental Quality Incentives Program under chapter 4 of subtitle D of the Food Security Act of 1985, as amended; or a payment under any other provision of Subtitle D of that Act;

(4) A payment made under section 401 or 402 of the Agricultural Credit Act of 1978 (16 U.S.C. 2201 or 2202);

(5) A payment, loan, or other assistance under section 3 or 8 of the Watershed Protection and Flood Prevention Act (16 U.S.C. 1003 or 1006a).

(e) *Programs subject to highly erodible land only.* In addition to programs listed in paragraph (d) of this section, a person determined to be ineligible under paragraph (a)(1) of this section shall be ineligible as determined by FSA for the following USDA program benefits for which the person otherwise would have been eligible during the crop year for which the determination applies:

(1) A farm storage facility loan made under section 4(h) of the Commodity Credit Corporation Charter Act (15 U.S.C. 714b(h));

(2) A disaster payment made under the Federal Agricultural Improvement and Reform Act, Pub. L. 104–127, or any other act; and

(3) A payment made under section 4 or 5 of the Commodity Credit Corporation Charter Act (15 U.S.C. 714b or 714c) for the storage of an agricultural commodity acquired by the Commodity Credit Corporation.

(f) *Prior loans.* The provisions of paragraphs (a), (b), and (c) of this section do not apply to any loan described in paragraphs (d) or (e) of this section that was made prior to December 23, 1985.

(g) *Determination of ineligibility.* For the purpose of paragraph (a) of this section, a person shall be determined to have produced an agricultural commodity on a field in which highly erodible land is predominant or to have designated such a field for conservation use, to have produced an agricultural commodity on converted wetland, or to have converted a wetland if:

(1) NRCS has determined that—

(i) Highly erodible land is predominant in such field, or

(ii) All or a portion of the field is converted wetland; and

(2) FSA has determined that the person is or was the owner or operator of the land, or entitled to share in the crops available from the land, or in the proceeds thereof; and

(3) With regard to the provisions of paragraph (a)(1) and (a)(2) of this section, FSA has determined that the land is or was planted to an agricultural commodity or was designated as conversation use during the year for which the person is requesting benefits.

(h) *Intent to participate in USDA programs.* Persons who wish to participate in any of the USDA programs described in paragraph (d) or (e) of this section are responsible for contacting the appropriate agency of USDA well in advance of the intended participated date so that Form AD–1026 can be completed. This contact will help assure that the appropriate determinations regarding highly erodible land or wetland, and conversation plans or conversation systems are scheduled in a timely manner. A late contact may not allow sufficient time for USDA to service the request and could result in a substantial delay in receiving a USDA determination of eligibility or ineligibility.

### § 12.5    Exemption.

(a) *Exemptions regarding highly erodible land.*

(1) *Highly erodible cropland in production or in USDA programs during 1981 through 1985 crop years.* During the period beginning on December 23, 1985, and ending on the later of January 1, 1990, or the date that is two years after the date the cropland on which an agricultural commodity is produced was surveyed by NRCS to determine if such land is highly erodible, no person shall be determined to be ineligible for benefits as provided in § 12.4 as the result of the production of an agricultural commodity on any highly erodible land:

(i) That was planted to an agricultural commodity in any year 1081 through 1985; or

(ii) That was set aside, diverted, or otherwise not cultivated in any such crop years under a program administered by the Secretary for any such crops to reduce production of an agricultural commodity.

(2) *Compliance with a conservation plan or conservation system.* As further specified in this part, no person shall be ineligible for the program benefits described in § 12.4 as the result of production of an agricultural commodity on highly erodible land or the designation of such land for conservation use if such production or designation is in compliance with a conservation plan or conservation system approved under paragraph (a)(2)(i) or (a)(2)(ii) of this section. A person shall not be ineligible for program benefits under § 12.4 as the result of the production of an agricultural commodity on highly erodible land or as the result of designation of such land as conservation use if the production or designation is:

(i) In an area within a CD, under a conservation system that has been approved by the CD after the CD determines that the conservation system is in conformity with technical standards set forth in the NRCS field office technical guide for such district; or

(ii) In an area not within a CD, under a conservation system that has been approved by NRCS to be adequate for the production of such agricultural commodity on highly erodible land or for the designation of such land as conservation use.

(3) *Reliance upon NRCS determination for highly erodible land.* A person may be relieved from ineligibility for program benefits as the result of the production of an agricultural commodity which was produced on highly erodible land or for the designation of such land as conservation use in reliance on a determination by NRCS that such land was not highly erodible land, except that this paragraph shall not apply to any agricultural commodity that was planted on highly erodible land, or for the designation of highly erodible land as conservation use after NRCS determines that such land is highly erodible land, and the person is notified of such determinations.

(4) *Areas of 2 acres or less.* No person shall be determined to be ineligible under § 12.4 for noncommercial production of agricultural commodities on highly erodible land on an area of 2 acres or less if it is determined by FSA that such production is not intended to circumvent the conservation requirements otherwise applicable under this part.

(5) *Good faith.*

(i) No person shall become ineligible under § 12.4 as a result of the failure of such person to apply a conservation system on highly erodible land that was converted from native vegetation, i.e. rangeland or woodland, to crop production before December 23, 1985, if FSA determines such person has acted in good faith and without the intent to violate the provisions of this part and if NRCS determines that the person complies with paragraph (a)(5)(ii) of this section.

(ii) A person is who determined to meet the requirements of paragraph (a)(5)(i) of this section shall be allowed a reasonable period of time, as determined by NRCS, but not to exceed one year, during which to implement the measures and practices necessary to be considered applying the person's conservation plan. If a person does not take the required corrective actions, the person may be determined to be ineligible for the crop year during which such actions were to be taken as well as any subsequent crop years. Notwithstanding the good-faith requirements of paragraph (a)(5)(i) of this section, if NRCS observes a possible compliance deficiency while providing on-site technical assistance, NRCS shall provide to the responsible person, not later than 45 days after observing the possible violation, information regarding actions needed to comply with the plan and this subtitle. NRCS shall provide this information in lieu of reporting the observation as a violation, if the responsible person attempts to correct the deficiencies as soon as practicable, as determined by NRCS, after receiving the information, and if the person takes corrective action as directed by NRCS not later than one year after receiving the information. If a person does not take the required corrective actions, the person may be determined to be ineligible for the crop year during which the compliance deficiencies occurred as well as any subsequent crop years.

(iii) No person shall become ineligible under § 12.4 as a result of failure to apply a conservation system with respect to highly erodible cropland that was converted from native vegetation, i.e., rangeland or woodland, to crop production after December 23, 1985, if such person has acted in good faith and without an intent to violate the provisions of this part. The person shall, in lieu of the loss of all benefits specified under § 12.4 (d) and (e) for such crop year, be subject to a reduction in benefits of not less than $500 nor more than $5,000 depending upon the seriousness of the violation, as determined by FSA. The dollar amount of the reduction will be determined by FSA and may be based on the number of acres and the degree of erosion hazard for the area in violation, as determined by NRCS, or upon such other factors as FSA deems appropriate.

(iv) Any person whose benefits are reduced in a crop year under paragraph (a)(5) of this section may be eligible for all of the benefits specified under § 12.4 (d) and (e) for any subsequent crop year if NRCS determines that such person is applying a conservation plan according to the schedule set forth in the plan on all highly erodible land planted to an agricultural commodity or designated as conservation use.

(6) *Allowable variances.*

(i) Notwithstanding any other provisions of this part, no person shall be determined to be ineligible for benefits as a result of the failure of such person to apply a conservation system if NRCS determines that—

(A) The failure is technical and minor in nature and that such violation has little effect on the erosion control purposes of the conservation plan applicable to the land on which the violation has occurred; or

(B) The failure is due to circumstances beyond the control of the person; or

(C) NRCS grants a temporary variance from the practices specified in the plan for the purpose of handling a specific problem, including weather, pest, and disease problems, which NRCS determines cannot reasonably be addressed except through such variance.

(ii) If the person's request for a temporary variance involves the use of practices or measures to address weather, pest, or disease problems, NRCS shall make a decision on whether to grant the variance during the 30-day period beginning on the date of receipt of the request. If NRCS fails to render a decision during the period, the temporary variance shall be considered granted unless the person seeking the variance had reason to know that the variance would not be granted. In determining whether to grant a variance for natural disasters such as weather, pest, or disease problems, NRCS will consider such factors as:

(A) The percent of a stand damaged or destroyed by the event;

(B) The percent of expected crop production compared to normal production for that crop;

(C) The documented invasion of non-native insects, weeds, or diseases for which no recognized treatment exists;

(D) Whether an event is severe or unusual based on historical weather records; and

(E) Other specific circumstances caused by a natural event that prevented the implementation of conservation practices or systems, installation of structures, or planting of cover crops.

(b) *Exemptions for wetlands and converted wetlands.*

(1) *General exemptions.* A person shall not be determined to be ineligible for program benefits under § 12.4 as the result of the production of an agricultural commodity on converted wetland or the conversion of wetland if:

(i) The land is a prior-converted cropland and meets the definition of a prior-converted cropland as of the date of a wetland determination by NRCS;

(ii) The land has been determined by NRCS to be a prior-converted cropland and such determination has been certified, and NRCS determines that the wetland characteristics returned after the date of the wetland certification as a result of—

(A) The lack of maintenance of drainage, dikes, levees, or similar structures,

(B) The lack of management of the lands containing the wetland, or

(C) Circumstances beyond the control of the person;

(iii) The land was determined by NRCS to be a farmed wetland or a farmed-wetland pasture and—

(A) Such land meets wetland criteria through a voluntary restoration, enhancement, or creation action after that determination,

(B) The technical determinations regarding the baseline site conditions and the restoration, enhancement, or creation action have been adequately documented by NRCS,

(C) The proposed conversion action is documented by the NRCS prior to implementation, and

(D) The extent of the proposed conversion is limited so that the conditions will be at least equivalent to the wetland functions and values that existed at the time of implementation of the voluntary wetland restoration, enhancement, or creation action;

(iv) NRCS has determined that the conversion if for a purpose that does not make the production of an agricultural commodity possible, such as conversions for fish production, trees, vineyards, shrubs, cranberries, agricultural waste management structures, livestock ponds, fire control, or building and road construction and no agricultural commodity is produced on such land;

(v) NRCS has determined that the actions of the person with respect to the conversion of the wetland or the combined effect of the production of an agricultural commodity on a wetland converted by the person or by someone else, individually and in connection with all other similar actions authorized by NRCS in the area, would have only a minimal effect on the wetland

functions and values of wetlands in the area;

(vi) (A) After December 23, 1985, the Army Corps of Engineers issued an individual permit pursuant to section 404 of the Clean Water Act, 33 U.S.C. 1344, authorizing such action and the permit required mitigation that adequately replaced the functions and values of the wetlands converted, as determined by NRCS, or

(B) After December 23, 1985, the action is encompassed under section 404 of the Clean Water Act, 33 U.S.C. 1344, by an Army Corps of Engineers nationwide or regional general permit and the wetland functions and values were adequately mitigated, as determined by NRCS; or

(vii) The land is determined by NRCS to be—

(A) An artificial wetland,

(B) A wet area created by a water delivery system, irrigation, irrigation system, or application of water for irrigation,

(C) A nontidal drainage or irrigation ditch excavated in non-wetland, or

(D) A wetland converted by actions of persons other than the person applying for USDA program benefits or any of the person's predecessors in interest after December 23, 1985, if such conversion was not the result of a scheme or device to avoid compliance with this part. Further drainage improvement on such land is not permitted without loss of eligibility for USDA program benefits, unless NRCS determines under paragraph (b)(1)(v) of this section that further drainage activities applied to such land would have minimal effect on the wetland functions and values in the area. In applying this paragraph, a converted wetland shall be presumed to have been converted by the person applying for USDA program benefits unless the person can show that the conversion was caused by a third party with whom the person was not associated through a scheme or device as described under § 12.10 of this part. In this regard, activities of a water resource district, drainage district, or similar entity will be attributed to all persons within the jurisdiction of the district or other entity who are assessed for the activities of the district or entity. Accordingly, where a person's wetland is converted due to the actions of the district or entity, the person shall be considered to have caused or permitted the drainage. Notwithstanding the provisions of the preceding sentences and as determined by FSA to be consistent with the purposes of this part, the activities of a drainage district or other similar entity will not be attributed to a person to the extent that

the activities of the district or entity were beyond the control of the person and the wetland converted is not used by the person for the production of an agricultural commodity or a forage crop for harvest by mechanical means or mitigation for the converted wetland occurs in accordance with this part.

(2) *Commenced conversion wetlands.*

(i) The purpose of a determination of a commenced conversion made under this paragraph is to implement the legislative intent that those persons who had actually started conversion of a wetland or obligated funds for conversion prior to December 23, 1985, would be allowed to complete the conversion so as to avoid unnecessary economic hardship.

(ii) All persons who believed they had a wetland or converted wetland for which conversion began but was not completed prior to December 23, 1985, must have requested by September 19, 1988, FSA to make a determination of commencement in order to be considered exempt under this section.

(iii) Any conversion activity considered by FSA to be commenced under this section lost its exempt status if such activity was not completed on or before January 1, 1995. For purposes of this part, land on which such conversion activities were completed by January 1, 1995, shall be evaluated by the same standards and qualify for the same exemptions as prior-converted croplands. For purposes of this part, land on which such conversion activities were not completed by January 1, 1995, shall be evaluated by the same standards and qualify for the same exemptions as wetlands or famed wetlands, as applicable.

(iv) Only those wetlands for which the construction had begun, or to which the contract or purchased supplies and materials related, qualified for a determination of commencement. However, in those circumstances where the conversion of wetland did not meet the specific requirements of this paragraph, the person could have requested a commencement of conversion determination from the FSA Deputy Administrator for Farm Programs, upon a showing that undue economic hardship would have resulted because of substantial financial obligations incurred prior to December 23, 1985, for the primary and direct purpose of converting the wetland.

(3) *Wetlands farmed under natural conditions.* A person shall not be determined to be ineligible for program benefits under § 12.4 of this part as a result of the production of an agricultural commodity on a wetland on which the owner or operator of a farm

or ranch uses normal cropping or ranching practices to produce agricultural commodities in a manner that is consistent for the area, where such production is possible as a result of natural conditions, such as drought, and is without action by the producer that alters the hydrology or removes woody vegetation.

(4) *Mitigation.*

(i) No person shall be determined to be ineligible under § 12.4 for any action associated with the conversion of a wetland if the wetland functions and values are adequately mitigated, as determined by NRCS, through the restoration of a converted wetland, the enhancement of an existing wetland, or the creation of a new wetland, if the mitigation—

(A) Is in accordance with a mitigation plan approved by NRCS;

(B) Is in advance of, or concurrent with, the wetland conversion or the production of an agricultural commodity, as applicable;

(C) Is not at the expense of the federal government in either supporting the direct or indirect costs of the restoration activity or costs associated with acquiring or securing mitigation sites, except if conducted under a mitigation banking pilot program established by USDA;

(D) Occurs on lands in the same general area of the local watershed as the converted wetlands, provided that for purposes of this paragraph, lands in the same general area of the local watershed may include regional mitigation banks;

(E) Is on lands for which the owner has granted an easement to USDA, recorded the easement on public land records, and has agreed to the maintenance of the restored, created, or enhanced wetland for as long as the converted wetland for which the mitigation occurred remains in agricultural use or is not returned to its original wetland classification with equivalent functions and values; and

(F) Provides the equivalent functions and values that will be lost as a result of the wetland conversion.

(ii) A mitigation plan is a record of decisions that document the actions necessary to compensate for the loss of wetland functions and values that result from converting a wetland. The mitigation plan may be a component of a larger natural resources conservation plan.

(iii) The State Conservationist, in consultation with the State Technical Committee, may name certain types or classes of wetland not eligible for exemption under paragraph (b)(4)(i) of this section where the State

Conservationist determines that mitigation will not achieve equivalent replacement of wetland functions and values within a reasonable time frame or for other reasons identified by the State Conservationist. Any type or class of wetland that a State Conservationist identifies as not eligible for exemption under paragraph (b)(4)(i) of this section will be published in the **Federal Register** for inclusion in this part.

(5) *Good Faith Violations.*

(i) A person who is determined under § 12.4 to be ineligible for benefits as the result of the production of an agricultural commodity on a wetland converted after December 23, 1985, or as the result of the conversion of a wetland after November 28, 1990, may regain eligibility for benefits if—

(A) FSA determines that such person acted in good faith and without the intent to violate the wetland provisions of this part, and

(B) NRCS determines that the person within an award to period, not to exceed 1 year, is implementing all practices in a mitigation plan.

(ii) In determining whether a person acted in good faith under paragraph (b)(5)(i)(A) of this section, the FSA shall consider such factors as whether—

(A) The characteristics of the site were such that the person should have been aware that a wetland existed on the subject land,

(B) NRCS had informed the person about the existence of a wetland on the subject land,

(C) The person did not convert the wetland, but planted an agricultural commodity on converted wetland when the person should have known that a wetland previously existed on the subject land,

(D) The person has a record of violating the wetland provisions of this part or other Federal, State, or local wetland provisions, or

(E) There exists other information that demonstrates that the person acted with the intent to violate the wetland provisions of this part.

(iii) After the requirements of paragraph (b)(5)(i) of this section are met, USDA may waive applying the ineligibility provisions of § 12.4.

(6) *Reliance upon NRCS wetland determination.* (i) A person shall not be ineligible for program benefits as a result of taking an action in reliance on a previous certified wetland determination by NRCS.

(ii) A person who may be ineligible for program benefits as the result of the production of an agricultural commodity on converted wetland or for the conversion of a wetland may seek relief under § 12.11 of this part if such

action was taken in reliance on an incorrect technical determination by NRCS as to the status of such land. If the error caused the person to make a substantial financial investment, as determined by the NRCS, for the conversion of a wetland, the person may be relieved of ineligibility for actions related to that portion of the converted wetland for which the substantial financial investment was expended in conversion activities. The relief available under this paragraph shall not apply to situations in which the person knew or reasonably should have known that the determination was in error because the characteristics of the site were such that the person should have been aware that a wetland existed on the subject land, or for other reasons.

(7) *Responsibility to provide evidence.* It is the responsibility of the person seeking an exemption related to converted wetlands under this section to provide evidence, such as receipts, crop-history data, drawings, plans or similar information, for purposes of determining whether the conversion or other action is exempt in accordance with this section.

## § 12.6　Administration.

(a) *General.* A determination of ineligibility for benefits in accordance with the provisions of this part shall be made by the agency of USDA to which the person has applied for benefits. All determinations required to be made under the provisions of this part shall be made by the agency responsible for making such determinations, as provided in this section.

(b) *Administration by FSA.*

(1) The provisions of this part which are applicable to FSA will be administered under the general supervision of the Administrator, FSA, and shall be carried out in the field in part by State FSA committees and county FSA committees (COC).

(2) The FSA Deputy Administrator for Farm Programs may determine any question arising under the provisions of this part which are applicable to FSA and may reverse or modify any determination of eligibility with respect to programs administered by FSA made by a State FSA committee or COC or any other FSA office or FSA official (except the Administrator) in connection with the provisions of this part.

(3) FSA shall make the following determinations which are required to be made in accordance with this part:

(i) Whether a person produced an agricultural commodity on a particular field as determined under § 12.5(a)(1);

(ii) The establishment of field boundaries;

(iii) Whether land was planted to an agricultural commodity in any of the years, 1981 through 1985, for the purposes of § 12.5(a)(1);

(iv) Whether land was set aside, diverted, or otherwise not cultivated under a program administered by the Secretary for any crop to reduce production of an agricultural commodity under § 12.4(g) and § 12.5(a)(1);

(v) Whether for the purposes of § 12.9, the production of an agricultural commodity on highly erodible land or converted wetland by a landlord's tenant or sharecropper is required under the terms and conditions of the agreement between the landlord and such tenant or sharecropper;

(vi) Whether the conversion of a particular wetland was commenced before December 23, 1985, for the purposes of § 12.5(b)(3);

(vii) Whether the conversion of a wetland was caused by a third party under § 12.5(b)(1)(vii)(D);

(viii) Whether certain violations were made in good faith under §§ 12.5(a)(5) or 12.5(b)(5);

(ix) The determination of the amount of reduction in benefits based on the seriousness of the violation, based on technical information provided by NRCS;

(x) The determination of whether the application of the producer's conservation system would impose an undue economic hardship on the producer; and

(xi) Whether the proceeds of a farm loan made, insured, or guaranteed by FSA will be used for a purpose that will contribute to excessive erosion of highly erodible land or to the conversion of wetland.

(4) A representative number of farms selected in accordance with instructions issued by the Deputy Administrator shall be inspected by an authorized representative of FSA to determine compliance with any requirement specified in this part as a prerequisite for obtaining program benefits.

(5) FSA may consult with U.S. Fish and Wildlife Service on third-party determinations.

(c) *Administraiton by NRCS.*

(1) The provisions of this part that are applicable to NRCS shall be administered under the general supervision of the Deputy Chief for Natural Resources Conservation Programs, and shall be carried out in the field by the regional conservationist, state conservationist, area conservationist, and district conservationist or other NRCS representative.

(2) An NRCS representative shall make the following determinations which are required to be made in accordance with this part:

(i) Whether land is highly erodible or has a wetland type or a converted wetland identified in accordance with the provisions of this part;

(ii) Whether highly erodible land is predominant on a particular field under § 12.22;

(iii) Whether the conservation plan that a person is applying is based on the local NRCS field office technical guide and is approved by—

(A) The CD and NRCS, or

(B) By NRCS;

(iv) Whether the conservation system that a person is using has been approved by the CD under § 12.5(a)(2) or, in an area not within a CD, a conservation system approved by NRCS to be adequate for the production of an agricultural commodity on highly erodible land;

(v) Whether the actions of a person(s) with respect to the conversion of a wetland or production of an agricultural commodity on converted wetland would have only a minimal effect on the functions and values of wetlands in the area;

(vi) Whether an approved conservation plan is being applied on highly erodible fields in accordance with the schedule specified therein or whether a failure to apply the plan is technical and minor in nature, due to circumstances beyond the control of the person, or whether a temporary variance form the requirements of the plan should be granted;

(vii) Whether an approved conservation system is being used on a highly erodible field;

(viii) Whether the conversion of a wetland is for the purpose or has the effect of making the production of an agricultural commodity possible;

(ix) Whether a farmed wetland or farmed-wetland pasture is abandoned;

(x) Whether the planting of an agricultural commodity on a wetland is possible under natural conditions;

(xi) Whether maintenance of existing drainage of a wetland described in § 12.33 exceeds the scope and effect of the original drainage;

(xii) Whether a plan for the mitigation of a converted wetland will be approved and whether the mitigation of a converted wetland is accomplished according to the approved mitigation plan;

(xiii) Whether all technical information relating to the determination of a violation and severity of a violation has been provided

to FSA for making payment-reduction determinations; and

(xiv) Whether or not a commenced-conversion activity was completed by January 1, 1995.

(3) NRCS may provide such other technical assistance for implementation of the provisions of this part as is determined to be necessary.

(4) A person may obtain a highly erodible land or a wetland scope-and-effect determination by making a written request on Form AD–1026. The determination will be made in writing, and a copy will be provided to the person.

(5) A determination of whether or not an area meets the highly erodible land criteria or whether wetland criteria, identified in accordance with the current Federal wetland delineation methodology in use at the time of the determination and that are consistent with current mapping conventions, may be made by the NRCS representative based upon existing records or other information and without the need for an on-site determination. This determination will be made by the NRCS representative as soon as possible following a request for such a determination.

(6) An on-site determination as to whether an area meets the applicable criteria shall be made by an NRCS representative if the person has disagreed with the determination made under paragraph (c)(5) of this section, or if adequate information is not otherwise available to an NRCS representative on which to make an off-site determination.

(7) An on-site determination, where applicable, will be made by the NRCS representative as soon as possible following a request for such a determination, but only when site conditions are favorable for the evaluation of soils, hydrology, or vegetation.

(8) With regard to wetland determinations, if an area is continuously inundated or saturated for long periods of time during the growing season to such an extent that access by foot to make a determination of predominance of hydric soils or prevalence of hydrophytic vegetation is not feasible, the area will be determined to be a wetland.

(9) Persons who are adversely affected by a determination made under this section and believe that the requirements of this part were improperly applied may appeal, under § 12.12 of this part, any determination by NRCS.

(d) *Administration by CSREES.* The CSREES shall coordinate the related information and education program for

USDA concerning implementation of this rule.

(e) *Assistance of other Federal agencies.* If NRCS determines, through agreement or otherwise, that the purposes of this part would be furthered by the assistance of other Federal agencies with wetland responsibilities, NRCS may accept such assistance and adopt any or all such actions by these agencies as an action by an NRCS representative under this part.

**§ 12.7    Certification of compliance.**

(a) *Self-certification.* In order for a person to be determined to be eligible for any of the benefits specified in § 12.4:

(1) It must be determined by USDA whether any field in which the person applying for the benefits has an interest and intends to produce an agricultural commodity contains highly erodible land;

(2) The person applying for or receiving the benefits must certify in writing on Form AD–1026 that such person will not produce an agricultural commodity on highly erodible land, or designate such land for conservation use; or plant an agricultural commodity on a converted wetland; or convert a wetland to make possible the production of an agricultural commodity during the crop year in which the person is seeking such benefits, unless such actions are exempt, under § 12.5, from the provisions of § 12.4 of this part;

(3) A person may certify application of practices required by the person's conservation plan. NRCS shall permit a person who makes such a certification with respect to a conservation plan to revise the conservation plan in any manner, if the same level of conservation treatment provided for by the conservation system under the person's conservation plan is maintained. NRCS may not revise the person's conservation plan without the concurrence of the person;

(4) The person applying for a FSA direct or guaranteed farm credit program loan must certify that such person shall not use the proceeds of the loan for a purpose that will contribute to excessive erosion on highly erodible land or to conversion of wetlands for the purpose, or to have the effect, of making the production of an agricultural commodity possible; and

(5) The person applying for the benefits must authorize and provide representatives of USDA access to all land in which such person has an interest for the purpose of verifying any such certification.

(b) *Availability to other agencies.* Each agency of USDA shall make all certifications of compliance received by such agency and the results of investigations concerning such certifications of compliance available to other agencies.

(c) *Compliance.* A certification made in accordance with this section does not relieve any person from compliance with provisions of this part.

**§ 12.8    Affiliated persons.**

(a) *Ineligibility of affiliated persons.* Ineligibility of an individual or entity under this part for benefits shall also be an ineligibility for benefits for "affiliated persons" as defined in this section.

(b) *Affiliated persons of an individual.* If the person requesting benefits is an individual, the affiliated persons are:

(1) The spouse and minor child of such person or guardian of such child; except that spouses who establish to the satisfaction of the COC that operations of the husband and wife are maintained separately and independently shall not be considered affiliates;

(2) Any partnership, joint venture, or other enterprise in which the person or any person listed in paragraphs (b)(1) has an ownership interest or financial interest; unless such interest is held indirectly through another business enterprise; or

(3) Any trust in which the individual, business enterprise, or any person listed in paragraph (b)(1) is a beneficiary or has a financial interest, unless such interest is held indirectly through another business enterprise.

(c) *Affiliated persons of an entity.* If the person who has requested benefits from USDA is a corporation, partnership, or other joint venture, the affiliated persons are any participant or stockholder therein of the corporation, partnership, or other joint venture, except for persons who have an indirect interest through another business enterprise in such corporation, partnership, or other joint venture or persons with a 20 percent or less share in a corporation.

(d) *Limitation.* Any reduction in payments which results only from the application of the affiliation provisions of this section to a partnership, joint venture, trust, or other enterprise shall be limited to the extent of interest held in such partnership, joint venture, trust, or other enterprise by the person or business enterprise that committed the violation. However, for violations for which the business enterprise is considered directly responsible under the provisions of this part, the business enterprise shall be subject to a full loss

of benefits, including those instances in which the business enterprise has an interest in the land where the violation occurred or where the business enterprise had an interest in the crops produced on the land.

(e) *Avoidance of this part.* Limitations on affiliation shall not apply as needed to correct for any action that would otherwise tend to defeat the purposes of this part.

**§ 12.9    Landlords and tenants.**

(a) *Landlord eligibility.*

(1) Except as provided in paragraph (a)(2) of this section, the ineligibility of a tenant or sharecropper for benefits (as determined under § 12.4) shall not cause a landlord to be ineligible for USDA program benefits accruing with respect to land other than those in which the tenant or sharecropper has an interest.

(2) The provisions of paragraph (a)(1) of this section shall not be applicable to a landlord if the production of an agricultural commodity on highly erodible land or converted wetland by the landlord's tenant or sharecropper is required under the terms and conditions of the agreement between the landlord and such tenant or sharecropper and such agreement was entered into after December 23, 1985, or if the landlord has acquiesced in such activities by the tenant or sharecropper.

(b) *Tenant or renter eligibility.*

(1) The ineligibility of a tenant or renter may be limited to the program benefits listed in § 12.4(c) accruing with respect to only the farm on which the violation occurred if:

(i) The tenant or renter shows that a good-faith effort was made to comply by developing an approved conservation plan for the highly erodible land in a timely manner and prior to any violation of the provisions of this part; and

(ii) The owner of such farm refuses to apply such a plan and prevents the tenant or renter from implementing certain practices that are a part of the approved conservation plan; and

(iii) FSA determines that the lack of compliance is not a part of a scheme or device as described in § 12.10.

(2) If relief is granted under paragraph (b)(1) of this section, the tenant or renter must actively apply those conservation treatment measures that are determined to be within the control of the tenant or renter.

**§ 12.10    Scheme or device.**

All or any part of the benefits listed in § 12.4 otherwise due a person from USDA may be withheld or required to be refunded if the person adopts or participates in adopting any scheme or

**47034** **Federal Register** / Vol. 61, No. 174 / Friday, September 6, 1996 / Rules and Regulations

device designed to evade, or which has the effect of evading, the provisions of this part. Such acts shall include, but are not limited to, concealing from USDA any information having a bearing on the application of the provisions of this part or submitting false information to USDA or creating entities for the purpose of concealing the interest of a person in a farming operation or to otherwise avoid compliance with the provisions of this part. Such acts shall also include acquiescence in, approval of, or assistance to acts which have the effect of, or the purpose of, circumventing these regulations.

**§ 12.11  Action based upon advice or action of USDA.**

The provisions of part 718 of this Title, as amended, relating to performance based upon the action or advice of a County Committee (COC) or State FSA Committee shall be applicable to the provisions of this part. In addition, if it is determined by the appropriate USDA agency that the action of a person which would form the basis of any ineligibility under this part was taken by such person in good-faith reliance on erroneous advice, information, or action of any other authorized representative of USDA, the appropriate agency may make such benefits available to the extent that similar relief would be allowed under 7 CFR part 718.

**§ 12.12  Appeals.**

Any person who has been or who would be denied program benefits in accordance with § 12.4 as the result of any determination made in accordance with the provisions of this part may obtain a review of such determination in accordance with the administrative appeals procedures of the agency which rendered such determination. Agency appeal procedures are contained in the Code of Federal Regulations as follows: FSA, part 780 of this title; NRCS, part 614 of this title; Rural Utilities Service, part 1900, subpart B of this title.

**Subpart B—Highly Erodible Land Conservation**

**§ 12.20  NRCS responsibilities regarding highly erodible land.**

In implementing the provisions of this part, NRCS shall, to the extent practicable:

(a) Develop and maintain criteria for identifying highly erodible lands;

(b) Prepare and make available to the public lists of highly erodible soil map units;

(c) Make soil surveys for purposes of identifying highly erodible land; and

(d) Provide technical guidance to conservation districts which approve conservation plans and systems, in consultation with local county FSA committees, for the purposes of this part.

**§ 12.21  Identification of highly erodible lands criteria.**

(A) *Basis for identification as highly erodible.* Soil map units and an erodibility index will be used as the basis for identifying highly erodible land. The erodibility index for a soil is determined by dividing the potential average annual rate of erosion for each soil by its predetermined soil loss tolerance (T) value. The T value represents the maximum annual rate of soil erosion that could occur without causing a decline in long-term productivity. The equation for measuring erosion is described below.

(1) The potential average annual rate of sheet and rill erosion is estimated by multiplying the following factors of the Universal Soil Loss Equation (USLE):

(i) Rainfall and runoff (R);

(ii) The degree to which the soil resists water erosion (K); and

(iii) The function (LS), which includes the effects of slope length (L) and steepness (S).

(2) The potential average annual rate of wind erosion is estimated by multiplying the following factors of the Wind Erosion Equation (WEQ): Climatic characterization of windspeed and surface soil moisture (C) and the degree to which soil resists wind erosion (I).

(3) The USLE is explained in the U.S. Department of Agriculture Handbook 537, ''Predicting Rainfall Erosion Losses.'' The WEQ is explained in the paper by Woodruff, N.P., and F. H. Siddaway, 1965, ''A Wind Erosion Equation,'' Soil Science Society of America Proceedings, Vol. 29. No. 5, pages 602–608. Values for all the factors used in these equations are contained in the NRCS field office technical guide and the references which are a part of the guide. The Universal Soil Loss Equation, the Revised Universal Soil Loss Equation, and the Wind Erosion Equation and the rules under which NRCS uses the equations are published at §§ 610.11 through 610.15 of this title.

(b) *Highly erodible.* A soil map unit shall be determined to be highly erodible if either the RKLS/T or the CI/T value for the map unit equals or exceeds 8.

(c) *Potentially highly erodible.* Whenever a soil map unit description contains a range of a slope length and steepness characteristics that produce a range of LS values which result in RKLS/T quotients both above and below

8, the soil map unit will be entered on the list of highly erodible soil map units as ''potentially highly erodible.'' The final determination of erodibility for an individual field containing these soil map unit delineations will be made by an on-site investigation.

**§ 12.22  Highly erodible field determination criteria.**

(a) *Predominance.* Highly erodible land shall be considered to be predominant on a field if either:

(1) 33.33 percent or more of the total field acreage is identified as soil map units which are highly erodible; or

(2) 50 or more acres in such field are identified as soil map units which are highly erodible.

(b) *Modification of field boundaries.* A person may request the modification of field boundaries for the purpose of excluding highly erodible land from a field. Such a request must be submitted to, and is subject to the approval of, FSA. FSA shall use the technical determination of NRCS in approving this request.

(C) *Impact of changing field boundaries.* When field boundaries are changed to include areas of land that were included in a field that was previously determined to be predominately highly erodible according to paragraph (a) of this section, such areas shall continue to be subject to the requirements for predominately highly erodible fields, except as provided in paragraph (b) of this section.

(d) *Small area of noncropland.* Small areas of noncropland within or adjacent to the boundaries of existing highly erodible crop fields such as abandoned farmsteads, areas around filled or capped wells, rock piles, trees, or brush which are converted to cropland are considered to meet the requirement of § 12.5(a)(2) if they are included in an approved conservation plan for the entire highly erodible field.

**§ 12.23  Conservation plans and conservation systems.**

(a) *Use of field office technical guide.* A conservation plan or conservation system developed for the purposes of § 12.5(a) must be based on, and to the extent practicable conform with, the NRCS field office technical guide in use at the time the plan is developed or revised. For highly erodible croplands which were used to produce agricultural commodities prior to December 23, 1985, the applicable conservation systems in the field office technical guide are designed to achieve substantial reductions in soil erosion. Conservation systems shall be

technically and economically feasible; based on local resource conditions and available conservation technology; cost-effective; and shall not cause undue economic hardship on the person applying the conservation system. Any conservation plans or systems that were approved prior to July 3, 1996, are deemed to be in compliance with this paragraph.

(b) *Substantial reduction in soil erosion.* For the purpose of determining whether there is a substantial reduction in soil erosion on a field containing highly erodible cropland which was used to produce an agricultural commodity prior to December 23, 1985, the measurement of erosion reduction achieved by applying a conservation plan or system shall be based on a comparison of the estimated annual level of erosion that is expected to occur on that portion of the field for which a conservation plan or system was developed and is being applied, to the estimated annual level of erosion that existed on that same portion of the field before the application of a conservation plan or system. On a field that is converted from native vegetation after July 3, 1996, and where any crop production will result in increased erosion, in no case will the required conservation plan or system permit a substantial increase in erosion.

(c) *Field trials.* NRCS may allow a person to include in the person's conservation plan or a conservation system under the plan, on a field-trial basis, practices that are not currently approved but that NRCS considers have a reasonable likelihood of success. These trials must have prior approval by NRCS, and must be documented in the person's conservation plan specifying the limited time period during which the field trial is in effect. If, at the end of the conservation field trial period, NRCS finds that the practice does not meet conservation compliance requirements, the person will not be ineligible for USDA program benefits during the period of the field trial.

(d) *Highly erodible land previously under a Conservation Reserve Program contract.* Any person who owns or operates highly erodible land that was under a Conservation Reserve Program contract as authorized by section 1231 of the Food Security Act of 1985, as amended, shall have 2 years after the expiration of termination of the contract to fully apply a conservation system if the conservation plan for such land requires the installation of structural measures for the production of an agricultural commodity. NRCS officials may extend this period one additional year for circumstances beyond the

control of the person. The person shall not be required to meet a higher conservation standard than the standard applied to other highly erodible cropland located within the area served by the field office technical guide for the area in which the field is located.

(e) *Information regarding conservation options.* NRCS, in providing assistance to a person for the preparation or revision of a conservation plan under this part, will provide such person with information concerning cost-effective and applicable erosion control alternatives, crop flexibility, or other conservation assistance options that may be available.

(f) *Timely request for assistance.* Persons who require NRCS assistance for the development of a conservation plan or the installation of a conservation system are encouraged to request this assistance well in advance of deadline dates for compliance; otherwise the person may not be able to comply with these provisions and maintain eligibility for USDA program benefits.

(g) *Action by conservation districts.* Conservation districts approve or disapprove conservation plans or conservation systems after NRCS determines that the plans or systems conform to the NRCS field office technical guide. If a conservation district fails, without due cause, to act on a request for conservation plan or conservation system approval within 45 days, or if no conservation district exists, NRCS will approve or disapprove, as appropriate, the conservation plan or system in question.

(h) *Application of a conservation plan or system.* A person is considered to be applying a conservation plan for purposes of § 12.5(a) if the conservation system or plan being applied achieves or exceeds the substantial reduction in soil erosion as described in paragraph (b) which the conservation system or plan was designed to achieve. It is the responsibility of the person to:

(1) Certify that the conservation plan or system is being applied; and

(2) Arrange for a revision of the conservation plan with NRCS, if changes are made in land use, crop rotation or management, conservation practices, or in the original schedule of practice installation that would affect the achievement of substantial reduction in soil erosion in a given crop year.

(i) *Appeal to FSA.* Persons who are adversely affected by the determinations made under this subpart and believe that the requirements of this subpart were improperly applied may appeal the decision to FSA under § 12.12.

(j) *Undue economic hardship.* After a technical determination has been made, the FSA county committee shall, if a person asserts that the application of the person's conservation system would impose an undue economic hardship on the person, make a recommendation to the State FSA Committee as to whether or not the application of the conservation system would impose an undue economic hardship. The State FSA Committee may provide the person with a variance on the basis of the hardship. Under this variance, and any conditions that may be required in the variance, the person will be considered to be in compliance with the applicable provisions of this part. The State FSA Committee will consider relevant factors, such as the cost of installation of required conservation practices and benefits earned through programs subject to compliance with this part, and the person's general economic situation.

## Subpart C—Wetland Conservation

### § 12.30   NRCS responsibilities regarding wetlands.

(a) *Technical and coordination responsibilities.* In carrying out the provisions of this part, NRCS shall:

(1) Oversee the development and application of criteria to identify hydric soils in consultation with the National Technical Committee for Hydric Soils and make available to the public an approved county list of hydric soil map units, which is based upon the National List of Hydric Soils;

(2) Coordinate with the U.S. Fish and Wildlife Service and others in updating the National List of Plant Species that Occur in Wetlands;

(3) Make or approve wetland determinations, delineations and certifications, functional assessments, mitigation plans, categorical minimal effects, and other technical determinations relative to the implementation of the wetland conservation provisions of this part;

(4) Develop and utilize off-site and on-site wetland identification procedures;

(5) Assure quality of service and determinations through procedures developed by NRCS in consultation with other Federal agencies that have wetland responsibilities;

(6) Investigate complaints and make technical determinations regarding potential violations;

(7) Develop a process at the state level, in coordination with the U.S. Fish and Wildlife Service, to ensure that these provisions are carried out in a technically defensible and timely

manner, seek assistance as appropriate, and annually review the progress being made on implementation; and

(8) Conduct reviews of implementation and provide the Army Corps of Engineers, Environmental Protection Agency, and the U.S. Fish and Wildlife Service an opportunity to participate in this review.

(b) *Technical assistance from others* In carrying out the provisions of this part, NRCS may request technical assistance from the U.S. Fish and Wildlife Service, State or local agencies conservation districts, or qualified private entities when NRCS determines that additional staff resources or technical expertise are needed to address adequately the requirements of this part or to enhance the quality of implementation of this part.

(c) *Certification of wetland determinations and wetland delineations.*

(1) Certification of a wetland determination means that the wetland determination is of sufficient quality to make a determination of program benefits under § 12.4 of this part. Certification of a wetland determination shall be completed according to delineation procedures agreed to by the Army Corps of Engineers, the Environmental Protection Agency, the U.S. Fish and Wildlife Service and NRCS. NRCS may certify a wetland determination without making a field investigation. NRCS will notify the person affected by the certification and provide an opportunity to appeal the certification prior to the certification becoming final. All wetland determinations made after July 3, 1996, will be done on a tract basis and will be considered certified wetland determinations. A not-inventoried designation within a certified wetland is subject to change when the soil, hydrology, and vegetation evaluation is completed and identified as to type of wetland or as a non-wetland. This change from a not-inventoried designation to an approved wetland designation will be done at the request of the landowner or during a formal investigation of a potential violation.

(2) The wetland determination and wetland delineation shall be certified as final by the NRCS official 30 days after providing the person notice of certification or, if an appeal is filed with USDA, after the administrative appeal procedures are exhausted.

(3) In the case of an appeal, NRCS will review and certify the accuracy of the determination of all lands subject to the appeal to ensure that the subject lands have been accurately delineated. Prior to a decision being rendered on the

appeal, NRCS will conduct an on-site investigation of the subject land.

(4) Before any benefits are withheld, an on-site investigation of a potential wetland violation will be made by NRCS. The affected person will be provided an opportunity to appeal the on-site determination to USDA if the on-site determination differs from the original determination. Such action by NRCS shall be considered a review of the prior determination and certification of the delineation. If prior determination was a certified wetland determination, an appeal of the NRCS on-site determination shall be limited to the determination that the wetland was converted in violation of this part.

(5) A copy of the information from the final certified wetland determination and the wetland delineation shall be recorded on official USDA aerial photography, digital imagery, or other graphic representation of the area.

(6) As long as the affected person is in compliance with the wetland conservation provision of this part, and as long as the area is devoted to the use and management of the land for production of food, fiber, horticultural crops, a certification made under this section will remain valid and in effect until such time as the person affected by the certification requests review of the certification by NRCS. A person may request review of a certification only if a natural event alters the topography or hydrology of the subject land to the extent that the final certification is no longer a reliable indication of site conditions, or if NRCS concurs with an affected person that an error exists in the current wetland determination

### § 12.31   On-site wetland identification criteria.

(a) *Hydric soils.*

(1) NRCS shall identify hydric soils through the use of published soil maps which reflect soil surveys completed by NRCS or through the use of on-site reviews. If a published soil map is unavailable for a given area, NRCS may use unpublished soil maps which were made according to the specifications of the National Cooperative Soil Survey or may conduct an on-site evaluation of the land.

(2) NRCS shall determine whether an area of a field or other parcel of land has a predominance of hydric soils that are inundated or saturated as follows:

(i) If a soil map unit has hydric soil as all or part of its name, that soil map unit or portion of the map unit related to the hydric soil shall be determined to have a predominance of hydric soils;

(ii) If a soil map unit is named for a miscellaneous area that meets the

criteria for hydric soils (i.e., riverwash, playas, beaches, or water) the soil map unit shall be determined to have a predominance of hydric soils; or

(iii) If a soil map unit contains inclusions of hydric soils, that portion of the soil map unit identified as hydric soil shall be determined to have a predominance of hydric soils.

(3) *List of hydric soils.*

(i) Hydric soils are those soils which meet criteria set forth in the publication "Hydric Soils of the United States 1985" which was developed by the National Technical Committee for Hydric Soils and which is incorporated by reference. This publication may be obtained upon request by writing NRCS at U.S. Department of Agriculture, P.O. Box 2890, Washington, DC 20013, and is available for inspection at the Office of the Federal Register Information Center, 800 North Capitol Street NW., Suite 700, Washington, DC 20408. Incorporation of this publication by reference was approved by the Director of the Federal Register on June 24, 1986. The materials are incorporated as they exist on the date of the approval and a notice of any change in these materials will be published in the **Federal Register**.

(ii) An official list of hydric soil map units shall be maintained at the local NRCS office and shall include—

(A) All soils from the National List of Hydric Soils that can be found in that field office area, and

(B) Any soil map units or areas which the state conservationist determines to meet such hydric soil criteria.

(iii) Any deletions of a hydric soil unit from the hydric soil map unit list must be made according to the established procedure contained in the publication "Hydric Soils of the United States 1985" for adding or deleting soils from the National List of Hydric Soils.

(b) *Hydrophytic vegetation.* Hydrophytic vegetation consists of plants growing in water or in a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content.

(1) A plant shall be considered to be a plant species that occurs in wetland if such plant is listed in the National List of Plant Species that Occur in Wetlands. The publication may be obtained upon request from the U.S. Fish and Wildlife Service at National Wetland Inventory, Monroe Bldg. Suite 101, 9720 Executive Center Drive, St. Petersburg, Florida 33702.

(2) For the purposes of the definition of "wetland" in § 12.2 of this part, land shall be determined to have a prevalence of hydrophytic vegetation if:

(i) NRCS determines through the criteria specified in paragraph (b)(3) of

this section that under normal circumstances such land supports a prevalence of hydrophytic vegetation. The term ''normal circumstances'' refers to the soil and hydrologic conditions that are normally present, without regard to whether the vegetation has been removed; or

(ii) In the event the vegetation on such land has been altered or removed, NRCS will determine if a prevalence of hydrophytic vegetation typically exists in the local area on the same hydric soil map unit under non-altered hydrologic conditions.

(3) The determination of prevalence of hydrophytic vegetation will be made in accordance with the current Federal wetland delineation methodology in use by NRCS at the time of the determination.

(c) *Mitigation wetlands.* Notwithstanding the provisions of this section, wetlands which are created in order to mitigate the loss of other wetlands as a result of irrigation, recreation, municipal water, flood control, or other similar projects shall not be considered to be artificial wetland for the purposes of § 12.5(b)(1)(vii)(A) of this part.

(d) *Minimal effect determination.* For the purposes of § 12.5(b)(1)(v) of this part, NRCS shall determine whether the effect of any action of a person associated with the conversion of a wetland, the conversion of wetland and the production of an agricultural commodity on converted wetland, or the combined effect of the production of an agricultural commodity on a wetland converted by someone else has a minimal effect on the functions and values of wetlands in the area. Such determination shall be based upon a functional assessment of functions and values of the wetland under consideration and other related wetlands in the area, and will be made through an on-site evaluation. A request for such determination will be made prior to the beginning of activities that would convert the wetland. If a person has converted a wetland and then seeks a determination that the effect of such conversion on wetland was minimal, the burden will be upon the person to demonstrate to the satisfaction of NRCS that the effect was minimal.

The production of an agricultural commodity on any portion of a converted wetland in conformance with a minimal-effect determination by NRCS is exempt under § 12.5(b)(1)(v) of this part. However, any additional action of a person that will change the functions and values of a wetland for which a minimal-effect determination has been made shall be reported to NRCS for a determination of whether the effect continues to be minimal. The loss of a minimal effect determination will cause a person who produces an agricultural commodity on the converted wetland after such change in status to be ineligible, under § 12.4, for certain program benefits. In situations where the wetland functions and values are replaced by the restoration, enhancement or creation of a wetland in accordance with a mitigation plan approved by NRCS, the exemption provided by the determination will be effective after NRCS determines that all practices in a mitigation plan are being implemented.

(e) *Categorical Minimal Effect Exemptions.*

(1) The state conservationist, in consultation with the state technical committee established under 16 U.S.C. 3861, shall identify any categories of conversion activities and conditions which are routinely determined by NRCS to have minimal effect on wetland functions and values, as described in paragraph (d) of this section, and recommend to the Chief, NRCS, or a designee, inclusion on a list of categorical minimal effect exemptions.

(2) The Chief, or designee, shall evaluate the conversion practices recommended by the state conservationists in the region to ensure consistency across State and regional lines, and to determine whether any categories of conversion activities identified pursuant to paragraph (e)(1) of this section, if such activities were exempt from the ineligibility provisions of § 12.4, would only have a minimal effect on wetland functions and values in a wetland system within the region.

(3) Any categories of conversion activities which meet the criteria of paragraph (e)(2) of this section will be published in the **Federal register** for inclusion in this part and shall be exempt under § 12.5(b)(1)(v) of this part.

(4) The NRCS local field office shall maintain a list of any activities and conditions which are determined by the Chief, or designee, exempt pursuant to this section and will provide the list to a person upon request.

### § 12.32   Converted wetland identification criteria.

(a) Converted wetland shall be identified by determining whether the wetland was altered so as to meet the definition of converted wetland. In making this determination, the following factors are to be considered:

(1) Where hydric soils have been used for production of an agricultural commodity and the effect of the determination of whether the effect continues to be minimal. The loss of a minimal effect determination will cause a person who produces an agricultural commodity on the converted wetland after such change in status to be ineligible, under § 12.4, for certain program benefits. In situations where the wetland functions and values are replaced by the restoration, enhancement or creation of a wetland in accordance with a mitigation plan approved by NRCS, the exemption provided by the determination will be effective after NRCS determines that all practices in a mitigation plan are being implemented.

drainage or other altering activity is not clearly discernible, NRCS will compare the site with other sites containing the same hydric soils in a natural condition to determine if the hydric soils can or cannot be used to produce an agricultural commodity under natural conditions. If the soil on the comparison site could not produce an agricultural commodity under natural conditions, the subject wetland will be considered to be converted wetland.

(2) Where woody hydrophytic vegetation has been removed from hydric soils for the purpose of or permitting the production of an agricultural commodity, the area will be considered to be converted wetland.

(b) A wetland shall not be considered to be converted if:

(1) Production of an agricultural commodity on such land is possible as a result of a natural condition, such as drought, and it is determined that the actions of the person producing such agricultural commodity does not permanently alter or destroy natural wetland characteristics. Destruction of herbaceous hydrophytic vegetation (i.e., plants other than woody shrubs or trees) as a result of the production of an agricultural commodity shall not be considered as altering or destroying natural wetland characteristic if such vegetation could return following cessation of the natural condition which made production of the agricultural commodity possible; or

(2) Such land is correctly identified as farmed wetland or farmed-wetland pasture.

### § 12.33   Use of wetland and converted wetland.

(a) The provisions of § 12.32(b)(2) are intended to protect remaining functions and values of the wetlands described therein. Persons may continue to farm such wetlands under natural conditions or as they did prior to December 23, 1985. However, no action can be taken to increase effects on the water regime beyond that which existed on such lands on or before December 23, 1985, unless NRCS determines the effect on losing remaining wetland values would be minimal under § 12.5(b)(1)(v). If, after December 23, 1985, changes due to human activity occurred in the watershed and resulted in an increase in the water regime on a person's land, the person may be allowed to adjust the existing drainage system to accommodate the increased water regime on the condition that the person affected by this additional water provides NRCS with appropriate documentation of the increased water regime, the causes thereof, and the

planned changes in the existing drainage system. In order to maintain program eligibility, a person must provide sufficient documentation and receive approval from NRCS prior to making any changes that will have the effect of increasing the capacity of the existing drainage systems.

(b) Unless otherwise provided in this part, the production of an agricultural commodity on land determined by NRCS to be prior-converted cropland is exempted by law from these regulations for the area which was converted. Maintenance or improvement of drainage systems on prior-converted croplands are not subject to this rule so long as the prior-converted croplands are used for the production of food, forage, or fiber and as long as such actions do not alter the hydrology of nearby wetlands or do not make possible the production of an agricultural commodity on these other wetlands. Other wetlands under this section means any natural wetland, farmed wetland, farmed-wetland pasture, or any converted wetland that is not exempt under § 12.5 of this part.

(c) Abandonment is the cessation for five consecutive years of management or maintenance operations related to the use of a farmed wetland or a farmed-wetland pasture. Unless the criteria for receiving an exemption under § 12.5(b)(1)(iii) are met, such land is considered to be abandoned when the land meets the wetland criteria of § 12.31. In order for documentation of site conditions to be considered adequate under § 12.5(b)(1)(iii), the affected person must provide to NRCS available information concerning the extent of hydrological manipulation, the extent of woody vegetation, and the history of use. In accordance with § 12.5(b)(1)(iii), participation in a USDA approved wetland restoration, set-aside, diverted acres, or similar programs shall not be deemed to constitute abandonment.

(d) The maintenance of the drainage capacity or any alteration or manipulation, including the maintenance of a natural waterway operated and maintained as a drainage outlet, that affects the circulation and flow of water made to a farmed wetland or farmed-wetland pasture would not cause a person to be determined to be ineligible under this part, provided that the maintenance does not exceed the scope and effect of the original alteration or manipulation, as determined by NRCS, and provided that the area is not abandoned. Any resultant conversion of wetlands is to be at the minimum extent practicable, as determined by NRCS.

**§ 12.34   Paperwork Reduction Act assigned number.**

The information collection requirements contained in this regulation (7 CFR part 12) have been approved by the Office of Management and Budget under provisions of 44 U.S.C. chapter 35 and have been assigned OMB Number 0560–0004.

Signed at Washington, D.C. on August 23, 1996.

**Dan Glickman,**
*Secretary.*
[FR Doc. 96–22784 Filed 9–5–96; 8:45 am]
BILLING CODE 3410–01–M

---

## Agricultural Marketing Service

**7 CFR Part 1075**

**[DA–96–12]**

**Milk in the Black Hills, South Dakota, Marketing Area; Termination of the Order**

**AGENCY:** Agricultural Marketing Service, USDA.

**ACTION:** Final rule; termination order.

**SUMMARY:** This document terminates all but certain administrative sections of the order regulating the handling of milk in the Black Hills, South Dakota, marketing area. Termination of this order was requested by Black Hills Milk Producers, a cooperative association that represents all of the producers whose milk is pooled under the order. Thus, termination of the order is required under the Agricultural Marketing Agreement Act of 1937, as amended.

**EFFECTIVE DATE:** October 1, 1996.

**FOR FURTHER INFORMATION CONTACT:** Clifford M. Carman, Marketing Specialist, USDA/AMS/Dairy Division, Order Formulation Branch, Room 2971, South Building, P.O. Box 96456, Washington, DC 20090–6456, (202) 720–9368.

**SUPPLEMENTARY INFORMATION:** The Department is issuing this rule in conformance with Executive Order 12866.

This termination order has been reviewed under Executive Order 12988, Civil Justice Reform. This action is not intended to have retroactive effect. This rule will not preempt any state or local laws, regulations, or policies, unless they present an irreconcilable conflict with this rule.

The Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601–674), provides that administrative proceedings must be exhausted before parties may file suit in court. Under section 608c(15)(A) of the Act, any handler subject to an order may file with the Secretary a petition stating that the order, any provision of the order, or any obligation imposed in connection with the order is not in accordance with the law and requesting a modification of an order or to be exempted from the order. A handler is afforded the opportunity for a hearing on the petition. After a hearing, the Secretary would rule on the petition. The Act provides that the District Court of the United States in any district in which the handler is an inhabitant, or has its principal place of business, has jurisdiction in equity to review the Secretary's ruling on the petition, provided a bill in equity is filed not later than 20 days after the date of the entry of the ruling.

This order of termination is issued pursuant to the provisions of the Agricultural Marketing Agreement Act and of the order regulating the handling of milk in the Black Hills, South Dakota, marketing area.

**Small Business Consideration**

During June 1996, the representative period determined for this action, 58 producers (all members of the Black Hills Milk Producers cooperative association) had their milk pooled under the Black Hills order. The Small Business Administration (SBA) criterion of $500,000 in annual receipts, adjusted to reflect the information for one month ($500,000 divided by 12, divided by the 1995 average order blend price of $13.95 per hundredweight) was used to determine that dairy farmers marketing less than 300,000 pounds of milk meet the description of a small dairy farm. On the basis of the pounds of milk marketed during the representative period, 54 of the 58 dairy farmers would be small businesses. Of these, 27 marketed less than 100,000 pounds during June, 20 marketed between 100,000 and 200,000 pounds, and 7 marketed between 200,000 and 300,000 pounds.

In addition to the cooperative, there is one other milk handler regulated under the Black Hills order in South Dakota. Under SBA criterion, this handler would be considered a small business. Consequently, nearly all of the parties affected by the Black Hills milk order would be classified as small entities.

The current reporting, recordkeeping and other compliance requirements of the rule would cease with termination of the order. None of the currently-affected entities would be subject to any additional reporting or recordkeeping requirements for purposes of the Federal milk order program as a result of the

| | |
|---|---|
| **Subpart A** | **General Provisions For Making Agricultural Land Wetland Determinations** |

| | |
|---|---|
| **514.10** | **Overview** |
| **a** **Land to be** **Identified as** **Wetland** | In order for land to be identified as wetland according to this part, it must meet the wetland criteria. |
| | **For purposes, of the 1985 Act, as amended, the State Conservationist has final authority for all agricultural land wetland determinations within the state.** |
| **b** **Wetland** **Provision by Statute** | **The 1985 Act** provided that any person who in any crop year plants an agricultural commodity on wetland that was converted after December 23, 1985, shall be ineligible for applicable USDA benefits unless one of the exemptions or exceptions to **the Act** applies. |
| | **The 1985 amendments** provide that in addition to the planting rule, any person who in any crop year after November 28, 1990, converts a wetland by draining, dredging, filling, leveling, or any other means for the purpose, or to have the effect of making the production of an agricultural commodity possible, shall be ineligible for USDA benefits for that crop year and all subsequent crop years until the wetland is or restored, unless one of the exemptions or exceptions to FSA applies. **The 1996 amendments allow for mitigation of other sites in addition to the restoration alternative.** |
| **c** **Other Wetland** **Provisions** | The **1985 act as amended** provides exemptions from the wetland provisions. The specific requirements for exemptions and determinations are found in this part and Parts 516 and 517. |

000510

**514.51**          **Certifying Wetland Determinations**

a
Purpose

**SPECIAL NOTE:  The Federal Agricultural Improvement and Reform Act of 1996 amended the provisions concerning certification of wetland determinations.  The final rule and subsequent amendments to this manual will provide additional guidance.**

**The 1990 amendments to the Act** include a certification requirement for all wetland determinations.  The certification procedures to be used on wetland determinations completed before November 28, 1990, and the certification procedures to be used on wetland determinations completed after November 28, 1990, are both described in this part.

The MOA provides that all certifications done after January 6, 1994, will be conducted with mapping conventions agreed on by the signatory agencies (513.30).  These certified determinations will be used for the 1985 Act as amended and the CWA.

**Procedures and guidelines for review and quality assurance of wetland determinations is contained in Part 519.13 and 519.14.**

**NOTE:  It is the goal to have all wetland determinations certified to the quality standards set forth in the jointly agreed upon (MOA) wetland mapping conventions.**

(180-V-NFSAM, Third Ed., Amend. 2, Nov. 1996)

000511

514.51

b
Applicability of
Certified Wetland
Determinations/
Delineation's

Follow this table to determine if **determinations**/delineations are accepted for both **the 1985 Act** and CWA purposes.

| Initial Determination done (date) | Determination Certified if | Accepted for the 1985 Act | Accepted for CWA |
|---|---|---|---|
| a) Prior to MOA mapping conventions on <u>agricultural land</u> | - meets quality criteria in MOA mapping conventions<br>- reflects up-to-date and current situation on the landscape<br>- was appealed at least one level | Yes | Yes, unless questions about the quality were raised by two or more of the MOA signatory agencies |
| | - meets quality criteria in MOA mapping conventions<br>- reflects up-to-date and current situation on the landscape<br>- was <u>not</u> appealed | Yes, after appeal rights expire or upon final decision | |
| b) After MOA mapping conventions on <u>agricultural land</u> | - meets quality criteria in MOA mapping conventions.<br>- reflects up-to-date and current situation on the landscape | | |
| c) Non-agricultural land | COE/EPA makes final wetland determination | Yes | Yes |
| | NRCS makes determinations on narrow bands immediately adjacent to or small pockets interspersed among agricultural land using COE-87 Manual | | |
| | NRCS makes determination on non-agricultural lands owned or operated by a USDA program participant at their request using COE 87 Manual in coordination with COE | | |

(180-V-NFSAM, Third Ed., Amend. 2, Nov. 1996)

000512

# NRCS Evaluation of Off-Site Wetland Mapping Conventions and Wetland Determinations in the Prairie Pothole Region

Northern Plains Region and Midwest Region - Oversight and Evaluation Staff
Executive Summary - January, 1997

The Northern Plains Oversight and Evaluation (O&E) staff, in consultation with the Midwest O&E staff, conducted a review of the state wetland mapping conventions and on-site determinations within the prairie pothole region in 1996. The review focused on comparing state procedures and interpretation of policy. Technical specialists that provide state leadership for wetland procedures and policy performed all wetland determinations in the review. This procedure was utilized because it is believed that their determinations would be a reflection of determinations in the state. No attempt was made to compare existing determinations in field office case files.

The Prairie Pothole Wetland Technical Team in Jamestown, North Dakota used mapping conventions from two or more states in making off-site determinations at each selected site. Each team member used conventions and made determinations independently to allow an evaluation to be made of match frequency by reviewer and by state mapping convention. Approximately 400 maps were generated consisting of almost 5700 individual delineations. Comparisons were separated into two wetland type categories: depressions (potholes) and linear. State technical teams conducted on-site determinations on eleven tracts.

Comparisons were made for several combinations of reviewer, mapping convention, delineation size, and wetland type. After reviewing results, an acceptance level was established of 80 percent match for delineations and 90 percent for labels. Areas with lower determination matches were considered not acceptable for Food Security Act (FSA) purposes.

### Issues, Summary of Analysis and Recommendations

**Issue:** Consistency of off-site wetland mapping conventions across state lines.

There was very little difference in the match frequency of delineations and determinations between off-site reviewers. There was also no significant difference in the match frequency of delineations or determinations based on state mapping conventions. Delineations greater than 0.5 acre matched 20 percent more frequently than those less than 0.5 acre and delineations of potholes matched twice as frequently as delineations of linear areas. However, the match frequency of delineations and determinations for both potholes and linears was unacceptable for all of the mapping conventions used.

Since the use of different mapping conventions does not significantly change the match frequency it appears that more study is needed to determine which conventions or components will give accurate delineations and determinations versus an immediate attempt to make existing conventions the same across state lines. Once improvements are made on these components revision of state wetland mapping conventions to reflect these changes will result in more consistent determinations across state lines.

**Recommendation:** Prior to any attempt to revise wetland mapping conventions states should coordinate the testing of off-site wetland mapping conventions to determine which factors lead to more accurate determinations.

**Recommendation:** Upon completion of the testing of off-site wetland mapping conventions states should coordinate the revision of the conventions to assure consistency across state lines in the prairie pothole region.

**Recommendation:** States should formalize and/or eliminate unwritten policy.

**Recommendation:** The Regions should establish and implement minimum documentation which meets the National Food Security Act Manual policy.

**Issue:** Certification.

On-site delineations matched one and a half times more frequently than off-site delineations. This study, however, indicates that there was not enough consistency in delineations and determinations to recommend certification as required in the FSA for existing wetland determinations.

Off-site mapping conventions are valuable tools in identifying potential areas for delineation. However, the use of off-site mapping conventions as a sole source for making certified determinations will lead to too many erroneous wetland delineations and determinations. When off-site mapping conventions are used in conjunction with other tools and on-site investigations, more consistent determinations will be attained.

**Recommendation:** Certification of all existing determinations in the study area should not be granted.

**Recommendation:** Certified determinations should only be granted after an on-site visit has been made.

**Recommendation:** Off-site wetland mapping conventions should be used in conjunction with other tools and on-site investigations in making certified wetland determinations.

# NRCS Evaluation of Off-Site Wetland Mapping Conventions and Wetland Determinations in the Prairie Pothole Region

Northern Plains Region and Midwest Region - Oversight and Evaluation Staff
January, 1997

## Background

In January 1994, the United States Department of Agriculture (USDA), Environmental Protection Agency (EPA), United States Department of Interior (USDI) and the United States Army - Corps of Engineers (COE) entered into a Memorandum of Agreement (MOA) regarding wetland delineations and certain other determinations of waters of the United States made by USDA under various farm bills and for purposes of the Clean Water Act - Section 404. The MOA called for the signatory agencies to work cooperatively at the field level to achieve interagency concurrence on wetland mapping conventions used by NRCS for wetland delineations on agricultural lands, and to certify wetland determinations. Off-site wetland mapping conventions were developed by all states prior to August, 1994. These mapping conventions were agreed to by all signatory agencies of the MOA.

Concerns have been raised regarding consistency of approved mapping conventions across state lines. These concerns are especially obvious within the prairie pothole region that encompasses parts of Montana, North Dakota, South Dakota, Minnesota and Iowa. The NRCS Northern Plains Region Board of Directors, consisting of the State Conservationists and Regional Conservationist, identified the need for the Oversight and Evaluation (O&E) staff to review the different mapping conventions in their July, 1995 meeting. The Midwest Region O&E staff identified the need for evaluating off-site mapping conventions within their region in FY 1996.

Additionally, concerns have been raised regarding consistency with States' interpretation of agency policy in making on-site wetland determinations required in the 1985 Food Security Act (FSA) as amended. Specifically, concerns have been raised over determinations on linear areas that serve as drainage ways and definitions of Prior Converted Wetlands (PCs), Farmed Wetlands (FWs) and Non-Wetland (NW).

The Northern Plains O&E staff, in consultation with the Midwest O&E staff, initiated a review of the state wetland mapping conventions and on-site determinations within the prairie pothole region. State Offices assisted in selecting counties for the review. Field Office staffs provided local information on sites selected for the review. State technical specialists and the Prairie Pothole Wetland Technical Team in Jamestown, North Dakota, assisted in the review with technical determinations. The Northern Plains O&E staff worked with the Midwest O&E staff in coordinating all activities affecting Minnesota and Iowa.

## Objectives

- Determine level of consistency of the off-site wetland mapping conventions across state lines.

- Determine if off-site wetland mapping conventions allow for consistent results from different users.

- Determine level of consistency of on-site determinations in pothole and linear drainage areas.

- Determine correlation between off-site wetland mapping conventions and on-site determinations.

- Determine level of consistency in interpretation of the National Food Security Act Manual for selecting wetland labels

1

000516

## Methodology

The review focused on comparing state procedures and interpretation of policy. Technical specialists that provide state leadership for wetland procedures and policy performed all wetland determinations in the review. This procedure was utilized because it is believed that their determinations would be a reflection of determinations in the state. No attempt was made to compare existing determinations in field office case files.

Consistency was evaluated by determining the frequency of match of delineations and determinations made by different reviewers on the same site. The criteria used to define when delineations and determinations matched is given in Appendix B (Wetland Delineation and Determination Match Procedure).

O&E staff worked with State Office staff in selecting counties to be reviewed within the prairie pothole region (Figure 1). Selected counties were placed in groups for data comparison purposes. County groups include:

Group 1 -- Sheridan County, Montana and Divide County, North Dakota
Group 2 -- Richland County, North Dakota, Roberts County South Dakota, and Big Stone County, Minnesota
Group 3 -- Moody and Minnehaha Counties, South Dakota; Pipestone and Rock Counties, Minnesota; and Lyon County, Iowa

**Off-Site:**

O&E staff selected one or more Soil Association(s) in each selected county that was most likely to contain the kinds of wetlands that are of issue. Eight (8) sections (1 square mile each) were randomly selected in each county within the Soil Association(s) for review. All necessary information to conduct an off-site wetland determinations was requested from the appropriate Field Office. Material was then sent to the NRCS Prairie Pothole Wetland Technical Team in Jamestown, North Dakota.

One person from each state and one person from the O&E staff traveled to Jamestown on July 10-11, 1996 and worked with the Prairie Pothole Wetland Technical Team in the final selection of the sample areas. Entire sections were selected where linear wetlands were predominant while parts of sections were selected where depressions (potholes) were predominant. State representatives instructed the Prairie Pothole Team in the use of their respective mapping conventions.

The Prairie Pothole Wetland Technical Team used mapping conventions from two or more states in making off-site determinations at each selected site. Each team member used conventions and made determinations independently to allow an evaluation to be made of match frequency by reviewer and by state mapping convention.

All off-site determinations were delineated on a map with a wetland label corresponding to the particular state convention used. Measurements were taken from the southwest corner section to the center of each depressional area to assist in comparing the locations of the area delineated. Measurements were made to the ends of each linear area. Acreages of each delineated area were also determined. Information was then put into a database for analysis by the O&E staff. Staff at the Brookings, South Dakota Field Support Office assisted in map measurements and data entry.

2

Figure 1. Counties Selected for Review in the Evaluation of Off-Site Wetland Mapping Conventions and wetland Determinations in the Prairie Pothole Region.

000518

<u>On-Site</u>:

State Office staff worked with Field Offices in selecting final sites for making comparisons of on-site determinations. These sites were within the same group that had been selected for making off-site mapping comparisons. July 22-26, 1996, State staff from North Dakota, South Dakota and Minnesota along with O&E staff traveled to Richland County, North Dakota; Roberts County, South Dakota; and Big Stone County, Minnesota. The focus of this trip was on depressional areas. July 29-August 2, 1996, state staff from South Dakota, Minnesota and Iowa along with O&E staff traveled to Moody County, South Dakota; Rock County, Minnesota; and Lyon County, Iowa. The focus of this trip was on linear sites.

Each state was represented with state technical specialists for soils, hydrology and plants during the field reviews. The State Resource Conservationist (SRC) and Assistant State Conservationist (ASTC) from South Dakota and ASTC from Minnesota also participated in the field reviews. State teams reviewed aerial slides and other material used in making wetland determinations the evening before they went to the site. Two (2) sites in each county was visited except Lyon County, Iowa where delineations were made on one (1) site. Each state team performed on-site determinations using their respective state procedures regardless of the site location. A map delineating the various determinations was produced. Wetland boundaries were identified with the use of a global positioning system (GPS). State teams also documented their determinations on forms typically used in their state. The O&E staff made all map measurements and calculated acreages of delineated areas.

No member of the Prairie Pothole Team was involved in the field visits, nor was anyone involved in the field reviews involved in making the off-site determinations. This eliminated any biases in the comparisons. Those participating in the review from state staffs are listed in Appendix A.

The O&E staff analyzed all the data using the procedure described in Appendix B. Comparisons were made for several combinations of reviewer, mapping convention, delineation size, and wetland type. After reviewing results, an acceptance level was established of 80 percent match for delineations and 90 percent for labels. Areas with lower determination matches were considered not acceptable for FSA purposes.

## Results

<u>Off-Site</u>:

Comparisons were made between the maps that were developed using the off-site wetland mapping conventions for the five states in the prairie pothole region. Approximately 400 maps were generated consisting of almost 5700 individual delineations. Comparisons were separated into two wetland type categories: depressions (potholes) and linear.

Comparisons were made between <u>different reviewers</u> using the <u>same</u> state wetland <u>mapping conventions</u> on the <u>same area</u>. The purpose for these comparisons was to determine the match frequency which could be expected when two different individuals use the same wetland mapping conventions. Results from the comparisons indicate that delineations and determinations made by different reviewers will match at approximately the same frequency when using the same state wetland mapping convention. However, a lower level of match frequency for delineations and determinations was achieved on linear areas than for potholes.

Comparisons were also made between the <u>same reviewer</u> using <u>different</u> state wetland <u>mapping conventions</u> on the <u>same area</u>. The purpose of these comparisons was to determine the match frequency one could expect when an individual used two different conventions on the same area. Results from all three reviewers indicate that one could expect a higher match frequency between North Dakota's and South Dakota's conventions in potholes. Overall for potholes, match frequency was about the same for the other

4

states. In the linear region, no two conventions resulted in significantly higher match frequency of delineations or determinations than any other two conventions. However, the match frequency for delineations and determinations for linear wetlands was significantly lower than for potholes.

In all cases the match frequency of the off-site determinations was not adequate for uniform implementation of the wetland provisions of the FSA.

## On-Site:

There was very little difference in match frequency of on-site delineations and determinations by state teams in the pothole region. The teams from Minnesota and South Dakota had a somewhat higher match frequency than any other two states when making delineations and determinations in linear areas. However, the overall match frequency for linear wetlands was significantly lower than for potholes.

The match frequency of the on-site delineations in the pothole area was adequate for uniform implementation of the wetland provisions of the FSA. However, there was significant disagreement of what labels should be assigned to the delineations which resulted in a determination match frequency lower then acceptable.

## Off-Site vs. On-Site:

Data from all of the off-site delineations and determinations were compared to each of the State's on-site data in the pothole region. There was a significantly lower match frequency between the off-site reviewers versus on-site reviewers than there was among the on-site reviewers or among the off-site reviewers.

No comparisons were made of off-site versus on-site delineations and determinations in linear wetland areas because many of the areas were identified as "non-inventoried" using some of the state off-site mapping conventions. Since the on-site teams made delineations in these "non-inventoried" areas, any comparison would not have been valid.

## Use of Labels:

The frequency of use of labels was consistent between individual off-site reviewers and the combined on-site reviews. Of the seven FSA labels used in the review two labels were used most frequently. Approximately 75 percent of all delineations made were given a W label, while the FW label was used about 18 percent of the time.

The PC label was not used. The off-site reviewers indicated that even though the state mapping conventions had procedures for off-site delineation of PC areas all of the states had a policy of not delineating PC areas off-site. The on-site reviewers indicated that they did not delineate PC areas except during appeals or when requested.

## Size Distribution:

The distribution of size classes for potholes and linear delineations was the same for off-site reviewers and on-site reviewers. Almost half (45 percent) of the 5700 delineation made were 0.2 acre or less, 60 percent were 0.5 acre or less, and 85 percent were 1.0 acre or less.

## Size vs. Match:

The match frequency of delineations and determinations increased with size of delineations. A comparison between delineations of 0.5 acre and less and those larger than 0.5 acre showed a 20 percent increase in the match frequency of delineations and a 12 percent increase in the match frequency of determinations with the larger delineations

### Analysis Summary

- There was very little difference in the match frequency of delineations and determinations between off-site reviewers.

- There was no significant difference in the match frequency of delineations or determinations based on state mapping conventions or state teams.

- No significant pattern or difference of assignment of W and FW labels based on different state procedures was detected for either off-site or on-site reviewers.

- Delineations of potholes matched twice as frequently as delineations of linear areas.

- On-site delineations matched one and a half times more frequently than off-site delineations.

- Delineations greater than 0.5 acre matched 20 percent more frequently than those less than 0.5 acre.

- The highest delineation match frequency of the review was for on-site potholes between the North Dakota and South Dakota Teams.

- The average on-site pothole delineation match frequency for all on-site teams was acceptable for FSA purposes.

- The average on-site linear delineation match frequency for all on-site teams was not acceptable for FSA purposes.

- The average on-site pothole and linear determination match frequency for all on-site teams was not acceptable for FSA purposes.

- The average off-site delineation and determination match frequency for all off-site reviewers was not acceptable for FSA purposes.

### Observations/Findings

Following are a mix of O&E staff observations and state participants' comments obtained during a review discussion session in Brookings, South Dakota. Comments prepared by the Prairie Pothole Wetland Team relating to the off-site wetland mapping conventions are presented in appendix C.

- There were differences in interpretation of areas that had been manipulated but still met wetland criteria. On some sites the manipulation was somewhat inconspicuous, on others it was obvious. This difference in interpretation of what constituted "manipulation" was a major factor in the difference in FSA wetland labels.

- Minnesota and North Dakota indicated that there had to be some evidence that manipulation was effective before they considered the area manipulated. Iowa and South Dakota indicated that if manipulation was present it did not matter if it was effective. This difference in interpretation of policy could account for some difference in FSA wetland labels.

- Some areas that were vegetated in grass were identified as FWP even though there was no apparent haying or grazing on the site.

6

000521

- On a few sites, states did not agree on the presence of hydric soils based on hydric soil indicators. This accounted for the difference in labels on these sites.

- There were several sites on which the states did not agree on whether the wetland hydrology criteria for saturation was met.

- There was some disagreement on when FSA "pothole" criteria should be used. Iowa defines pothole sites by soil type and Major Land Resource Area (MLRA 103) while other states appeared to focus on landscape position.

- All states use only one label on each individual area. All states agreed that it is too time consuming and not necessary to delineate all FSA wetland types on every area.

- None of the states delineate "Other Waters" of the United States. If a stream or ditch flows through a wetland, it is included with the wetland delineation.

- All states have policy that PCs will not be delineated except by request or appeal. Typically, the rest of the field outside the delineated areas is assumed to be PC/NW. No PC/NW was delineated on any of the maps that were developed during the on-site reviews.

- Some constructed waterways in cropland were delineated as W even though it was obvious that the sites would not be flooded or ponded for 15 days or ten percent of the time during the growing season. Some of these were on slopes that exceeded five percent. It appeared that in some cases the only reason the site displayed wetland characteristics was because of the physical features developed as a result of the construction. These areas were apparently determined to be non-agricultural land which allowed the W label to be used.

- On-site reviewers did not have direct landowner input as to the scope and effect of manipulation. They felt they would have attained a higher match frequency of determinations if this information had been available.

- Minnesota indicated that their policy requires an area that meets wetland criteria, regardless of manipulation, to be labeled a W until the landowner provides scope and effect data. This would account for a lower match frequency with other states that identified manipulated areas as FW. However, in some cases the Minnesota team did label areas FW without landowner documentation.

- There is a difference in indicator status of some plants between Minnesota and the Dakotas. This could account for some difference in labels between states but was not observed as an issue during this review.

### Issues/Recommendations

**Issue:** Consistency of off-site wetland mapping conventions across state lines.

The use of different off-site mapping conventions did not have a significant effect on the consistency of off-site delineations and determinations. The match frequency was unacceptable for all of the mapping conventions used. Since the use of different mapping conventions does not significantly change the match frequency it appears that more study is needed to determine which conventions or components will give accurate delineations and determinations versus an immediate attempt to make the conventions the same

7

across state lines. Once improvements are made on these components revision of state wetland mapping conventions to reflect these changes will result in more consistent determinations across state lines.

**Recommendation:** Prior to any attempt to revise wetland mapping conventions states should coordinate the testing of off-site wetland mapping conventions to determine which factors lead to more accurate determinations.

**Recommendation:** Upon completion of the testing of off-site wetland mapping conventions states should coordinate the revision of the conventions to assure consistency across state lines in the prairie pothole region.

**Issue:** Consistency of on-site determinations in pothole and linear areas.

The consistency of on-site delineations for pothole area was acceptable, but disagreement on when an area was manipulated resulted in a level of consistency for determinations which was not adequate for implementation of the FSA. The consistency of linear delineations and determinations was not adequate for implementation of the FSA. This appeared to be due to differences in what constituted an FSA wetland in linear areas.

Because of the various criteria and state of the science used to identify wetlands, some level of inconsistency in making determinations can be expected. With full implementation of the recommendations in this report a level of 80 percent delineation match and 90 percent label match should be achieved.

**Recommendation:** National Headquarters (NHQ) should develop and distribute clarification that constructed waterways in cropland are to be considered part of the cropland if cropping would normally occur on the site in the absence of the waterway.

**Recommendation:** NHQ should develop and distribute clarification on how to distinguish streams and ditches from wetland delineations.

**Recommendation:** NHQ should develop a performance standard of consistency on wetland determinations and delineations after additional reviews are conducted in other regions of the U.S.

**Recommendation:** States should develop and implement standard quality assurance plans which will assess the level of consistency of wetland determinations.

**Issue:** Interpretation of the National Food Security Act Manual policy for wetland determinations.

States were split on their interpretation of documentation required for "manipulation." States used different criteria for the definition of "potholes" and the FWP label was not used consistently. The use and documentation of wetland indicators varied widely between states. All states operated on one or more unwritten policy when making wetland determinations.

**Recommendation:** NHQ should develop and distribute clarification on what constitutes "manipulation" of a wetland and specify the extent of documentation required on the manipulation for the case file.

**Recommendation:** NHQ should develop and distribute clarification on the definition of FWP; when it should be used and when it should not be used.

**Recommendation:** NHQ should change FSA wetland hydrology criteria to make them identical for FW and FWP.

000523

**Recommendation:** NHQ should reinforce current guidance on the use of indicators and required documentation to support wetland criteria during on-site wetland determinations.

**Recommendation:** NHQ should use a team of technical specialists to develop a more detailed definition of potholes, including in which geographic areas (i.e., MLRAs) potholes occur, and guidance on when and when not to use pothole hydrology criteria.

**Recommendation:** States should ensure that national policy is being followed by delineating areas of all wetland types, affixing the correct label and accounting for all acres on the subject tract.

**Recommendation:** States should formalize and/or eliminate unwritten policy.

**Recommendation:** The Regions should establish and implement minimum documentation which meets the National Food Security Act Manual policy.

**Issue:** Certification.

Initially, a review of the impacts of certification of existing wetland determinations was not part of this review. However, as the review progressed it became obvious that recommendations on this issue could be made based upon conclusions from this study. This study indicates that there was not enough consistency in delineations and determinations to recommend certification as required in the FSA for existing wetland determinations.

Off-site mapping conventions are valuable tools in identifying potential areas for delineation. However, the use of off-site mapping conventions as a sole source for making certified determinations will lead to too many erroneous wetland delineations and determinations. When off-site mapping conventions are used in conjunction with other tools and on-site investigations, more consistent determinations will be attained.

**Recommendation:** Certification of all existing determinations in the study area should not be granted.

**Recommendation:** Certified determinations should only be granted after an on-site visit has been made.

**Recommendation:** Off-site wetland mapping conventions should be used in conjunction with other tools and on-site investigations in making certified wetland determinations.

**Quality Assessment of Existing Wetland Determinations
as provided on CPA-026/026E**

**Action Required by: February 14, 1997**

State __ND__ State Contact Person/Phone __David Dewald/701-250-4425__

Regional Office Contact Person/Phone _____

Tracts enrolled in USDA Programs-1996 (from FSA): __168,882__

    1) __104,167__ Number of tracts with any wetland label, except NW (026)
    2) __36,667__ Number of tracts where all acres are NW (026)
    **3) __140,834__ Total delivered wetland determinations (item 1 & 2)\***

    4) __28,048__ Number of tracts for which wetland determinations have <u>not</u> been
           delivered to clients

**Provide an <u>estimate</u> of the quality of existing wetland determinations.**

1. **PASS**-Number of tracts where determiniations are of sufficient quality for
   implementation of wetland conservation provisions of the Food Security Act and for
   purposes of implementing section 404 of the Clean Water Act.
                                 __14,083**__ tracts.\*
   Estimates indicate there are 90,134 tracts with approximately 70-
   95% accuracy for wetlands correctly located in the field.  A field
   visit is needed to correctly label and delineate the wetland.
2. **FAIL**-Number of tracts where determinations are NOT of sufficient quality for
   implementation of wetland conservation provisions of the Food Security Act and for
   purposes of implementing section 404 of the Clean Water Act.
                                 __126,751__ tracts.\*

\*Note: The sum of the tracts in PASS and FAIL should equal the number of wetland
determinations delivered to clients.  (Item #3 above)

_____

List most common reasons why existing wetland determinations fail to meet quality
standards:

- 1.  Incorrect labels - PC labels not on PC Area, but by field number.
- 2.  FWP and NI label came after determination was delivered to client.
- 3.  Wetland is correctly located in field; however wetland boundary and
     size may be incorrect.
- 4.  Other waters are not labeled.
\*\* Represents approximately 10% of tracts that have been field visited and that
    have correct labels and correct delineation.

**Concurrence Signatures-**

State Conservationist ___*Scott Phg G*___ date 3/22/97
NRCS

Regulatory Branch Chief _____ date _____
COE

Wetlands Division Chief ___*James E Luey for CLC*___ date 3/11/97
EPA

State Private Lands Coordinator ___*Kevin Wllis*___ date 3/5/97
FWS

**Other comments:**

- 5. Mapping conventions were originally used with only 5 to 6 years of FSA slides which were taken during normal and below normal precipitation years. This caused temporary wetlands to be missed. Additional years of slides are providing increased wetland determination accuracy.

- 6. Timing of FSA slides (late June, early July) caused temporary wetlands to be missed.

- 7. During the early use (1987 to 1990) of the wetland inventory, many partially drained wetlands (FW) were PC'd by office personnel without a field visit causing wetland determination errors.


**FAX Response to Bruce Julian at 202/720-2143**

000542

 **USDA**

| United States | Natural Resources | P.O. Box 2890 |
| Department of | Conservation | Washington, D.C. |
| Agriculture | Service | 20013 |

## INFORMATIONAL MEMORANDUM FOR THE SECRETARY

THROUGH:    James R. Lyons
            Under Secretary
            Natural Resources and Environment

FROM:       Paul W. Johnson
            Chief
            Natural Resources Conservation Service

SUBJECT:    Quality of Existing Wetland Determinations

*This informational memorandum is a companion document to a decision memorandum on the same topic.*

### ISSUE:

A substantial number of wetland determinations conducted since December 23, 1985, are not of sufficient quality for administering the Food Security Act (FSA) or the Clean Water Act (CWA). We are in a precarious position in the management of the Department of Agriculture (USDA) financial and technical assistance programs, as reliance upon faulty wetland determinations may cause producers to violate Federal and State statutes.

### DISCUSSION:

Since passage of the wetland conservation provisions contained in the Food Security Act o f1985 the Natural Resources Conservation Service has made over 3 million wetland determinations. A recent agency evaluation regarding the accuracy of these determinations, indicated a relatively high error rate, particularly in the older determinations. (38 percent of existing wetland determinations on cropland and 60 percent when considering all land uses do not meet today's determination and mapping standards).

Due to the magnitude of the field office workload, many earlier wetland determinations were based solely on off-site procedures (i.e., use of aerial photography, exiting soil surveys and other readily available information), and reliance on non-documented information from landowners rather than specific on-site evaluations. Often times the photography was of inferior quality and soil survey information was obsolete or lacking adequate detail.

Since 1985, the number of wetland categories that required identified has steadily increased to meet the need for greater detail and accuracy in determinations. Today there are some 19 different categories (farmed wetland, wetland farmed under natural conditions, farm wetland pasture, etc.). Consequently, some of the older determinations are now incorrectly identified relative to the new categories.

000543

**INFORMATIONAL MEMORANDUM FOR THE SECRETARY**                    2

A substantial number of wetlands were not clearly labeled or their scope and extent was incorrectly delineated on the official base maps or delineation field maps. As an example, areas that are exempt under Swampbuster and Section 404 of the Clean Water Act, such as prior converted cropland (PC) and NW (non-wetlands) were often not determined or delineated.

The ability to deliver updated was great hampered by the use of two different delineation manuals, rapidly changing policy, and the advance of new technology such as hydrology assessment tools. As a result, training in wetland delineation was inadequate and resulted in incorrect determinations.

**SUMMARY:**

In order to fully implement the flexibility provisions to 1996 Farm Bill and provide quality technical assistance to our clients, we need to swiftly terminate the moratorium on conducting wetland determinations. By conducting wetland determinations only on request, when a manipulation is planned and potential violations, we can assure clients are provided with accurate natural resource information in order to comply with applicable State and Federal laws. Additionally, the Department will be assured to comply with the National Environmental Policy Act and Executive Order 11990 in the delivery of its numerous natural resource programs.

NRCS:WWD:BruceJulian:aw:720-3527          certfix1.doc:7-7-97

6/14/99

# Implementation of the Wetland Conservation Provisions
## Food Security Act

### *Recent Oversight and Evaluations*
### *of*
### *Swampbuster Implementation Activities*

**1) NRCS Evaluation of Off-Site Wetland Mapping Conventions and Wetland Determinations in the Prairie Pothole Region (MT, ND, SD, MN, IA)--January 1997**

- Commissioned by the Northern Plains and Midwest Regional Conservationists
- The Northern Plains Oversight and Evaluation staff, in consultation with the Midwest O&E staff conducted a review of the state wetland mapping conventions and on-site determinations within the prairie pothole region in 1996. The review focused on comparing state procedures and interpretation of policy. Technical specialists that provide state leadership for wetland procedures and policy performed all wetland determinations in the review. <u>No attempt was made to compare existing determinations in field office case files.</u>

**Findings:**
- Off-site delineation procedures, in themselves, are not adequate to determine wetlands.
- The use of any of the state mapping conventions did not significantly effect results.
- The consistency of on-site delineations for potholes was acceptable, but disagreement on when an area was manipulated resulted in a level of consistency for determinations which was not adequate.
- The consistency of linear wetland delineations and determinations was not adequate for Swampbuster. This appeared to be due to differences in what constituted a wetland in linear area.
- States were split on their interpretation of documentation required for manipulation.
- States used different criteria for the definition of "potholes".
- The FWP label was not used consistently.
- The use and documentation of wetland indicators varied widely between states.
- All states operated on one or more unwritten policy when making wetland determinations.
- When off-site mapping conventions are used in conjunction with other tools and on-site investigations, more consistent determinations are attained.

## 2) Quality Assessment of Existing Wetland Determinations--March 1997

- Commissioned by the Deputy Chief for Programs
- In order to address the certification of wetland determinations as called in the 1996 Farm Bill in preparation for a final rule, NRCS made a decision to conduct a quality survey of the existing 3 million wetland determinations performed since 12/23/85. Each state conservationist was requested to meet with their MOA partners (EPA, Army, Interior) and provide an estimate of how many previously completed wetland determinations would meet current quality standards as set forth in the mapping conventions called for in the MOA of 1994. *"Of the existing wetland determinations, how many are sufficient for both Swampbuster **and** the Clean Water Act?"*

**Finding:**

- 61% of current 3 million, wetland determinations **fail** to meet the current quality criteria for purposes of Swampbuster and the Clean Water Act.
- Only conduct wetland determinations upon request by the client for a planned manipulation, or when there is a potential violation.
- Do not make unilateral/wholesale certifications
- Improve and provide additional wetland identification/delineation technical tools
- Use only highly skilled and experienced staff to conduct wetland determinations/delineations
- Provide adequate staff resources to complete quality products

## 3) National Wetland Flexibility--November 1998

- Commissioned by the Deputy Chief for Programs to determine if NRCS was implementing the wetland flexibility provisions of the 1996 Farm Bill.
- NRCS wants to ensure implementation of wetland flexibility provisions. Agricultural producers have complained about a lack of information and mitigation requirements. Complaints have also been raised that NRCS is unwilling to grant minimal effect determination or provide assistance in developing mitigation plans. Additionally, NRCS records indicate that minimal effect determinations and mitigation plans are not being used extensively.

**Findings:**
- The number of minimal effects exemptions granted are not meeting landowner needs
- Improper use and coordination of wetland functional assessments have resulted in wetland decisions costing landowners' time and expense and possible loss of wetland function
- Wetland functions are being lost which could be replaced through mitigation
- Field Office administration of mitigation plans was not acceptable and mitigation of wetland functions was not adequate in all cases

2

**United States
Department of
Agriculture**

Natural Resources
Conservation Service

Iowa State University
Statistical Laboratory

# Summary Report
# 1997 National
# Resources Inventory
## (revised December 2000)





Figure 3.  Losses and gains in Palustrine and Estuarine wetlands between 1992 and 1997, by NRCS Region



Figure 4.  Causes of Palustrine and Estuarine wetland losses between 1992 and 1997, by NRCS Region

000646



## United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Reply Refer To:
FWS/AES/DCHR/007178

Memorandum

To:         Regional Director, Regions 1, 2, 3, 4, 5, 6, and 7
            Manager, California/Nevada Operations Office

From:   Acting Deputy Director  *Robyn Thorson*         APR 2  2001

Subject:    Endangered Species Act Consultations for Natural Resources Conservation
            Service Wetland Determinations

This memorandum clarifies that consultation under section 7(a)(2) of the Endangered Species
Act is not required when the Natural Resources Conservation Service conducts official wetland
determinations or delineations on private lands under the Food Security Act of 1985, as
amended.

A wetland determination made by the NRCS in these circumstances is a technical determination
based upon the presence of hydrology, hydrophytic vegetation, and hydric soils. A wetland
determination does not constitute a management plan, design, or permit allowing a landowner to
manipulate a wetland. Rather, a wetland determination is a factual determination based upon the
presence of wetland characteristics. In short, either an area is wetland or it is not and the action
of NRCS conducting the determination is non-discretionary.

Please advise all field offices under your supervision that consultation under section 7(a)(2) is
neither required nor appropriate for these actions. Contact Ren Lohoefener, Chief, Division of
Consultation, Habitat Conservation Planning, Recovery, and State Grants at (703) 358-2171 if
you have any questions regarding this matter.

cc:     H. Hankin, NRCS

United States Department of Agriculture
Natural Resources Conservation Service

**State Office**                                              **Phone (608) 276-8732**
6515 Watts Road, Suite 200                                    Fax (608) 276-5890
Madison, Wisconsin  53719-2726

April 24, 2001

NATIONAL FOOD SECURITY ACT MANUAL (NFSAM)
Third Edition, Amendment 2
180-V-NFSAM, Amendment WI22

Purpose:  To provide a state supplement to the NFSAM to all Wisconsin NRCS offices.

SUBJECT:  Release of NRCS Wetland Inventory Maps

Effective Date.  Upon receipt.

**Background:**  In an effort to be consistent statewide and based on guidance from the NRCS National Headquarters, NRCS wetland inventory maps are not to be released to the general public. The inventories are available as a tool to our partners:  WDOT, WDNR, DATCP, LCD, Zoning, FWS, and COE.  Released maps must be labeled "Draft" or "Not Official."  Anyone can view the inventory maps in our offices, but may not be allowed to make copies.

The Food Security Act of 1985 contained wetland conservation provisions that denied program benefits to landowners who manipulated wetlands.  NRCS is the agency responsible for informing producers where wetlands occur on their property and any associated restrictions by making wetland determinations.  To help locate and classify Farm Bill wetlands, NRCS used teams from 1989 to 1991 to make wetland inventory maps.  The maps were made by reviewing soil surveys, topographic maps, Wisconsin Wetland Inventory maps, rainfall data, stereo pair air photos, and Farm Service Agency 35mm aerial slides.  Some counties had ten years of slides to review while others only had five.  NRCS wetland inventories only show potential wetlands and were produced as a tool to predict the presence and approximate boundary of wetlands (NFSAM p. 513-21).  NRCS does not contend that the inventory is accurate.  Inventory labels are only relevant to USDA programs.

Pre-July 3, 1996, wetland determinations were based solely on the wetland inventory map.  The producer would appeal inaccurate determinations and NRCS would go to the field to document, make corrections to, and accurately delineate any wetlands.

The Natural Resources Conservation Service works hand-in-hand with
the American people to conserve natural resources on private lands.          AN EQUAL OPPORTUNITY EMPLOYER



**USDA**

**United States Department of Agriculture**

Office of the Secretary
Washington, D.C. 20250

JAN 18 2005

The Honorable John Paul Woodley, Jr.
Assistant Secretary of the Army for Civil Works
The Department of the Army
108 Army Pentagon – Room 3Echo 446
Washington, D.C. 20310

Dear Mr. Woodley:

In 1994, the Department of Agriculture (USDA), the Environmental Protection Agency, the Department of the Interior, and the Department of the Army entered into a Memorandum of Agreement (MOA) to streamline wetland delineation processes on agricultural lands, promote consistency between the Clean Water Act (CWA) and the Food Security Act (FSA), and to provide predictability for USDA program participants. Since the MOA was signed, the FSA has been amended twice (the Federal Agriculture Improvement and Reform Act of 1996 and the Farm Security and Rural Investment Act of 2002). As a result, the MOA is in conflict with current statute. In addition, differences now exist between the FSA and the CWA on the jurisdictional status of certain wetlands (e.g., prior converted cropland or isolated wetlands may be regulated by one agency, but not the other).

Therefore, effective immediately, USDA intends to withdraw from participation in the MOA, and no longer make wetland determinations for purposes other than implementation of the Swampbuster Provisions of the FSA.

If we can be of further assistance, please contact Thomas W. Christensen, Acting Deputy Chief for Programs, NRCS, at (202) 720-4527.

Sincerely,

*Mark Rey* (signature)

MARK REY
Under Secretary
Natural Resources and Environment



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY
CIVIL WORKS
**108 ARMY PENTAGON**
**WASHINGTON DC 20310-0108**



REPLY TO
ATTENTION OF

January 24, 2005

The Honorable Mark Rey
Under Secretary
Natural Resources Department
U.S. Department of Agriculture
1400 Pennsylvania Avenue, SW
Washington, D.C. 20205

Dear Mr. Rey:    *Mark*

I have received your letter of January 18, 2005, regarding the 1994 *Interagency Memorandum of Agreement Regarding the Delineation of Wetlands for Purposes of the Section 404 of the Clean Water Act and Subtitle B of the Food Security Act.* Likewise, Army Civil Works intends to withdraw from participation in this agreement for the reasons cited in your letter, as well as the impacts of the Supreme Court decision in the Solid Waste Agency vs. Northern Cook County case,. By copy of this letter I am notifying the U.S. Environmental Protection Agency and the U.S. Department of the Interior of this action.

Please do not hesitate to contact me if you have questions. Your staff may contact Mr. Chip Smith, Assistant for Environment, Tribal and Regulatory Affairs, at (703) 693-3655.

Sincerely,

George S. Dunlop
Principal Deputy Assistant Secretary of the Army
(Civil Works)

CF:
Mr. Benjamin Grumbles
Acting Assistant Administrator for Water
U.S. Environmental Protection Agency

The Honorable Craig Manson
Assistant Secretary for Fish, Wildlife and Parks
U.S. Department of the Interior

Printed on 🔁 Recycled Paper

SUBJECT:     PGM – Conservation Compliance                    Feb. 1, 2005
                    Memorandum of Agreement (MOA)

TO:          State Conservationists                          File Code:  440

One of our primary goals for updating and revising the wetland conservation compliance
procedures is to clarify Natural Resources Conservation Service (NRCS) roles and
responsibilities in the Federal wetland compliance arena.  As we have heard from many of you
and your staffs, the 1994 Interagency Memorandum of Agreement (MOA) among the
Department of Agriculture (USDA), the Environmental Protection Agency, and the Departments
of Defense and Interior is obsolete and impossible to follow legally.  Accordingly, USDA has
officially withdrawn from the MOA and has informed the other Departments and agencies that
NRCS will no longer perform wetland determinations for purposes other than implementation of
the swampbuster provisions of the Food Security Act.  A copy of that letter is attached.

We also have been working with the U.S. Army Corps of Engineers, in consultation with the
team of NRCS employees who are revising the National Food Security Act Manual, to develop
joint guidance for both agencies to use when conducting wetland determinations.  This guidance
will replace the procedures in the former MOA.  We expect this guidance to be provided to you
shortly.  In the meantime, NRCS should only be making wetland determinations for the purpose
of implementing the Food Security Act, or when providing financial or technical assistance
through its programs.

If you have any questions about this matter, please contact Carlos Henning, Director,
Conservation Planning and Technical Assistance Division, at (202) 720-1510, or Jennifer
McCarthy, Wetland Conservation Program Manager, Conservation Planning and Technical
Assistance Division at (202) 690-1588.


  /S?


THOMAS W. CHRISTENSEN
Deputy Chief of Programs

Attachment

000659

Sylvia
Lisa
Mary
file

**United States Department of Agriculture**


NRCS

Natural Resources Conservation Service
P.O. Box 2890
Washington, D.C. 20013

MAR - 1 2005

FEB 2 2 2005   Karen

SUBJECT:    PGM – Conservation Compliance Joint Guidance – Wetlands

TO:         State Conservationists                              File Code: 440

The Department of Agriculture (USDA) has withdrawn from the 1994 Interagency Memorandum of Agreement (MOA) among USDA, the Environmental Protection Agency, and the Departments of Defense and Interior, regarding wetland determinations for the Food Security Act and the Section 404 of the Clean Water Act.  We will shortly be issuing new joint guidance from the Natural Resources Conservation Service (NRCS) and the U. S. Army Corps of Engineers for both agencies to use when conducting wetland determinations.

I am forwarding background information and talking points to assist you in communicating USDA's objectives and rationale for these actions.  We are confident that the changes underway will improve the efficiency and effectiveness of NRCS's wetland conservation compliance program in a way that will benefit both our staff and the USDA program participants they serve.

If you have any questions about this matter, please contact Carlos Henning, Director, Conservation Planning and Technical Assistance Division, at (202) 720-1510, or Jennifer McCarthy, Wetland Conservation Program Manager, Conservation Planning and Technical Assistance Division, at (202) 690-1588.

THOMAS W. CHRISTENSEN
Deputy Chief of Programs

Attachment

cc:
Bruce I. Knight, Chief, NRCS, Washington, D.C.
Dana D. York, Associate Chief, NRCS, Washington, D.C.
Merlin Bartz, Regional Assistant Chief, NRCS, Central, Washington, D.C.
Sarah Braasch, Regional Assistant Chief, NRCS, West, Washington, D.C.
Richard Coombe, Regional Assistant Chief, NRCS, East, Washington, D.C.
Division Directors and Above
Center Directors

The Natural Resources Conservation Service provides leadership in a partnership effort to help people conserve, maintain, and improve our natural resources and environment.

An Equal Opportunity Provider and Employer

### Guidance on Conducting Wetland Determinations for the Food Security Act and Section 404 of the Clean Water Act
### Talking Points

- In 1994, the Departments of Agriculture, Interior and Army and the Environmental Protection Agency entered into a Memorandum of Agreement (MOA) concerning the delineation of wetlands for purposes of Section 404 of the Clean Water Act (CWA) and the Food Security Act (FSA). The MOA was developed to streamline the wetland delineation process on agricultural lands, to promote consistency between the CWA and the FSA, and to provide predictability and simplification for USDA program participants.

- The 1996 and 2002 FSA amendments changed the wetland conservation provisions, producing inconsistency between them and the CWA, and making the 1994 MOA obsolete and illegal for NRCS to follow. Specific reasons for withdrawing from the MOA are listed on the back of this document.

- USDA withdrew from the MOA on January 18, 2005 and the Corps of Engineers (COE) withdrew from it on January 24, 2005.

- NRCS has been working with the COE to develop joint guidance for both agencies to use when conducting wetland determinations. This will replace the procedures in the former MOA.

- Highlights of the Joint Guidance:

  - NRCS will conduct wetland determinations for the purpose of implementing the swampbuster provisions of the FSA, and in providing other financial and technical assistance authorized by law.
  - The COE will conduct wetland determinations for CWA purposes.
  - Both agencies will inform landowners that their wetland determinations may not apply to the other agency's wetland programs.
  - NRCS may not disclose confidential information regarding a producer's personal information, such as objectives or decisions, conservation compliance determinations (HEL/WC), natural resource inventories, or environmental assessments to agencies outside of USDA. This includes wetland delineations and labels. If a wetland determination made by NRCS is needed for CWA purposes, NRCS may encourage the producer to provide a copy directly to the COE, or the COE will request a copy from the landowner, but NRCS will not provide it to the COE.
  - The COE and NRCS will coordinate as much as possible on wetland determinations and violations that involve both agencies' jurisdiction, to maximize consistency and minimize delay and inconvenience for the landowner.
  - The guidance encourages interagency coordination on training, wetland delineation procedures and developing local operating agreements to improve service to the public.

## <u>NRCS's Rationale for Withdrawing from the 1994 Memorandum of Agreement (MOA)</u>

- The MOA, which was signed by the EPA, COE, FWS and NRCS in 1994, was developed to streamline the wetland delineation process on agricultural lands and to provide predictability and "one-stop shopping" for USDA program participants.

- The 1996 and 2002 FSA amendments changed the wetland conservation provisions, producing inconsistency between them and Section 404 of the Clean Water Act (CWA).

- The procedures used by NRCS in accordance with the MOA are no longer consistent with current statute and regulations for the following reasons:

  ➢ The 2002 amendments prohibit NRCS from sharing confidential producer information to agencies outside USDA. This makes it illegal for NRCS to provide wetland delineations and determinations to the COE and EPA for CWA permitting and enforcement.

  ➢ 1996 amendments eliminated the concept of "abandonment" for prior converted (PC) cropland. As a result, land may be considered non-wetland for Swampbuster purposes, and wetland for CWA purposes. Further, as a result of the Supreme Court's "SWANCC" decision, a wetland may be subject to Swampbuster, but no longer regulated by the COE for CWA purposes. These inconsistencies in jurisdiction defeat a major purpose of the MOA, which was to ensure that wetland determinations performed by one agency would be relied upon by the other.

  ➢ The MOA states that NRCS wetland determinations shall not be revised without interagency coordination. However, NRCS is required to comply with the decisions of the USDA National Appeals Division, which may overturn a previous wetland determination without coordination among the agencies.

  ➢ Per the MOA, NRCS agreed to conduct wetland determinations on agricultural land for the purpose of obtaining a CWA permit. Regulations at 7 C.F.R. §12.30 state that NRCS's responsibilities regarding wetlands extend only to implementing the wetland conservation provisions of the FSA.

- For these reasons, NRCS cannot comply with the MOA and the MOA has lost its usefulness for the agency, the other signatory agencies, and the owners of agricultural land that is subject to it.

000778

**Subpart D**       **Certification of Wetland Determinations**

**514.50**          **Overview**

**a**
**Purpose**         This part provides guidelines for **certification of** wetland determinations.

**514.51**     **Certifying Wetland Determinations**

**a**
**Purpose**

**SPECIAL NOTE:  The Federal Agricultural Improvement and Reform Act of 1996 amended the provisions concerning certification of wetland determinations.  The final rule and subsequent amendments to this manual will provide additional guidance.**

**The 1990 amendments to the Act** include a certification requirement for all wetland determinations.  The certification procedures to be used on wetland determinations completed before November 28, 1990, and the certification procedures to be used on wetland determinations completed after November 28, 1990, are both described in this part.

The MOA provides that all certifications done after January 6, 1994, will be conducted with mapping conventions agreed on by the signatory agencies (513.30).  These certified determinations will be used for the 1985 Act as amended and the CWA.

**Procedures and guidelines for review and quality assurance of wetland determinations is contained in Part 519.13 and 519.14.**

**NOTE:  It is the goal to have all wetland determinations certified to the quality standards set forth in the jointly agreed upon (MOA) wetland mapping conventions.**

(180-V-NFSAM, Third Ed., Amend. 2, Nov. 1996)

**514.51**

d
Procedures for
Certification

~~NRCS will provide certified wetland determinations on tracts for which a NRCS-CPA-38 has been received using the following procedures:~~

~~1. Review existing tract determinations to determine if they were made according to mapping conventions approved by interagency oversight Team. (See 513.30 and 519.13.)~~

~~2. Notify the person that the determination has been certified as correct.~~

~~3. Notify the person that the determination is sufficient for determining eligibility for USDA programs and:~~

~~4. Provide form NRCS-CPA-026E and mark the NRCS and FSA base maps showing the location of all wetland labels on the tract.~~

~~NOTE: NRCS will assure that the NRCS and FSA base maps are correctly labeled and marked. NRCS will assure the appropriate resource inventory data fields in FOCS are populated.~~

~~5. If the initial determination was given to the person between 11/28/90 and the date of the certification letter and was not appealed, or if the decision (either before or after 11/28/90) was appealed to at least one level, the person does not have additional appeal rights unless the decision is changed. For all others offer appeal rights.~~

NRCS will provide certified wetland determinations/delineations on tracts where a Form AD-1026 and/or a Form NRCS-CPA-38 have been received using the following procedures:

1. Review existing tract determinations/delineations to determine if they were made according to mapping conventions approved by interagency oversight Team. (See Sections 513.30 and 519.13.)
2. Notify the person that the determination/delineation has been certified as correct.
3. Notify the person that the determination/delineation is sufficient for determining eligibility for USDA programs.
4. Provide Form NRCS-CPA-026E and mark the USDA base maps showing the location of all wetland labels on the tract.

NOTE: NRCS will assure that the USDA base maps are correctly labeled and marked.

5. If the initial determination was given to the person between November 28, 1990 and the date of the certification letter and was not appealed, or if the decision (either before or after November 28, 1990) was appealed, the participant does not have additional appeal rights unless he/she requests that the decision be reviewed and is consequently changed. For all other determinations/delineations, offer appeal rights.
6. It is NRCS policy that all wetland determinations/delineations be conducted and/or verified using all appropriate tools including methodologies in the approved State mapping conventions by properly trained staff.

**514.51**

e
Notification

~~All determinations and certifications will be based on mapping conventions approved by the interagency oversight team or by use of on-site procedures in 527.4 and will be completed on a tract basis (522.24).~~

~~Certified wetland determinations become effective when the person is notified on form NRCS-CPA-026 with copies of appropriate maps.~~

~~NRCS will notify the person and FSA that the determination will be certified 30 days after the determination is issued.~~

~~Persons who have already appealed decision will not have appeal rights unless determination is changed or revised.~~

~~See example letters in 526.~~

~~FSA will provide mailing labels for all current owners, operators, and tenants for every tract on which an AD-1026 has been completed.~~

~~Other cooperating agencies will be notified of wetland certifications upon request.~~

All certified determinations/delineations will be based on the State mapping conventions approved by the interagency oversight team or by use of procedures in Section 527.4 and will be completed when the USDA participant makes a request using the Form AD-1026 and/or Form NRCS-CPA-038.

Certified wetland determinations/delineations become effective when the USDA participant is notified on Form NRCS-CPA-026 with copies of appropriate delineation maps. NRCS will notify the USDA participant and FSA that the determination/delineation will be certified 30 days after the determination is issued unless the participant requests appeal or mediation within the required timeframe.

USDA participants who have already appealed the certified wetland determination/delineation will not have appeal rights unless determination is changed or revised.

FSA will provide mailing labels for all current owners, operators, and tenants for every tract on which a Form AD-1026 has been completed.

Other cooperating agencies will be notified of wetland certifications upon request.

(180-V-NFSAM, Third Ed., Circular 1, August 2006)

514-64

<u>1985</u>

514.30  Prior Converted Cropland (PC)

514.31  Farmed Wetlands (FW)

514.32  Farmed Wetland Pasture or Hayland (FWP)

514.33  Abandonment

## Subpart E - Labels:  Wetlands Converted After December 23, 1985

514.40  Converted Wetlands (CW or CW+Year)

514.41  Converted Wetland Technical Error (CWTE)

514.42  Third-Party Conversion Exemption (TP)

## Subpart F - Labels:  Prior Manuals

514.50  Commenced Conversion (CC)

514.51  Converted Wetland for Non-Agricultural Purposes (CWNA)

514.52  Not Inventoried (NI)

## Subpart G - Authorized Activities for Wetland Compliance

514.60  Uses and Maintenance

[M180.514 Fourth Edition, Amendment 4 - January 2008]

---

# Subpart A - Wetland Determination and Delineation

## 514.0  Background

A.  The Food Security Act of 1985, as amended, requires NRCS to delineate, determine, and certify wetlands located on land subject to the wetland conservation (WC) provisions on a farm or ranch in order to establish a producer's eligibility for certain USDA program benefits.  (16 U.S.C. Sec. 3822; 7 CFR 12.30)

B.  This manual provides policy pertaining to the WC provisions.  Policy concerning NRCS technical and financial assistance and the protection of wetlands is located in the NRCS General Manual at Title 190, Part 410, Section 410.26.  In addition, wetlands may be subject to other Federal, State, or local regulations.

C.  In carrying out the provisions of the Act, NRCS may request technical assistance from the U.S. Fish and Wildlife Service (FWS) and State or local conservation agencies.  (7 CFR 12.30)

## 514.1  Certification

A.  Certification of Wetland Determinations

(1)  Certification of a wetland determination means that the wetland determination is of sufficient

D.  Appeals of Certified Wetland Determinations

(1)  Before finalizing a certified wetland determination, NRCS will notify the person affected by the certification and provide an opportunity to appeal it. NRCS will certify the wetland determination as final 30 days after providing the person notice of certification or, if an appeal is filed with USDA, after the administrative appeal procedures are exhausted or discontinued by the affected person. (See the 440-Conservation Programs Manual, Part 510 for NRCS policy and procedure regarding appeals.) NRCS appeal procedures are contained in 7 CFR 614.

(2)  In the case of an appeal, NRCS must review and certify the accuracy of the determination for all lands subject to the appeal to ensure that it is accurate. Before a decision is rendered on the appeal, NRCS will conduct an onsite investigation of the subject land.

E.  Preparing the Certified Wetland Determination

(1)  NRCS will delineate all wetlands subject to the WC provisions by outlining the boundaries of the wetland on aerial photography, digital imagery, or other graphic representation.  If possible, NRCS will use GPS to digitally map the wetland boundary in the field and to import that data onto digital orthophotoquadrangle maps (DOQs) or other GIS digital photographic imagery.  Refer to Part 514, Subparts B-E, to determine the appropriate labels to apply to the delineated wetlands.

(2)  The complete boundaries and acreage of all fields that were delineated and identified must be shown on the map, including areas identified as non-wetland (NW).  This must be clearly depicted on the wetland determination map.  The label and acreage information from the map will be used to prepare the CPA-026e.  A copy of the CPA-026e, along with the delineation map, will be provided to the USDA program participant and Farm Service Agency (FSA).  A copy should be retained in the participant's file located in the NRCS office.

F.  Duration of Ineligibility

(1)  Persons who plant an agricultural commodity on wetland converted between December 23, 1985, and November 28, 1990, are ineligible for USDA benefits for any year in which an agricultural commodity crop is planted or until the functions or values of the converted wetland are mitigated.  [7 CFR 12.4(a)(2)]

(2)  Persons who convert wetlands for the purpose of, or in such a way as to make the production of an agricultural commodity possible after November 28, 1990, remain ineligible for USDA benefits until the functions or values of the converted wetland are mitigated.  [7 CFR 12.4(a)(3)]  Ineligibility will remain with the person even if the person is no longer associated with the land.  Subsequent owners and operators will not be in violation as long as the converted wetland is not planted to an agricultural commodity and the new owner or operator was not affiliated with the conversion action.  [7 CFR 12.4 (g)]

G.  Coordination with the U.S. Army Corps of Engineers (COE)

Wetland determinations performed by NRCS may not be valid for COE Clean Water Act (CWA) jurisdiction and permitting requirements.  NRCS will include the following language in all wetland determinations provided to the USDA participant:

"This certified wetland determination/delineation has been conducted for the purpose of implementing the wetland conservation provisions of the Food Security Act of 1985.  This determination/delineation may not be valid for identifying the extent of the COE's Clean Water Act jurisdiction for this site.  If you intend to conduct any activity that constitutes a discharge of dredged or fill material into wetlands or other waters, you should request a jurisdictional determination from the local office of the COE prior to starting the work."

# 514.2  Definitions

A.  Agricultural Commodity

An agricultural commodity is defined as any crop planted and produced by annual tilling of the soil,

**United States Department of Agriculture**

**◊ NRCS**

Natural Resources Conservation Service
P.O. Box 2890
Washington, D.C. 20013

July 9, 2010

NATIONAL FOOD SECURITY ACT MANUAL (NFSAM)
180 - CPA
Circular No. 5, Part 527, Appendix

SUBJECT:    CPA – Food Security Act Wetland Identification Procedures

Purpose. To provide wetland identification procedures to be used when making wetland determinations and delineations for the Food Security Act of 1985, as amended.

Effective Date. This circular is effective upon receipt.

Background. Under the Food Security Act of 1985, as amended, NRCS has the sole responsibility to make wetland determinations and delineations for USDA program eligibility. The U.S. Army Corps of Engineers has responsibility for wetland jurisdiction under the Clean Water Act. NFSAM Circular No. 4, Part 514, Wetland Conservation Compliance (Guidance on Wetland Determination and Delineation Methodology), dated December 23, 2009, provided notification that NRCS staff with the appropriate job-approval level who are listed on the State Conservationist's roster of employees approved to make wetland determinations should utilize the methods found in Part IV of the Corps of Engineers Wetlands Delineation Manual (January 1987) and regional supplements to make wetland determinations.

There may be situations in which the NRCS agency experts need to vary from the methods provided in the 1987 Corps manual and regional supplements due to the statutory requirements of the Food Security Act. This circular provides wetland identification procedures to be used in making wetland determinations and delineations for the Food Security Act of 1985, as amended. These procedures are based on the Corps method (Part IV of the Corps manual and regional supplements), but contain variances based on statutory and regulatory authorities provided for in the Food Security Act, as amended.

Policy. This amendment clarifies procedures in making wetland determinations and delineations for the Food Security Act of 1985, as amended. These procedures should be utilized for wetland determinations that commence after the date of receipt.

*Helping People Help the Land*

An Equal Opportunity Provider and Employer

Contact. Questions regarding this policy should be directed to Dan Lawson, Planning Team Leader, Conservation Technical Assistance Program Manager at (202) 720-5322 or by e-mail at dan.lawson@wdc.usda.gov.

/s/ Roland Alvarado for

ANTHONY J. KRAMER
Deputy Chief
Easements and Landscape Planning

Attachment

# Food Security Act Wetland Identification Procedures

## (Part I)  Introduction

(1-1)  The NRCS conducts wetland determinations, delineations, or both for the  purpose of assisting USDA program participants in complying with the wetland conservation (WC) provisions of the FSA of 1985 (FSA), as amended.  The wetland identification procedures detailed in this section (FSA wetland identification procedures) are for the sole purpose of identifying FSA wetlands.

(1-2)  Unless otherwise noted, the use of the term "act" in this section refers to the FSA, "statute" refers to 16 U.S.C. Sections 3801 and 3821-3824, and the terms "regulation" and "rule" refer to 7 CFR Part 12, "Highly Erodible Land and Wetland Conservation."

(1-3)  The Secretary of Agriculture directed NRCS to "develop and utilize offsite and onsite wetland identification procedures" (7 CFR Section 12.30(a)(4)).

(1-4)  Part IV, "Methods," of the 1987 Corps of Engineers Wetlands Delineation Manual (Wetlands Research Program Technical Report Y-87-1) and the approved Corps of Engineers regional supplements to the manual are the foundations to the FSA wetland identification procedures.  Part IV of the Corps manual and supplements are collectively referred to as "Corps methods."

(1-5)  In addition to the offsite procedures provided in the Corps methods, States will continue to have the option of utilizing State mapping conventions or State offsite methods as detailed in part V, subpart B, of these procedures.

(1-6)  Because the act, statute, and regulation provide specific definitions (e.g., wetland, hydric soils, hydrophytic vegetation) and guidance for implementation of the FSA WC provisions that differ from those used by the Corps for implementation of the Clean Water Act, certain variances to the Corps methods are listed.  The definitions and concepts provided in the statute and regulation take precedence over what is provided in the Corps methods as detailed in the "FSA Variances" found in part V of these procedures.

## (Part II)  Definitions

(2-1)  The following are definitions as applied to this section.

(2-2)  **Agency Expert.**—An individual granted job approval authority by a State Conservationist to make technical decisions related to the WC provisions.  Job approval authority criteria are found in Title 180, National Food Security Act Manual (NFSAM), Part 514, Subpart A, Section 514.1(B).  All agency experts must be listed on a roster of qualified employees, maintained by the State Conservationist and filed in section III of the Field Office Technical Guide.

1

(2-3) **Certified Wetland Determination or Delineation**.—A wetland determination or delineation that is of sufficient quality to make a determination of ineligibility for program benefits (7 CFR Section 12.30(c)(1)). All final FSA determinations and delineations made after July 3, 1996, are certified determinations or certified delineations.

(2-4) **Comparison Site**.—A site in the local area that has the same hydric soil map unit as the subject site. The comparison site is used to make a decision on the presence of hydrophytic vegetation when the subject site is altered and the plant community that occurred prior to the alteration cannot be determined from onsite inspection or remote sensing and other remote data sources. The comparison site should support hydrologic conditions that are similar to what existed on the subject site prior to the alteration.

(2-5) **Diagnostic Factor (Factor)**.—A physical characteristic common to all wetlands that is used in the identification of a wetland. The three diagnostic factors are hydric soils, hydrophytic vegetation, and wetland hydrology. In the Corps manual, these are referred to as "diagnostic environmental characteristics" or "parameters," whereas they are referred to as "factors" in the supplements.

(2-6) **Drainage**.—Any human-induced onsite or offsite activity that results in a reduction in the depth, duration, frequency, or timing of the hydrology (inundation or saturation by surface or ground water) of the site.

(2-7) **Normal Circumstances (NC)**.—The soil and hydrologic conditions that are normally present, without regard to whether the vegetation has been removed (7 CFR Section 12.31(b)(2)(i)). For FSA wetland identification purposes, this concept is the consideration of normal and abnormal climate-based site changes and natural and artificial disturbance-based site changes that can create wetland identification challenges. "Normally present" is further explained as the vegetative, soil, and hydrologic conditions that occur under both of these conditions:
   a. During the wet portion of the growing season under normal climatic conditions (normal environmental conditions).
   b. Without regard to whether the site has been subject to drainage actions (see drainage definition) after December 23, 1985, and without regard to whether the vegetation has been removed or significantly altered.

(2-8) **Normal Environmental Conditions (NEC)**.—The climate-based concept of NC, defined as the physical conditions, characteristics (hydrology, soil, vegetation), or both that would exist in a typical situation (2-11) on a site during the wet portion of the growing season in a normal climatic year.

(2-9) **Sampling Unit**.—The smallest portion of the area subject to the wetland determination, delineation, or both for which consideration is made regarding a wetland determination decision. In part IV of the Corps manual, this unit is referred to as a unique "plant community." In the supplements, the concept is referred to interchangeably as "plant community," "vegetative unit," and "landscape unit." Sampling units are selected based on having (or would have) similar plant communities resulting from similar soil properties, hydrologic regimes, and landscape positions.

2

Each sampling unit differs (landscape position, hydrology, soils, and vegetation) from other sampling units within the subject area. In the second step of the FSA wetland determination process (determination of FSA wetland type or assignment of the wetland conservation label), sampling units may be further divided or combined.

(2-10) **State Mapping Conventions (SMC)**.—Methods developed by States in response to the 1994 Agricultural Wetland memorandum of agreement. SMCs are unique as they were developed cooperatively between the Corps, Environmental Protection Agency (EPA), U.S. Fish and Wildlife Service, and NRCS for consistent use for Clean Water Act and FSA purposes.

(2-11) **State Offsite Methods (SOSM)**.—Methods developed by NRCS for the sole purpose of supplementing the offsite methodology in the Corps manual for use in identifying wetlands for FSA purposes. The adoption process for State offsite methods will include solicitation of State Technical Committee recommendations. These methods may replace or supplement methods provided for in SMCs.

(2-12) **Typical and Atypical Situations**.—A typical situation is one in which neither of the following apply:
   a. A post-1985 drainage action that has altered the normal soil or hydrologic conditions.
   b. An alteration (removal or change) in the plant community such that a decision cannot be made if the site would support a prevalence of hydrophytic vegetation if undisturbed or in the absence of a post-1985 drainage action.
An atypical situation is one that does not meet the criteria above.

(2-13) **Undrained Condition**.—This phrase is used in the FSA hydric soils definition. A hydric soil may be either drained or undrained. In the FSA hydric soil definition, a hydric soil in its undrained condition supports hydrophytic vegetation. A drained hydric soil is one in which sufficient ground or surface water has been removed by artificial means that the area will no longer support hydrophytic vegetation.

(2-14) **Wetland Delineation**.—Outlining the boundaries of a wetland determination on aerial photography, digital imagery, other graphic representation, or on the land.

(2-15) **Wetland Determination**.—A technical decision regarding whether or not an area is a wetland, including identification of appropriate wetland type (WC label) and size.

(2-16) **Wetland Identification**.—The technical decision regarding whether or not an area is a wetland (first step in the FSA wetland determination process). This does not include the determination of the FSA wetland type (assignment of a WC label).

(2-17) **Wetland Type**.—In the regulation, the term "wetland type" is used to refer to the FSA wetland conservation labels assigned to a subject area based on the definition of wetland types in 7 CFR Section 12.2(a) and exemptions provided in 7 CFR Section 12.5(b).

**(Part III)  FSA Wetland Definition**

(3-1) For FSA purposes, the term "wetland" is defined in 16 U.S.C. Section 3801(a)(27) as land that—

    A) Has a predominance of hydric soils.
    B) Is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions.
    C) Under normal circumstances supports a prevalence of such vegetation. For the purposes of FSA and any other act, this term does not include lands in Alaska indentified as having high potential for agricultural development that have a predominance of permafrost soils.

(3-2) This definition is unique to the statute and all decisions regarding the identification of FSA wetlands must be based on this definition. The statute adds further clarity to the concept of an FSA wetland by defining "hydric soil" and "hydrophytic vegetation" (as those concepts will be applied to the WC provisions) and by the specific direction given to the Secretary as to the hydric soils and hydrophytic vegetation criteria that must be developed by USDA (16 U.S.C. Section 3801(b)(1)).

    o  Hydric soil "means soil that, in its undrained condition, is saturated, flooded, or ponded long enough during a growing season to develop an anaerobic condition that supports the growth and regeneration of hydrophytic vegetation" (16 U.S.C. Section 3801(a)(12)).
    o  Hydrophytic vegetation "means a plant growing in (A) water; or (B) a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content" (16 U.S.C. Section 3801(a)(13)).

(3-3) "Normal circumstances" as used in the FSA wetland definition requires that decisions be based not on anomalies, but rather what would normally occur on the site if all of the following applied:

    (1) The vegetation was minimally disturbed.
    (2) The hydrology had not been reduced from any post-1985 drainage actions.
    (3) Normal climatic conditions were being experienced.

(3-4) In the Corps manual, the concept of "normal" is separated into the disturbance-based concept of normal circumstances (typical/atypical situations) and the climate-based concept of normal circumstances called "normal environmental conditions" (NEC). NRCS adopts this concept that a determination of "normal" is a two-pronged consideration.

(3-5) For FSA purposes, the agency expert will determine the normal circumstances (NC) of the site as those that would be expected to occur—
    (1) In the absence of post-1985 drainage actions that alter the normal soil or hydrologic conditions.
    (2) In the absence of an alteration (removal or change) in the plant community such that a decision cannot be made if the site would support a prevalence of hydrophytic vegetation if undisturbed.

4

(3) During the wet portion of the growing season during a year experiencing normal weather patterns (50-percent chance or more).

## (Part IV) The Indicator-Based Approach as Used in the FSA Wetland Identification Methods

(4-1)  FSA wetlands are identified by direct evidence (observation of conditions under NC) or indirect evidence (indicators of what the site condition would be under NC).

(4-2)  When a site visit is required, agency staffs cannot always visit the subject site during optimum field conditions (under NC).  In these situations, indicators are used to render a decision.  An indicator is indirect evidence of what the site conditions would be under NC and may be obtained from remote resources, site visits, or both.

(4-3)  In the absence of direct evidence, the decision if a site meets a particular diagnostic factor (wetland hydrology, prevalence of hydrophytic vegetation, and a predominance of hydric soils) is assisted by confirmation of the presence of indicators.  The use of indicators to predict the conditions that would occur under NC is referred to as the "indicator-based approach to wetland identification."  The Corps, EPA, and NRCS utilize the indicator-based approach to assist in decisionmaking.  The ultimate decision if a site meets the FSA criteria for any of the three diagnostic factors is made from a preponderance of evidence, best professional judgment, and the FSA definitions, criteria, or both of hydrophytic vegetation, hydric soils, and wetland hydrology.

(4-4)  The decision if the site is an FSA wetland is ultimately rendered based on the determination of a presence or absence of each of the three factors.  Areas determined to support wetland hydrology, a prevalence of hydrophytic vegetation, and a predominance of hydric soils as each factor is defined by the FSA are wetlands subject to the WC provisions of the act.

## (Part V) FSA Wetland Identification Methods

### Act

(5-1)  Section 1201(b) of the FSA requires that "The Secretary shall develop (1) criteria for the identification of hydric soils and hydrophytic vegetation; and (2) lists of such soils and such vegetation."  (Note:  Applicable statute cross-reference citations are found at 16 U.S.C. Sections 3801 and 3821-3824.)

### Regulations

(5-2)  In 7 CFR Section 12.30(a)(4), the Secretary directs NRCS to "develop and utilize offsite and onsite wetland identification procedures."  Further, in Section 12.31, "Onsite Wetland Identification Criteria," the Secretary provides additional guidance to NRCS on processes and technical resources for identifying and determining a predominance of hydric soils and the prevalence of hydrophytic vegetation.

### Policy

5

(5-3)  NRCS meets the departmental regulation (12.30(a)(4)) by the adoption of:

    (1) The wetland identification methods provided in Part IV, "Methods," of the Corps manual and the "flexibility provisions" provided in Part I, "Introduction," paragraph 23.  Any reference to the Corps manual refers to the online version available during the adoption of these procedures.

    (2) Corps Regional Supplements are available online at http://www.usace.army.mil/CECW/Pages/reg_supp.aspx (only nondraft versions will be used).  If an area is not covered by a supplement, then the hydrophytic vegetative indicators (paragraph 35) and wetland hydrology indicators (paragraph 49) provided in Part III, "Characteristics and Indicators of Hydrophytic Vegetation, Hydric Soils, and Wetland Hydrology," of the Corps manual will be utilized.  Additionally, in all circumstances NRCS staffs may use—

        i. The "Hydrology Tools for Wetland Determination" contained in Title 210, National Engineering Handbook (NEH), Chapter 19, Part 650, to base a decision on the hydrology factor.

        ii. The latest version of the "Field Indicators of Hydric Soils in the United States" (currently USDA Natural Resources Conservation Service 2010) to base a decision on the hydric soils factor.

    (3) Variances to the Corps Methods Discussed and Presented in Subparts A Through C of This Part.—These variances are based on the unique statutory and regulatory requirements associated with the FSA, as well as unique challenges associated with the identification of wetlands on lands associated with agricultural operations.

## Subpart A:  General FSA Variances to the Corps Methods

(5-4)  In the statute and regulations, there are situations that are specific to wetland identification as authorized under FSA.  These situations must be considered when developing any wetland determinations or delineations for FSA purposes.  They are detailed as follows:

o  7 CFR Section 12.6(c)(6).—An onsite determination as to whether an area meets the applicable criteria must be made by an NRCS representative if he or she disagrees with the determination made under paragraph (c)(5) of this section or if the information available to the NRCS representative is insufficient to make an offsite determination.

o  7 CFR Section 12.6(c)(7).—An onsite determination, where applicable, will be made by the NRCS representative as soon as possible following a request for such a determination, but only when site conditions are favorable for the evaluation of soils, hydrology, or vegetation.

**Note:** An onsite determination (or onsite inspection or site visit) does not necessarily mean the exclusive application of onsite methods or the exclusive use of onsite indicators.  In keeping with the statute at 16 U.S.C. Section 3822(a)(5) and 16 U.S.C. Section 3822(c), an onsite inspection is required upon appeal or prior to the withholding of benefits.  This onsite inspection or site visit might be conducted merely to collect additional information about planned or completed manipulations, or it may be conducted to verify remotely sensed data or offsite indicators when the decision was rendered from the exclusive use of offsite methods, among many other reasons.

o   7 CFR Section 12.6(c)(8).—With regard to wetland determinations, if an area is continuously inundated or saturated for long periods of time during the growing season to such an extent that access by foot to make a determination of predominance of hydric soils or prevalence of hydrophytic vegetation is not feasible, the area will be determined to be a wetland.

**Subpart B:  Discussion and FSA Variances to the Corps Manual**

**Corps Manual Section A:  Introduction**

(5-5)  In the application of the Corps manual, flexibility has been provided for by the Corps.  The Corps provides that the user should consider the quantity and quality of existing information and the subject site's physical complexity prior to the selection of any method presented, especially with respect to sampling design.  Standard sampling methodology must be modified if it does not accurately assess the site; however, the basic approach for making wetland determinations should not be altered (i.e., the determination should be based on the vegetative, soil, and hydrologic characteristics of the area in question).  Any variation from the sampling methods should be fully documented by the agency expert and the following caution from the Corps manual should be followed:  Modification of *"...sampling procedures requires that the user be familiar with wetlands of the area and use his or her training, experience, and good judgment in making wetland determinations."* [1]

(5-6)  **FSA Variance.**—None.

**Corps Manual Section B:  Preliminary Data Gathering and Synthesis**

(5-7)  In this section, the Corps provides a list of remote data sources that may prove of value when deciding which method is most appropriate.  Remote resources can serve as indicators if the routine Level-1 method, "Onsite Inspection Unnecessary," is selected.  USDA has compiled an array of aerial imagery representing decades of site conditions during the growing season.  Additionally, quality light detection and ranging (LiDAR) data can be a valuable tool in the identification of some wetlands.

(5-8)  Although the Corps manual does not require preliminary data gathering, review of such data, regardless of the sampling method used, can provide an opportunity to "view" the subject site over many years and conditions and will add to the information used in decisionmaking at the diagnostic factor level.

(5-9)  **FSA Variance.**—Because NC is determined based on pre- and post-1985 drainage actions, agency experts must utilize preliminary data gathering and synthesis in determining whether NC exists.

**Corps Manual Section C:  Selection of Method**

---

[1] Environmental Laboratory, Corps of Engineers wetlands delineation manual Technical Report Y-87-1 (U.S. Army Engineer Waterways Experiment Station, 1987) 8.

7

(5-10) The Corps provides for two major approaches: the **routine approach** and the **comprehensive approach**. The various options under the routine approach provide for adequate means to identify an FSA wetland.

(5-11) **FSA Variance**.—The **comprehensive approach** will not be used for FSA determinations.

### Corps Manual Section D: Routine Determinations

(5-12) Within the routine approach, part IV, Section C, of the Corps manual describes three "levels":
  o  Level 1 – Onsite Inspection Unnecessary.—In this level, remote resources (offsite methods and indicators) are utilized to make a decision on each of the three diagnostic factors for a sampling unit.
  o  Level 2 – Onsite Inspection Necessary.—In this level, onsite data (onsite methods and indicators) are used to make a decision on each of the three diagnostic factors for a sampling unit.
  o  Level 3 – Combination of Levels 1 and 2.—Utilization of Level 3 may include the use of offsite methods for one sampling unit and onsite methods for another sampling unit. A Level-3 effort may also include the use of offsite methods for one factor of a sampling effort, while using onsite methods for another factor of that same sampling unit.

(5-13) **Note:** These levels are first introduced by the Corps in Part I: Introduction, paragraph 21.

Each level is discussed in more detail below:

(5-14) **Onsite Inspection Unnecessary (Level 1 Determination)**.—This level (offsite methods) allows for decisions regarding each of the three diagnostic factors without collecting field data or using onsite indicators. The preponderance of evidence collected from remote resources is then used in deciding if the sampling unit supports any of the three diagnostic factors (hydric soils, hydrophytic vegetation, and wetland hydrology).

(5-15) This subsection is particularly useful for obvious wetland and obvious nonwetlands where the NRCS agency expert may determine that a decision can be rendered for a sampling unit without collecting any onsite data or indicators. A site visit may be conducted for verification of offsite indicators but no field data is collected.

(5-16) **FSA Variances**.—Agency experts will use Part IV, Section D, Subsection 1, "Onsite Inspection Unneccessary," of the Corps manual with the following variances:

  o  (5-17) States are provided an option of developing and approving additional guidance to a Level-1 determination, as well as using any additional guidance currently in place. This Level-1 additional guidance is referred to as **State Offsite Methods** or **State Mapping Conventions** (refer to Part II, "Definitions"). These documents provide locally specific

8

remote sensing methods that may be used to address unique problems associated with wetland identification on agricultural landscapes.

○ (5-18) For some sampling units, a soil survey may be sufficient to determine that the site supports a predominance of hydric soils. This use of soils mapping and hydric soils lists is supported by regulation (7 CFR Section 12.31(a)) as the sole indicator for a determination of a predominance of hydric soils.

(5-19) **Onsite Inspection Necessary (Level-2 Determination).**—The Corps provides for two routine Level-2 methods: **Areas Equal To or Less Than 5 Acres in Size** and **Areas Greater Than 5 Acres in Size.**

(5-20) **FSA Variance.**—Agency experts will use Section D, Subsection 2, "Onsite Inspection Necessary," of the Corps manual with the following variance:

○ (5-21) The 5-acre threshold is only a guide based on the assumption that areas greater than 5 acres will be too complex or too difficult to divide visually into different vegetative communities. For subject sites where differing areas (of soils, vegetation, or hydrology) can be easily separated into different sampling units as described in the **Areas Equal To or Less Than 5 Acres in Size** method, there is no advantage in using the **Areas Greater Than 5 Acres in Size** method. For the majority of FSA wetland determinations and delineations, the **Areas Equal To or Less Than 5 Acres in Size** method will be appropriate, regardless of size.

(5-22) **Combination of Levels 1 and 2 (Level-3 Determination).**—This routine method allows for the use of a combination of offsite and onsite methods. Level 1 could be used for one sampling unit or factor, while Level 2 is used for another unit or factor. For example onsite methods (Level 2) are used for vegetation and soils, while wetland hydrology is confirmed from remote sources (Level 1). This method is particularly suitable for agricultural lands where suitable comparison sites are lacking and field indicators have been removed by current or past cultural practices and for sites where the development and persistence of indicators are problematic (i.e., problem soils, seasonal depressional wetlands).

(5-23) **FSA Variance.**—None.

### Corps Manual Section E: Comprehensive Determination

(5-24) The comprehensive method was developed by the Corps for sites that are very complex, when the determination requires rigorous documentation, or both. The Corps provides litigation as an example of when this is needed. With the flexibility provisions provided for in the Corps manual, agency experts have the opportunity to increase the sampling intensity to meet the project needs or site conditions; the requirement for the comprehensive method as a standard method has no advantage.

(5-25) **FSA Variance.**—The **comprehensive approach** will not be used for FSA determinations.

## Corps Manual Section F:  Atypical Situations

(5-26)  The Corps manual directs the user to utilize these methods when the site has been significantly disturbed, making the decision more difficult (drainage or vegetation removed or significantly altered).  For FSA determinations, all hydrologic alterations that occurred prior to (and existed on the date of) December 23, 1985, are "grandfathered" by the statute.  Thus, the hydrologic or soil conditions that have resulted from the pre-1985 alteration (e.g., drainage, filling, leveling, etc.) are considered NC for FSA purposes.  The disturbance portion of NC is not met when a post-1985 alteration (vegetation, soils, or hydrology) is significant enough to potentially alter the wetland identification decision.  This typically occurs when the alteration removed indicators of wetland hydrology, soils, vegetation, or some combination of these.

(5-27)  **Note:**  The climate-based considerations included in the FSA concept of NC are addressed in the discussion of section G of the Corps manual, below.

(5-28)  **FSA Variances**.—NRCS will use the date of December 23, 1985, when making a decision on the disturbance-based consideration portion of NC as it relates to the soils and hydrology diagnostic factors.

- o  (5-29)  The terms "unauthorized activities" and "unauthorized discharges" in paragraph 71(a) are replaced with the term "Recent (post-1985) activities or actions."
- o  (5-30)  For vegetation, when using the Corps manual *adjacent vegetation* data source (Corps manual paragraph 73, STEP 3 (d)), the NRCS will collect vegetative data from a comparison site "in the local area on the same hydric soil map unit," in accordance with 7 CFR Section 12.31(b)(2)(ii).  The comparison site should support hydrologic conditions that are similar to what existed on the altered site prior to the drainage.  Long-term hydrologic monitoring, as referenced in the Corps methods, is not required.  **Note:**  The *adjacent vegetation* data source is only one of several options provided for making a decision on the hydrophytic vegetation factor in section F.
- o  (5-31)  For vegetation, when using the *SCS records* data source (Corps manual paragraph 73, STEP 3 (e)), the agency expert will consider NRCS records, such as ecological site descriptions and data from NRCS reference sites, as potential data sources in addition to soil survey data.
- o  (5-32)  When using Section F, Subsection 4, "Man-Induced Wetlands," the agency expert will disregard paragraph 76, STEP 2.

(5-33)  **Note:**  In the supplements, the Corps combines their concepts of NEC and NC into Chapter 5 - Difficult Wetland Situations.  In addition to problems associated with NC and NEC, the Corps includes situations where indicators are absent for other reasons (i.e., soil properties do not allow for the development or expression of a hydric soil field indicator).  The information in chapter 5 of the supplements is designed to support both sections F and G and add guidance for other wetland identification problems not associated with disturbance or climate.

## Corps Manual Section G:  Problem Areas

(5-34) The agency expert will utilize section G when site data are determined to **not** be reflective (false positive or false negative indicators) of NEC. Section G provides examples of common problem situations related to climate-based site changes and includes a four-step procedure to address the situations. The Corps manual clearly encourages and allows for the use of best professional judgment ("personal ecological knowledge"[2], "basic knowledge of the ecology of the particular community types"[3]) in the implementation of section G.

(5-35) **Note:** In the supplements, the Corps combines their concepts of NEC and NC into Chapter 5, "Difficult Wetland Situations." In addition to problems associated with NC and NEC, the Corps includes situations where indicators are absent for other reasons (i.e., soil properties do not allow for the development or expression of a hydric soil field indicator). The information in chapter 5 of the supplements is designed to support both sections F and G and add guidance for other wetland identification problems not associated with disturbance or climate.

(5-36) **FSA Variance.**—None.

## SUBPART C: DISCUSSION AND FSA VARIANCES TO THE REGIONAL SUPPLEMENTS TO THE CORPS MANUAL

(5-37) The Corps has nearly completed an effort to develop supplements to the Corps manual in order to address regional differences in diagnostic characteristics of wetlands. In their release, the Corps stressed that regional supplements are not stand-alone documents, but rather are to be used in conjunction with the Corps manual. Portions of the supplements replace portions of the Corps manual while other portions of the supplements are provided as alternative guidance or methods only.

(5-38) The following is an overview of each of the five common sections contained within each supplement. Additionally, a brief discussion of each chapter is provided with comments on how NRCS will vary (variances) from what is provided by the Corps in their supplements.

### Supplements Chapter 1: Introduction

(5-39) **Discussion.**—In Chapter 1, "Introduction," of each supplement, the Corps provides table 1 to clarify which sections of the Corps manual are replaced by the supplement. The Corps explains that other guidance, methods, procedures, or some combination of these given in the supplements (e.g., sampling recommendations) are intended to augment the Corps manual, but do not supersede or replace what is presented in the manual.

(5-40) **FSA Variance.**—None.

### Supplements Chapter 2: Hydrophytic Vegetation Indicators

---

[2] Environmental Laboratory 86.
[3] Environmental Laboratory 85.

(5-41) **Act**.—The portions of the FSA that are related to hydrophytic vegetation are contained in title XII, subtitle A:

- o The act defines hydrophytic vegetation to mean "a plant growing in (A) water; or (B) a substrate that is at least periodically deficient in oxygen during a growing season as a result of excessive water content" (section 1201(a)(13)).
- o Section 1201(b) of the act directed the Secretary to develop criteria for identifying and lists of such vegetation to assist in the wetland identification process.

(5-42) **Regulation**.—The portions of 7 CFR Part 12 related to hydrophytic vegetation are as follows:

- o Section 12.2.—The Secretary defined hydrophytic vegetation identically to what was provided by statute.

- o Section 12.31(b)(1).—"A plant shall be considered to be plant species that occurs in wetland if such plant is listed in the National List of Plant Species that Occur in Wetlands." Thus, for FSA purposes a plant occurring on a site and listed on the National Plant List may be considered hydrophytic vegetation. For FSA purposes, the question is not as much the species, but rather how individual plants are behaving within any one sampling unit. The indicators provided for in regional supplements may be used when direct evidence and observations cannot confirm if a plant is growing in water or growing in a substrate deficient in oxygen due to excessive water content, but do not take precedence over the FSA definition of hydrophytic vegetation or what is provided for in Section 12.31(b).
- o The Secretary met the statutory mandate of developing a list of hydrophytic vegetation by adopting the U.S. Fish and Wildlife Service's *National List of Plant Species that Occur in Wetlands*.
- o Section 12.31(b)(3).—The Secretary adds that the determination of prevalence of hydrophytic vegetation will be "made in accordance with the current Federal wetland delineation methodology in use by NRCS at the time of the determination."

(5-43) **Discussion**.—NRCS has developed these procedures as the current Federal wetland delineation methodology in use by NRCS for FSA purposes.

(5-44) As an indicator of hydrophytic vegetation, agency experts will utilize the most current wetland plant list authorized for use by the applicable supplement. This is supported by discussion in the preamble of the following rule: *"Section 12.31(b)(3) is amended to provide that the determination of prevalence of hydrophytic vegetation will be made in accordance with the current Federal wetland delineation methodology in use at the time of the determination. This change assures that the four agencies will utilize consistent and up-to-date technical standards and criteria."*

(5-45) **Note:** In the supplements, alternative vegetative sampling methods are provided to what is presented in the Corps manual. As explained in chapter 1, these sampling methods do not replace what is in the Corps manual, but rather are alternative methods. The agency expert

should select the sampling intensity and method that best characterizes the plant community, soils, or hydrology. Standard sampling methodology provided in the Corps manual allows for modification if it is determined that it does not accurately assess the site, and all variations should be documented by the agency expert.

(5-46) **FSA Variances**.—Agency experts will utilize chapter 2 to assist in the determination of a prevalence of hydrophytic vegetation with the following variances:

- o (5-47) The FSA hydrophytic vegetation definition and the guidance provided for in 7 CFR Section 12.31(b) will take precedence over what is provided for in chapter 2.
- o The FSA definition of hydrophytic vegetation will be used.
- o (5-48) As an alternative to the indicators in chapter 2, the hydrophytic vegetation factor can be verified directly **if the site visit is conducted under NC** by direct observation that the FSA hydrophytic vegetation definition has been met (plants growing in water, or plants growing in a substrate that is periodically deficient in oxygen).

### Supplements Chapter 3:  Hydric Soil Indicators

(5-49) **Act**.—In title XII, subtitle A, the FSA provides two concepts, mandates, or both related to hydric soils.

- o Section 1201(a)(12).—Defines hydric soil as "soil that, in its undrained condition, is saturated, flooded, or ponded long enough during a growing season to develop an anaerobic condition that supports the growth and regeneration of hydrophytic vegetation."
- o Section 1201(b).—Directs that NRCS will develop criteria and lists of such soils.

(5-50) **Regulations**.—Portions of the regulation that relate specifically to hydric soils are found in the following sections:
- o Section 12.2.—USDA repeated the FSA hydric soil definition.
- o Section 12.31(a)(1).—"NRCS shall identify hydric soils through the use of published soil maps which reflect soil surveys completed by NRCS or through the use of onsite reviews.  If a published soil map is unavailable for a given area, NRCS may use unpublished soil maps which were made according to the specifications of the National Cooperative Soil Survey or may conduct an onsite evaluation of the land."

(5-51) **Discussion**.—By regulation, NRCS is afforded the opportunity to utilize two processes to determine if this criterion is met:  utilization of soil maps, lists, or both, or an onsite evaluation.

(5-52) If the agency expert determines that the soil map, list, or both are sufficient, then it is considered a Level-1 or Level-3 determination, decision, or both (refer to part V, subpart B, section D of these procedures).  If the "onsite evaluation" option is selected for a determination of hydric soils, then the hydric soil decision will be based on field observations involving one of the following:

(1) Use of the most recent version of the Field Indicators of Hydric Soils in the United States with the supporting information in chapters 3 and 5 of the appropriate regional supplement.

(2) Verification during NC that the FSA hydric soil definition is met.

(5-53) **FSA Variances**.—Agency experts will utilize chapter 3 to make the determination of a predominance of hydric soils with the following variances:

o (5-54) If soil mapping and hydric soil lists are used, the criteria in 7 CFR Section 12.31(a)(2) will be followed:
  o NRCS must determine whether a sampling unit has a predominance of hydric soils that are inundated or saturated, as follows:
    ▪ If a soil map unit has hydric soil as all or part of its name, that soil map unit or portion of the map unit related to the hydric soil will be determined to have a predominance of hydric soils.
    ▪ If a soil map unit is named for a miscellaneous area that meets the criteria for hydric soils (i.e., riverwash, playas, beaches, or water) the soil map unit will be determined to have a predominance of hydric soils.
    ▪ If a soil map unit contains inclusions of hydric soils, that portion of the soil map unit identified as hydric soil will be determined to have a predominance of hydric soils.
o (5-55) In chapter 3 of every supplement, the Corps provides the following guidance: "Indicators are not intended to replace or relieve the requirements contained in the definition of a hydric soil. Therefore, a soil that meets the definition of a hydric soil is hydric whether or not it exhibits indicators."[4] Since the FSA hydric soil definition differs from that used by the Corps, EPA, and the National Technical Committee of Hydric Soils, the agency expert will use the FSA definition when applying this principle.

### Supplements Chapter 4: Wetland Hydrology Indicators

(5-56) **Act**.—The portion of the act concerning hydrology is solely found in the FSA wetland definition, that a wetland "…is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation…." The act does not specifically define wetland hydrology, nor does it direct the Secretary to link FSA wetland identification methodology to the consideration of hydrology, as was done with hydric soils and hydrophytic vegetation.

(5-57) **Regulation**.—In adherence to the statute, only soils and vegetation are listed in Section 12.31, "Onsite Wetland Identification Criteria." However, inferences to the Corps' three-factor approach (using hydrology as a diagnostic factor in addition to soils and vegetation) exists in section 12.6 (c)(7), which states, "An onsite determination, where applicable, will be made by the NRCS representative as soon as possible following a request for such a determination, but only when site conditions are favorable for the evaluation of soils, hydrology, or vegetation."

---

[4] U.S. Army Corps of Engineers, **Interim regional supplement to the Corps of Engineers wetland delineation manual: Atlantic and Gulf Coastal Plain Region** (U.S. Army Engineer Research and Development Center, 2008) 28.

Similarly, in Section 12.2, not-inventoried land is defined as "…an area for which no evaluation of soils, vegetation, or hydrology has been conducted to determine if wetland criteria are met."

(5-58) **Discussion**.—Based on the inferences in the current rule that wetland hydrology should be considered as a diagnostic factor in the FSA wetland identification process, NRCS has adopted the concepts in Chapter 4, "Wetland Hydrology Indicators," of the supplements. The consideration of wetland hydrology is particularly important on sites where the hydrology has been altered (increased or decreased) by manipulations, as some plant communities are slow to respond to changes in hydrology. Coupled with the fact that redoximorphic soil features are very resistant to change, it becomes important that the agency expert confirms that under NC wetland hydrology is still present at the time of rendering a FSA wetland identification decision.

(5-59) The FSA wetland hydrology criterion is derived from the statutory wetland definition as:

- Under NC the site would be inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation.

(5-60) **FSA Variances**.—Agency experts will utilize chapter 4 to make the determination of a presence of wetland hydrology with the following variances:

o (5-61) The appropriate analytical techniques for determining duration and frequency of saturation, inundation, or both found in "Hydrology Tools for Wetland Determination" contained in 210-NEH, Chapter 19, Part 650, may be used by the agency expert as a primary hydrology indicator.
o (5-62) As an alternative to the indicators in chapter 4, the hydrology factor can be verified directly **if the site visit is conducted under NC** by direct observation of inundation or saturation by surface or groundwater at a frequency and duration sufficient to support a prevalence of FSA hydrophytic vegetation.

### Supplements Chapter 5: Difficult Wetland Situations

(5-63) **Act**.—In the FSA wetland definition, the phrase "normal circumstance" is used to ensure that decisions rendered are based on site characteristics that normally occur, rather than an anomaly expressed at the time of a site visit. For example, anomalies in site characteristics might be due to either recent disturbances (disturbances to the vegetation or post-1985 drainage activities) or seasonal or annual changes in the "wetness" of a site due to climatic variability.

(5-64) **Regulation**.—In 7 CFR Part 12, sections of the rule that relate specifically to NC are found in the following sections:

o Section 12.2.—The regulatory wetland definition mimics the statute with the use of the phrase "normal circumstances."
o Section 12.31(b)(2)(i).—"The term normal circumstances refers to the soil and hydrologic conditions that are normally present, without regard to whether the vegetation has been removed."

(5-65) **Discussion**.—For FSA wetland identification purposes, the statutory and regulatory intent of NC is addressed by following the Corps manual approach of dividing the concept into two distinct parts: the disturbance-based challenges and the climate-based challenges.

(5-66) In chapter 5 of each of the supplements, the Corps provides an inclusive discussion on situations where decisions are made more difficult due to the lack of evidence (indicators) when a site does not meet NC. Using part IV of the Corps manual, the user would be directed to Section F, "Atypical Situations"; Section G, "Problem Areas"; or both, each being supplemented by chapter 5.

(5-67) In addition to NC, the Corps recognizes another situation that can be problematic in the identification of wetlands using indicators that were not addressed in the Corps manual. In some situations, field diagnostic indicators fail to develop based on unique site characteristics. The most common situations are when a particular soil meets the hydric soil definition but fails to develop any apparent redoximorphic features and where a seasonally wet herbaceous depression fails to develop a persistent wetland hydrology indicator. The Corps includes these problematic situations that are not related to disturbance or climate in chapter 5 of the supplements.

(5-68) It is important that the agency expert understand that all FSA wetland identification decisions should be based on what the site conditions would be under NC.

(5-69) **Note:** Under the "Wetland/Non-Wetland Mosaics" portion of chapter 5, the point-intercept sampling at fixed intervals method should be appropriate for most FSA wetland identification purposes.

(5-70) **FSA Variance**.—Agency experts will utilize chapter 5 with the following variance:

o (5-71) When using the "Reference Sites" approach as detailed in chapter 5, a comparison site "in the local area on the same hydric soil map unit" will be used, in accordance with 7 CFR Section 12.31(b)(2)(ii). The comparison site should support hydrologic conditions that are similar to what existed on the altered site prior to the alteration. Long-term hydrologic monitoring, as referenced in the Corps methods, is not required. **Note:** The "Reference Sites" approach is only one of several procedures for making a decision on the hydrophytic vegetation factor provided in chapter 5.

## References

Environmental Laboratory. 1987. *Corps of Engineers Wetlands Delineation Manual.* Technical Report Y-87-1. Vicksburg, MS: U.S. Army Engineer Waterways Experiment Station. (http://el.erdc.usace.army.mil/wetlands/pdfs/wlman87.pdf)

U.S. Army Corps of Engineers. 2008. *Interim Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Atlantic and Gulf Coastal Plain Region.* ed. J. S. Wakeley, R. W. Lichvar, and C. V. Noble. ERDC/EL TR-08-30. Vicksburg, MS: U.S. Army Engineer Research and Development Center. (http://el.erdc.usace.army.mil/elpubs/pdf/trel08-30.pdf)

USDA Natural Resources Conservation Service. 1997. Hydrology Tools for Wetland

16

Determination. Chapter 19 in *Engineering Field Handbook*. Fort Worth, TX:
U.S. Department of Agriculture, NRCS.
(http://www.info.usda.gov/CED/ftp/CED/EFH-Ch19.pdf)

USDA Natural Resources Conservation Service. 2010. *Field Indicators of Hydric Soils in the
United States, version 7.0*. ed. L. M. Vasilas, G. W. Hurt and C. V. Noble. Fort Worth, TX:
USDA NRCS in cooperation with the National Technical Committee for
Hydric Soils. (http://soils.usda.gov/use/hydric/)



# Technical Assistance for Agriculture Conservation

Updated January 7, 2011

**Congressional Research Service**

https://crsreports.congress.gov

RL34069

**CRS REPORT**
Prepared for Members and
Committees of Congress

with the introduction of conservation compliance.[22] It was not until the 1990s that NRCS assumed greater responsibility in USDA's financial assistance programs for conservation. As part of the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994 (P.L. 103-354), USDA was reorganized. On October 13, 1994, through a USDA memorandum (1010-1) the Soil Conservation Service was renamed the Natural Resources Conservation Service. The newly created NRCS also received responsibility for the Wetlands Reserve Program (WRP), Water Bank, Colorado River Basin Salinity Control, and Forestry Incentives programs from the Agricultural Stabilization and Conservation Service (now known as the Farm Service Agency).[23] While leadership for these programs transferred to NRCS, the function of making payments to program participants remained with FSA.

Following enactment of the 1996 farm bill (P.L. 104-127), NRCS became responsible for administering the Environmental Quality Incentives Program (EQIP), a combination of several financial assistance programs. NRCS was given the leadership role for the financial as well as the technical aspects of the conservation programs, including developing the type of practices available, assisting producers with preparation of applications, ranking applications, and checking on installation of practices. The payment function for EQIP, WRP, and other conservation programs administered by NRCS remained with FSA. It was not until the enactment of the 2002 farm bill (P.L. 107-171) that NRCS became responsible for most of the conservation programs under the conservation title, including payment responsibility. FSA retained the administration of the Conservation Reserve Program (CRP), with NRCS continuing to provide technical assistance; administration of the Grasslands Reserve Program (GRP) was split between NRCS and FSA. The increase in responsibility following the 2002 farm bill came with an expanding list of natural resource concerns and a significant increase in funding authority.[24]

Despite the transition of program leadership, some functions continue to be maintained by each agency. NRCS continues to be the leader for the technical assistance of conservation programs (e.g., planning, practice standards, etc.). FSA continues to be the leader for participant eligibility determinations (e.g., adjusted gross income, compliance records, etc.). For programs that involve both agencies (e.g., CRP and GRP) NRCS and FSA have a memorandum of agreement (MOA) or memorandum of understanding (MOU) that divide responsibilities (**Appendix B**).

# Non-Federal Technical Assistance

The current conservation technical assistance network includes more than just the federal USDA component. State and local governments, for-profit businesses, non-profit organizations, universities, and other entities expand the capacity to deliver technical assistance beyond the

---

[22] The 1985 farm bill (P.L. 99-198) authorized conservation compliance (commonly referred to as *sodbuster*) and wetlands compliance (commonly referred to as *swampbuster*) requirements, transforming many technical assistance functions that NRCS historically performed by requiring enforcement of conservation under certain circumstances. Sodbuster prohibits participation in numerous specified USDA programs when annually tilled commodity crops are produced on highly erodible land (HEL) without adequate erosion protection. Swampbuster provisions prohibit participation in numerous specified USDA programs when annually tilled commodity crops are produced, or land is drained to make production possible, on certified wetlands. SCS had, and NRCS (successor to SCS) continues to have, primary responsibility for providing technical assistance to determine whether land should be classified as highly erodible or a wetland.

[23] Helms, Douglas, "Technical Assistance—The Engine of Conservation," March 2005, at http://www.nrcs.usda.gov/about/history/articles/CTA_17Mar_Draft3.pdf.

[24] Ibid.

# Wetland Determination for FSA Purposes – An Advanced Course for Experienced Staff.

## Target Audience

NRCS staff who -
- ✓ Have previously completed a Corps <u>Regulatory IV Course</u> or the NRCS (NEDC) <u>Wetland ID for FSA Purposes; Phase 2</u> course.
- ✓ Have experience in conducting wetland determinations.
- ✓ Have the responsibility to support such determinations at the agency level (NRCS reconsiderations) or department level (USDA-National Appeals Division hearings).
- ✓ National and State staff in technical and leadership positions in need of understanding the complexities of NRCS responsibilities associated with the WC Provisions.

## Course Objective

This advanced refresher course is specifically designed to upgrade the knowledge-base of NRCS staff with significant past experienced in conducting wetland determinations.  Because of the assumption that the participants have experience in the identification of field indicators provided for in Chapters 2-4 of the Corps Regional Supplements, those skills (rapid test, dominance text, hydric soils indicators and hydrology indicators) are not covered in detail.   Rather this course is a process/procedure-based session targeting staff who routinely conduct wetland determinations or those staff who represent the agency in appeals of adverse decisions associated with the Wetland Conservation (WC) provisions of the Food Security Act (FSA) of 1985, as amended.

It has been discovered that most NRCS staff erroneously use the Corps Data Form (*Data Form 1*) as their procedural guide rather than the actual procedural manuals (Corps Wetland Delineation Manual, Corps Regional Supplements and FSA Wetland ID Procedures). It has also been discovered that the training material and approach provided in the Corps Regulatory IV courses lack the procedural integrity needed by NRCS staff.  This commonly results in flawed decisions not supported by law, regulation or agency policy.  In this course, participants are presented the structure, opportunities and limitations provided for by the Corps' Methods (Corps Manual and Supplements).  Additionally, participants are provided a detail review and discussion on the purpose, structure and requirements of the FSA variances to the Corps methods provided in the NFSAM; Part 527; <u>FSA Wetland Identification Procedures</u> released as NRCS policy via Circular 6 (December 1, 2010).  Lastly, specific case-law decisions related to the identification of wetlands are provided and discussed.  Although, this course is not designed to teach the appeals process, it has been discovered that few understand the process provided in the NRCS Appeal Procedures rule. This rule is discussed to assure full understanding of the appeal procedures.

Following completion of this refresher course, the observant participant will have new appreciation of the proper application of procedures used render an adverse technical decision regarding each of the 3 steps of the FSA Wetland *Determination* Process as defined in the FSA Wetland ID Procedures (NFSAM; Part 527; December 1, 2010), paragraph (2-18).

- <u>Step 1: Wetland ID</u>;

- o Policy reference to complete this step is the FSA Wetland ID Procedures is Part 527 of the NFSAM. NRCS NEDC courses titled Wetland ID for FSA Purposes (Phases 1 and 2) target this step.
- Step 2: Identification of Wetland Conservation Type (WC Label)
  - o Policy references are 7CFR12.2 and 12.5(b) and NFSAM Part 514, subpart B and subpart C.
- Step 3: Determination of Size
  - o Policy reference NFSAM Part 514.1 E. (1) and (2).

### How does this course differ from the NEDC courses Wetland ID for FSA Purposes: Phase 1; Basic Concepts and Wetland ID for FSA Purposes; Phase 2; Application?

The two NEDC courses are designed for inexperienced staff or those with limited experience in conducting wetland determinations. The emphasis of these two courses is to present basic skills and procedures required in rendering a decision if a site is a wetland (Step 1 of the FSA Wetland Determination Process). These two NEDC courses primarily provide hands-on training on field identification of indicators for hydrophytic vegetation, hydric soils and wetland hydrology. Conversely, this advance course is designed for experienced staff and includes detailed discussion of all three steps in the FSA wetland determination process (wetland ID, assignment of WC labels and delineation/size/certified wetland map) with additional discussions on case law decision, the statute, the regulations and the NRCS reconsideration and appeal process. Administrative (forms and correspondence) procedures used in transmittal of an adverse technical decisions related to the WC provisions are also discussed.

Lee Davis, Technical Assistance Biologist, NRCS Central National Technical Support Center, provides this course to States and other national staff as part of his technical assistance responsibilities. Leander Brown, Soil Scientist, East National Technical Support Center provides support during the field visit portion related to  is supported by identification of hydric soils, delineation of sampling units and location of representative observation points. This advanced course is not currently in Ag-Learn. Approval of this course is granted by the Director of the CNTSC in response to requests by State Conservationists. The host State(s) arranges for the meeting room, designation of hotels and the development of the list of participants and any certifications of completion.

### Required Prerequisites

1. Regulatory IV course, training on the Corps regional supplements and/or NEDC's Wetland ID for FSA Purposes (Phases 1 and 2).
2. Experience in identifying wetlands using the Corps methods (Corps of Engineers Wetland Delineation Manual and Regional Supplements).

### Participant Pre-course Responsibilities. (10-hours) - To increase efficiency and retention of material, participants should read the following material. Each will be provided electronically to the course participants. *Note: These are listed in order of priority.*

1. Modules 1, 2 and 6 of the NEDC Course – Wetland ID for FSA Purposes; Phase 1, Basic Principles.

- ▪ 2-hours
2. FSA Wetland ID Procedures "Circular 6" with special consideration of each of the 20 FSA Variances to the Corps Methods.
   - ▪ 1-hour
3. B&D, Barthel and Koshman Decisions.
   - ▪ 2-hours
4. 1990 Conference Managers Report, with comments
   - ▪ 30 minutes
5. Wetland Conservation (WC) Provisions from the statute (FSA)
   - ▪ 1-hour
6. Portion of the HELC and WC rule (7CFR12) related to the WC Provisions
   - ▪ 1.5 hours
7. Portions of the HELC and WC rule related to exemptions (labels) with comments
   - ▪ 1-hour
8. NRCS Appeal Rule, with comments
   - ▪ 1-hour

**Recommended activities following completion of this course.**

1. Successful completion of the NEDC course <u>Wetland ID for FSA Purposes; Phase 1; Basic Principles (16-24 hours).</u>

2. Study and then apply Chapter 4 (Hydrology) and Chapter 5 (Difficult Situations) of the Corps Regional Supplements with special consideration of the limitations and mandates.

<div align="center">

**Course Materials**

</div>

Course materials (below) will be provided electronically (document or link) to each participant. Each participant (or State) will print the material, assembled into a 3-ring binder and bring to the session. This assembled material can be used as a "WC desk reference" following completion of the course.
1. Portions of the Corps Manual
   - ✓ flexibility paragraph 23 and Part IV (without Section E)
   - ✓ Copy in Black and White (B&W)
2. Applicable Corps Regional Supplement–
   - ✓  suggested to be bound separately for field use
   - ✓ Copy in color
3. FSA Wetland ID Procedures "Circular 6"
   - ✓ Transmittal (Circular) and body (FSA Procedures)
   - ✓ Copy in B&W
4. 1990 Conference Report, with comments
   - ✓ Copy in color
5. "Exemptions portions" from the rule, with comments
   - ✓  Copy in color
6. Entire HELC and WC rule (7CFR12)
   - ✓  Copy in B&W
7. WC portions of the statute (Food Security Act), with comments
   - ✓  Copy in color
8. B&D Decision

      ✓  Copy in B&W
9.  Barthel Decision
      ✓  Copy in B&W
10.  Koshman Decision
      ✓  Copy in B&W

To facilitate flexibility regarding logistics at different locations, this course is divided into 5 sessions requiring a total of 12 hours in the office. The optional field session, if selected by the host State, requires an additional 3- 4 hours. Typically -

- Courses with a field exercise begins at noon on Tuesday and end at noon on Thursday, with Wednesday having ½ day in the office and ½ in the field.
- Courses without a field trip are 2 full office days.


## SESSION 1: INTRODUCTION, TECHNICAL and LEGAL FOUNDATIONS
### (2 hours, 30 minutes)

- o Introductions
- o Housekeeping
- o Legal and Policy Foundations
- o Civics 101
- o Statute
- o Regulations (7CFR12)
  - 7CFR12.31: On-Site Wetland Identification Criteria
- o Food Security Act Wetland Determination (3-Step Process)
- o Overview: What Did NRCS Actually Adopt as Policy? (15 minutes)


## SESSION 2:  REVIEW OF THE FSA WETLAND ID PROCEDURES DOCUMENT
### (1 hours, 30 minutes)

- o FSA Wetland ID Procedures Part I:  Introduction
- o Part II: Definitions
- o Part III:  FSA Wetland Definition
- o Part IV:  The Indicator-Based Approach
- o Part V: FSA Wetland Identification Method
  - o General Variances (n=3)
  - o Variances to the Corps Manual (n=10)
  - o Variances to the Regional Supplements (n=7)
- o On-Site "*Visit*" , "*Determination*" and "*Methods*"


## SESSION 3:  DETAILED REVIEW OF STEP 1 OF THE FSA WETLAND DETERMINATION PROCESS (WETLAND ID)
### (4 hours)

- o Paragraph 23: Flexibility Provision (FSA Variances: None)
- o Part IV; Section A: Introduction (FSA Variances: None)
- o Part IV; Section B: Preliminary Data Gathering (FSA Variance 5-17)
- o Part IV; Section C:  Selection of Method (FSA Variances 5-21)
  - ✓ Level 1
  - ✓ Level 2
  - ✓ Level 3

- o   Part IV; Section D: Routine Determinations *as supplemented with Chapters 2-4*
    - ✓   Subsection 1: On-Site Inspection Unnecessary
        - ▪
    - ✓   Subsection 2 (FSA Variances
        - ▪   Routine Less than or Equal To 5 Acres in Size
        - ▪   Routine Greater than 5 Acres in Size
- ~~o   Part IV; Section E~~
- o   Part IV; Section F, as supplemented with Chapter 5
- o   Part IV; Section G, as supplemented with Chapter 5
- o   Further review of Chapter 5


## SESSION 4: SAMPLING UNIT AND REPRESENTATIVE OBSERVATION POINT FIELD EXERCISE (OPTIONAL)


## SESSION 5:  STEP 2: ASSIGNMENT OF WC LABELS
### (2 hours)

- o   Statute
- o   Regulations
- o   Policy
- o   Labels
    - ✓   Commenced Conversion (CC)
    - ✓   Categorical Minimal Effect (CWE)
    - ✓   Converted Wetland, prior to 11/28/1990 (CW)
    - ✓   Converted Wetland after 1990 (CW-year)
    - ✓   Non-Wetland and Not PC (NW)
    - ✓   Non-Manipulated Wetland (W)
    - ✓   Prior Converted Cropland (PC)
    - ✓   Farmed Wetland (FW)
    - ✓   Farmed Wetland Pasture (FWP)
    - ✓   Artificial Wetland (AW)
    - ✓   Corps Permit, with Mitigation (CPD)
    - ✓   Mitigation (MIW)
    - ✓   Minimal Effect (MW)
    - ✓   Third Party (TP)
    - ✓   Mitigation Site (MWM)
    - ✓   Wetland Not Fully Converted (WX)
    - ✓   PC/NW


## SESSION 6:  STEP 2: APPEALS, CASE-LAW AND WORKFLOW PROCESS
### (2 hours)

- o   1990 Conference Report
- o   B&D Decision
- o   Barthel Decision
- o   Koshman Decision

- o NRCS Appeal Rule
  - ✓ Request for Reconsideration
  - ✓ Request for Appeal
- o AD-1026
- o CPA-026
- o FSA-569
- o CPA-38
- o Letters of Transmittals

**1990 Farm Bill Conference Report:**

<mark>**Disclaimer: This was cut and pasted from an email and should not be used outside of information only.**</mark> *– red print are comments added for training purposes and are not part of the managers report.*

*Background and Comments:  To understand the issues at the time, remember that the 1989* <u>*Federal Manual for Identifying and Delineating Jurisdictional Wetlands*</u> *had been developed with MUCH controversy.  Per the mandate by Congress and the President, the four federal agencies released the 1991 Proposed Revisions to the 1989 Manual.  The result was the eventual directive to stop using the 1989 manual (and its 1991 proposed revisions) and go back to what was being used previously – that being the1987 manual for 404 and NFSAM (SCS) for FSA. However, understand how controversial the issue of the identification of wetland was at the time, you can understand some of the comments in the managers' report.  It also explains why they were so firm on the 3-factor approach when the 1985 statute and USDA regulation (1987) used a 2-factor approach (soils and vegetation).  Because SCS wetland experts at NHQ had been so ingrained in the 1989 manual effort, they had bought off on the 3-factor approach (in direct conflict with the 1985 Farm Bill and 1987 rule).  This managers' report provides value to our question about the two-factor option provided in Section F of the Corps Manual.  Because this managers' report is tied to the 1990 Farm Bill, the two-factor approach in the 1985 is replaced with the 3-factor approach in the 1990 Farm Bill - Lee Davis*

*Subtitle B-Wetland Conservation*
*(12) Wetland Definition*

The House amendment places into statute a definition of wetlands that is consistent with the current definition, but emphasizes that for the land in question: 1) the frequency of inundation or saturation by surface or groundwater is sufficient to support hydrophytic vegetation; and 2) under normal circumstances supports such wetland vegetation. (Section 1602)

The Senate bill has no comparable provision. The Conference substitute adopts the House provision. (Section 1421)

The Managers note that there has been considerable confusion and controversy generated by attempts to apply the provisions of Subtitle C of Title XII of the Food Security Act of 1985. The provisions of this section, while restating the three characteristics that apply to a wetland, are not intended to indicate a change, in any way, in the intent of the original provision.

<mark>A wetland possesses three essential characteristics: (1) hydrophytic vegetation, (2) hydric soils, and (3) wetland hydrology, which is the driving force creating all wetland. The Managers intend that the three criteria for identifying the specific characteristics of a wetland must all be met for an area to be identified as wetland for the purposes of this section. Wetlands generally include swamps, marshes, bogs, prairie potholes, and other similar areas.</mark>

<mark>The Managers' intent continues to be that an agricultural area cannot be designated a wetland on the basis of a single characteristic (e.g., the predominance of hydric soils). All three criteria must be satisfied in order for an area to be designated a wetland. The Managers do not intend that designations be made</mark>

solely on the basis of the existence of a single characteristic. All three characteristics must be present to arrive at a wetland designation, unless interrupted by temporary weather conditions or if hydrophytic vegetation has been removed by farming or ranching practices.

*Clearly the manager's report REQUIRES that "all 3 factors be present" (under Normal Circumstances) and all "3 criteria must be met for an area to be identified as a wetland" for FSA purposes. This is why NRCS State Offsite Methods (SOSM) replace State Mapping Conventions (SMC). SMC's fail to meet this mandate as they target "wetland signatures" rather than remote indicators for each factor (hydric soils, hydrophytic vegetation or wetland hydrology).*

When evaluating agricultural land to determine the presence or absence of wetland, the Managers recognize that agricultural lands are disturbed areas and must be viewed in that context. Cropping practices that can result in the removal of hydrophytic vegetation, or other conditions such as temporary drought or excessive moisture, can complicate the process of identifying wetland.

The Managers also reaffirm that unconverted wetland acreage may continue to be farmed without penalty, when conditions permit, and so long as the producer does not drain, dredge, fill, or level the farmed wetland so as to cause its conversion.

The Managers recognize that a farmed wetland often will not exhibit hydrophytic vegetation, since the act of cultivation will frequently remove such vegetation. In that regard, the Managers intend the term "under normal circumstances" to mean that a prevalence of hydrophytic vegetation must be present to allow a wetland designation unless such vegetation has been removed, or if disturbed by farming, ranching, or related activities, or eliminated as the result of unusual natural events and a determination made that hydrophytic vegetation would have been present but for the disturbance.

The Managers intend that the term "prevalence of hydrophytic vegetation" refers to a condition in which, under normal circumstances", a majority of the plant life species present require saturated or inundated soil conditions, as well as those that can tolerate saturated or inundated soil conditions but are capable of surviving in upland areas.

The Managers further intend that the term "frequency and duration" of inundation or saturation required in the definition of the term "wetland" means that permanent or periodic inundation, or soil saturation to the surface, exists during a significant portion of the growing season, conforming the hydrology of the area to the wetland definition, and that this condition occurs in years of normal precipitation. Such condition may also exist seasonally. The Managers do not intend that land subject to infrequent flooding or occasional, brief pooling, such as from abnormally heavy rains or unusually heavy snowmelt, be construed to meet the hydrological requirements of a wetland.

*This statement provides an idea of - How wet must an area be to be a wetland? Answer: "permanent or periodic inundation, or soil saturation to the surface, exist during a significant portion of the growing season and these wetting event must occur under normal climatic years.*

*(4) Timing of Violation*

The Senate bill establishes that a swampbuster violation is deemed to have occurred at either the point of planting an agricultural commodity on a converted wetland, or after the date of enactment of this Act, at the point of converting a wetland for the purpose of, or to have the effect of making possible, the production of a commodity. (Section 1286)

The House amendment is essentially identical to the Senate bill (House language replaces "date of enactment of this Act" with 'December 23, 1985". (Section 1602)

The Conference substitute adopts the House provision with technical amendments. (Section 1421)

*(5) Wetland Delineation*

The House amendment directs the Secretary to delineate wetland on a map and to make a reasonable effort to make an on-site wetland determination whenever requested by an owner or operator. The Secretary is also directed to provide notice to affected owners or operators, to certify each map as sufficient evidence for the purpose of making determinations of ineligibility for program benefits under section 1221, and to provide an opportunity to appeal the delineations to the Secretary prior to the certification. The Secretary also must maintain a public listing of all completed certifications. (Section 1602)

The Secretary is directed to review and certify the accuracy of the mapping of all lands mapped prior to the date of enactment of the Food and Agricultural Resources Act of 1990 for the purpose of wetland delineations to ensure that wetland on such lands have been accurately delineated. The Secretary must provide by regulation a process for the periodic review and update of wetland delineations, as determined appropriate by the Secretary.

*We never did this, so those conducted prior to 1990 were never certified.*

Persons are exempted from being "adversely affected because of having taken an action based on a previous determination by the Secretary.

*In the 1996 rule, USDA made it clear that this protection was only provided to certified determinations. No such protect is provided to non-certified (A.K.A. "official determinations" or "inventories") determinations.*

The Senate bill has no comparable provision.

The Conference substitute adopts the House provision with amendments. The House requirement for the review of all lands mapped for wetland delineation purposes prior to enactment of this Act is deleted. All maps will be certified, as required in the House provision, and such maps may be appealed, but no appeal will be allowed on maps completed prior to the date of enactment of this Act that had not been changed, and where such maps had already been appealed and for which an on-site visit had been conducted. (Section 1602)

000932

*Here they state that no review of pre-1990 is required.  This suggests that the idea for pre-1990 determinations that were appealed AND an onsite visit conducted, that they could not be appealed. It is unclear if these determinations (pre-1990 and appealed) are certified.*

The Managers agree that the certification process is to provide farmers with certainty as to which of their lands are to be considered wetlands for purposes of Swampbuster. The Managers note that the current USDA wetland delineation process involves the use of substantial materials to make an initial determination in the field office, developed in consultation with other appropriate Federal and State agencies. Wetlands identified in this process are delineated on maps which are then mailed to producers for review. If the producer finds such map to be in error, and the USDA agrees that an error has been made, then the map is corrected. If the USDA does not agree that there is an error in the map, and the producer continues to believe so, then the producer may appeal such determination.

The Managers find that this process is adequate for certification of any new maps delineated after the date of enactment of this Act. For maps completed prior to the date of enactment of this Act, the Managers intend for producers to be notified that their maps are to be certified and that they have some appropriate time for appeal. In this circumstance, producers who had not already been mailed their maps should be given a map for their review.

*This suggest that for those determinations conducted prior to 1990 ("official determinations"), that NRCS must notify them that their maps are now  certified, with appeal rights.  That never happened.  Thus, determinations conducted prior to 1990 are not certified. The exception might be those that were appealed prior to 1990. Some could argue that those are certified. The 1991 rule did not speak to certification. The 1996 rule basically stated that all determination conducted after July 3, 1996 (90 days after the 1996 rule was published) are certified, but did not speak to those conducted between 11-28-1990 and 7-3-1996, nor those conducted prior to 11-28-1990.*

# NOAA'S 1981–2010
# U.S. CLIMATE NORMALS
## An Overview

by Anthony Arguez, Imke Durre, Scott Applequist, Russell S. Vose,
Michael F. Squires, Xungang Yin, Richard R. Heim Jr., and Timothy W. Owen

The latest 30-year U.S. Climate Normals, available from the National Climatic Data Center,
were calculated for over 9,800 weather stations and include several new products
and methodological enhancements.

Climate normals are typically defined as 30-yr averages of meteorological conditions, such as air temperature, precipitation, etc. They are arguably the most fundamental attributes of the climate of a given locale. In fact, the terms *normal* and *climatology* are often used interchangeably. As a measure of central tendency, climate normals characterize the background state about which anomalous conditions and even extremes are allowed to operate. They can be used to determine what crops to plant, what clothes to pack for an extended trip, the rates a power company can charge its customers, where and when to schedule an outdoor wedding, and countless other applications.

In the United States, the term *normals* is also commonly used in a broader sense to refer to a full suite of products issued by the National Oceanic and Atmospheric Administration (NOAA) that describes climatological conditions with 30-yr averages and other statistics (e.g., standard deviations). The new 1981–2010 set of NOAA's climate normals are described herein and replace the 1971–2000 normals that were released in the early 2000s. The overarching goals of NOAA's 1981–2010 U.S. Climate Normals are sixfold:

- to produce high-quality climate normals for as many U.S. stations as possible, including estimates for short-record stations;
- to compute the climate normals in a manner that is representative of the 1981–2010 time period, including stations with incomplete observing records;
- to compute the climate normals such that they reflect the station locations and their observing practices at the end of 2010;
- to add new products to meet user needs as identified via user engagement during the development process;
- to develop new statistical techniques as needed to meet the goals listed above; and

**AFFILIATIONS:** Arguez, Durre, Applequist, Vose, Squires, Heim, and Owen—NOAA/National Climatic Data Center, Asheville, North Carolina; Yin*—STG, Inc., Asheville, North Carolina
**CORRESPONDING AUTHOR:** Anthony Arguez, NOAA/NCDC, Room 506, 151 Patton Avenue, Asheville, NC 28801
**\*CURRENT AFFILIATION:** ERT, Inc., Asheville, North Carolina
E-mail: anthony.arguez@noaa.gov

*The abstract for this article can be found in this issue, following the table of contents.*
DOI:10.1175/BAMS-D-11-00197.1

In final form 13 April 2012

United States Department of Agriculture



NRCS

Natural Resources Conservation Service
Post Office Box 2890
Washington, D.C. 20013

---

## DECISION MEMORANDUM FOR THE SECRETARY

THROUGH:   Harris D. Sherman            3/23/13
           Under Secretary, NRE

FROM:      Jason A. Weller              MAR 1 8 2013
           Acting Chief

SUBJECT:   Wetland Conservation Compliance Changes and Clarifications

### ISSUE:

Producers participating in most U.S. Department of Agriculture (USDA) programs must comply with wetland conservation compliance provisions as required by the Food Security Act of 1985, as amended (1985 Farm Bill). To meet this requirement, producers with wetlands on their agricultural land work with the Natural Resources Conservation Service (NRCS) to obtain certified wetland determinations. In the past several years, certified determination requests have outpaced NRCS capacity. In order to address the increasing determination backlog and gain efficiencies, NRCS, in consultation with the Office of General Counsel, proposes several clarifications and administrative and regulatory changes to the wetland compliance provisions under 7 CFR part 12. Departmental leadership discussed and concurred with the proposal at a February 21, 2013 meeting.

### BACKGROUND:

Since 2009, producers expanded their production of corn and soybeans in response to increasing commodity prices. Most of this expanded production occurred in the Northern Great Plains region of Eastern North Dakota, Eastern South Dakota, Central Iowa, and Western Minnesota. This region, also known as the Prairie Pothole Region, contains numerous small, temporary wetlands (potholes) that provide important wildlife habitat for migrating waterfowl. The changing economics of corn and soybean production have also led to a surge in producer interest in drainage improvements on their land through installation of subsurface tile systems.

The 1985 Farm Bill requires producers participating in most USDA programs to comply with the wetland conservation compliance provisions at 7 CFR part 12 on any of their agricultural land that is determined to be a wetland. In particular, to remain eligible for USDA program benefits,

**DECISION MEMORANDUM FOR THE SECRETARY**                                       2

producers must not plant an agricultural commodity on a wetland converted after December 23, 1985, or convert a wetland to make possible the production of an agricultural commodity after November 29, 1990.

NRCS assists producers with meeting their wetland conservation compliance responsibilities by issuing certified wetland determinations. Certified wetland determinations identify the location of all wetlands on their land and the scope of protection that must be provided for a producer to maintain eligibility for USDA program benefits. Producers' requests for certified wetland determinations within the Prairie Pothole Region have outpaced NRCS' capacity to service them in a timely manner.

In 2011, NRCS responded to the surge in requests by establishing a wetland initiative in the Prairie Pothole Region States and providing funding dedicated to hire non-permanent staff for the purpose of reducing the backlog of requests. The initiative has proven successful, reducing the net backlog of requests that exceeded 12,000 in the spring of 2012 to approximately 7,000.

Central to NRCS' efforts to further reduce the backlog is the implementation of procedural changes and clarifications to improve consistency and increase efficiency. NRCS has proposed several clarifications and changes to the wetland compliance provisions under 7 CFR part 12 to provide USDA program participants with greater transparency and predictability in wetlands determinations, while also gaining efficiencies in the agency's wetland determinations process. NRCS, in consultation with the Office of the General Counsel, analyzed the agency's options to implement these changes and concluded that some of the changes required rulemaking with notice and comment.

The attached proposal explains these revisions and the methods of implementation in full. The regulatory changes would ensure (1) continued use of the 1971-2000 precipitation dataset, which best represents the normal climatic conditions as of December 23, 1985 when wetlands compliance was enacted; (2) consistent setback distance calculations for proposed drainage improvements near a wetland and allow for categorical exemptions; (3) better use of mitigation banks and involvement of third parties; and (4) consistency in identification of playas, pocosins, and potholes to provide transparency and predictability for producers. The regulatory preamble also will provide clarification regarding historic wetland determinations. NRCS began making wetland determinations in 1987, but the certified wetland determination process did not begin until the 1990 Farm Bill. The preamble will clarify that certified determinations are considered to be final and explain the extent to which producers' can use and rely non-certified wetland determinations.

Non-regulatory actions to be implemented will further streamline and increase consistency in the wetlands determinations process. These include (1) developing and publishing in the Federal Register consistent State Off-Site Methods (SOSM) that NRCS may use to make wetland determinations, and (2) revising the National Food Security Act Manual to more fully describe the basis and use of the Department of the Army Corps of Engineers' wetland delineation procedures and other technical resources used in making wetland determinations.

000952

**DECISION MEMORANDUM FOR THE SECRETARY**                                    **3**

On February 21, 2013, the NRCS Acting Chief presented the NRCS proposal to Deputy
Secretary Kathleen Merrigan, Deputy Chief of Staff Carole Jett, Associate General Counsel
Ralph Linden, Senior Advisor Robert Bonnie, Under Secretary Harris D. Sherman, Deputy
Under Secretary Ann C. Mills, and Deputy Director Chris Zehren.  These leaders voiced support
for the agency proposal, and recommended that it be provided to the Secretary of Agriculture for
final concurrence.

**RECOMMENDATION**:

NRCS recommends approval to implement the proposed changes and clarifications to the
wetland conservation compliance provisions under 7 CFR part 12 through the combination of
rulemaking and  preamble discussion , public notice, and administrative updates to the National
Food Security Act Manual as described in the attached proposal.

**DECISION BY THE SECRETARY:**

Approve                    _____

Disapprove                 _____

Discuss with me            _____

Date                       ___4/1/13_____

Reviewed by                _____

cc:
Kathleen Merrigan, Deputy Secretary of Agriculture
Carole Jett, Deputy Chief of Staff for the Secretary
Robert Bonnie, Senior Advisor for Environment and Climate
Ann C. Mills, Deputy Under Secretary, Natural Resources and Environment
Ralph Linden, Associate General Counsel
Chris Zehren, Deputy Director, Office of Budget and Program Analysis

# Summary of Proposed Wetland Conservation Compliance Changes and Clarifications
## February 12, 2013

NRCS seeks to achieve better administrative consistency and efficiency in its implementation of the Wetland Conservation Compliance (WCC) provisions.  This paper defines the Agency's proposed method to address several implementation issues through changes and clarifications to the WCC regulation at 7 CFR part 12 and to policy in the National Food Security Act Manual (NFSAM).

The Office of the General Counsel (OGC) has recommended that any change to the WCC criteria that may affect a producer's eligibility to receive USDA payments be made through a rule-making.  After consulting with OGC, NRCS reviewed each proposed change and has placed them into one of the following categories:

I.  **Regulatory** – To address a change in current procedures or criteria that define the existence and size of wetlands and which therefore may impact an individual producer's eligibility, NRCS recommends the change be made through an addition or change to the WCC regulation at 7 CFR part 12.

II.  **Preamble to the Rule** – To address issues that are currently supported by regulatory language but where inconsistent implementation can be addressed through clarification of policy, NRCS recommends the clarification be made through an amendment to the National Food Security Act Manual (NFSAM), with public notice included in the preamble of the rule used to promulgate regulatory changes.

III.  **Federal Register Notices by States** – To address proposed changes that involve State or regionally developed criteria that will be reviewed by State Technical Committees, NRCS recommends the changes be made through a notice posted in the Federal Register consistent with procedures that have been used for such changes to State procedures since 1996.

IV.  **Administrative** – To address revisions to NFSAM procedures that do not impact a producer's eligibility, NRCS recommends that revisions be made through clarifications to NFSAM policy.

# I.  Proposed Regulatory Changes
## 1)  Determining "normal" precipitation

The WCC provisions define wetlands in reference to whether, "under normal circumstances," the land supports a prevalence of hydrophytic vegetation (defined as a plant growing in water or in a water-saturated soil deficient in oxygen).  Therefore, the existence of wetlands and their size is largely dependent on climatic conditions, most notably precipitation, that represent "normal conditions."  The procedures NRCS uses to determine the existence of wetlands includes comparing aerial imagery to "normal conditions," which are in part defined by a precipitation data set collected by the National Weather Service and analyzed by the NRCS National Water and Climate Center (NWCC).  The NWCC standard, which is not outlined in either statute or regulation, is to use a sliding 30-year precipitation data set that is updated every 10 years and is scheduled soon to slide forward with data representing the 1981–2010 period.  The data currently used is from 1971–2000.  In many areas, the updated precipitation data set shows an increase or decrease in the amount of normal precipitation. These changes appear to be significant (greater than 10 percent increase) for much of the Prairie Pothole Region (South Dakota, North Dakota, Minnesota, and Iowa).  In these cases, using the updated precipitation data (1981–2010) will likely result in: 1) more areas being identified as wetlands, and 2) larger wetland areas subject to the USDA wetland compliance provisions.

To maintain consistency in WCC wetland determinations, the precipitation data set will be frozen to the existing timeframe (1971–2000).  NRCS believes the data from this timeframe best represents conditions on December 23, 1985, when the WCC statute was enacted in the Food Security Act.  This date is consistent with USDA wetland labels (Prior Converted Cropland [PC], Farmed Wetland [FW], and Farmed Wetland Pasture [FWP]) that have full or limited exemption from WCC provisions, which is tied to their condition when the 1985 law was enacted.

2) **Setback distance calculations for drainage improvements near a wetland**

One of the most common requests for assistance from producers who desire to remain in compliance with the WCC provisions is for an agency-determined setback distance, which defines how close to a protected wetland a producer may install a new drainage improvement (ditches or tile) and still have only a minimal effect on the wetland's functions and values. NRCS believes that this activity-based wetland manipulation would be handled most efficiently under the "Categorical Minimal Effect" provision cited in 7 CFR §12.31(e), which requires that any categories of conversion activities that meet the criteria of Categorical Minimal Effect be published in the Federal Register. Using the Categorical Minimal Effect provision will streamline the process of determining setback distances and provide greater certainty for producers.

3) **Mitigation**

The WCC provisions provide producers with a wetland mitigation option to remain in compliance or regain compliance when they convert or plan to convert a wetland. Many states have developed mitigation banks as a tool to meet wetland mitigation requirements under various legal requirements and wetland jurisdictions. Existing regulatory language at 7 CFR §12.5(b)(4)(E) specifies that USDA is required to hold the easement on mitigated acres. Allowing only USDA to hold the easement creates a barrier to a streamlined mitigation process and, in the case of multiple jurisdictions, can require multiple easements on the same acres. To address these barriers, NRCS recommends revising the regulation to allow mitigation easements to be held by other entities. Other entities that could hold easements include state and local agencies and land trusts with an interest in conservation.

4) **Definition of pothole, playa, pocosin**

Current regulatory language at 7 CFR §12.2(a)(4)(ii) distinguishes farmed wetland (FW) hydrology criteria in areas considered to be a pothole, playa, or pocosin. However, these three landforms and their extent are not defined in regulation or existing administrative procedure. The rule will further clarify wetland criteria by defining these landforms and identifying the locations where they generally exist. Because this clarification may result in hydrology criteria that are more restrictive than what some states currently use, it may affect some producers' eligibility to receive USDA funding and therefore reaches a threshold for inclusion in regulation. Including these definitions will provide greater consistency across states and allow greater transparency.

**Recommended implementation:** Write a proposed rule with language that will:
- Identify and maintain the precipitation criteria used in USDA wetland determinations to the 1971–2000 timeframe;
- Explain the Categorical Minimal Effect process for setback distances;
- Revise current regulatory language to allow mitigation easements to be held by other entities other than USDA; and
- Define the landforms and locations for the pothole, playa, and pocosin criteria.

# II.    Preamble to the Rule

### 5) Certainty—historic determinations

Beginning in the late 1980s, NRCS completed and distributed wetland determinations and maps to producers. Many of these original determinations have limitations because of the technology and reference data available at the time they were produced. The 1990 Farm Bill addressed this problem by creating a wetland determination certification process. NRCS is proposing to clarify the question of when a wetland determination is considered certified under the law and how NRCS will address wetland determinations that were official at the time they were issued, but are not certified in accordance with statutory and regulatory requirements. This clarification is not a change from current NRCS procedures but will provide consistency within and across states and will provide greater transparency to producers.

- By regulation at 7 CFR §12.30(c)(1), all determinations issued after July 3, 1996, are considered certified.
- For determinations issued between April 23, 1991, and July 3, 1996, prior regulatory language at 7 CFR §12.30 (c) indicated that these determinations were certified when producer appeal rights were provided. Case file records do not uniformly include documentation of appeal rights. Administrative guidance will be developed to consider determinations from this era as certified when documentation exists to show that producers were provided appeal rights. Where appeal documentation doesn't exist, producers will be allowed to either accept their determination as certified or request a new certified determination. All newly issued determinations will be completed using the most current certification procedures.
- Determinations issued between 1985 and April 23, 1991, are not certified unless they were appealed to the State Conservationist or National Appeals Division, or settled through litigation. In locations where the number of producer-requested wetland determinations exceeds NRCS's capacity to provide assistance in a timely manner, producers who take actions resulting in a wetland conversion while relying on their non-certified wetland determination may seek relief through an agency technical error process. These situations will be resolved on a case-by-case basis using existing procedures in the NFSAM.

**Recommended implementation:** Explain the date-specific wetland certification requirements in the preamble of the proposed rule (outlined in Section I above) and provide notice on the use of non-certified (official) wetland determinations.

## III.    Federal Register Notice by States
### 6)  Consistent State Off-Site Methods (SOSM)

NRCS is required to make an on-site wetland determination only if: 1) insufficient information exists to make an off-site determination; 2) a producer appeals an off-site wetland determination; or 3) USDA is making a determination of ineligibility for USDA program benefits based upon a violation of the WCC provisions. Therefore, many of NRCS's initial wetland determinations are made off-site, using methods and data that are developed at the State level. NRCS is authorized to develop and use off-site methods at 7 CFR § 12.30(a)(4), and current policy requires each State to define its procedures for these determinations in a SOSM document that is posted for public information in their State's Field Office Technical Guide. All revisions to the NRCS State technical guides that are used to implement the WCC provisions must be published for notice and comment in accordance with Section 343 of the Federal Agriculture Improvement and Reform Act of 1996 (PL 104-127). Each State's SOSM is reviewed by its State Technical Committee. NRCS will also pilot the development of a Regional SOSM in the Prairie Pothole Region of Iowa, North Dakota, Minnesota, and South Dakota.

**Recommended implementation:** Each State will develop SOSM to be implemented after review with its State Technical Committee and publication for notice and comment in the <u>Federal Register</u>. Precedent for publishing this type of state technical document occurred in 2010 when North and South Dakota published their wetland mapping conventions.

## IV.    Administrative
### 7)  Defining NRCS technical and policy references for conducting certified wetland determinations in relation to the U.S. Army Corps of Engineers` wetland delineation procedures

Since 1994 NRCS has used portions of the U. S. Army Corps of Engineers (Corps) wetland delineation procedures when making wetland determinations under the wetland conservation compliance (WCC) provisions of the Food Security Act of 1985. In 2010 NRCS clarified various exceptions to the Corps procedures related to the unique WCC statutory and regulatory requirements. These exceptions and further guidance are detailed in the "NRCS Food Security Wetland Identification Procedures" (FSA Procedures), last revision issued as Circular

000956

6 to the National Food Security Act Manual, Part 527, Appendix.  One outside stakeholder has expressed concern that NRCS does not have authority to use the Corps wetland delineation procedures when making WCC wetland determinations.  NRCS disagrees with this stakeholder and believes that our current use of the Corps procedures, with USDA exceptions, provides consistency and the best possible science for wetland determinations.  Further clarifying NRCS's use of Corps procedures will provide greater transparency for all stakeholders.

**Recommended implementation** NRCS will revise the National Food Security Act Manual (NFSAM) to strengthen the language regarding the use of the NRCS Food Security Act Wetland Identification Procedures and further define the similarities and differences between NRCS's FSA Procedures and the Corps methods.

4

001053

**This form is available electronically.**

AD-1026
(10-30-14)

*(See Page 2 for Privacy Act and Paperwork Reduction Act Statements)*

**U.S. DEPARTMENT OF AGRICULTURE**
FarmServiceAgency

# HIGHLY ERODIBLE LAND CONSERVATION (HELC) AND
# WETLAND CONSERVATION (WC) CERTIFICATION

Read attached AD-1026 Appendix before completing form.

## PART A – BASIC INFORMATION

| 1. Name of Producer | 2. Tax Identification Number *(Last 4 digits)* | 3. Crop Year |
|---|---|---|
| | | |

4. Names of affiliated persons with farming interests . *Enter "None," if applicable.*

*Affiliated persons with farming interests must also file an AD-1026. See Item 7 in the Appendix for a definition of an affiliated person.*

5. Check one of these boxes if the statement applies ; otherwise continue to Part B.

A. ☐  The producer in Part A does not have interest in land devoted to agriculture.  Examples include bee keepers who place their hives on another person's land, producers of crops grown in greenhouses, and producers of aquaculture AND these producers do not own/lease any agricultural land themselves.  **Note:**  Do not check this box if the producer shares in a crop.

B. ☐  The producer in Part A meets all three of the following:
- does not participate in any USDA program that is subject to HELC and WC compliance except Federal Crop Insurance;
- only has interest in land devoted to agriculture which is exclusively used for perennial crops, except sugarcane, and
- has not converted a wetland after February 7, 2014.

Perennial crops include, but are not limited to, tree fruit, tree nuts, grapes, olives , native pasture and perennial forage. A producer that produces alfalfa should contact the Natural Resources Conservation Service at the neares t USDA Service Center to determine whether such production qualifies as production of a perennial crop.

**Note:**  *If either box is checked, and the producer in Part A does not participate in Farm Service Agency (FSA) or Natural Resources Conservation Service (NRCS) programs, the full tax identification number of the producer must be provided, but establishment of detailed farm records with FSA is not required. Go to Part D and sign and date.*

## PART B - HELC/WC COMPLIANCE QUESTIONS

| | YES | NO |
|---|---|---|
| **Indicate  YES or NO to each question.** *If you are unsure of whether a HEL determination, wetland determination, or NRCS evaluation has been completed, contact your local USDA Service Center.* | | |
| 6. During the crop year entered in Part A or the term of a requested USDA loan, did or will the producer in Part A plant or produce an agricultural commodity (including sugarcane) on land for which an HEL determination has not been made? | | |
| 7. Has anyone performed (since December 23, 1985), or will anyone perform any activities to: | | |
| A. Create new  drainage systems, conduct land leveling, filling, dredging, land clearing, or excavation that has **NOT** been evaluated by NRCS? *If "YES", indicate the year(s): _____* | | |
| B. Improve or modify an existing drainage system that has **NOT** been evaluated by NRCS? *If "YES", indicate the year(s): _____* | | |
| C. Maintain an existing drainage system that has **NOT** been evaluated by NRCS? *If "YES", indicate the year(s): _____*  **Note:** *Maintenance is the repair, rehabilitation, or replacement of the capacity of existing drainage systems to allow for the continued use of wetlands currently in agricultural production and the continued management of other areas as they were used before December 23, 1985. This allows a person to reconstruct or maintain the capacity of the original system or install a replacement system that is more durable or will realize lower maintenance or costs.* | | |

**Note:** *If "YES" is checked for Item 7A or 7B, then Part C must be completed to authorize NRCS to make an HELC/WC and/or certified wetland determination on the identified land. If "YES" is checked for Item 7C, NRCS does not have to conduct a certified wetland determination.*

8. Check one or both boxes, if applicable; otherwise, continue to Part C or D.

A. ☐  Check this box only if the producer in Part A has FCIC reinsured crop insurance and f iling this form represents the <u>first time</u> the producer in Part A, including any affiliated person, has been subject to HELC and WC provisions.

B. ☐  Check this box if either of the following applies to the producer and crop year entered in Part A:
- Is a tenant on a farm that is/will not be in compliance with HELC and WC provisions because the landlord refuses to allow compliance, but all other farms not associated with that landlord are in compliance. (AD-1026B, Tenant Exemption Request, must be completed).
- Is a landlord of a farm that is/will not be in compliance with HELC and WC provisions because of a violation by the tenant on that farm, but all other farms not associated with that tenant are in compliance. (AD-1026C, Landlord or Landowner Exemption Request, must be completed).

## PART C - ADDITIONAL INFORMATION

9. If "YES" was checked in Item 6 or 7, provide the following information for the land to which the answer applies:

A.   Farm and/or tract/field number: _____
     If unknown, contact the Farm Service Agency at the nearest USDA Service Center.

B.   Activity: _____

C.   Current land use *(specify crops)*: _____

D.   County: _____



**June 23, 2015**

Mr. Daniel McGlynn
Production, Emergencies and Compliance Division
Farm Service Agency, United States Department of Agriculture
1400 Independence Avenue SW.
Washington, DC 20250-0517

      Via the Federal e-Rulemaking Portal at [www.regulations.gov](http://www.regulations.gov).

**RE:**     **Comments regarding the Interim Final Rule with amendments dealing with the U.S. Department of Agriculture (USDA) regulations that specify the conservation compliance requirements that participants in USDA programs must meet to be eligible for certain USDA benefits; Docket Number USDA-2015-0001.**

Dear Mr. McGlynn:

The National Corn Growers Association (NCGA) offers below comments on the amendments dealing with the U.S. Department of Agriculture (USDA) regulations that specify the conservation compliance requirements that participants in USDA programs must meet to be eligible for certain USDA benefits; Docket Number USDA-2015-0001.

NCGA represents approximately 41,000 dues-paying corn growers across the country and the interests of more than 300,000 farmers who contribute through corn check-off programs. NCGA has been a consistent advocate for many of the USDA conservation programs, and the resources they are intended to protect, including Swampbuster and the Highly Erodible Land (HEL) "conservation compliance" program. Many of our producer members will be directly and profoundly affected by the application of this Interim Final Rule.

Congress, in adopting the 2014 farm bill's amendments adding eligibility for crop insurance premium subsidies to the list of benefits subject to the conservation compliance provisions, was not seeking to create a mechanism to diminish in any way the scope and effectiveness of the crop insurance program.  Congress recognized in the farm bill the immense importance of the crop insurance program to farmers and the US agricultural system.  Today it is the largest and most important piece of the federal farm safety net to help producers and the agricultural economy cope with weather and related disasters that threaten the livelihood of farmers, individually and collectively.  This program must continue to be broadly available, efficient and straight forward for farmers to obtain coverage, and it must be the same for the insurance industry and its efforts to service the farming community's insurance needs.  The goal of the conservation compliance program, and hence this rule, therefore should be to advance farmers' efforts to protect HEL and valuable wetland resources while also ensuring that crop insurance and the other covered programs remain highly effective as part of the farm safety net.  We offer these comments with this goal in mind.

**Notice and Comment Program Change Ideas that May Emerge from Questions**--We understand and applaud USDA's desire to seek comment during this period on conservation compliance matters not directly associated with the regulatory changes required by the farm bill with respect to eligibility for crop insurance premium subsidies.  Program modernization and updating to take into account new information and conditions is important and valuable.  We caution USDA, though, against making rule changes on the basis of the answers USDA might receive in response to the questions it has posed without subjecting those changes to further notice and comment rulemaking.  The questions USDA has posed are sound and relevant.  Yet they are also extremely broad and the answers USDA receives could well involve important new directions for the conservation compliance program.  As a result, USDA should not go directly from the answers it receives into an interim final rulemaking.  An intermediate step must be taken; publish those possible changes to the program for a round of public comments.  Failure to do so would certainly violate the spirit, if not the letter, of the Administrative Procedures Act.

**Restoring Eligibility for the Subsequent Reinsurance Year**--The farm bill requires that a producer who converts a wetland or is in violation of their HEL conservation plan be made ineligible for crop insurance premium subsidies in the subsequent reinsurance year.  There may be instances where a producer in this circumstance has sufficient time to correct the resource issue in the current year and would actively undertake work with the Natural Resources Conservation Service and the Farm Services Agency in that crop year to correct the problem.  We strongly urge USDA to consider policies that would give such producers the incentive to take these steps as quickly as possible.  If the producer is willing during that crop year to restore



United States
Department of
Agriculture
Natural Resources
Conservation Service

USDA

2012
National Resources Inventory
Summary Report
August 2015

**Table 10 - Cropland use, by State and year**
**In thousands of acres, with margins of error**

| State | Year | Cultivated Cropland | | | Noncultivated Cropland | | | Total cropland |
|---|---|---|---|---|---|---|---|---|
| | | Irrigated | Nonirrigated | Total | Irrigated | Nonirrigated | Total | |
| **New Mexico** | **1982** | 988.4 ±111.5 | 1,012.9 ±100.1 | 2,001.3 ±155.6 | 380.9 ±75.3 | 28.4 ±23.5 | 409.3 ±77.2 | 2,410.6 ±165.6 |
| | **1987** | 750.2 ±124.1 | 752.8 ±114.3 | 1,503.0 ±181.2 | 419.3 ±52.2 | 31.3 ±23.9 | 450.6 ±63.1 | 1,953.6 ±183.3 |
| | **1992** | 725.8 ±93.6 | 740.8 ±114.9 | 1,466.6 ±163.0 | 402.9 ±93.3 | 22.0 ±22.4 | 424.9 ±93.0 | 1,891.5 ±187.2 |
| | **1997** | 639.1 ±91.1 | 741.6 ±106.6 | 1,380.7 ±147.6 | 458.2 ±85.8 | 26.0 ±29.4 | 484.2 ±85.4 | 1,864.9 ±174.4 |
| | **2002** | 544.4 ±84.2 | 576.5 ±108.4 | 1,120.9 ±148.6 | 424.4 ±100.6 | 10.0 ±7.8 | 434.4 ±101.4 | 1,555.3 ±190.0 |
| | **2007** | 540.4 ±71.5 | 580.5 ±127.9 | 1,120.9 ±158.8 | 400.2 ±114.0 | 5.7 ±6.6 | 405.9 ±115.6 | 1,526.8 ±199.3 |
| | **2012** | 528.2 ±77.2 | 587.2 ±135.3 | 1,115.4 ±149.9 | 384.6 ±69.4 | 37.8 ±67.7 | 422.4 ±112.1 | 1,537.8 ±199.5 |
| **New York** | **1982** | 44.9 ±18.5 | 3,342.7 ±175.9 | 3,387.6 ±179.8 | 13.4 ±11.0 | 2,453.7 ±131.5 | 2,467.1 ±130.7 | 5,854.7 ±232.3 |
| | **1987** | 56.4 ±19.1 | 3,066.0 ±156.0 | 3,122.4 ±161.6 | 18.5 ±12.8 | 2,548.7 ±133.9 | 2,567.2 ±135.1 | 5,689.6 ±225.8 |
| | **1992** | 58.9 ±21.7 | 2,767.2 ±164.1 | 2,826.1 ±163.6 | 18.9 ±11.5 | 2,709.4 ±144.4 | 2,728.3 ±146.1 | 5,554.4 ±212.4 |
| | **1997** | 66.2 ±22.3 | 2,639.2 ±175.1 | 2,705.4 ±173.8 | 18.5 ±12.1 | 2,613.0 ±130.3 | 2,631.5 ±132.1 | 5,336.9 ±223.1 |
| | **2002** | 63.5 ±27.7 | 2,307.0 ±190.8 | 2,370.5 ±186.7 | 29.1 ±18.8 | 2,826.0 ±215.4 | 2,855.1 ±211.1 | 5,225.6 ±201.1 |
| | **2007** | 51.1 ±26.2 | 2,231.1 ±180.9 | 2,282.2 ±178.3 | 24.7 ±18.3 | 2,698.6 ±196.9 | 2,723.3 ±192.3 | 5,005.5 ±220.0 |
| | **2012** | 57.7 ±27.5 | 2,458.6 ±189.4 | 2,516.3 ±187.7 | 25.7 ±17.3 | 2,580.6 ±184.8 | 2,606.3 ±183.0 | 5,122.6 ±227.4 |
| **North Carolina** | **1982** | 271.0 ±51.6 | 6,097.2 ±267.6 | 6,368.2 ±261.9 | 4.5 ±5.7 | 338.6 ±63.6 | 343.1 ±63.8 | 6,711.3 ±256.6 |
| | **1987** | 317.0 ±65.0 | 5,744.3 ±266.9 | 6,061.3 ±260.7 | 4.3 ±7.6 | 317.4 ±55.3 | 321.7 ±55.3 | 6,383.0 ±272.5 |
| | **1992** | 325.1 ±73.0 | 5,237.7 ±231.1 | 5,562.8 ±240.9 | 9.8 ±9.0 | 397.7 ±78.1 | 407.5 ±79.3 | 5,970.3 ±255.5 |
| | **1997** | 328.9 ±71.8 | 4,788.1 ±216.9 | 5,117.0 ±233.0 | 16.6 ±15.6 | 553.2 ±65.6 | 569.8 ±64.7 | 5,686.8 ±248.8 |
| | **2002** | 242.5 ±98.8 | 4,608.0 ±230.7 | 4,850.5 ±203.0 | 29.1 ±12.7 | 569.9 ±109.1 | 599.0 ±110.8 | 5,449.5 ±237.3 |
| | **2007** | 187.9 ±67.4 | 4,430.4 ±207.3 | 4,618.3 ±185.2 | 31.2 ±12.7 | 641.1 ±126.1 | 672.3 ±126.8 | 5,290.6 ±231.4 |
| | **2012** | 178.5 ±73.2 | 4,287.3 ±229.7 | 4,465.8 ±216.6 | 33.4 ±17.7 | 650.1 ±110.4 | 683.5 ±112.4 | 5,149.3 ±258.2 |

**Table 10 - Cropland use, by State and year**
**In thousands of acres, with margins of error**

| State | Year | Cultivated Cropland | | | Noncultivated Cropland | | | Total cropland |
|---|---|---|---|---|---|---|---|---|
| | | Irrigated | Nonirrigated | Total | Irrigated | Nonirrigated | Total | |
| Wisconsin | 1982 | 311.5 ±66.1 | 9,133.1 ±243.0 | 9,444.6 ±244.5 | 21.7 ±13.0 | 2,001.1 ±127.7 | 2,022.8 ±131.5 | 11,467.4 ±286.8 |
| | 1987 | 327.3 ±58.4 | 9,104.3 ±272.2 | 9,431.6 ±273.0 | 11.8 ±9.3 | 1,896.8 ±114.4 | 1,908.6 ±112.4 | 11,340.2 ±312.0 |
| | 1992 | 341.7 ±59.5 | 8,501.5 ±285.3 | 8,843.2 ±271.6 | 35.0 ±20.2 | 1,957.1 ±119.5 | 1,992.1 ±119.2 | 10,835.3 ±290.3 |
| | 1997 | 365.6 ±66.9 | 8,388.3 ±290.0 | 8,753.9 ±290.2 | 30.2 ±21.8 | 1,822.5 ±141.0 | 1,852.7 ±148.6 | 10,606.6 ±305.7 |
| | 2002 | 395.4 ±93.8 | 7,904.9 ±381.9 | 8,300.3 ±377.8 | 37.9 ±21.5 | 1,935.0 ±191.9 | 1,972.9 ±199.0 | 10,273.2 ±284.4 |
| | 2007 | 415.6 ±93.6 | 7,828.5 ±425.8 | 8,244.1 ±423.8 | 26.8 ±21.4 | 1,889.5 ±252.9 | 1,916.3 ±257.7 | 10,160.4 ±293.8 |
| | 2012 | 429.1 ±92.8 | 8,140.1 ±395.0 | 8,569.2 ±406.3 | 33.0 ±29.0 | 1,762.7 ±234.4 | 1,795.7 ±244.9 | 10,364.9 ±285.4 |
| Wyoming | 1982 | 500.5 ±90.9 | 922.4 ±243.8 | 1,422.9 ±266.7 | 928.6 ±145.7 | 172.4 ±94.7 | 1,101.0 ±151.0 | 2,523.9 ±303.2 |
| | 1987 | 518.6 ±89.1 | 685.8 ±194.7 | 1,204.4 ±226.2 | 886.6 ±132.8 | 270.0 ±182.2 | 1,156.6 ±214.6 | 2,361.0 ±329.0 |
| | 1992 | 494.0 ±92.7 | 493.1 ±183.6 | 987.1 ±229.0 | 912.3 ±137.6 | 300.6 ±160.6 | 1,212.9 ±183.5 | 2,200.0 ±332.6 |
| | 1997 | 470.2 ±116.5 | 507.5 ±206.0 | 977.7 ±250.4 | 859.3 ±133.0 | 294.9 ±123.3 | 1,154.2 ±152.2 | 2,131.9 ±339.9 |
| | 2002 | 494.0 ±148.1 | 456.5 ±157.2 | 950.5 ±214.7 | 901.8 ±154.9 | 352.9 ±197.3 | 1,254.7 ±171.2 | 2,205.2 ±301.7 |
| | 2007 | 445.7 ±155.1 | 378.8 ±124.0 | 824.5 ±180.7 | 940.6 ±179.7 | 383.2 ±201.7 | 1,323.8 ±185.0 | 2,148.3 ±285.0 |
| | 2012 | 433.3 ±143.0 | 396.6 ±124.8 | 829.9 ±185.0 | 941.0 ±172.1 | 388.6 ±199.3 | 1,329.6 ±193.9 | 2,159.5 ±297.8 |
| Total | 1982 | 49,824.8 ±901.5 | 326,424.4 ±2,014.2 | 376,249.2 ±2,148.2 | 12,294.1 ±513.8 | 32,044.3 ±618.2 | 44,338.4 ±837.5 | 420,587.6 ±2,087.1 |
| | 1987 | 49,480.9 ±1,039.4 | 313,453.4 ±1,875.4 | 362,934.3 ±2,065.7 | 12,293.2 ±518.6 | 31,147.5 ±728.5 | 43,440.7 ±927.5 | 406,375.0 ±2,026.7 |
| | 1992 | 49,540.4 ±938.3 | 285,839.0 ±1,948.9 | 335,379.4 ±1,981.0 | 13,018.3 ±610.2 | 33,603.4 ±643.1 | 46,621.7 ±926.5 | 382,001.1 ±1,985.1 |
| | 1997 | 49,098.7 ±979.6 | 277,631.2 ±2,217.2 | 326,729.9 ±2,091.1 | 13,370.7 ±642.6 | 36,260.2 ±688.9 | 49,630.9 ±1,032.4 | 376,360.8 ±2,046.7 |
| | 2002 | 48,392.1 ±949.5 | 266,263.3 ±2,387.6 | 314,655.4 ±2,285.1 | 14,471.5 ±796.9 | 38,548.2 ±903.6 | 53,019.7 ±1,266.7 | 367,675.1 ±2,080.0 |
| | 2007 | 47,472.3 ±950.0 | 258,505.6 ±2,037.6 | 305,977.9 ±2,111.8 | 14,276.6 ±673.3 | 38,611.8 ±981.6 | 52,888.4 ±1,272.8 | 358,866.3 ±2,009.3 |
| | 2012 | 48,263.9 ±962.5 | 262,057.8 ±1,984.1 | 310,321.7 ±2,096.6 | 14,002.0 ±638.9 | 38,402.4 ±840.2 | 52,404.4 ±1,046.4 | 362,726.1 ±1,933.0 |

**Table 12 - Cropland and pastureland, by specific land cover/use and year**
**In thousands of acres, with margins of error**

| Land cover/use | Specific land cover/use | 1982 | 1987 | 1992 | 1997 | 2002 | 2007 | 2012 |
|---|---|---|---|---|---|---|---|---|
| Cultivated cropland | Fruits, nuts & flowers | 205.0 ±37.3 | 177.3 ±33.9 | 112.4 ±20.8 | 37.4 ±21.7 | 59.8 ±29.5 | 92.1 ±34.1 | 133.3 ±60.7 |
| | Small grain | 128,114.3 ±1,537.5 | 109,484.1 ±1,620.3 | 104,740.3 ±1,292.1 | 94,843.7 ±1,207.7 | 80,841.7 ±1,094.4 | 79,572.1 ±1,395.0 | 72,459.9 ±1,499.0 |
| | Corn | 91,642.3 ±880.0 | 83,396.3 ±970.4 | 86,909.4 ±929.6 | 84,581.3 ±936.1 | 81,239.1 ±1,008.8 | 95,276.8 ±1,290.4 | 98,355.0 ±1,036.7 |
| | Soybeans | 66,574.7 ±619.8 | 63,909.7 ±741.7 | 59,290.8 ±856.8 | 67,513.9 ±767.3 | 76,147.5 ±864.4 | 66,763.1 ±1,098.0 | 77,021.3 ±1,249.8 |
| | Cotton | 17,316.1 ±651.9 | 16,113.7 ±699.4 | 14,080.7 ±468.2 | 17,399.1 ±526.5 | 16,288.8 ±886.4 | 13,506.9 ±758.3 | 14,730.6 ±512.7 |
| | Peanuts | 1,759.1 ±133.7 | 1,807.7 ±137.9 | 2,114.2 ±107.4 | 1,882.3 ±148.8 | 1,684.7 ±192.0 | 1,500.4 ±216.9 | 1,388.3 ±184.9 |
| | Tobacco | 1,347.2 ±88.8 | 1,046.0 ±113.2 | 1,298.2 ±106.1 | 1,366.3 ±105.3 | 640.8 ±133.2 | 574.6 ±99.7 | 519.4 ±117.5 |
| | Sugar beets | 1,275.9 ±140.2 | 1,155.0 ±148.7 | 1,338.5 ±139.8 | 1,230.0 ±186.6 | 1,204.3 ±245.4 | 990.0 ±197.8 | 1,032.4 ±129.0 |
| | Potatoes | 1,247.8 ±88.5 | 1,394.4 ±155.3 | 1,340.1 ±129.2 | 1,199.4 ±131.5 | 1,335.0 ±204.4 | 1,214.4 ±200.9 | 1,129.7 ±139.2 |
| | Sunflowers | 3,598.0 ±182.2 | 1,888.5 ±135.3 | 1,869.8 ±166.3 | 2,411.3 ±205.2 | 2,406.3 ±381.5 | 1,892.8 ±305.8 | 1,765.6 ±196.1 |
| | Summer fallow | 28,097.1 ±742.9 | 28,286.1 ±903.4 | 23,461.4 ±958.6 | 20,868.5 ±837.7 | 17,139.9 ±1,084.9 | 15,269.5 ±876.7 | 14,694.6 ±876.6 |
| | Aquaculture | 4.1 ±5.6 | 17.9 ±17.6 | 53.6 ±18.9 | 20.7 ±12.1 | 46.5 ±31.9 | 97.3 ±38.7 | 39.8 ±29.8 |
| | Other cropland not planted | 8,086.3 ±375.4 | 20,988.7 ±390.1 | 12,412.3 ±563.6 | 7,675.2 ±445.6 | 5,862.7 ±508.0 | 4,713.0 ±432.6 | 5,418.8 ±452.8 |
| | Hayland | 13,579.1 ±461.7 | 18,008.4 ±499.6 | 13,274.1 ±470.6 | 12,522.0 ±394.6 | 13,254.8 ±463.8 | 10,492.1 ±621.8 | 9,016.1 ±414.9 |
| | Pastureland | 1,986.8 ±136.3 | 3,514.9 ±279.0 | 1,709.5 ±114.6 | 1,336.9 ±143.5 | 3,634.3 ±191.0 | 2,398.4 ±235.4 | 1,522.1 ±213.5 |
| | Other crops | 11,415.4 ±528.9 | 11,745.6 ±528.6 | 11,374.1 ±439.6 | 11,841.9 ±433.5 | 12,869.2 ±763.3 | 11,624.4 ±673.1 | 11,094.8 ±591.7 |
| | Total Cultivated Cropland | 376,249.2 ±2,148.2 | 362,934.3 ±2,065.7 | 335,379.4 ±1,981.0 | 326,729.9 ±2,091.1 | 314,655.4 ±2,285.1 | 305,977.9 ±2,111.8 | 310,321.7 ±2,096.6 |

USDA
**United States Department of Agriculture**



# NRCS: Wetland Conservation Provisions in the Prairie Pothole Region

**Audit Report 10601-0003-31**

**January 2017**

OFFICE OF INSPECTOR GENERAL



# NRCS: Wetland Conservation Provisions in the Prairie Pothole Region

## Audit Report 10601-0003-31

## OBJECTIVE

Our objective was to evaluate NRCS' administration of the wetland conservation provisions in the prairie pothole region. Specifically, we evaluated whether NRCS established adequate guidance and procedures to administer the wetland conservation provisions.

## REVIEWED

We selected a non-statistical sample of 35 wetland determinations for two States in the prairie pothole region that were identified by the complainants and suggested by NRCS State office officials. We also reviewed State-level policies and guidance in the other two prairie pothole States.

## RECOMMENDS

We recommend that NRCS issue official guidance reinforcing correct and current rules and clarifying procedures for making wetland determinations and certifications, including the status of pre-1996 determinations.

**OIG reviewed how NRCS administers the wetland provisions in the "prairie pothole region" to evaluate if NRCS established adequate guidance and procedures.**

# WHAT OIG FOUND

According to the Natural Resources Conservation Service (NRCS), if farmers are receiving a wide range of USDA benefits, then they may not bring wetlands into agricultural production. NRCS is responsible for making technical determinations regarding whether a wetland exists on a given tract of land. If farmers convert wetlands to production, then a violation may be issued, and the farmer can lose USDA farm program payments.

After receiving a complaint concerning recent changes in how NRCS makes these determinations, the Office of Inspector General (OIG) reviewed determinations made in the "prairie pothole region" (Iowa, Minnesota, North Dakota, and South Dakota). We found that, in response to a backlog of requests for wetland determinations, NRCS made significant changes in its process for wetland determinations that allowed producers to drain and farm more wetlands. The process for making this change was not carried out in a transparent manner.

NRCS generally agreed with our finding, and we accepted management decision on both recommendations.

001335



United States Department of Agriculture

Office of Inspector General

Washington, D.C. 20250



DATE:          January 19, 2017

AUDIT
NUMBER:     10601-0003-31

TO:             Jason Weller
                   Chief
                   Natural Resources Conservation Service

ATTN:          Leon Brooks
                   Director
                   Compliance Division

FROM:         Gil H. Harden
                   Assistant Inspector General for Audit

SUBJECT:    NRCS: Wetland Conservation Provisions in the Prairie Pothole Region

This report presents the results of the subject audit. Your written response, dated January 10, 2017, is included in its entirety at the end of the report. Excerpts from your response and the Office of Inspector General's position are incorporated in the relevant sections of the report. Based on your written response, we are accepting management decision for all audit recommendations in the report, and no further response to this office is necessary.

In accordance with Departmental Regulation 1720-1, final action needs to be taken within 1 year of each management decision to prevent being listed in the Department's annual Agency Financial Report. Please follow your internal agency procedures in forwarding final action correspondence to the Office of the Chief Financial Officer.

We appreciate the courtesies and cooperation extended to us by members of your staff during our audit fieldwork and subsequent discussions. This report contains publicly available information and will be posted in its entirety to our website (http://www.usda.gov/oig) in the near future.

001337

# Table of Contents

**Background and Objectives** ........................................................... 1

**Section 1:  Wetland Conservation** ................................................. 6

**Finding 1: NRCS Changed its Wetland Determination Process Contradicting Its Prior Implementation of Policy and Practice** ........................ 6

    **Recommendation 1** ............................................................10

    **Recommendation 2** ............................................................11

**Scope and Methodology** ............................................................. 12

**Abbreviations** ........................................................................... 14

**Agency's Response** ................................................................... 15

001339

# Background and Objectives

## Background

Wetlands are the link between land and water. They are some of the most productive and dynamic habitats in the world, comparable to rain forests and coral reefs. Wetlands are a source of substantial biodiversity in supporting numerous species from all the major groups of organisms—from microbes to mammals. Wetlands also provide essential ecological functions and values that significantly benefit society. These functions include surface and subsurface water storage, nutrient cycling, particulate removal, maintenance of plant and animal communities, water filtration or purification, and groundwater recharge. Wetland values include providing habitats for a wide variety and number of wildlife and plants, collecting and holding flood waters, absorbing wind and tidal forces, buffering shorelines from wave damage, and providing recreation sites for boating and fishing. Approximately 221 million acres of wetlands existed in the conterminous United States at the time of European settlement in the early 1600s,[1] and by 1984, over half of these wetlands were drained or filled for development or agriculture production.[2] In 2004, it was estimated that only 107.7 million acres of wetlands existed in the conterminous United States.[3] In 2009, there were an estimated 6.4 million acres[4] of wetlands in the prairie pothole region (Iowa, Minnesota, North Dakota, and South Dakota).[5]

The Natural Resources Conservation Service's (NRCS) conservation programs and initiatives help producers reduce soil erosion, enhance water supplies, improve water quality, increase wildlife habitat, and reduce the damage caused by natural disasters. According to NRCS, the first protection of wetlands[6] occurred in 1977, when President Jimmy Carter issued Executive Order 11990.[7] This Order stated that each agency shall provide leadership and take action to minimize the destruction, loss, or degradation of wetlands, and to preserve and enhance natural and beneficial values of wetlands in carrying out the agency's responsibilities. NRCS formalized

---

[1] Thomas E. Dahl & Gregory J. Allord, *Technical Aspects of Wetlands: History of Wetlands in the Conterminous United States* (U.S. Geological Survey 1997), http://water.usgs.gov/nwsum/WSP2425/history.html (describing history of wetlands).

[2] USDA-NRCS, *Wetlands*, http://www.nrcs.usda.gov/wps/portal/nrcs/main/national/water/wetlands/ (last visited Apr. 8, 2016) (describing wetlands).

[3] T.E. Dahl, *Status and Trends of Wetlands in the Conterminous United States 1998 to 2004* (U.S. Department of the Interior, U.S. Fish and Wildlife Service, 2014), http://www.fws.gov/wetlands/Documents/Status-and-Trends-of-Wetlands-in-the-Conterminous-United-States-1998-to-2004.pdf.

[4] T.E. Dahl, *Status and trends of prairie wetlands in the United States 1997 to 2009*, at 32 (U.S. Department of the Interior, Fish and Wildlife Service, Ecological Services, 2014).

[5] The glaciated prairie region is an area located in the central portion of the North American continent and extends from central Iowa, north to the Canadian border, and includes portions of the States of Iowa, Minnesota, Montana, North Dakota, and South Dakota. As a result, there are numerous small landscape depressions left behind as the glaciers receded from this part of the continent. These landscape depressions, termed "potholes," collect rainfall and snowmelt, forming small shallow wetlands and ponds. *Id.* at 6.

[6] Wetland is defined as land that has a predominance of hydric soils that are inundated or saturated in duration to support prevalence of hydrophytic vegetation and under normal circumstances does support prevalence of hydrophytic vegetation. *See* 16 U.S.C. § 3801(a)(27).

[7] Exec. Order 11990 (May 24, 1977).

its implementation of Executive Order 11990 and policy for protection of wetlands in NRCS' general manual.[8]

Title XII of the 1985 Farm Bill, as amended, established protections for our nation's existing wetlands and highly erodible land.[9]  The purpose of the wetland conservation provisions is to remove incentives for producers[10] to convert wetlands for agricultural purposes.  NRCS is designated as the lead technical agency responsible for establishing regulations, policies, and procedures for making wetland and highly erodible[11] land determinations.[12]  The Farm Service Agency (FSA) determines eligibility for program benefits based on NRCS' technical determinations.[13]  The 1985 Farm Bill dramatically changed NRCS' technical assistance functions and responsibilities.  It authorized conservation compliance (commonly referred to as "sodbuster") and wetlands compliance (commonly referred to as "swampbuster") activities, transforming many technical assistance functions that NRCS historically performed by requiring enforcement of conservation under certain circumstances.[14]

Swampbuster provisions prohibit participation in numerous specified Department of Agriculture (USDA) programs when annually tilled commodity crops[15] are produced, or land is drained to make production possible.  Sodbuster provisions prohibit participation in numerous specified USDA programs when annually tilled commodity crops are produced on highly erodible land without adequate erosion protection.[16]

The 1985 Farm Bill requires producers participating in most USDA programs administered by NRCS, FSA, and the Risk Management Agency (RMA) to abide by wetland and highly erodible land conservation compliance provisions on any land owned or farmed that is determined by NRCS to be a wetland or highly erodible.  Therefore, producers are required to preserve wetlands if they want to receive USDA program benefits.  Originally, Federal crop insurance premium subsidies were included as a benefit that could be denied under the conservation compliance provisions; however, crop insurance premium subsidies were removed in the

---

[8] USDA NRCS, *General Manual*, tit. 190, pt. 410, subpt. B, § 410.26(A)(2), "Protection of Wetlands" (Aug. 2012).
[9] Food and Security Act of 1985, Pub. L. No. 99-198, tit. XII, subtit. A-C, 99 Stat. 1354, 1504-08 (1985 Farm Bill).
[10] For purposes of this audit report, we define producers as persons who participate in USDA programs as an individual, partnership, corporation, or other legal entity.  *See generally* 7 C.F.R. § 12.2 (definition of "person"); USDA NRCS, *National Food Security Act Manual* § 510.1(F) (5th ed. Nov. 2010) (table definition of "persons," which includes individuals and various entities that participate in USDA programs).
[11] Highly erodible land is cropland, hayland, or pasture that can erode at excessive rates and contain soils with an erodibility index of eight or more.  USDA-NRCS, *Conservation Compliance on Highly Erodible Land and Wetlands* (last visited March 9, 2016), http://www.nrcs.usda.gov/wps/portal/nrcs/detail/ny/programs/?cid=nrcs144p2_027057.
[12] 7 C.F.R. § 12.30 (NRCS responsibilities regarding wetlands).
[13] 7 C.F.R. § 12.4 (determination of eligibility for USDA program benefits).
[14] Congressional Research Serv., *Technical Assistance for Agriculture Conservation*, CRS Report RL34069, at 26 (2011); *see also* 1985 Farm Bill, tit. XII, subtit. A-C, 99 Stat. 1504-08.
[15] An agricultural commodity is any commodity (corn, soybeans, etc.) planted and produced by annual tilling of soil or planting of sugarcane.  *See National Food Security Act Manual*, § 514.2(A) (5th ed. Dec. 2015); *see also* 1985 Farm Bill, § 1201(a)(1), 99 Stat. 1504.
[16] Practices that protect soil erosion are crop rotation, grassed waterways, and using cover crops during non-crop periods.

1996 Farm Bill.[17]  The 2014 Farm Bill once again made crop insurance premium subsidies subject to swampbuster and sodbuster provisions.[18]

Producers who intend to participate in USDA programs must complete the AD-1026, "Highly Erodible Land Conservation and Wetland Conservation Certification," which documents their compliance with highly erodible land and wetland compliance provisions.  By completing the form, producers agree not to produce or make production possible on converted wetlands and also not to convert a wetland by draining, dredging, filling, removing woody vegetation, or any other activity affecting water regimen that would allow the planting of agriculture commodities. When a producer completes the AD-1026 and indicates on the form that manipulation has or is intended to be completed that has not been evaluated by NRCS, then a certified wetland determination will be completed by NRCS.  NRCS can also perform a certified wetland determination in response to a complaint.

Certification of a wetland determination means that the wetland determination is of sufficient quality to make a determination of ineligibility for program benefits.[19]  NRCS policy is that all wetland determinations after passage of the 1996 Farm Bill are considered certified, and those determinations made prior to that date are certified if they met procedural appeal rights and quality mandates.[20]

After 1996 and the completion of many internal studies,[21] NRCS' implementation of its policy was to not consider wetland determinations completed from 1990 to 1996 to be certified unless the determination was appealed and upheld, a process which required field visits and supporting documentation.[22]  NRCS published many factsheets explaining wetland conservation compliance that stated that most wetland determinations completed prior to July 3, 1996, are not considered certified and therefore may not be valid for determining compliance with wetland conservation provisions.[23]  NRCS also reported that in the 1996 Farm Bill, Congress decided that

---

[17] Federal Agriculture Improvement and Reform Act of 1996, Pub. L. No. 104-127, §§ 311(2)(B), 321(a)(2), 110 Stat. 888, 982, 986 (1996 Farm Bill).

[18] Agricultural Act of 2014, Pub. L. No. 113-79, § 2611, 128 Stat. 649, 762-66 (2014 Farm Bill).

[19] 7 C.F.R. § 12.30(c)(1) (NRCS responsibilities regarding wetlands); *see also National Food Security Act Manual* § 514.1(A) (5th ed. Jan. 2010).  The Secretary is required to certify whether a map is sufficient for making a determination of ineligibility for USDA program benefits.  A final certification remains in effect as long as the area is devoted to an agricultural use or until such time as the person affected by the certification requests review of the certification.  16 U.S.C. § 3822(a); *National Food Security Act Manual* § 514.1(C); *see also In re XXXXX*, No. 2011W000064 (Jan. 26, 2012) (NAD Reconsideration Decision), available at http://www.nad.usda.gov/public_search.html (click "search hyperlink" at bottom of page and then enter the case number on search page)..

[20] *National Food Security Act Manual* § 514.1(A) (5th ed. Jan. 2010).

[21] *See, e.g.*, USDA-NRCS, Evaluation of Off-Site Wetland Mapping Conventions and Wetland Determinations in the Prairie Pothole Region (Jan. 1997); USDA-NRCS, Quality Assessment of Existing Wetland Determinations as Provided on CPA-026/026E (Mar. 1997) (assessing wetland determinations in North Dakota).

[22] A wetland determination generally included an inventory map delineating the wetlands and a signed CPA-026, "Highly Erodible Land and Wetland Conservation Determination."  NRCS concluded that these determinations were not of sufficient quality to be considered certified.  In addition, NRCS was concerned that producer files lacked evidence of appeal rights which are required.

[23] NRCS, "Wetlands and Conservation Compliance: What Every Iowa Farmer Needs to Know" (no date); NRCS, "Wetlands and Conservation Compliance: What Every Georgia Farmer Needs to Know" (no date); NRCS, "Wetlands and Conservation Compliance: What Every Wisconsin Farmer Needs to Know" (no date).

the inventory maps, while providing useful information, were not completely accurate. The inventory maps have been in the process of being replaced by certified wetland determinations.[24]

In 2009, agricultural commodity prices spiked dramatically, which created an economic incentive to bring more land into production. Consequently, producers made many requests for wetland determinations. The number of requests for certified wetland determinations drastically increased, and NRCS started to experience a significant backlog. In fiscal year 2012, NRCS reported a backlog of over 12,000 wetland determination requests.[25] Producers grew frustrated with NRCS' wetland determination process with wait times of up to two years. The frustrated producers held public forums and expressed their desire to receive wetland determinations that were technically and procedurally correct, and completed in a timely manner of less than one year from the date of the request. Producers also expressed frustration with inconsistent treatment across State lines.

In response to producers' frustrations, in fiscal year 2011, NRCS created an initiative called the North Central Wetlands Conservation Initiative comprised of the prairie pothole States (i.e., Iowa, Minnesota, North Dakota, and South Dakota). The initiative was aimed at proposing efficiencies to reduce the growing backlog of wetland determination requests from producers. Special initiative funds of $10.5 million were dedicated to hire term employees to work exclusively on reducing the backlog of wetland compliance requests. In the spring of 2013, NRCS provided the Secretary with a decision memorandum regarding proposed regulatory changes and clarifications to wetland policy. On April 1, 2013, the Secretary approved the memorandum, which allowed NRCS to move forward with the proposed changes and clarifications to the wetland conservation compliance provisions through a combination of rulemaking and preamble discussion, public notice, and administrative updates to the National Food Security Act Manual.[26] According to NRCS National Office officials, in the days following the passage of the 2014 Farm Bill, it was eventually determined to be too controversial to make any changes other than those needed to recouple federal crop insurance benefits to conservation compliance in order to not place in jeopardy the alliance between environmental and agricultural interests which formed to support the statutory change. As of December 2016, NRCS has not published any public notices or made any formal changes to policy or regulations to address the decision memorandum.

In late April 2013, the North Central Wetlands Conservation Initiative held a meeting led by the Regional Conservationist with the State Conservationists of the prairie pothole region. NRCS documented in the meeting notes that it would be revising the definition for certified wetland determinations in the preamble of the proposed rule. NRCS acknowledged in the meeting notes that these changes could not be implemented until the proposed rule was published. However,

---

[24] NRCS inventory maps were made by reviewing soil surveys, topographic maps, and FSA 35 mm aerial slides. These maps only show potential wetlands and were a tool to predict the presence and approximate boundary of wetlands. Pre-July 3, 1996 wetland determinations were based solely on the wetland inventory maps. NRCS, *Release of NRCS Wetland Inventory Maps*, Bulletin 180-V-NFSAM, Amend. WI22 (Apr. 24, 2001) (amending National Food Security Act Manual (3d ed. Amend. 2)).

[25] USDA-NRCS, Decision Mem., "Wetland Conservation Compliance Changes and Clarifications" (Apr. 1, 2013) (decision memo from NRCS to the Secretary).

[26] The *National Food Security Act Manual* provides NRCS personnel with policy and guidance on the implementation of wetland conservation provisions. *National Food Security Act Manual* (5th ed.).

agency officials directed the States to go forward with the proposed change of accepting wetland determinations made prior to July 3, 1996, while waiting for the proposed rule to be published.[27] States were further instructed not to issue any written guidance. As of December 2016, NRCS has not published any public notices or made any formal changes to policy or to regulations.

In April 2014, we received a complaint. The complaint alleged that NRCS State office officials were not following existing NRCS policies and laws allowing farmers to drain wetlands. The complaint specifically alleged that the State office officials are reverting back to wetland determinations, which were deemed to be of insufficient quality (crop years 1990 through 1996), instead of relying on current certified wetland determinations based on detailed technical analysis conducted by NRCS field staff. We reviewed the complaint, and as a result, the Office of Inspector General (OIG) initiated an audit on wetland conservation provisions in the prairie pothole region.

## Objectives

Our objective was to evaluate NRCS' administration of the wetland conservation provisions in the prairie pothole region. Specifically, we evaluated whether NRCS established adequate guidance and procedures to administer the wetland conservation provisions, and whether wetland determinations were in accordance with laws and regulations.

As noted in our finding, we question NRCS' process to change its practice for making wetland determinations in the prairie pothole States. Accordingly, our work did not conclude on whether the determinations were in accordance with the underlying laws and regulations.

---

[27] North Central Wetlands Conservation Initiative, "Wetland Summit II Meeting Notes, Action Items and Decisions" (Apr. 25-26, 2013).

## Section 1:  Wetland Conservation

### Finding 1: NRCS Changed its Wetland Determination Process Contradicting Its Prior Implementation of Policy and Practice

In 2013 in the prairie pothole States, NRCS began accepting as certified pre-1996 wetland determinations.  These determinations were based on older inventory maps, which NRCS regarded as unacceptable for almost 20 years.  Most of these pre-1996 determinations lack evidence of appeal rights and supporting documentation.  In making this significant change in the implementation of policy, NRCS did not issue an official directive to communicate its decision to field staff.  Furthermore, NRCS did not publicly disclose this change in the implementation of policy.

NRCS officials made this change because they were under pressure to reduce the backlog and because producers complained about the time needed to obtain a determination.  This change (accepting the pre-1996 determinations) was successful in reducing the backlog, but it also resulted in inaccurate wetland determinations.  As a result of this change in the implementation of policy, many acres of wetlands are being inappropriately drained and converted to agricultural production.  Based on the 17 tracts[28] OIG reviewed in North Dakota, these changes in the wetland determination process reduced the protection of wetland acreage by nearly 75 percent on 13 tracts.

In order to conserve wetlands, Congress established legislation, beginning in 1985, to stop farmers who converted wetlands from receiving any USDA farm benefits.[29]  That legislation has been renewed through consecutive Farm Bills in 1990, 1996, 2002, 2008, and 2014, representing an abiding commitment to preserve wetlands.[30]  The Secretary delegated responsibility for this program to NRCS as the lead technical agency.   NRCS' current published policy is that all wetland determinations after passage of the 1996 Farm Bill are certified, and those determinations made prior to that date are certified if they met procedural appeal rights and quality mandates.[31]

In response to legislative and executive mandates, NRCS developed a system of internal controls in the National Food Security Act Manual for making wetland determinations.  Prior to the change in the implementation of policy in 2013, these controls involved a combination of onsite and offsite evaluations, including using aerial photography, Light Detection and Ranging

---

[28] We reviewed a total of 35 tracts (17 tracts in North Dakota and 18 tracts in South Dakota). For this finding we only included 17 tracts from North Dakota because South Dakota did not accept pre-1996 wetland determinations as certified.

[29] *See* 1985 Farm Bill, § 1221, 99 Stat. 1507-08.

[30] Food, Agriculture, Conservation, and Trade Act of 1990, Pub. L. No. 101-624, §§ 1401-1424, 104 Stat. 3359, 3568-76 (1990 Farm Bill) (Title XIV of the 1990 Farm Bill, which renewed the conservation provisions of the 1985 Farm Bill, is also known as the Conservation Program Improvements Act); 1996 Farm Bill, §§ 301-326, 110 Stat. 980-92; Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, §§ 2001-2006, 2201-2204, 116 Stat. 134, 223-38, 252-53; Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 2001-2003,122 Stat. 1651, 1753-56; 2014 Farm Bill.

[31] *National Food Security Act Manual* § 514.1(A) (5th ed. Jan. 2010).

001346

(LiDAR) data, precipitation data, hydrology reviews, and soil and vegetation samples.[32] As an outcome of this process, a more current detailed color map was created of the producer's property that indicated the location of wetlands. Producers had appeal rights; if an appeal was made to NAD, NRCS would then implement the NAD determination.[33]

Starting in 2009, agricultural commodity prices spiked dramatically; this created an economic incentive to bring more land into production. Consequently, producers made many more requests for wetland determinations. By the spring of 2012, the number of requests in the backlog had risen to about 12,000 pending determinations in the prairie pothole region. Since it could take years for a wetland determination to be made, NRCS senior level officials believed they needed to develop an alternative method to reduce the backlog. In 2012 and 2013, NRCS held several gatherings of employees from the prairie pothole region to discuss, among other issues, what might be done to reduce the backlog of pending wetland determinations.

As part of these internal discussions, NRCS officials proposed accepting pre-1996 determinations as certified. Beginning in 2013, NRCS moved forward with this proposal in the prairie pothole region. Officials believed that regulations and official policy would soon be revised, as they believed this change in the implementation of policy would reduce its backlog considerably. One State Conservationist responded to headquarter officials that this new interpretation could reduce the backlog by as much as 50 percent.

In March 2014, OIG received a complaint alleging that the wetland determinations resulting from this change in policy were "un-ethical," "fraudulent," "illegal," and "against the appeals of the National Appeals Division." In response to this allegation, we reviewed wetland determinations completed on 17 tracts that were made in accordance with the official current policy using technical information, and then compared them to the determinations completed with pre-1996 information. We found that pre-1996 determinations did not contain evidence in the file that procedural appeal rights and quality mandates were met.

For example, for a producer in North Dakota, the NRCS State office rescinded a 2010 determination that a district conservationist completed, showing 34 acres of wetlands on a tract. This determination was based on 10 years of current aerial photography, as well as an onsite visit. NRCS had thus invested considerable resources into this wetland determination.

This 2010 determination showed the location and size of at least 34.0 acres of wetlands on this property. However, as a result of the change in the implementation of policy, the NRCS' State office discarded the current determination and instead used a pre-1996 determination. The pre-1996 determination showed only 2.5 acres of wetland. The district conservationist protested, but the NRCS State office certified the 1995 map. The producer then proceeded to drain these acres

---

[32] LiDAR is a remote sensing technology that measures distance by illuminating a target with a laser and analyzing the reflected light. LiDAR elevation data can be used to map the potential, static distribution of current and historic wetlands and key wetland functional drivers based on physical controls on water distribution. LiDAR intensity data can be used to map actual, dynamic variations in wetland inundation extent which can provide additional insights concerning key functional drivers.

[33] NAD provides USDA program participants an opportunity to file an appeal and receive a hearing if the participant disagrees with a program decision. 7 C.F.R. §§ 11.1-.15 (NAD Rules of Procedure)

of wetlands without violation and therefore continued to receive USDA farm program benefits. As a result of NRCS's decision to switch between these methods for making determinations, the producer drained 31.5 acres of wetland, or 93 percent.

This case is not an isolated instance of the consequences of this change in how NRCS makes wetland determinations. We reviewed 13 tracts where NRCS rescinded current determinations and replaced them with pre-1996 determinations. In total, for these 13 tracts, 341.8 out of 456.9 acres (75 percent) of wetlands that existed, according to the current data, are no longer protected and are subject to being drained.

We also reviewed two determinations rescinded by NRCS State office officials after they had been already adjudicated by NAD in 2012 and were considered administratively final. In both cases, the officials changed the determinations by removing converted wetland[34] violations and re-classifying wetlands. One determination was changed by relying on a 1991 inventory map; this change resulted in the loss of 14.6 acres of wetlands. In the other case, the State office issued a new determination that removed 20.6 acres of converted wetland violations. However, the State office did not have the authority to implement an alternative course of action contrary to the NAD decision.[35] Program regulations only provide for a producer, not the Department nor a USDA agency like NRCS, to request judicial review of a final NAD decision.[36]

Moreover, the decision to revert to pre-1996 determinations contradicts NRCS' longstanding position that these earlier determinations were inaccurate and unacceptable. In 1997, the Chief of NRCS wrote to the Secretary's office and stated that NRCS had made over three million wetland determinations using these maps and that 60 percent of these determinations were inaccurate.[37] At that time, the decision was made not to certify the older determinations.

When, in 2013, NRCS reversed its earlier stance by deciding to accept the pre-1996 determinations, nine district conservationists in North Dakota requested in a letter that the new policy be put in writing.[38] The State Conservationist responded that the policy was already in writing and instructed them to merely read the 1990 Farm Bill.[39] Seven States we contacted did not consider the pre-1996 determinations certified until the national office permitted the four States in the prairie pothole region to implement the change.[40] The three States outside the prairie pothole region we contacted still do not consider these pre-1996 determinations to be certified.[41] In addition, we identified standardized brochures that NRCS used to describe

---

[34] A "converted wetland" is a wetland that has been drained, dredged, filled, or otherwise altered in some way that impairs or reduces the water flow making agriculture production possible when production was not previously possible, and before the alteration or other activity, the land was a wetland and not highly erodible land or crop land. *See* 16 U.S.C. § 3801(7)(A).

[35] NRCS is required to implement a NAD determination no later than 30 days after the determination becomes a final determination of USDA. *See* 7 C.F.R. § 11.12(a), 614.15(a) (implementation of final NAD determinations).

[36] *See* 7 C.F.R. §§ 11.13, 614.17 (judicial review of NAD decisions).

[37] *See* Informational Memorandum from Paul W. Johnson, Chief, NRCS, to Daniel Glickman, Secretary of Agriculture (July 1997).

[38] *See* Memorandum from TMU 6 District Conservationists to Mary Podoll, State Conservationist, Bismarck State Office, NRCS.

[39] *See* Memorandum from State Conservationist to District Conservationist, NRCS, et al. (Apr. 3, 2014).

[40] Indiana, Iowa, Minnesota, Nebraska, North Dakota, South Dakota, and Wisconsin.

[41] Indiana, Nebraska, and Wisconsin.

wetland compliance in Georgia, Illinois, and Wisconsin. These informational brochures explain that "[m]ost wetland determinations completed prior to July 3, 1996, are not considered "certified" and therefore may no longer be valid due to changes in the swampbuster provisions."

OIG found that NRCS' process for approving this major change in the implementation of policy—effectively a reversal of almost 20 years of history—was undocumented. NRCS presented a Decision Memorandum in March 2013 to the Secretary, indicating that NRCS would be "clarifying" how it makes wetland determinations among other regulatory changes.[42] We found that NRCS' Decision Memorandum did not mention that for almost 20 years these determinations were deemed to be of insufficient quality to be considered certified. In fact, NRCS internal studies evaluating wetland determinations completed prior to 1996 reported that these determinations did not meet NRCS standards and had recommended that the determinations not be certified.[43] This Decision Memorandum was approved by the Secretary April 1, 2013. This Decision Memorandum allowed NRCS to propose changes and clarifications through the rulemaking process. However, the memorandum did not authorize NRCS to implement these changes before regulations were finalized. According to NRCS National Office officials, in the days following the passage of the 2014 Farm Bill it was eventually determined to be too controversial to make any changes other than those needed to recouple federal crop insurance benefits to conservation compliance in order to not place in jeopardy the alliance between environmental and agricultural interests that formed to support the statutory change. As of December 2016, NRCS has not published any rule changes addressing this major change in certification.

After the Decision Memorandum was approved, a wetland summit was held with the four States in the prairie pothole region and the Regional Conservationist. The meeting notes distributed to all attendees instructed the States to implement these changes while the new regulations and policies were developed. These notes also included specific instructions to the State offices not to issue any written guidance. Ultimately, Iowa, Minnesota, and North Dakota followed these instructions and began accepting pre-1996 determinations as certified. South Dakota officials stated that they declined to make any changes because they had been sued by environmental groups and were hesitant to make this change for fear of additional lawsuits. Other States outside the prairie pothole region that share a similar geography (e.g., Indiana, Nebraska, and Wisconsin) were not aware of, and did not follow, the change in the implementation of policy. They continued making wetland determinations based on the current regulations and policies that prescribe more technically accurate methods.

Ultimately, these wetland certifications are intended to be used for determining program eligibility by NRCS, FSA, and RMA. When we spoke to FSA officials, they stated that they also were unaware of the change in the implementation of policy. They further stated that they were

---

[42] These other changes included continued use of the 1971-2000 precipitation dataset, consistent setback distance calculations for proposed drainage improvements, better use of mitigation banks, and consistency in identification of potholes.

[43] See, e.g., USDA-NRCS, Evaluation of Off-Site Wetland Mapping Conventions and Wetland Determinations in the Prairie Pothole Region (Jan. 1997); USDA-NRCS, Quality Assessment of Existing Wetland Determinations as Provided on CPA-026/026E (March 1997) (assessing wetland determinations in North Dakota).

shocked that NRCS would use the determinations from the 1990s, as they regarded the older maps as of poor quality and not certified.

Senior-level NRCS officials acknowledged there were problems of inconsistency between the States. They did not, however, indicate that they would instruct the prairie pothole States to stop using the pre-1996 determinations and argued that their continued use of the pre-1996 determinations complied with current NRCS policy as well as applicable statutes. NRCS senior level officials also claimed that they have always been following NRCS policy when determining if a pre-1996 wetland determination would or would not be considered certified. NRCS policy is that all wetland determinations after 1996 are certified, and those determinations prior to 1996 are certified if they met procedural (appeal rights) and quality mandates.[44] However,(as previously noted) for almost 20 years, NRCS did not consider most pre-1996 determinations certified.

Finally, in 2012, to defend almost 20 years of how NRCS implemented its policy, NRCS requested[45] the NAD Director to reconsider his final determination that reversed a hearing officer's decision and ruled that a pre-1996 determination was certified.[46] NRCS argued that the review determination did not consider that pre-1996 determinations were never certified, and notices of certification were never provided at that time. NRCS also argued that the 1996 Farm Bill required all wetland determinations after July 3, 1996, to be certified because earlier wetland determinations were not reliable, and the changes were codified in the Code of Federal Regulations. NRCS' arguments were so persuasive that the NAD Director vacated his earlier decision and reaffirmed that pre-1996 determination was not certified. In other words, in 2012, NRCS argued that the pre-1996 determinations were unacceptable. However, in 2013, NRCS reversed this position and accepted the pre-1996 determinations as certified.

By making this change in the implementation of policy, NRCS replaced its backlog of pending determinations with inaccurate determinations. NRCS should issue official guidance reinforcing current rules and clarifying procedures for making wetland determinations and certifications, including the status of pre-1996 determinations. NRCS also needs to review all NAD decisions in the prairie pothole region from January 1, 2010, through the present to determine whether the decisions were implemented.


## Recommendation 1

Issue official guidance reinforcing correct and current rules and clarifying procedures for making wetland determinations and certifications, including the status of pre-1996 determinations.

---

[44] *National Food Security Act Manual* § 514.1.(A)(1) (5th ed. Jan. 2010).

[45] In this case, the producer appealed to FSA. FSA was designated as the Agency of record, and officially made or filed the arguments with NAD. However, based upon a review of available records and interviews with NRCS personnel involved in this matter, we determined that the Department's position and arguments were NRCS,' which they filed through FSA as the Agency of record.

[46] *In re XXXXX*, No. 2011W000064 (2012 NAD Reconsideration Decision), (2011 NAD National Director Review), (2011 Administrative Judge Decision), available at http://www.nad.usda.gov/public_search.html (click "search hyperlink" at bottom of page and then enter the case number on search page).

## Agency Response

NRCS accepts this recommendation.  This report identifies that NRCS staff in certain states in the prairie pothole region were incorrectly implementing existing policy concerning the certification status of previously issued wetland determinations, specifically wetland determinations conducted prior to July 3, 1996.  Additional policy clarification providing specific guidance to evaluate the certification status of determinations issued prior to 1996 will be developed.  The estimated completion date is April 28, 2017.

## OIG Position

We accept management decision for this recommendation.

## Recommendation 2

Review all NAD decisions in the prairie pothole region from January 1, 2010, through the present to determine whether the decisions were implemented.  In those cases where the NAD final determination was set-aside or modified instead of implemented as directed by NAD, require the State office to implement the NAD decision in accordance with applicable law.

## Agency Response

NRCS accepts this recommendation.  In carrying out its responsibilities for wetland compliance, NRCS completes wetland determinations that are issued with appeal rights.  One of the appeal options for a person affected by the determination is the opportunity to request a hearing with NAD.  At the conclusion of the NAD hearing, the Administrative Judge issues a decision that rules on whether the determination was conducted according to policy and procedures.  If the agency is upheld, the determination becomes final.  The regulation at 7 CFR section 12.11 also provides NRCS the responsibility to determine if the affected person's action was taken in good faith reliance on advice or information provided by an agency employee.  When NRCS determines that noncompliance is due to reliance on employee provided advice or information, appropriate relief can be provided.  This relief may be requested, considered, and potentially granted at any time.  In these cases, a new final technical determination becomes the legal certification, and by statute can only be modified at the request of the person.  NRCS will review all NAD decisions and ensure that States take appropriate action in accordance with applicable law.  The estimated completion date is April 28, 2017.

## OIG Position

We accept management decision for this recommendation.

## Scope and Methodology

We conducted our review of the NRCS wetland conservation provisions in the prairie pothole region. We reviewed the controls over wetland determinations, appeals, and certifications of wetland determinations. We conducted field work between September 2014 and November 2015. Our audit covered wetland determinations from 2010 through 2015 in the prairie pothole region, which contains over six million acres of wetlands.[47]

We determined that NRCS did not have a database that included wetland violations and wetland determinations. As a result, we selected a non-statistical sample of 35 wetland determinations from North and South Dakota provided by the complainants and also suggested by NRCS State office officials.[48] We obtained FSA data that identified the number of tracts and associated acres with the presence of highly erodible land and wetlands. We did not assess the reliability of FSA data.

We performed our field work by conducting interviews and reviewing documentation at the NRCS and FSA national offices in Washington, D.C., and four NRCS and FSA State offices in the prairie pothole region: Iowa, Minnesota, North Dakota, and South Dakota. We also met with three additional NRCS and FSA State offices outside the prairie pothole region: Indiana, Nebraska, and Wisconsin[49] to determine how States near the prairie pothole region were applying wetland conservation provisions. Additional fieldwork was performed at 10 NRCS field offices and FSA county offices in Minnesota, North Dakota, and South Dakota.[50] We also visited the Central National Technical Support Center in Fort Worth, Texas, to interview personnel that provided training on wetland determinations.

We reviewed the conservation files for the selected samples to determine if wetland determinations were completed according to wetland conservation laws, regulations, and procedures.

To meet our audit objectives, we performed the following audit procedures:

- reviewed applicable law, regulations, and agency procedures related to wetland conservation provisions;

- reviewed NRCS national office policies, procedures, and oversight of wetland conservation provisions;

- interviewed complainants to obtain information about the allegations. We reviewed the documents provided and determined an audit was justified;

---

[47] T.E. Dahl, *Status and trends of prairie wetlands in the United States 1997 to 2009*, at 32 (U.S. Department of the Interior, U.S. Fish and Wildlife Service., Ecological Services, 2014).
[48] We reviewed 17 tracts in North Dakota and 18 tracts in South Dakota.
[49] We did not contact the FSA State office in Indiana.
[50] We did not perform work at a Minnesota FSA county office.

- interviewed NRCS national office officials on the agency's policy and procedures for wetland determinations;

- interviewed NRCS State officials from Indiana, Iowa, Minnesota, Nebraska, North Dakota, South Dakota, and Wisconsin to determine how wetland conservation provisions were being applied;

- interviewed retired NRCS employees to get a historical perspective and description of the implementation of wetland conservation provisions; and

- assessed if NRCS correctly applied wetland determinations, handled appeals, and issued certification of wetland determinations in accordance with wetland conservation provisions.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions, based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Abbreviations

| | |
|---|---|
| FSA | Farm Service Agency |
| LiDAR | Light Detection and Ranging |
| NAD | National Appeals Division |
| NRCS | Natural Resources Conservation Service |
| OIG | Office of Inspector General |
| RMA | Risk Management Agency |
| USDA | Department of Agriculture |

**Agency's Response**

# USDA'S
# NATURAL RESOURCES CONSERVATION SERVICE
# RESPONSE TO AUDIT REPORT



United States Department of Agriculture

January 10, 2017

SUBJECT:    ESD - Natural Resources Conservation Service (NRCS) Wetland Conservation
Provisions in the Prairie Pothole Region Audit Report 10601-0003-31

TO:    Gil H. Harden                                    File Code:  190
Assistant Inspector General for Audit
Office of Inspector General

Attached is the NRCS response to the subject audit report.  This report has undergone dramatic
improvements since the first draft was originally transmitted in April 2016.  NRCS is
appreciative of the Office of Inspector General (OIG) audit team for working through these
many changes.  Apart from the official agency response, NRCS retains several concerns that
the report's content has failed to include or within the report's language that could be
misconstrued or misleading.  Additional opportunities to clarify the report scope, context, and
complete information are also identified in the attached version of the report provided by OIG
with comments from NRCS.

The following is a summary of the agency's major concerns with this version of the audit
report
- Despite the audit executive summary, the report fails to evaluate if wetland
determinations in the prairie pothole region were in accordance with laws and
regulations.  By omitting reference to the legal status of pre-1996 determinations, the
link to the report's findings and recommendation on the need for policy clarification
is not clear.  Without this legal context, evidence presented also may confuse the lay
reader.  For example, the report cites a historic (1997) internal study that
recommended that wetland determinations in North Dakota should not be considered
certified.  However, by that time Congress had changed the law regarding
certification, making this recommendation irrelevant.
- Throughout the report, OIG cites to NRCS making a significant change in procedural
implementation of wetland policy without clarifying that any change was limited to
specific States.  The report language infers the scope of the change was national and
the change itself was to agency national policy.  The report also cites several State-
issued documents as evidence; however, these State issued guidance documents are
not reflective of national NRCS opinion or guidance.  This evidence provides
additional examples of inconsistent policy application by States.
- In regard to the change in the implementation of policy, the report does not reflect that
in some prairie pothole region States NRCS was incorrectly rejecting pre-1996
determinations without first evaluating their certification status, as is required by

Page 2

current national policy.  Omitting this fact fails to provide the context in which NRCS directed States to follow current policy.

If you have questions, please contact me at (202) 720-7246, or have a member of your staff contact Leonard Jordan, Associate Chief for Conservation, at (202) 720-7246.


/s/


Jason A. Weller
Chief

Attachments

cc:  (w/attachments)
Val Dolcini, Administrator, Farm Service Agency

Wetland Conservation Provisions in the Prairie Pothole Region—10601-0003-31
Agency Response

Summary

NRCS generally accepts the two audit recommendations in the Wetland Conservation
Provisions in the Prairie Pothole Region—10601-0003-31; however, there remain inaccuracies
in the report text that misportray key facts and have potential to confuse the reader.  In this
response, we refine key points to ensure that the public is provided with the most complete
information on this important topic.
The report has taken an important step to identify that the evidence presented and conclusions
drawn relate to the implementation of policy; however, the report does not state unequivocally
that the audit clearly found that NRCS staff in the Prairie Pothole Region were applying
inconsistent procedures regarding the certification status of wetland determinations conducted
prior to July 3, 1996 (1996).  For example, the report correctly presents the current policy that
determinations made prior to 1996 are certified if they met procedural appeal rights and quality
mandates; however fails to provide the context that States were found to be incorrectly
following that policy by automatically rejecting the certification status of all pre-1996
determinations.  NRCS has also provided evidence that pre-1996 determinations were provided
with appeal rights on the back side of the "Person Copy," page in the carbon set form used at
the time; however, this fact is not recognized in the report.  Recommendation 1 signals that the
implementation inconsistency is the key finding from the audit, which is strengthened if this
line of discussion is clearly identified.

There are several areas where the report scope is not clear in the text, suggesting that the
presented evidence may apply beyond the narrow, non-statistically drawn sample used as the
foundation for the audit.  For example, the report states that NRCS implementation of policy
was "to not consider wetland determinations completed from 1990 to 1996 to be certified
unless the determination was appealed and upheld, a process which required field visits and
supporting documentation."  This was the case in North Dakota, one State in the Prairie
Pothole Region; however, this criteria is not contained in national policy and there is no
evidence of it being applied on a broad scale.  In another example, the report cites Wisconsin
State guidance that incorrectly asserts that all pre-1996 determinations were based on
inventories.  Again, a single State although that is not evident in the discussion.

There are several areas in the report where the evidence presented is not complete and could be
misleading to the lay reader.  For example, the report cites internal studies that judged the
quality of pre-1996 determinations, but does not provide the context (i.e., studies conducted to
assess the determination quality for implementation of the Clean Water Act, as well as the
Food Security Act provisions at a time that USDA was operating in accordance with a
memorandum of agreement with the Army Corps of Engineers).  Recommendation 1 is more

clearly understood by identifying that the changing requirements and policies during the late 1990s contributed significantly to the inconsistent application of wetland certification policy.

The report includes a comparison of determinations from North Dakota made using pre-1996 approved procedures and those using a set of post-2009 procedures. The report concludes that more wetlands and more wetland acres were identified on the more recent determinations. This comparison is irrelevant to the legal standing of certified wetland determinations and merely demonstrates that technical tools and capabilities have improved over time and that regional weather patterns have become wetter. However, as presented, the comparison poses the risk that an uninformed reader may conclude that older determinations are not valid.

The report presents a 2012 NAD case as evidence that NRCS disputed the certification status of pre-1996 determinations. However, does not indicate this to be a single case in one State and that the particular determination could not be considered certified because it did not contain the certification statement signed by USDA.

Finally, the report includes quotations from the complaint alleging that NRCS actions were "un-ethical," "fraudulent," and "illegal." These are inflammatory statements and do not belong in an audit, particularly since their veracity was not evaluated in light of the statute and regulation.

<u>Recommendation 1</u>

Issue official guidance reinforcing correct and current rules and clarifying procedures for making wetland determinations and certifications, including the status of pre-1996 determinations.

**Agency Response**

NRCS accepts this recommendation. This report identifies that NRCS staff in certain States in the prairie pothole region were incorrectly implementing existing policy concerning the certification status of previously issued wetland determinations, specifically wetland determinations conducted prior to July 3, 1996.

Certification of wetland determinations first was enacted in the Food, Agriculture, Conservation, and Trade Act of 1990, with corresponding changes made in the regulation at that time. Since June 1991, certified wetland determinations were provided with the inclusion of appeal rights on the back side of the "Person Copy" of the SCS-CPA-026 form. Additional clarification of the certification issue was made in the Federal Agricultural Improvement and Reform Act of 1996, when Congress made it clear that certifications made prior to that date remain valid unless a new certification is requested by a person. Certified wetland determinations are provided by NRCS to persons so that they can make informed decisions about the management of their lands to remain eligible for USDA program assistance.

As part of this process, policy is developed that must be consistent with the statutory and regulatory provisions. The policy regarding certification has varied through the years and has contributed to general misunderstanding. For example, there was a period of time when USDA operated in accordance with a memorandum of agreement with the Army Corps of Engineers to make determinations that would be valid for the Food Security Act and the Clean Water Act

(CWA).  During this time, there were internal USDA studies that found some determinations lacked the quality required for implementation of the CWA, which led to further confusion.

Policy in place since 2010 specifies that wetland determinations conducted prior to July 3, 1996, are considered certified if they met the procedural (appeal rights) and quality mandates as provided in 7 CFR Section 12.  USDA's Office of the General Counsel (OGC) has confirmed that this policy is in alignment with statute and regulation.  However, staff in some prairie pothole region States were rejecting **all** wetland determinations conducted prior to July 1996 without considering if the determinations met requirements in accordance with established policy.  In some cases staff in prairie pothole region States were incorrectly requiring evidence of an appeal, which resulted in a field visit at the time the original determination was completed; however, by policy all that was required was that the operator had received appeal rights—there was no obligation to exercise those rights.

NRCS attempted to correct these inconsistent implementation issues in 2013 by instructing NRCS staff in prairie pothole region States to follow existing policy and begin to examine determinations conducted prior to 1996 to determine if they met procedural and quality mandates and should be correctly identified as certified determinations.  These actions, to bring States in alignment with national policy, are referred to in the report as being a significant change in policy.  In addition, the instruction to NRCS State offices only occurred in specific States where it was identified that policy was not being followed, which led to the complaint that initiated the audit.

The audit also highlights a large determination backlog in the prairie pothole region, suggesting that the direction to follow existing policy may have been driven in part by the backlog.  Since 2009, the combination of expired Conservation Reserve Program acres returning to crop production and the changing economics of corn and soybean production led to a surge in producer interest in drainage improvements and the need for NRCS completed wetland determinations.  NRCS responded to this increased demand, and beginning in 2011, has dedicated an additional $10.5 million of funding aimed at completing determinations, which has resulted in completing approximately 60,000 new certified determinations in the prairie pothole region, and reducing the backlog by 70 percent.  The focus on wetlands determinations helped to reveal that some NRCS staff in the prairie pothole region were not following existing policy, but the affirmation and direction to adhere to policy was not for the purposes of reducing the backlog.

Additional policy clarification regarding the quality aspect of determinations is needed, as demonstrated in this report.  Additional policy clarification providing specific guidance to evaluate the certification status of determinations issued prior to 1996 will be developed.  The estimated completion date is April 28, 2017.

<u>Recommendation 2</u>

Review all NAD decisions in the prairie pothole region from January 1, 2010, to the present to

determine whether the decisions were implemented. In those cases where the NAD final determination was set-aside or modified instead of implemented as directed by NAD, require the State office to implement the NAD decision in accordance with applicable law.

**Agency Response**

NRCS accepts this recommendation. In carrying out its responsibilities for wetland compliance NRCS completes wetland determinations that are issued with appeal rights. One of the appeal options for a person affected by the determination is the opportunity to request a hearing with NAD. At the conclusion of the NAD hearing, the Administrative Judge issues a decision that rules on whether the determination was conducted according to policy and procedures. If the agency is upheld, the determination becomes final. The regulation at 7 CFR section 12.11 also provides NRCS the responsibility to determine if the affected person's action was taken in good faith reliance on advice or information provided by an agency employee. When NRCS determines that noncompliance is due to reliance on employee provided advice or information, appropriate relief can be provided. This relief may be requested, considered, and potentially granted at any time. In these cases, a new final technical determination becomes the legal certification, and by statute can only be modified at the request of the person. NRCS will review all NAD decisions and ensure that States take appropriate action in accordance with applicable law. The estimated completion date is April 28, 2017.

001361

**Learn more about USDA OIG**
Visit our website:  www.usda.gov/oig/index.htm
Follow us on Twitter:  @OIGUSDA

**How to Report Suspected Wrongdoing in USDA Programs**

**Fraud, Waste, and Abuse**
File complaint online: www.usda.gov/oig/hotline.htm

**Monday–Friday, 9:00 a.m.– 3:00 p.m. ET**
In Washington, DC 202-690-1622
Outside DC 800-424-9121
TDD (Call Collect) 202-690-1202

**Bribes or Gratuities**
202-720-7257 (24 hours)



In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (e.g., Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720-2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877-8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD-3027, found online at How to File a Program Discrimination Complaint and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632-9992. Submit your completed form or letter to USDA by: (1) mail: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue, SW, Washington, D.C. 20250-9410; (2) fax: (202) 690-7442; or (3) email: program.intake@usda.gov.

USDA is an equal opportunity provider, employer, and lender.

United States Department of Agriculture
Natural Resources Conservation Service

Manuals
Title 180 - Conservation Planning and Application
National Food Security Act Manual, Fifth Edition
Part 514 - Wetland Determination and Labels

Case 1:19-cv-02416-TSC Document 65-9 Filed 09/18/21 Page 202 of 211    001362

## Subpart A – Wetland Determination and Delineation

### 514.0 Background

A. The Food Security Act of 1985, as amended, requires NRCS to delineate, determine, and certify wetlands located on land on a farm or ranch subject to wetland conservation (WC) provisions in order to establish a producer's eligibility for certain USDA program benefits (16 U.S.C. Section 3822, 7 CFR Section 12.30).

B. This manual provides policy pertaining to the WC provisions. Policy concerning NRCS technical and financial assistance and the protection of wetlands is located in Title 190, General Manual (GM), Part 410, Subpart B, Section 410.26. In addition, wetlands may be subject to other Federal, State, or local regulations.

C. In carrying out the provisions of the Food Security Act, NRCS may request technical assistance from the U.S. Fish and Wildlife Service (FWS) and State or local conservation agencies (7 CFR Section 12.30). By statute, only NRCS may make certified wetland determinations (16 U.S.C. Section 3821(e)).

### 514.1 Certification

A. Certification of Wetland Determinations

(1) Certification of a wetland determination means that the wetland determination is of sufficient quality to make a determination of ineligibility for USDA program benefits. All wetland determinations made after July 3, 1996, are considered certified determinations (7 CFR Section 12.30(c)(1)). Determinations made prior to July 3, 1996, are considered certified if they met the procedural (appeal rights) and quality mandates as provided in 7 CFR Section 12, as detailed in paragraph B.

(2) Certified wetland determinations will be made under either of the following circumstances:

(i) In response to Farm Service Agency (FSA) Form AD-1026 or NRCS-CPA-038 completed by a USDA program participant for the field(s) identified

(ii) In response to Form FSA-569, if required

(3) To identify wetlands subject to the WC provisions, NRCS uses offsite (7 CFR Section 12.6(c)(5)) and onsite (7 CFR Section 12.6(c)(6)) methods. Site visits are conducted only in following circumstances:

(i) Before withholding any USDA benefits (7 CFR Section 12.30(c)(4))

(ii) When a USDA program participant requests an onsite determination (7 CFR Section 12.6(c)(7))

(iii) When there is an appeal (7 CFR Section 12.6(c)(6))

(iv) When a USDA program participant requests a preconversion minimal effect determination (7 CFR Section 12.31(d))

(v) In response to a Form FSA-569 or a whistleblower complaint (7 CFR Section 12.30(a)(6))

(vi) In conjunction with a compliance status review

(vii) If there is inadequate information to make determinations offsite (7 CFR Section 12.6(c)(6))

(4) Methods for offsite and onsite determinations are listed in the Food Security Act wetland identification procedures, located in the exhibit in section 514.8(A).

B. Evaluation of Previously Issued Wetland Determinations

United States Department of Agriculture
Natural Resources Conservation Service

Manuals
National Food Security Act Manual, Fifth Edition
Part 514 - Wetland Determination and Labels

Case 1:19-cv-02416-TSE 180-Document-1 Filed 09/18/21  Page 203 of 211

001363

Prior to conducting a certified wetland determination, NRCS will evaluate all previously issued determinations to determine their certification status using the criteria below:

(i) All wetland determinations made on or after July 3, 1996, are considered certified determinations (7 CFR Section 12.30(c)(1)) when all of the following apply:

• The determination was issued to the participant as noted on the Form NRCS-CPA-026(e), "Highly Erodible Land and Wetland Conservation Determination." For the purpose of this guidance, the NRCS-CPA-026(e) and previous versions will be referred to solely as the NRCS-CPA-026.

• The NRCS-CPA-026 was signed by NRCS.

• The NRCS-CPA-026 is accompanied by a wetland determination map.

(ii) For certified determinations issued on or after July 3, 1996, nonwetland (NW) and not inventoried (NI) areas were required labels according to policy, and unlabeled areas (cropland or noncropland) may not be considered NW. Unlabeled areas on a certified determination issued on or after July 3, 1996, are subject to receiving a new wetland conservation label.

(iii) All wetland determinations made after November 28, 1990, and before July 3, 1996, are considered certified if all of the following apply:

• The determination was issued to the participant as noted on the NRCS-CPA-026 or SCS-CPA-026.

• The NRCS-CPA-026 or SCS-CPA-026 was signed by NRCS (formerly known as SCS). The SCS-CPA-026 (version dated June 1991 – see exhibit at section 514.8B) and later versions of the NRCS-CPA-026 contain a valid producer notification statement in block 29 and appeal rights were provided on the back of the "Person Copy." If a different version of the SCS-CPA-026 was used (other than the June 1991 version) to issue the determination, there must also be evidence that the producer was informed the determination was certified and provided appeal rights.

• The determination map document meets the quality mandate "of sufficient quality to make a determination of ineligibility for program benefits" (7 CFR Section 12.30(c)(1)). "Sufficient quality" means that the map document is legible to the extent that the location of designated wetlands in relation to other ground features can be determined. For example, the map document is of sufficient quality to be able to see reference ground features such as wooded areas, field boundaries, or roads, which then can be used as a reference for determining a wetland location.

(iv) In some cases, certified determinations issued on or after November 28, 1990, contain lands that were not labeled on the wetland determination map, but were recorded with a label on the associated NRCS-CPA-026, which indicated that the label applied to some numbered (or otherwise designated) land unit. Those land units are considered certified and are not subject to a new wetland conservation label.

(v) For certified wetland determinations issued prior to July 3, 1996, unlabeled cropland areas are considered NW and are not subject to a new wetland certification (unless cropland areas are marked "determination not made" or similar). For this purpose, cropland is considered nonrangeland or nonwoodland, which has a field polygon designated on the map with an associated field number.

(vi) Wetland determinations made prior to November 28, 1990, are not considered certified.

(vii) Regardless of the date the certified determination was issued, certain lands, within or associated with a certified determination, are subject to receiving a new (or revised in the case of NI) wetland conservation label, including—

• Noncropland areas without a wetland conservation label. This would include areas having a designation that is not a wetland conservation label such as "NCL" (noncropland).



**United States Department of Agriculture**

JAN 1 9 2017

SUBJECT:    ECS – Conservation Compliance – Agency Policy of the Certification Status of
            Wetland Determinations

TO:    NRCS State Conservationists and                          File Code: 190
       Directors, Pacific Islands and Caribbean Areas

### ACTION REQUIRED BY FIELD STAFF IMPLEMENTING WETLAND
### COMPLIANCE

Background:
The Food Security Act of 1985, as amended, requires NRCS to delineate, determine, and certify
wetlands located on land on a farm or ranch subject to the wetland conservation (WC) provisions
in order to establish a producer's eligibility for certain USDA program benefits. Wetland
certification provides USDA program participants certainty with respect to the areas on their
operations that are subject to the WC provisions. This memo announces a revision that clarifies
existing agency policy for use in evaluating the certification status of previously issued wetland
determinations to Title 180, National Food Security Act Manual (NFSAM), Part 514, Subpart A.
This memo also provides background information to NRCS personnel concerning various
aspects of wetland certification under Title XII of the Food Security Act of 1985, as amended
(the 1985 Act).

Certification of Wetland Determinations under the 1985 Act
Beginning in the late 1980s upon enactment of the 1985 Act, NRCS completed and distributed
wetland determinations and maps to producers. NRCS based these original determinations on
the best technology and reference data available at the time they were produced. Wetlands
identified on these maps are commonly referred to as "inventories" or "official" wetland
determinations, but are not necessarily "certified." Wetland certification did not exist as part of
the WC provisions until enactment of the Food, Agriculture, Conservation, and Trade Act of
1990 (the 1990 amendments).

In particular, the 1990 amendments required the Secretary to certify wetland delineation maps as
"sufficient for the purpose of making determinations of ineligibility for program benefits" and to
provide a producer an opportunity to appeal such determination prior to making such
certification final. On April 23, 1991, USDA issued regulations concerning the 1990 Act,
identifying at 7 CFR Section 12.30(c) (1991) the following:

> "Notification of the wetland determination, a copy of the wetland delineation and the
> SCS appeal procedures shall be provided to each person who completes a Form AD-
> 1026. The wetland determination and wetland delineation shall be certified as final by
> the SCS official 45 days after providing the person notice or, if appeal is filed with SCS,
> after a final appeal decision is made by SCS."

Natural Resources Conservation Service
Post Office Box 2890
Washington, D.C. 20013
An Equal Opportunity Provider and Employer

Page 2

Shortly thereafter in June 1991, a revised SCS-CPA-026 form was put in use that included a signed certification statement and appeal rights to the producer were provided on the back side of the "Person Copy" of a 4-part carbon-pack form.

Certification of wetland determinations was further refined by the amendments to the WC provisions made by the Federal Agriculture Improvement and Reform Act of 1996 (the 1996 amendments). While the 1990 amendments had anticipated that the agency would periodically update certified wetland determinations, the 1996 amendments required that certified wetland determinations would remain in effect except for very limited circumstances. Pursuant to the 1996 amendments, USDA issued revised regulations at 7 CFR Part 12 that specified all wetland determinations made after July 3, 1996, will be considered certified, but that any determinations made prior to that date would be subject to the regulations in place at the time of the determination. No further amendments have been made to the WC provisions with respect to the certification of wetland determinations.

Considerable confusion has been added to the certification issue due to the memorandum of agreement (MOA) that existed from January of 1994 until February of 2005 between the Departments of the Army, Agriculture, and the Interior, and the Environmental Protection Agency. This agreement specified the manner in which wetland determinations made by USDA under the Food Security Act (FSA) could be relied upon for purposes of section 404 of the Clean Water Act (CWA). For the purposes of the agreement, NRCS developed policies that detailed how previously conducted wetland determinations could be deemed acceptable for both the CWA and FSA. After the MOA was dissolved in 2005, NRCS modified policies to remove the criteria that was used to evaluate previously conducted wetland determinations.

The National Food Security Act Manual (NFSAM)
From 2010 until January of 2017, the policy has been that determinations conducted prior to July 3, 1996, "are considered certified if they met the procedural (appeal rights) and quality mandates as provided in 7 CFR Section 12." However, no specific criteria to evaluate appeal rights or quality has been provided until now. Therefore, this policy is further clarified and affirmed with this update.

Current NRCS procedures for certification of wetland determinations are found in the National Food Security Act Manual (NFSAM) and are attached. In summary, the NFSAM identifies the following:

- Determinations made after July 3, 1996, are certified as defined in the July 3, 1996, regulation.
- Determinations made between November 28, 1990, and July 3, 1996, are certified as defined in the April 23, 1991, regulation, provided that they met the procedural (appeal rights) and quality standard mandates as provided in 7 CFR Part 12. In particular, the quality standard requires that the map document must be legible to the extent that the location of designated wetlands in relation to other ground features can be determined. The determination must also have been provided with a signed certification statement by a USDA official, and have been provided on the June 1991 version of the NRCS-CPA-026 form that provided appeal rights.

Page 3

- Determinations made before November 28, 1990, are not certified unless they had been subsequently determined certified under the certification criteria post-1990, and provided to the person with a certification statement and appeal rights.
- Where more than one certified determination has been issued for the same land area, NRCS recognizes the most recent certified determination for which appeal rights have been exhausted as the certified wetland determination for the affected land area. However, when conducting an evaluation of past potential noncompliance, consistent with a person's right to rely upon a prior wetland certification, the evaluation of potential noncompliance will be completed using the certified wetland determination in place at the time the potential noncompliance activity took place.

NRCS believes the information in this memo and the detailed certification criteria will improve transparency and increase consistency in the implementation of the WC provisions.

Questions on this information should be directed to Jason Outlaw, National Wetland and HEL Compliance Specialist.


GAYLE N. BARRY
Regional Conservationist, Northeast

JAMES E. TILLMAN, SR.
Regional Conservationist, Southeast

KEVIN WICKEY
Regional Conservationist, Central

ASTOR BOOZER     ACTING FOR
Regional Conservationist, West

cc:
Leslie Deavers, Acting Chief of Staff, Office of the Chief, NRCS, Washington, D.C.
Leonard Jordan, Associate Chief for Conservation, NRCS, Washington, D.C.
Myron L. Taylor, Chief of Staff, Office of the Regional Conservationists, NRCS, Washington, D.C.
Jimmy Bramblett, Deputy Chief for Science and Technology, NRCS, Washington, D.C.
Terrell Erickson, Director Ecological Sciences Division, NRCS, Washington, D.C.
Jason Outlaw, National Wetlands and HEL Compliance Specialist, NRCS, Washington, D.C.

| | |
|---|---|
| **From:** | Grady, Mary - NRCS, Washington, DC |
| **To:** | Deavers, Leslie - NRCS, Washington, DC |
| **Bcc:** | hunter@aradc.org; Richard@aradc.org; donp@fb.org; danielleq@fb.org; jbaird@farmland.org; jstierna@farmland.org; mdopp@meatami.com; jdemarchi@betterseed.org; vhouston@betterseed.org; lsmith@sciencesocieties.org; kanderson@sciencesocieties.org; thance@gordley.com; Paul, Bev (EXT) - RMA; rgeib@americansugarbeet.org; tom.hebert@bayardridge.com; alan.ayers@bayer.com; skirsch@lawbc.com; Jbode@corn.org; Dchartier@corn.org; ccrider@corn.org; maxwilliamson@williamsonlawpolicy.com; agomez@cgagroup.com; Shipman, Hunt (EXT) - RMA; bgreenwood@croplifeamerica.org; elaws@crowell.com; ehuston@cfbf.com; rsnyder@fieldtomarket.org; johnfarner@irrigation.org; elizabethmccartney@irrigation.org; dtenny@nafoalliance.org; rich-duesterhaus@nacdnet.org; coleman-garrison@nacdnet.org; Jeremy-peters@nacdnet.org; britt@nasda.org; Nathan@nasda.org; kfranz@wheatworld.org; bshupe@wheatworld.org; Thorenson, Dale (EXT) - RMA; Kent Bacus; tbeymer@beef.org; elane@beef.org; mhart@beef.org; syager@beef.org; emerson@ncga.com; willard@ncga.com; Rlangley@cotton.org; RMinnich@cotton.org; kswango@ncfc.org; lvandoren@ncfc.org; Larew Robert - FASContact; cmatzen@nfudc.org; mperdue@nfudc.org; tdriscoll@nfudc.org; rbennett@nmpf.org; jjonker@nmpf.org; formicam@nppc.org; abailey@turkeyfed.org; loden@turkeyfed.org; dwells@turkeyfed.org; erin@youngfarmers.org; andrew@youngfarmers.org; jeffeisenberg@rockspringrs.com; bknight@stratconserve.com; tschoonhoven@stratconserve.com; laura.peterson@syngenta.com; malikka.smith@syngenta.com; ariel.wiegard@syngenta.com; lmoody@tfi.org; cgarrison@garrisongroup.com; crichter@thepolicygroup.com; charles.penry@tyson.com; pbredwell@uspoultry.org; Robert.Guenther-FASContact; jhankins@usarice.com; fleach@usarice.com; bmosely@usarice.com; dnuxoll@wga.com; bsacher@wga.com; Jordan, Leonard - NRCS, Washington, DC; Tillman, James - NRCS, Washington, DC; Gelbard, Diane - NRCS, Washington, DC; Outlaw, Jason - NRCS, Washington, DC; Englert, John - NRCS, Washington, DC; Branham, Sharif - NRCS, Washington, DC; Wickey, Kevin - NRCS, Washington, DC; Simon, Kurt - OSEC, Washington, DC; Bachmann, Peter - OCR, Washington, DC; CloverAdams, Jamie - OSEC, Washington, DC; Finley, Amanda - RMA; Fritscher, Justin - NRCS, Washington, DC; Boozer, Astor - NRCS, Washington, DC; Montoya, Xavier - NRCS, Albuquerque, NM; Taylor, Myron - NRCS, Washington, DC; Erickson, Terrell - NRCS, Washington, DC |
| **Subject:** | Acting Chief"s Meeting with Agriculture Stakeholders - July 25 |
| **Date:** | Thursday, July 19, 2018 4:23:00 PM |

SENT ON BEHALF OF LESLIE DEAVERS

All,

Acting Chief Jordan is hosting a stakeholder meeting on July 25 at 1:00 p.m. in Room 5006-S to discuss updates that are planned for the Wetland Conservation provisions at 7 CFR Part 12. These updates were included on the USDA Spring Regulatory Agenda that was published on May 9th, 2018. Although you are likely familiar with several of the changes which have been discussed in meetings over the past several years, NRCS would like to present the changes in total and bring you up to date with the current effort.

The updates are being developed to ensure the regulatory provisions are consistent with statutory requirements, apply current technical standards, and provide the public with transparency and consistency in implementation of the provisions. Key changes include:

- Following up on past administrative actions by confirming the certification status of wetland determinations completed between November 28, 1990, and July 3, 1996, to ensure consistency with statutory requirements.

- Specifying the continued use of the 1971-2000 precipitation dataset for consistent determinations.

- Adding definitions of pothole, playa, and pocosins to provide consistency and predictability.

- Updating hydrology criteria to focus on observations in-field rather than on days of saturation and flooding.

- Streamlining wetland minimal effect exemptions.

Please RSVP to Mary Katharine Grady if you plan on attending. Mary Katharine can be reached at 202-720-3210 or by e-mail at mary.grady@wdc.usda.gov.

July 25, 2018

Sonny Perdue, Secretary
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

Leonard Jordan, Acting Chief
Natural Resource Conservation Service, Office of the Chief
1400 Independence Ave., S.W., Room 5105-A
Washington, DC 20250

      **Re:     Preliminary Comments on Proposed Changes to the Wetland Conservation
             Provisions at 7 C.F.R. part 12**

On behalf of the National Wildlife Federation and Izaak Walton League of America (IWLA) we
are submitting preliminary comments on the Natural Resource Conservation Service's (NRCS)
proposed changes to the wetland conservation provisions at 7 C.F.R. part 12. NRCS proposes to
implement several significant changes to the wetland conservation provisions with an interim
final rule, to be published in August 2018.

The undersigned groups, representing millions of people across the country, are concerned about
procedural and substantive flaws in this proposal, and urge the agency to correct these errors and
offer ample time for public input before proceeding further with this ill-advised rulemaking.
Wetlands are among the most important habitats in the world, and provide an essential ecological
functions and values, including nutrient cycling, water filtration and purification, nutrient sinks,
and water storage. Despite the myriad benefits and significant economic value of wetlands, well
over half of the wetlands that once existed in the coterminous US have been drained or filled for
development or agriculture.

Serious concerns over the continued destruction and degradation of wetland habitat due to
agricultural practices led Congress to take definitive action to protect agricultural wetlands in the
1985 Farm Bill. Congress renewed protections for agricultural wetlands in subsequent Farm Bills
passed in 1990, 1996, 2002, 2008, and 2014, affirming the importance of wetland conservation
to the administration of USDA benefits, and repeatedly expressing Congress's intent to continue
and improve the conservation program. It is critical to ensure that wetland conservation
compliance remains a strong conservation tool.

Based upon the information provided, we are extremely concerned that NRCS's proposed action
is contrary to the very purposes of these wetland conservation provisions, and threatens to hasten
the destruction and degradation of agricultural wetlands, particularly seasonal prairie pothole
wetlands. Additionally, the undersigned groups remind NRCS that it must issue an
Environmental Impact Statement pursuant to the National Environmental Policy Act, and
undergo Section 7 consultation pursuant to the Endangered Species Act, *prior* to issuing any
interim rule in order to comply with federal environmental statutes.

001388

Before publishing this rule, we urge NRCS to provide more opportunities for public engagement, to undergo an EIS and Section 7 consultation, and to ensure that any changes to wetland compliance do not undermine the program.

Signed,

Jan Goldman-Carter
Senior Director, Wetlands and Water Resources
**National Wildlife Federation**

Duane Hovorka
Agriculture Program Director
**Izaak Walton League of America**



July 27, 2018

**<u>Via Certified Mail and Email Delivery</u>**

Sonny Perdue, Secretary
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

Leonard Jordan, Acting Chief
Natural Resource Conservation Service, Office of the Chief
1400 Independence Ave., S.W., Room 5105-A
Washington, DC 20250

James E. Tillman, Sr., Acting Associate Chief for Conservation
Natural Resource Conservation Service, Office of the Chief
1400 Independence Ave., S.W., Room 5105-A
Washington, DC 20250

> **Re:    Preliminary Comments on Proposed Changes to the Wetland Conservation
> Provisions at 7 C.F.R. part 12**

On behalf of the National Wildlife Federation ("NWF"), I am submitting comments on the Natural Resource Conservation Service's ("NRCS") proposed changes to the wetland conservation provisions at 7 C.F.R. part 12. NRCS proposes to implement several significant changes to the wetland conservation provisions with an interim final rule, to be published in August 2018. NWF was notified of this intent by way of an email inviting its participation in a stakeholder meeting scheduled to take place only one week after the email was received. The invitation did not contain any draft language or supporting materials that would have been useful to developing robust comments and fostering meaningful public participation *prior* to the publication of the interim rule. As a result of NRCS's failure to provide necessary information about its proposed action, these comments are preliminary, and NWF expects NRCS to comply with its statutory mandate and the Administrative Procedure Act ("APA") by providing a full opportunity for comment.

With these comments, NWF alerts NRCS to serious procedural and substantive flaws already apparent in its proposal, in order to provide the agency the opportunity to correct the errors before it proceeds further with this ill-advised rulemaking. Additionally, NWF reminds NRCS that it must issue an Environmental Impact Statement ("EIS") pursuant to the National

Moreover, there can be no legitimate dispute that the impacts from NRCS's proposed regulation will be "significant" within the meaning of NEPA. In fact, NRCS' action implicates numerous "significance" factors that necessitate the preparation of an EIS, including the policy's impacts to wetlands and other ecologically significant areas, the uncertainty of the policy's effects on the environment, the degree to which the environmental effects are likely to be highly controversial, the precedential nature of this change in policy, and the policy's potential impacts on endangered and threatened species. 40 C.F.R. § 1508.27. Finally, the large-scale draining of agricultural wetlands will unquestionably result in ecological, aesthetic, cultural, economic, and social effects on the natural and physical environment. *Id.* §§ 1508.14, 1508.27. Therefore, under NEPA, NRCS is required to prepare an EIS to assess the alternatives to, and impacts of, its proposed changes to the wetlands conservation provisions. *Accord Humane Soc'y of the U.S. v. Johanns*, 520 F. Supp. 2d 8 (D.D.C. 2007) (finding that promulgation of interim final rule governing the administration of a federal program constitutes a major federal action with reasonably foreseeable significant impacts such that the agency was required to subject its interim rule to NEPA analysis prior to its promulgation).

NRCS' obligation to prepare an EIS is only compounded by the fact that the proposed changes to the wetland conservation provisions will be published as interim rules that are immediately effective. The NEPA process represents the only opportunity for the public to provide meaningful input on the environmental impacts of the proposed changes *before* they are implemented. Therefore, to serve NEPA's goal of ensuring "fully informed and well-considered decision[s] by federal agencies, " *See Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017), NRCS must prepare and issue an EIS prior to any interim rule.

## III.    The ESA Requires that NRCS Undergo Section 7 Consultation Prior to Promulgating its Proposed Interim Rule.

Completion of the ESA's consultation process is vital to compliance with the Act's substantive mandates. "Absent consultation with [the FWS], there is no confirmation that [the agency's action] would avoid jeopardizing threatened or endangered species or adversely modifying critical habitat." *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 21 (D.D.C. 2014) (citations omitted). NRCS must undertake the legally mandated process for analyzing and addressing impacts to listed species and their habitat *before* implementing this final interim rule that *will* indisputably harm myriad listed species in various ways.

Wetlands are crucial habitat for at least one third of all plants and animals listed as threatened or endangered under the ESA. *See, e.g.*, Nat'l Park Serv., *Why Are Wetlands Important?*, https://www.nps.gov/subjects/wetlands/why.htm. Nearly half of all listed species use wetlands at some point during their lifecycle. *See, e.g.*, Roddy Scheer & Doug Moss, *Why Are Wetlands So Important to Preserve?*, Scientific Am., https://www.scientificamerican.com/article/why-are-wetlands-so-important-to-preserve/. Since the 1700s, more than half of the 221 million acres of wetlands that once existed in the lower forty-eight states have been

---

A at 4-5. Additionally, NRCS seeks to use a static 30-year precipitation data set *precisely because* it will result in fewer protected wetlands subject to the wetland conservation provisions. *See* Attach. C at 1.