**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL WILDLIFE FEDERATION, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-02416 (TSC) |
| | ) | |
| LOHR, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

---

**JOINT APPENDIX OF ADMINISTRATIVE RECORD**

**VOLUME 2**

---







# HIGHLY ERODIBLE LAND CONSERVATION AND WETLAND CONSERVATION



Interim Rule
Environmental Assessment
August 2018







001402

**USDA Nondiscrimination Statement**
The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and where applicable, sex, marital status, family status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or a part of an individual's income is derived from any public assistance program.  (Not all prohibited bases apply to all programs.)  Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at 202-720-2600 (voice and TDD).  To file a complaint of discrimination write to USDA, Director, Office of Civil Rights, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410 or call 800-795-3272 (voice) or 202-720-6382 (TDD).  USDA is an equal opportunity provider and employer.

**Table of Contents**

1.    Introduction.................................................................................................................1

2.    Need for Action .........................................................................................................3

3.    Alternatives ...............................................................................................................3

   A.    No Action ...........................................................................................................3

   B.    Proposed Action Alternative – Amend the regulations .......................................3

   C.    Alternatives considered but eliminated from detailed analysis..........................5

4.    Affected Environment ...............................................................................................6

5.    Environmental Impacts.............................................................................................8

6.    Persons and Agencies Consulted............................................................................11

7.    References................................................................................................................12

# 1. Introduction

The United States Department of Agriculture (USDA) is issuing an interim rule for the Highly Erodible Land and Wetland Conservation Compliance provisions of the Food Security Act of 1985, as amended, hereafter referred to as the "conservation compliance provisions". The Food Security Act of 1985, as amended (the 1985 Act), requires producers participating in many programs administered by USDA to abide by certain conditions on any land owned or farmed that is highly erodible or wetland. Producers participating in these programs, and any person or entity considered to be an "affiliated person" of the producer, are subject to these conservation compliance provisions. The current regulations for conservation compliance are set forth in 7 CFR Part 12.

To be eligible for most programs administered by the Farm Service Agency (FSA), the Natural Resources Conservation Service (NRCS), and the Risk Management Agency (RMA), conservation compliance requires producers to apply a conservation system if they plant annually tilled crops on highly erodible land and prohibits producers from planting an agricultural commodity on a converted wetland or converting a wetland to make possible the production of an agricultural commodity. Several USDA agencies administer portions of the conservation compliance provisions. NRCS responsibilities include making technical determinations to identify highly erodible land and wetland, determining whether certain technical exemptions apply, and determining whether wetland conversion has occurred.

Conservation compliance does not apply to planting or production of perennial crops, structures built to support livestock and poultry production, or other structures on highly erodible land or wetland. Other Federal, State, and local laws that regulate activities in wetlands may apply regardless of the conservation compliance provisions and participation in USDA programs. Wetland determinations made for the purpose of conservation compliance are not necessarily valid for Clean Water Act permitting or other laws regulating activities in wetlands.

Producers choose whether to comply with the conservation provisions based on their desire to participate in covered USDA programs. NRCS helps producers comply by making highly erodible land and wetland determinations. NRCS provides this technical assistance consistent with the regulations in 7 CFR Part 12 and internal agency policy in the National Food Security Act Manual (NFSAM).

To implement the wetland conservation components of the conservation compliance provisions (the WC provisions), USDA includes in 7 CFR Part 12 definitions of terms; identification procedures for highly erodible land, wetland, and converted wetland; and exemptions from ineligibility for wetlands and converted wetlands. The last update to 7 CFR Part 12 was completed in 2015, in accordance with the amendments made by Sections 2609 and 2611 of the Agricultural Act of 2014 (2014 Act), which relinked eligibility for USDA crop insurance premium subsidies with the conservation compliance provisions. With this interim rule, USDA seeks to make minor changes to 7 CFR Part 12 to codify how NRCS makes technical determinations for land subject to the conservation compliance provisions.

The National Environmental Policy Act of 1969 (NEPA) requires that Federal agencies prepare Environmental Impact Statements (EIS) for major federal actions significantly affecting the quality of the human environment.  In addition, the Council on Environmental Quality (CEQ) regulations implementing NEPA (40 CFR Parts 1500-1508) require Federal agencies to prepare Environmental Assessments (EAs) to assist in determining whether they need to prepare an EIS for actions that have not been categorically excluded from the requirement.

The CEQ has defined "major federal action" to include activities over which Federal agencies have control, including promulgation of regulations in which they exercise discretion. In the case of the conservation compliance provisions, Congress has prescribed many requirements in statute, and there is little discretion remaining for USDA to exercise. Many decisions that do remain are administrative in nature and fall within a category of activities excluded from the requirement to prepare an EIS. Despite this, USDA has decided to prepare this EA to review the environmental impacts of the proposed clarifications in 7 CFR Part 12.

CEQ has indicated that because an EA is a concise document, the purpose of which is to determine the need for an EIS, it should not contain long descriptions or detailed data which the agency may have gathered. Rather, it should contain a brief discussion of the need for the proposal, alternatives to the proposal, the environmental impacts of the proposed action and alternatives, and a list of agencies and persons consulted.

USDA prepared EAs to analyze the environmental impacts of administering the conservation compliance provisions in 1986, 1990, and 1996. The relevant portions of those EAs are incorporated herein by reference. The 2015 update to 7 CFR Part 12 was determined not to require analysis under NEPA because the changes were either mandated by Congress in the 2014 Act and USDA had no discretion over their implementation, or were administrative in nature and fell within a category of activities excluded from the requirement to prepare an EIS.

Provision of financial assistance to producers under USDA programs are also discretionary actions subject to NEPA. As such, FSA and NRCS comply with their NEPA implementing regulations and policy when providing financial assistance, as well as other laws, regulations, Executive Orders (EO) and policy for the protection of the environment. This includes the Endangered Species Act, Clean Water Act, and EO 11990 on the Protection of Wetlands. FSA and NRCS conduct site-specific environmental evaluations before providing financial assistance to identify potential impacts to wetlands, plant and animal species of concern, and other resources; and to document how compliance with NEPA and other requirements have been met. If potential adverse impacts are anticipated, the agency identifies (in consultation with other agencies as required by law) alternatives to avoid, minimize, or mitigate adverse impacts whenever practicable. If no practicable alternatives exist or the producer will not agree to implement such alternative, the agency will not provide the financial assistance.

Producers receiving USDA financial assistance for activities that would affect wetlands are responsible for obtaining any necessary permits, such as those required under the Clean Water Act, and applicable State and local laws. Wetlands are defined differently within various Federal and State programs and for identification, delineation, and classification purposes.  USDA's

2

identification of wetlands subject to site-specific review under NEPA and potentially under the jurisdiction of other laws, includes areas that exhibit indicators of hydric soil, hydrophytic vegetation, and wetland hydrology, regardless of their identification pursuant to the WC provisions or the applicability of any exemptions from ineligibility.

## 2. Need for Action

The proposed clarifications are needed to ensure that the regulations are consistent with the current technical standards being applied by NRCS in making technical determinations. In amending the regulations as proposed, USDA seeks to codify the technical determination procedures it uses, for the purposes of providing the public with transparency, providing certainty to USDA program participants, and improving the consistency of how the conservation compliance provisions are implemented by USDA in all 50 States, including the Caribbean and Pacific Island Areas. Publication of the interim rule will provide the public an opportunity to review the clarifications and provide comments to help USDA better explain the wetland identification procedures used by NRCS. This will result in improved communication, better understanding by USDA program participants of the wetland determination process, and transparency for the public.

## 3. Alternatives

### A. No Action

Under the No Action Alternative, USDA would not update its regulations at 7 CFR Part 12. NEPA regulations at 40 CFR 1502.14 require analysis of a no action alternative as a basis for comparison against the proposed action.

Because the proposed changes to the interim rule would merely clarify some aspects of the technical procedures already being used by USDA, the main difference between the No Action and Proposed Action alternatives is that under the No Action Alternative, USDA would not provide transparency to the public concerning the procedures it uses to make wetland determinations, and the public would not have the opportunity to provide comment to help USDA better explain the wetland identification process. Therefore, the No Action Alternative would not meet the purposes of or need for the proposed action.

### B. Proposed Action Alternative – Amend the regulations

USDA proposes to make the following clarifying amendments to the regulations at 7 CFR Part 12:

1. <u>Precipitation data used in wetland determinations</u>: The WC provisions define "wetland" in reference to normal circumstances, but wetlands are dynamic systems that can vary based on changing climatic conditions. NRCS uses a precipitation data set based on U.S. Climate Normals during the 1971-2000 period in reference to determining "normal circumstances". NRCS believes the use of this specific precipitation dataset ensures the consistency of determinations over time and represents normal climatic conditions at

enactment of the 1985 Act, especially when evaluating the scope and effect of any drainage features that were installed prior to 1985. The current regulation does not identify the use of any particular precipitation dataset. In amending the interim rule, USDA proposes to identify the precipitation data set that has been used by NRCS for nearly 20 years.

2. <u>Definitions of pothole, playa, pocosin and other terms</u>: Due to their residual function, unique hydrology criteria are applied to depressional wetlands identified as potholes, playas, and pocosins that were manipulated prior to 1985, though such wetland landforms are not defined in regulation. Defining these terms will provide increased consistency in their identification and greater transparency and predictability for the public. USDA plans to put into regulation the definitions that were established in policy in 1996.

   USDA is also adding definitions of the terms "best drained condition", "normal climatic conditions", and "wetland hydrology" to clarify how these terms have long been used in policy, training, and application; and revising the definition of "wetland determination" to  clarify how hydrology indicators are used in assigning WC provision labels of Prior Converted Cropland, Farmed Wetland, and Farmed Wetland Pasture.

3. <u>Certification of wetland determinations</u>: NRCS began making wetland determinations in 1986, but the Food, Agriculture, Conservation, and Trade Act of 1990 (1990 Act) required NRCS to certify wetland determinations. The 1990 Act directs USDA to delineate wetlands on a map, provide notice to affected producers, certify each map as sufficient evidence to determine ineligibility, and provide producers an opportunity to appeal the mapped delineation prior to the certification becoming final. As stated in the 1990 Act's Conference Report, the certification process was "to provide farmers with certainty as to which of their lands are to be considered wetlands" for purposes of the WC provisions. These 1990 Act requirements were incorporated into the April 23, 1991 version of 7 CFR Part 12. As required by The Federal Agriculture Improvement and Reform Act of 1996 (1996 Act), certified wetland determinations remain valid and in effect as long as the land is in agricultural use or until the producer makes a valid request for review of the determination.

   The 1996 interim rule at §12.3 identified that determinations completed after July 3, 1996, are considered certified and that "Actions taken and determinations made prior to July 3, 1996, are subject to regulations set forth in this part as of July 2, 1996, except as otherwise provided in this part."  While the 1996 interim rule in §12.21(c) specified that wetland determinations made after July 3, 1996 would be considered certified, it did not specifically identify the certification status of pre-July 3, 1996 wetland determinations. However, under the pre-July 3, 1996 version of the regulations, a wetland determination was certified if it was delineated on a map, notice was provided to the producer that such determination was sufficient for determining ineligibility, and the producer was given an opportunity to appeal the determination.  USDA is updating the rule to clarify that wetland determinations completed between November 28, 1990 and July 3, 1996 under the regulations in effect from April 23, 1991 through July 2, 1996 are certified if they meet the requirements for certification in the 1990 Act and associated regulation.  This additional language in §12.21(c) is for clarification purposes, and does not change the

4

legal status of any wetland determination made between November 28, 1990 and July 3, 1996, nor does NRCS have discretion to change certified wetland determinations except under the limited circumstances identified in the current regulations. Thus, the clarifying language in this rule does not change in any way how NRCS administers the certified wetland determination portion of the WC provision, the regulatory basis for certified wetland determinations, nor how such determinations are certified as a matter of law.

4. <u>Simplification of hydrology criteria</u>: Current regulatory language provides hydrology criteria with reference to the "number of days" of inundation or soil saturation for the wetland types of farmed wetland, farmed wetland pasture, and prior converted cropland. The wetland scientific community has moved away from establishing any such "number of days" standard which cannot reasonably be applied over broad geographic regions. USDA proposes to provide greater technical detail on the indicators used to determine if hydrology criteria are met when assigning WC provision labels for Prior Converted Cropland, Farmed Wetland, and Farmed Wetland Pasture. As documenting a certain number of days of inundation or saturation is a difficult and seldom-used practical standard, this change is not expected to affect the scope of protection currently afforded to farmed wetlands and farmed wetland pasture.

5. <u>Wetland minimal effect exemption</u>: The 1985 Act provides for an exemption for wetland conversions which have only a minimal effect on the functional hydrological and biological value of the wetland and other wetlands in the area. Current regulatory language requires the minimal effect determination be based upon a functional assessment made during an on-site evaluation, even for other wetlands in the area. This requirement is overly burdensome and on-site evaluations cannot always be made on property not controlled by the subject person. Removing this requirement will better allow USDA to provide this statutory exemption to USDA program participants, but is not expected to provide a substantially different decision than the current language, as effective functional assessments can also be conducted remotely.

6. Other minor technical corrections.

## C. Alternatives considered but eliminated from detailed analysis

USDA considered an alternative of updating its regulations as proposed under Alternative B, except the precipitation dataset used in making wetland determinations would change every 10 years to one based on the most recent 30-year U.S. Climate Normals dataset (currently 1981-2010.) This alternative was eliminated from detailed analysis because it would not meet the need for the proposed action to ensure that the regulations are consistent with the current technical standards being applied by NRCS in making wetland determinations. It also would undermine the purpose of the proposed action to provide certainty to producers and go against Congressional intent to provide certainty as expressed in the Conference Manager's Report for the 1990 Act and strengthened in statutory language in the 1996 Act.

## 4. Affected Environment

The Affected Environment was described in the U.S. DEPARTMENT OF AGRICULTURE ENVIRONMENTAL ASSESSMENT FOR THE WETLAND CONSERVATION PROVISIONS OF THE FOOD SECURITY ACT 1985, completed in June 1986, and applicable portions of the description there are incorporated herein by reference and updated below.

In 1991, NRCS' National Resources Inventory (NRI) completed a wetlands survey that confirmed wetland conversions had slowed compared to those occurring before the 1985 Act and that agricultural activities seemingly had less impact on wetland conversions than expected (Schnepf 2008.) The Wetland Reserve Program (now the Wetland Reserve Easement component of the Agricultural Conservation Easement Program) authorized by Congress in 1990 and offered nationwide by 1995 has helped to restore wetland hydrology to millions of acres of cropland. The Conservation Reserve Program authorized in 1985 and first available in 1986 also helps protect wetlands in agricultural landscapes. In fact, the period between 1997 and 2007 was the first decade in modern history that saw a nationwide increase in palustrine and estuarine wetlands (U.S. Department of Agriculture, 2015b.) Most of the gains were in the highly agricultural central region of the U.S.

The 2010 NRI Summary Report included an analysis of data (Sucik and Marks 2014) showing the status and recent trends of wetlands in each of NRCS' four Regions (Figure 1). The NRI uses a modified Cowardin (Cowardin et al., 1979) classification system to recognize five different types of wetland and deepwater habitats; marine (oceans), lacustrine (lakes), riverine (rivers), estuarine (saltwater marsh), and palustrine (freshwater marsh). The analysis combines these into two major categories: palustrine and estuarine wetlands and other aquatic habitats. Palustrine and estuarine wetlands comprise nearly 70% of wetlands in the U.S. outside of Alaska.



**Figure 1. NRCS regional boundaries.**

The analysis shows the Northeast region of the U.S. experienced a gradual loss of over 100,000 acres of palustrine and estuarine wetlands between 1992 and 2010. Urban development was the primary reason for wetland losses in the Northeast.

The Southeast Region had a modest gain in total wetland acres between 1992 and 2010, but there was a reduction of more than 200,000 acres of palustrine and estuarine wetlands there according to NRI data. Wetland losses in the Southeast are also driven primarily by urbanization as well as rising sea levels. Despite the losses, the Southeast Region remains rich in wetlands. As of 2010, the Southeast contained 17% of the land area in the conterminous U.S., but 43% of the nation's palustrine and estuarine wetlands.

The Central Region leads production of corn, soybeans, wheat, sorghum, and cotton. However, despite increases in land values and demand for these commodity crops, the region has seen an increase in palustrine and estuarine wetland acres since 1992.

Due to the West Region's arid climate, only about 1% of the nation's non-federal wetlands occur there, after Alaska is excluded. NRI data show a modest, slow and steady increase in the restoration and creation of palustrine and estuarine wetlands between 1992 and 2010.

About 70% of land in the U.S. is privately owned and many of the Nation's remaining wetlands occur on working lands devoted to the production of food, fiber, and forest products. Population growth results in increased urbanization that contributes to the continued loss of agricultural and forest lands and the wetlands they support. In addition, agricultural producers make economic decisions regarding land use that continue to contribute to wetland conversion, often on lands not subject to the WC provisions. Producers may decide the value of USDA benefits is less than the value of economic returns they can expect from converting wetlands to commodity crop production, especially when commodity prices are high. The WC provisions do not apply to conversion activities conducted by non-USDA participants. Other agricultural activities that can result in loss of wetlands and are exempt from the WC provisions include planting and production of perennial crops such as blueberries and almonds, construction of structures such as barns, installation of agricultural infrastructure, and creation of ponds for livestock water or irrigation.

Climate plays an important role in the genesis and identification of wetlands. U.S. Climate Normals are three-decade averages of climatological variables including temperature and precipitation. This dataset contains daily and monthly normals of temperature, precipitation, snowfall, heating and cooling degree days, frost/freeze dates, and growing degree days calculated from observations at approximately 9,800 stations operated by the National Oceanic and Atmospheric Administration's (NOAA's) National Weather Service. Every 10 years, NOAA's National Centers for Environmental Information (NCEI) updates the 30-year dataset. The 1981–2010 U.S. Climate Normals dataset is the latest release of NCEI's Climate Normals. In the early 2020s, a dataset based on precipitation averages from the period 1991-2020 will become available.

Compared with the same calculations for 1971–2000, the 1981-2010 dataset shows fewer days with snow on the ground and less total annual snowfall across much of the contiguous United States; wetter conditions over much of the Great Plains, Midwest, and northern California; and drier conditions over much of the Southeast and Pacific Northwest (Arguez, et al. 2012, Durre, et al. 2013, Figure 2).



**Figure 2. Percent difference between precipitation normals for 1981–2010 and comparable averages for the 1971–2000 period. Only stations with at least 25 years of complete monthly data in both time periods are plotted. From: Arguez, et al. 2012.**

NRCS Climate Analysis for Wetlands Tables, known as the WETS Tables, were developed to help identify average climatic conditions which can affect the presence of wetland hydrology. The WETS Tables define the normal range for monthly precipitation and growing season required to assess the climatic characteristics for a geographic area over a representative period.

# 5. Environmental Impacts

Under both the No Action and Proposed Action Alternatives, NRCS would continue to use its existing technical procedures, therefore the environmental impacts described below are the same for both Alternatives. USDA's administration of the WC provisions would continue to discourage agricultural producers from converting wetlands to commodity crop production. However, eligibility for USDA benefits is only one of a producer's considerations when deciding whether to convert wetlands on land they farm or own to agricultural production or other uses and compliance with the WC provisions remains voluntary.

Adding and modifying the definitions of terms in the regulations will not change the way USDA identifies wetlands subject to the WC provisions, and therefore will not have any environmental impact.

Removing the requirement to conduct an on-site functional assessment of wetlands in the area to determine whether a minimal effect exemption applies is also not expected to result in

substantive differences in the extent of wetlands subject to the WC provisions. The requirement to evaluate the functional hydrological and biological value of wetlands in the area when determining minimal effect is set in the U.S. Code. However, NRCS does not usually have permission to make on-site visits to conduct functional assessments on wetlands in the surrounding area of a wetland where a minimal effect exemption has been requested. As better quality aerial imagery, Light Detection and Ranging (LiDAR) data, and other remote sensing technology has become available, NRCS is able to complete accurate functional assessments offsite. NRCS will continue to make an onsite visit of the subject land to conduct an onsite functional assessment of the area where a minimal effect exemption has been requested.

Congress has made clear that USDA is to provide certainty to producers that the extent of wetlands mapped under final certified wetland determinations will not change over time. As stated in the 1990 Act Conference Manager's Report, the purpose of certification of wetland determinations "is to provide farmers with certainty as to which of their lands are considered wetlands" for purposes of compliance with the WC provisions. The 1996 Farm Bill strengthened statutory certainty for producers by ensuring that certified wetland determinations remain valid and in effect as long as the land is used for agricultural purposes, unless the producer requests a review from USDA. USDA clarified in the 1996 interim rule that a person may request review of a certification only if a natural event alters the topography or hydrology of the subject land to the extent that the final certification is no longer a reliable indication of site conditions, or if NRCS concurs with an affected person that an error exists in the current wetland determination. Because of the certification requirements in statute and regulation, USDA has no discretion to re-determine certified wetland determinations (i.e., those conducted after November 28, 1990 that meet the notification, provision of appeal rights, and mapping requirements) unless a violation of the WC provisions has occurred, or the person requests review under the limited circumstances allowed by regulation. The language in the interim rule on certification is simply a restatement of the original regulatory provision and no change is being made to these determinations' regulatory status as being certified or not certified.

Identifying a specific precipitation dataset based on the 1971-2000 U.S. Climate Normals used in making decisions regarding the presence or absence of wetland hydrology will also meet Congress' intent to provide certainty for producers. If NRCS updated the precipitation dataset used based on current U.S. Climate Normals, the total acres of wetlands identified as subject to the WC provisions would change every 10 years. Areas previously identified as wetland might no longer meet the criteria and vice versa. Under the 1981-2010 dataset, more acres of wetlands would be identified than under the 1971-2000 dataset, due to an overall increase in precipitation. However, the differences would not be evenly distributed nationwide. More acres would be mapped in regions experiencing increases in precipitation, such as the Great Plains, Midwest, Northern California and fewer acres would be mapped in those experiencing less precipitation (Southeast and most of the arid West.) USDA program participants in areas experiencing a decrease in precipitation since 1981 could request review of their certified wetland determinations based on a decrease in hydrology, and new determinations would result in fewer acres of wetlands subject to compliance and increases in wetlands converted to the production of agricultural commodities. These changes would be most likely to result in the Southeast, which is still experiencing loss of palustrine and estuarine wetlands and the arid West, where the extent of wetlands is naturally limited and therefore disproportionately important to maintain.

Future decadal updates of the U.S. Climate Normals would likely include periods of widespread and severe drought, particularly in the West and Great Plains. If NRCS decided to continually update to the current decadal dataset, such periods would result in fewer acres of wetland identified as subject to the WC provisions.

The overall impact of maintaining use of the 1971-2000 dataset is expected to be negligible over time. This is because NRCS must determine the hydrology conditions that existed under "normal circumstances." NRCS's evaluation of normal circumstances includes not only normal climatic conditions reflected in the precipitation data, but also drainage actions and other manipulations that enabled agricultural use of wetlands before passage of the 1985 Act. Pre-1985 manipulations are "grandfathered in" by the statute as part of normal circumstances. In other words, when NRCS makes a certified wetland determination, the decision on a positive indicator for wetland hydrology is often based on conditions that existed on the site on or before December 23, 1985, after any hydrologic manipulations made before that date. December 23, 1985 falls near the middle of the 1971-2000 precipitation dataset, which therefore represents the normal climatic conditions at that time.

In addition, as discussed above, NRCS has no authority to change final certified wetland determinations, except under limited circumstances. Changing the precipitation dataset used to make wetland determinations over time could result in the same landform area extending across field boundaries being assigned different wetland statuses (i.e. wetland or non-wetland) and exemption labels, based on when the determination was made. The resulting certified wetland delineation map would not be scientifically or politically defensible.

Since the 1996 interim rule, NRCS must also determine the number of days inundation or saturation is or would be present under normal circumstances, to distinguish between wetlands converted to commodity crop production before December 23, 1985 that had little or no remaining hydrology (Prior Converted Cropland) and those that had sufficient hydrology remaining to meet the definition of wetland (Farmed Wetland or Farmed Wetland Pasture.) In practice, it is not possible to ascertain the number of days hydrology is present without the installation of monitoring equipment and observation of data collected over several years of normal climatic conditions. Therefore, NRCS almost always determines the presence or absence of wetland hydrology under normal circumstances based on indicators, including remotely-sensed data as described in NRCS' Engineering Field Handbook Chapter 19, *Hydrology Tools for Wetland Delineation.*

Remotely sensed data includes aerial photography, multi-spectral imagery (including infrared), and other image sources. Such data is commonly used to help make wetland determinations on cropland, as it provides a useful opportunity to assess site conditions over a period of time. NRCS evaluates the images for signatures that indicate the presence of wetland conditions on the ground. Wetness signatures in an image are evidence that wet conditions existed on or before the date that the image was collected. A series of images, collected during years when precipitation was normal or drier than normal, is used to determine whether wetland hydrology is present in most years. WETS Table data, collected from a weather station near the wetland determination site, is used to determine whether the image is reflective of normal climatic conditions. Because

10

NRCS often must determine the wetland hydrology conditions that existed on or before December 23, 1985, it needs to use climate data collected for enough years prior to that date to ensure evaluation of images taken during normal or drier climatic periods. Sufficient years of climate data prior to December 23, 1985 is provided by the 1971-2000 precipitation dataset, but would not be by the current (1981-2010) or future datasets.

Because NRCS commonly uses the precipitation dataset to evaluate the presence of wetland hydrology on crop and pasture land as indicated by signatures on a series of aerial images under normal climatic conditions, continually updating to the current 30-year dataset would make it more difficult for NRCS to render accurate certified wetland determinations based on the intent of Congress to "grandfather in" hydrology manipulations resulting in conversions of wetlands that were completed or commenced prior to December 23, 1985. Further, the current dataset in use would continue to change over time, decreasing the certainty Congress intended to provide to producers.

In summary, most of the changes to the current regulations as described in the proposed action are administrative in nature and the remainder simply clarify some aspects of the technical procedures already being used by NRCS.  Therefore, the proposed action is not expected to substantially change the extent of agricultural lands subject to the conservation compliance provisions over time, and so will not have any significant direct, indirect, or cumulative impact on the environment. In addition, Congress has prescribed many requirements USDA must follow when implementing the conservation provisions, and USDA has no discretion to deviate from the authority as provided by Congress. The proposed action is intended to provide transparency to producers and stakeholder organizations about how NRCS determines, delineates, and certifies wetlands located on subject land in a manner sufficient for making determinations of ineligibility for certain USDA program benefits.  Implementation of the proposed action will also allow producers to understand whether their actions will result in ineligibility for USDA program benefits by providing timely and scientifically-based wetland determinations.

## 6. Persons and Agencies Consulted

Lee Davis, NRCS, Biologist, Ft. Worth, TX
Andree DuVarney, NRCS, National Environmental Coordinator (retired)
Karen Fullen, NRCS, Environmental Compliance Specialist, Portland, OR
Martha Joseph, NRCS, Special Assistant, Washington, DC
James Marron, NRCS, National Water & Climate Center, (retired)
Melissa Martin, NRCS, Science Advisor, Washington, DC
Norman Melvin, NRCS, Wetlands Team Leader, (retired)
Jason Outlaw, NRCS, National Leader for Wetland and Highly Erodible Land Conservation, Washington, DC
Charile Rewa, NRCS, Conservation Effects Assessment Project Wildlife Component Leader, Beltsville, MD
Don Riley, NRCS, Environmental Compliance Specialist, Greensboro, NC
Daria Scala, Ph.D, NRCS, Management Analyst, Washington, DC
Jason Steele, NRCS, Management Analyst, Washington, DC

# 7. References

16 U.S. Code 3801-3824.

7 CFR Part 12.

Arguez, A., I. Durre, S. Applequist, R.S. Vose, M.F. Squires, X. Yin, R.R. Heim, and T.W. Owen, 2012: NOAA's 1981–2010 U.S. Climate Normals: An Overview. Bull. Amer. Meteor. Soc., 93, 1687–1697, https://doi.org/10.1175/BAMS-D-11-00197.1 Accessed July 3, 2018.

Cowardin, L.M., V. Carter, F.C. Golet, and E.T. LaRoe. 1979. Classification of Wetlands and Deepwater Habitats or the United States. U.S. Fish and Wildlife Service, Washington, DC. FWS/OBS-79/31, 131 pp.

Durre, I., M.F. Squires, R.S. Vose, X. Yin, A. Arguez, and S. Applequist, 2013: NOAA's 1981–2010 U.S. Climate Normals: Monthly Precipitation, Snowfall, and Snow Depth. J. Appl. Meteor. Climatol., 52, 2377–2395, https://doi.org/10.1175/JAMC-D-13-051.1 Accessed July 2, 2018.

Schnepf, Max. 2008. A History of Natural Resource Inventories Conducted by the USDA's Soil Conservation Service and Natural Resources Conservation Service. Soil and Water Conservation Society. Updated by Patrick Flanagan 2016. 40 pp.

Sucik, Michael T. and Elizabeth Marks. 2014. The Status and Recent Trends of Wetlands in the United States: 2010 National Resources Inventory, USDA Natural Resources Conservation Service, Ghent, NY, and Center for Survey Statistics and Methodology, Iowa State University, Ames, Iowa.

U.S. Department of Agriculture. 2015a. Hydrology Tools for Wetland Identification and Analysis, in Part 650 Engineering Field Handbook National Engineering Handbook, Natural Resources Conservation Service, Washington, DC.

U.S. Department of Agriculture. 2015b. Summary Report: 2012 National Resources Inventory, Natural Resources Conservation Service, Washington, DC, and Center for Survey Statistics and Methodology, Iowa State University, Ames, Iowa.

U.S. Department of Agriculture. 2000. Summary Report: 1997 National Resources Inventory (revised December 2000), Natural Resources Conservation Service, Washington, DC, and Statistical Laboratory, Iowa State University, Ames, Iowa, 89 pages.

U.S. House. 1990. Conference Report to Accompany Food, Agriculture, Conservation, and Trade Act of 1990, (H.R. Rep. No.101-916). Available from: The National Agricultural Law Center; Accessed: July 31, 2018.

**FINDING OF NO SIGNIFICANT IMPACT
FROM REVISING REGULATIONS IMPLEMENTATING THE
HIGHLY ERODIBLE LAND CONSERVATION AND WETLAND CONSERVATION
PROVISIONS OF THE FOOD SECURITY ACT OF 1985, AS AMENDED**

The National Environmental Policy Act (NEPA) requires Federal agencies to prepare an Environmental Impact Statement (EIS) for major Federal actions significantly affecting the quality of the human environment. The Natural Resources Conservation Service (NRCS) has completed an Environmental Assessment (EA) of its promulgation of a revised regulation codifying how USDA determines, delineates, and certifies wetlands located on subject land in a manner sufficient for making determinations of ineligibility for certain USDA program benefits and making other minor administrative changes. The NRCS Chief, the responsible Federal official, must determine if the proposed action, Alternative B of the EA, constitutes a major Federal action significantly affecting the quality of the human environment such that an EIS should be prepared.

In developing its proposed action, NRCS had to ensure the Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) provisions would be implemented in a manner that achieves the purposes of the provisions. As stated in the legislation, the purposes of the provisions are to remove certain incentives for persons to produce agricultural commodities on highly erodible land or converted wetland and to thereby—
    (1) Reduce soil loss due to wind and water erosion;
    (2) Protect the Nation's long-term capability to produce food and fiber;
    (3) Reduce sedimentation and improve water quality; and
    (4) Assist in preserving the values, acreage, and functions of the Nation's wetlands.

Because the proposed changes would merely codify some aspects of the technical procedures already being used by USDA, they are not expected to substantively change the extent of wetlands subject to the WC provisions. Continuing use of the 1971-2000 precipitation dataset may result in differences in acres of wetlands subject to the WC provisions being identified, but because USDA is required by statute to integrate hydrologic manipulations made before December 23, 1985 into its determination of wetland hydrology, the differences are expected to be minimal.

The EA evaluated the impacts of the proposed action, which is to make the following clarifying amendments to the regulations at 7 CFR Part 12:

1. Precipitation data used in wetland determinations: The WC provisions define "wetland" in reference to normal circumstances, but wetlands are dynamic systems that can vary based on changing climatic conditions. NRCS uses a precipitation data set based on U.S. Climate Normals during the 1971-2000 period in reference to determining "normal circumstances". NRCS believes the use of this specific precipitation dataset ensures the consistency of determinations over time and represents normal climatic conditions at enactment of the 1985 Act, especially when evaluating the scope and effect of any drainage features that were installed prior to 1985. The current regulation does not identify the use of any particular precipitation dataset. In amending the interim rule, USDA proposes to identify the precipitation data set that has been used by NRCS for nearly 20 years.

2. Definitions of pothole, playa, pocosin and other terms: Due to their residual function, unique hydrology criteria are applied to depressional wetlands identified as potholes, playas, and pocosins that were manipulated prior to 1985, though such wetland landforms are not defined in regulation. Defining these terms will provide increased consistency in their identification and greater transparency and predictability for the public. USDA plans to put into regulation the

definitions that were established in policy in 1996.

USDA is also adding definitions of the terms "best drained condition", "normal climatic conditions", and "wetland hydrology" to clarify how these terms have long been used in policy, training, and application; and revising the definition of "wetland determination" to clarify how hydrology indicators are used in assigning WC provision labels of Prior Converted Cropland, Farmed Wetland, and Farmed Wetland Pasture.

3. Certification of wetland determinations: NRCS began making wetland determinations in 1986, but the Food, Agriculture, Conservation, and Trade Act of 1990 (1990 Act) required NRCS to certify wetland determinations. The 1990 Act directs USDA to delineate wetlands on a map, provide notice to affected producers, certify each map as sufficient evidence to determine ineligibility, and provide producers an opportunity to appeal the mapped delineation prior to the certification becoming final. As stated in the 1990 Act's Conference Report, the certification process was "to provide farmers with certainty as to which of their lands are to be considered wetlands" for purposes of the WC provisions. These 1990 Act requirements were incorporated into the April 23, 1991 version of 7 CFR Part 12. As required by The Federal Agriculture Improvement and Reform Act of 1996 (1996 Act), certified wetland determinations remain valid and in effect as long as the land is in agricultural use or until the producer makes a valid request for review of the determination.

The 1996 interim rule at §12.3 identified that determinations completed after July 3, 1996, are considered certified and that "Actions taken and determinations made prior to July 3, 1996, are subject to regulations set forth in this part as of July 2, 1996, except as otherwise provided in this part." While the 1996 interim rule in §12.21(c) specified that wetland determinations made after July 3, 1996 would be considered certified, it did not specifically identify the certification status of pre-July 3, 1996 wetland determinations. However, under the pre-July 3, 1996 version of the regulations, a wetland determination was certified if it was delineated on a map, notice was provided to the producer that such determination was sufficient for determining ineligibility, and the producer was given an opportunity to appeal the determination. USDA is updating the rule to clarify that wetland determinations completed between November 28, 1990 and July 3, 1996 under the regulations in effect from April 23, 1991 through July 2, 1996 are certified if they meet the requirements for certification in the 1990 Act and associated regulation. This additional language in §12.21(c) is for clarification purposes and does not change the legal status of any wetland determination made between November 28, 1990 and July 3, 1996, nor does NRCS have discretion to change certified wetland determinations except under the limited circumstances identified in the current regulations. Thus, the clarifying language in this rule does not change in any way how NRCS administers the certified wetland determination portion of the WC provision, the regulatory basis for certified wetland determinations, nor how such determinations are certified as a matter of law.

4. Simplification of hydrology criteria: Current regulatory language provides hydrology criteria with reference to the "number of days" of inundation or soil saturation for the wetland types of farmed wetland, farmed wetland pasture, and prior converted cropland. The wetland scientific community has moved away from establishing any such "number of days" standard which cannot reasonably be applied over broad geographic regions. USDA proposes to provide greater technical detail on the indicators used to determine if hydrology criteria are met when assigning WC provision labels for Prior Converted Cropland, Farmed Wetland, and Farmed Wetland Pasture. As documenting a certain number of days of inundation or saturation is a difficult and seldom-used practical standard, this change is not expected to affect the scope of protection currently afforded to farmed wetlands and farmed wetland pasture.

2

5. Wetland minimal effect exemption: The 1985 Act provides for an exemption for wetland conversions which have only a minimal effect on the functional hydrological and biological value of the wetland and other wetlands in the area. Current regulatory language requires the minimal effect determination be based upon a functional assessment made during an on-site evaluation, even for other wetlands in the area. This requirement is overly burdensome and on-site evaluations cannot always be made on property not controlled by the subject person. Removing this requirement will better allow USDA to provide this statutory exemption to USDA program participants but is not expected to provide a substantially different decision than the current language, as effective functional assessments can also be conducted remotely.

6. Other minor technical corrections.

The EA accompanying this statement has provided the analysis needed to assess the significance of the impacts of the proposed action. I have determined, for the reasons outlined below, that there will be no significant individual or cumulative impacts on the quality of the human environment as a result of implementing the HELC and WC provisions or the clarifications to the HELC and WC provisions made by the interim final rule, particularly when focusing on the significant adverse impacts which NEPA is intended to help decisionmakers avoid and mitigate. Therefore, an EIS will not be prepared.

1. The proposed action will not result in significant adverse effects on public health or safety. The application of the HELC and WC provisions is expected to discourage USDA program participants from converting sensitive lands to agricultural production which will tend to reduce soil loss from wind erosion that can result in airborne particulate matter and improve water quality.

2. There is no evidence indicating there will be any significant adverse effects to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas from selection of the proposed action, particularly on a national basis. Implementation of the HELC and WC provisions are intended to benefit soil and water resources, including wetlands.

3. The effects of the HELC and WC provisions on the quality of the human environment are not controversial. USDA is seeking comments from the public about these clarifications which will be considered prior to issuing a final rule. If necessary, a supplemental EA or EIS may be prepared to ensure compliance with NEPA.

4. The proposed action is not considered highly uncertain and does not involve unique or unknown risks. USDA was first authorized to implement the HELC and WC provisions by The Food Security Act of 1985 (1985 Act.). National Resources Inventory data collected in 1991 showed the WC provisions slowed the conversion of wetlands to commodity crop production after the 1985 Act as intended by Congress. The proposed action does not change the procedures by which USDA identifies wetlands subject to the WC provisions according to current internal agency policy; it merely codifies those procedures and discloses them for public comment in the regulations.

5. The proposed action will not establish a precedent for future actions with significant adverse effects, nor does it represent a decision in principle about future considerations. The proposed action involves updating regulations to codify the wetland determination procedures used by NRCS and make minor administrative changes. Future updates to the regulations may result from changes Congress makes to the HELC and WC provisions or another decision by USDA

3

that further clarifications are needed.

6. The proposed action will result in providing the public with transparency, providing certainty to USDA program participants, and improving the consistency of how the WC provisions are implemented by USDA in all 50 States, including the Caribbean and Pacific Island Areas. Publication of the interim rule will provide the public an opportunity to review the clarifications proposed and provide comments to help USDA better explain the wetland identification procedures used by NRCS. This will result in improved communication, better understanding by USDA program participants of compliance requirements, and transparency for the public. As discussed in the EA, most of the proposed clarifications is not expected to substantially change the extent of agricultural lands subject to the conservation compliance provisions overtime, and so will not have any significant direct, indirect, or cumulative impact on the environment, particularly when focusing on the significant adverse impacts that NEPA is intended to help decisionmakers avoid, minimize, or mitigate. As the EA also indicates, to the extent that public comments received on the interim rule indicate the proposed action may have potential to result in significant adverse effects to the quality of the human environment, a supplemental EA or EIS may be prepared.

7. The proposed action will not adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or cause loss or destruction of significant scientific, cultural, or historical resources. Historic properties are not affected by USDA's implementation of the HELC and WC provisions. Conservation compliance is voluntary on the part of agricultural producers who wish to be eligible for USDA program benefits, and as such is not a federal action with the potential to affect historic properties.

8. The proposed action will not adversely affect endangered or threatened species, marine mammals, or critical habitat to any significant degree. Species and habitat protected under the Endangered Species Act are not affected by USDA's implementation of the HELC and WC provisions. Conservation compliance is voluntary on the part of agricultural producers who wish to be eligible for USDA program benefits, and as such is not a federal action with the potential to affect protected species or habitat. The proposed action would indirectly, by continuing to discourage conversion of wetlands to commodity crop production, aid in the conservation of endangered and threatened species that use wetland habitats.

9. The proposed action does not threaten the violation of Federal, State, or local requirements imposed for protection of the environment. Conservation compliance is voluntary on the part of agricultural producers who wish to be eligible for USDA program benefits and no federal action results from an agricultural producer's decision to comply. Compliance with other Federal, State, or local requirements remains the responsibility of individual agricultural producers.

Leonard Jordan                                              Date  11 / 05 / 2018
Acting Chief, Natural Resources Conservation Service
U.S. Department of Agriculture

4

**63046** **Federal Register** / Vol. 83, No. 235 / Friday, December 7, 2018 / Rules and Regulations

(37) Palm Bay-Melbourne-Titusville, FL—consisting of the Palm Bay-Melbourne-Titusville, FL MSA;

(38) Philadelphia-Reading-Camden, PA-NJ-DE-MD—consisting of the Philadelphia-Reading-Camden, PA-NJ-DE-MD CSA, except for Joint Base McGuire-Dix-Lakehurst;

(39) Phoenix-Mesa-Scottsdale, AZ—consisting of the Phoenix-Mesa-Scottsdale, AZ MSA;

(40) Pittsburgh-New Castle-Weirton, PA-OH-WV—consisting of the Pittsburgh-New Castle-Weirton, PA-OH-WV CSA;

(41) Portland-Vancouver-Salem, OR-WA—consisting of the Portland-Vancouver-Salem, OR-WA CSA;

(42) Raleigh-Durham-Chapel Hill, NC—consisting of the Raleigh-Durham-Chapel Hill, NC CSA and also including Cumberland County, NC, Hoke County, NC, Robeson County, NC, Scotland County, NC, and Wayne County, NC;

(43) Richmond, VA—consisting of the Richmond, VA MSA and also including Cumberland County, VA, King and Queen County, VA, and Louisa County, VA;

(44) Sacramento-Roseville, CA-NV—consisting of the Sacramento-Roseville, CA CSA and also including Carson City, NV, and Douglas County, NV;

(45) San Antonio-New Braunfels-Pearsall, TX—consisting of the San Antonio-New Braunfels-Pearsall, TX CSA;

(46) San Diego-Carlsbad, CA—consisting of the San Diego-Carlsbad, CA MSA;

(47) San Jose-San Francisco-Oakland, CA—consisting of the San Jose-San Francisco-Oakland, CA CSA and also including Monterey County, CA;

(48) Seattle-Tacoma, WA—consisting of the Seattle-Tacoma, WA CSA and also including Whatcom County, WA;

(49) St. Louis-St. Charles-Farmington, MO-IL—consisting of the St. Louis-St. Charles-Farmington, MO-IL CSA;

(50) Tucson-Nogales, AZ—consisting of the Tucson-Nogales, AZ CSA and also including Cochise County, AZ;

(51) Virginia Beach-Norfolk, VA-NC—consisting of the Virginia Beach-Norfolk, VA-NC CSA;

(52) Washington-Baltimore-Arlington, DC-MD-VA-WV-PA—consisting of the Washington-Baltimore-Arlington, DC-MD-VA-WV-PA CSA and also including Kent County, MD, Adams County, PA, York County, PA, King George County, VA, and Morgan County, WV; and

(53) Rest of U.S.—consisting of those portions of the United States and its territories and possessions as listed in 5 CFR 591.205 not located within another locality pay area.

[FR Doc. 2018–26519 Filed 12–3–18; 11:15 am]

**BILLING CODE 6325–39–P**

---

**DEPARTMENT OF AGRICULTURE**

**Office of the Secretary**

**7 CFR Part 12**

**[NRCS–2018–0010]**

**RIN 0578–AA65**

**Highly Erodible Land and Wetland Conservation**

**AGENCY:** Office of the Secretary, USDA.

**ACTION:** Interim rule with request for comments.

**SUMMARY:** The U.S. Department of Agriculture (USDA) is issuing an interim rule for the Highly Erodible Land and Wetland Conservation Compliance provisions of the Food Security Act of 1985, as amended. This rulemaking clarifies how USDA delineates, determines, and certifies wetlands located on subject land in a manner sufficient for making determinations of ineligibility for certain USDA program benefits. USDA is seeking comments from the public about these clarifications that will be considered prior to issuing a final rule.

**DATES:** Effective December 7, 2018. Comments must be received February 5, 2019.

**ADDRESSES:** Comments should be submitted, identified by Docket Number NRCS–2018–0010, using any of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail or hand-delivery:* Public Comments Processing, Attention: National Leader for Wetland and Highly Erodible Land Conservation, USDA, Natural Resources Conservation Service, 1400 Independence Avenue SW, Washington, DC 20250.

NRCS will post all comments on *http://www.regulations.gov.* In general, personal information provided with comments will be posted. If your comment includes your address, phone number, email, or other personal identifying information (PII), your comments, including PII, may be available to the public. You may ask in your comment that your PII be withheld from public view, but this cannot be guaranteed.

This rule also may be accessed, and comments submitted, via the internet.

**FOR FURTHER INFORMATION CONTACT:** For specific questions about this document, please contact Jason Outlaw at (202) 720–7838 or *Jason.outlaw@wdc.usda.gov.*

**SUPPLEMENTARY INFORMATION:**

**Regulatory Certifications**

*Executive Order 12866*

This rule is not a ''significant regulatory action'' under Executive Order 12866.

*Regulatory Flexibility Act*

The Regulatory Flexibility Act is not applicable to this rule because USDA is not required by 5 U.S.C. 533 or any other provisions of law to publish a notice of proposed rulemaking with respect to the subject matter of this rule.

*Environmental Evaluation*

It has been determined through an environmental assessment that the issuance of this interim final rule will not have a significant impact upon the human environment. Copies of the environmental assessment may be obtained by contacting Karen Fullen at (503) 273–2404 or *Karen.fullen@por.usda.gov.*

*Executive Order 12372*

Executive Order 12372, ''Intergovernmental Review of Federal Programs,'' requires consultation with State and local officials. The objectives of the Executive Order are to foster an intergovernmental partnership and a strengthened federalism, by relying on State and local processes for State and local government coordination and review of proposed Federal Financial assistance and direct Federal development. This program is not subject to Executive Order 12372, which requires consultation with State and local officials.

*Executive Order 12988*

This rule has been reviewed under Executive Order 12988, Civil Justice Reform. This rule will not preempt State or local laws, regulations, or policies unless they present an irreconcilable conflict with this rule. Before any judicial action may be brought regarding the provisions of this rule, appeal provisions of 7 CFR parts 11, 614, and 780 must be exhausted.

*Executive Order 13132*

This rule has been reviewed under Executive Order 13132, ''Federalism.'' The policies contained in this rule do not have any substantial direct effect on States, on the relationship between the Federal Government and the States, or

on the distribution of power and responsibilities among the various levels of government, nor does this rule impose substantial direct compliance costs on State and local governments; therefore, consultation with the States is not required.

*Executive Order 13175*

This rule has been reviewed in accordance with Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments." Executive Order 13175 requires Federal agencies to consult and coordinate with Tribes on a government-to-government basis on policies that have Tribal implications, including regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

USDA has assessed the impact of this rule on Indian Tribes and determined that this rule does not, to our knowledge, have Tribal implications that require Tribal consultation under Executive Order 13175. If a Tribe requests consultation, the Natural Resources Conservation Service (NRCS) will work with the USDA Office of Tribal Relations to ensure meaningful consultation is provided.

*Unfunded Mandates Reform Act of 1995*

Pursuant to Title II of the unfunded Mandates Reform Act of 1995, Public Law 104–4, the effects of this rulemaking action on State, local, and Tribal governments, and the public have been assessed. This action does not compel the expenditure of $100 million or more by any State, local, or Tribal governments, or anyone in the private sector; therefore, a statement under Section 202 of the Unfunded Mandates Reform Act of 1995 is not required.

*Federal Assistance Programs*

This rule has a potential impact on participants for many programs listed in the Catalog of Federal Domestic Assistance in the Agency Program Index under the Department of Agriculture.

*Paperwork Reduction Act*

Section 1246 of the Food Security Act of 1985 provides that regulations issued under Title XII are exempt from the requirements of the Paperwork Reduction Act (44 U.S.C. Chapter 35).

*E-Government Act Compliance*

USDA is committed to complying with the E-Government Act to promote the use of the internet and other information technologies to provide increased opportunities for citizen access to Government information and services, and for other purposes.

*Discussion of Provisions*

Title XII of the Food Security Act of 1985, as amended (the 1985 Act), encourages participants in USDA programs to adopt land management measures by linking eligibility for USDA program benefits to farming practices on highly erodible land and wetlands. In particular, the highly erodible land conservation (HELC) provisions of the 1985 Act provide that after December 23, 1985, a program participant is ineligible for certain USDA program benefits for the production of an agricultural commodity on a field in which highly erodible land is predominant. Additionally, the wetland conservation (WC) provisions of the 1985 Act provide that after December 23, 1985, a program participant is ineligible for certain USDA program benefits for the production of an agricultural commodity on a converted wetland, or after November 28, 1990, for the conversion of a wetland that makes the production of an agriculture commodity possible. The Agricultural Act of 2014 amended the 1985 Act to expand the HELC/WC requirements to encompass crop insurance benefits, and thus, producers obtaining Federally reinsured crop insurance must be in compliance with an NRCS-approved conservation plan for all highly erodible land; not plant or produce an agricultural commodity on a wetland converted after February 7, 2014; and not have converted a wetland after February 7, 2014, to make possible the production of an agricultural commodity. The 1985 Act, however, affords relief to program participants who meet certain conditions identified under the 1985 Act by exempting such actions from the ineligibility provisions.

The USDA regulations implementing the HELC and WC provisions of the 1985 Act are found at 7 CFR part 12. The regulations at 7 CFR part 12 list actions that may result in a determination of ineligibility, the program benefits that are at risk, and the conditions under which these activities can occur without losing program eligibility. The regulations are divided into three subparts. Subpart A describes the terms of ineligibility, USDA programs encompassed by its terms, the list of exemptions from ineligibility, the agency responsibilities, and conditions that apply when persons adversely affected by an agency determination request an appeal. Subpart B describes in greater detail the technical aspects of the HELC provisions, including the technical criteria for identification of highly erodible lands, criteria for highly erodible field determinations, and requirements for the development of conservation plans and conservation systems. Subpart C describes in greater detail the technical aspects of the WC provisions, including the criteria for determining a wetland, the criteria for determining a converted wetland, and the uses of wetlands and converted wetlands that can be made without losing program eligibility.

USDA policy guidance regarding implementation of the HELC and WC provisions is found in the current edition of the NRCS National Food Security Act Manual (NFSAM), including the procedures for how to delineate wetlands and make wetland determinations in accordance with Subpart C of 7 CFR part 12. This rule provides transparency to USDA program participants and stakeholders concerning how USDA delineates, determines, and certifies wetlands. It also allows program participants to better understand whether their actions may result in ineligibility for USDA program benefits. USDA requests public comment and will consider incorporating such public comment into its policy guidance.

**Wetland Determination Criteria—Policy and Regulatory Clarifications**

*The Complexity of Identification of Wetlands in the Agricultural Landscape*

The complexity of making a wetland determination in highly altered agricultural landscapes requires flexibility in the approach used to identify wetlands. Since 1986, USDA has provided the internal agency policy on making HELC and WC determinations in the NFSAM. In response to multiple statutory changes and changes to the science, those methods have evolved over the decades since passage of the WC provisions. The regulations and internal agency policy have also been revised many times over this 33-year period. The purpose of this interim rule, with request for comment, is to codify many technical portions of the existing agency policy that have not undergone public review and comment.

**Overview of Wetland Determination Procedures**

USDA developed the wetland determination procedures from the statutory framework for the WC provisions. In particular, section 1201(a) of the 1985 Act defines "wetland" as follows:

(27) The term "wetland", except when such term is part of the term "converted wetland", means land that—

(A) has a predominance of hydric soils;

(B) is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions; and

(C) under normal circumstances does support a prevalence of such vegetation. For purposes of this Act, and any other Act, this term shall not include lands in Alaska identified as having high potential for agricultural development which have a predominance of permafrost soils.

Section 1201(b) of the 1985 Act requires the Secretary to develop "(1) criteria for the identification of hydric soils and hydrophytic vegetation; and (2) lists of such soils and such vegetation."

USDA then defined in the regulation that a wetland determination is "a decision regarding whether or not an area is a wetland, including identification of wetland type and size." Thus, the term wetland determination for the WC provisions includes a basic three-step process: (1) Wetland identification; (2) application of exemption criteria from § 12.5(b) of this part, to determine the appropriate wetland conservation label; and (3) determination of size of each area delineated on the certified wetland determination map.

*Step One—Wetland Identification.* During the first step of wetland identification, NRCS determines whether the site meets the 1985 Act's definition of wetland "under normal circumstances." Normal circumstances are those conditions (vegetation, soils, and hydrology) that would occur in the absence of any post-1985 drainage actions, without regard to whether the vegetation has been removed or significantly altered, and during the wet portion of the growing season under normal climatic conditions.

NRCS staff utilize four different sources of information when deciding whether an area would, under normal circumstances, meet the 1985 Act definition of wetland, including 7 CFR part 12, the 1987 Corps of Engineers Wetland Delineation Manual (Corps Manual), the regional supplements to the Corps Manual, and the Food Security Act Wetland Identification Procedures (FSA Procedures) located in the NFSAM, Part 514. The FSA Procedures are not stand-alone procedures, but rather, they supplement the Corps methods when identifying wetlands for Food Security Act purposes. The Corps Manual provides for three levels:

• A *Level 1* determination is the use of only off-site resources to confirm the presence or absence of a prevalence of hydrophytic vegetation, a predominance of hydric soil, and the occurrence of wetland hydrology. Each of the three factors is assessed independently of the others. In some States, NRCS augments the Corps Level 1 methods with State Off-Site Methods (SOSM), tailored to unique wetland identification challenges in the State. SOSM identify additional off-site indicators and processes that can be used to assist in the determinations of hydrophytic vegetation, hydric soils, and wetland hydrology.

• A *Level 2* determination is based on the use of on-site methods from the Corps Manual and field indicators from the regional supplements for each of the three factors. As appropriate, the FSA Procedures augment the Corps methods. If a Level 2 approach is used, SOSM would not be used since SOSM are designed to augment off-site methods.

• A *Level 3* determination is a combination of the use of on-site and off-site indicators or methods among the three factors, but not within a single factor. For example, a Level 3 determination might utilize off-site methods or indicators for soils, then utilize on-site methods and indicators for vegetation and hydrology. If applicable, SOSM would be limited to the factor(s) where a decision is made exclusively from off-site methods/ resources, so in this example, SOSM would be used for soils, but not for vegetation or hydrology.

The findings in Step 1 results are recorded on a wetland identification base map indicating the area(s) in question as either wetland or non-wetland as defined in the 1985 Act.

*Step 2—Determination of Food Security Act Exemptions/Labels.* In this step, NRCS utilizes the wetland/non-wetland base map produced from Step 1 to assign WC labels. WC labels are based on exemptions to the WC provisions, as provided in § 12.5(b) of this part.

*Step 3—Sizing of Wetlands.* The last step is to determine the size of each area delineated and assigned a WC label. The delineations, WC labels, and sizes of each delineation are documented on the certified wetland determination map provided to the program participant.

*Determining Normal Precipitation*

In Step 1 (wetland identification) of the wetland determination process, NRCS applies the FSA Procedures to determine if a site "under normal circumstances" meets the 1985 Act wetland definition. "*Normal*

*circumstances*" as used in the statutory wetland definition is not defined in § 12.2 (Definitions) of this part but is discussed in § 12.31(b) only as it relates to a determination of hydrophytic vegetation. In the FSA Procedures, the term is defined as it relates to the entire wetland identification process. The consideration of normal circumstances includes assessing how disturbance (*e.g.*, tillage, mowing, grazing, application of herbicides, and drainage) might alter the site conditions, and how climate (*e.g.*, dry season, wet season, snow pack, drought, and excessive precipitation) might alter the site conditions. NRCS policy requires the consideration of normal circumstances for each of the three wetland diagnostic factors.

To determine normal circumstances, NRCS is required to determine if the indicators (on-site or off-site) are reflective of normal climatic conditions. NRCS is identifying in part 12 the criteria that NRCS commonly uses to determine normal climatic conditions.

The NRCS National Water and Climate Center compiles precipitation data using information from National Oceanic and Atmospheric Administration weather stations and publishes normal precipitation data that encompass 30 years of weather data. NRCS uses this weather data in Chapter 19 of the NRCS National Engineering Field Handbook Climate Analysis for Wetlands Tables (WETS). The tables can be updated to encompass the most recent 30-year cycle of data and are available in the Field Office Technical Guide.

The agency is concerned that the forward adjustment of precipitation data will result in unfair and inconsistent determinations and will fail to best represent conditions in or prior to 1985, a critical decision common to many exemptions. To address this concern, NRCS is establishing a fixed precipitation data set. This data set will provide continued certainty to agricultural producers, and the 1985 date of enactment of the WC provisions falls near the mid-point of this data set.

*Use of Corps Manual*

NRCS utilizes parts of the 1987 Army Corps of Engineers Wetland Delineation Manual and approved regional supplements, subject to agency-defined variances required to implement the 1985 Act provisions. NRCS has received questions about the basis for its use of the 1987 Corps Manual.

In 1980, the Environmental Protection Agency (EPA) issued interim guidance for identifying wetlands under Section 404 of the Clean Water Act. In 1980 and

1982, the Army Corps of Engineers and EPA published a joint rule and provided their definition of a wetland as:

"Those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." (33 CFR Section 328.3)

This definition was used by the Corps and EPA as they developed and published the *Technical Report Y–87–1 Corps of Engineers Wetlands Delineation Manual* and *Wetland Identification and Delineation Manual* (EPA 1988 Manual).

In the 1985 Act, Congress defined wetlands subject to the WC provisions as:

land that has a predominance of hydric soils and that is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions.

In the *Urgent Supplemental Appropriation Act,* 1986, Congress added the following to the wetland definition:

this term shall not include lands in Alaska identified as having high potential for agricultural development which have a predominance of permafrost soils.

The 1985 Act definition represents the first time that Congress defined the term "wetland." Also, for the first time in Federal law, Congress also provided a definition for the terms "hydric soil" and "hydrophytic vegetation." These three congressional definitions in the 1985 Act only differ slightly from what is used by the Corps and EPA for Section 404 of the Clean Water Act. The Manager's Report to the 1990 Act acknowledges that NRCS used wetland delineation methodology that had been developed in consultation with other Federal and State agencies.

Since the WC provisions contain specific definitions, exemptions, and guidance for its implementation, where these provisions differ from those in the Corps Manual, NRCS identifies these differences in the FSA procedures. Thus, NRCS adopted the use of the Corps methods, but not in their entirety. Where needed to address differences in the two laws, and where needed to address unique challenges of delineating wetlands on agricultural lands, NRCS provides variances to the Corps methods.

To avoid confusion, NRCS clearly informs the program participant that the determinations are for purposes of the WC provisions only, and that the producer should contact the Army Corps of Engineers for clarification about whether a particular activity will require a Clean Water Act Section 404 permit.

*Definition of Pothole, Playa, and Pocosin*

Current language in 7 CFR part 12 distinguishes farmed wetland hydrology criteria on whether the area is a pothole, playa, or pocosin. These three landforms are not defined in the regulation. Since it is a critical determination about the scope of the restrictions to which a producer will be subject, there is a need for a regulatory definition to provide consistency in the determination of the presence of these special land forms. NRCS has longstanding definitions in policy, located in the appendix to the NFSAM; however, the appendix was not transferred to the current electronic policy document storage system. NRCS is amending § 12.2 to add these definitions to the WC regulation.

*Hydrology Criteria for Farmed Wetland, Farmed Wetland Pasture, and Prior Converted Cropland*

The prior hydrologic criteria for farmed wetland and farmed wetland pasture was based strictly on the quantification of the number of days that the wetland experienced inundation or saturation during the growing season. Further, for farmed wetland, these criteria differed depending on the landscape position of the wetland, with playa, pothole, and pocosin requiring 7 days of inundation or 14 of saturation, and all other landscape positions requiring 15 consecutive days of inundation.

Quantification of a number-based hydrologic criteria is both inefficient and cost prohibitive, and if practiced, requires the installation of monitoring equipment. For this reason, other Federal agencies with responsibilities for wetland conservation or regulation either did not adopt or have since abandoned such an approach in favor of one that uses more readily observable and easily quantifiable criteria. The agency has itself moved from a number-based approach to such an approach, with criteria that are based on observable conditions resulting from such inundation or saturation and is therefore more consistent with the agency's statutory definition of "wetland." Codifying this indicator-based approach as the current science

and approach by NRCS to make a decision on wetland hydrology will improve transparency and understanding by program participants and the general public.

*Best Drained Condition*

The term "best drained condition" is introduced and defined to provide clarity regarding a long-standing and practiced statutory concept that is fundamental to the identification of wetlands that experienced drainage manipulations prior to enactment of the 1985 Act, and to meet congressional intent to provide certainty to persons concerning the status of such land and its future use. This long-standing concept provides that a person has the statutory right to maintain hydrologic conditions on wetlands that were converted to crop production prior to the 1985 Act, and are not abandoned, to the extent that those conditions existed on or before December 23, 1985.

*Wetland Hydrology*

The definition of wetland requires the presence of hydrology sufficient to support a prevalence of hydrophytic vegetation. Hydrology, as it relates to the definition of "wetland" contained in § 12.2, is further referenced throughout part 12 as a diagnostic factor for which consideration is required during the identification of wetlands. To provide clarification concerning this requirement, the definition of wetland hydrology and its related identification procedures are being incorporated into part 12, with associated reference to the underlying considerations of "best drained condition" and the determination of normal climatic conditions in § 12.31.

*Tract Versus Field*

Wetland determinations can be conducted on different areas of an agricultural operation. In some cases, the wetland determinations are conducted on a farm tract, while in other instances only specific farm fields or areas within a field are assessed. The USDA program participant initiates the wetland determination with a request submitted to the Farm Service Agency on an AD–1026. If an activity that could potentially result in a determination of ineligibility is planned, the program participant identifies the location of the activity on a map. NRCS will conduct wetland determinations on a field or sub-field basis except when the producer requests a determination for their entire farm tract. To clarify that NRCS will conduct a wetland determination only on the area specified by the USDA program participant,

NRCS is replacing the term "tract" with the term "field or sub-field" in 7 CFR 12.30(c), so that it is clear that all wetland determinations will be done on a field or sub-field basis and will be considered certified wetland determinations.

*Wetland Minimal Effect Determinations*

Part 12 provides for a minimal effect exemption for wetland conversions that have only a minimal effect on the functional hydrological and biological value of the wetland and other wetlands in the area. Current regulatory language requires that the minimal effect determination be based upon a functional assessment made during an on-site evaluation of all wetlands in the area. This requirement is overly burdensome, and on-site evaluations can seldom be made on property not controlled by the subject person. Removing the on-site requirement will better allow USDA to provide this statutory exemption to USDA program participants, and such removal will not provide a substantially different decision as would otherwise occur, especially considering that assessments can be conducted remotely based on a general knowledge of wetland conditions in the area.

*Wetland Determination Certification*

NRCS began making wetland determinations subsequent to the enactment of the 1985 Act and the interim final rule for 7 CFR part 12 promulgated in 1986. These wetland determinations were completed utilizing soil surveys, U.S. Fish and Wildlife Service National Wetland Inventory maps, and USDA aerial imagery or site visits. Producers were provided appeal rights with these determinations. In the 1990 Farm Bill, the concept of certification of wetland determinations was incorporated into the WC provisions. In particular, as described in the Manager's Report to the 1990 Farm Bill:

[T]he certification process is to provide farmers with certainty as to which of their lands are to be considered wetlands for purposes of Swampbuster. The Managers note that the current USDA wetland delineation process involves the use of substantial materials to make an initial determination in the field office, developed in consultation with other appropriate Federal and State agencies. Wetlands identified in this process are delineated on maps which are then mailed to producers for review. If the producer finds such map to be in error, and the USDA agrees that an error has been made, then the map is corrected. If the USDA does not agree that there is an error in the map, and the producer continues to believe so, then the producer may appeal

such determination. The Managers find that this process is adequate for certification of any new maps delineated after the date of enactment of this Act. For maps completed prior to the date of enactment of this Act, the Managers intend for producers to be notified that their maps are to be certified and that they have some appropriate time for appeal. In this circumstance, producers who had not already been mailed their maps should be given a map for their review.

The changes made to 7 CFR part 12 in 1991 included the following incorporation of certification at § 12.30(c) (1991):

SCS determinations of wetland status and any applicable exemptions granted under this part shall be delineated on a map of the farm or tract. Notification of the wetland determination, a copy of the wetland delineation and the SCS appeal procedures shall be provided to each person who completes a Form AD–1026. The wetland determination and wetland delineation shall be certified as final by the SCS official 45 days after providing the person notice or, if appeal is filed with SCS, after a final appeal decision is made by SCS.

By statute, as clarified in the 1990 Conference Managers Report, determinations made pursuant to the 1991 rule are certified determinations when the producer was provided a copy of the determination and had been provided appeal rights. The producer was not required to appeal the determination for the determination to become certified. In June of 1991, USDA issued a revised CPA–026 form that included certification language in the agency signature block and contained the applicable appeal rights on the back side of the person copy.

The certification provisions were further strengthened in the 1996 Farm Bill, due in part to a moratorium that had been placed on wetland determinations by the Secretary of Agriculture in 1995. In response to these changes, in the 1996 interim final rule USDA identified that all wetland determinations made after its effective date of July 3, 1996, would be considered a certified wetland determination. A final certification remains valid and in effect as long as the area is devoted to an agricultural use or until such time as the person, affected by the review, requests review of the certification if "a natural event alters the topography or hydrology of the subject land to the extent that the final certification is no longer a reliable indication of site conditions, or if NRCS concurs with an affected person that an error exists in the current wetland determination." 7 CFR 12.30(c)(6).

NRCS, program participants, farm organizations, conservation organizations, and others have long

focused upon the certification process for NRCS wetland determinations because of the certainty that such determinations provide to program participants regarding future business decisions. Through this rulemaking, USDA is adding further guidance in the WC regulation to improve clarity on the statutory concept of certification, particularly for those certified determinations issued between 1990 and 1996.

**List of Subjects in 7 CFR Part 12**

Administrative practice and procedure, Coastal zone, Crop insurance, Flood plains, Loan programs—agriculture, Price support programs, Reporting and recordkeeping requirements, Soil conservation.

For the reasons explained above, USDA amends 7 CFR part 12 as follows:

**PART 12—HIGHLY ERODIBLE LAND CONSERVATION AND WETLAND CONSERVATION**

■ 1. The authority citation for part 12 continues to read as follows:

**Authority:** 16 U.S.C. 3801, 3811–12, 3812a, 3813–3814, and 3821–3824.

■ 2. Amend § 12.2(a) as follows:
■ a. Add definitions, for "Best drained condition", "Normal climatic conditions", "Playa", "Pocosin", and "Pothole", in alphabetical order;
■ b. Revise paragraphs (4), (5), and (8) of the definition for "Wetland determination"; and
■ c. Add the definition of "Wetland hydrology", in alphabetic order.

The additions and revision read as follows:

**§ 12.2   Definitions.**

(a) * * *

*Best drained condition* means the hydrologic conditions with respect to depth, duration, frequency, and timing of soil saturation or inundation resulting from drainage manipulations that occurred prior to December 23, 1985, and that exist during the wet portion of the growing season during normal climatic conditions.

* * * * *

*Normal climatic conditions* means the normal range of hydrologic inputs on a site as determined by the bounds provided in the Climate Analysis for Wetlands Tables or methods posted in the Field Office Technical Guide.

* * * * *

*Playa* means a usually dry and nearly level lake plain that occupies the lowest parts of closed depressions (basins). Temporary inundation occurs primarily in response to precipitation-runoff

events. Playas may or may not be characterized by high water table and saline conditions. They occur primarily in the Southern Great Plains.

*Pocosin* means a wet area on nearly level interstream divides in the Atlantic Coastal Plain. Soils are generally organic but may include some areas of high organic mineral soils.

*Pothole* means a closed depression, generally circular, elliptical, or linear in shape, occurring in glacial outwash plains, moraines, till plains, and glacial lake plains.

*    *    *    *    *

*Wetland determination *  *  *

(4) *Farmed wetland* is a wetland that prior to December 23, 1985, was manipulated and used to produce an agricultural commodity, and on December 23, 1985, did not support woody vegetation, and met the following hydrologic criteria:

(i) If not a playa, pocosin, or pothole, experienced inundation for 15 consecutive days or more during the growing season or 10 percent of the growing season, whichever is less, in most years (50 percent chance or more), as determined by having met any of the following hydrologic indicators:

(A) Inundation is directly observed during a site visit conducted under a period of normal climatic conditions or drier;

(B) The presence of any indicator from Group B (Evidence of Recent Inundation) of the wetland hydrology indicators contained in the applicable regional supplement to the Corps of Engineers Wetland Delineation Manual is observed;

(C) The presence of conditions resulting from inundation during the growing season is observed on aerial imagery, and the imagery is determined to represent normal or drier than normal climatic conditions (that is, not abnormally wet); or

(D) The use of analytic techniques, such as the use of drainage equations or the evaluation of monitoring data, demonstrate that the wetland would experience inundation during the growing season in most years (50-percent chance or more).

(ii) If a playa, pocosin, or pothole experienced ponding for 7 or more consecutive days during the growing season in most years (50-percent chance of more) or saturation for 14 or more consecutive days during the growing season in most years (50-percent chance or more) as determined by having met any of the following hydrologic indicators:

(A) Inundation or saturation is directly observed during a site visit

conducted under a period of normal climatic conditions or drier;

(B) The presence of one primary or two secondary wetland hydrology indicators contained in the applicable regional supplement to the Corps of Engineers Wetland Delineation Manual is observed;

(C) The presence of conditions resulting from inundation or saturation during the growing season is observed on aerial imagery, and the imagery is determined to represent hydrologic conditions that would be expected to occur under normal or drier than normal climatic conditions (that is, not abnormally wet); or

(D) The use of analytic techniques, such as the use of drainage equations or the evaluation of monitoring data, demonstrate that the wetland would experience inundation or saturation during the growing season in most years (50-percent chance or more).

(5) *Farmed-wetland pasture* is wetland that was manipulated and managed for pasture or hayland prior to December 23, 1985, and on December 23, 1985, experienced inundation or ponding for 7 or more consecutive days during the growing season in most years (50-percent chance or more) or saturation for 14 or more consecutive days during the growing season in most years (50-percent chance or more) as determined by having met any of the following hydrologic indicators:

(i) Inundation or saturation is directly observed during a site visit conducted under a period of normal climatic conditions or drier;

(ii) The presence of one primary or two secondary wetland hydrology indicators contained in the applicable regional supplement to the Corps of Engineers Wetland Delineation Manual is observed;

(iii) The presence of conditions resulting from inundation or saturation during the growing season is observed on aerial imagery, and the imagery is determined to represent hydrologic conditions that would be expected to occur under normal, or drier than normal climatic conditions (that is, not abnormally wet); or

(iv) The use of analytic techniques, such as the use of drainage equations or the evaluation of monitoring data, demonstrate that the wetland would experience inundation or saturation during the growing season in most years (50-percent chance or more).

*    *    *    *    *

(8) *Prior-converted cropland* is a converted wetland where the conversion occurred prior to December 23, 1985, an agricultural commodity had

been produced at least once before December 23, 1985, and as of December 23, 1985, the converted wetland did not support woody vegetation and did not meet the hydrologic criteria for farmed wetland.

*    *    *    *    *

*Wetland hydrology* means inundation or saturation by surface or groundwater during a growing season at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation.

*    *    *    *    *

■ 3. Amend § 12.21 by revising paragraph (c) to read as follows:

### § 12.21    Identification of highly erodible lands criteria.

*    *    *    *    *

(c) *Potentially highly erodible.* Whenever a soil map unit description contains a range of a slope length and steepness characteristics that produce a range of LS values that result in RKLS/T quotients both above and below 8, the soil map unit will be entered on the list of highly erodible soil map units as "potentially highly erodible." The final determination of erodibility for an individual field containing these soil map unit delineations will be made by an on-site investigation, or by use of Light Detection and Ranging or other elevation data of an adequate resolution to make slope length and steepness measurements. In any case where a person disagrees with an off-site determination on potentially highly erodible soils, a determination will be made on-site.

■ 4. Amend § 12.30 by revising paragraph (c)(1), and adding paragraph (c)(7), to read as follows:

### § 12.30    NRCS responsibilities regarding wetlands.

(c) *  *  *

(1) Certification of a wetland determination means that the wetland determination is of sufficient quality to make a determination of ineligibility for program benefits under § 12.4. In order for a map to be of sufficient quality to determine ineligibility for program benefits, the map document must be legible to the extent that areas that are determined wetland can be discerned in relation to other ground features. NRCS may certify a wetland determination without making a field investigation. NRCS will notify the person affected by the certification and provide an opportunity to appeal the certification prior to the certification becoming final. All wetland determinations made after July 3, 1996, will be done on a field or sub-field basis and will be considered certified wetland determinations.

Determinations made after November 28, 1990, and before July 3, 1996, are considered certified if the determination was issued on the June 1991 version of form NRCS–CPA–026 or SCS–CPA–026, the person was notified that the determination had been certified, and the map document was of sufficient quality to determine ineligibility for program benefits. If issued on a different version of the form, a determination will be considered certified if there is other documentation that the person was notified of the certification, provided appeal rights, and the map document was of sufficient quality to make the determination.

\*    \*    \*    \*    \*

(7) The wetland determination process for wetland conservation compliance includes three distinct steps. In Step 1, wetland identification, it is determined if the area of interest supports a prevalence of hydrophytic vegetation, a predominance of hydric soils, and wetland hydrology under normal circumstances. In Step 2, determination of wetland type, it is determined if any exemptions apply from § 12.5(b). The findings are reflected in the assignment of an appropriate wetland conservation compliance label. In Step 3, sizing of the wetland, the boundary of each wetland type determined in Step 2 is delineated on the certified wetland determination map.

■ 5. Amend § 12.31 by revising the section heading, redesignating paragraphs (c) through (e) as paragraphs (d) through (f), adding a new paragraph (c), and revising newly redesignated paragraph (e) to read as follows:

### § 12.31    Wetland identification procedures.

(c) *Wetland Hydrology.* (1) Wetland Hydrology consists of inundation or saturation by surface or groundwater during a growing season at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation.

(2) When a wetland is affected by drainage manipulations that occurred prior to December 23, 1985, wetland hydrology shall be identified on the basis of the best-drained condition resulting from such drainage manipulations.

(3) The determination of wetland hydrology will be made in accordance with the current Federal wetland delineation methodology in use by NRCS at the time of the determination.

(4) When making a decision on wetland hydrology, NRCS will utilize a fixed precipitation date range of 1971–2000 for determining normal climatic conditions.

\*    \*    \*    \*    \*

(e)(1) *Minimal effect determination.* For the purposes of § 12.5(b)(1)(v), NRCS shall determine whether the effect of any action of a person associated with the conversion of a wetland, the conversion of wetland and the production of an agricultural commodity on converted wetland, or the combined effect of the production of an agricultural commodity on a wetland converted by someone else has a minimal effect on the functions and values of wetlands in the area. Such determination shall be based upon a functional assessment of functions and values of the subject wetland and other related wetlands in the area. The assessment of functions and values of the subject wetland will be made through an on-site evaluation. Such an assessment of related wetlands in the area may be made based on a general knowledge of wetland conditions in the area. A request for such determination will be made prior to the beginning of activities that would convert the wetland. If a person has converted a wetland and then seeks a determination that the effect of such conversion on wetland was minimal, the burden will be upon the person to demonstrate to the satisfaction of NRCS that the effect was minimal.

(2) *Scope of minimal-effect determination.* The production of an agricultural commodity on any portion of a converted wetland in conformance with a minimal-effect determination by NRCS is exempt under § 12.5(b)(1)(v). However, any additional action of a person that will change the functions and values of a wetland for which a minimal-effect determination has been made shall be reported to NRCS for a determination of whether the effect continues to be minimal. The loss of a minimal-effect determination will cause a person who produces an agricultural commodity on the converted wetland after such change in status to be ineligible, under § 12.4, for certain program benefits. In situations where the wetland values, acreage, and functions are replaced by the restoration, enhancement, or creation of a wetland in accordance with a mitigation plan approved by NRCS, the exemption provided by the determination will be effective after NRCS determines that all practices in a mitigation plan are being implemented.

Dated: November 28, 2018.

**Stephen L. Censky,**

*Deputy Secretary.*

[FR Doc. 2018–26521 Filed 12–6–18; 8:45 am]

**BILLING CODE 3410–16–P**

# DEPARTMENT OF AGRICULTURE

## Food Safety and Inspection Service

### 9 CFR Parts 317 and 381

**[Docket No. FSIS–2018–0049]**

**RIN 0583–AD77**

### Uniform Compliance Date for Food Labeling Regulations

**AGENCY:** Food Safety and Inspection Service, USDA.

**ACTION:** Final rule.

**SUMMARY:** The Food Safety and Inspection Service (FSIS) is establishing January 1, 2022, as the uniform compliance date for new meat and poultry product labeling regulations that will be issued between January 1, 2019, and December 31, 2020. FSIS periodically announces uniform compliance dates for new meat and poultry product labeling regulations to minimize the economic impact of label changes.

**DATES:** This rule is effective December 7, 2018. Comments on this final rule must be received on or before January 7, 2019.

**ADDRESSES:** FSIS invites interested persons to submit comments on this final rule. Comments may be submitted by one of the following methods:

• *Federal eRulemaking Portal:* This website provides the ability to type short comments directly into the comment field on this web page or attach a file for lengthier comments. Go to *http://www.regulations.gov.* Follow the on-line instructions at that site for submitting comments.

• *Mail, including CD–ROMs, etc.:* Send to Docket Clerk, U.S. Department of Agriculture, Food Safety and Inspection Service, 1400 Independence Avenue SW, Mailstop 3758, Room 6065, Washington, DC 20250–3700.

• *Hand- or courier-delivered submittals:* Deliver to 1400 Independence Avenue SW, Room 6065, Washington, DC 20250–3700.

*Instructions:* All items submitted by mail or electronic mail must include the Agency name and docket number FSIS–2018–0049. Comments received in response to this docket will be made available for public inspection and posted without change, including any personal information, to *http://www.regulations.gov.*

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-26521

The is a Comment on the **Natural Resources Conservation Service** (NRCS) Rule: **Highly Erodible Land and Wetland Conservation**

For related information, **Open Docket Folder** 

### Comment

See attached file(s)

### Attachments (1)

**Docket NRCS-2018-0010 02042019**

**View Attachment:** [PDF]

---

**ID:** NRCS-2018-0010-0036

**Tracking Number:** 1k3-982n-f952

### Document Information

**Date Posted:**
Feb 5, 2019

**RIN:**
0578-AA65

**Show More Details**

### Submitter Information

**Submitter Name:**
BLAKE RODERICK

001505

February 4, 2019

Public Comments Processing
Attention: National Leader for Wetland and  Highly Erodible Land Conservation
USDA, Natural Resources Conservation Service
1400 Independence Avenue SW
Washington, DC 20250

Attention: Docket ID No. NRCS-2018-0010

**RE:    Highly Erodible Land and Wetland Conservation,
        83 Fed. Reg. 63,046 (Dec. 7, 2018)**

To Whom It May Concern:

        The Pike-Scott Farm Bureau appreciates this opportunity to offer comments on the U.S.
Department of Agriculture's ("USDA") interim final rule amending its Highly Erodible Land and
Wetland Conservation regulations at 7 C.F.R. part 12 (collectively, the "conservation
compliance" program). The revisions were published in the *Federal Register* on December 7,
2018 at 83 Fed. Reg. 63,046 and were made effective that same day. The stated purpose of
these revisions is to "codify many technical portions of the existing agency policy that have not
undergone public review and comment." 83 Fed. Reg. at 63,047.
        We are extremely troubled by this rulemaking due to the fundamental lack of
transparency and due process it affords farmers and ranchers. **Highly Erodible Land and
Wetland Conservation regulations are not incentive programs; rather, they are
compliance regulations that not only impact participation in farm programs but also
directly influence the ability of farmers and ranchers to secure vital operating loans.**
        The Pike-Scott Farm Bureau represents the interests of its 2,200 members in west-
central Illinois. We have as borders the Mississippi and Illinois rivers with thousands of acres of
river valley land in addition of hill ground with many acres of highly erodible land.
        We have been involved in the issue of Swampbuster since its roll-out in 1986. Over
those 35-years, we have represented the interests of our members in disputes over the
application and administration of USDA rules on many occasions.
        The Pike-Scott County Farm Bureau has driven much of the standing policy of the Illinois
Farm Bureau and American Farm Bureau Federation on wetlands and conservation from our
experiences with working with USDA agencies overseeing Swampbuster and HEL regulations
over the years.
         The Pike-Scott Farm Bureau is concerned with this Interim Rule because it makes
program participation significantly more difficult and fails to provide the notice and opportunity to
participate in the process due regulated entities.

001511

was minimal" in the case of an already-converted wetland. 7 C.F.R. § 12.31(e)(1); *see also id.* § 12.5(b)(7). When the determination is USDA's duty in the first instance, and USDA retains access to the relevant technical information and applicable guidance, USDA must set the specific criteria required to claim that a wetland conversion was minimal instead of requiring landowners to attempt to prove the same "to the satisfaction of the NRCS."

Second, the statute requires the Secretary to "identify by regulation categorical minimal effect exemptions on a regional basis." 16 U.S.C. § 3822(d). But USDA's regulations impermissibly delegate this authority to the states. Most states have not identified or adopted the required categorical exemptions and even if they have made a recommendation, USDA has not adopted any categorical exemptions in its rules. USDA should take this authority back and promulgate clear standards for minimal-effect exemptions.

Third, although the "Scope of minimal-effect determination" subsection contains a passing reference to mitigation of wetland conversion, 7 C.F.R. § 12.31(e)(2), we remind USDA that § 12.5(4) is a wholly distinct and fully self-executing mitigation exception, which largely tracks the statutory language regarding the ability of farmers to offset the values, acreage, and functions affected by conversion, 16 U.S.C. § 3822(f)(2). Indeed, in recent farm bills Congress specifically set aside USDA money to be used in mitigation activities, indicating that Congress wanted more farmers to be able to take advantage of the program. *See* Pub. L. No. 113-79, § 2609, 128 Stat. 649, 761 (2014); Pub. L. No. 115-334, § 2103 (2018). USDA should similarly encourage mitigation efforts, and in doing so, amend its regulations generally not to require more than a one-to-one ratio for mitigation; functional capacity should be the benchmark. *See* 16 U.S.C. §§ 3822(f)(2)(D), (E).

The minimal effect exemption provisions have not been fully implemented by the USDA in accordance with the statute. The elimination of required on-site visits for area wetlands evaluations falls far short of meeting the statutory requirements for the exemption. To comply with the statute, USDA should evaluate the applicability of the exemption before the wetland delineation instead of placing the burden on the farmer to request and satisfy the NRCS with indeterminate criteria. The rules should also establish clear criteria of what will be considered during a minimal effect analysis in order to give fair notice and allow farmer participation in the process.

## VI. Conclusion

USDA has an opportunity to both clarify the Interim Rule and promulgate new rules that could provide much needed transparency and certainty for the farmers regulated by the conservation compliance program. USDA should not go partway and stop. Instead, USDA should take a hard look at the discretion it has arrogated to itself, determine whether it accords with the statute, and promulgate new rules that are consistent with Congressional intent and that provide clear, reasonable requirements for farmers.

Respectfully submitted,


Blake E. Roderick, Executive Director
Pike-Scott Farm Bureau

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-26521

The is a Comment on the **Natural Resources Conservation Service** (NRCS) Rule: **Highly Erodible Land and Wetland Conservation**

For related information, **Open Docket Folder**

---

### Comment

Docket Number NRCS-2018-0010; Comments on the Natural Resources Conservation Services Interim Rule and Environmental Assessment for the Highly Erodible Land and Wetland Conservation Compliance Provisions
at 7 C.F.R. part 12.

The National Wildlife Federation (NWF) submits the attached comments on the Natural Resources Conservation Services
(NRCS) interim rule and Environmental Assessment (EA) for the Highly Erodible Land and Wetland Conservation Compliance provisions of the Food Security Act of 1985, which amended the wetland conservation provisions at 7 C.F.R.
part 12. The interim rule implements several significant changes to the wetland conservation provisions.

As discussed below, although the interim rule purports to provide clarity and transparency to NRCSs implementation of
the wetlands compliance provisions, in reality the rule further obfuscates the wetlands determination process and thwarts
Congresss intent in enacting the 1996 Farm Bill. In addition, in several crucial respects, NRCSs EA does not adequately assess a full range of reasonable alternatives, nor does it take the requisite hard look at the impacts of its action, as mandated by the National Environmental Policy Act (NEPA), 42 U.S.C. 4321-4370m. To the contrary, the document reads as a justification for a decision already made, in violation of NEPA. Further, the significant impacts that this interim
rule will have on wetlands and the wildlife that depend on

**ID:** NRCS-2018-0010-0049

**Tracking Number:** 1k3-9838-qlif

### Document Information

**Date Posted:**
Feb 5, 2019

**RIN:**
0578-AA65

**Show More Details**

### Submitter Information

**Submitter Name:**
Jan Goldman-Carter



February 5, 2019

Public Comments Processing
Attention: National Leader for Wetland and Highly Erodible Land Conservation
U.S. Department of Agriculture
Natural Resources Conservation Service
1400 Independence Avenue SW
Washington, DC 20250

**Re:    Docket Number NRCS-2018-0010; Comments on the Natural Resources Conservation Service's Interim Rule and Environmental Assessment for the Highly Erodible Land and Wetland Conservation Compliance Provisions at 7 C.F.R. part 12.**

The National Wildlife Federation ("NWF") submits the following comments on the Natural Resources Conservation Service's ("NRCS") interim rule and Environmental Assessment ("EA") for the Highly Erodible Land and Wetland Conservation Compliance provisions of the Food Security Act of 1985, which amended the wetland conservation provisions at 7 C.F.R. part 12. The interim rule implements several significant changes to the wetland conservation provisions.

As discussed below, although the interim rule purports to provide "clarity" and "transparency" to NRCS's implementation of the wetlands compliance provisions, in reality the rule further obfuscates the wetlands determination process and thwarts Congress's intent in enacting the 1996 Farm Bill. In addition, in several crucial respects, NRCS's EA does not adequately assess a full range of reasonable alternatives, nor does it take the requisite "hard look" at the impacts of its action, as mandated by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370m. To the contrary, the document reads as a justification for a decision already made, in violation of NEPA. Further, the significant impacts that this interim rule will have on wetlands and the wildlife that depend on them—including several species listed as threatened or endangered under the Endangered Species Act ("ESA")—require in-depth analysis in an Environmental Impact Statement ("EIS").

Given these concerns, we urge NRCS to withdraw the interim final rule and instead propose a rule that promotes accurate wetland determinations that include all seasonal wetlands and one that is subject to robust environmental review and public comment.

1

## BACKGROUND

### A.     Statutory Background

The Administrative Procedure Act ("APA") permits judicial review of "final" agency action. *See* 5 U.S.C. § 704. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D). To avoid judicial reversal of their actions, agencies must demonstrate that they have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006).

### 1.     NEPA

Congress enacted NEPA more than four decades ago "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment . . . ." 42 U.S.C. § 4321. In light of this mandate, the Supreme Court has reasoned that NEPA is "intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321).

In achieving NEPA's substantive goals, Congress created two specific mechanisms whereby federal agencies must evaluate the environmental and related impacts of a particular federal action—an EA and an EIS. *See* 42 U.S.C. § 4332(c). These procedural mechanisms are designed to inject environmental considerations "in the agency decisionmaking process itself," and to "'help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment.'" *Pub. Citizen*, 541 U.S. at 768-69 (emphasis added) (quoting 40 C.F.R. § 1500.1(c)). Therefore, "NEPA's core focus [is] on improving agency decisionmaking," *Pub. Citizen*, 541 U.S. at 769 n.2, and specifically on ensuring that agencies take a "hard look" at potential environmental impacts and environmentally enhancing alternatives "as part of the agency's process of deciding whether to pursue a particular federal action." *Baltimore Gas and Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 100 (1983).

The alternatives analysis "is the heart" of an EIS or EA. 40 C.F.R. § 1502.14. NEPA's implementing regulations require that the decisionmaking agency "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* Importantly, the NEPA process "shall serve as the means of assessing the environmental impact of proposed agency actions, *rather than justifying decisions already made*." 40 C.F.R. § 1502.2(g) (emphasis added); *see also id.* § 1502.5 (requiring that NEPA review "shall be prepared early enough *so that it can serve practically as an important contribution to the*

2

001712

*decisionmaking process* and *will not be used to rationalize or justify decisions already made*" (emphases added)).

An EIS must be prepared by an agency for every "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). Under NEPA's implementing regulations, "significance" requires consideration of both context and intensity. "Context" considerations include the affected region, interests, and locality, varying with the setting of the action, and include both short and long-term effects. "Intensity" refers to the severity of impact, including impacts that may be both beneficial and adverse; unique characteristics of the geographic area, such as proximity to wetlands, wild and scenic rivers, or ecologically critical areas; the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act; and whether the action threatens a violation of federal law imposed for the protection of the environment. *See* 40 C.F.R. § 1508.27. Where an action is not expected to result in a significant environmental impact, the agency must still prepare an EA and a FONSI. *Id.* §§ 1508.9, 1501.3.

## 2.    ESA

The ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Section 9 of the ESA prohibits any "person" from "taking" any member of an endangered or threatened species. 16 U.S.C. § 1538(a). Pursuant to Section 7 of the ESA, before undertaking any action that may have direct or indirect effects on any listed species, an action agency must engage in consultation with the FWS in order to evaluate the impact of the proposed action. *See id.* § 1536(a). The FWS has defined the term "action" for the purposes of Section 7 broadly to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," 50 C.F.R. § 402.02, "in which there is discretionary federal involvement or control." *Id.* § 402.03. An agency may only avoid this consultation requirement for a proposed action if it determines that its action will have "no effect" on threatened or endangered species or critical habitat. *Id.* § 402.14(a).[1]

---

[1] The term "take" is defined broadly to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." *Id.* § 1532(19). FWS has further defined "harass" to include "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3. In addition, "harm" is defined to "include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.*

3

001713

**B.     Factual Background**

**1.     Brief History of Wetland Conservation in the Farm Bill**

Wetlands are among "the most dynamic habitats in the world," and "provide essential ecological functions and values that significantly benefit society." U.S. Dep't of Agric. Off. Of the Inspector Gen., *NRCS: Wetland Conservation Provisions in the Prairie Pothole Region* 1 (Jan. 2017) (Attach. A). These functions include nutrient cycling, water filtration and purification, nutrient sinks, and water storage. *Id.* Despite the myriad benefits and significant economic value of wetlands, over half of the wetlands that existed in the coterminous United States in 1600—approximately 221 million acres—were drained or filled for development or agriculture by 1984. *Id.* By 2004, only an estimated 107.7 million acres of wetlands remained in the coterminous United States. *Id.*

Serious concerns over the continued destruction and degradation of wetland habitat due to agricultural practices led Congress to take definitive action to protect agricultural wetlands in the Food Security Act of 1985 ("Food Security Act"). *See* Food Security Act of 1985, sec. 1221, Pub. L. 99-198, 99 Stat 1354 (Dec. 23, 1985). These "wetland conservation provisions," as amended, make participation in, or payments from, most United States Department of Agriculture ("USDA") benefit programs contingent upon the conservation of wetlands. 16 U.S.C. § 3822; *see also* Megan Stubbs, Cong. Res. Serv., *Conservation Compliance and U.S. Farm Policy* 5-6 (2016) ("As it exists today, conservation compliance applies to most farm program payments, loans, or other benefits administered by . . . NRCS"). Accordingly, producers who fill wetlands for agricultural production may not participate in, or receive payments from, these USDA programs. Attach. A at 2.[2]

Congress renewed protections for agricultural wetlands in subsequent "Farm Bills" passed in 1990, 1996, 2002, 2008, 2014, and 2018, affirming the importance of wetland conservation to the administration of USDA benefits, and repeatedly expressing Congress's intent to continue and improve the conservation program. Attach. A at 6; Agriculture Improvement Act of 2018, Pub. L. 115-334, § 2102, 132 Stat. 4490, 4530 (codified at 16 U.S.C. § 3822) [hereinafter "2018 Farm Bill]. Particularly relevant here, NRCS is responsible for making the technical determinations required to administer the wetland conservation provisions and ensure compliance, including whether land is a wetland, whether certain technical exemptions apply, and whether an improper wetland conversion has occurred.[3]

---

[2] Benefits affected by conservation compliance include Marketing Assistance Loans, ad hoc disaster assistance programs, Emergency Assistance for Livestock, Honey Bees, and Farm-raised Fish, Livestock Indemnity Program, Farm Services Agency Farm Operating Loans, Emergency Disaster Loans, Federal crop insurance premium subsidies, and the Watershed Protection and Flood Prevention program. *See* Megan Stubbs, *supra*, at 6.

[3] A second agency within the USDA, the Farm Services Agency, makes determinations concerning producers' eligibility for Farm Bill programs administered by USDA. Attach. A at 2.

2.    **Brief History of Wetland Determinations under the Wetland Conservation Provisions, as Amended**

After the enactment of the Food Security Act, state-level NRCS offices developed mapping conventions for off-site wetlands determinations on agricultural lands. *See* Comm. On Characterization of Wetlands, Nat'l Res. Council, *Wetlands: Characteristics and Boundaries* 193 (1995). To improve the administration of the wetland conservation program, Congress amended the 1985 Food Security Act in 1990. The amendments directed NRCS to create wetland delineation maps, and establish a certification and appeals process. Food, Agriculture, Conservation, and Trade Act of 1990, § 1422, Pub. L. 101-624, 104 Stat. 3359 (Nov. 28, 1990) ("1990 Farm Bill"). Controversy and issues with inaccurate determinations continued, *see* Jeffrey A. Zinn & Claudia Copeland, CRS Issue Brief for Congress: Wetland Issues 9 (Sept. 1, 2000), so in 1996, Congress again amended the wetland conservation provisions to *combine* the delineation and certification processes, requiring that NRCS to "delineate, determine, *and certify* all wetlands located on subject land on a farm." *See* Federal Agriculture Improvement and Reform Act of 1996 (1996 Farm Bill), Pub. L. 104-127, § 322(a), 110 Stat. 888 (Apr. 4, 1996) (codified as amended at 16 U.S.C. § 3822) ("1996 Farm Bill") (emphasis added). Critically, Congress intended for the 1996 Farm Bill to require greater methodological rigor and substantive accuracy in wetlands certifications in order to correct NRCS's prior failure to accurately identify wetlands. *See, e.g.*, NRCS, Wetland Information for USDA Participants Fact Sheet (undated) (acknowledging that the 1996 Farm Bill was enacted because "Congress decided that the inventory maps" NRCS used to make the wetlands determinations prior to 1996, "while providing good information, were not completely accurate"); *see also* Attach. A at 3, n.23 (same).

Pursuant to the 1996 Farm Bill, NRCS increased the rigor of its wetlands certification process. With respect to wetlands determinations made between 1990 and 1996, NRCS's published policy was that such determinations were only considered certified if they met *both* "the procedural (appeal rights) *and* quality mandates as provided in 7 CFR Section 12." *See* § 514.1(A) (5th ed. 2010) (emphasis added). However, pre-1996 wetland determinations were often based solely on the wetland inventory maps that Congress had rejected as insufficient to determine eligibility for benefits under the Farm Bill. *See* Attach. A at 4 n.24. Thus, NRCS circulated several fact sheets alerting producers that "most wetland determinations completed prior to July 3, 1996 [were] not considered certified and therefore may not be valid for determining compliance with wetland conservation provisions." NRCS, Wetland Information for USDA Participants Fact Sheet (undated); *see also* Attach. A at 3 n.23 (reporting same). The agency has never previously proposed to accept as certified wetland determinations made prior to 1996. In fact, Congress *specifically rejected* proposed amendments to *both* the 2014 and 2018 Farm Bills that would have allowed the certification of pre-1996 wetland determinations. *See* Steve Davies, *Farmers, Enviros Alarmed by USDA's New Wetlands Rules*, AgriPulse, Jan. 23, 2019, *available at* www.agri-pulse.com/articles/11831-producers-enviros-keep-close-eye-on-swampbuster-changes (Attach. B).

In 2013, the Secretary of Agriculture signed a Decision Memorandum ("2013 Memorandum") prepared by NRCS that proposed changes to the agency's wetland determination policy. USDA, *Summary of Proposed Wetland Conservation Compliance Changes and*

001715

*Clarifications* (Feb. 12, 2013) (Attach. C). One such change was to permit the NRCS to accept pre-1996 determinations as certified, even without evidence that the delineation maps met the quality mandates required by the 1996 regulations and set forth in the Food Security Act Manual ("FSA Manual"). The document allowed the NRCS to begin implementing the proposed changes and clarifications "through a combination of rulemaking and preamble discussion, public notice, and administrative updates to the [FSA Manual]." Attach. A at 4. Shortly thereafter, the NRCS held a summit with agency officials from the four prairie pothole region states and the Regional Conservationist, and through meeting notes distributed to all attendees "instructed the States to implement [the changes in the 2013 Memorandum] *while the new regulations and policies were developed.*" *Id.* at 4-5 (emphasis added). The notes also specifically instructed states to *not issue any written guidance. Id.* at 5.

Shortly after the passage of the 2014 Farm Bill, the NRCS abandoned its efforts to implement the policies recommended by the 2013 Memorandum through rulemaking and public notice, citing the controversy that would arise should the agency "make any changes other than those needed to recouple federal crop insurance benefits to conservation compliance in order to not place in jeopardy the alliance between environmental and agricultural interests to support the statutory change." Attach. A at 4. However, the NRCS officials in the prairie pothole states continued to follow the 2013 Memorandum. *Id.* at 9. Other states were not aware of, and therefore did not follow, the policy change. *Id.* at 9. Farm Services Agency officials were also unaware of the shift, and were reportedly "shocked that NRCS would use the determinations from the 1990s, as they regarded the older maps as of poor quality and not certified." *Id.* at 9-10.

In sum, NRCS's published policy with respect to wetland determinations issued between 1990 and 1996 remained consistent until 2013, when it issued secret instructions to staff in Minnesota, South Dakota, North Dakota, and Iowa—i.e., the "prairie pothole" states—to begin accepting as certified wetland determinations made during that interim, even without evidence that procedural appeal rights and quality mandates had been met. Attach. A at 4.

In March 2014, the Office of the Inspector General received a complaint alleging that the wetland determinations resulting from the 2013 change in policy were "unethical," "fraudulent," "illegal," and "against the appeals of the National Appeals Division." Attach. A at 7. The OIG Report, issued in January 2017, concluded that the agency's shift in the implementation of its policy merely replaced its backlog of pending determinations with inaccurate determinations, and recommended that NRCS issue "official guidance reinforcing current rules and clarifying procedures for making wetlands determinations and certifications." Attach. A at 10. However, far from rectifying the inconsistencies in policy, two days after the report was published, NRCS issued an "Amendment" to the National Food Security Act Manual formalizing, without explanation, the post-2013 approach to addressing pre-1996 determinations and applying that policy nationwide. *See* Memorandum from NRCS Headquarters, to NRCS State Conservationists and Directors (Jan. 19, 2017) (Attach. D). In short, rather than correcting its failure to rigorously evaluate wetlands certifications in the prairie pothole states, NRCS adopted a manual change that expanded its unlawful and inaccurate wetlands certification process nationwide.[4]

---

[4] NRCS's use of a manual update to implement this change was also unlawful. NRCS itself had previously recognized that this change would require rulemaking, in part because of the intensely

### 3. Interim Rule

Now, with today's truncated regulatory process, NRCS seeks to make official what it has been attempting to do in secret for the past five years—accept inaccurate wetland determinations as sufficient for the purposes of the wetland conservation program. Based upon the information available, NRCS's interim rule is contrary to the very purposes of the wetland conservation provisions, and threatens to hasten the destruction and degradation of agricultural wetlands. By proceeding to issue its interim rule without preparing an EIS or engaging in the required Section 7 consultation under the ESA, the agency has enacted this policy in violation of those vitally important federal environmental statutes and will risk incurring serious legal liability.

Shortly before issuing its interim rule—which became effective immediately on publication, *see* 16 U.S.C. § 3846(b)(2) (providing that interim rules implementing the wetland conservation program are "effective on publication with an opportunity for notice and comment")—NRCS notified selected stakeholders of its intent to implement significant changes to the wetland conservation provisions by way of an email inviting their participation in a stakeholder meeting scheduled to take place *only one week* after the email was received. The invitation did not contain any draft language that would have been useful to developing robust comments and fostering meaningful public participation *before* the publication of the interim rule. However, in a presentation accompanying the emailed invitation, NRCS summarized the changes that it would be proposing. Several of those changes—particularly those proposing to allow producers to rely on pre-1996 "official" determinations to demonstrate compliance with the wetland conservation provisions, *see* Attach. E at 16-19—are precisely the changes that NRCS issued as secret instructions in 2013, *see* Attach. A at 4-5, 9; Attach. C.

NWF attended the stakeholder meeting and submitted written comments, which are incorporated by reference herein. *See* Attach. F ("NWF's Preliminary Comments"). On January 7, 2019, NRCS published its proposed changes to the wetland conservation provisions as an interim rule, effective upon publication, with a request for comments. *See* Highly Erodible Land and Wetland Conservation, 83 Fed. Reg. 63,046 (Dec. 7, 2018). The interim rule was accompanied by an EA. There is no indication that NRCS ever consulted with the U.S. Fish and Wildlife Service under the ESA, either formally or informally. Nor does the interim rule candidly state how NRCS will treat pre-1996 "official" determinations. This is particularly concerning because the 2013 internal memorandum originally proposing these changes noted that "[a]dministrative guidance will be developed" to allow producers "to either accept their [pre-1996] determination as certified or request a new certified determination." Attach. C at 3. The interim rule fails to foreclose this possibility, apparently leaving NRCS with the option of formalizing through administrative guidance a highly controversial change in policy that the agency itself previously stated would require a rulemaking proceeding, that is in direct

---

controversial nature of the agency's action. *See* Attach. A at 4 (noting that the USDA Secretary signed a Decision Memorandum in 2013 (Attach. C) allowing the agency to proceed with a rulemaking to implement the same changes NRCS now proposes to make with its interim rule, but the agency abandoned the effort in 2014, deeming it "too controversial"); *see also* Attach. C at 1-3 (acknowledging changes that must be made via rulemaking—these very same changes NRCS now proposes to implement in its interim rule).

contravention to Congress's longstanding and well-documented intent to improve the accuracy of wetland determinations, and even worse, without the robust public participation and review that should accompany such a significant shift in agency policy and practice.

NWF reminds NRCS that even though comments may be submitted post-promulgation, NRCS still "must respond in a reasoned manner" to comments that "raise significant problems." *Am. Coll. Of Emergency Physicians v. Price*, 264 F. Supp. 3d 83, 94 (D.D.C. 2017) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003)) (discussing agency's obligation to respond to comments on interim rules). Should NRCS fail to do so, its action will be arbitrary and capricious. *Id.*

NRCS's duty to meaningfully respond to comments is only heightened by the fact that, based upon the information presently available, the proposed regulatory changes to the wetland conservation program suffer from several serious substantive and procedural flaws. First, NRCS's proposal is contrary to Congressional intent, and thus, is arbitrary and capricious. Second, as discussed *infra*, Parts II and III, NRCS has failed to comply with NEPA and the ESA.

## DISCUSSION

I.    **NRCS's Proposed Regulatory Action Suffers from Serious Substantive Deficiencies that Must be Corrected.**

A.    **NRCS Must Clarify its Policy Regarding Pre-1996 "Official" Determinations.**

NRCS's administration of the wetland conservation provisions has long been mired in controversy. As a result, NRCS has a well-documented history of subverting both congressional intent and public participation in its implementation of the certification procedures for wetlands determinations. *See, e.g.*, Attach. A at 8-9 (describing how NRCS implemented a policy that significantly altered the administration of the wetland conservation provisions through unwritten instructions that were not subjected to public review and comment); Attach. C. In response to a growing backlog of wetland certification requests, in 2013, NRCS began to explore ways to accept as certified pre-1996 wetlands determinations for which appeal rights were not given, *without any supporting evidence of their accuracy*. Despite its determination that such a change could only be made by regulation, NRCS issued a secret memorandum to staff in the prairie pothole states that directed the offices to implement the changes in secret. *See* Attach. A. at 9. After the OIG found that NRCS's actions amounted to a significant change in policy that was never subjected to public review, and further, merely "replaced [the] backlog of pending determinations with inaccurate determinations," Attach. A at 10, NRCS initiated several actions, including amending the FSA Manual and promulgating this interim rule, under the pretext of providing "clarity" to the certification process. However, as demonstrated below, NRCS's interim rule disingenuously fails to provide clarity on the very issue that provided the impetus for this rulemaking, namely, the status of pre-1996 official determinations that were not certified.

As an initial matter, any action to accept as certified the very pre-1996 inventory maps that inspired Congress to amend the wetland conservation provisions to strengthen the

8

certification procedures is contrary to the clearly-expressed intent of Congress and as such, must fail. In the 1996 Farm Bill, Congress recognized that the "inventory maps" NRCS had been relying upon to make wetlands determinations, "while providing good information, were not completely accurate," *see, e.g.*, NRCS, Wetland Information for USDA Participants Fact Sheet (undated) (Attach. G); *see also* Attach. A at 3 n.23, and that as a result, the administration of the wetland conservation program was becoming increasingly controversial. Accordingly, the 1996 Farm Bill amended the wetland conservation provisions to require that *all* determinations be certified. *See* Federal Agriculture Improvement and Reform Act of 1996 (1996 Farm Bill), Pub. L. 104-127, § 322(a), 110 Stat. 888 (Apr. 4, 1996) (codified as amended at 16 U.S.C. § 3822). To make these new certified determinations, after 1996 NRCS relied on a "system of internal controls," set forth in the FSA Manual that ensured the quality and accuracy of wetland determinations, including the use of new technologies and both off-site and on-site evaluations. Attach. A at 6-7. Congress also provided that only those actions taken based on previous *certified* determinations would be exempt from adverse agency action under a safe harbor provision. *See* 16 U.S.C. § 3822(a)(6). Actions taken based upon a previous "final" or "official" determination were not so exempted.[5] The legislative history of the 1996 Farm Bill reveals that this omission was intentional. By providing a "safe harbor" only to those producers that had relied on a "certified" wetland determination, Congress balanced its concern about inaccurate wetland determinations with the producers' interest in certainty.[6] 142 Cong. Rec. S4420. Thus, as NRCS has repeatedly stated in various fora over the years,[7] with the amendments to the wetland conservation provisions in the 1996 Farm Bill, Congress clearly intended that previous determinations be replaced with accurate certified wetland determinations.

Most significantly, Congress not only considered, but *expressly rejected* amendments to *both* the 2014 *and* the 2018 Farm Bills that would have allowed NRCS to consider pre-1996 determinations as certified. *See* Attach. B. "Congress' rejection of the very language that would

---

[5] NRCS itself also conducted "many internal studies" that revealed that pre-1996 determinations were not sufficiently accurate to be considered certified, i.e., they failed to comply with the statutory requirement that wetland delineation maps be "sufficient for the purpose of making determinations of ineligibility for program benefits." Attach. A at 3. Additionally, NRCS expressed concern that producer files lacked evidence that producers had been notified of their appeal rights, which was a required element of "certification." *Id.*

[6] Moreover, the legislative history reveals that the USDA itself requested that the statutory language be altered to exempt only previous *certified* wetland determinations from review. 142 Cong. Rec. S4420. NRCS cannot now seek to change the meaning of the statute it helped write.

[7] See, e.g., NRCS, USDA, 1996 Farm Bill Summary: Conservation Provisions 3 (April 1996) (reporting that the 1996 Farm Bill "[r]equires wetland determinations to be certified by [the] NRCS. Previous wetland determinations will be certified to verify their accuracy"); NRCS, USDA, Wetland Information for USDA Participants: Fact Sheet (Standardized Brochures, various states) (undated) (reporting that "[i]n the 1996 Farm Bill, Congress decided that the inventory maps . . . were not completely accurate and since then these inventory maps have been in the process of being replaced by certified wetland determinations").

have achieved the result [NRCS] urges weighs heavily against the [NRCS's] interpretation." *Hamdan v. Rumsfeld*, 548 U.S. 557, 579 (2006).

As discussed in detail in NWF's Preliminary Comments, many organizations, individuals, and even agency staff have long expressed concerns about the impacts of implementing such a policy nationwide—chiefly, the continued loss and degradation of agricultural wetlands that Congress had sought to prevent in enacting the wetland conservation provisions. *See* Attach. F. Now, under the guise of "transparency," NRCS's interim rule only further muddies the waters. Due to the timing and substance of the interim rule, it is clearly a direct response to the highly critical OIG Report released in January 2017, in which the OIG identified significant problems with NRCS's implementation of the wetland conservation provisions.[8] Yet, neither the interim rule, nor the EA accompanying it, even *mention* the OIG Report or its findings. Nor does the rule clarify how NRCS will treat pre-1996 "official" determinations that lack documentation of appeal rights or supporting documentation of their accuracy—the precise policy that was at issue in the OIG Report. It is disingenuous for NRCS to claim that its interim rule provides "transparency," *see* 83 Fed. Reg. at 63,047, when it utterly fails to address the very concerns that inspired the agency to issue it.

To the contrary, those concerns are only amplified by the text of the interim rule, or more precisely, what the text leaves open. The interim rule restates NRCS's established policy that pre-1996 determinations are considered certified if "the person was notified that the determination had been certified, and the map document was of sufficient quality to determine ineligibility for program benefits." 83 Fed. Reg. at 63,052. However, it does not require that the producer have been given notice of his appeal rights *when he was issued the determination*. Moreover, it defines "sufficient quality to determine ineligibility for program benefits" to require that the map document "be legible to the extent that areas that are determined wetland[s] can be discerned in relation to other ground features." *Id.* Thus, nothing in the interim rule restricts NRCS from issuing guidance permitting the agency to accept as certified the very pre-1996 determinations both Congress and the agency rejected as too inaccurate to determine eligibility for benefits, as long as the map documents are "legible" and the producer was belatedly issued appeal rights.[9] *See id.* at 63,051-52.

_____

[8] Specifically, the OIG found that "NRCS made significant changes in its process for wetland determinations that allowed producers to drain and farm more wetlands" by accepting as certified the very pre-1996 wetland inventory maps as certified wetlands determinations that had inspired Congress to amend the wetland conservation provisions in the 1996 Farm Bill, and that "[t]he process for making this change was not carried out in a transparent manner." Attach. A at i.

[9] In fact, at another point, the interim rule *reveals* that NRCS anticipates reviewing and certifying previously issued wetland determinations. Indeed, when setting forth the procedures for identifying the presence of wetland hydrology—one of the three essential characteristics of a wetland—the rule provides that the "determination of wetland hydrology will be made in accordance with the current Federal wetland delineation methodology in use by NRCS *at the time of the determination*." 83 Fed. Reg. at 63,052. Determinations issued after 1996 are considered "certified" and are not subject to review. *See* 16 U.S.C. § 3822; 7 C.F.R. §

NRCS's initial proposal for the interim rule renders NRCS's failure to explicitly address its treatment of pre-1996 "official" determinations particularly glaring. NRCS initially proposed amending the regulations to allow producers to rely on "official" determinations issued between 1985 and 1990 for a two-year "sunset clause," provided the producer doesn't drain "obvious wetlands." Attach. E at 16. The proposal also recommended that for "official" determinations made between 1991 and 1996 for which documentation of appeal rights could not be produced, NRCS allow producers to "self-certify" that they had received appeal rights, after which the official determination would be considered certified. *See id.* at 18-19. Even where the producer did not certify that it had received appeal rights, NRCS proposed to accept the official determination as certified *without any supporting evidence of its accuracy*, unless the producer requested a new determination. *See id.* at 18-19.

Now, in the interim rule, NRCS omits *any* reference to these recommendations, and instead adopts vague language that, far from offering "clarity," *see* 83 Fed. Reg. at 63,050, leaves open an avenue for the agency to adopt, without any public involvement, the precise practice that was soundly criticized by the OIG—i.e., accepting as certified the very pre-1996 determinations that *inspired* Congress to amend the Food Security Act to add increasingly stringent requirements for accuracy. As explained in NWF's Preliminary Comments, *see* Attach. F, to the extent that NRCS is considering implementing changes that would allow the agency to accept as certified pre-1996 wetland determinations without additional evidence of their accuracy or that appeal rights were given *at the time the determination was made* (e.g., by augmenting the interim rule with additional administrative guidance), such a policy would contravene Congress' clear intent, and as such, would necessarily fail. *See Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1368 (D.C. Cir. 1990) (providing that Congress' "intention is the law and must be given effect" (quotation omitted)). Such a policy would also represent a significant reversal of prior agency practice, *see* Attach. A at 6, 10, and accordingly, could not be implemented without a robust explanation to ensure that there is a "rational connection between the facts found and the choice made." *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (providing that while agencies are free to change their existing policies, they must, at a minimum "display awareness that it is changing position" and "show that there are good reasons for the new policy"). Significantly, such an explanation is decidedly lacking here.

To the contrary, NRCS insists that its policy regarding pre-1996 determinations has remained consistent since 2010. *See* Attach. D at 2; EA at 5 (insisting that "the clarifying language in th[e] [interim] rule does not change in any way how NRCS administers the certified wetland determination portion of the [wetland conservation] provision, the regulatory basis for certified wetland determinations, nor how such determinations are considered certified as a matter of law"). However, the OIG unequivocally determined that NRCS in fact implemented a

---

12.30(c)(1). Pre-1996 determinations that were "certified" remain so, and are also not subject to review. *See* 16 U.S.C. § 3822(a)(4). Thus, the only time NRCS would need to apply the "wetland delineation methodology in use . . . at the time of the determination," 83 Fed. Reg. at 63,052, is where the agency reviews wetland determinations, and the only wetland determinations theoretically subject to review are the "official" determinations issued prior to 1996.

001721

significant change in its certification procedures in the prairie pothole states in 2013. *See* Attach. A at 6 (finding that "NRCS Changed its Wetland Determination Process Contradicting Its Prior Implementation of Policy and Practice); *id.* at 10 (finding that "[b]y making this change in the implementation of policy, NRCS replaced its backlog of pending determinations with inaccurate determinations"). In the interim rule, NRCS failed to even acknowledge this finding, and thus, failed to fulfill its basic obligation under administrative law principles to "display awareness that it is changing position." *Fox Television*, 556 U.S. at 515.

Relatedly, even while NRCS continued to insist that its practices regarding the certification status of pre-1996 wetland determinations has remained consistent, the agency paradoxically conceded that the rule was needed to "improv[e] the consistency of how the conservation compliance provisions are implemented." EA at 3. NRCS thus reaffirmed its previous statements that there has been "inconsistent application of wetland certification policy" that has yet to be resolved. *See* Attach. A at 19. However, the interim rule fails to elaborate not only on what the inconsistent policy applications have been, but also on how the interim rule will resolve them. As a result, the interim rule omits what is arguably its most essential piece—i.e., an explicit policy regarding the certification status of pre-1996 wetland determinations to be uniformly applied across states—particularly considering the interim rule's express purposes to provide clarity and improve consistency. This is particularly troubling in light of the fact that the "considerable confusion" surrounding the certification of pre-1996 wetland maps served as the *major impetus* for this rulemaking effort. *See* Attach. D at 2. Thus, the interim rule represents at best, an arbitrary and capricious failure to acknowledge and correct the rampant inconsistencies that have plagued NRCS's implementation of the wetland conservation provisions, *see Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (providing that unexplained inconsistencies in agency position are arbitrary and capricious and therefore unlawful), and at worst, a deliberate attempt to further conceal NRCS's practices from the public eye.

In sum, although purporting to provide clarity regarding NRCS's treatments of pre-1996 determinations, the 2019 Interim Rule continues to obscure a fundamental piece of the agency's implementation of the wetland conservation provisions—namely, how NRCS plans to comply with its statutory duty to ensure the accuracy of wetland determinations. While NWF is generally supportive of efforts to provide transparency to the public concerning the procedures it uses to make wetlands determinations, when placed within the context of NRCS's past actions concerning wetlands compliance, the interim rule fails to achieve this goal. To the contrary, the interim rule only further obfuscates NRCS's policies for certifying wetlands determinations. Particularly in light of NRCS's well-documented history of attempting to do in secret what would be "too controversial" to do through an open, procedurally valid administrative process, *see* Attach. A at 4 (reporting that NRCS declined to move forward with implementing the 2013 Memorandum through a rulemaking after deeming the proposed changes "too controversial"), NRCS *must* explicitly clarify how it will treat pre-1996 "official" determinations that do not meet procedural or quality mandates. Moreover, to the extent that NRCS's proposed policy regarding such determinations alters its currently stated policy, NRCS must provide the public an opportunity to comment. *See* 5 U.S.C. § 553; *Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 237 (D.C. Cir. 1992) (providing that regardless of an agency's characterization, rules that "effect[] a change in existing law or policy" constitute legislative rules that must go through notice and comment rulemaking (quotation omitted)).

### B.    NRCS Must Replace Pre-1996 Official Determinations With New Certified Determinations Using Current Wetland Delineation Methodologies.

In the 2017 Amendment to the FSA Manual, NRCS declared for the first time that pre-1996 wetland determinations would be reviewed according to the Federal wetland delineation methodology in use by NRCS *at the time of the determination*." 2017 Amendment at 2. This change appears to have been carried over into the interim rule, where it is buried in the provision regarding the determination of wetland hydrology. Specifically, NRCS provides that the "determination of wetland hydrology will be made in accordance with the current Federal wetland delineation methodology in use by NRCS *at the time of the determination*." 83 Fed. Reg. at 63,052 (emphasis added). This provision is contrary to the plain language and Congressional intent of the 1996 Farm Bill, and must be omitted from the final rule.

As discussed above, NRCS cannot, consistent with the 1996 Farm Bill, accept as certified the very pre-1996 wetland maps that inspired Congress to amend the Farm Bill to strengthen the wetland determination and certification procedures. To the contrary, such wetland determinations are only considered "certified" if they met the procedural and quality mandates *when they were issued*. With the 1996 Farm Bill amendments, Congress balanced its concern with providing certainty to producers with its desire to ensure the accuracy of determinations by providing a "safe harbor" only to those producers that took an action relying on a previously issued *certified* determination. *See* 142 Cong. Rec. S4420. NRCS itself supported this legislative change. *Id.* Thus, it is no surprise that NRCS's own statements in various fora over the years evince its understanding that, with the amendments to the wetland conservation provisions in the 1996 Farm Bill, Congress clearly intended that previous determinations be replaced with accurate certified wetland determinations.[10]

Accordingly, NRCS's assertion that determinations made prior to 1996 are subject to the statutory and regulatory provisions in place at the time has no foundation in the statute. Congress knows how to exempt actions taken before a certain date from amended provisions—the 1996 Farm Bill is replete with examples. NRCS cannot read into the statute what is not there.

The Farm Bill dictates that where the determination is considered certified, NRCS lacks the discretion to review it regardless of when it was issued. *See* 16 U.S.C. § 3822(a)(6). However, where the pre-1996 determination is not considered certified, consistent with Congress's intent in amending the Farm Bill to ensure the accuracy of wetlands determinations, NRCS *must* issue a new determination that complies with the quality mandates that are presently

---

[10] *See, e.g.*, NRCS, USDA, 1996 Farm Bill Summary: Conservation Provisions 3 (April 1996) (reporting that the 1996 Farm Bill "[r]equires wetland determinations to be certified by [the] NRCS. Previous wetland determinations will be certified to verify their accuracy"); NRCS, USDA, Wetland Information for USDA Participants: Fact Sheet (Standardized Brochures, various states) (undated) (reporting that "[i]n the 1996 Farm Bill, Congress decided that the inventory maps . . . were not completely accurate and since then these inventory maps have been in the process of being replaced by certified wetland determinations").

in force. There are simply no circumstances, consistent with the statute, under which NRCS could use outdated wetland delineation methods to review and certify an old determination. NRCS must remove the provision from its final interim rule, and instead make clear that determinations of wetland hydrology will be made in accordance with the wetland delineation methodology currently in use by NRCS.

Moreover, any attempt to review wetland determinations using outdated methodologies represents a significant—and as yet unexplained—departure from past practice. Although NRCS considers the interim rule to be a mere clarification of existing policy, NRCS's own contemporaneous statements made when promulgating its own regulations implementing the 1996 Farm Bill demonstrate that the agency understood its statutory mandate to require a review of previous wetland determinations to ensure their "accuracy." *See, e.g.*, 61 Fed. Reg. at 47,025 (noting that NRCS was "considering establishing a specific time frame for completing the evaluation of existing wetland determinations"); *see also* NRCS, USDA, 1996 Farm Bill Summary: Conservation Provisions 3 (April 1996) (reporting that the 1996 Farm Bill "[r]equires wetland determinations to be certified by [the] NRCS. Previous wetland determinations will be certified to verify their accuracy"). Thus, at the *bare minimum*, NRCS *must* offer a robust explanation for its actions to ensure that there is a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. 29, 43 (1983); *Fox Television Stations, Inc.*, 556 U.S. at 515 (providing that while agencies are free to change their existing policies, they must, at a minimum "display awareness that it is changing position" and "show that there are good reasons for the new policy").

### C.    Although The Interim Rule And EA Fail To Provide The Public With Sufficient Information To Offer Meaningful Comment, NWF Makes The Following General Comments Based On The Information That Is Available.

As discussed below, NRCS's EA fails to provide the public with the environmental information necessary to weigh in with their views and inform the agency decisionmaking process. *See Ctr. for Biological Diversity v. Gould ("Gould")*, 150 F. Supp. 3d 1170, 1183 (E.D. Cal. 2015) (holding that the Forest Service failed to provide adequate pre-decisional opportunity for public comment when its EA failed to include information vital to understanding the agency's action, such as the maps the Service relied upon, and the analysis underlying the agency action). Had NRCS issued a legally adequate NEPA document that objectively considered alternatives and analyzed and disclosed the environmental consequences of the interim rule, NWF "would have been able to submit a more complete comment." *Id.* at 1082. Consequently, in accordance with the basic NEPA principles regarding public participation and informed decisionmaking, and for the additional reasons set forth below, NRCS must withdraw its EA to correct the serious flaws in its analysis.

Moreover, as discussed above and outlined in more detail below, NRCS's interim rule fails to effectuate Congress's intent to preserve agricultural wetlands by, e.g., permitting the certification of inaccurate pre-1996 wetland determinations, failing to require the use of best available methods for wetland delineation, and redefining terms to allow for the manipulation of wetland determinations. This failure is particularly concerning because the interim rule is

*already effective*. Thus, the agency must immediately withdraw the interim rule and correct the serious deficiencies highlighted by these comments.

NWF nevertheless offers the following preliminary substantive comments on the EA and interim rule:

- **Interim Rule Amendments to 7 C.F.R. §§ 12.2(a), .31(c); Best Drained Condition**: NWF appreciates the clarification by rule of this longstanding concept that has been difficult to consistently apply in the field. The agency's codification of this term should also set a standard for credible and consistent documented evidence of the on-going (not abandoned) best drained condition prior to December 23, 1985 that is providing the basis for wetland determinations. As the agency recognizes in its interim rule preamble, "best drained condition" is "fundamental to the identification of wetlands that experienced drainage manipulations prior to enactment of the 1985 Act, and to meet congressional intent to provide certainty to persons concerning the status of such land and its future use." 83 Fed. Reg. at 63049. It is important, then, that this "best drained condition" be based on sound documentation and not be subject to manipulation based on weak or non-existent documentation.

- **Interim Rule Amendments to 7 C.F.R. § 12.2(a)(4)(i), (ii), (iii); Hydrology Criteria for Farmed Wetland, Farmed Wetland Pasture, and Prior Converted Cropland:** As explained in the interim rule, "[t]he prior hydrologic criteria for farmed wetland and farmed wetland pasture was based strictly on the quantification of the number of days that the wetland experienced inundation or saturation during the growing season," and "differed depending on the landscape position of the wetland." 83 Fed. Reg. at 63,049. Citing administrative difficulties, NRCS now proposes to adopt an approach that "uses more readily observable and easily quantifiable criteria." *Id.* However, this indicator approach is scientifically sound and consistent with the statutory definition of wetland *only if* in practice, determinations are capturing the full range of relevant "observable conditions resulting from inundation or saturation," *id.*, during both the growing season, and the wet portion of the growing season to capture actual wetland hydrology. Given the facts that (1) NRCS is moving away from on-site determinations in favor of off-site determinations, and (2) those off-site determinations are based largely on mid-summer aerial imagery taken during the dry portion of the growing season, many indicators of inundation will be missed, resulting in wetland determinations that omit many farmed wetlands. Indeed, an analysis of U.S. Fish and Wildlife Service waterfowl and pond surveys conducted in May and July each year from 1974-2003 found that the number of wetland basins containing water is 73% lower in July than in May. *See* NWF & The Izaak Walton League, *Wetland Conservation in the Farm Bill* 3 (undated) (Attach. H); *see also* Letter from Dan Ashe, Director, FWS, to Dave White, Chief, NRCS (June 21, 2012) (Attach. I) (reporting that "[t]he magnitude of difference between May and July surface hydrology is profound," and that the "long-term data set [collected by FWS] illustrated that in the [Prairie Pothole Region] portion of the

Dakotas, the number of basins with water declined on average *by more than 70%* between May and July" (emphasis added)). Accordingly, by using mid-summer imagery, NRCS risks omitting seasonal wetlands from wetland determinations, robbing the wetlands of statutory protections. NRCS should revise these indicator requirements to require the use of on-site wetland determinations and/or the best available off-site wetland delineation methods (e.g., the use of spring imagery, LiDAR, hydric soils mapping, and precipitation data that reflects the wet portion of the growing season), as determined by rigorous quality control studies, to ensure that off-site methods are not omitting seasonal wetlands on the landscape.

- **Interim Rule Amendment at 7 C.F.R. § 12.30(c); Replacing the Term "Tract" with the Term "Field or Sub-field":** NRCS states in the rule preamble that NRCS will conduct wetland determinations on a field or sub-field basis except when the producer requests a determination for their entire farm tract. 83 Fed. Reg. 63049-50. Yet the interim final rule then "clarif[ies]" that "[a]ll wetland determinations made after July 3, 1996, *will* be done on a field or sub-field basis and will be considered certified wetland determinations." *Id.* at 63051-52. NRCS's existing practice is to conduct wetland determinations on a field or sub-field basis, except when the producer requests a determination for their entire farm tract. Thus, limiting tract-wide determinations is in fact, *inconsistent* with current practice. Moreover, limiting such determinations is inefficient, and opens the door to piecemealing of wetland determinations and manipulation of the wetland determination and wetland conservation compliance enforcement operations. Rather than preclude a producer from requesting a determination on a tract-basis, NRCS should revise the interim rule to continue to allow producers the option of requesting a determination for the entire tract to improve efficiency, and to reduce delays and backlogs for the agency.

- **Interim Rule Amendments to 7 C.F.R. § 12.31(c)(4); Determining Normal Precipitation:** NWF is concerned that NRCS's only stated rationale for the use of this fixed dataset is to provide "continued certainty" to producers. NWF questions the use of this fixed precipitation dataset on several fronts:

  o First, the criteria set forth in the interim rule establish wetland identification procedures for current and future wetland determinations. Specifically, they establish criteria for use in determining whether wetland hydrology exists under normal circumstances, including under the normal climatic conditions existing at the time of the wetland determination, not necessarily as of December 23, 1985. Thus, for new wetland determinations related to new wetland conversion activities, the 30-year precipitation dataset that reflects current conditions would seem to be the appropriate dataset to employ. Presumably, NRCS keeps these WETS tables for such purposes. Even for new wetland determinations related to activities planned on fields or tracts that may have been subject to some previous agricultural activity and/or drainage manipulation, NWF questions the wisdom in using outdated precipitation data to determine

001726

current normal climatic conditions, particularly where the full impacts of using the static dataset as opposed to the new dataset have not been fully analyzed or disclosed. *See also infra* at Section II.E.

o   At a minimum, if NRCS relies on the outdated 1971-2000 precipitation data to determine wetland hydrology under normal climatic conditions, the agency should limit its use to only those situations where the producer can demonstrate the existence of special circumstances, such as where the use of the new dataset would create a demonstrably unfair result.

o   In addition, at a minimum, for NRCS to reject current best available precipitation data in determining wetland hydrology under normal climatic conditions, NRCS must conduct a robust and objective environmental analysis of the potential loss of seasonal wetlands resulting from the use of this outdated precipitation data alone, and in combination with the other methods set forth in this interim rule that also skew wetland determinations toward the omission of seasonal wetlands (e.g., by relying on off-site determinations and imagery taken in mid-summer, when wetlands are driest, rather than in spring, *see* Attach. H at 3 (noting that "the number of wetland basins containing water is 73% lower in July than in May")). *See also infra* at Section II.E.

- **Interim Rule Amendment at 7 C.F.R. § 12.31(e); Removal of the On-Site Determination Requirement for Minimal Effect Determinations:** The interim final rule removes the requirement of on-site evaluation as overly burdensome and that removing the requirement will "better allow USDA to provide this statutory exemption to USDA program participants" and will "not provide a substantially different decision" given that "assessments can be conducted remotely based on a general knowledge of wetland conditions in the area." 83 Fed. Reg. at 63,050. NWF offers the following comments on this rule provision:

o   We do strongly support the rule's codification of the requirement that a request for a minimal effect determination must be made prior to the beginning of wetland conversion activities, and that, in the event of a request for an after-the-fact minimal effect determination, the burden will be upon the person to demonstrate to the satisfaction of NRCS that the effect was minimal.

o   The minimal effect exemption is, by statute and regulation, limited to situations where, based the individual or cumulative effect of a wetland conversion for crop production has a minimal effect on the functions and values of wetlands in the area, "based on a functional assessment of functions and values of the subject wetland and other related wetlands in the area." The agency has a statutory duty to apply the minimal effect exemption narrowly and consistent with the wetland conservation objectives of the conservation title. The agency may not justify the

17

removal of the on-site evaluation requirement simply to make it easier to offer this exemption to USDA program participants.

o   NRCS recognizes that this is to be a science based determination and continues to require an on-site functional assessment of the subject wetland. While we do not oppose the use of off-site methods to support a functional assessment of functions and values of wetlands in the area, our concern is with the very loose standard for the off-site assessment of wetlands in the area: "Such an assessment of related wetlands in the area may be made based on a general knowledge of wetland conditions in the area." The final rule with respect to minimal effects must require the use of the best available aerial photos, spatial analysis, and other specific hydrological and biological data available for all wetlands in the area.

o   With respect to the producer's burden of proof in the event of a request for an after-the-fact minimal effect determination, we urge NRCS to be clear that NRCS will hold the producer (and the agency) to the standard that any determination of minimal effect must be based on a thorough on-site evaluation coupled with the best available aerial photos, spatial analysis, and other specific hydrological and biological data available for all wetlands in the area.

Of course, without the necessary environmental information regarding the changes to agency policy implemented by this regulatory process, NWF cannot offer fully informed comments. NRCS must immediately take steps to provide such information to the public to facilitate a fully informed decisionmaking process that complies with the agency's obligations under NEPA and the APA.

## II.    **Violations of NEPA**

NRCS has chosen to utilize an EA to consider and analyze the environmental impacts of, and reasonable alternatives to, the agency's decision to accept as certified wetlands determinations that for nearly two decades the agency deemed unacceptable for the purposes of determining eligibility for program benefits. However, its EA suffers from the same defect as its interim rule in that the EA presents an entirely disingenuous discussion of the purported benefits of the interim rule, and even more troubling, entirely omits a robust discussion of the topics that an EA is required to discuss, namely, alternatives to the proposed action, and the impacts of the proposed action.

### A.    **NRCS Must Prepare An EIS.**

NRCS should have prepared an EIS, because many of the NEPA "significance" factors are implicated by this federal action. Thus, NRCS's decision to prepare an EA here, in lieu of an EIS, is contrary to NEPA and its implementing regulations.

As pertinent case law explains, an EIS must be completed here to fulfill NRCS's NEPA obligations. Indeed, several of the NEPA "significance" factors are triggered by the proposed action, although the presence of *only one* significance factor *requires* preparation of an EIS. *See Pub. Citizen v. Dept. of Transp.*, 316 F.3d 1002, 1023 (9th Cir. 2003) ("If the agency's action is environmentally 'significant' according to any of these criteria [set forth in 40 C.F.R. § 1508.27], then DOT erred in failing to prepare an EIS."); *Humane Soc'y of the U.S.* v. *Johanns*, 520 F. Supp. 2d 8, 20 (D.D.C. 2007) (explaining that "courts have found that the presence of one or more of [the CEQ significance] factors should result in an agency decision to prepare an EIS" (citations omitted)); *Fund For Animals* v. *Norton,* 281 F. Supp. 2d 209, 218 (D.D.C. 2003) (same).

As an initial matter, the EA does not even *mention* the significance factors, much less set forth any analysis of whether they are implicated by the proposed action. However, the following significance factors are triggered here, thus requiring preparation of an EIS:

- **40 C.F.R. § 1508.27(b)(3)** – This factor is triggered where the proposed action will affect "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, *wetlands*, wild and scenic rivers, or *ecologically critical areas*." (emphasis added). The interim rule indisputably will impact wetlands. In fact, NRCS *acknowledges* that its decision to use a static decadal precipitation dataset will impact the number of wetland acres that are identified as subject to the wetland compliance provisions. Moreover, the OIG Report documented the significant local effects that NRCS's change in policy is having on agricultural wetlands. *See Anderson v. Evans*, 314 F.3d at 1019–20 (holding that "local effects are a basis for a finding that there will be a significant impact" where there are substantial questions as to the effects of the proposed actions on local resources). Yet, NRCS never addresses this—or indeed, *any*—significance factor, and thus does not explain why the interim rule's acknowledged impacts to wetlands will ostensibly be insignificant. Given Congress' findings as to the importance of wetlands to the nation, and its clearly expressed intent to preserve agricultural wetlands, and further, in light of the dramatic impacts that NRCS's changes to their wetland conservation policies have *actually had* on agricultural wetlands, this significance factor is triggered and therefore warrants a fuller analysis in an EIS.

- **40 C.F.R. § 1508.27(b)(4)** – This factor addresses "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." The OIG Report notes that NRCS originally sought to make the changes implemented by the interim rule in 2013. However, the changes were deemed "too controversial," and NRCS instead attempted to implement the changes behind closed doors. Thus, NRCS has *conceded* that this is a controversial activity within the meaning of NEPA. Moreover, as demonstrated by the long and complicated history of the implementation of the wetland conservation provisions, there are significant scientific, legal, and practical controversies implicated by the program, particularly over the methodologies used to delineate wetlands. This point is only reinforced by NRCS's well-documented history of attempting to shroud its administration of the program in secrecy. Accordingly, this action is highly controversial as defined by NEPA and therefore requires consideration

19

in an EIS.

- **40 C.F.R. § 1508.27(b)(5)** – This factor addresses "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." NRCS has failed to identify the environmental impacts of its action on agricultural wetlands and the species that depend on them. Courts have found that in such cases, "uncertainty as to the impact of a proposed action" on local resources is "a basis for a finding that there will be a significant impact" and setting aside a FONSI. *See Anderson v. Evans*, 314 F.3d at 1018–21. As demonstrated by the OIG, NRCS's wetland conservation policies are already impacting agricultural wetlands. Moreover, because many of the policies implemented by the interim rule are ill-defined, their precise effects remain unknown. Thus, this significance factor is triggered and warrants a fuller analysis in an EIS.

- **40 C.F.R. § 1508.27(b)(6)** – This factor addresses "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." With this interim rule, NRCS proposes significant changes to its administration of the wetland conservation provisions that represent significant departures from prior policy. This dramatic shift in legal interpretation and management approach cannot avoid scrutiny in an EIS and is precisely the type of activity triggering the precedent-setting significance factor.

- **40 C.F.R. § 1508.27(b)(7)** – This factor addresses "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." In particular, "[s]ignificance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." Taken as a whole, the interim rule imposes several changes to NRCS's wetlands identification policies that, when considered cumulatively with existing practices, result in the exclusion of seasonal wetlands in wetlands determinations. For example, the interim rule provides that NRCS will use a decadal precipitation dataset that is widely acknowledged to be "dry." When considered cumulatively with the fact that NRCS's practice is to use aerial imagery from the dry season—i.e., after seasonal wetlands have already dried—NRCS's proposal threatens to have cumulatively significant impacts on whether seasonal wetlands are identified as subject to wetlands conservation compliance. Additionally, the interim rule provides that NRCS will now conduct wetland determinations on a field basis, which allows for the piecemealing of wetland determinations and opens the door for manipulation of wetland determinations. These cumulatively significant impacts were never even *mentioned* in the EA. Thus, this significance factor is triggered and must be analyzed in an EIS.

- **40 C.F.R. § 1508.27(b)(9)** – This factor addresses "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the [ESA]." As set forth below, the interim rule will indisputably impact endangered and threatened species that rely upon affected wetlands for various biological functions. These impacts have never been analyzed in a NEPA process, nor has NRCS undergone consultation as required under the ESA. Accordingly, NRCS must immediately initiate consultation with FWS, and must analyze the interim

20

rule's impacts on endangered and threatened species in an EIS.

- **40 C.F.R. § 1508.27(b)(10)** – This factor addresses "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." NRCS never considered whether the interim rule and the policies it implements are consistent with the Farm Bill. Thus, NRCS unlawfully failed to analyze several critical issues. *See ONDA*, 625 F.3d at 1109 ("[C]onsiderations made relevant by the substantive statute driving the proposed action must be addressed in NEPA analysis."). In enacting the wetland conservation provisions of the Farm Bill, Congress recognized that "[w]etlands are a priceless resource whose contributions have long gone unrecognized," H. Rep. 99-271 at 86, and sought "to discourage the draining of wetlands or 'swampbusting' for the purpose of growing agricultural commodities," *id.* at 78. Yet, NRCS never assessed whether implementing policies that in fact lessen the rigor of the methods used to make wetlands determinations is an appropriate implementation of a statute that aims to preserve agricultural wetlands. Nor did NRCS consider whether those policies are consistent with its own regulations, which declare as a central purpose of the wetlands conservation program, to "remove certain incentives for persons to produce agricultural commodities on . . . converted wetland and to thereby [a]ssist in preserving the functions and values of the Nation's wetlands." 7 C.F.R. § 12.1. NRCS cannot avoid grappling with its legal duties under the Farm Bill and its implementing regulations. To the contrary, a full and fair discussion of alternatives to the interim rule and their impacts would only serve to better inform the agency's administration of the wetlands conservation program, and is precisely why an EIS must be prepared. In addition, because NRCS has failed to initiate consultation under section 7 of the ESA where this action so clearly "may affect" endangered or threatened, an EIS is required because the action threatens a substantial violation of the ESA and its implementing regulations.

In short, an EIS is required when even *one* of these factors is implicated. Because at least *seven* significance factors are triggered here, it is wholly inconsistent with NEPA and its regulations for NRCS to prepare only an EA under the circumstances, and therefore it would be a patent NEPA violation if NRCS refuses to prepare an EIS here. For all of these reasons, an EIS is required for this action.

**B.      NRCS's Characterization Of The Changes Set Forth In Its Interim Rule As Merely Administrative Is Contrary to the Evidence And Cannot Be Cited To Avoid Its Obligations Under NEPA.**

NRCS suggests that even an EA is unnecessary in this case, as "Congress has prescribed many requirements [of the wetlands compliance provisions] in statute, and there is little discretion remaining for [NRCS] to exercise." EA at 2. Thus, according to NRCS, "[m]any decisions that remain are administrative in nature and fall within a category of activities excluded from the requirement to prepare an EIS." *Id.* NRCS concludes that "*despite this*, [the agency] has decided to prepare this EA to review the environmental impacts of the proposed clarifications" in the interim rule. *Id.* (emphasis added)

NEPA compliance is not a favor to the public, nor is it a tool to justify a decision already made. It is an indispensable, statutorily required component of agency decisionmaking that both informs the public and forces the agency to take a hard look at the environmental consequences of its action. As set forth below, NRCS's EA fails at both counts. However, that failure begins with NRCS's characterization of its action as merely "administrative" and as such, exempt from a full environmental review. This characterization is demonstrably false. As discussed above and conclusively established in the OIG Report, NRCS made significant changes in its wetlands determination policy in response to a growing backlog of determination requests. These changes have led to significant impacts on agricultural wetlands, as exhaustively detailed in the OIG Report. Thus, it is indisputable that NRCS has taken a "major federal action" because it "adopt[ed] . . . new . . . procedures" for making and evaluating wetland determinations. *See* 40 C.F.R § 1508.18(a), (b); *see also Comm. for Auto Responsibility v. Solomon*, 603 F.2d 992, 1002-03 (D.C. Cir. 1979) ("The duty to prepare an EIS normally is triggered when there is a proposal to change the status quo." (footnote omitted)).

Yet, neither the interim rule, nor the EA, even *acknowledge* that NRCS significantly changed its policy. To the contrary, NRCS has steadfastly refused to acknowledge the OIG's findings, instead insisting that subsequent actions that were taken *in direct response* to the OIG Report were intended to "clarify" existing policy with regard to the certification issue. This is particularly disingenuous in light of the fact that NRCS's subsequent actions have uniformly been taken to make permanent the very changes that the OIG Report faulted NRCS for making outside of the lawful rulemaking process—indeed, the very changes that *NRCS itself* acknowledged could not be made without an explicit regulatory amendment. NRCS cannot continue to turn a blind eye to the impacts of its own actions and avoid public scrutiny by attempting to mischaracterize such major policy changes as mere "clarifications" of existing policy. *Cf. CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) (noting that "the agency's characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule with the 'force of law,' but the record indicates otherwise" (citations omitted)).

The same is true for other major policy changes set forth in the interim rule. For example, in the interim rule, NRCS takes a discretionary action to use a static precipitation dataset in reference to determining "normal circumstances." The EA *concedes* that this decision will impact the number of wetland acres that are identified as subject to the wetland conservation provisions. The draining of agricultural wetlands that would otherwise have been identified—or not—had the dataset shifted forward will unquestionably result in ecological, aesthetic, cultural, economic, and social effects on the natural and physical environment. *Id.* §§ 1508.14, 1508.27. Thus, it defies logic to characterize this decision as administrative in nature. Rather, by making this discretionary decision in accordance with its statutory mandate to administer the wetland conservation provisions, NRCS took a major federal action that will have significant impacts on the environment, and that accordingly, must be subjected to a full NEPA analysis.

## C.    The Purpose And Need Statement Mischaracterizes The Proposed Action And Impermissibly Constrains The Range Of Reasonable Alternatives

Irrespective of whether an EIS or EA is appropriate under the circumstances, NRCS's analysis of alternatives in the EA does not satisfy NEPA or its implementing regulations. An EA

must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives." 40 C.F.R. § 1508.9(b). The goals of the action necessarily dictates the range of "reasonable" alternatives that the agency must consider in evaluating the environmental impacts of a proposed action. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991). Therefore, an agency cannot define its objectives in unreasonably narrow terms. *See, e.g., Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999) (providing that "the statements of purpose and need drafted to guide the environmental review process" may not be "unreasonably narrow").

NRCS defined the need for the action in the EA: "The proposed clarifications are needed to ensure that the regulations are consistent with the current technical standards being applied by NRCS in making technical determinations." EA at 3. NRCS reported that the purposes of the proposed action were to "provid[e] the public with transparency, provid[e] certainty to USDA program participants, and improv[e] the consistency of how the conservation compliance provisions are implemented" across the country. *Id.* NRCS thus framed the purpose and need for the interim rule as merely codifying NRCS's existing policies. However, this characterization is contrary to the overwhelming evidence demonstrating that the interim rule constitutes a major policy change that will impact NRCS's effectiveness in fulfilling its statutory mandate to preserve agricultural wetlands. Because the purpose and need statement inaccurately describes the action and ignores the facts before the agency, it is arbitrary and capricious.

The purpose and need statement is also flawed in that it impermissibly constrains the range of reasonable alternatives. While NRCS enjoys "considerable discretion" in defining the purpose and need of a project, it cannot define its objectives in "unreasonably narrow terms," such that only one alternative would accomplish its goals and the EA becomes a foreordained formality. *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010); *Davis v. Mineta*, 302 F.3d 1104, 1118–20 (10th Cir. 2002). In formulating the purpose and need statement, NRCS was obliged to consider the statutory context of its action. *See League of Wilderness Defenders v. U.S. Forest Serv.*, 689 F.3d 1060, 1070 (9th Cir. 2012); *Citizens Against Burlington*, 938 F.2d at 196 (stating that "an agency should always consider the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives"); *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 743 (2d Cir. 1983) ("Frequently, a pertinent guide for identifying an appropriate definition of an agency's objective will be the legislative grant of power underlying the proposed action.").

The conservation compliance provisions and their implementing regulations have as their goal "to remove certain incentives for persons to produce agricultural commodities on . . . converted wetland and to thereby . . . [a]ssist in preserving the functions and values of the Nation's wetlands." 7 C.F.R. § 12.1(b)(4). Accordingly, NRCS's consideration of the interim rule must include an evaluation of whether the regulatory and policy changes will better achieve this goal. Yet, NRCS framed the purpose and need so narrowly as to exclude consideration of any policies except for those it identified as the "current technical standards." In so doing, NRCS ensured that the changes implemented by the interim rule were the *only* solution to the various technical and practical challenges faced by the agency in administering the wetlands conservation provisions, thus rendering a regional project a "foregone conclusion" in violation of

23

NEPA. *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 710-11 (10th Cir. 2009).

## D.    NRCS Unlawfully Avoided its Obligation to Consider a Full Range of Alternatives Under NEPA

NEPA requires that NRCS "[r]igorously explore and objectively evaluate *all* reasonable alternatives" to the proposed action, including a "no action" alternative. 40 C.F.R. § 1502.14(a) (emphasis added); *see also id.* § 1508.9(b); *Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1039 (10th Cir. 2001). Because NEPA's overriding purpose is to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment," 40 C.F.R. § 1500.1, NEPA's implementing regulations, which are binding on all federal agencies, provide that the consideration of alternatives for reducing adverse impacts "is the heart" of an EIS or EA. 40 C.F.R. § 1502.14. Accordingly, EAs "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.*

### 1.    The EA Fails to Include a True "No Action" Alternative.

The EA purported to consider two alternatives: a No Action Alternative, under which NRCS would not update its regulations; and the Proposed Action Alternative, under which NRCS would make the proposed changes set forth in the interim rule. EA at 2. According to NRCS, the interim rule "merely clarifies some aspects of the technical procedures already being used by [NRCS]." NRCS therefore maintains that there is no practical difference between the No Action Alternative and the Proposed Action Alternative.

A no action alternative "allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action." *Ctr. for Biological Diversity v. U.S. Dept. of Interior*, 623 F.3d 633, 642 (9th Cir. 2010). Where the agency is proposing changes to an ongoing management program, "'no action' is 'no change' from current management direction or level of management intensity." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).

Applying those principles here, it is clear that NRCS's No Action Alternative is inconsistent with NEPA and cannot be sustained. "To fulfill NEPA's goal of providing the public with information to assess the impact of a proposed action, the "no action" alternative should be based on the status quo." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1091 (N.D. Cal 2009). According to NRCS, the status quo *is* the interim rule because the interim rule merely "clarifies" existing policy and does not change the agency's procedures. However, as demonstrated above, this assertion is directly contradicted by the agency's own statements in the 2013 Memorandum, where it acknowledged that many of the interim rule's proposed changes *required* the agency to undergo a rulemaking. *See generally* Attach B. Moreover, the OIG determined that NRCS *did* change its policy with respect to its policy regarding the certification of pre-1996 wetlands determinations, the precise contours of

001734

which remain a central issue. Such significant changes cannot fairly be characterized as mere codifications of existing agency policy, and cannot possibly reflect the status quo. Rather, the true status quo—i.e., the alternative that represents "no change" from NRCS's longstanding practices with respect to its administration of the wetlands conservation provisions—is NRCS's administration of the wetlands conservation program as it existed prior to the adoption of *any* of the changes developed over the course of this regulatory process. *See* 46 Fed. Reg. at 18,027 (providing that the no action alternative is properly construed as one under which the agency continues its course of action "until that action is changed").

As a practical matter, NRCS's characterization of its No Action Alternative skews the agency's entire analysis of alternatives. The "no action" alternative "serves as a benchmark" for comparing the other alternatives. *Theodore Roosevelt Conservation P'ship v. Salazar*, 744 F. Supp. 2d 151, 160 (D.D.C. 2010), *aff'd*, 661 F.3d 66 (D.C. Cir. 2011); *see also Ctr. for Biological Diversity*, 623 F.3d at 642 (providing that the no action alternative is intended to "provide a baseline against which the action alternative" is evaluated). Without "[accurate baseline] data, an agency cannot carefully consider information about significant environment impacts . . . resulting in an arbitrary and capricious decision." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011); *see also Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (holding an agency's no action alternative invalid because it improperly defined the baseline). This is precisely what occurred here, where NRCS's No Action Alternative "assume[d] the existence of the very plan being proposed." *Friends of Yosemite Valley v. Scarlett*, 439 F. Supp. 2d 1074, 1105 (E.D. Cal. 2006), *aff'd*, *Friends of Yosemite Valley*, 520 F.3d at 1037-38. To establish as the baseline the existence of the very rule being analyzed "is logically untenable" and renders the no action alternative "meaningless." *Id.* Thus, NRCS's formulation of the no action alternative deprived NRCS and the public of a meaningful opportunity to assess the impacts of a regional project against those of less environmentally destructive projects. Thus, the current alternatives analysis for the interim rule is fundamentally flawed. To comply with NEPA, the alternatives analysis must be revised to include a true no action alternative that accurately serves as the baseline for its NEPA analysis.

## 2.    Because the Action Alternatives are Substantially Similar, the FEIS Fails to Analyze a Reasonable Range of Alternatives.

NEPA imposes a clear-cut procedural obligation on NRCS to take a "hard look" at alternatives that would entail less significant impacts on resources affected by the project. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 100 (1983). EAs must "[r]igorously explore and objectively evaluate all reasonable alternatives" and, in particular, "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. The regulations further mandate that the EA must "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency," but that may nonetheless meet the overall objectives of the action while ameliorating environmental impacts. *Id.*

The EA violates these requirements. The EA purported to consider two alternatives: a No Action Alternative, under which NRCS would not update its regulations; and the Proposed

Action Alternative, under which NRCS would make the proposed changes set forth in the interim rule. As NRCS acknowledges, there is not a major environmental impact difference among the alternatives. In fact, the alternatives are functionally identical. As a result, NRCS's analysis is devoid of any meaningful consideration of alternatives. Even the No Action Alternative assumed the existence of the interim rule, and deprived the EA of a meaningful baseline against which to measure the rule's anticipated impacts. In fact, because the No Action Alternative and Proposed Action Alternative are functionally identical, the EA essentially considered only the impacts from a single alternative. Such an approach cannot satisfy the agency's obligations under NEPA to examine "all reasonable alternatives," including those that lie outside the jurisdiction of the agency. *See Citizens for Envtl. Quality v. United States*, 731 F. Supp. 970, 989 (D. Colo. 1989) ("Consideration of alternatives which lead to similar results is not sufficient under NEPA[.]"); *Friends of Yosemite Valley*, 520 F.3d at 1038 (finding that SEIS "lacked a reasonable range of action alternatives" because "the [three action] alternatives are essentially identical" and thus are "not varied enough to allow for a real, informed choice"). Indeed, courts have rejected precisely this type of avoidance approach by agencies in the past. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (concluding that the EIS violated NEPA when the two action alternatives considered in detail were "virtually identical"); *Friends of Yosemite Valley*, 520 F.3d at 1038 (finding that SEIS "lacked a reasonable range of action alternatives" because "the [three action] alternatives are essentially identical" and thus are "not varied enough to allow for a real, informed choice"); *cf. Dombeck*, 185 F.3d at 1175 (holding that agencies must "provide legitimate consideration to alternatives that fall between the obvious extremes")

While NEPA does not require NRCS to "consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives," *Seattle Audubon Soc'yy v. Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996), it is particularly troubling here that NRCS failed to consider any alternatives that were more consistent with the basic policy objectives of the wetland conservation provisions than the single alternative subjected to consideration. As discussed above, NRCS's objectives must take into account "the views of Congress, expressed . . . in the agency's statutory authorization to act." *Citizens Against Burlington, Inc.*, 938 F.2d at 196; *see also Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72 (defining "reasonable alternative" to mean one that "is objectively feasible as well as 'reasonable in light of [the agency's] objectives'" (alterations in original) (quoting *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999))). With respect to agricultural wetlands, Congress has unequivocally expressed its intent to preserve agricultural wetlands. *See, e.g.*, H. Rep. 99-271 at 78 (noting that a "major objective" of the wetland conservation provisions is "to discourage the draining of wetlands or 'swampbusting' for the purpose of growing agricultural commodities"); *id.* at 86 ("Wetlands are a priceless resource whose contributions have long gone unrecognized."); *accord* 7 C.F.R. § 12.1 (listing as a central purpose of the wetland conservation provisions the "remov[al] [of] certain incentives for persons to produce agricultural commodities on . . . converted wetland and to thereby [a]ssist in preserving the functions and values of the Nation's wetlands"). Thus, NRCS's failure to rigorously explore a single action alternative (or more than one) that would be more protective of agricultural wetlands—e.g., alternatives that would resolve the certification issue by establishing that the only pre-1996 determinations that are considered certified are those that were certified at the time they were issued, require the use of best available methods when

26

making off-site determinations for minimal effects exemptions, or ensure the accuracy of wetland determinations by implementing measures to better identify seasonal wetlands—is a flagrant violation of NEPA.

Moreover, because the EA's alternatives analysis evaluates only a single alternative, NRCS's approach raises grave questions as to whether NRCS is merely using this process not to genuinely consider alternatives to the action but instead to justify the decision NRCS already made when it began taking actions in 2014 to implement the regulatory and policy changes detailed in the 2013 Decision Memorandum ostensibly to reduce the backlog of wetland determination requests. As the NEPA regulations make clear, utilizing the NEPA process as nothing more than a ruse to justify or rationalize a decision already made is a patent violation of the letter and spirit of NEPA. *See, e.g.*, 40 C.F.R. § 1502.2(g) (explaining that the NEPA process "shall serve as the means of assessing the environmental impact of proposed agency actions, *rather than justifying decisions already made*." (emphasis added)); *see also id.* § 1502.5 (requiring that NEPA review "shall be prepared *early enough so that it can serve practically as an important contribution to the decisionmaking process* and **will not be used to rationalize or justify decisions already made**" (emphases added)).

For all of these reasons, and in order to satisfy the obligations of NEPA and its implementing regulations, NRCS must consider reasonable action alternatives that would better protect agricultural wetlands and minimize the adverse impacts on these important habitats. *Cf. Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 577 (D.C. Cir. 2016) ("Accordingly, because the Service in these circumstances did not consider any other reasonable alternative that would have taken fewer Indiana bats than Buckeye's plan, it failed to consider a reasonable range of alternatives and violated its obligation under NEPA.").

### 3.    NRCS Should Consider The Following Alternatives In An EIS.

When developing alternatives to the interim rule for consideration in an EIS, NRCS should include the following elements.

First, NRCS should establish a certification standard that accurately reflects Congressional intent in enacting the wetland conservation provisions. The interim rule defines "sufficient quality to determine ineligibility for program benefits" to require only that the map document "be *legible* to the extent that areas that are determined wetland can be discerned in relation to other ground features." 83 Fed. Reg. at 63,051 (emphasis added). Such a relaxed standard plainly does not satisfy NRCS's statutory mandates under the wetland conservation provisions to preserve agricultural wetlands, in part, by ensuring the accuracy of wetland determinations. Instead, NRCS should define "sufficient quality to determine ineligibility for program benefits" to require that the map document be based on a field investigation or on off-site methods that are demonstrated to be accurate. Methods should be selected only after a robust and publicly available wetland accuracy assessment that ground-truths offsite methods, and ensures that for the methods selected, the errors of wetland omission do not exceed errors of wetland commission. Specifically, only methods that have omission and commission error rates that are both under 5%, and symmetrical should be used to make certified determinations.

27

Second, the certification of pre-1996 determinations should be subject to NRCS's longstanding policy that was in place before the agency began implementing the changes set forth in the 2013 Memorandum. In other words, they are only considered "certified" if they met procedural and quality mandates *when they were issued*. Pre-1996 determinations that do not meet this standard should be replaced with a new certified determination made subject to the same "sufficient quality" standard outlined above.

Third, to effectuate Congressional intent in preserving agricultural wetlands and providing certainty to producers, NRCS should explicitly require the use of best available science when making off-site determinations, including with respect to hydrology, normal climatic conditions, minimal effect, and best drained conditions definitions and rule provisions. Specifically, these methods should incorporate some or all of the following elements:

- On-site wetland determinations and/or the enhanced use of spring imagery to ensure that seasonal wetlands are not improperly excluded from determinations;

- LiDAR technology; and

- Precipitation data that more accurately reflects the field conditions during the wet portion of the growing season.

Moreover, NRCS should require that its off-site delineation methods be subjected to quality control studies to ensure that off-site methods are not omitting seasonal wetlands on the landscape. Other quality control methods NRCS should consider as alternatives include:

- Revising the hydrology indicators to incorporate the presence of hydric soil inclusions within non-hydric soils fields;

- Sliding the decadal precipitation dataset forward and presently using the 1981-2010 dataset when determining "normal conditions," *except* in specified circumstances where the use of the 1971-2000 dataset is determined to be appropriate when considering past agricultural conversions that have occurred on the tract;

- Requiring that the best available data sources be used when making determinations to ensure that the wetland determination process is as accurate and technically robust as possible, and further, to ensure that seasonal wetlands are not improperly omitted from such determinations, including: spring imagery, where such imagery is available[11];  National Wetlands Inventory data; updated soils

---

[11] This is particularly important because NRCS has now specifically included observations from aerial imagery as hydrologic indicators. The current wetland determination process does not consistently utilize spring imagery, and instead largely relies on imagery from late summer. The vast majority of wetlands in the Prairie Pothole Region are temporary or seasonal in nature, and are critical to the production of waterfowl and other migratory birds, and the protection of water quality and flood attenuation. Traditional aerial images obtained in later summer months,

001738

maps; LiDAR data; and physical site visits;

- Investing in the increased development of spring imagery to make it more widely available; and

- Requiring the use of a consistent, science-based methodology and process for completing off-site assessments of wetlands when making a minimal effects determination, as specified above.

### E.    NRCS Failed to Adequately Analyze the Impacts of its Action

The EA also failed to adequately evaluate the impacts of its action as required by NEPA and its implementing regulations. As discussed above, under NEPA, an EA must "take[] a hard look at the problem." *Van Antwerp*, 661 F.3d at 1154. "Although the contours of the 'hard look' doctrine may be imprecise," the agency's analysis must, at minimum, be sufficient to demonstrate that it "'has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.'" *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006) (quoting *Balt. Gas*, 462 U.S. at 97–98); *see also Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 16 (D.D.C. 2009) (noting that to comply with the "hard look" requirement, agencies must "consider all direct, indirect, and cumulative impacts that are foreseeable as a result of the [interim] rule").

Because the No Action Alternative and Proposed Action Alternative were functionally identical, the EA is devoid of any meaningful comparison of the impacts of alternatives. As a result, NRCS's impacts analysis must also fail. *See W. Watersheds Proj. v. Christiansen*, --- F. Supp. 3d ---, 2018 WL 6715536 (D. Wyo. Sept. 14, 2018) (holding that the Forest Service's "failure to consider a reasonable range of alternatives" necessarily meant that the Service had also "failed to take a hard look at the alternatives to the proposed action, some of which might mitigate impacts").

The EA's impacts analysis is also insufficient under NEPA because it omits discussion of several significant impacts from its analysis. *See Brady Campaign*, 612 F. Supp. 2d at 21 (providing that "[i]gnoring possible environmental consequences" renders an agency's impact analysis arbitrary and capricious (quoting *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 154-55 (D.C. Cir. 1985)). In particular, the EA does not even *mention* the significant change in policy that allowed the agency to accept as certified inaccurate pre-1996 wetland determinations, nor does it discuss the environmental impacts that are *already occurring* as a result of the policy change. As mentioned above, the OIG reported that in its review of several tracts where NRCS applied its new policy—i.e., where NRCS accepted as certified pre-1996 wetland determinations—75 % of wetlands that existed were "no longer protected and are subject to being drained." Attach. A at 7-8. Yet, NRCS never undertook an analysis of the environmental impacts that are likely to occur as a result of this wetland loss. Without such a discussion, the EA fails to satisfy NEPA's most basic command to "consider every significant aspect of the

---

however, fail to consistently capture these temporary wetlands. *See* Attach. H at 3 (noting that "the number of wetland basins containing water is 73% lower in July than in May"); Attach. I.

environmental impact of a proposed action," *Balt. Gas*, 462 U.S. at 97 (internal quotation omitted), and consequently, is quintessentially arbitrary under NEPA, *see Brady Campaign*, 612 F. Supp. 2d at 21.

Even for the impacts that the EA does mention, the limited discussion only serves to highlight the deficiencies in NRCS's evaluation, and underscores the practical value of a full analysis that takes the required "hard look" at the impacts of the interim rule. For example, NRCS proposes in its interim rule to determine normal precipitation using a static 30-year average precipitation dataset (1971-2000). To determine the "normal circumstances" under which the land is properly classified as a wetland subject to the wetland conservation program, NRCS uses the National Oceanic and Atmospheric Administration's ("NOAA") 30-year average precipitation dataset, which slides forward every ten years and is scheduled to do so soon—i.e., moving from the 1971-2000 dataset to the 1981-2010 dataset. As the EA reports, more acres of wetlands would be identified under the 1981-2010 dataset than under the 1971-2000 dataset due to an overall increase in precipitation; "however, the differences would not be evenly distributed nationwide." EA at 9. NRCS insists that "[f]uture decadal updates . . . would likely include periods of widespread and severe drought," which "would result in fewer acres of wetland identified as subject to the [wetland conservation] provisions." *Id.* at 10. However, NRCS does not explain why the agency could not account for periods of widespread drought in its analysis. NRCS concludes without meaningful analysis that "[t]he overall impact of maintaining use of the 1971-2000 dataset is expected to be negligible over time." *Id.* at 10.

Courts have long held that such "general statements about 'possible' effects" as insufficient to satisfy the "hard look" requirement. *See, e.g.*, *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). The EA never attempts to quantify the impact of lost wetlands under *either* decadal dataset, nor does it offer "a justification regarding why more definitive information could not be provided." *Id.* Rather, it discusses the impacts of its action using general descriptors—e.g., "negligible," "fewer"—that are undefined, and as such, "are wholly uninformative." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 101-02, 106 (D.D.C. 2006). Despite its lack of data, NRCS nevertheless asserts throughout the EA that the use of the updated decadal dataset "*would* result in fewer acres of wetland" subject to the wetland conservation provisions. However, whether the use of one decadal dataset over another will result in fewer identified wetlands is only part of the inquiry. The proper evaluation should identify the *environmental impacts* of having fewer wetlands subject to the wetland conservation provisions, in light of the documented losses that have already occurred—and that are reasonably expected to continue—due to changing agricultural practices, climate change, and development. *See Blue Mountains Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (finding that the Forest Service failed to take a "hard look" at the impacts of its action where failed to properly "identify the impact of the increased sediment from the logging and roadbuilding on the fisheries habitat in light of the documented increases that already have resulted from the fire"). Without such an analysis, the EA cannot be said to contain "a reasonably thorough discussion of the significant aspects of the probable environmental consequences," as required under NEPA. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992).

30

Nor can the EA be said to "foster both informed decisionmaking and informed public participation." (quoting *California v. Block*, 690 F.2d 753, 761 (9th Cir.1982)). The "hard look" mandate serves NEPA's twin goals of ensuring that agencies "consider every significant aspect of the environmental impact of a proposed action," and "ensur[ing] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas*, 462 U.S. at 97. Accordingly, "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b). However, NRCS's impacts discussion is devoid of any scientific analysis of the environmental effects of the interim rule. In fact, its impacts analysis is largely devoid of any acknowledgement that NRCS's actions will impact the environment *at all*.[12] Such information is essential to an informed evaluation of the merits of the interim rule as compared to alternatives, and, thus, is critical to meaningful public participation. The EA's failure to disclose the impacts of its action "preclude[d] meaningful evaluation of the effectiveness of the agency's proposed action in achieving its stated goals, as well as the availability of alternatives," and "belies its claim that it took the 'hard look' required to avoid a finding that [its EA] was arbitrary, capricious, and contrary to law." *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 227, 229 (D.D.C. 2003) (finding that the agency's failure to provide information in the EA process sufficient to foster public participation violated NEPA's "hard look" requirement).

Had NRCS taken a legally adequate "hard look" at the impacts of the interim rule—e.g., by comparing the actual impacts of using either decadal dataset on the number of wetlands identified—both the agency and the public would be better informed of the environmental effects of the alternatives and would be able to offer meaningful comment on the interim rule. *Cf. Gould*, 150 F. Supp. 3d at 1182 (finding that the Forest Service violated NEPA where the agency's failure to include environmental information that it relied upon in its decision precluded plaintiffs from submitting more complete comments). Moreover, the EA's omission of information regarding the interim rule's impacts is particularly troubling in light of the fact that the policies NRCS has sought to implement with this rulemaking process have *already* resulted in significant adverse impacts to agricultural wetlands. Accordingly, NRCS must revise its EA to include a more robust, objective analysis of the environmental impacts of the interim rule that allows the public to "ensure that the agency has adequately considered and disclosed the environmental impact of its actions." *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 269 (D.C. Cir. 2002). At the very least, NRCS must "provide[] sufficient evidence and analysis" to support its decision not to prepare an EIS. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)).

---

[12] For example, returning to the agency's discussion of the interim rule's implementation of the static decadal precipitation dataset, the EA states in general terms that shifting the dataset forward would result in more wetland acres mapped in some regions, and fewer wetland acres mapped in others. NRCS does not discuss the *environmental impacts* that would result from the increase or decrease in protected wetlands. Likewise, when discussing the agency's policy regarding the certification of pre-1996 wetland determinations, NRCS maintains that there are no environmental impacts because, according to the agency, there has been "no change" to the "determinations' regulatory status as being certified or not certified."

NRCS's failure to take a "hard look" at the impacts of its action is also apparent in its focus on the *administrative* impacts of the interim rule on NRCS's implementation of the wetlands conservation program, as opposed to the *environmental* impacts. It is axiomatic that the purpose of an impacts analysis under NEPA is to evaluate the environmental impacts or effects of a proposed action. *Cf. Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983) ("The theme of § 102 [of NEPA] is sounded by the adjective 'environmental': NEPA does not require the agency to assess every impact or effect of its proposed action, but only the impact or effect on the environment."). However, aside from a few general and conclusory statements regarding the interim rule's impacts on the amount of wetland acres that will be identified as subject to the wetlands conservation provisions, NRCS's impacts analysis consists of a discussion of the political and administrative difficulties the agency faces in administering the program. As a result, the EA reads less as a meaningful comparison of alternatives and their impacts, and more as an impermissible attempt to "rationalize a decision already made." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000); *see also, e.g.*, 40 C.F.R. § 1502.2(g) (explaining that the NEPA process cannot be used to "justify[] decisions already made").

Moreover, while considerations of administrative difficulty properly inform the agency's evaluation of the feasibility of alternatives, *see, e.g.*, *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72 (defining "reasonable alternatives" as those that are "objectively feasible as well as 'reasonable in light of [the agency's] objectives.'" (alterations in original) (quoting *City of Alexandria*, 198 F.3d at 867)), NEPA and its implementing regulations demand that the impacts analysis provide an evaluation of the *environmental effects* of the proposed action. 40 C.F.R. § 1508.8 (defining environmental impacts to include "ecological . . . , aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative"). Indeed, nothing in NEPA prevents NRCS from selecting an alternative based on its own policy considerations, as long as the agency "has adequately considered and disclosed the environmental impact of its actions." *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C.Cir.2006) (quoting *Balt. Gas*, 462 U.S. at 97–98); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) ("NEPA merely prohibits uninformed—rather than unwise—agency action."). By focusing on policy and political considerations and giving short shrift to environmental impacts, NRCS's impacts analysis fails to meet this most basic requirement. Accordingly, because NRCS's EA fails to meaningfully grapple with the impacts of its own action on the environment, it violates NEPA's "hard look" standard and is arbitrary and capricious.

In sum, the failure to fully consider an environmental impact has long been held to be arbitrary and capricious under the procedures set forth in NEPA. *See Brady Campaign*, 612 F. Supp. 2d at 21. NRCS's EA not only fails to consider the environmental impacts of the interim rule, it fails to acknowledge that such impacts even exist. However, it is well-established that "[i]gnoring possible environmental consequences will not suffice." *Found. on Econ. Trends*, 756 F.2d at 154 (citing 40 C.F.R. § 1508.27(b)(5)). Accordingly, for all of these reasons, NRCS arbitrarily and capriciously ignored the environmental impacts that would result from its interim rule. NRCS must correct these serious deficiencies to comply with its obligations under NEPA.

**F.    By Failing To Take A "Hard Look" At The Impacts Of, And Alternatives To, The Interim Rule, NRCS Precluded Meaningful Public Participation In Violation Of NEPA.**

As a practical matter, as discussed below, NRCS's failure to adequately describe and evaluate the alternatives and their impacts deprived the public of any meaningful opportunity to participate in the agency's decisionmaking process. Indeed, NEPA regulations require federal agencies to involve the public in the NEPA process "to the fullest extent possible" 40 C.F.R. § 1500.2.

As discussed above, NRCS failed to provide the public with sufficient information regarding the proposed action and its potential environmental impacts to allow for meaningful substantive comment. Although NRCS held public meetings and distributed a slideshow packet describing the interim rule, the scoping notice did not provide any environmental information about the rule's potential environmental impacts. Courts have previously faulted agencies for "fail[ing] to give the public an adequate pre-decisional opportunity for informed comment" where they distributed a scoping letter but no draft EA, particularly where "the scoping notice provided no environmental data concerning impacts to wildlife, cultural resources, watersheds, soils, fisheries, or aquatics," nor did it discuss "potential cumulative effects." *Sierra Nev. Forest Prot. Campaign v. Weingardt*, 376 F.Supp.2d 984, 992 (E.D. Cal. 2005). Repeated requests to NRCS for draft EAs and related documents were refused. As a result, the only opportunity for the public to participate in the NEPA process was after the EA was finalized. Moreover, the EA was released on the same day as the interim rule, which became effective immediately. The public was therefore precluded from providing input on the interim rule, its impacts, and any alternatives *before* the rule went into effect. This cannot be squared with NEPA's command to begin the environmental review process "early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." 40 C.F.R. § 1502.5; *cf. Gould*, 150 F. Supp. 3d at 1182).

After the interim rule was issued, the serious deficiencies in the EA rendered informed public comment impossible. In preparing its EA, NRCS was obliged to "provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008). As established above, NRCS's EA utterly failed in this regard. For example, by adopting a purpose and need statement that failed to account for its statutory mandate and impermissibly restricted its range of reasonable alternatives, NRCS deprived the public of any opportunity to evaluate reasonable alternatives that may better protect agricultural wetlands while still providing certainty to producers.

The EA's overarching and fatal flaw, however, arises from NRCS's mischaracterization of the interim rule as a mere "clarification" of existing agency policy. This contrived construction of the agency's action taints NRCS's entire analysis, and is at best, disingenuous, and at worst, amounts to an intentional effort to once again preclude public participation in, and oversight of, an administrative program that has significant environmental effects. Either way, neither the procedure nor the substance of the EA were sufficient "to permit members of the

001743

public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008). Consequently, NRCS's EA violates NEPA.

### III.    The ESA Requires that NRCS Undergo Section 7 Consultation Prior to Promulgating its Proposed Interim Rule.

Completion of the ESA's consultation process is vital to compliance with the Act's substantive mandates. "Absent consultation with [the FWS], there is no confirmation that [the agency's action] would avoid jeopardizing threatened or endangered species or adversely modifying critical habitat." *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 21 (D.D.C. 2014) (citations omitted). NRCS must undertake the legally mandated process for analyzing and addressing impacts to listed species and their habitat *before* implementing this final interim rule that *will* indisputably harm myriad listed species in various ways. Indeed, because the interim rule is already in effect, NRCS is currently in ongoing violation of the ESA and its implementing regulations.

Wetlands are crucial habitat for at least one third of all plants and animals listed as threatened or endangered under the ESA. *See, e.g.*, Nat'l Park Serv., *Why Are Wetlands Important?*, https://www.nps.gov/subjects/wetlands/why.htm. Nearly half of all listed species use wetlands at some point during their lifecycle. *See, e.g.*, Roddy Scheer & Doug Moss, *Why Are Wetlands So Important to Preserve?*, Scientific Am., https://www.scientificamerican. com/article/why-are-wetlands-so-important-to-preserve/. Since the 1700s, more than half of the 221 million acres of wetlands that once existed in the lower forty-eight states have been destroyed. *See* Nat'l Park Serv., *supra*. Agricultural conversion has destroyed a "very high percentage" of wetlands. U.S. Fish & Wildlife Serv., Report to Congress: Wetlands Losses in the United States, 1780s to 1980s at 9 (1990).

Three quarters of wetlands in the coterminous United States occur on private lands. NRCS, *Shorebirds* 6 (July 2000), *available at* https://directives.sc.egov.usda.gov/Open NonWebContent.aspx?content =18480.wba. These wetlands are also experiencing severe degradation and loss due to agricultural practices and programs. *See* T. E. Dahl, U.S. Fish & Wildlife Serv., *Status and Trends of Wetlands in the Conterminous United States, 2004 to 2009* 42 (2011) (attributing the loss of over 100,000 acres of wetlands to agricultural land uses and practices from the period of 2004 to 2009). In certain regions, the "profound reductions in wetland extent have resulted in habitat loss, fragmentation, and limited opportunities for reestablishment and watershed rehabilitation." *Id.* at 16. Thus. The degradation and loss of agricultural wetlands have been cited as continuing threats to listed species and their recovery.[13]

---

[13] *See, e.g.*, FWS, *Bog Turtle Fact Sheet* (2010), *available at* https://www.nrcs.usda.gov/ Internet/FSE_DOCUMENTS/nrcs142p2_017978.pdf (citing the loss of essential breeding wetland habitat and habitat fragmentation due to agricultural practices as "the greatest threats" to the threatened bog turtle, especially since the majority of remaining bog turtle habitat occurs on private lands); FWS, *Wood Stork (*Mycteria americana*), 5-Year Review* 16 (2006) (noting that "loss, fragmentation, and modification of wetland habitats continue as threats to [endangered] wood storks"); NRCS, *Massasauga Rattlesnake Conservation*, https://www.nrcs.usda.gov/wps

By permitting producers to certify inaccurate wetland determinations and convert improperly delineated wetlands to agricultural use without penalty, NRCS's actions at the very least "may affect" listed species by facilitating the destruction of important habitat for endangered migratory birds and other animals that frequent agricultural wetlands. Indeed, considering that nearly half of all listed species depend on wetland habitat at some point in their lifecycles, and further, that three quarters of wetland habitat in the coterminous United States occurs on private lands, it defies logic to assume that a change in policy reversing the incentive to preserve such wetlands would *not* affect listed species. Accordingly, NRCS is obligated to consult with FWS to "insure" that the implementation of its new policies will avoid jeopardy to those species. *See* 16 U.S.C. § 1536; *cf. Nat'l Parks Conservation Ass'n*, 62 F. Supp. 3d at 12-13 ("The "may affect" threshold for triggering the consultation duty under section 7(a)(2) is low."); *see also id.* at 13 ("Any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement.").[14]

Additionally, pursuant to Section 9 of the ESA, it is unlawful to undertake or authorize activities likely to result in the incidental take of listed species without an adequate biological opinion—and, most importantly, an incidental take statement—in place. 16 U.S.C. §§ 1536, 1538(g). Those who choose to do so despite this prohibition may be subject to criminal and civil federal enforcement actions, as well as civil actions by citizens for declaratory and injunctive relief. *See* 16 U.S.C. § 1540. NRCS's implementation of the changes proposed in the final interim rule are reasonably certain to take listed species. Thus, should NRCS proceed to implement its final interim rule without obtaining authorization from the FWS to take listed species, NRCS will be in violation of Section 9. 16 U.S.C. § 1538(a)(1)(B).

Because the destruction of wetlands—incentivized by NRCS—has serious adverse effects on listed species, NRCS must conduct Section 7 consultation on the proposed interim rule. Further, because NRCS is obligated to avoid "mak[ing] any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures," 16 U.S.C. § 1536(d)(1), ESA consultation must be completed *before* the interim rule is finalized.

---

/portal/nrcs/detail/pa/technical/ecoscience/threat/?cid=nrcseprd1289249 (reporting that the threatened massasauga rattlesnake is "closely linked to wetlands and the areas around them," and is vulnerable to wetland habitat loss due to agricultural practices wetlands); FWS, *Southwestern Willow Flycatcher, 5-Year Review* 35 (2014) (finding that the "primary cause of the [endangered southwestern willow] flycatcher's decline is loss and modification" of the wetland and riparian habitats on which it depends due to urban and agricultural development); 74 Fed. Reg. 6700, 6703 (Feb. 10, 2009) (noting that the endangered reticulated salamander depends on wetlands for breeding habitat, and citing "[r]ange-wide historic losses of both upland and wetland habitat . . . due to conversion of flatwoods sites to agriculture" as a primary threat to the species' recovery).

[14] To the extent that species under the jurisdiction of the National Marine Fisheries Service ("NMFS") will also be impacted by this policy change, the ESA also requires that NRCS consult with NMFS concerning the effects to those listed species prior to issuing the interim rule.

## <u>CONCLUSION</u>

For the foregoing reasons, NRCS's proposed changes to the wetland conservation provisions are legally deficient. We urge NRCS to withdraw the interim final rule and instead propose a rule that promotes accurate wetland determinations that include all seasonal wetlands and one that is subject to robust environmental review and public comment. If NRCS nonetheless proceeds to issue an interim rule promulgating these changes, it will be doing so in clear violation of federal administrative and environmental laws. In lieu of taking that step, NWF urges NRCS to withdraw the rule and explore a less environmentally destructive alternative in an EIS and through ESA consultation.

Sincerely,

Jan Goldman-Carter
Counsel, Wetlands and Water Resources
National Wildlife Federation
1200 G St., NW Suite 900
Washington, DC 20005
goldmancarterj@nwf.org
202-797-6894

c: Leslie Deavers,
   Jason Outlaw

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



# Comment on FR Doc # 2018-26521

The is a Comment on the **Natural Resources Conservation Service** (NRCS) Rule: <u>**Highly Erodible Land and Wetland Conservation**</u>

For related information, **<u>Open Docket Folder</u>** 🔁

## Comment

Attached please find the comments of the North Carolina Farm Bureau Federation on the interim final rule amending the Highly Erodible Land and Wetland Conservation regulations.

## Attachments (1)

Comments of NCFB on HEL and Wetland Conservation Interim Rule - pdf - 2-5-19

**View Attachment:** 

---

**ID:** NRCS-2018-0010-0050
**Tracking Number:** 1k3-9838-odzk

### Document Information

**Date Posted:**
Feb 5, 2019

**RIN:**
0578-AA65

**Show More Details** 🗗

### Submitter Information

**Submitter Name:**
Anne Coan

**Organization Name:**
NC Farm Bureau Federation



**NORTH CAROLINA**
**FARM BUREAU FEDERATION, INC.**

PO Box 27766, Raleigh, NC 27611   Phone: 919-782-1705   Fax: 919-783-3593   www.ncfb.org

February 5, 2019

Public Comments Processing
Attention: National Leader for Wetland and
 Highly Erodible Land Conservation
USDA, Natural Resources Conservation Service         filed via regulations.gov
1400 Independence Avenue SW
Washington, DC 20250

Attention: Docket ID No. NRCS-2018-0010

**RE:  Highly Erodible Land and Wetland Conservation, 83 Fed. Reg. 63,046 (Dec. 7, 2018)**

To Whom It May Concern:

The North Carolina Farm Bureau Federation (NCFB) is North Carolina's largest general farm organization representing the interests of farm and rural people in our state.  This letter is to comment on the U.S. Department of Agriculture's ("USDA") interim final rule amending its Highly Erodible Land and Wetland Conservation regulations at 7 C.F.R. part 12 (collectively, the "conservation compliance" program). The revisions were published in the *Federal Register* on December 7, 2018 at 83 Fed. Reg. 63,046 and were made effective that same day. The stated purpose of these revisions is to "codify many technical portions of the existing agency policy that have not undergone public review and comment." 83 Fed. Reg. at 63,047.

NCFB is extremely troubled by this rulemaking due to the fundamental lack of transparency and due process it affords farmers in our state. Highly Erodible Land and Wetland Conservation regulations are not incentive programs; rather, they are compliance regulations that not only impact participation in farm programs but also directly influence the ability of farmers and ranchers to secure vital operating loans.

NCFB is concerned with this Interim Rule because it makes program participation significantly more difficult and fails to provide the notice and opportunity to participate in the process due regulated entities.

**I.    Conservation Compliance Programs Must Provide Farmers with Due Process.**

The following background regarding the conservation compliance program provides important context for the specific comments on the Interim Rule that follow.

A.    The Conservation Compliance Program Effectively Regulates American Farms.

First and foremost, the conservation compliance programs operate fundamentally as regulatory programs. As such, they should operate with all the duties and rights that such a regulatory program entails. Farmers are regulated entities because they stand to lose vital payments, loans, and crop insurance benefits in the event of adverse determinations. But from

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-26521

The is a Comment on the **Natural Resources Conservation Service** (NRCS) Rule: **Highly Erodible Land and Wetland Conservation**

For related information, **Open Docket Folder** ⊕

### Comment

National Wildlife Federation
National Advocacy Center
1200 G Street NW, Suite 900
Washington, DC 20005

February 5, 2019

Public Comments Processing
Attention: National Leader for Wetland and Highly Erodible Land Conservation, USDA
Natural Resources Conservation Service
1400 Independence Avenue SW
Washington, DC 20250

Dear National Leader for Wetland and Highly Erodible Land Conservation,

Attached are 14,446 individually submitted comments from National Wildlife Federation members and supporters reflecting the following:

I urge Natural Resource Conservation Service (NRCS), a division of the U.S. Department of Agriculture, to withdraw the interim final rule on wetland determinations because it promotes the exclusion of seasonal wetlands from the Farm Bill's wetland conservation compliance safeguards, encouraging additional wetland drainage in the Prairie Pothole Region and beyond. Instead, NRCS should propose a rule that promotes accurate wetland determinations that include all seasonal wetlands and one that is subject to robust environmental review and public comment.

The current rule undermines protections for seasonal

**ID:** NRCS-2018-0010-0051

**Tracking Number:** 1k3-9838-5xm8

### Document Information

**Date Posted:**
Feb 5, 2019

**RIN:**
0578-AA65

**Show More Details** ⧉

### Submitter Information

**Submitter Name:**
Zachary Evans

**Organization Name:**
National Wildlife Federation Action Fund

| Diana | Anderson | 1489 Oak Hill Rd | Roseburg | OR | 97471-9683 | I urge Natural Resource Conservation Service (NRCS), a division of the U.S. Department of Agriculture, to withdraw the interim final rule on wetland determinations because it promotes the exclusion of seasonal wetlands from the Farm Bill's wetland conservation compliance safeguards, encouraging additional wetland drainage in the Prairie Pothole Region and beyond. Instead, NRCS should propose a rule that promotes accurate wetland determinations that include all seasonal wetlands and one that is subject to robust environmental review and public comment.  The current rule undermines protections for seasonal wetlands, encouraging wetland drainage and ignoring the letter and spirit of the Farm Bill wetland conservation compliance provisions for the following reasons:  *The rule systematically excludes seasonal wetlands from wetland maps that form the basis for producer compliance. Of particular concern is the rule's certification of old (pre-1996) wetland determinations that have consistently excluded seasonal wetlands.  *The rule relies on satellite imagery from the hottest time of the year (July/August), when seasonal wetlands have likely dried out. It also looks at precipitation data from a historically dry period (1990-2000) further limiting the number and size of seasonal wetlands subject to the wetland conservation compliance requirements. What is worse, there has been no scientific analysis of the impacts of using this outdated information.  Seasonal wetlands fill early in the spring, which is when they provide their most important flood storage and wildlife benefits, particularly for migrating and nesting waterfowl. Any NRCS wetland determination rule should account for the use of summer imagery and promote investments in more accurate spring imagery. |
|-------|----------|------------------|----------|-----|------------|---|
| Diane | Anderson | 1468 Southfield Rd | Birmingham | MI | 48009-3053 | I urge Natural Resource Conservation Service (NRCS), a division of the U.S. Department of Agriculture, to withdraw the interim final rule on wetland determinations because it promotes the exclusion of seasonal wetlands from the Farm Bill's wetland conservation compliance safeguards, encouraging additional wetland drainage in the Prairie Pothole Region and beyond. Instead, NRCS should propose a rule that promotes accurate wetland determinations that include all seasonal wetlands and one that is subject to robust environmental review and public comment.  The current rule undermines protections for seasonal wetlands, encouraging wetland drainage and ignoring the letter and spirit of the Farm Bill wetland conservation compliance provisions for the following reasons:  *The rule systematically excludes seasonal wetlands from wetland maps that form the basis for producer compliance. Of particular concern is the rule's certification of old (pre-1996) wetland determinations that have consistently excluded seasonal wetlands.  *The rule relies on satellite imagery from the hottest time of the year (July/August), when seasonal wetlands have likely dried out. It also looks at precipitation data from a historically dry period (1990-2000) further limiting the number and size of seasonal wetlands subject to the wetland conservation compliance requirements. What is worse, there has been no scientific analysis of the impacts of using this outdated information.  Seasonal wetlands fill early in the spring, which is when they provide their most important flood storage and wildlife benefits, particularly for migrating and nesting waterfowl. Any NRCS wetland determination rule should account for the use of summer imagery and promote investments in more accurate spring imagery. |

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-26521

The is a Comment on the **Natural Resources Conservation Service** (NRCS) Rule: **Highly Erodible Land and Wetland Conservation**

For related information, **Open Docket Folder** 

## Comment

Please see the attached comment from the American Farm Bureau Federation.

## Attachments (1)

**2019.02.05 AFBF Comments on USDA Wetlands Determinations Interim Final Rule**

**View Attachment:** [PDF]

---

**ID:** NRCS-2018-0010-0054

**Tracking Number:** 1k3-9839-8579

### Document Information

**Date Posted:**
Feb 11, 2019

**RIN:**
0578-AA65

**Show More Details**

### Submitter Information

**Submitter Name:**
Lee Bridgett

009319

**AMERICAN FARM BUREAU FEDERATION®**
600 Maryland Ave. SW  |  Suite 1000W  |  Washington, DC 20024

ph. 202.406.3600
f. 202.406.3602
www.fb.org

February 5, 2019

Public Comments Processing
Attention: National Leader for Wetland and
  Highly Erodible Land Conservation
USDA, Natural Resources Conservation Service
1400 Independence Avenue SW
Washington, DC 20250

Attention: Docket ID No. NRCS-2018-0010

**RE:     Highly Erodible Land and Wetland Conservation, 83 Fed. Reg. 63,046 (Dec. 7, 2018)**

To Whom It May Concern:

The American Farm Bureau Federation (AFBF) appreciates this opportunity to offer comments on the U.S. Department of Agriculture's ("USDA") interim final rule amending its Highly Erodible Land and Wetland Conservation regulations at 7 C.F.R. part 12 (collectively, the "conservation compliance" program). The revisions were published in the *Federal Register* on December 7, 2018 at 83 Fed. Reg. 63,046 and were made effective that same day. The stated purpose of these revisions is to "codify many technical portions of the existing agency policy that have not undergone public review and comment." 83 Fed. Reg. at 63,047. The revisions amend four sections of USDA's regulations. Farm Bureau is extremely troubled by this rulemaking due to the fundamental lack of transparency and due process it affords farmers and ranchers. Highly Erodible Land and Wetland Conservation regulations are not incentive programs; rather, they are compliance regulations that not only impact participation in farm programs but also directly influence the ability of farmers and ranchers to secure vital operating loans.

AFBF is the nation's largest general farm organization, representing farm and ranch families in all 50 states and Puerto Rico. As a farm advocacy organization, AFBF regularly represents its members' interests before Congress, federal regulatory agencies and the courts. AFBF's members produce a variety of commodities grown or raised commercially in the United States. Many AFBF members are forced to participate in USDA conservation compliance programs, meaning they are not eligible for farm programs or crop insurance premium discounts unless they comply with USDA requirements, which over time has proven to be an increasingly difficult and unpredictable endeavor. Therefore, many producers are directly affected by the interim final rule.

AFBF offers the following comments on specific aspects of USDA's Interim Rule. To be clear, AFBF favors significant reforms to the conservation compliance program. We are concerned with this Interim Rule because it makes program participation significantly more difficult and fails to provide the notice and opportunity to participate in the process due regulated entities.

**I.     Conservation Compliance Background**

The following background regarding the conservation compliance program provides important context for the specific comments on the Interim Rule that follow.

A.    The Conservation Compliance Program Effectively Regulates American Farms.

First and foremost, the conservation compliance programs operate fundamentally as regulatory programs. As such, they should operate with all the duties and rights that such a regulatory program entails. By standing to lose vital payments, loans, and crop insurance benefits in the event of adverse determinations, farmers are regulated entities. But from these programs' inception, USDA has avoided providing farmers the certainty and due process they need and deserve to be able to determine the extent of their legal obligations and rights under the programs. More importantly, we find that guidance, policy and even the interim rules fail to match up with the statute in very substantive ways.

It is bad enough that USDA's conservation compliance programs lack clear regulatory standards; compounding the problem is that binding requirements are difficult to find, located on often obscure websites. Worse still, binding guidance and policy tend to morph over time without proper notification or legal justification. This opaque regulatory approach complicates farmers' good-faith attempts to comply with the law.

B.    The Conservation Compliance Program Must Provide Farmers Meaningful Involvement in the Wetland Determination Process and Rights to Appeal the Same.

Farm Bureau is concerned that USDA is codifying policy and regulations in a manner that undermines congressional intent (as expressed in the 1985 farm bill and in subsequent farm bills) and unjustifiably disadvantages farmers without adequate notice and opportunity to be heard. While we agree that codifying clear, readily ascertainable program requirements into regulation is important, it is but an initial step in a much larger task of reforming the conservation compliance programs as a whole. As the U.S. Department of Justice made clear in 2018 in what has come to be known as the "Brand Memo" (a copy of which is provided along with these comments as Exhibit A, and available at https://www.justice.gov/file/1028756/download), federal agencies may not rely on guidance to enforce purported violations of law. Yet this is effectively what USDA has been doing, by its own admission. USDA contends that this rulemaking is only attempting to "codify many technical portions of the existing agency policy that have not undergone public review and comment." This statement alone highlights two very significant problems. First, the changes finalized in this interim rule are not mere technical changes to existing regulations; the changes are substantive and will directly impact eligibility of program participants. And secondly, the fact that USDA admits it is codifying "…existing agency policy that ha[s] not undergone public review and comment…" showcases the fundamental lack of transparency and due process farmers and ranchers have endured under this regulatory program.

Program participants both demand and deserve to know "how USDA delineates, determines, and certifies wetlands," and "program participants" deserve "to better understand whether their actions may result in ineligibility for USDA program benefits." 83 Fed. Reg. at 63,047. Essentially, USDA has been making regulatory determinations with significant legal and

2

009602

# Meyer Glitzenstein & Eubanks LLP

4115 Wisconsin Avenue, N.W., Suite 210
Washington, D.C.  20016
Telephone (202) 588-5206
Fax (202) 588-5049
lmink@meyerglitz.com

2601 S. Lemay Ave.
Unit 7-240
Fort Collins, CO 80525
Telephone (970) 703-6060
Fax (202) 588-5049
beubanks@meyerglitz.com

May 2, 2019

**Via Electronic and/or Certified Mail**

David Bernhardt, Secretary
U.S. Department of the Interior
1849 C St. NW
Washington, DC 20240
exsec@ios.doi.gov

Matthew Lohr, Chief
Natural Resource Conservation Service
1400 Independence Ave., S.W., Room 5105-A
Washington, DC 20250
Matthew.lohr@usda.gov

Margaret Everson, Acting Director
U.S. Fish and Wildlife Service
1849 C. St. NW, Rm. 3331
Washington, DC 20240
Margaret_Everson@fws.gov

Kevin Norton., Acting Associate Chief
Natural Resource Conservation Service
1400 Independence Ave., S.W., Room 5105-A
Washington, DC 20250
Kevin.norton@la.usda.gov

Sonny Perdue, Secretary
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250
agsec@usda.gov

> **Re:** **Notice of Violations of the Endangered Species Act in Connection with Major Policy Changes by USDA and NRCS Concerning the Process for Making Wetland Determinations for Farm Bill Incentive Eligibility**

On behalf of the National Wildlife Federation ("NWF") we hereby notify you of violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, in connection with changes to the implementation of the Natural Resource Conservation Service's ("NRCS") wetland conservation compliance policies, as articulated in the February 12, 2013 Memorandum titled "Summary of Proposed Wetland Conservation Compliance Changes and Clarifications" ("2013 Memorandum"), and the January 19, 2017 Amendment to the Food Security Act ("FSA") Manual § 514.1(A) ("2017 Amendment"), and formalized in the December 2018 Interim Rule for the Highly Erodible Land and Wetland Conservation Compliance provisions of the Food Security Act of 1985, *see* 83 Fed. Reg. 63,046 (Dec. 7, 2018). The 2013 Memorandum was implemented in three states—North Dakota, Minnesota, and Iowa—and authorizes NRCS to accept agricultural wetland determinations made prior to July 3, 1996 ("pre-1996 determinations") as "certified" for the purposes of the conservation compliance provisions of the 1996 Farm Bill, Pub. L. 104-127, § 322(a), 110 Stat. 888 (Apr. 4, 1996) (codified as amended at



On December 7, 2018, NRCS published its proposed changes to the wetland conservation provisions as an interim rule, effective upon publication, with a request for comments. *See* Highly Erodible Land and Wetland Conservation, 83 Fed. Reg. 63,046 (Dec. 7, 2018) (Ex. AA). The interim rule was accompanied by an Environmental Assessment. There is no indication that NRCS ever consulted with the U.S. Fish and Wildlife Service under the ESA, either formally or informally. Nor does the interim rule candidly state how NRCS will treat pre-1996 "official" determinations. This is particularly concerning because the 2013 internal memorandum originally proposing these changes noted that "[a]dministrative guidance will be developed" to allow producers "to either accept their [pre-1996] determination as certified or request a new certified determination." Ex. V at 3. The interim rule fails to foreclose this possibility, apparently leaving NRCS with the option of formalizing through administrative guidance a highly controversial change in policy that the agency itself previously stated would require a rulemaking proceeding, that is in direct contravention to Congress's longstanding and well-documented intent to improve the accuracy of wetland determinations, and even worse, without the robust public participation and review that should accompany such a significant shift in agency policy and practice.[15]

Since the 2013 Memorandum and continuing until the Interim Rule, NRCS has taken consistent actions to formalize its policy of permitting the certification of inaccurate pre-1996 wetland determinations, which effectively removes the economic incentive to preserve agricultural wetlands. Indeed, by allowing farmers to receive agricultural subsidies when they destroy wetlands, NRCS has established a perverse incentive that thwarts the congressional intent behind the Wetland Conservation provisions of the Farm Bill. As the Inspector General found and reported in the OIG Report, the policy *has in fact* led to a dramatic reduction in agricultural wetland acreage. *See* Ex. S at 6 ("As a result of this change in the implementation of policy, many acres of wetlands are being inappropriately drained and converted to agricultural production."); *id.* at 7-8 (describing how NRCS's change in the implementation of its policy led to the destruction of a total of 75% of the wetlands on thirteen reviewed tracts that had previously existed and been identified under NRCS's old policy).

Despite the fact that the destruction of wetlands in the prairie pothole region—incentivized by NRCS—has serious adverse effects on listed species, NRCS has not conducted any Section 7 consultation (either informal or formal) on the policy changes implemented by the Interim Rule and its associated actions—i.e., the 2013 Memorandum, the 2017 Amendment, and any certification of inaccurate pre-1996 wetland determinations under the Memorandum, Amendment, or Interim Rule—despite the fact that many acres of wetlands used by listed species have been converted to farmland since 2013.

---

[15] NWF submitted written comments on the Interim Rule on February 5, 2019, which are incorporated by reference herein. *See* Ex. Z.

## LEGAL VIOLATIONS

**A.     NRCS is in Violation of Section 7(a)(2) of the ESA by Failing to Consult with FWS Regarding its Interim Rule and Associated Actions Implementing Significant Changes in its WC Policies and Jeopardizing the Continued Existence of Several Endangered and Threatened Migratory Birds that Frequent the Prairie Pothole Region.**

Completion of the consultation process is vital to compliance with the ESA's substantive mandates. "Absent consultation with [the FWS], there is no confirmation that [the agency's action] would avoid jeopardizing threatened or endangered species or adversely modifying critical habitat." *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 21 (D.D.C. 2014) (citations omitted). Here, NRCS failed to undertake the legally mandated process for analyzing and addressing impacts to listed species and their habitat, although it is apparent that the policy changes implemented by the Interim Rule and its associated actions indisputably harm myriad such species in various ways.

By permitting producers to certify inaccurate wetland determinations and convert improperly delineated wetlands to agricultural use without penalty, NRCS's actions not only "may affect," but *are presently affecting* listed species through the destruction of important habitat for endangered migratory birds that frequent the prairie pothole states. *See, e.g.*, Ex. S at 7-8 (reporting cases where NRCS rescinded more recent wetland determinations and certified pre-1996 determinations—which resulted in the drainage of 75% of previously protected wetlands on examined tracts—and noting that those cases were not "isolated incident[s]"). Examples of such listed species that are affected by the destruction and degradation of wetland habitat include the whooping crane, the piping plover, and the least tern. *See supra* at 5-7.

Furthermore, the application of this policy nationwide by the Interim Rule threatens the destruction of even more wetland habitat, and at the very least, "may affect" additional endangered species that inhabit agricultural wetlands outside of the prairie pothole states. Indeed, considering that nearly half of all listed species depend on wetland habitat at some point in their lifecycles, and further, that three quarters of wetland habitat in the coterminous United States occurs on private lands, it would defy logic for NRCS to decline to undergo consultation on the basis that a change in policy reversing the incentive to preserve such wetlands would *not* affect listed species. Accordingly, prior to promulgating its Interim Rule, NRCS was obligated to consult with the FWS to "insure" that the implementation of its new policies will avoid jeopardy to those species. *See* 16 U.S.C. § 1536; *cf. Nat'l Parks Conservation Ass'n*, 62 F. Supp. 3d at 12-13 ("The "may affect" threshold for triggering the consultation duty under section 7(a)(2) is low."); *see also id.* at 13 ("Any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement."). Yet, NRCS has never undergone *any* such consultation, in violation of Section 7(a)(2).

Moreover, NRCS's adoption and implementation of a policy that *has in fact* led to the destruction of agricultural wetlands that provide important habitat for listed species cannot be reconciled with the ESA's command that federal agencies "insure" that their actions avoid species jeopardy. *See* Ex. S at 7-8. As the Supreme Court has explained, to "'insure' something

009617

National Park Service (/)

NPS.gov (/)  /  Explore This Subject (/subjects/wetlands/index.htm)  /  About Wetlands (/subjects/wetlands/about.htm)  /  Why are Wetlands Important?

# Why are Wetlands Important?



Wetlands are highly productive and biologically diverse systems that enhance water quality, control erosion, maintain stream flows, sequester carbon, and provide a home to at least one third of all threatened and endangered species.

Wetlands are important because they:

- improve water quality

- provide wildlife habitat

- maintain ecosystem productivity

- reduce coastal storm damage

- provide recreational opportunities

- improve the water supply

- provide opportunities for education

# Why Are Wetlands Important?

In the not too distant past, wetlands were regarded as wastelands. Most people felt that they were places to be avoided, and it was common practice to drain them, fill them or treat them as dumping grounds. A study published by the U.S. Fish and Wildlife Service in 1990 revealed a startling fact: more than half of the 221 million acres of wetlands that existed in the lower 48 states in the late 1700s have been destroyed.

Today, we know that wetlands provide many important services to the environment and to the public. They offer critical habitat for fish, waterfowl and other wildlife, they purify polluted waters, and they help check the destructive power of floods and storms. They also provide a wide variety of recreational opportunities such as fishing, hunting, photography, and wildlife observation. As these and many other wetland functions and values described below have become more widely known, wetlands are increasingly seen as productive and valuable resources worthy of protection and restoration.

- Water Quality:   Wetlands act as natural water purifiers, filtering sediment and absorbing many pollutants in surface waters. In some wetland systems, this cleansing function also enhances the quality of groundwater supplies.

- Reduction of Coastal Storm Damage:    Coastal wetlands help to blunt the force of major storms. For example, mangrove forests in south Florida and salt marshes along the Atlantic and Gulf Coasts reduce flooding, coastal erosion, and property damage during major storms.

- Flood Control and Streamflow Maintenance    : Wetlands along rivers and streams absorb energy and store water during storms, which reduces downstream flood damage and lessens the risk of flash floods. The slow release of this stored water over time can help keep streams flowing during periods of drought.

- Streambank Stabilization and Erosion Control:    Wetland vegetation binds the soil on streambanks and riparian wetlands, preventing excessive erosion and sedimentation downstream.

- Wildlife Habitat:   Wetlands provide habitat for many species of amphibians, reptiles, birds and mammals that are uniquely adapted to aquatic environments. Upland wildlife

like deer, elk and bears commonly use wetlands for food and shelter. Wetlands are particularly vital to many migratory bird species. For example, wood ducks, mallards, and sandhill cranes winter in flooded bottomland forests and marshes in the southern U.S., and prairie potholes provide breeding grounds for over 50% of North American waterfowl.



Least Bittern

Photo by Thom Curdts

- Fish and Shellfish Habitat: Freshwater and marine life including trout, striped bass, pike, sunfish, crappie, crab, and shrimp rely on wetlands for food, cover, spawning, and nursery grounds. Between 60% and 90% of U.S. commercial fisheries depend on wetlands.

- Habitat for Threatened and Endangered Species:     About one-third of all plants and animals listed as threatened or endangered species in the United States depend on wetlands for their survival, including whooping cranes, American crocodiles, the dwarf lake iris and several orchid species.

- Specialized Plant Habitat:    Nearly 7000 plant species live in U.S. wetlands, many of which can only survive in these wet environments.

- Ecosystem Productivity:    Some wetland types are among the most productive ecosystems on earth. A stand of cordgrass in a salt marsh can produce more plant material and store more energy per acre than any agricultural crop except cultivated sugar cane. Nutrients and plant material flushed from some wetland systems during storms provide essential food for plants, fish, and wildlife in estuaries and other downstream ecosystems.

- Recreational Opportunities:    Many wetlands contain a diversity of plants, animals and water features that provide beautiful places for sightseeing, hiking, fishing, hunting, boating, bird watching, and photography.

- Water Supply:  Some wetlands help provide clean, plentiful water supplies. For example, wetlands in Florida's Everglades help recharge the Biscayne Aquifer, the sole source of drinking water for the Miami metropolitan area.

- Education:  Ecological, cultural, and historic resources run abundant in our nation's wetlands, and provide countless opportunities for environmental education and public awareness programs.



A staff member at Channel Islands National Park describes a wetlands restoration project to visitors and the media.

Last updated: May 5, 2016





National Park Service
U.S. Department of the Interior

(www.nps.gov)

## Cutting-Edge Programs

UMUC's cybersecurity courses can help prepare you for selected DOD 8140 certifications. learn-more.u 



SCIENTIFIC
AMERICAN®

SUBSCRIBE

ETHICS

# Why Are Wetlands So Important to Preserve?

Besides recharging groundwater supplies and trapping floodwaters, wetlands serve a variety of important ecological functions

decades due to increased global demand for land and water, as well as climate change."

The widespread expansion of development in the U.S. in recent decades has brought the issue of wetlands loss to the forefront of debates on zoning and land use planning. One of the key and underlying issues is concern about endangered species: More than a third of species on the U.S. Endangered Species List live only in wetlands and almost half use them at some time during their lifecycles.

While the issue lingers on in municipal planning meetings around the country, the federal government does what it can to protect wetlands. It does so through regulations spelled out in the Clean Water Act, which include providing tax incentives for selling or giving wetlands to land trusts or other conservation groups, via cooperative efforts with state and local entities, and by acquiring wetlands outright to add acreage to public lands systems. And several states have passed laws to regulate activities in wetlands, and many municipalities include wetlands conservation in their development permitting and zoning processes.

Readers can do their part by staying current on local zoning laws, keeping an eye on local wetlands and speaking up if something looks amiss. Potential problems are much easier to resolve early on than after damage is done, so speaking up soon can often lead to more successful and less contentious outcomes.

CONTACTS  : EPA Wetlands, water.epa.gov/type/wetlands/; Wetlands International, www.wetlands.org.

ADVERTISEMENT

EarthTalk®   is written and edited by Roddy Scheer and Doug Moss and is a registered trademark of E - The Environmental Magazine

009649



U.S. Fish & Wildlife Service

# Status and Trends of Prairie Wetlands in the United States 1997 to 2009

# Executive Summary

This study examined recent trends in wetland extent and habitat type throughout the Prairie Pothole Region (PPR) in the United States. Wetland trends were measured by the examination of high resolution imagery for 755 randomly selected sample plots covering the prairie regions of Montana, North Dakota, South Dakota, Minnesota and Iowa. The analysis of this imagery in combination with field verification provided a scientific basis for estimations of wetland extent, type and distribution that had occurred between 1997 and 2009.

This information provides a quantitative measure of the areal extent of all wetlands, regardless of ownership, in the PPR. Wetlands were defined using biological criteria and standardized nomenclature for the classification of wetland types. Recently acquired remotely sensed imagery was used as the principle means to assess wetland change with a number of geoprocessing and quality control measures implemented to ensure data completeness and accuracy. The spatial sample design involved randomized sampling of geospatial information on 4 mi² (10.4 km²) plots. This was a well-established procedure that provided a practical, scientific approach for measuring wetland area extent (status) and change rates (trends). Statistical estimates provided regionally specific status and change information as well as estimates by wetland type. Important procedural enhancements to this study of the PPR included the addition of wetland and water basin morphology, hydrologic descriptors and the addition of an upland grassland category to track changes in grassland area. Field verification was completed for 205 (27 percent) of the sample plots during 2010 to 2013.

This report provides data regarding trends in wetland extent and type; however, it does not draw conclusions regarding the quality or condition of prairie wetlands.

Results from this study indicated that there were an estimated 6,427,350 acres (2,602,165 ha ± 4.3 percent) of wetlands in the PPR in 2009. Emergent wetlands made up about 87.7 percent of the total wetland area and 93 percent of all wetland basins in the PPR. Wetlands classified with woody vegetation (wetland forest or shrubs collectively) composed 8.3 percent of the surface area and open water ponds 4 percent. By area, seasonally flooded emergent marshes had the greatest area with 2,313,650 acres (936,700 ha) followed by semi-permanently flooded marshes with 1,945,460 acres (787,636 ha) and temporarily flooded wetland with 1,187,700 acres (480,850 ha).

The number of wetland/water basins[1] in the PPR was determined using a geospatial model to calculate spatial dominance of basin area by water regime type. There were an estimated 2,624,990 wetland/water basins in the PPR. Temporarily flooded emergent wetland basins were the most numerous, composing almost half of all emergent wetland basins in the PPR. An estimated 41.7 percent of emergent basins were seasonally flooded, 6 percent were semi-permanently flooded and farmed wetlands made up an estimated 2.4 percent of the emergent wetland basins in 2009. There were very few (0.2 percent) saturated emergent wetland areas in the PPR.

The maximum density of wetland was 148 basins per mi² (57 basins/km²) in portions of North Dakota. Wetland/water basins averaged from 30 per mi² (12 basins/km²) in North Dakota to 4 and 5 basins per mi² (1–2 basins/km²) in Iowa and Minnesota. The mean number of wetland/water basins found in the PPR in 2009 was 17.4 basins per mi² (6.7 basins/km²). The mean size of these basins was 3.2 acres (1.3 ha).

Wetlands as a percentage of surface area in the PPR were most abundant in North Dakota, making up 9 percent of the surface area in the prairie region of that state in 2009. South Dakota was similar with 8.5 percent of the land area identified as wetland. Minnesota had 6.7 percent wetland by area, Iowa 2.7 percent and wetlands were the least common in Montana with 1.9 percent of the land area as wetland.

An estimated 94 percent of wetlands were located within or adjacent to agricultural lands or grassland. Less than 1 percent were within or adjacent to urban or developed areas and about 5 percent were within or adjacent to other types of uplands or river corridors.

Between 1997 and 2009, total wetland area declined by an estimated 74,340 acres (30,100 ha) or 1.1 percent in the PPR. This represents an average annual net loss of 6,200 acres (2,510 ha). However, emergent wetlands (emergent marshes and farmed wetlands) declined by an estimated 95,340 acres (38,600 ha). Shrub wetlands also declined by 46,080 acres (18,660 ha). Forested wetlands increased in area (61,280 acres or 24,810 ha) ameliorating some of the loss of emergent marsh and shrub wetland area. Open water ponds also increased in area by 5,800 acres (2,350 ha) over the 12 year period.

---

[1]Basin numbers include wetland and lake (deepwater) basin types.

*1*

# The Prairie Pothole Region of the United States

The glaciated prairie region is an area of about 300,000 mi² (777,000 km²) located in the central portion of the North American Continent (Smith *et al.* 1964). In the United States, this region encompasses an area of about 150,930 mi² (390,910 km²) and extends from central Iowa north to the Canadian border and includes portions of the states of Iowa, Minnesota, North Dakota, South Dakota and Montana. The region is characterized by glacial or post-glacial derived depressions or basins resulting from the retreat of the Laurentide ice sheet of the Wisconsin Glacial Episode (Johnson *et al.* 2008). As a result, there are numerous small landscape depressions left behind as the glaciers receded from this part of the continent. These landscape depressions, termed "potholes," collect rainfall and snowmelt, forming small shallow wetlands and ponds (Figure 1).

The PPR is a grassland ecoregion of regional and global importance for migratory birds and other fauna (Blann *et al.* 2009). The North American prairie as it existed prior to European settlement was dominated by grasses, and a scarcity of shrubs and trees except along river or stream corridors (Weaver 1954). By the late 1990s less than 1 percent of the historic native tall-grass prairie and less than 30 percent of the native mixed-grass prairie remained (Samson *et al.* 1998; Wright and Wimberly 2013). Grasslands are considered one of North America's most endangered ecosystems (Beyersbergen *et al.* 2004; Hoekstra *et al.* 2005). Upland grassland in the PPR provides a range of ecological benefits including trapping of sediment; slowing of water runoff; and a source of food, nesting cover and habitat corridors for many wildlife species.



**Figure 1.**    *Aerial image of numerous wetland basins, Day County, SD, circa 2010.*

Historically, throughout the PPR the average annual precipitation has always been less than the average annual rate of evaporation (Winter 1989). The amount and timing of precipitation affects the duration and depth of water in prairie pothole wetlands on a seasonal or annual basis, and changes in snowfall, rainfall, soil moisture, frost, temperature and winds can cause dramatic fluctuations in surface water conditions and alter the number of ponded prairie wetlands at irregular intervals. There has been a strong tendency for many pothole wetlands to become dry late in the growing season. Smith *et al.* (1964) estimated that in any given year as many as one third of prairie pothole wetlands will dry up between May and July. Cowardin *et al.* (1988) assumed that only 26 percent of the temporarily flooded wetland basins, 51 percent of the seasonal and 72 percent of the semi-permanent basins may hold water in an average year.

This cyclical pattern of flooding and drying greatly influences wetland ecology in the PPR as it is possible for an intact wetland basin to exhibit different hydrologic traits along a continuum depending on precipitation from year to year or even season to season. For example, during extended wet periods, some wetland basins classified as temporarily flooded can take on the characteristics of seasonally flooded (hierarchically wetter) wetlands. The opposite may apply in dry years as semi-permanently flooded wetlands may be the only basins with surface water and resemble seasonal or even temporarily flooded wetlands in both appearance and function (Johnson *et al.* 2008). These dynamics, compounded by anthropogenic alterations (i.e. drainage or redirection of water) and potential long-term climatic changes, complicate efforts to categorize wetlands in the PPR by type.

Variations in the hydrology of prairie wetlands also make their biological characterization challenging (Euliss and Mushell 2011) as plant community composition and extent change to reflect current water conditions.

Nationally, waterfowl are the most economically important wildlife using prairie pothole wetlands (Figure 3). At least 15 duck species nest in the prairie region (Niering 1985) and an estimated 70 to 80 percent of the production of Mallard (*Anas platyrhynchos*), Northern Pintail (*A. acuta*), Canvasback (*Aythya valisineria*) and Redhead (*A. americana*) are concentrated in the PPR of North America (Smith *et al.* 1964; Munro 1967).

Wetlands are the cornerstone that support these species as well as other populations of North American waterbirds including Franklin's Gull (*Leucophaeus pipixcan*), Western Grebe (*Aechmophorus occidentalis*), American Bittern (*Botaurus lentiginosus*), Sora (*Porzana carolina*), Black Tern (*Chlidonias niger*), American White Pelican (*Pelecanus erythrorhynchos*) and Sandhill Crane (*Grus canadensis*) (Figure 4).

Prairie pothole wetlands are also extremely important to other forms of wildlife. There are over 300 animal species known to use wetlands in the PPR (Peterson *et al.* 1985; Fritzell 1989; USGAO 2007; Herman and Johnson 2008). Many game species such as Ring-necked Pheasants (*Phasianus colchicus*) and White-tailed Deer (*Odocoilius virginianus*) use pothole wetlands extensively for habitat cover (Figure 5). Additionally, various state and federally endangered species such as the Whooping Crane (*Grus americana*), Piping Plover (*Charadrius melodus*) and Interior Least Tern (*Sterna antillarum*) use these wetlands as habitat or for forage. Shorebirds such as Long-billed Dowitchers (*Limnodromus scolopaceus*), Stilt Sandpipers (*Calidris himantopus*) and Wilson Phalaropes (*Phalaropus tricolor*) utilize prairie wetlands as staging or stopover sites and seek out wet mud flats and shallow water areas during migration (Skagen and Knopf 1994; Skagen and Thompson 2013).

This report provides a comprehensive, scientifically sound assessment on the status of these wetland resources that has not been summarized for this region as a whole.

**Figure 3.**   *(Right, top). The Prairie Pothole Region is renowned for waterfowl production. Mallards, pictured here, are a common species that use prairie pothole wetlands.*

**Figure 4.**   *(Right, bottom). Wetlands in the Prairie Pothole Region support many species of wildlife including the Sandhill Crane, Logan County, ND.*

**Figure 5.**   *(Right, center). The Ringed-neck Pheasant has become a popular bird for hunters and wildlife enthusiasts. The availability of cover during winter months is important for the health and survival rate of pheasants in the upper Midwest. In agricultural landscapes, pockets of wetland grasses and sedges provide vegetative cover and may be all that is available during the winter season.*

# Next Steps for a Healthy Gulf of Mexico Watershed

## Prairie Potholes

## Landscape at a Glance



Map of the Prairie Potholes focal area by Roy Hewitt, USFWS.

The broad delineation of the Prairie Pothole Region extends across five U.S. states and three Canadian provinces. For our purposes, this focal area includes about one-third (100,000 square miles) of the overall region, specifically the northern plains of Iowa, Minnesota, North Dakota, South Dakota and Montana. It constitutes one the richest wetland systems on earth, characterized by millions of depressional wetlands known as "potholes." The complex of highly productive freshwater wetlands and surrounding grasslands are critically important to nesting waterfowl, shorebirds and grassland birds. The area is often referred to as North America's "duck factory" because it is estimated that about one-third of the continent's waterfowl breeding population nest within it, many of which spend the winter months in the coastal marshes along the Gulf.

Prairie wetlands along North and South Dakota's Missouri Coteau (plateau) provide valuable spring and fall stopover habitat for a majority of the endangered whooping cranes in the Wood-Buffalo/Aransas population. In addition, the focal area also provides breeding habitat for a wide diversity of wetland- and grassland-dependent birds, as well as stopover habitat for significant numbers of spring and fall avian migrants and native pollinators such as the monarch butterfly.



Aerial view of depressional wetlands known as "potholes." Photo by USFWS.

Once a vast grassland system, the Prairie Pothole Region is now an agrarian system dominated by cropland. Changes in land use practices have, for the most part, negatively impacted the availability of foraging and nesting habitat for migratory birds using the region. Many wetlands have been drained or degraded, and wetland losses continue today with technological advances like pattern tile drainage systems. The extensive loss of native prairie with the conversion to row crop agriculture, particularly in the eastern portion of the focal area, has further compromised this region's ability to provide resources necessary to meet the needs of the vast array of migratory birds that depend upon it sometime during their annual cycle. Despite these losses, millions of wetlands and large tracts of native prairie still remain to make the Prairie Pothole Focal Area "one of the most altered — yet one of the most important — migratory bird habitats in the Western Hemisphere," as noted in the Prairie Pothole Joint Venture's *2005 Implementation Plan*. The Service believes this illustrates that the fundamental needs of local agrarian communities and wildlife are not mutually incompatible. We believe that by joining partners in addressing factors that impact both, we can advance the interests of both communities and conservation.

# Target Species

# 2017
# IMPLEMENTATION PLAN
## Executive Summary



Prairie
Pothole
Joint
Venture

# EXECUTIVE SUMMARY

The Prairie Pothole Joint Venture (PPJV) boundaries include one-third (100,000 square miles) of North America's Prairie Pothole Region (PPR). Its uniqueness lies in the millions of depressional wetlands that constitute one of the richest wetland systems in the world. These "prairie potholes" and their surrounding grasslands are highly productive and support an incredible diversity of bird life. The PPR is breeding habitat for myriad wetland and grassland birds and also supports significant numbers of spring and fall migrants.

Once a vast grassland, the PPR is now an agrarian system dominated by cropland. Changes in land use have been, for the most part, detrimental to the migratory birds that use the PPR. Many wetlands have been drained or degraded, and the loss of native prairie—particularly in the eastern portion of the PPJV—has been extensive. Despite these losses, millions of wetlands and large tracts of native prairie still remain. The PPR is one of the most altered— yet also one of the most important—migratory bird habitats in the Western Hemisphere. It is the backbone of North America's "duck factory," and critical habitat for many wetland- and grassland-dependent migratory birds.

The PPR is envisioned as a place where abundant populations of wetland and grassland birds can be sustained in perpetuity for the benefit of all people who enjoy these species. Accordingly, the mission of the PPJV is to implement conservation programs that sustain populations of waterfowl, shorebirds, other waterbirds, and prairie landbirds at objective levels through targeted wetland and grassland protection, restoration, and enhancement programs. The PPJV operates through partnerships to accomplish its mission.

The U.S. PPR is a dynamic place, socially as well as climatically. Nowhere is that more apparent than in rural communities, which are experiencing difficult social stresses due, in large part, to depopulation and changing economies. Several factors are involved, including human demography, new land uses, advances in farm equipment, new crops, and energy development. These factors affect migratory bird resources as well as human populations and economies. The PPJV recognizes these interrelationships and believes that by addressing factors that impact both people and birds, we can have positive impacts on both communities and avian conservation. Today, approximately 90% of the entire U.S. PPR is privately owned, most of which consists of working farms and ranches. This overwhelming private landownership underlies the need to work cooperatively with agricultural producers to achieve the goals and objectives outlined in this plan.

This plan provides a road map for integrating the conservation of all migratory birds under one framework. The process involves stepping down the objectives of the four, international "species groups" plans for waterfowl, shorebirds, waterbirds, and landbirds as they apply to the PPJV. Population and habitat trends, coupled with knowledge of how



Casey Stemler

slowed the expansion of tillage agriculture but pressures on wetlands and grasslands have escalated. During wet periods when seasonal basins retain water throughout the brood-raising period, the Drift Prairie provides valuable migration habitat and may help facilitate periodic "booms" in continental waterfowl populations like that which occurred in the 1990s. A mixed approach of habitat protection and restoration, complemented by enhancement techniques in a few key areas, characterizes the approach of PPJV partners. The positive impact of agricultural programs, especially the Conservation Reserve Program (CRP) and the Wetlands Reserve Program (WRP), and successor programs under the Agricultural Conservation Easement Program (ACEP), cannot be over emphasized.

*Missouri Coteau and Coteau Slope* – The Missouri Coteau was formed in ways similar to the Prairie Coteau. Comparatively steep terrain and relatively poor soils have, until recently, limited tillage agriculture. However, new crops and crop varieties, coupled with favorable commodity support policies, have increased the rate of grassland loss in recent years, particularly in South Dakota. Intact grasslands and abundant seasonal wetland basins make the Missouri Coteau a continental mainstay for many species of waterfowl and other wetland and grassland birds. The Coteau Slope that borders the Missouri River has an older glacial history and is characterized by fewer depressional wetlands and more coulees and streams, many of which are dry for most of the year. Consequently, the Coteau Slope is a lower priority for waterfowl, but is important habitat for many priority species of grassland land birds. Grassland and wetland protection are the primary goals in these physiographic regions.

*Montana Glaciated Grasslands* – An area of slight to moderate relief, the Montana Glaciated Grasslands are dry because of the "rain-shadow effect" of the Rocky Mountains. This is dry mixed-grass prairie, adapted to the natural forces of drought, wind, and fire. For wetland-dependent birds, it is a boom-and-bust system. During periods of deluge, wetland communities of the Montana grasslands can be extremely productive breeding habitats for ducks. Several species, most notably northern pintails, settle to breed in this region when wetlands are flooded in early spring. Owing to its droughty nature, the Montana Glaciated Grasslands were once thought suitable only for grazing. However, the development of drought-tolerant crops has stimulated the plowing and cultivation of vast tracts of prairie. As in other locales, intensification of agriculture has caused the loss and degradation of wetlands. Fortunately, large expanses of native prairie still exist in this region, which provide an opportunity for grassland and wetland easements to protect the remaining habitat. In addition, land owned and managed by federal agencies receives an added measure of protection because actions are subject to a suite of regulatory reviews and statutes. The glaciated grasslands of Montana are a priority for conservation/protection since several priority grassland bird species extensively use this area for breeding, including pintail during favorable habitat conditions.

## The Importance of the U.S. Prairie Pothole Region to Wildlife

The historic PPR was a mecca for breeding waterfowl unparalleled anywhere else in North America. Ducks produced in the U.S. PPR are harvested in 49 states of the U.S. (the only exception being Hawaii) as well as Canada, Mexico, the Caribbean and northern South America (Figure 4).



**Figure 4.** Hunter band returns from ducks banded in the U.S. PPR

Although every regular breeding species of waterfowl occurs in each state, the diversity of species increases from southeast to northwest. In Iowa and Minnesota, mallards (*Anas platyrhynchos*), blue-winged teal (*Anas discors*), and wood ducks (*Aix sponsa*) predominate, while in North Dakota, South Dakota, and Montana the species are more diverse

– mallards, blue-winged teal, northern pintail (*Anas acuta*), gadwall (*Anas strepera*), northern shoveler (*Anas clypeata*) and American wigeon (*Anas americana*) among other dabbling and diving ducks are the common species (see Waterfowl Section Appendix A). Despite agricultural conversion of wetlands and grasslands, the U.S. PPR remains a national treasure for its waterfowl and other wildlife. In the late 2000s, when the entire U.S. PPR was wet, the region supported nearly 14 million ducks, and in a typical year is believed to be able to sustain up to 10 million ducks. Based on data from the U.S. Fish and Wildlife Service (USFWS) and Canadian Wildlife Service (CWS) Waterfowl Breeding Population and Habitat Survey (WBPHS), the PPR portion of the eastern Dakotas, which comprises just 7% of the traditional survey area, supported about 22% of the total breeding pairs counted throughout the entire survey area in the US and Canada. The PPR portions of Minnesota, Iowa, and Montana contribute more to that total.



Neal & MJ Mishler

The historic production of breeding ducks must have made these estimates pale by comparison. For example, in Iowa, where survey-based models yield current estimates of about 57,000 breeding pairs in average years, historical wetlands probably once supported over 1.1 million pairs (Bishop 1981, Tiner 1984). Southern Minnesota production was similarly impressive.

The value of the U.S. PPR to wildlife goes far beyond waterfowl, providing breeding or migration stopover habitat for 36 of 50 shorebird species that regularly occur in the US, breeding habitat for 13 of 20 species, and migration stopover habitat for 23 of 36 species (Skagen and Thompson 2001). Skagen et al. (2008) found that in wet years when small basins are ponded, at least 98% of shorebirds use small wetland habitats, rather than large, often well-known, stopover sites. Ironically, removal of residual emergent vegetation by farming in areas without extensive grazing may have improved habitat for some shorebirds that use shallow wetlands. However, drainage of these wetlands could be significantly affecting populations of some of these species, especially short-distance migrants that require regular feeding stops to refuel and add weight from high-protein invertebrates to continue migration. Fortunately, in most years even drained wetlands and sheet water provide abundant, food-rich habitat for shorebirds in the spring, albeit for brief periods. Terrain remodeling and sediment accumulation in farmed-through shallow wetlands may be further impairing their value for shorebirds and other wetland species as shallow depressions slowly disappear.

U.S. PPR wetlands provide habitat for at least 40 species of waterbirds such as terns and gulls, secretive marshbirds like rails and bitterns, and American white pelicans. Black terns are known to use quality seasonal and semi-permanent basins, and, as surveys expand, more species are found or found to be more common than believed. One such example is the king rail, currently found at number of sites in the Iowa PPR where it was thought to be extirpated. Recolonization and range expansion may also be factors in these observations.

Grassland birds are a group of North American species of special concern because their populations are declining faster than any other group of birds (Knopf 1994, Sauer and Link 2011). In particular, 4 species of mixed-grass specialists are of conservation concern due to ongoing population declines (Sauer 2014): Sprague's pipit (*Anthus spragueii*), Baird's sparrow (*Ammodramus bairdii*), McCown's longspur (*Rhynchophanes mccownii*) and chestnut-collared longspur *(Calcarius ornatus*). Of the three grassland ecosystems in the U.S. PPR (Figure 5), the tallgrass ecosystem has suffered the greatest losses of habitat and populations, with many species being extirpated, followed by the mixed-grass and dry mixgrass prairies in order of severity of habitat loss and impacts to populations. These losses persist. Dahl (2014) estimated that South Dakota alone had lost 600,000 acres of grassland to cropland conversion from 1997-2009 with further losses since then with the return of USDA Conservation Reserve Program (CRP) grasslands to cropland.



**Figure 5.** Grassland ecoregions of the PPJV based on Wright and Bailey (1982).

Legend:
- Dry Mixed Grass Ecoregion
- Mixed Grass Ecoregion
- Tallgrass Ecoregion

Some grassland bird species are "area sensitive," requiring relatively large blocks of grassland to settle and breed (Johnson and Igl 2001, Davis 2004). Moreover, nesting success of ground nesting birds including waterfowl may be higher in large grassland patches. Fragmentation of grasslands reduces habitat suitability for many native species and may reduce production to a level below that needed for population maintenance.

U.S. PPR wetlands are critical for migrating waterfowl, shorebirds, and waterbirds; waves of species pass through the region each spring and fall. The only consistent exceptions seem to be in the Iowa and southern Minnesota PPR where birds may encounter widespread habitat loss which has undoubtedly caused a shift in migration patterns, likely affected migration survival rates of some species, and potentially affected fecundity. Thus, even though the U.S. PPR is at the northern edge of the country, it is a continental nexus for species migrating to and from the southern U.S., Mexico, Central America, and South America. Northern Pintails wintering in California's Central Valley often fly though the PPR, remaining to breed or reversing direction to northern Canada and Alaska (Miller et al. 2005). Remaining U.S. PPR wetlands and grasslands are essential links in a chain of migratory habitat that runs the length of the Western Hemisphere.

Most recently, monarch butterflies and other pollinators have received an immense amount of attention because of rapid population declines, particularly in the tallgrass portion of the U.S. PPR, and the potential ramifications of declining pollinator populations to the security of the world's food supply. For example, producers in U.S. PPR states maintained 40% of the U.S. honey bee colonies that produced 51% of the 2014 national honey production (National Agricultural Statistics Service 2016). The causal factor for pollinator declines appears to be the continuing loss of native habitat to cropland and cropland technology including the use of glyphosate herbicide and neonicotinoid-treated seed. Loss of these species is a graphic illustration of the destabilization of ecosystems and the ecosystem services provided to humans that occurs with extensive habitat loss. If there is a positive note in this emerging crisis it is that, in general, what is good for one species of conservation concern is generally good for another, making habitat protection, restoration and management in the U.S. PPR even more critical. For example, tallgrass prairie restoration efforts provide habitat for several priority species of grassland birds, while providing nectar source plants and milkweed for butterflies and other pollinators.

The North American Waterbird Conservation Plan (NAWCP; Kushlan et al. 2002), was developed to provide a continental perspective on the status of, and conservation efforts for, waterbirds in North America. The NAWCP covers 210 species of waterbirds in 23 families that spend at least part of the year in the NAWCP planning area, which includes the interests of 29 nations in North America, Central America, and surrounding pelagic zones. However, the NAWCP specifically addresses colonial and semi-colonial waterbirds only; solitary breeders were to be addressed in the second version of the NAWCP, which was planned but has not been completed. Some information about population status, monitoring, and conservation of solitary-breeding waterbirds is available on the NAWCP web page, but the material is limited and there do not appear to be plans to rectify the situation. This information gap is particularly significant to the PPR, where 38% of species are generally solitary breeders, as opposed to only 20% of waterbird species across the continent.

The Northern Prairie & Parkland Waterbird Conservation Plan (Beyersbergen et al. 2004) was developed to address waterbird conservation issues specific to the PPR. The Plan describes knowledge, biology, and conservation efforts for 40 waterbird species (Table 1) in the Plan area, which also includes the Canadian Peace Parklands (Figure 2).



**Figure 2.** The Northern Prairie and Parkland Waterbird Conservation Region (green shading) consists of those areas covered by the Prairie Pothole Joint Venture (PPJV) in the United States and the Prairie Habitat Joint Venture (PHJV) in Canada and approximates Bird Conservation Region 11 (black outline) in north-central North America.

> The overall goal of the Northern Prairie & Parkland Waterbird Conservation Plan is
>
> "To provide guidelines for conservation that, when implemented, result in maintaining and managing healthy populations, distributions, and habitats of waterbirds throughout the Northern Prairie & Parkland Region of North America."

Waterbirds breeding in the PPR spend only a portion of their annual cycle there, and migration corridors, staging areas, and wintering grounds are also vital to waterbird conservation. Continental planning efforts must recognize and support conservation of linkages between different geographic regions, and regional plans should identify and address conservation issues within their respective boundaries.

## Landscape Changes and Associated Implications to Waterbirds

Ecological functions are increasingly being lost in portions of the PPR as native habitat is altered or converted to other uses. Because agriculture is the primary land use in the PPR, many of the threats to the ecological integrity of the landscape are related to agricultural practices and programs. Threats can be direct, as in habitat loss from wetland drainage and conversion of grassland to cropland, or indirect, such as pesticide-induced loss of invertebrate populations necessary for growth and survival of birds.

Vast numbers of wetlands already have been converted to other uses in the PPR. Statewide estimates of number of wetlands lost through the 1980s are 89% for Iowa, 49% for North Dakota, 42% for Minnesota, 35% for South Dakota, and 27% for Montana (Dahl 1990). The percentage of surface area lost is smaller than the percentage of number of wetlands, as smaller wetlands, which are easier to drain, are generally drained first. In addition, consolidation of wetlands, where several small wetlands are drained

009900

into one larger wetland, is common (Anteau 2012). Loss of small wetlands can disrupt habitat connectivity and reduce diversity and function of wetland complexes (Anteau 2012). Wetland loss continues, especially drainage of wetlands in crop fields, which is particularly high during times of high commodity prices (Dahl 2011, Johnston 2013).



Neal & MJ Mishler

Conversion of grassland, particularly native prairie, to cropland in the region is extensive and ongoing as agricultural subsidies, new crop varieties, and altered climate enable planting of lands that were previously considered unsuitable for crop production (Stephens et al. 2008, Rashford et al. 2011, Lark et al. 2015). When crop prices are high, farmers are more likely to convert native habitat, including grassland and wetlands, to crop fields. However, agriculture can have a tremendous impact on land use even in the absence of direct market forces. For example, the U.S. Department of Agriculture's Conservation Reserve Program (CRP), which takes land out of production by paying farmers to plant grass on croplands for a contracted time period, paid farmers in North Dakota approximately $100 million per year during the late 1990s. CRP enrollment is particularly important in Minnesota and Iowa, where 68% and 41%, respectively, of grass cover in the PPR portion of each state was CRP in 2006 (Doherty et al. 2013). However, CRP enrollment has fallen dramatically in recent years (Table 2) due to reductions in available program acres and non-renewal of contracts during periods of high commodity prices. As CRP contracts expired in the Midwest between 2010 and 2013, only a small amount (~3%) of the land shifted into similar, non-CRP land-retirement or easement programs, with approximately 30% returning to primarily corn and soybean production (Morefield et al. 2016).

Wetlands in the U.S. presently receive some protection under the Swampbuster provision of the *Food Security Act of 1985* (a.k.a. Farm Bill) and its successors, which deny federal agricultural benefits to farmers who drain wetlands, although wetlands can be farmed in dry years. Swampbuster is important to wetland-dependent wildlife; however, protection under it is temporary, and may be lost as new Farm Bill legislation is enacted. Wetland protection also may be jeopardized by other government regulations and decisions. For example, the U.S. Supreme Court ruled that isolated, non-navigable, intrastate wetlands (such as those typical of the PPR) are no longer protected under Section 404 of the *Clean Water Act of 1972*, which prohibits the dredging or filling of any portion of the waters of the United States without a permit (van der Valk and Pederson 2003).

**Table 2.** State-wide acres of land enrolled in the USDA Conservation Reserve Program in 2006, acres enrolled in 2015, change in acres 2006-2015, and percent change 2006-2015. State-level data from http://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/Conservation/Excel/statepayments8615.xls

| State | 2006 acres | 2015 acres | Change (acres) | Change (%) |
|-------|-----------|-----------|----------------|------------|
| Iowa | 1,958,883 | 1,484,593 | -47,4290 | -24.2 |
| Minnesota | 1,796,541 | 1,151,306 | -64,5235 | -35.9 |
| Montana | 3,481,533 | 1,499,179 | -198,2354 | -56.9 |
| North Dakota | 3,371,661 | 1,523,997 | -184,7664 | -54.8 |
| South Dakota | 1,515,227 | 926,266 | -58,8961 | -38.9 |
| Total | 12,123,845 | 6,585,341 | -5,538,504 | -45.7 |

009901



Swampbuster is important to wetland-dependent wildlife; however, protection under it is temporary, and may be lost as new Farm Bill legislation is enacted.

Neal & MJ Mishler

Wetlands can be degraded even if they are not drained, as cultivation of wetland basins during dry years may reduce quality of wetland habitat during subsequent wet years when basins hold water. Marsh plants can survive several years of cultivation, but tillage of basins over extended periods can alter wetland plant community composition and reduce structure of wetland vegetation. In addition, wetlands in agricultural fields may have reduced numbers of invertebrates relative to wetlands in grasslands. Agriculture also has many less obvious, indirect effects that threaten the ecological integrity of the PPR, including siltation and fertilizer and herbicide inputs. Pesticides can decrease reproductive success as well as cause direct and indirect mortality of birds. Pesticides such as carbofuran, chlorpyrifos, and parathion can cause direct mortality of birds, kill invertebrates upon which many waterbirds feed, and contaminate food resources (Grue et al. 1986, Forsyth 1989). Use of neonicotinoid pesticides in the region is increasing, with considerable transport of neonicotinoids into wetlands (Main et al. 2014), resulting in many direct and indirect negative effects for wildlife (Gibbons et al. 2015).

Climate change will alter temperature, precipitation amounts and patterns, growing season, plant evapotranspiration, and a host of related factors such as snow cover, timing of migration, timing and duration of dormancy, species composition of native and agricultural systems, and urbanization, all of which could have dramatic impacts on many aspects of ecology in the PPR. The potential of climate change to reduce wetland water levels, wetland numbers, and waterbird populations has received considerable attention; however, analyses suggesting declines in wetlands over time (i.e., Poiani et al. 1991, Johnson et al. 2005, Johnson et al. 2010, Steen et al. 2016) were based on limited data and scenarios that "did not fully incorporate interacting or potentially overshadowing impacts of land use on wetland hydrology and ecology" (Anteau 2016). Long-term (1974-2013) trends suggest that, contrary to results of scenario-based models, actual May pond numbers in the PPR are stable or increasing and that indirect effects of climate change such as wetland drainage and land conversion may be greater threats to wildlife in the region than direct effects such as drying of wetlands (Niemuth et al. 2014). Increased precipitation and changes in precipitation due to climate change could actually reduce wetland quality for some waterbird species by flooding of emergent vegetation and reductions in nutrient release facilitated by seasonal drying of wetlands.

Exotic species are spreading within the region, including terrestrial species such as leafy spurge and spotted knapweed and wetland/riparian species such as reed canary grass, purple loosestrife and salt cedar. Many ecosystem functions are lost or altered as native species are displaced, nonnative species invade, and natural disturbances such as grazing and fire are altered (Collins and Wallace 1990).

Not all waterbird species have been negatively affected by human-induced landscape changes. Populations of some gull species have increased locally due to increased availability of food associated with humans. In addition, recent expansion of range into the PPR by several heron species may be a consequence of climate change.



Neal & MJ Mishler


Kevin Barnes

## Factors Limiting Waterbird Populations

Primary factors limiting waterbird populations in the PPJV administrative area are largely unknown. Advances in understanding limiting factors have not progressed quickly due to funding limitations, the difficulty of studying often-secretive species, large inter-annual fluctuations in population numbers and distribution, and low priority of waterbirds relative to many other species. Loss and degradation of wetland and upland habitats likely limit carrying capacity of the landscape. Carrying capacity may not decline linearly with wetland loss, as some waterbird species (e.g., Yellow Rail) key in on specific wetland types and several waterbird species respond to wetland complexes and structure of vegetation within wetlands (Kantrud and Stewart 1984, Johnson and Dinsmore 1986, Fairbairn and Dinsmore 2001, Naugle et al. 2001). Factors influencing nesting success, chick survival, and adult survival certainly vary among species, but are simply unknown or have only been studied in short, localized studies. It is likely that some of the factors and processes that affect waterfowl populations also affect waterbirds. For instance, composition of landscapes and predator communities might influence nesting success of waterbirds. However, colonial nesting, mobbing of potential predators, and over-water nesting of some waterbirds likely produce patterns of nesting success and survival that differ from waterfowl.

Given limited knowledge about factors limiting waterbird populations and the difficulty and expense of understanding limiting factors for these often-secretive species, it is important that research and resources be applied to clearly identified needs and questions. Overall, most waterbird populations in the PPR are doing well. Of the 40 waterbird species that occur, at least occasionally, in BCR 11, 18 species have trend information with trend credibility estimates (95% intervals). Of those, 6 had positive population trends and 1 had a negative population trend (Table 1). The remaining 11 species had trends not differentiated from stable. At the continental level, 31 species have trend information with trend credibility estimates (95% intervals). Of those, 4 had positive continental population trends and 6 had negative continental population trends (Table 1). The remaining 21 species had trends not differentiated from stable.

## Biological Models for Waterbirds

Models are generalizations that can help managers understand relationships between species and habitat, with the end goal of increasing efficiency of conservation. Biological models for waterbirds vary among species, as well as with spatial and temporal scales. Waterbird habitat and behaviors vary throughout the year. Birds may use one habitat or area for courtship, another for nesting, another for brood-rearing, and still others for post-breeding molt and pre-migration staging. Availability of wetland habitat also may vary among years depending on precipitation. On a spatial scale, waterbird habitat may be characterized at nest site, wetland, wetland complex, and landscape scales, among others.

Colonial waterbirds may be subdivided according to the substrate that they choose for nesting. In general, these species may nest on floating vegetation platforms or islands, or in trees or tall shrubbery. With few exceptions, most species fall neatly into one of these categories. Species using the same nesting substrate often are found nesting in association with other colonial waterbirds. Species nesting on vegetation platforms in marshes include the Eared, Western, and Clark's Grebes; Black-crowned Night-Heron; White-faced Ibis; Franklin's Gull; and Forster's and Black Terns. The solitary nesting American Coot may be found nesting with these species. Among the island-nesting species, American White Pelicans; Double-crested Cormorants; California, Herring and Ring-billed Gulls; and Caspian and Common Terns often are found nesting together. Tree-nesting species include most of the herons

and Double-crested Cormorants in some areas. Tree-nesting colonies may be composed of single species, or, especially in the southeastern portion of the BCR, many species. Non-colonial species may nest on floating platforms of vegetation, in emergent vegetation over water, or on the ground in drier sites such as sedge meadows, or even in dry upland vegetation. Cranes build a mound of vegetation that may be constructed in shallow water on or near the edge of a wetland. Waterbirds also can be categorized by their preference for a general type of wetland utilized for nesting during the breeding season in the PPR (Table 3; adapted from Beyersbergen et al. 2004).

Wetlands in Group A generally have extensive stands of emergent vegetation. These sites range from flooded sedge meadows to cattail or bulrush stands in deep water marshes and may be seasonal to permanent wetlands. Group B wetlands include mostly larger, permanent freshwater marshes with patches of emergent vegetation interspersed with open water. Wetlands in Group C have emergent vegetation (e.g., sedges, rushes, Phragmites) with extensive areas of open water. Some shallow-water marshes are included in this set, but the majority are deep-water marshes or lakes. Group D wetlands are typified by the presence of wooded areas that serve as nesting sites on islands, flooded stands of trees, or uplands near the wetland; some waterbirds using this group also will nest on barren sites. Finally, Group E includes wetlands or waterways with an island (vegetated or barren), sandbar, or exposed shoreline. Although these species are separated into general categories, habitat preferences will overlap across the region. Many wetlands have multiple vegetation zones based on basin substrate and water depth; distribution and structure of vegetation in a basin may change depending on variation in water levels. Maintaining appropriate interspersion of vegetation and wetland complexes is important because waterbirds may use multiple zones throughout the year or in different years.

**Table 3.** General waterbird habitat preferences based on amount of emergent vegetation, open water, and preferred nesting habitat.

| GROUP | | | | |
|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** |
| Wetland with<br>- much emergent vegetation<br>- variable open water | Wetland with<br>- emergent vegetation<br>- partial open water | Wetland with<br>- emergent vegetation<br>- extensive open water | Wetland with<br>- emergent vegetation<br>- open water<br>- nesting trees | Lake or River with<br>- open water<br>- barren ground<br>- islands |
| American Bittern<br>Least Bittern<br>Black-crowned Night-Heron<br>Yellow Rail<br>Black Rail<br>King Rail<br>Virginia Rail<br>Sora | Sandhill Crane<br>Franklin's Gull<br>Bonaparte's Gull<br>Forster's Tern<br>Black Tern | Common Loon<br>Pied-billed Grebe<br>Horned Grebe<br>Red-necked Grebe<br>Eared Grebe<br>Western Grebe<br>Clark's Grebe<br>White-faced Ibis<br>American Coot<br>Common Moorhen | Great Blue Heron<br>Great Egret<br>Snowy Egret<br>Tricolored Heron<br>Little Blue Heron<br>Cattle Egret<br>Green Heron<br>Yellow-crowned Night-Heron | American White Pelican<br>Double-crested Cormorant<br>Ring-billed Gull<br>California Gull<br>Herring Gull<br>Caspian Tern<br>Common Tern<br>Least Tern |

Waterbirds also select habitat on a broader spatial scale that encompasses characteristics of landscapes. Conservation planning at the landscape level is appropriate for several reasons. As mentioned previously, bird habitat selection is hierarchical and influenced by a variety of biotic and abiotic factors, with birds first selecting habitat at broad scales, then making fine-grained selections such as nest and foraging sites (Johnson 1980, Wiens 1989). Landscape-level conservation thus provides a broad habitat foundation within which birds can select habitat at a fine-grained scale. Landscape characteristics also are important from logistical and management standpoints. If habitat is purchased or otherwise selected for management based on landscape characteristics, local characteristics (e.g., vegetation composition and structure) within a patch can be modified relatively easily. But it is difficult to modify the landscape around a patch with suitable local characteristics if landscape characteristics are not suitable. For these reasons, most bird conservation initiatives (e.g., North American Waterfowl Management Plan, Partners In Flight, North American Bird Conservation Initiative) explicitly promote a landscape approach to bird conservation.

Habitat selection varies among species, but available information indicates that many waterbirds are



Casey Stemler

strongly influenced by proximity to other wetlands, presence of grassland/wetland complexes, and presence or absence of trees (Brown and Dinsmore 1986, Naugle et al. 1999, Fairbairn and Dinsmore 2001, Naugle et al. 2001, Niemuth et al. 2008). Obviously, fine-grained habitat characteristics also influence use of wetlands by waterbirds, but broad-scale features can be used to assess suitability of landscapes for waterbird conservation planning. For example, Black Terns in South Dakota were positively associated with total wetland area, area of semipermanent wetlands within a complex, and amount of grassland surrounding wetlands (Naugle et al. 2001). Analysis of BBS data from North Dakota and South Dakota indicates that Black Terns were positively associated with amount of seasonal wetland, semipermanent wetland, and grassland surrounding survey points and negatively associated with forest cover; detection was also influenced by geographic location and observer ability (Figure 3).

Development of spatially explicit habitat models throughout the PPJV administrative area is ongoing; existing models continue to be refined and new models are developed for additional species as appropriate data become available (Figure 4).





**Figure 3.** Estimated probability of detecting Black Tern in the Prairie Pothole Region of North Dakota and South Dakota in June of 1995. Model developed using georeferenced BBS data, digital National Wetlands Inventory data, and landcover information derived from Landsat Thematic Mapper imagery (Niemuth et al. 2005).

**Figure 4.** Whooping Crane habitat in North and South Dakota was identified and ranked by decile. The landscape was divided into equal-area units, each covering 10% of the analysis region. In this model, the top three deciles captured 78% of 427 independent, unbiased validation observations. The centerline of the migration corridor is shown in yellow.



Chuck Loesch

# PAST TRENDS AND POPULATION DISTRIBUTIONS

Populations of many waterbird species are poorly understood and available population data are often imperfect. Nevertheless, available data indicate population declines for several species, which is a logical outcome of the extensive wetland and upland habitat loss that has taken place in much of the PPR. Whooping Crane and the interior population of the Least Tern are listed as endangered species in the U.S., and the Northern Prairie & Parkland Waterbird Conservation Plan identifies Western Grebe, Franklin's Gull, Black Tern, Horned Grebe, American Bittern, Yellow Rail, and King Rail as species of high concern (Table 1).

Wetland numbers in the PPR vary greatly across space and among years due to high inter-annual and regional variation in precipitation (Figure 5; Kantrud et al. 1989, Woodhouse and Overpeck 1998). Although the effect of wetland availability on breeding distribution and density of waterbirds is poorly known, limited information indicates that waterbirds are affected in a manner similar to waterfowl. Numbers of several waterbird species are positively correlated with number of May ponds (Figure 6; Niemuth and Solberg 2003), and changes in Black Tern populations in the prairie provinces of Canada are correlated with changes in Mallard populations, both of which vary with availability of wetlands (Peterjohn and Sauer 1997).

Fluctuations in waterbird numbers in response to wetland availability may be particularly important in the PPR, which is highly susceptible to drought and harbors a large proportion of the breeding populations of several species of waterbirds. Understanding the relationship between wetland numbers and waterbirds is likely as critical to the monitoring and management of waterbird populations in the PPR as it is for waterfowl. For example, if birds settle in different areas depending on water availability, apparent changes in local and regional populations may reflect wetland conditions instead of true population changes.





# Shorebirds

*July 2000*     ***Fish and Wildlife Habitat Management Leaflet***     *Number 17*



*American avocet.*

## General Information

Shorebirds belong to the diverse avian Order Charadriiformes, suborder Charadrii, and members occupy a wide range of environments. Habitats include coastal, saline, and freshwater wetlands, flooded agricultural fields, interior grasslands, and arctic tundra. Most shorebirds have small bodies with long, thin legs for wading. Three unwebbed toes point forward and the hind toe is reduced or absent (except in the partially webbed-toed American Avocet and lobed-toed phalaropes). Beaks come in a variety of shapes and sizes, and each is designed for a specific foraging substrate. Shorebirds such as oystercatchers and sandpipers exhibit countershading, where dark colors on the back balance the shaded light-colors on the underside. Killdeer and Semipalmated plovers display disruptive coloration—bold patterns break up the bird's outline to help avoid detection by predators. If juvenile birds survive their first year, life spans greater than ten years are not uncommon for some shorebird species.

Shorebirds are champion migrators, travelling thousands of miles between Arctic nesting grounds and wintering grounds in Central and South America. Migration routes typically follow coastlines or interior water sources. Staging areas and stopover sites in North America provide abundant food resources crucial for supplying the energy needed to complete migration. About 51 species migrate through North America each year. However, declining numbers have been observed at many staging grounds.

Wetland habitat alterations have contributed to significant decreases in populations of Eskimo curlews, buff-breasted sandpipers, whimbrels, and sanderlings. Nearly all *Charadrius* plover species including mountain plovers, piping plovers, killdeer, and snowy plovers have experienced population declines and have serious status concerns. In the lower 48 states, more than 50% of original wetland habitat suitable for shorebirds has been destroyed or degraded since the late 1700s. Coastal and wetland developments have limited foraging and staging areas along migration routes. Inland fresh and salt water habitats continue to be threatened by industrial and agricultural land use, agricultural runoff, and chemical pollution. Human use of

| Family name | Species representatives |
|---|---|
| Haematopodidae | Oystercatchers |
| Recurvirostridae | Stilts and avocets |
| Charadriidae | Lapwings and plovers |
| Scolopacidae | Sandpipers, godwits, curlews, willet, yellowlegs, phalaropes dunlin, red knot, turnstones, dowitchers, and whimbrel |
| Jacanidae | Jacanas |

1



*Long-billed dowitcher.*                    U.S. Fish and Wildlife Service

### Wintering and migration staging areas

Wintering shorebirds usually gather in large flocks on estuarine mudflats, inland shorelines, and other open wetland areas. The spacing of wintering birds depends on location, time of day, and density of food resources. Some migrating birds feed along the margins of inland lakes and rivers. Spotted sandpipers, Wilson's plovers, and wandering tattlers defend individual feeding territories that have well-defined boundaries. Winter territories may be occupied for several weeks or months. Stilt sandpipers, red knots, and short-billed dowitchers move in large foraging flocks.

Migrating shorebirds need suitable staging areas to complete migration. Inland stopover sites for migrating birds are just as important as coastal habitats. Fluctuating water levels in inland wetlands provide mudflat and shallow water sites used by feeding shorebirds. Upland areas interspersed with wetlands are also important, making the Prairie Pothole Region a major stopover area. Most shorebirds favor foraging areas with less than 25 percent vegetative cover, whether it is sandy beaches or shortgrass prairies.

The future of many migrating shorebirds depends on the suitability of wintering and staging sites. Winter habitats in Central and South America are quickly disappearing because of increased human land development activity. Chemical or oil spills at "super" staging sites could significantly reduce food resources and negatively affect migrating shorebird populations. Ensuring adequate quantity and quality of migrating and winter habitats is important, as most shorebirds spend nine or ten months of the year in these areas.

### Interspersion of habitat types

Shorebird habitat management should emphasize maintaining a variety of wetland types to support the needs of various species. A mixture of aquatic and upland habitats maximizes habitat quality for some shorebirds. Optimal habitat requirements depend on whether the

**Shorebird habitat requirements summary table.**

| Habitat component | Habitat requirement |
|---|---|
| Food | Aquatic insects and other invertebrates including crustaceans, and mollusks, terrestrial insects, small fish and amphibians. |
| Water | Adult food contain sufficient water; chicks need fresh water sourc during the first few weeks of life. |
| Nesting habitat | Most prefer open, sparsely vegetated sandy habitats along coastal and inland wateeways and wetlands; arctic lowland tundra. Huma disturbance reduces nesting habitat potential. |
| Wintering and migrating habitats | Wide variety of coastal and inland waterways and wetlands, inclu natural and artificially managed wetlands and flooding agricultura lands. |
| Habitat interspersion | Prefer feeding and nesting sites in close proximity. |

009958





# The State of the Birds 2013

## Report on Private Lands

### *United States of America*







# WETLANDS

Photo by Jason Johnson, USDA-NRCS, Iowa

## At a Glance

- Three-quarters of remaining wetlands are on private lands, making them vital to wetland bird conservation.
- More than half of the U.S. historic wetland habitat base of 220 million acres has been lost.



Blue-winged Teal by Ducks Unlimited

- The Wetlands Reserve Program has restored 2.6 million acres of private wetlands habitat.
- Wetlands sustain waterfowl populations and therefore duck hunting, which contributes more than $2.3 billion in total economic output.
- Landowners and their communities see several benefits from wetlands conservation, such as flood mitigation and improved water quality.

## Wetland Birds on Private Lands

Private lands are essential to wetland birds and wetland conservation, as three-quarters of wetlands in the U.S. occur on private lands. And birds, by their abundance and distribution across regions and seasons, are effective indicators of the health of our nation's wetlands. More than 75% of both the breeding and wintering distributions of American Black Ducks, Blue-winged Teal, Northern Pintails, and Wood Ducks are on private wetlands. Herons, egrets, grebes, and rails also all depend on private wetlands throughout the year. Landowners and their communities likewise depend on wetlands, which provide flood mitigation, coastal buffering, ground water replenishment, improved water quality, and wetland-based recreation.

## Conservation Successes

Funding from Farm Bill programs (such as the Environmental Quality Incentives Program), Migratory Bird Hunting and Conservation stamps (also known as Federal Duck Stamps), and the North American Wetlands Conservation Act has enabled public–private partnerships to conserve millions of acres on private lands for birds.

The Wetland Reserve Program—a Farm Bill provision that provides financial incentives for farmers and landowners to convert croplands in drained areas back into wetlands—has restored 2.6 million acres of private wetlands across the nation. In the Mississippi Alluvial Valley, more than 650,000 WRP acres from southern Illinois to Louisiana play a key role in sustaining bird populations. The valley, which retains only 20% of its original bottomland forested wetlands, is largely in private ownership and dominated by agriculture. WRP-conserved wetlands provide essential breeding habitat for waterbirds such as Wood Duck, White Ibis, and Hooded Merganser, wintering habitat for 3.5 to 4.5 million waterfowl every winter, and migratory stopover habitat for shorebirds such as Black-necked Stilt and Greater Yellowlegs. WRP benefits human residents of the valley, too, as wetlands restored through the program have helped reduce the extent of natural flooding by as much as 88%.

In the Central Valley of California, winter-flooded wetlands support 5 to 7 million waterfowl, as well as large populations of shorebirds, rails, and bitterns. In this region, more than 90% of the original winter wetlands have been lost or highly altered, and only 400,000 acres are left today—more than 60% of which are privately owned and managed. Wetland restoration efforts here, combined with the presence of wetland-type habitat provided by ricelands, have allowed the White-faced Ibis to bounce back from near extirpation.

*"Restoring marginal cropland on my farm that should have never been cleared has been one of the most fulfilling events in my farming career. It has been good for my business but great for the ducks."*

—*George Dunklin, Jr., Mississippi Alluvial Valley landowner*

Photo by Jason Johnson, USDA-NRCS, Iowa

009964

## Conservation Challenges

Wetland habitat is vital for breeding, migrating, and wintering birds. More than half of our nation's historic wetland habitat base of 220 million acres has been lost, with losses exceeding 80% in some regions. Although substantial acres of wetlands have been restored and conserved through programs such as WRP, many of these gains have been offset recently. Wetland protections from the Clean Water Act have been reversed. Increasing crop prices have spurred a new wave of draining and converting wetlands for agricultural production. Residential development and urban expansion are impacting wetlands as well. Due to these pressures on our nation's already greatly reduced supply of wetlands, a diverse mix of programs is needed to encourage and support private landowners who conserve wetlands.

In the Prairie Pothole Region of the northern Great Plains, nearly 90% of the land is in private ownership, and 40% to 90% of native wetlands have been drained, primarily for agricultural production. The key challenge here involves protecting small wetlands amid large expanses of grass to support the productivity of prairie–wetland breeding birds. Prairie Pothole wetlands provide breeding habitat for dozens of waterbird species, such as Black Terns. This region is known as the "Duck Factory," because the shallow-water basins provide protein-rich invertebrate food resources for nesting females and growing ducklings. The eastern Dakotas alone supported more than 10 million breeding dabbling ducks in recent years. Successful waterfowl breeding here is dependent on the private landowners who are stewards of so

### Wetlands Reserve Program (WRP) at 20 Years

#### Wood Duck Distribution

*This map shows more than 13,000 WRP projects on 2.6 million acres. These sites closely match habitats used by important waterfowl species, such as Wood Duck. (Breeding season distribution shown at left. Brighter areas on map indicate higher probability of occupancy. Occupancy estimates were based on bird observations from eBird and characteristics of the local environment from remote sensing data.) Wood Duck photo courtesy of Ducks Unlimited.*

much of this habitat. Farm Bill Conservation Reserve Program payments to farmers and landowners provide economic compensation for reserving lands from planting that are not typically the most productive for growing crops. CRP lands in the Prairie Pothole Region have produced a net increase of 2 million waterfowl per year, or a 30% increase in breeding production, over the past two decades. Because duck production in the Prairie

Pothole Region is critical to the sustainability of North American waterfowl populations, protecting breeding habitat helps sustain the sport of duck hunting, which contributes more than $2.3 billion in total economic output and more than 27,000 jobs to the U.S. economy. "CRP is a strategy in many parts of the country for growing the economy for this reason: habitat is also tied to an expansion of outdoor recreation and it is an enormous opportunity for rural America," said U.S. Secretary of Agriculture Tom Vilsack.

Along the Gulf Coast, marshes from Mobile Bay, Alabama, to the Rio Grande in Texas are being lost. Historically, the amount of coastal marsh fluctuated due to elemental factors (such as amount of sediment deposited in deltas), but recently the trend has been completely downward, with net wetland loss in the region currently estimated at about 10,000 acres per year. Although there are many important publicly owned lands across this region, most land is privately owned. These coastal marsh wetlands constitute a continentally important habitat for migratory birds. Up to 13 million waterfowl winter here, including about 90% of the continental population of Mottled Ducks. Gulf Coast wetlands provide breeding, winter, and migration habitat to nearly every wading bird species, including Roseate Spoonbill and Wood Stork.

A Gulf Coast wetlands complex east of Corpus Christi, Texas—consisting of Aransas National Wildlife Refuge and surrounding privately owned wetlands—provides winter habitat for the only remaining wild population of Whooping Cranes. In 2012, The Nature Conservancy, with additional funding from the Whooping Crane Conservation Association, the U.S. Fish and Wildlife Service, and other private donors and foundations, purchased a conservation easement on more than 100 acres at the Falcon Point Ranch to protect this prime parcel of coastal real estate (and important crane wintering habitat) from development.



## Articles

# Consolidation Drainage and Climate Change May Reduce Piping Plover Habitat in the Great Plains

**Lisa A. McCauley,\* Michael J. Anteau, Max Post van der Burg**

*L.A. McCauley*

South Dakota State University, U.S. Geological Survey, Northern Prairie Wildlife Research Center, Jamestown, North Dakota 58401

*Present address:* The Nature Conservancy, Center for Science and Public Policy, Tucson, Arizona 85719

*M.J. Anteau, M. Post van der Burg*

U.S. Geological Survey, Northern Prairie Wildlife Research Center, Jamestown, North Dakota 58401

## Abstract

Many waterbird species utilize a diversity of aquatic habitats; however, with increasing anthropogenic needs to manage water regimes there is global concern over impacts to waterbird populations. The federally threatened piping plover (*Charadrius melodus*; hereafter plovers) is a shorebird that breeds in three habitat types in the Prairie Pothole Region of North Dakota, South Dakota, and Canada: riverine sandbars; reservoir shorelines; and prairie wetlands. Water surface areas of these habitats fluctuate in response to wet–dry periods; decreasing water surface areas expose shorelines that plovers utilize for nesting. Climate varies across the region so when other habitats are unavailable for plover nesting because of flooding, prairie wetlands may periodically provide habitat. Over the last century, many of the wetlands used by plovers in the Prairie Pothole Region have been modified to receive water from consolidation drainage (drainage of smaller wetlands into another wetland), which could eliminate shoreline nesting habitat. We evaluated whether consolidation drainage and fuller wetlands have decreased plover presence in 32 wetlands historically used by plovers. We found that wetlands with more consolidation drainage in their catchment and wetlands that were fuller had a lower probability of plover presence. These results suggest that plovers could have historically used prairie wetlands during the breeding season but consolidation drainage, climate change, or both have reduced available shoreline habitat for plovers through increased water levels. Prairie wetlands, outside of some alkali wetlands in the western portion of the region, are less studied as habitat for plovers when compared with river and reservoir shorelines. Our study suggests that these wetlands may have played a larger role in plover ecology than previously thought. Wetland restoration and conservation, through the restoration of natural hydrology, may be required to ensure that adequate habitat exists among the three habitat types in the face of existing or changing climate and to ensure long-term plover conservation**.**

Keywords: agriculture drainage; North Dakota; Prairie Pothole Region; shorebirds; waterbirds; wetland alteration; wetland hydrology

Received: July 27, 2015; Accepted October 27, 2015; Published Online Early: November 2015; Published: June 2016

Citation: McCauley LA, Anteau MJ, Post van der Burg M. 2015. Consolidation drainage and climate change may reduce piping plover habitat in the Great Plains. *Journal of Fish and Wildlife Management* 7(1):4-12; e1944-687X. doi: 10.3996/072015-JFWM-068

Copyright: All material appearing in the *Journal of Fish and Wildlife Management* is in the public domain and may be reproduced or copied without permission unless specifically noted with the copyright symbol ©. Citation of the source, as given above, is requested.

The findings and conclusions in this article are those of the author(s) and do not necessarily represent the views of the U.S. Fish and Wildlife Service.

\* Corresponding author: lmccauley32@gmail.com



**Figure 3.** The influence of the percent fullness of a wetland on probability of piping plover *Charadrius melodus* presence in wetlands historically used by plovers in North Dakota from 2001 to 2011. Model-predicted values calculated by holding catchment drainage constant at its median. Dashed lines represent 85% confidence limits.

sample wetlands over all the years was 89.5% ± 11% (SD). In drier years (drought index < 0.5) the average fullness of our sample wetlands was 79.6% ±22% (SD) and in wetter years the average fullness or our sample wetlands was 92.3% ± 0.09% (SD). The probability of plover presence was 90.1% higher in wetlands that were half full when compared with wetlands that are completely full. On average, wetlands used by plovers were 88% full, whereas wetlands no longer used by plovers were 92% full.

## Discussion

Our study provides an example of the potential biological impacts of wetland consolidation drainage on wildlife. More specifically, our work shows how consolidation drainage and fuller wetlands have potentially reduced habitat quality of prairie wetlands used by plovers. Previous work on a larger set of wetlands in the region showed that wetlands in highly drained catchments had 197% larger water surface areas than those in catchments with no drainage (McCauley et al. 2015) and that these wetlands get progressively larger with each wetting cycle (Wiltermuth 2014). However, on the basis of McCauley et al. (2015), it was unclear if consolidation drainage was occurring on wetlands used by plovers and whether this would affect plover presence on these wetlands. Our results showed that consolidation drainage was occurring in the catchments of our sample wetlands similarly to other wetlands in the region (McCauley et al. 2015 drainage range 0–13%; this study drainage range 0–11.5%). We found that plovers historically used prairie wetlands as habitat during the breeding season but that plover presence was negatively

associated with fuller wetlands and wetland drainage in the catchment. The half of our sample wetlands that was previously used by plovers but is no longer used is fuller and surrounded by more drainage than our sample wetlands that remain used by plovers. Prairie wetlands are less studied as plover habitat when compared with river and reservoir shorelines but survey data suggest that the remaining alkali lakes, mostly in the Missouri Coteau, are habitat for more than half of the plovers in this region (Haig and Plissner 1993; Plissner and Haig 2000). Monitoring data indicate that plovers bred in wetlands throughout the Glaciated Plains in North Dakota. Our results support the possibility that prairie wetlands may have played a role in plover ecology in the region but consolidation drainage may have caused a range change by eliminating some wetlands as habitat and reducing habitat quality at other wetlands. Our finding that fullness of a wetland is a major driver of plover presence also ties the fate of plover habitat to potential changes in climate, even in areas where drainage may be absent.

Other studies have found that consolidation drainage has increased water levels and had a progressive effect upon the hydrology of wetlands that receive surface water from drained wetlands (Wiltermuth 2014; McCauley et al. 2015). Wiltermuth (2014) found that wetlands with about 2% of their catchment drained become larger and will likely continue to increase in size with every wetting period, even without further drainage, until they overspill or stabilize. This was the same level of drainage we observed associated with the greatest rate of decrease in probability of plover presence. In drier years, wetlands could be less full and drainage could have less of an effect on plover habitat in the region. However, future climate change projections in the region predict conditions becoming warmer and wetter, with increases in winter and spring precipitation, the main source of precipitation for prairie wetlands (Millett et al. 2009; Melillo et al. 2014). Accordingly, even wetlands that currently have a high probability of plover presence may not be able to continue to support plover productivity in most years or provide habitat for plovers for dispersal if conditions are unsuitable elsewhere. In this case, the northern Great Plains population of plovers may have already and may continue to become even more dependent upon the highly modified habitats along reservoir shorelines and sandbars of the Missouri River.

Our results also corroborate concerns that habitat loss could be a factor inhibiting recovery of the northern Great Plains population of piping plovers (Prindiville Gaines et al. 1988; Root and Ryan 2004). Clearly, interannual water levels and flow dynamics are responsible for the creation and maintenance of habitat in all three principal breeding areas for plovers in the Northern Great Plains (Prindiville Gaines et al. 1988; U.S. Fish and Wildlife Service 2003b; Anteau et al. 2014), but the bulk of attention about plover conservation has been focused on river and reservoir management (U.S. Fish and Wildlife Service 2003b). Including prairie wetland restoration and management as part of a

Case 1:19-cv-02416-TSC     Document & Wildlife Service 21     Page 111 of 248

U.S. Fish & Wildlife Service

# Status and Trends of Wetlands
# in the Conterminous United States
# 2004 to 2009



**Report to Congress**

The study indicated that there were an estimated 110.1 million acres (44.6 million ha) of wetlands in the conterminous United States in 2009[4] (the coefficient of variation of the national estimate was 2.7 percent). An estimated 95 percent of all wetlands were freshwater and 5 percent were in the marine or estuarine (saltwater) systems. With the exception of minor statistical adjustments to the area estimates, the overall percentage of wetland area and representation by saltwater and freshwater components remained unchanged.

Estuarine emergent (salt marsh) wetland was the most prevalent type of all estuarine and marine intertidal wetland. Salt marsh made up an estimated 66.7 percent of all estuarine and marine wetland area. Forested wetlands made up the single largest category (49.5 percent) of wetland in the freshwater system. Freshwater emergents made up an estimated 26.3 percent, shrub wetlands 17.8 percent and freshwater ponds 6.4 percent by area.

The difference in the national estimates of wetland acreage between 2004 and 2009 was not statistically significant. Wetland area declined by an estimated 62,300 acres (25,200 ha) between 2004 and 2009. The reasons for this are complex and potentially reflect economic conditions, land use trends, changing wetland regulation and enforcement measures and climatic changes. Certain types of wetland exhibited declines while others increased in area. The result of these gains and losses yielded the net change and it was possible to have losses or gains of particular wetland types that exceed the overall net change for all wetlands.

Collectively, marine and estuarine intertidal wetlands declined by an estimated 84,100 acres (34,050 ha) or an estimated 1.4 percent between 2004 and 2009. The majority of these losses (73 percent) were to deepwater bay bottoms or open-ocean. Losses of estuarine emergent (salt marsh) and changes in marine and estuarine non-vegetated wetlands reflected the impacts of coastal storms and relative sea level rise along the coastlines of the Atlantic and Gulf of Mexico. The majority (99 percent) of all estuarine emergent losses were associated with processes related to the marine environment such as saltwater inundation and/or coastal storm events. The effects of sea level on wetlands are subject to considerable uncertainties; however, recent changes in non-vegetated intertidal wetlands (beaches, bars and shoals) along the South Atlantic and Gulf of Mexico indicated considerable instability and change. Coastal environments continue to face a variety of stressors that can interact with climate-related processes and potentially increase the vulnerability of coastal wetlands.

Overall, freshwater wetlands realized a slight increase in area between 2004 and 2009. Freshwater ponds have continued to increase although the rate of pond development had slowed from previous reporting periods. Freshwater vegetated wetlands continued to decline albeit at a reduced rate. This most recent annual rate of loss represented a reduction in the loss rate of roughly 50 percent since 2004. Declines in freshwater forested wetland area (633,100 acres or 256,300 ha) negated area gains in freshwater emergent and shrub categories.

Forested wetlands sustained their largest losses since the 1974 to 1985 time period. Freshwater wetland losses continued in regions of the country where there has been potential for wetlands to come into conflict with competing land and resource development interests.

Between 2004 and 2009, 489,600 acres (198,230 ha) of former upland were re-classified as wetland. These increases were attributed to wetland reestablishment and creation on agricultural lands and other uplands with undetermined land use including undeveloped land, lands in conservation programs or idle lands. The rate of wetland reestablishment increased by an estimated 17 percent from the previous study period (1998 and 2004). Conversely, the estimated wetland loss rate increased 140 percent during the same time period and, as a consequence, national wetland losses have outdistanced gains.

The cumulative effects of losses in the freshwater system have had consequences for hydrologic and ecosystem connectivity. In certain regions, profound reductions in wetland extent have resulted in habitat loss, fragmentation, and limited opportunities for reestablishment and watershed rehabilitation.

---

[4] This estimate has been revised to reflect 2010 wetland status as well as the addition of wetland area in the coastal zone of the Pacific coast for WA, OR, and CA as described in the Sample Design section of this report.

010250

**Freshwater Emergent Marshes**

The acreage of freshwater emergent marsh increased by an estimated 1.0 percent between 2004 and 2009. There was a net gain of an estimated 267,800 acres (108,400 ha). These gains resulted principally from wetland reestablishment or creation on upland agricultural lands and lands of other unspecified land use (primarily idle or set-aside lands with no discernible land use type). There were an estimated 367,000 acres (148,600 ha) of freshwater marsh gain from these two upland land use categories and these findings coincided with estimates that more than 59 percent of wetland gains occurred on agricultural lands between 1997 and 2007 (USDA 2010). Although freshwater marshes sustained some losses to urban and rural development (collectively 17,200 acres or 7,000 ha) and silviculture operations (28,500 acres or 11,500 ha), the increases noted above resulted in a net gain in acreage. Some of the gains in wetland emergents also came from areas previously classified as forested wetlands. If forested wetlands were clear cut but the hydrology remained, they were reclassified as emergent wetland. An estimated 421,000 acres of forested wetland were changed to emergent wetlands between 2004 and 2009.

The opposite was true for shrub wetlands as an estimated 570,600 acres of emergent marsh became shrub wetland. Natural succession may account for some of this change, however, drier conditions particularly in the southeastern United States likely promoted shrub growth. Some shrub growth in emergent wetlands also was the result of re-planting pine saplings following clear-cuts for silviculture. The interchange between freshwater emergent marsh wetland and other wetland and upland types is shown in Figure 41.

Losses of freshwater marsh also outdistanced gains in certain portions of the country including the prairie pothole region States of North Dakota, South Dakota, Minnesota, and Iowa. Emergent wetland area also declined in other Midwestern States including Nebraska, Kansas, Missouri, Indiana, Wisconsin, and Michigan. Losses were observed in the Lower Mississippi Alluvial Plain States of Arkansas, Mississippi, and Louisiana and the southeastern States of North Carolina, South Carolina, Georgia, Florida, and Alabama.

Efforts to improve drainage of farm fields as a result of economic and climatic conditions were factors that influenced the loss of freshwater marshes in agricultural areas. Increased drainage in portions of the upper Midwest attempted to eliminate excess water from cropped areas and renewed interest and installation of subsurface drain tile as replacement of aging subsurface drainage systems effectively drained some wetlands (Blann *et al.* 2009). Additionally, acres enrolled in agriculture conservation programs were reduced. Land area in the Conservation Reserve Program (CRP) shrunk in 2007 and 2008 as farmers opted in favor of planting crops to take advantage of high prices for corn and soybeans (Miller 2008). In 2007, CRP acreage in North Dakota declined by 12.4 percent (North Dakota Game and Fish Dept. 2008). Incentives for corn production as part of biofuel programs (the vast majority of United States based ethanol is produced from corn) also encouraged agricultural producers to put additional acreage into row crop production.

# Bog Turtle
## *Clemmys muhlenbergii*

You've heard the old phrase, "Good things come in small packages." Consider America's smallest turtle – the federally listed threatened bog turtle – which lives in small, sunny, wet meadows. The northeast population is limited to scattered locations in Connecticut, Delaware, Maryland, Massachusetts New Jersey, New York and Pennsylvania.

### Our Tiniest Turtle
The bog turtle measures just 3 to 4 inches, no bigger than the palm of your hand, and can most easily be identified by a mahogany-colored shell and bright yellow-orange blotches located on both sides of the head. Bog turtles live in a mosaic of open, sunny, spring-fed wetlands and scattered dry areas. The variety of wet and dry places meets all the basic bog turtle needs: basking, foraging, nesting, hibernating and finding shelter. Sunny open areas provide the warmth needed to regulate the turtle's body temperature and incubate its eggs. Soft muddy areas allow turtles to escape, both from predators and extreme temperatures. Dry areas provide a place to nest. Springs and seeps that flow year-round ensure that bog turtles will not freeze during the winter.

Bog turtles are active from April through October. In the spring, they are busy basking, eating and mating. Bog turtles eat worms, slugs, beetles, snails, millipedes, seeds and carrion. During the summer months, bog turtles build nests in sphagnum moss or on clumps of sedges above the water level of the wetland. A female turtle lays from 1 to 6 eggs and leaves them to incubate unattended for 6 to 8 weeks. The eggs hatch from late August through September. Bog turtle eggs and young are prey for mice, raccoons, skunks, foxes and birds. In October, bog turtles nestle into abandoned muskrat and meadow vole



*Bog turtle*

USFWS

burrows, logs, mud or tree roots, where they lie dormant through the winter; a dozen or more turtles may overwinter together. A bog turtle may live 40 to 50 years and spend its entire life in the same wetland where it was born.

### Grazing Cattle—Unlikely Friendship
Historically, this tiny turtle made its living in the sunny, wet meadows that were maintained by fire, beavers and grazers like bison. But these have declined as the human population has grown, leading the habitat to dwindle. The good news is that sunny, open meadows make good pastureland for small farms. Grazing cattle have taken on the role of fire, beavers and grazing bison, and today help keep encroaching trees and shrubs from taking over a wetland.

### Cutting Habitat into Pieces
The greatest threats to the bog turtle are the loss and fragmentation of its habitat. The places a bog turtle needs are also attractive to people for cropland, development and

roads. Draining, ditching and other changes that alter the flow of water ruin a wetland's ability to function. Development breaks up wetlands that are connected by small streams. These connections serve as potential corridors for bog turtles to travel from one wetland to another. Fragmenting connected wetlands limits the bog turtle's ability to find mates and new habitat, and increases the amount of edge – the line where open meadow and surrounding forest meet – around the wetlands. Increased edge provides habitat for predators and increases the likelihood of invasion by non-native and non-wetland plants.

### Unscrupulous Predators
The bog turtle's small size and attractive markings make it a target of disreputable pet traders. Bog turtles, and all other wild animals, are not pets and will not thrive in captivity.  It is illegal to search, collect or sell them.  If you ever find a bog turtle, leave it in its place.

# Wood stork (*Mycteria americana*)

### 5-Year Review:
### Summary and Evaluation



**U.S. Fish and Wildlife Service**
**Southeast Region**
**Jacksonville Ecological Services Field Office**
**Jacksonville, Florida**

the viability of the U.S. breeding population of wood storks may no longer be as closely tied to the health of the Everglades for reproduction as originally believed.

Wood storks use man-made wetlands for foraging and breeding purposes. Man-made wetlands include, but are not limited to, storm water treatment areas and ponds, golf course ponds, borrow pits, reservoirs, roadside ditches, agricultural ditches, drainages, flow-ways, mining and mine reclamation areas, and dredge spoil sites. The impacts can be positive in certain scenarios as these wetlands provide forage, protected nesting habitat, and may offset some losses of natural wetlands caused by development. A significant number of wood stork colonies are located where water management practices can impact the nesting habitat negatively. Colonies that are perpetually flooded will have no tree regeneration. Draining surface waters of a colony's wetland or pond will prevent wood storks from nesting and lowered water levels after nest initiation facilitates raccoon predation. Lowering surface water or water table may occur through water control structures, manipulating adjacent wetlands, or water withdrawals from the local aquifer.

In summary, loss, fragmentation, and modification of wetland habitats continue as threats to wood storks. However, the significance of the threat cannot be quantified. Changes in local habitat conditions are known to impact wood storks. However, range-wide information on rates of loss, acquisition, protection, restoration, conversion, fragmentation, and creation of wetlands of value to wood storks is unavailable. Our subjective assessment is that the overall threat to the species is reduced, not necessarily because of habitat conservation programs, but rather due to expansion in the range of the species. Historically, the core of the wood stork breeding population was located in the Everglades of South Florida. Populations there had diminished because of deterioration of the habitat. But the breeding range has now almost doubled in extent and shifted northward along the Atlantic coast as far as southeastern North Carolina. So dependence of wood storks on any specific wetland complex has been reduced. The improved wood stork population statistics also suggest that wetland habitat is not yet limiting the population, at least at the landscape level. However, it is not known whether the current habitat base will support a population at levels sufficient to prevent extinction in the long term.

**b.    Overutilization for commercial, recreational, scientific, or educational purposes:**

**Natural Resources Conservation Service**
**Pennsylvania**

**United States Department of Agriculture**

About Us  |  National Centers  |  State Websites

Browse By Audience  |  A-Z Index  |  Help

Topics    Programs    Newsroom    Contact Us

You are Here: Home / Technical Resources / Ecological Science / Threatened & Endangered Species / Massasauga Rattlesnake Conservation

Stay Connected

---

## Technical Resources

Conservation Planning

Data, Maps, & Analysis

Ecological Science

  Agronomy

  Biology

  Cultural Resources

  Invasive Species

  Manure Management

  Nutrient Management

  Pest Management

  Threatened & Endangered Species

Engineering

Land Use

State Technical Committee

## Massasauga Rattlesnake Conservation

Massasauga Rattlesnake Conservation

**Massasauga Rattlesnake**

Listing Status: Threatened (1998)



The massasauga rattlesnake, a relatively small and well-camouflaged rattlesnake, is very uncommon and rarely seen in Pennsylvania.  It has been listed as Threatened under the Endangered Species Act since 1998, because of habitat loss and persecution by humans.

Massasauga rattlesnakes are closely linked to wetlands and the areas around them, spending virtually all their time in wetlands and upland habitats near them hunting rodents and other small prey.  Many people fear or kill them simply because they are poisonous snakes, however, massasaugas are extremely secretive and rarely interact with humans at all.  In addition, they are surprisingly docile and the few recorded bites by massasaugas have never caused a fatality in Pennsylvania.  Massasaugas prefer to avoid humans whenever possible, and if given enough habitat and privacy, would rarely  conflict with humans.

*Massasauga rattlesnake range map (in orange)*

**Goals and Objectives for Massasauga Rattlesnakes**

NRCS activities to benefit massasauga rattlesnakes focus on the protection of existing wetlands, restoration of drained or manipulated wetlands, and enhancing the wildlife habitat of nearby areas.



Through the Environmental Quality Incentives Program (EQIP), NRCS can provide financial assistance to assist private landowners with the sustainable management and improvement of their wetlands and wildlife habitat areas.  Through Wetland Restoration Easements (WRE), NRCS can purchase conservation easements on wetlands of importance to massasauga rattlesnakes.  Additional management and conservation practices are also available on those easement acres, as well.  A wide variety of NRCS programs offer other wildlife-friendly practices, like riparian forested buffers, riparian herbaceous cover, and conservation plantings, which can all provide excellent habitat for massasauga rattlesnakes and the species associated with them.

*Undisturbed wetlands are vital to massasauga rattlesnakes, as well as, the wildlife habitat around them.*



**Conservation Practices that Benefit Massasauga Rattlesnakes**

Wetland Restoration (657)

# Southwestern Willow Flycatcher
## *(Empidonax traillii extimus)*

## 5-Year Review:
## Summary and Evaluation



**Photo of southwestern willow flycatcher resting in willow**
**Photographer:  Susan Sferra, USFWS**

## U.S. Fish and Wildlife Service
## Arizona Ecological Services
## Phoenix, Arizona

## August 15, 2014

i

***Habitat Loss and Modification***

The primary cause of the flycatcher's decline is loss and modification of habitat. Its riparian nesting habitat tends to be uncommon, isolated, dispersed, and dynamic due to natural disturbance and regeneration events such as floods, drought, and to a lesser extent, fire. These habitat characteristics have been exacerbated over time through alteration of river function from land and water management actions. With increasing human populations and related agricultural and urban development, riparian areas have largely been modified, reduced, and destroyed by various mechanisms. In some instances, there have also been site-specific and temporal increases in riparian habitat. Overall, riparian ecosystems in the Southwest have declined from reductions in water flow and groundwater, interruptions in natural hydrological events and cycles, physical modifications to streams, direct removal of riparian vegetation, and an increase in fire events, due to water management and land use practices.

<u>Dams and Reservoirs</u>

Most of the larger and many of the minor southwestern streams that likely supported flycatcher habitat are now dammed. Operation of dams modifies, reduces, destroys, or (in some instances) increases riparian habitats both downstream and upstream of the dam site. Below dams, changing the amplitude, magnitude, frequency, duration, timing, and rate of change of hydrologic conditions strongly influences the structure and function of riparian ecosystems (Poff *et al*. 1997, pp. 269-274). As a result of the operation of dams, maximum and minimum flow events can both be altered; base flows can be increased or decreased; and flood flows are reduced in size and frequency. Below dams managed for downstream water supply, high flows are often reduced or shifted from that of the natural hydrograph. Daily water fluctuations can be very high below dams operated for hydroelectric power. The more or less annual cycle of base flow punctuated by short duration floods is frequently lost.

In altering these downstream flows, dams inhibit the natural cycles of flood-induced sediment transport and deposition, floodplain hydration and flushing, groundwater aquifer replenishment, and timing of seed dispersal necessary for establishment and maintenance of native riparian habitats. Lack of flooding also allows a buildup of debris, resulting in less substrate available for seed germination and an increase in the frequency of fires. Because of the lack of flushing flood flows, natural levels of salt and other minerals are often artificially elevated in downstream alluvial soils. Changes in soil and water chemistry (as well as overall stream flow) can affect plant community makeup, often preventing native plants and trees from flourishing, but favoring more adaptable exotic vegetation, such as tamarisk.

Immediately upstream of dam sites, riparian habitats are inundated by water within the conservation space of the reservoir. In some areas, the effect to riparian habitat and flycatchers is partially reduced by large fluctuations in lake size. Reservoir fluctuations can mimic the dynamics occurring along rivers,



**Tuesday,**
**February 10, 2009**

**Part II**

# Department of the Interior

**Fish and Wildlife Service**

**50 CFR Part 17**
**Endangered and Threatened Wildlife and Plants; Determination of Endangered Status for Reticulated Flatwoods Salamander; Designation of Critical Habitat for Frosted Flatwoods Salamander and Reticulated Flatwoods Salamander; Final Rule**

over the last 4 decades because of habitat degradation on lands currently managed as pine plantations. In addition, ponds surrounded by pine plantations and protected from the natural fire regime may become unsuitable as reticulated flatwoods salamander breeding sites due to canopy closure and the resultant reduction in emergent herbaceous vegetation needed for egg deposition and larval development sites (Palis 1997, p. 62). In addition, lack of fire within the pond during periods of dry-down may result in chemical and physical (vegetative) changes that are unsuitable for the salamander (Palis 1997, p. 62). Lack of fire in the ecotone may result in the development of a thick shrub zone making it physically difficult or impossible for adult salamanders to enter the breeding ponds (Ripley and Printiss 2005, pp. 1–2, 11).

Land use conversions to urban development and agriculture eliminated large areas of pine flatwoods in the past (Schultz 1983, pp. 24–47; Stout and Marion 1993, pp. 422–429; Outcalt and Sheffield 1996, pp. 1–5; Outcalt 1997, pp. 1–6). Urbanization and agriculture have resulted in the loss of one reticulated flatwoods salamander population from each of the following counties: Mobile and Baldwin Counties, Alabama; Escambia, Jackson, and Washington Counties, Florida; and Early County, Georgia. Two known populations have been extirpated from Santa Rosa County, Florida. State forest inventories completed between 1989 and 1995 indicated that flatwoods losses through land use conversion were still occurring (Outcalt 1997, pp. 3–6). Urbanization in the panhandle of Florida and around major cities is reducing the available pine forest habitat. Wear and Greis (2002, pp. 47, 92) identify conversion of forests to urban land uses as the most significant threat to southern forests. They predict that the South could lose about 12 million ac (4.9 million ha) of pine forest habitat to urbanization between 1992 and 2020. Several relatively recent discoveries of previously unknown reticulated flatwoods salamander breeding sites in Santa Rosa County, Florida, have been made in conjunction with wetland surveys associated with development projects (Cooper 2008a). No reticulated flatwoods salamanders have been observed at these degraded sites since completion of the projects (Cooper 2008a).

In addition to the loss of upland forested habitat, the number and diversity of small wetlands where reticulated flatwoods salamanders breed have been substantially reduced.

Threats to breeding sites include alterations in hydrology, agricultural and urban development, road construction, incompatible silvicultural practices, shrub encroachment, dumping in or filling of ponds, conversion of wetlands to fish ponds, domestic animal grazing, soil disturbance, and fire suppression (Vickers *et al.* 1985, pp. 22–26; Palis 1997, p. 58; Ashton and Ashton 2005, p. 72). Hydrological alterations, such as those resulting from ditches created to drain flatwoods sites or fire breaks and plow lines, represent one of the most serious threats to reticulated flatwoods salamander breeding sites. Lowered water levels and shortened hydroperiods at these sites may prevent successful flatwoods salamander recruitment because larval salamanders require 11 to 18 weeks to reach metamorphosis and leave the ponds (Palis 1995, p. 352).

Drought conditions exacerbate other threats and, although they represent a natural phenomenon, can lower the resiliency of populations to withstand other man-made threats. The U.S. Geological Survey (USGS) has documented multiple drought periods in the southeastern United States since the 1890s (USGS 2000, p. 1). Significant drought periods documented in the last three decades are: 1980–1982, 1984–1989, 1998–2002, 2005–2008 (USGS 1991, p. 163; USGS 2000, p. 1; Seager *et al.* 2008, pp. 2, 22). Although a naturally occurring condition, drought presents additional complications for a species, like reticulated flatwoods salamander, which has been extirpated from most of its historic range and for which populations are represented by single ponds. Palis *et al.* (2006, pp. 5–6) conducted a study in Florida on a population of the closely related frosted flatwoods salamander during a drought from 1999–2002. This study found three consecutive years of reproductive failure and a steadily declining adult immigration to breed at the site as the drought progressed.

Taylor *et al.* (2005, p. 792) noted that wide variation in reproductive success is common among pond-breeding amphibians that depend on seasonal filling of these areas, but that adult persistence may buffer against fluctuations in that success, particularly for species that are long-lived. Although Palis *et al.* (2006, p. 6) suggested that the flatwoods salamander may only live about 4 years (based on captive animals), we are currently unsure of the exact lifespan of wild individuals. Other sources have suggested 10 years may represent a maximum lifespan (Jensen 2008). As a result, it is difficult to

predict how long adults could persist in the landscape without a successful breeding event to replenish the population. However, Taylor *et al.* (2005, pp. 792, 796) constructed a model, based on extensive population data available for the marbled salamander (*Ambystoma opacum*), to look at how many years of reproductive failure would be required to result in local extinction of pond-breeding salamanders (with varying lifespans) and found that even without total reproductive failure, populations required moderate to high upland post-metamorphic survival to persist. Catastrophic failure in this study created fluctuations in the population, raised the threshold of survival required to achieve persistence, and imposed the possibility of extinction even under otherwise favorable environmental conditions. Reproductive failure was closely tied to hydrologic conditions; insufficient or short hydroperiod was the primary cause for complete failure. In addition, early filling of the ponds could also facilitate the establishment of invertebrate or vertebrate predators before hatching of the eggs (Taylor *et al.* 2005, p. 796).

Palis *et al.* (2006, pp. 6–7) discussed the necessity of protecting clusters of flatwoods salamander breeding sites, especially those with different hydrologic regimes, to guard against population declines at any one breeding site resulting from random events, such as droughts (Palis 2006, p. 7). A cluster of breeding sites represents a metapopulation, which is defined as neighboring local populations close enough to one another that dispersing individuals could be exchanged (gene flow) at least once per generation. Currently, the only place where a metapopulation exists for the reticulated flatwoods salamander is on Eglin Air Force Base.

Habitat fragmentation of the longleaf pine ecosystem resulting from habitat conversion threatens the survival of the reticulated flatwoods salamander. Large tracts of intact longleaf pine flatwoods habitat are fragmented by pine plantations, roads, and unsuitable habitat. Most reticulated flatwoods salamander populations are widely separated from each other by unsuitable habitat. This has been verified through recent reviews of aerial photography and site visits to localities of historical and current records for the species. Studies have shown that the loss of fragmented populations is common, and recolonization is critical for their regional survival (Fahrig and Merriam 1994, pp. 50–56; Burkey 1995, pp. 527–540). Amphibian populations may be

010519



Congressional
Research Service
Informing the legislative debate since 1914

# Conservation Compliance and U.S. Farm Policy

**Megan Stubbs**
Specialist in Agricultural Conservation and Natural Resources Policy

October 6, 2016

**Congressional Research Service**

7-5700

www.crs.gov

R42459

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

The Food Security Act of 1985 (P.L. 99-198, 1985 farm bill) included a number of significant agricultural conservation provisions designed to reduce farm production and conserve soil and water resources. Many of the provisions remain in effect today, including the two compliance provisions—highly erodible land conservation (sodbuster) and wetland conservation (swampbuster). The two provisions, collectively referred to as conservation compliance, require that in exchange for certain U.S. Department of Agriculture (USDA) program benefits, a producer agrees to maintain a minimum level of conservation on highly erodible land and not to convert wetlands to crop production.

Conservation compliance affects most USDA benefits administered by the Farm Service Agency (FSA) and the Natural Resources Conservation Service (NRCS). These benefits can include commodity support payments, disaster payments, farm loans, and conservation program payments, to name a few. If a producer is found to be in violation of conservation compliance, then a number of penalties could be enforced. These penalties range from temporary exemptions that allow the producer time to correct the violation, to a determination that the producer is ineligible for any USDA farm payment and must pay back current and prior years' benefits.

A controversial issue in the 2014 farm bill (P.L. 113-79) debate was whether federal crop insurance subsidies should be included on the list of program benefits that could be lost if a producer were found to be out of compliance with conservation requirements on highly erodible land and wetlands. Ultimately the 2014 farm bill did add federal crop insurance subsidies to the list of benefits that could be lost, but created separate considerations when addressing compliance violations and the loss of federal crop insurance premium subsidies compared with the loss of other farm program benefits. How compliance is calculated, where compliance provisions apply, and traditional exemptions and variances were not amended. The 2014 farm bill also extended limited protection for native sod in select states.

The levels of interest and debate generated by the changes to conservation compliance in the 2014 farm bill are likely to continue with implementation, raising additional questions and oversight in Congress. Recent concerns about a growing backlog of wetland determinations in the Northern Plains and approaching compliance deadlines for crop insurance policyholders have been raised. Additionally, the reduction in soil erosion from highly erodible land conservation continues, but at a slower pace than following the enactment of the 1985 farm bill. The leveling off of erosion reductions leaves broad policy questions related to conservation compliance, including whether an acceptable level of soil erosion on cropland has been achieved; whether additional reductions could be achieved, and, if so, at what cost; and how federal farm policy could encourage additional reductions in erosion.

mitigated wetland is required to replace one acre of wetland lost). This is allowed by statute if "more acreage is needed to provide equivalent functions and values that will be lost as a result of the wetland conversion to be mitigated." The provisions remained unchanged in the 2014 farm bill. The conference report (H.Rept. 113-333), however, included language encouraging USDA to use a wetland mitigation ratio not to exceed 1-to-1 acreage.

The 2014 farm bill also provided $10 million in mandatory funding for mitigation banking efforts. In August 2016, NRCS awarded over $7 million for agricultural wetland mitigation bank projects through the Wetland Mitigation Banking Program. NRCS received over 24 applications and funded 10 projects located in the Midwest and Northern Great Plains states. Projects were selected based on the applicants' experience with wetland mitigation banking and geographic location to potential agricultural wetland conversion.[9]

## Sodsaver

The 2014 farm bill amended and expanded the "sodsaver" provision, which reduces benefits for crops planted on native sod. The provision applies only to native sod acres in Minnesota, Iowa, North Dakota, South Dakota, Montana, and Nebraska.[10] If a producer chooses to plant an insurable crop on native sod, then crop insurance premium subsidies are reduced by 50 percentage points during the first four years of planting.[11] Crops planted on native sod also will have higher fees under the noninsured crop disaster assistance program (NAP)[12] and reduced yield guarantees.[13] This provision is expected to reduce the federal incentive to produce on native sod.

## Affected Program Benefits

As it exists today, conservation compliance applies to most farm program payments, loans, or other benefits administered by FSA and NRCS. **Table 2** includes the statutory description and examples of specific USDA program benefits that are affected if a producer is found to be out of compliance with the highly erodible land and wetland conservation provisions.

---

[9] For additional information on the Wetland Mitigation Banking Program, see http://www.nrcs.usda.gov/wps/portal/nrcs/detail/national/programs/farmbill/?cid=NRCSEPRD362686.

[10] Section 11014 of the crop insurance title (title XI). Sodsaver was originally authorized in the 2008 farm bill and only applied to the Prairie Pothole National Priority Area. The provision was never activated and is discussed further in **Appendix**.

[11] In 2016, an average of 63% of the total crop insurance premium is paid for by the federal government, and the remainder by the participating farmer. Therefore, a 50 percentage point reduction would lower a premium subsidy rate of 63% to 13%.

[12] For additional information on crop insurance and NAP, see CRS Report R40532, *Federal Crop Insurance: Background*; CRS Report RS21212, *Agricultural Disaster Assistance*; or CRS Report R43494, *Crop Insurance Provisions in the 2014 Farm Bill* (P.L. 113-79).

[13] The yield guarantee for a crop insurance policy is a producer's "normal" crop yield based on actual production history (APH). In the absence of actual yield data (e.g., production on native sod or no yield documentation on existing fields), a "transition yield" (T-yield) is assigned, which is based on a portion of 10-year average county yields for the crop. The 2014 farm bill sets the T-yield factor on native sod equal to 65% of the 10-year average county yield for production on native sod. For other cropland, the percentage can be higher depending on the number of years of actual data included in the APH. Also, "yield substitution" is not allowed; that is, low farm yields must be used in the APH rather than replacing them with potentially higher T-yields as allowed for other cropland.

words, if producers are found out of compliance on one portion of their land, they are deemed out of compliance for all land owned or associated with them, regardless of where it is located.[14]

# Implementation

Both NRCS and FSA implement conservation compliance as part of USDA farm programs. FSA has primary responsibility for making producer eligibility determinations about conservation compliance. NRCS has primary responsibility for technical determinations associated with conservation compliance.

NRCS conducts compliance status reviews on farm and ranch lands that have received USDA benefits and which are subject to the conservation compliance provisions (highly erodible land, wetland compliance, or both). A compliance status review is an inspection of a cropland tract to determine whether the USDA farm program beneficiary is in compliance with the conservation compliance provisions (**Table 3**). NRCS selects a random sample of tracts for annual compliance reviews from data supplied by FSA. Other tracts may be selected for review based on recommendations from other USDA agencies, whistleblower complaints, observed potential violations by NRCS, and tracts with prior year variances.[15] The review process requires an NRCS employee to make an on-site determination when a violation is suspected, and ensures that only qualified NRCS employees report violations. Ultimately, penalties for noncompliance are determined by FSA. Penalties may range from a good faith exemption that allows producers up to one year to correct the violation, to a determination that the producer is ineligible for any government payment and must pay back current and prior years' benefits.

**Table 3. Summary of Conservation Compliance Status Reviews**

|  | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Total Tracts Reviewed | 18,704 | 22,210 | 24,309 | 23,627 | 22,127 |
| Total Acres Reviewed (approx.) | 3.3 million | 2.8 million | 3.6 million | 3.6 million | 3.2 million |
| Tracts Out of Compliance | 344 | 530 | 744 | 680 | 606 |
|     Wetland Conservation Violation Only | 177 | 158 | 343 | 216 | 240 |
|     Both Highly Erodible Land and Wetland Conservation Violations | 167 | 372 | 401 | 21 | 22 |
| Percentage Out of Compliance | 1.8% | 2.4% | 3.1% | 2.9% | 2.7% |
| Number of States Recording Non-Compliance | 28 | 32 | 30 | 34 | 38 |
| Variances or Exemptions Issued | 732 | 887 | 1,081 | 1,354 | 1,121 |

**Source:** USDA, NRCS, complied by CRS.

**Note:** Information for 2014 is the most recent available.

---

[14] One exception to this was created in the 2014 farm bill. If a tenant is considered ineligible for benefits under conservation compliance and USDA determines that the tenant has made a good faith effort to comply with restoration or mitigation requirements and the landowner continues to refuse to comply, then the denial of benefits may be limited to the farm that is the basis of the ineligibility. The 2015 rule clarified that because federal crop insurance policies are not constructed on a "farm" basis, tenant relief provisions will be achieved through a prorated reduction of premium subsidies on all of a person's policies and plans of insurance. Similarly, a landlord's premium subsidy on all policies and plans of insurance will be prorated in the same manner when a landlord is in violation because of the actions (or inactions) of their tenant or sharecropper (7 C.F.R. 12.9).

[15] Additionally, compliance reviews are required at least once every three years on tracts owned or operated by USDA employees who receive USDA payments. National Food Security Act Manual, 5th edition, Part 518, Subpart A, §518.1 (A)(1)(viii), November 2010.

010540

# WETLAND INFORMATION FOR USDA PARTICIPANTS Fact Sheet



**United States Department of Agriculture**
Natural Resources Conservation Service

## How does a USDA participant meet their wetland compliance responsibilities?

Farmers that participate in USDA programs can achieve their wetland compliance responsibilities by taking these actions:

- Indicate your intention to perform any drainage activities that have not been previously evaluated by NRCS. This is done by completing the AD-1026 form.
- Self certify that you will comply with the USDA wetland protection requirements by not performing any additional drainage activity in protected wetland areas. This is done by signing the AD-1026 form.
- Limit all drainage activity so that protected wetland areas are not adversely impacted by additional drainage activities.

## Is USDA approval required before drainage activities can be installed?

No – the USDA wetland compliance provisions are not administered through an approval process. USDA does not issue drainage permits. Wetland compliance is administered through farmer self certification and does not require USDA prior approval of proposed drainage activity. By providing certified wetland determinations NRCS is proactively assisting farmers by indicating which specific areas are wetlands that are protected from new or additional drainage activity.

USDA has no authority to delay or shut down drainage activity. Participating farmers are responsible to limit their drainage activities to insure protected wetland areas are not adversely impacted.

## What happens if I install drainage prior to receiving a certified wetland determination and NRCS subsequently determines that a protected wetland area has been altered?

If a USDA participant has taken the following actions their risk of being found in violation with the wetland conservation provisions will be minimized;

- Update your AD-1026 and disclose to USDA your planned drainage activities.
- Use your **existing** USDA issued wetland inventory as a guide and avoid drainage activities in any identified wetland area.
- Avoid drainage activity in any area which is an "obvious" wetland, regardless of whether the obvious wetland has been identified on your wetland inventory.

## What if there is no existing NRCS issued wetland inventory of my land?

USDA participants do not need prior approval from USDA to install drainage improvements. Participants can assume the risk that their drainage activities will not result in altering and converting a protected wetland area. If you plan to install drainage improvements without a wetland determination you need to be aware that any drainage in a high risk area could result in altering a wetland and a subsequent violation of the USDA wetland conservation provisions. High risk areas include any site without a previous crop history and cropped areas that are consistently wet.

## What happens if USDA determines that a wetland violation has occurred on land where I installed drainage?

When USDA identifies that a wetland violation has occurred the person responsible for converting the wetland is at risk to lose USDA benefits for their entire farm operation, dating back to the time when the wetland was altered. If the drainage activity which resulted in the wetland violation was unintentional the participant can request that FSA grant Good Faith. In order for FSA to approve Good Faith the person responsible for the wetland violation must agree to restore or mitigate the converted wetland area. These actions will either restore or replace the wetland values that were altered through drainage. FSA deals with requests for Good Faith on a site specific basis.

## How can a farmer find out which areas on their land USDA considers to be wetlands that need to be protected from additional drainage?

USDA requires farmers to disclose their intention to conduct drainage improvements on the AD-1026 form. Farmers that indicate their proposed plans for new drainage will be receiving a certified wetland determination from NRCS. These certified determinations indicate the location of areas subject to protection through the USDA wetland compliance provisions. These determinations are issued to farmers via certified mail and contain a full explanation of the procedures for farmers to request agency reconsideration of any disputed wetland area.

## What is a certified (final) wetland determination?

USDA has had wetland protection provisions since 1985. Initially, many NRCS offices provided farmers with wetland inventory maps indicating those wetland areas which required protection from new drainage activities. In the 1996 Farm Bill, Congress decided that the inventory maps, while providing good information, were not completely accurate and since then these inventory maps have been in the process of being replaced by certified wetland determinations

Home (/) » Farmers, enviros alarmed by USDA's new wetlands rules
Environment (/topics/21692-environment)
News (/topics/71-news)
Politics (/topics/86-politics)

# Farmers, enviros alarmed by USDA's new wetlands rules

01/23/19 6:30 AM

By Steve Davies (/authors/2-steve-davies)

KEYWORDS American Farm Bureau Federation (/keywords/344-american-farm-bureau-federation) Andrew Schmidt (/keywords/8372-andrew-schmidt) Ducks Unlimited (/keywords/8378-ducks-unlimited) Jan Goldman-Carter (/keywords/677-jan-goldman-carter) Jason Outlaw (/keywords/8370-jason-outlaw) Kellis Moss (/keywords/8377-kellis-moss) National Wildlife Federation (/keywords/8375-national-wildlife-federation) Natural Resources Conservation Service (/keywords/8374-natural-resources-conservation-service) NRCS (/keywords/8369-nrcs) Scott VanderWal (/keywords/8376-scott-vanderwal) Swampbuster (/keywords/8373-swampbuster) wetlands (/keywords/8371-wetlands)

(http://www.facebook.com/sharer/sharer.php?u=https://www.agri-pulse.com/articles/11831-farmers-enviros-alarmed-by-usdas-new-wetlands-rules)

(https://twitter.com/intent/tweet?url=https://www.agri-pulse.com/articles/11831-farmers-enviros-alarmed-by-usdas-new-wetlands-rules)

(https://www.reddit.com/submit?url=https://www.agri-pulse.com/articles/11831-farmers-enviros-alarmed-by-usdas-new-wetlands-rules)

(https://www.linkedin.com/cws/share?url=https://www.agri-pulse.com/articles/11831-farmers-enviros-alarmed-by-usdas-new-wetlands-rules)

(/articles/print/11831-farmers-enviros-alarmed-by-usdas-new-wetlands-rules)

Case 1:19-cv-02416-TSC   Document 35-8   Filed 06/18/21   Page 128 of 248

For its part, NRCS says it is simply trying to make everything clearer for producers trying to figure out what's on their lands.

The Dec. 7 interim final rule (https://www.regulations.gov/document?D=USDA_FRDOC_0001-1950), which asks for comments by Feb. 5, would allow determinations made between 1990-96 to be "certified" for purposes of determining those benefits.

But groups such as Ducks Unlimited and the National Wildlife Federation say the rule deviates from longstanding NRCS practice and would allow conversion of many wetlands to cropland.

Their concern is the accuracy of maps developed before 1996. In 1997, NRCS itself said the agency "had made over 3 million wetland determinations using these maps and that 60 percent of these determinations were inaccurate," according to an Office of Inspector General report (https://www.usda.gov/oig/webdocs/10601-0003-31.pdf) issued in January 2017.

The report started with a complaint from within NRCS that the agency had decided on its own in 2013 to start certifying pre-1996 determinations to deal with a backlog of requests. The backlog resulted from farmers seeking to bring land into production after commodity prices began to increase in 2009. NRCS offices in Minnesota, Iowa and North Dakota implemented the new policy, but other states did not.

"After 1996 and the completion of many internal studies, NRCS policy was not to consider wetland determinations completed from 1990-96 certified unless the determination was appealed and upheld, a process which required field visits and supporting documentation," OIG said. "NRCS published many factsheets explaining wetland conservation compliance that stated that most wetland determinations completed prior to July 3, 1996, are not considered certified."

Congress has rejected attempts that would let NRCS use the pre-1996 determinations, Ducks Unlimited's Director of Public Policy Kellis Moss and its Director of Agriculture Policy, Andrew Schmidt, say.

They point out amendments to allow certification of the pre-1996 determinations failed in the 2014 and 2018 farm bills.

"In our opinion, congressional intent is pretty clear that the pre-96 wetlands maps are insufficient," Moss says.

And the National Wildlife Federation, in a July letter (https://agri-pulse.com/ext/resources/pdfs/s/Swampbuster-Interim-Final-Rule-Comment-Letter72718.pdf) that anticipated the now-issued interim final rule, said Congress in the 1996 farm bill "intended . . . to require greater methodological rigor and substantive accuracy in wetlands certifications in order to correct NRCS's prior failure to accurately identify wetlands."

"We know that a lot of those pre-96 determinations missed a lot of wetlands," says Jan Goldman-Carter, NWF senior director for wetlands and water resources.

The OIG report said in 13 of 17 cases it examined in North Dakota, protection of wetland acreage was reduced by 75 percent. Accepting the pre-96 determinations succeeded in reducing the backlog

# Wetlands and Conservation Compliance

## WHAT EVERY GEORGIA FARMER NEEDS TO KNOW



**United States Department of Agriculture**

Wetland conservation has been an integral part of Georgia agriculture since the passage of the Food Security Act in 1985 (1985 Farm Bill). High rates of wetland conversion and increased public awareness of the environmental benefits associated with wetlands prompted Congress to enact this legislation.

Historically, wetlands have largely been perceived as wasted space and many acres of high quality wetlands have been converted to other uses considered to be more beneficial at the time. A 1990 U.S. Fish and Wildlife study estimates that less than 80 percent of Georgia's original wetlands still existed by the early 1980s.



Through the wetland conservation provisions of the 1985 Farm Bill, and restoration efforts through other federal programs, Georgia continues to make progress in protecting and restoring wetlands in the state.

This document is intended to give a brief overview of the wetland conservation provisions of the 1985 Farm Bill, as amended; and pertains to USDA - Natural Resources Conservation Service (NRCS) wetland determinations only. It is not intended to cover all possible situations, but can be used as a quick reference to familiarize yourself with USDA wetland compliance provisions.

**Natural Resources Conservation Service**

*Helping People Help the Land.*

# Exemptions to Swampbuster Provisions

Several exemptions have been included in the wetland conservation provisions. Consult with your NRCS wetland specialist to determine if any apply to your farm. A few that are commonly used are:

### Prior Converted (PC):
Wetlands converted prior to December 23, 1985, on which an agricultural commodity was produced at least once prior to this date, and as of this date, did not support woody vegetation. No restrictions on use.

### Artificial Wetlands (AW):
Wetland areas created due to the activities of man. No restrictions on use.

### Manipulated Wetlands (WX):
Wetlands that have been manipulated but not for the purpose of, or making possible, the production of an agricultural commodity.

### Mitigation Exemption (MIW):
Compensation through wetland restoration, enhancement, or creation for wetland functions that are lost on a converted wetland. Mitigation areas are generally located on the same property as the converted wetland and often require a greater ratio of restored wetland to converted wetland acres.

# Other Provisions

### Scope and Effect:
In some cases, drainage may be maintained as it existed prior to December 23, 1985. No added drainage may be achieved after this date.

### Non-Agricultural Activities:
Swampbuster does not regulate non-agricultural activities, such as road or home site construction.

> **Most wetlands, including "Artificial Wetlands" and wetlands converted for non-agricultural activities, fall under U.S. Army Corps of Engineers' (USACE) jurisdiction under Section 404 of the Clean Water Act. Contact the USACE before conducting any planned activities in or around potential wetlands.**

## Wetland Determinations

It is the landowner's or program participant's responsibility to contact USDA if he or she plans to do any type of work in wet areas. Prior to starting any work, the landowner should visit the local USDA Service Center to review any existing wetland determinations and fill out an AD-1026 form at the Farm Service Agency (FSA) office if a determination is needed.

Most wetland determinations completed prior to July 3, 1996, are not considered "certified", and therefore may not be valid for determining compliance with the provisions.

NRCS will determine if a producer's land has wetlands that are subject to the Swampbuster provisions. Depending on the circumstances, the agency may conduct an off-site or an on-site determination.



If you disagree with the NRCS determination, you will be provided the opportunity to appeal the determination before it becomes final.



United States
Department of
Agriculture

# Wetlands and Conservation Compliance

## WHAT EVERY IOWA FARMER NEEDS TO KNOW



**United States Department of Agriculture**
Natural Resources Conservation Service

Wetland Conservation has been an integral part of Iowa agriculture since the passage of the Food Security Act of 1985. High rates of wetland conversion and increased national awareness of environmental benefits associated with wetlands prompted congress to enact the legislation.

Historically, many acres of high quality wetlands have been perceived as wasted space and were converted to other uses considered to be more beneficial. It is estimated that by the early 1990s, only about 400,000 acres of Iowa's original 4 to 6 million acres of wetlands still existed. However, thanks to wetland-related programs, Iowa continues to make progress in restoring its wetlands. The state's landowners have added more than 100,00 acres of wetlands in the past 15 years.

This document is intended to cover United States Department of Agriculture (USDA), Natural Resources Conservation Service (NRCS) wetland determinations only. It is not intended to cover all possible situations, but can be used as a quick reference to familiarize yourself with USDA wetland compliance provisions.

*Helping People Help the Land.*

## Variances And Exemptions To Swampbuster Provisions

Numerous variances and exemptions are included in the wetland conservation provisions. Work with your local NRCS office to determine if they apply to your farm.

**Prior Converted (PC):**
A wetland converted to a non-wetland state prior to December 23, 1985, on which an agricultural commodity was produced at least once prior to this date, and as of this date, did not support woody vegetation. No Farm Bill restrictions on use.

**Artificial Wetlands (AW):**
Wetland areas created due to the activities of man. No restrictions on use.

**Farmed Wetlands (FW):**
These cropland areas were manipulated and planted prior to December 23, 1985, but still meet Farm Bill wetland criteria. They can continue to be farmed as long as no additional manipulation is conducted, such as adding additional surface or subsurface drainage, and the area is not abandoned.

**Minimal Effect:**
May be granted when NRCS determines that the proposed wetland conversion activity or manipulation only minimally impacts wetland functions.

**Mitigation (Offsetting Losses):**
Compensation through wetland restoration, enhancement, or creation for wetland functions that are lost on a converted wetland. Mitigation areas are generally located on the same property as the converted wetland and may require a greater ratio of restored wetland to converted wetland acres. Plan must be implemented within 12 months of NRCS approval.

**Maintenance:**
Drainage may be maintained as it was prior to December 23,1985. No improvement to drainage systems in or near wetlands or to the mains into which they outlet may be completed after this date.

**Non-Agricultural Activities:**
Swampbuster does not regulate non-agricultural activities, such as road or home site construction.

REMEMBER:
All wetlands, including AWs and wetlands converted for non-agricultural activities, may fall under U.S. Army Corps of Engineers' (COE) jurisdiction under Section 404 of the Clean Water Act. Contact the COE before conducting any planned activities in or around potential wetlands.

## Wetland Determinations

It is the landowner's or program participant's responsibility to comply with the Swampbuster provisions. NRCS can assist you by completing a wetland determination for your farm. You can request a wetland determination at your local USDA service center.

NRCS will determine if a producer's land contains wetlands that are subject to the provisions. NRCS employees have been trained to identify, delineate and certify wetlands. These "certified" determinations stay in effect as long as the land is used for agricultural purposes or until the producer requests a review.

If you disagree with NRCS' determination, you will be provided the opportunity to appeal the determination before it becomes final.



size, it is subject to Swampbuster requirements.

### Can I clear trees from a wetland area?

Normal timber harvesting practices are generally not affected by Swampbuster if the site remains in timber production and stumps remain above ground level. Land clearing on a wetland involving stump grinding or stump removal making agricultural production possible may result in ineligibility for USDA program benefits.

### Can I install subsurface drain tile or surface drainage ditches on an existing crop field?

In most cases, drainage systems that existed prior to December 23, 1985, can be maintained. Before installing or maintaining any drainage system, you should contact NRCS. Installing any drainage system in or adjacent to a regulated wetland may result in ineligibility for USDA program benefits. *Note: Fields determined by NRCS to be PC cropland are exempt from wetland regulations. After confirming the PC determination, planned activities can be completed without further delay, as long as adjacent wetland areas are unaffected.*

### Are old creek channels wetlands?

In most cases, yes. Old creek channels (oxbow sloughs) separated from the original stream usually meet wetland criteria and are subject to wetlands regulations. If you plan to manipulate any old channel, you should contact NRCS to request a certified wetland determination.

### Can my planned flood protection levee be constructed across a wetland?

No. Placing fill material in a wetland may result in ineligibility for USDA program benefits. In certain cases, variances such as mitigating the converted wetland may be possible. Contact NRCS for the necessary determinations and mitigation plan development.

### When purchasing or renting a farm, what questions should be asked about wetlands?

Have certified wetland determinations been completed? What types of wetlands are present and what are the restrictions? Are there any wetland conversions that occurred on the property after December 23, 1985? If there are converted wetlands, what options are available to resolve the situation?

### What types of wetlands could be present on my property?

Wetlands occur in many different forms and on a wide range of land uses. They commonly occur in wooded areas, pastures, hayfields, cropland, and odd areas around the farm. An example of a cropland wetland type is Farmed Wetlands (FW). These cropland areas were manipulated and planted prior to December 23, 1985, but still meet wetland criteria of hydric soils, hydrology and ability to grow hydrophytic plants. They can continue to be farmed as long as no additional manipulation is conducted, such as adding additional surface or subsurface drainage, and the area is not abandoned. NRCS can assist you to determine what wetland determinations have been completed on your property and if a certified wetland determination might be needed.



**USDA NRCS**
**United States Department of Agriculture**
Natural Resources Conservation Service

USDA is an Equal Opportunity Employer and Provider.

### How to Contact NRCS

To get more information about wetlands, contact your local NRCS office. Look in the phone book under "U. S. Government, Department of Agriculture" or access the Iowa NRCS website at **www.ia.nrcs.usda.gov** and click on "Contact Us."

Follow us on _____ IowaNRCS



# Wetlands
## and
# Conservation Compliance

## WHAT EVERY WISCONSIN FARMER NEEDS TO KNOW





**USDA**
**U.S. Department of Agriculture**
**Natural Resources Conservation Service**

Wetland conservation has been an integral part of Wisconsin agriculture since the passage of the Food Security Act of 1985. High rates of wetland conversion and increased national awareness of the environmental benefits associated with wetlands prompted Congress to enact the legislation.

Historically, many acres of high quality wetlands had been perceived as wasted space and were converted to other uses considered to be more beneficial. It is estimated that by the early 1980s, only about 5.3 million acres of Wisconsin's original 10 million acres still existed. However, thanks to wetland-related programs, Wisconsin continues to make progress in restoring its wetlands. The state is currently restoring wetlands at a greater rate than loss is occurring.

This document is intended to cover United States Department of Agriculture (USDA), Natural Resources Conservation Service (NRCS) wetland determinations only. It is not intended to cover all possible situations, but can be used as a quick reference to familiarize yourself with USDA wetland compliance provisions.



*Helping People Help the Land.*

010623

## Variances And Exemptions To Swampbuster Provisions

Numerous variances and exemptions have been included in the wetland conservation provisions. Work with your local NRCS office to determine if they apply to your farm.

### Prior Converted (PC):
A wetland converted prior to December 23, 1985, on which an agricultural commodity was produced at least once prior to this date, and as of this date, did not support woody vegetation. No restrictions on use.

### Artificial Wetlands (AW):
Wetland areas created due to the activities of man. No restrictions on use.

### Minimal Effect:
May be granted when NRCS determines that the wetland conversion activity only minimally impacts wetland functions.

### Mitigation (Offsetting Losses):
Compensation through wetland restoration, enhancement, or creation for wetland functions that are lost on a converted wetland. Mitigation areas are generally located on the same property as the converted wetland and often require a greater ratio of restored wetland to converted wetland acres. Plan must be implemented within 12 months.

### Scope and Effect:
In some cases, drainage may be maintained as it existed prior to December 23, 1985. No added drainage may be achieved after this date.

### Non-Agricultural Activities:
Swampbuster does not regulate non-agricultural activities, such as road or home site construction.



## Wetland Determinations

It is the landowner's or program participant's responsibility to contact USDA if he or she plans to do any type of work in wet areas. The best way is to go to the local USDA Service Center to review any existing wetland determinations and fill out an AD-1026 form at the Farm Service Agency (FSA) office if a new determination is needed.

Most wetland determinations completed prior to July 3, 1996, are not considered "certified", and therefore are not valid for determining compliance with the provisions.

NRCS will determine if a producer's land has wetlands that are subject to the swampbuster provisions. The agency maintains lists of soils and plants typically found in wetlands. Along with assessing the hydrology of the area, NRCS uses this list to conduct wetland determinations. These determinations stay in effect as long as the land is used for agricultural purposes or until the producer requests a review.

If you disagree with the NRCS determination, you will be provided the opportunity to appeal the determination before it becomes final.

All wetlands, including AWs and wetlands converted for non-agricultural activities, fall under U. S. Army Corps of Engineers' (COE) jurisdiction under Section 404 of the Clean Water Act. Contact the COE and WDNR before conducting any planned activities in or around potential wetlands.

C.1.29 - Wetland and Conservation Compliance Illinois (most not certified), Illinois NRCS Website, 11-1-14

USDA ⬤ NRCS
United States Department of Agriculture
Natural Resources Conservation Service

# Wetlands and Conservation Compliance

## WHAT EVERY ILLINOIS FARMER NEEDS TO KNOW



⬤ NRCS
Natural Resources
Conservation Service

Wetland Conservation has been an integral part of Illinois agriculture since the passage of the Food Security Act of 1985. High rates of wetland conversion and increased national awareness of environmental benefits associated with wetlands prompted congress to enact the legislation.

Historically, many acres of high quality wetlands have been perceived as wasted space and were converted to other uses considered to be more beneficial. It is estimated that by the early 1990s, only about 1,254,500 acres of Illinois' original 8.2 million acres still existed. However, thanks to wetland-related programs, Illinois continues to make progress in restoring its wetlands.

This document is intended to cover United States Department of Agriculture (USDA), Natural Resources Conservation Service (NRCS) wetland determinations only. It is not intended to cover all possible situations, but can be used as a quick reference to familiarize yourself with USDA wetland compliance provisions.

*Helping People Help the Land.*

PEER 003098

## Variances And Exemptions To Swampbuster Provisions

Numerous variances and exemptions have been included in the wetland conservation provisions. Work with your local NRCS office to determine if they apply to your farm.

### Prior Converted (PC):

A wetland converted prior to December 23, 1985, on which an agricultural commodity was produced at least once prior to this date, and as of this date, did not support woody vegetation. No restrictions on use.

### Artificial Wetlands (AW):

Wetland areas created due to the activities of man. No restrictions on use.

### Minimal Effect:

May be granted when NRCS determines that the wetland conversion activity only minimally impacts wetland functions.

### Mitigation (Offsetting Losses):

Compensation through wetland restoration, enhancement, or creation for wetland functions that are lost on a converted wetland. Mitigation areas are generally located on the same property as the converted wetland and often require a greater ratio of restored wetland to converted wetland acres. Plan must be implemented within 12 months.

### Scope and Effect:

In some cases, drainage may be maintained as it was prior to December 23,1985. No added drainage may be achieved after this date.

### Non-Agricultural Activities:

Swampbuster does not regulate non-agricultural activities, such as road or home site construction.

All wetlands, including AWs and wetlands converted for non-agricultural activities, fall under U. S. Army Corps of Engineers' (COE) jurisdiction under Section 404 of the Clean Water Act. Contact the COE before conducting any planned activities in or around potential wetlands.



*NRCS Soil Scientist making a wetland determination on a seasonally flooded wooded wetland in Jackson County. Notice the depression area and the lack of ground cover.*

# Wetland Determinations

It is the landowner's or program participant's responsibility to contact USDA if he or she plans to do any type of work in wet areas. The best way is to go to the local USDA Service Center to review wetland determinations and fill out an AD-1026 form at the Farm Service Agency (FSA) office if a new determination is needed.

Most wetland determinations completed prior to July 3, 1996, are not considered "certified", and therefore are not valid for determining compliance with the provisions.

NRCS will determine if a producer's land has wetlands that are subject to the provisions. The agency maintains lists of soils and plants typically found in wetlands. Along with assessing the hydrology of the area, NRCS uses this list to conduct determinations. These determinations stay in effect as long as the land is used for agricultural purposes or until the producer requests a review.

If you disagree with NRCS' determination, you will be provided the opportunity to appeal the determination before it becomes final.

010629

C.1.17 - Minnesota Fact Sheet nrcs142p2_022178, NRCS
Minnesota website, 11-1-14

## MINNESOTA – WETLAND TALKING POINTS

### Why is USDA changing policy on wetland protection?

The USDA wetland policy has not and is not changing. Farmers in USDA
programs are required to protect wetland areas from additional drainage activity.
What is changing is that NRCS will be providing a certified (final) wetland
determination when farmers indicate their intention to install drainage
improvements.

**So - why am I hearing that USDA wetland policy is changing in MN?**
For the past 5 years, instead of completing and issuing a certified wetland
determination when a farmer indicated their intention to perform a drainage
improvement activity (on the AD-1026 form) MN also required farmers to submit
a written request for a certified determination (on the CPA-038 form). MN NRCS
will no longer require both a written request (CPA-038 form) and the farmer self
certification (AD-1026 form) to trigger agency completion of a certified
determination. **From the farmer's perspective nothing has changed –
farmers are responsible to limit their drainage activities so that protected
wetland areas are not adversely impacted and they are required to comply
with wetland protection regardless of whether NRCS has provided any type
of wetland determination.**

### What is a certified (final) wetland determination?

USDA has had wetland protection provisions since 1985. Initially, many NRCS
offices provided farmers with wetland inventory maps indicating those wetland
areas which required protection from new drainage activities. In the 1996 Farm
Bill, Congress decided that the inventory maps, while providing good information,
were not completely accurate and since then these inventory maps have been in
the process of being replaced by certified wetland determinations.

### Why is USDA involved in wetland protection?

Since December of 1985 congressionally approved Farm Bill legislation has
contained wording that restricts USDA program participants from adversely
impacting protected wetland areas with new or additional drainage activities.
These provisions acknowledge that participation in USDA programs are a
publically funded benefit to farmers. In return for these program benefits farmers
agree to protect wetland areas from additional drainage. Wetlands provide a
wide range of public benefits including water quality protection by trapping
sediment and nutrient runoff, potential flood reduction, carbon sequestration and
wildlife habitat.

| MINNESOTA WETLAND MAPPING CONVENTIONS |
| --- |
| FOR 1985 FOOD SECURITY ACT (FSA) AS AMENDED |
| AND SECTION 404 CLEAN WATER ACT (CWA) |

INTRODUCTION

This document outlines the procedures and methods the Natural Resources Conservation Service (NRCS), U.S. Fish and Wildlife Service (FWS), US Army Corps of Engineers (COE) and Environmental Protection Agency (EPA) will use in Minnesota to conduct FSA and CWA off-site wetland determinations. The mapping conventions are designed to ensure consistency between field offices and agencies. Four major mapping conventions are designed to ensure consistency between field offices and agencies. Four major mapping conventions are described herein. The mapping conventions take into consideration the normal circumstance[1], landscape, soils, hydrology, vegetation, etc. within major land resources areas.

Wetland Mapping Conventions:

1.  Potholes (prairie and forested).
2.  Herbaceous non-depressional saturated soils.
3.  Wooded non-depressional saturated soils.
4.  Flooded or ponded soils (e.g. floodplains) that are inundated for a period of time during the growing season[2]

General Information - All Conventions:

NOTE: Fish and Wildlife Service's Farmed Wetland Policy. It is the policy of the FWS to not map farmed wetlands in the National Wetlands Inventory (NWI) unless the wetland is a pothole-like depression or cranberry bog. Therefore, NWI maps may have various amounts of wetlands which have been intentionally omitted from the inventory. These omitted wetlands are likely to be farmed at the time of the photography. Wetlands of this type commonly occur within floodplains.

Ponding can occur anywhere while flooding is generally restricted to streams.

Size of an area is not part of the wetland criteria. Therefore, wetlands that are large enough to detect when interpreting aerial photographs will be mapped as wetland.

All pertinent information shall be reviewed before determining that a site is or is not a wetland. Decisions and the supporting material will be documented according to what is required in each step of these guidelines. Frequent field checking must be used until the reviewing person or mapping team has become proficient at photo interpretation in each resource area.

Maps developed from these conventions will be used as the basis for completing wetland determinations in accordance with established definitions and policy.

---

[1] Normal circumstance is defined as the soil and hydrologic conditions that are normally present, without regard to whether the vegetation has been removed.

[2] The growing season is defined as the part of the year when soil temperatures at 19.7" below the soil surface are higher than biologic zero (5 degrees C). Growing season may be estimated by approximating the number of frost-free days. The growing season can be approximated as the period of time between the average date of the last killing frost to the date of the first killing frost. This represents a threshold of 28 degrees **F** or lower at a 50% frequency. Consult the published county soil survey or NRCS climatic data coordinator.

NORTH DAKOTA WETLAND MAPPING CONVENTIONS
FOR FSA/FACTA

**INTRODUCTION**

This document outlines the offsite procedures and methods which will
be used by the Soil Conservation Service (SCS) in determining wetlands
on agricultural lands.  This document has been reviewed by the
signatory agencies of the Memorandum of Agreement (MOA) Concerning the
Delineation of Wetlands for Purposes of Section 404 of the Clean Water
Act (CWA) and Subtitle B of the Food Security Act (FSA).  Concurrence
is indicated by the signature appearing on the last page of this
document.

Agricultural lands for the purpose of these mapping conventions means
those lands intensively used and managed for the production of food or
fiber to the extent that the natural vegetation has been removed and
cannot be used to determine whether the area meets applicable
hydrophytic vegetation criteria in making a wetland delineation.

These procedures and methods are designed to map wetlands off site on
agricultural land, using various tools that will provide consistency
between field offices and surrounding states, and be compatible with
the MOA, the 3rd Edition of the National Food Security Act Manual
(NFSAM), and the offsite requirements of the 1987 Corps of Engineers
Wetland Delineation Manual.

These mapping conventions are designed to be applied to agricultural
land, as defined in Section III of the MOA.  If these mapping
conventions are used on nonagricultural lands, an onsite review will
need to be made to verify wetland determinations.  Nonagricultural
lands larger than 80 acres will not be determined using these mapping
conventions and will will be labeled Not Inventoried (NI).  Wetland
delineations made on nonagricultural and agricultural land will be
made in consultation and coordination with signatory agencies, as per
sections IVA and IVB of the MOA.  Onsite delineations will be
performed in accordance with Part 514, NFSAM.  Onsite delineations
will also be performed when any of the following circumstances exist:

1.  To verify a person's records of prior hydrologic manipulations.

2.  If the person requests reconsideration, appeals the wetland
    determination/delineation, or wetland boundary delineation is
    required.

3.  If additional information is needed to assess scope and effect
    of existing hydrologic manipulations.

# 1994 Iowa Wetland Mapping Conventions

PEER 010352

# WETLAND MAPPING CONVENTIONS FOR AGRICULTURAL LANDS[1]/
## FOR 1985 FOOD SECURITY ACT (FSA) AS AMENDED
## AND SECTION 404 CLEAN WATER ACT (CWA)[2]/

## IOWA 1994

### PREFACE

These conventions outline the procedures and methods the Natural Resources Conservation Service (NRCS), US Fish and Wildlife Service (FWS), US Army Corps of Engineers (COE), and Environmental Protection Agency (EPA) will use to conduct Food Security Act (FSA) and Clean Water Act (CWA) **off-site** wetland determinations on agriculture land. These mapping conventions will provide a consistent method to wetland delineators in making off site wetland determinations as per the National Food Security Act Manual (NFSAM). The Iowa conventions were developed by an interagency team comprised of EPA, FWS, COE, NRCS, and the Iowa Department of Natural Resources (IDNR). The conventions were developed based on field tested correlations between off site information and wetlands as observed in the field.

The mapping conventions rely on the interpretation of aerial photography and weather data in conjunction with other inventories like the County Soil Surveys and the National Wetland Inventory (NWI). This process requires training in properly identifying wetland signatures from different types of aerial photography under varying soil moisture conditions. The Wetland Inventory Team members will complete the course "Remote Sensing for Aerial Photo Interpretation" or have similar training/course work prior to conducting any mapping activity. A module for this course will be developed to address identifying wetland signatures. Off site determinations will only be made by personnel trained in both FSA wetland criteria and in identifying wetland signatures by using remote sensing.

Wetland terms used in these conventions are defined in the most recent edition of the National Food Security Act Manual (NFSAM). At the time these conventions were developed, the third edition, second amendment, was the revision in use.

---

1/  **Agricultural Land** is land intensively used and managed for the production of food or fiber to the extent that natural vegetation has been removed and cannot be used to determine whether the area meets the hydrophytic vegetation criteria. These may include cropland, hayland, pasture, orchards, and vineyards. In Iowa, bluegrass pastures are nearly always considered agricultural land.

   Agricultural land does not include range land, forest land, or wood lots on the farms nor lands where natural vegetation has not been removed, even though the natural vegetation may be regularly grazed or mowed and used for forage or fodder.

2/  US-COE 87 manual criteria to be used for all non ag-land., including those non ag-lands which are either narrow bands immediately adjacent to, or small pockets interspersed among, agricultural land. Size of these will be determined as the inventory progresses in each county.

   NRCS - NFSAM to be used for all ag-land.

United States
Department
of Agriculture

# NATIONAL FOOD SECURITY ACT MANUAL
# 3RD EDITION

Natural
Resources
Conservation
Service

## PART 514 - MAKING WETLAND DETERMINATIONS
## ON AGRICULTURAL LAND

Conservation and
Ecosystem Assistance
Division

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Part 514 | Making Wetland Determinations on Agricultural Land | 514-1 |
| 514.0 | Overview | 514-1 |
| | | |
| Subpart A | General Provisions For Making Agricultural Land Wetland Determinations | 514-3 |
| 514.10 | Overview | 514-3 |
| 514.11 | Applicability and Scope of Wetland Determinations | 514-4 |
| 514.12 | Off-site and On-Site Determinations | 514-8 |
| | | |
| Subpart B | Identifying Wetlands Where the 1985 Act Restrictions Apply | 514-9 |
| 514.20 | Overview | 514-9 |
| 514.21 | Wetlands (W) | 514-11 |
| 514.22 | Farmed Wetland (FW) | 514-12 |
| 514.23 | Farmed Wetland Pasture or Hayland (FWP) | 514-16 |
| 514.24 | Converted Wetland (CW and CW+year) | 514-20 |
| 514.25 | FW, or FWP That is Abandoned | 514-26 |
| 514.26 | Other Waters (OW) | 514-30 |
| | | |
| Subpart C | Identifying Wetlands with FSA Exemptions | 514-31 |
| 514.30 | Overview | 514-31 |
| 514.31 | Prior Converted Cropland (PC) | 514-32 |
| 514.32 | Converted Wetlands for Non-Agricultural Purposes (CWNA) | 514-35 |
| 514.33 | Artificial and Irrigation-Induced Wetlands (AW) | 514-41 |
| 514.34 | Converted Wetland Technical Error (CWTE) | 514-43 |
| 514.35 | Third Party Conversion (TP) | 514-49 |
| 514.36 | Commenced Conversion Exemption Determinations (CC) | 514-51 |
| 514.37 | Non-Wetland (NW) | 514-54 |
| 514.38 | Wetlands That Have Been Manipulated But Production Not Made Possible (WX) | 514-55 |
| 514.39 | Good Faith Determinations for Wetland Violations | 514-56 |

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

514.40     Information Required from NRCS for Making
           Good Faith Determinations ................................................................. 514-57
514.41     Providing Wetland Determinations to Other Agencies ............................................ 514-58


Subpart D  Certification of Wetland Determinations................................................................. 514-59
514.50     Overview ........................................................................................ 514-59
514.51     Certifying Wetland Determinatins.......................................................... 514-60

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

## Part 514     Making Wetland Determinations on Agricultural Land

### 514.0 Overview

**a**
**Background**

Part 513 provided instructions for collection of information in order to make wetland determinations for **the 1985 Act, as Amended** and Section 404 of the Clean Water Act (CWA).

This part describes how to make wetland determinations **for agricultural land**.

**b**
**Purpose**

This part provides instructions for identifying, labeling, **and certifying** wetlands to determine whether restrictions or exemptions apply to the land **per the 1985 Act, as amended.**

**NOTE:** For CWA, NRCS does not determine exemptions, but will provide person with CWA information including exemptions.

010788

**Subpart A**  **General Provisions For Making Agricultural Land Wetland Determinations**

---

**514.10**

**a**
**Land to be Identified as Wetland**

## Overview

In order for land to be identified as wetland according to this part, it must meet the wetland criteria.

**For purposes, of the 1985 Act, as amended, the State Conservationist has final authority for all agricultural land wetland determinations within the state.**

---

**b**
**Wetland Provision by Statute**

**The 1985 Act** provided that any person who in any crop year plants an agricultural commodity on wetland that was converted after December 23, 1985, shall be ineligible for applicable USDA benefits unless one of the exemptions or exceptions to **the Act** applies.

**The 1985 amendments** provide that in addition to the planting rule, any person who in any crop year after November 28, 1990, converts a wetland by draining, dredging, filling, leveling, or any other means for the purpose, or to have the effect of making the production of an agricultural commodity possible, shall be ineligible for USDA benefits for that crop year and all subsequent crop years until the wetland is or restored, unless one of the exemptions or exceptions to FSA applies. **The 1996 amendments allow for mitigation of other sites in addition to the restoration alternative.**

---

**c**
**Other Wetland Provisions**

The **1985 act as amended** provides exemptions from the wetland provisions. The specific requirements for exemptions and determinations are found in this part and Parts 516 and 517.

---

514.11      **Applicability and Scope of Wetland Determinations**

**a**
**When to Make Certified Wetland Determinations**

NRCS conducts certified wetland determinations **for agricultural land and for non-agricultural land, if requested,** when a NRCS-CPA-38 is received.

NRCS makes **certified** wetland determinations for agricultural lands when COE or person requests information for CWA program implementation purposes, whether or not the person who owns, manages or operates the land is a participant in USDA programs.

**Determinations completed using the approved mapping conventions approved by the federal agencies may be considered for certification.**

**NOTE:** All determinations will be provided using the NRCS-CPA-026E process in FOCS.

**b**
**Wetland Determinations Remain With the Land**

All **certified** wetland determinations, conditions, and exemptions remain with the land and apply to subsequent owners and operators **as long as the site remains in agricultural use or until such time a violation occurs.** Subsequent owners do not have appeal rights unless the **certified** wetland determination is changed. **Any owner may request a revised certified determination if natural events cause a change in topography or hydrology or if an existing wetland determination is rescinded by NRCS.**

**c**
**Duration of Ineligibility for Person**

Persons who plant an agricultural commodity on wetland converted between December 23, 1985 and November 28, 1990, are ineligible for USDA benefits for any year in which an **agricultural commodity** crop is planted **or until the converted wetland is mitigated.**

Persons who convert wetlands **for the purpose of, or** in such a way as to make the production of an agricultural commodity possible after November 28, 1990, remain ineligible for USDA benefits until the converted wetland is **mitigated.**

Ineligibility will remain with the person even if he or she is no longer associated with the land. Subsequent owners and operators will not be in violation as long as the converted wetland is not planted to an agricultural commodity or used for forage production.

**514.11**

d
**Extent of
Wetland
Determinations**

NRCS will make **certified** wetland determinations **on a whole tract basis (or remaining portion of a tract if only partially completed previously) for the 1985 act** and CWA on agricultural lands and on non-agricultural lands.

NRCS may make determinations on lands owned or operated by a USDA program participant that are not agricultural lands and for which a USDA program participant requests a **certified** wetland determination consistent with Section IV B of MOA, Appendix 527.12. These determinations will be made in coordination with the COE **or** EPA. Wetland **determinations** conducted by NRCS pursuant to the requirements of this paragraph shall not be revised by **NRCS** except where an opportunity for coordination is provided to the other MOA signatory agencies **as per the following table.**

Areas where determinations are not **completed will be** outlined on the **FSA and NRCS base map. Label the area "NI" to indicate not inventoried.** Document in the FOCS **resource inventory data field** case file. Inform the person of the need for a determination before altering **or manipulating** any area **where an NI** determination is made.

514.11
d
(Cont'd)

In accordance with the Wetlands MOA, when NRCS is considering a change of a wetland designation (certifications, determinations, delineations), the interagency oversight team is to be informed. The following is required and meets the intent of the Wetlands MOA.

| Site is: | and the reason for the proposed change is: | Then: |
|---|---|---|
| agricultural land | • Obvious error in inventory (Part 513.31d)<br><br>• ON-SITE EVALUATION SHOWS ERRORS IN OFF-SITE DETERMINATION OF:<br>  – Hydric soil, hydrology, or vegetation criteria are not met<br>  – Waters of U. S. but not wetland<br><br>• Previous detemiations/delineations were rescinded by NRCS.<br><br>• A review indicated that existing detemiations or delineations are inaccurate. (See 519.13)<br><br>• New or additional data caused a change of the wetland label.<br><br>• Change in acreage of same wetland label<br><br>• Other errors as agreed to by Wetland MOA agencies | • Notify COE of the change by copy of letter to the person  (519.13d).<br><br>NOTE:  These actions will be reviewed by the inter-agency oversight team during the quality oversight. |
| non-agricultural land | • any of the above reasons listed for agricultural land | Provide time for concurrence from COE. (See example letter in 526.95)<br>Include:<br>• location (map)<br>• current determination (type and acres)<br>• off-site documentation using conventions (if agricultural land)<br>• on-site appeal documentation worksheets and related documentation<br>• summary of logic for change<br><br>NOTE:  The time frame for a response from COE is 45 days.  If no response is received, NRCS proceeds. If disagreement at local level, forwarded to STC. |

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

010793

**514.11**

**e**

**Duration of Wetland determination**

NRCS certified wetland determinations will be effective **as long as the site remains in agricultural use or unless natural events or new information warrants a revision of the determination or until such time a violation occurs**.

## 514.12      Off-site and On-Site Determinations

**Off-Site
Determinations**

Offsite determinations are wetland determinations made without a visit to the site, **and** are completed using approved wetland mapping conventions and inventories.

Off-site determinations will be made using the off-site procedures in 513.30 Appendix 527.4

**b
On-Site
Determination**

On-site determinations are wetland determinations made by visiting the wetland site, and comparison site if appropriate. Make on-site wetland determinations according to Appendix 527.4 **and on-site visits for scope and effect evaluation procedures in Part 515** under the following circumstances:

- **to assess whether current conditions reflect those present on 12/23/85. This likely requires a review of off-site information of pre-1986 conditions.**

- if adequate interpretations cannot be made from data available in the office

- **if requested by a person or a** person appeals the wetland determination

- to verify person's records of prior hydrologic manipulations

- to assess scope and effect of existing **and/or planned** hydrologic manipulation.

| Subpart B | Identifying Wetlands Where the 1985 Act Restrictions Apply |
|---|---|

**514.20**
**a**
**Purpose**

### Overview

This subpart describes identification, labeling and allowable uses of wetland where **the 1985 Act** wetland restrictions apply.

**b**
**Explanation of Terms**

**The 1985 Act's** wetland restrictions apply to lands which continue to provide important wetland functions and values. Restricted activities are generally associated with "manipulation" and **"for the purpose of", or** "making production possible." These terms are frequently used in this subpart and are important in identifying wetlands that are subject to **the 1985 Act**. Consequently, these terms are defined in Paragraphs c, d, and e below for clarification.

**c**
**Explanation of "Manipulation"**

Manipulation is the alteration of the hydrology and/or the removal of woody vegetation (including stems and stumps) on a wetland. Hydrologic alterations that are considered manipulation may result from:

- dams
- dikes
- ditches
- diversions
- subsurface drains
- pumps
- terraces
- dredge and fill.

**NOTE:** These measures may alter hydrology even if installed offsite from the affected wetlands.

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

**514.22**          **Farmed Wetland (FW)**

**a
Definition of Farmed
Wetland (FW)**

Farmed wetlands are wetlands that were drained, dredged, filled, leveled or otherwise manipulated before December 23, 1985, for the purpose of, or to have the effect of, making the production of an agricultural commodity possible, and continue to meet specific **wetland hydrology** criteria.  This definition applies:

- **if** such production was not possible before the manipulation (see Part 514.20 d); and

- **if the site met FW criteria on 12/31/85**

- an agricultural commodity has been produced at least once prior to December 23, 1985, and

- **as long as the site remains in agricultural use, if prior to reverting to wetland, baseline conditions are documented and a wetland conservation plan is prepared.**

**514.22**

---

**b**
**Farmed Wetland**
**Hydrology Criteria**

Farmed wetlands are areas that:

- are not abandoned, and **(See Part 514.25)**

- if the area is a playa, pothole, or a pocosin, is inundated for at least 7 consecutive days or saturated for at least 14 consecutive days during the growing season, or

- if the area is not a pothole, playa, or pocosin, has 50% chance of being seasonally ponded or flooded for at least 15 consecutive days during the growing season, or 10% of the growing season, whichever is less, under normal conditions.

    See Appendix 527.4 for the procedures and indicators to be used in conjunction with the above hydrology criteria when making FW determinations. Correlation of the selected procedures or indicators with the long-term average hydrologic conditions for the wetland must be documented.

    **NOTE:** In order to protect remaining unique wetland functions and values, more restrictive criteria have been adopted for potholes, playas, and pocosins.

---

**c**
**Changing FW**
**Determinations**

Farmed wetland (FW) label changes will be limited to correct technical errors and to those made during the appeal process. **In both cases, changes must be based upon procedures located in 514.51c and 515.11f.** The appropriate coordination with COE, **and EPA per the MOA (Appendix 527.12), Part 519, and the appeal process in Part 521 will be followed.**

Changes in label may also be needed as a result of significant hydrological events which alter the landscape.

---

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

**514.22**

**d
Determine
Seasonally Flooded
Conditions for FW**

Document **seasonally flooded** conditions by using available data such as:

- Slides or aerial photographs taken during the growing season to verify the percent chance of occurrence

- analytical evaluations to determine length of flooding or ponding for a single occurrence.  For process see Appendix 527.4

- maps from flood frequency studies (**use 2 year frequency maps**)

- stream gauge data

- wetland hydrology delineation tools manual

- other available data.

**514.22**

| | |
|---|---|
| **e**<br>**Use of FW** | Areas designated as farmed wetland (FW) can be used as follows:<br><br>• can produce agricultural commodities without loss of eligibility for USDA benefits.<br><br>• existing drainage systems or other hydrologic manipulations can be maintained per Part 515.12. |
| **f**<br>**Intended**<br>**Maintenance**<br>**on FW** | Persons should request approval before performing maintenance on existing systems on FW **by completing a revised AD-1026.**<br><br>**Reference:** See Part 515.13 for requesting and processing maintenance requests. |
| **g**<br>**Document Scope and**<br>**Effect of Existing**<br>**Hydrologic**<br>**Manipulations on**<br>**FW** | Document the scope and effect of existing drainage systems or other hydrologic manipulations **to support on-site observations of FW** according to Parts 515.11, **527.4. and Part 515.13.** |
| **h**<br>**Delineating and**<br>**Recording FW**<br>**Determinations** | Refer to Part 523.22 for delineating and recording FW determinations on **NRCS-CPA-026E using FOCS.** |

## 514.23            Farmed Wetland Pasture or Hayland (FWP)

**a
Definition of Farmed
Wetland Pasture or
Hayland(FWP)**

Farmed wetland pasture or hayland (FWP) are wetlands that:

- were manipulated and used for pasture or hayland **(includes native pasture or hayland)** prior to December 23, 1985, still meet **specific** wetland **hydrology** criteria, and are not abandoned, or
- **is in agricultural use and met FWP criteria on 12/23/85.**

**Note: If prior to restoring an FWP site to wetland criteria, a person documents hydrologic and vegetative baseline conditions, the area may be protected from abandonment.**

**b
Hydrology Criteria
for FWP**

An area meets hydrology criteria for FWP if it is inundated for at least 7 consecutive days during the growing season or saturated for at least 14 consecutive days during the growing season. See Appendix 527.4 for procedures and indicators to be used in conjunction with the above hydrology criteria when making FWP determinations.

**c
Changing FWP
Determinations**

Farmed wetland pasture **and hayland** (FWP) label changes will be limited **to correcting** technical errors **and to those made during the appeal process. In both cases, the changes will be based upon the procedures located in 514.51d** The appropriate coordination with COE **and**, EPA per the MOA (Appendix 527.12), **Part 519 and the appeal process in Part 521 will be followed.**

Changes in label may also be needed as a result of significant hydrological events which alter the landscape.

**514.23**

**d**
**Uses of FWP**

Areas designated as farmed wetland pasture (FWP) can be used as follows:

- can produce agricultural commodities without loss of eligibility for USDA benefits.

- existing drainage systems or other hydrologic manipulations can be maintained per Part 515.12.

| IF the site... | AND is... | THEN... |
|---|---|---|
| has no crop history | managed for pasture or hayland | * the drainage or other hydrologic manipulation can be maintained but not improved<br><br>* Agricultural commodities may be planted on the site provided no woody vegetation is removed |

514.23

| | |
|---|---|
| **e**<br>**Intended**<br>**Maintenance on**<br>**FWP** | **Persons should request approval before performing maintenance on existing systems on FWP by completing a revised AD-1026.**<br><br>**Reference**:  See Part 515.13 for requesting and processing maintenance requests. |
| **f**<br>**Document Scope**<br>**and Effect of**<br>**Existing Hydrologic**<br>**Manipulations on**<br>**FWP** | Document the scope and effect of existing drainage systems or other hydrologic manipulations **to support on-site observations of FWP** according to Part 515.11 **and 527.4.** |
| **g**<br>**Outlining and**<br>**Recording FWP**<br>**Determinations** | Refer to Part 523.22 for delineating and recording FWP determinations on **NRCS-CPA-026E using FOCS.** |

**514.23**

h
**Inundation and
Saturation Criteria
for PC, FW, and
FWP**

The following table provides hydrology criteria for PC, FW, and FWP.

| IF the area... | AND... The drainage system is maintained to function as it did before 12/23/85 and the long term average conditions document that... | THEN... label the area |
|---|---|---|
| Is not a pothole, playa, or pocosin | inundation is less than 15 **consecutive** days during the growing season **or 10% of the growing season, whichever is less, most years (50% chance or more)** and has a crop history before 12/23/85 | PC |
| | inundation is 15 **consecutive** days or more during growing season **or 10% of the growing season, whichever is less, most years (50% chance or more)** and has crop history before 12/23/85 | FW |
| | is inundated for 7 **consecutive** or more days or saturated for 14 **consecutive** or more days during the growing **season most years (50% chance or more) with no cropping hsitory before 12/23/95, but managed for hay or pasture.** | FWP |
| Is a pothole, playa or pocosin | ponding is less than 7 **consecutive** days and saturation is less than 14 **consecutive** days during the growing season **most years (50% chance or more)** and has a crop history before 12/23/85 | PC |
| | ponds more than 7 **consecutive** days or is saturated 14 **consecutive** days or more during the growing season **most years (50% chance or more)** | FW or FWP |

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

010804

## 514.24 Converted Wetland (CW and CW+year)

**a**
**Change in the Law**

The 1985 Act provided that persons shall be ineligible for USDA benefits if an agricultural commodity is planted on wetland that was converted after December 23, 1985. **The 1990 amendments placed** additional restrictions on land converted after November 28, 1990. For this reason, NRCS is required to determine whether a wetland was converted before or after November 28, 1990.

**b**
**Definition of Converted Wetland**

**Converted wetland is a wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including the removal of woody vegetation or any activity that results in impairing or reducing the flow, circulation, or reach of water) for the purpose of or to have the effect of making possible the production of an agricultural commodity without further application of the manipulations described herein if (A) such production would not have been possible but for such action, and (B) before such action such land was wetland, farmed wetland, or farmed-wetland pasture and was neither highly erodible land nor highly erodible cropland;**

The following decision table defines a converted wetland.

| If, after 12/23/85... | Manipulation... | Intent/Purpose | ...then area is... |
|---|---|---|---|
| -Wetland (W)<br>-Farmed Wetland (FW)<br>-Farmed Wetland Pasture (FWP) | Drained, dredged, filled, leveled or otherwise manipulated, including any activity that results in impairing or reducing the flow, circulation or reach of water. | For the purpose of, or to make possible the production of agricultural commodities | Converted Wetland |
| -Wetland (W)<br>-Farmed Wetland Pasture (FWP)<br><br>-Area with hydric soils, no wetland determination and no documentation of wetland hydrology prior to manipulation | Woody hydrophytic vegetation was removed, including stems and stumps | | |

**NOTE:** See Parts 514.20c, d, and e for definition of "manipulation", **"for the purpose of"**, and "making production possible."

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

**514.24**

---

**c**
**Conservation Practices on HEL and NHEL**

Wetlands converted as a result of installation of required water erosion control practices on HEL lands will not be considered converted wetland. Alternatives that **avoid or** minimize impacts to wetlands will be **recommended to the person** and utilized **whenever** possible. These areas will keep wetland label.

If a wetland will be affected by a water erosion control practice on NHEL, the **NRCS representative** will follow minimal effect determination procedures. Water conservation measures are not included with water erosion control practices for this provision; thus, a water conservation measure that diverts water from a specific wetland may result in a CW+year designation unless exempted by a minimal effect determination.

---

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

**514.24**

**d**
**Examples of**
**Manipulation**
**that Convert**
**Wetlands**

This table provides examples of manipulations that are considered conversion, **if for the purpose of making, or that made** agricultural commodity production possible, and the effects on wetland functions **and values** are not minimal as determined by minimal effects evaluation (See Part 516), **or are not CWNA (Part 514.32)**

| Type | Actions that may cause conversion of wetlands |
|---|---|
| New Construction | New construction of open ditches or subsurface drains into or outlets through wetlands<br><br>**NOTE:** Maintenance of existing systems is addressed in Part 515. |
|  | New construction of a diversion that decreases flow of water to the wetland. |
|  | New construction of dugouts, or other ponds, **dikes, etc.** in wetlands resulting in fill being placed in a wetland. |
| Woody Vegetation | Stems, stumps, and brush removed after December 23, 1985, **if for the purpose of, or** made production of an agricultural commodity or **mechanical harvest of** forage possible.<br><br>**NOTE:** See Part 515.12e |
| Fill | Placing earth **(including spoil from drainage system maintenance)**, woodchips, manure, or any other material in a wetland |
| Hydrologic manipulation | Any manipulation of the hydrology by means of on-site or off-site activities that exceed the original scope and effect. |

**NOTE:** The examples of manipulation described in the above table may also be subject to **Clean Water Act.** If, within the course of administering their responsibilities, **NRCS** personnel observe such manipulations, they will notify the local District COE Office of nature and location of observed activity.

514.24

e
**Examples not Considered Conversion**

This table contains examples of actions not considered manipulation and manipulation not considered conversion. **These and other similar manipulations will not convert a wetland and do not need to be assessed for scope and effect or for minimal effect.**

| Type | Action not considered manipulation | Manipulation not considered conversion |
|------|-----------------------------------|----------------------------------------|
| Woody Vegetation | Removal of stumps in established pine plantations as a part of an established management plan or harvest of Christmas trees with roots as a part of a CWNA plan | Removal of woody vegetation:<br><br>• without removal of stumps, such that the area cannot be cropped or established **for mechanical harvests of** hay or pasture<br><br>• from an area that is so small that production on the area is not **possible, such as** clearing a fence line in a manner that will not permit the use of conventional tillage equipment on the cleared area. |
| Herbaceous Vegetation | | Removal of herbaceous vegetation as long as it does not affect the hydrology of the wetland. |
| Erosion Control | | On-site or off-site work done for erosion control on HEL land.<br><br>Erosion control practices on NHEL done with a minimal effect agreement. |
| Tillage | Normal tillage practices and operations with tillage equipment accepted as normal in the local area | |
| Hydrologic manipulation | • **Repair/replacement of damaged tile**<br>• **Removal of sediment from a drainage ditch**<br>• **Construction of a diversion which outlets back into the same wetland**<br>• **Repair/replacement of damaged tile intakes** | Wetland outlets for PC, FW, and FWP that do not alter wetland hydrology, such as:<br><br>• Construct sealed tubing or tile outlet<br>• Bypass the wetland<br>• Construct toewall or other structure that outlets into the ditch or stream that maintains the wetland hydrology<br>• Use a pump system that elevates the drainage system water into the wetland or design drainage ditch in such a way as to protect the wetland hydrology<br>• Install an impermeable lined channel (i.e., steel or concrete) with side berms so that surface hydrology is not affected. |

514.24

f
**Mining and Other
Major Land
Disturbing Activities**

Persons with wetlands converted after November 28, 1990, by mining and other major land disturbing activities shall not be subject to ineligibility for conversion, if a wetland reclamation plan provides for the restoration or replacement of all wetlands converted as a result of the land disturbing activity. Conditions regarding the restoration are as follows:

- the operator holding the surface rights will be permitted to resume agricultural production without loss of benefits when the wetland reclamation plan is fully applied, provided that reclamation plans required by other agencies and groups are carried out

- the replacement of wetlands converted on the mined areas is not required to be located on prior converted **cropland**, but must be located as shown on approved plan

- reclamation plan approval as required by state law.

**NOTE**: The use of mitigation banks is permitted according to Part 517.15.

514.24

**g**
**Determine When**
**Conversion**
**Occurred**

NRCS shall determine when conversion activities occurred and document them according to this table. The reasons for making the determination are also listed in this table.

| IF the conversion occurred.... | THEN... | AND...FSA will determine that: |
|---|---|---|
| between December 23, 1985 and November 28, 1990 | the wetland area shall be labeled CW | persons who produce agricultural commodities on the converted wetland shall be ineligible for USDA benefits for all crop years when commodity is planted. **NOTE**: Grasses, legumes and forage crops may be planted without loss of benefits. |
| after November 28, 1990  **NOTE**: See Paragraph h for land assumed to have been converted after November 28, 1990. | the wetland area shall be labeled CW+year  **Example**: A wetland converted in February, 1991 shall be labeled CW 91.  **NOTE: Further conversion of a CW after 11/28/90 will result in a CW+ year (see Part 515.21g)** | persons responsible for the conversion shall be ineligible for USDA benefits until the converted wetland is restored **or mitigated to replace lost functions and values.** (See Part 517.)  any other person such as a renter or new owner who plants a commodity or forage crop on the converted wetland shall be ineligible for USDA benefits for all crop years when a commodity or forage crop is planted. |

**h**
**Converted Wetlands**
**Discovered After**
**November 28, 1990**

Converted wetlands shall be considered converted after November 28, 1990, if all of the following apply:

- wetland is determined not to have been converted before December 23, 1985,
- the conversion is discovered after November 28, 1990,
- USDA does not have records that clearly demonstrate the date of the conversion.

**NOTE**: Persons may appeal a CW+year determination and provide information and documentation as to when the conversion took place or to support their contention that the area is not a converted wetland.

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

## 514.25          FW, or FWP That is Abandoned

**a**
**Definition of**
**Abandonment**

Abandonment is the cessation of management on FW or FWP for 5 consecutive years **and does not refer to the drainage system or other type of hydrologic manipulation**, such that:

- wetland criteria are met; and

- the area has not been enrolled in a conservation set-aside program; and

- the area was not enrolled in a state or federal wetland restoration program other than **perpetual easements**, the Wetland Reserve Program (WRP), **or Emergency Wetland Reserve Program (EWRP).**

**NRCS will accept copies of written statements from the person of intent to abandon. Upon receipt of written intent to abandon, NRCS will revise the NRCS-CPA-026E, using FOCS, to reflect the change in designation to wetland (W).**

**NOTE**: In some instances non-wetland (NW), including wetland converted before 12/23/85 and not cropped, may be considered for abandonment, if the area presently meets wetland criteria (see Part 514.37). **CW and CW+ year are not subject to abandonment. FW or FWP's are not subject to abandonment if the person provides hydrologic and vegetative baseline conditions prior to allowing the site to revert to wetland conditions.**

## 514.25

**b**
**Criteria For**
**Abandonment**
**Determination**

If FW and FWP exhibit wetland criteria, **and baseline functions and values were not documented**, the area shall be considered "abandoned" if it is determined there has been cessation of management according to this table.

| Condition for Abandonment | Description | When to Consider Abandoned |
|---|---|---|
| Cessation of management | Not carrying out operations which support cropping or forage production such as:<br><br>• tilling<br>• grazing<br>• planting<br>• haying<br>• burning<br>• mowing<br>• harvesting<br><br>NOTE: See Paragraph e, if failure to manage is beyond person's control. | When management activities have ceased for 5 successive years and wetland criteria have returned |
| Person intends not to abandon | Area enrolled in:<br><br>• CRP<br>• Federal or State approved wetland restoration project with less than a perpetual easement<br><br>Person shows intent not to abandon FW or FWP by providing hydrologic and vegetative baseline conditions prior to allowing the site to revert to wetland conditions.<br><br>NOTE: Intent to sell or develop land for non-agricultural uses does not constitute an intent to abandon. Enrollment in WRP or EWRP constitutes abandonment of land under agreement only when the area is under a perpetual easement. | Not considered for abandonment (excepting special circumstances) |

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

**514.25**

c
**How to Label Abandoned Wetlands**

If the area meets wetland criteria, make abandonment determinations as follows:

| IF the determination is... | AND... | THE area becomes... |
|---|---|---|
| FW or FWP | the area has <u>not</u> been managed for agricultural commodity or forage production for 5 successive years | wetland (W) **(Provided conditions of 514.25 are not met).** |

d
**Appeal of Abandonment Determination**

A person with FW or FWP that has been determined to be abandoned may appeal the determination. Consideration shall be given to whether or not the person was unable to **manage** the area due to circumstances beyond his or her control, such as the lack of maintenance of a related drainage facility by the drainage district, county, or neighbor on adjoining land.

e
**Abandonment Beyond Person's Control**

If the **NRCS representative determines** that abandonment was beyond the person's control, the presumption of abandonment may be considered rebutted, and the label changed.

**Exemption allowed if:**

- documented proof is provided to **NRCS** that the area was abandoned due to the lack of maintenance on a related drainage facility, by a neighbor, a drainage district, county, or other legal entity with control over maintenance of the related drainage facility; and

- documentation is provided from a neighbor, drainage district, county, or other legal entity with control over maintenance of the related drainage facility, that since 1985 the person has for the last 5 years actively pursued said entities to maintain the related drainage, and was unsuccessful until now, or said entities on behalf of the person have been prevented from completing the maintenance; and

**No exemption is allowed if area was abandoned prior to 12/23/85.**

**514.25**

| | |
|---|---|
| **f**<br>**Information Needed**<br>**for Rebuttal** | The person must supply the following information for rebuttal:<br><br>• **documentation** that the area was abandoned due to lack of maintenance on a related drainage facility by a drainage district, county, or similar entity, or neighbor, and<br><br>• documentation from the drainage district, county, or other entity that the person has actively pursued drainage, but has been refused:<br><br>Documentation must be in the form of court records, legal restraining orders, certified minutes of meetings, legally filed petitions, or copies of dated, formal requests to said entities. Such documentation must prove that the person or drainage district or other legal entity acting on behalf of the person has actively pursued the maintenance of the related drainage facility during the most recent 5 year period.<br><br>**NOTE**: If it cannot be demonstrated that active pursuit of the matter began before December 23, 1985, and has continued, then exemption from the abandonment provision will not be allowed. |
| **g**<br>**Notifying FSA of**<br>**Abandonment** | After a final determination is made, provide the person and FSA a revised **NRCS-CPA-026E, using FOCS, and mark the base map at FSA and NRCS** indicating the appropriate change in determination. |
| **h**<br>**Use of Abandoned**<br>**Wetlands** | When FW and FWP are redetermined to be W, all wetland restrictions apply according to Part 514.11. Abandoned wetlands may be cropped under natural conditions so long as hydrology is not manipulated and/or woody vegetation is not removed. Any alteration of wetland may be subject to CWA. |

## 514.26          Other Waters (OW)

**a**
**Definition of Other Waters**

Taken directly from 33 CFR 328:

*(a) The term "waters of the United States" means*
*(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide:*
*(2) All interstate waters including interstate wetlands;*
*(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters;*
*(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or*
*(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or*
*(iii) Which are used or could be used for industrial purpose by industries in interstate commerce;*
*(4) All impoundments of waters otherwise defined as waters of the United States under the definition;*
*(5) Tributaries of waters identified in paragraphs (a) (1) - (4) of this section;*
*(6) The territorial seas;*
*(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) (1)-(6) of this section.*
*Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 123.11(m) which also meet the criteria of this definition) are not waters of the United States.*

**b**
**NRCS Role**

In certain locations where NRCS and COE concur, NRCS will be the lead agency for determining and/or delineating "other waters" of the US as specified in local operating procedures as approved by the State Conservationist.

**c**
**Delineating and Recording OW Determinations**

Refer to Part 523.22 for delineating and recording OW determinations on the NRCS-CPA-026E using FOCS.

| | |
|---|---|
| **Subpart C** | **Identifying Wetlands with Exemptions to the 1985 Act** |
| **514.30** | **Overview** |
| **a**<br>**Introduction** | This subpart provides the conditions for determining the appropriate use of exemptions **allowed under the 1985 Act as amended**.<br><br>Even though certain exemptions may apply to the land identified in this part, certain restrictions may still apply for maintaining the exemption. |

010816

**514.31**          **Prior Converted Cropland (PC)**

**a**
**Definition of Prior Converted Cropland (PC)**

**Prior converted cropland is a converted wetland where the conversion occurred prior to December 23, 1985, an agricultural commodity had been produced at least once before December 23, 1985, and as of December 23, 1985, the converted wetland did not support woody vegetation and met the following hydrologic criteria:  (A) Inundation was less than 15 consecutive days during the growing season or 10 percent of the growing season, whichever is less, in most years (50 percent chance or more); and (B) If a pothole, playa or pocosin, ponding was less than 7 consecutive days during the growing season in most years (50 percent chance or more) and saturation was less than 14 consecutive days during the growing season most years (50 percent chance or more).**

Prior converted croplands converted before December 23, 1985, are exempt from the **1985 Act and CWA provisions. PC's retain this label as long as they are in agricultural use.** This paragraph provides instructions for making PC determinations.

**b**
**Criteria for a PC Determination**

Wetland shall be labeled as PC if <u>all</u> of the following conditions apply:

- manipulation of the wetland:

    – occurred before December 23, 1985

    – was for the purpose, or had the effect of making the production of an agricultural commodity possible.  See Part 514.20d

- an agricultural commodity was produced at least once prior to December 23, 1985;

- as of December 23, 1985, the area does not meet:

    – **farmed wetland criteria;**
    – **farmed wetland pasture criteria; or**
    – **wetland criteria.**

- **the site remains in agricultural use.**

**514.31**

c
**Examples of PC**      Wetlands that shall be considered PC are listed in this table.

| Condition | Criteria for PC Determination |
|---|---|
| Potholes Playas Pocosins | Meet all of the following criteria:<br><br>• were manipulated to make the production of an agricultural commodity possible before December 23, 1985<br><br>• were used to produce an agricultural commodity prior to December 23, 1985<br><br>• on December 23, 1985 no longer met wetland hydrology criteria, which is flooding or ponding for 7 consecutive days or saturation for 14 consecutive days during the growing season<br><br>• **remains in agricultural use.** |
| Flooded or ponded areas and not considered potholes, playas, or pocosins | Meet all of the following criteria:<br><br>• were manipulated to make the production of an agricultural commodity possible before December 23, 1985<br>• were used to produce an agricultural commodity at least once prior to December 23, 1985<br><br>• do not flood or pond for 15 consecutive days during the growing season or 10% of the growing season, whichever is less,<br><br>• **remains in agricultural use.** |
| Areas that meet only the water table (saturation) criteria and not considered potholes, playas or pocosins | Meet all of the following criteria:<br><br>• were manipulated to make the production of an agricultural commodity possible before December 23, 1985<br><br>• were used to produce an agricultural commodity prior to December 23, 1985<br><br>• **remains in agricultural use.** |

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

**514.31**

| | |
|---|---|
| **d**<br>**Use of PC** | **Certified PC's retain this label as long as they are in agricultural use.** Drainage systems or other hydrologic manipulations may be maintained or improved, provided that the **hydrology of adjacent wetland,** FW or FWP is **negatively impacted.** |

| | |
|---|---|
| **e**<br>**Label the PC Site** | Label areas determined to be prior converted cropland as PC on **the FSA and NRCS base maps.**<br><br>If no other wetland types or labels are involved, **NRCS** may elect to place PC on entire fields to avoid outlining PC areas in detail or **NRCS** may place PC and NW in field to show that field contains both prior converted cropland and non-wetland.<br><br>**NOTE:** For exception for **FSA-Farm Credit** see Part 524. |

## 514.32      Converted Wetlands for Non-Agricultural Purposes (CWNA)

**a**
**Background**

Conversion of wetland after November 28, 1990, is not a violation of Wetland Conservation provisions if:

- the conversion activities which make production possible, are for purposes <u>other than</u> **for the purpose of or making production possible** and,
- all other provisions are met according to this part.

**b**
**Requests for**
**Exemption on**
**CWNA**

Persons should request an exemption **and submit a plan** for conversion for non-agricultural purposes before starting the conversion activity. The person initiates the request by answering "yes" to question **10** on AD-1026.

**Prior to granting CWNA, NRCS will notify the COE. The COE will advise NRCS if the CWA applies to the proposed conversion within 45 days.**

**514.32**

c
**CWNA
Considerations**

Conversion of wetland for non-agricultural purposes **may** include conversions for any of the following:

- fruit trees
- trees
- vineyards
- shrubs
- fish, mollusk, and crustacean production
- cranberries
- roads **(includes roads for irrigation travel systems with a top width of less than 6' wide)**
- buildings
- agricultural waste management structures
- irrigation reservoirs
- livestock ponds
- fire control
- other non-agricultural uses.

**NOTE**: CWNA only applies to the area used for non-agricultural purposes and cannot be used when the action will result in making production possible on adjacent or other wetlands. Any conversion on wetland not specifically exempted by CWNA will result in a possible violation, unless exempted by a minimal effect determination **or when evidence is presented that production of an agricultural commodity is not possible.**

**514.32**

**d**
**Requirements for CWNA**

Specific requirements for CWNA exemptions are as follows:

- must not be used to produce an agricultural commodity;
- must be designed and established in a manner that is customary to the region;
- areas requiring vegetation must be planted or seeded and not allowed to establish naturally;
- **a person should demonstrate that alternatives were considered but are not possible or practicable to avoid adverse impacts on the wetland;**
- **must be** designed to include features to avoid or minimize the **adverse impacts** on the wetland and adjacent wetlands; and
- use minimal effect evaluation when adjacent wetlands not specifically exempted by CWNA would be affected.

**NOTE:  NRCS employees are encouraged to assist persons in planning agriculturally-related activities under this exemption (e.g., roads for irrigation travel systems, livestock ponds), to evaluate alternatives to minimize adverse wetland impacts and reduce costs to the person.  In all cases where USDA technical or cost-share assistance is provided, NRCS employees have a responsibility to protect wetlands to the extent possible, as required by NEPA, as contained in the General Manual NRCS Wetland Policy.**

**e**
**Written Plans for CWNA Exemptions**

Persons who request a CWNA exemption should provide NRCS with a written plan.  **If USDA technical or cost-share assistance is provided, a plan will be required.**  An acceptable plan should include all of the following:

- **Prior to granting CWNA, the person should demonstrate that alternatives were considered but are not possible to avoid an adverse impact on the wetland.**
- map or diagram of planned facilities in relation to wetland;
- present condition of the wetland;
- planned alterations to the wetland;
- **documentation of alternatives reviewed/considered to avoid/minimize adverse wetland impacts; and**
- planned land use.

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

**514.32**

| | |
|---|---|
| **e**<br>**Written Plans for CWNA Exemptions (Cont'd)** | • scheduled date of conversion<br>• scheduled date for full implementation of the plan (generally within 1 year)<br>• planned cover for the area<br>• appropriate federal, state, and local permits.<br><br>**NOTE:** Although not required for USDA program eligibility, **NRCS representative** should strongly encourage persons who intend to convert wetlands for non-agricultural uses to notify **NRCS** of their intent before taking any action. A written CWNA plan will protect the person by insuring that the action qualifies as non-agricultural use. If prior approval is not obtained, the burden of proof shifts to the person to prove that the actions did not convert a wetland for the purpose of producing an agricultural commodity. |
| **f**<br>**NRCS Representative Review of the CWNA Plan** | The **NRCS representative** shall:<br><br>• review the plan for required documentation<br>• revise the plan to include any additional conditions and monitoring requirements |
| **g**<br>**NRCS Representative Informs the Person** | If the plan and added conditions meet all the requirements for a CWNA exemption, the **NRCS representative** shall inform the person:<br><br>• **that** implementing the plan will meet requirements for **the 1985 Act**, but not necessarily other local, state, and federal wetland laws and regulations<br>• **of the COE response**<br>• **that** the person is responsible for complying with CWA and other wetland protection permits that may be required<br>• **that** if the plan is not followed and production is made possible<br>   - the land may be considered CW+year<br>   - the person may be ineligible for USDA benefits until the wetland is restored **or the lost wetland functions and values are mitigated.** |

**514.32**

**h**
**Signatures on the CWNA Plan**

Once an acceptable plan has been agreed upon, the **NRCS representative** shall:

- **sign the plan**
- have the person sign and date the plan
- place a copy of the plan in the **case file.**

**i**
**If Implementation Fails**

If any phase of the plan fails because of conditions beyond the person's control, the person must:

- present a new plan to **NRCS**
- get **NRCS** approval of the revised plan before taking actions not included in the original plan.

**j**
**Labeling the CWNA Exemption Site**

Once the plan is approved by the **NRCS representative**, label the area as CWNA on **the FSA and NRCS base map.**

**k**
**Notification of FSA and Person**

Once the plan is signed and approved, furnish **FSA** and the person:

- a copy of **the FSA base map** with CWNA delineated and labeled
- a copy of the revised **NRCS-CPA-026E.**

**l**
**Post Approval of CWNA**

Requests for a CWNA exemption where the conversion has already taken place can be approved if the following conditions are met:

- the person can verify and document that the converted site was not used to produce an agricultural commodity between the time of conversion and the implementation of the planned non-agricultural land use,

- the area is clearly in non-agricultural use.

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

**514.32**

**l**

**Post Approval of
CWNA (Cont'd.)**

---

- the person provides written verification or a post-construction permit from the COE that the conversion did not violate the CWA.

**NOTE:** If production is possible in an area intended for a non-agricultural use, and no plan was approved before the conversion, the area will be labeled CW+year until the non-agricultural use described in the plan is completed. The person will be ineligible for USDA program benefits for the period in which production was possible.

---

010825

**514.33**                     **Artificial and Irrigation-Induced Wetlands (AW)**

**a**
**Background and**
**Purpose**

Artificial and irrigation-induced wetlands are not subject to **the WC provisions of the 1985 Act.**

**Artificial wetland is an area that was formerly non-wetland, but now meets wetland criteria due to human activities, such as (A) an artificial lake or pond created by excavated or diking land that is not a wetland to collect and retain water that is used primarily for livestock, fish production, irrigation, wildlife, fire control, flood control, cranberry growing, or rice production, or as a settling pond; or (B) a wetland that is temporarily, or incidentally created as a result of adjacent development activity;**

- artificial wetlands can be drained, removed or manipulated without causing ineligibility for USDA benefits

- enhancement of hydrology on areas meeting wetland criteria under natural conditions does not make the area AW

- removal of enhanced hydrology is allowed as long as natural wetland hydrology is not affected.

**NOTE:**  CWA and state permits may apply.

**b**
**Wetland Created by**
**Human Activities**

Artificial wetlands may be created for purposes such as, but not limited to:

- livestock watering
- fish production
- irrigation
- rice production
- flood control
- recreation
- wildlife habitat
- gravel pits
- borrow pits
- other.

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

010826

**514.33**

**c**
**Irrigation Induced Wetland**

A wet area created by an irrigation system on an area that was formerly non-wetland is considered an artificial wetland.

**d**
**Labeling Artificial Wetlands**

Label artificial wetlands as AW to identify the area as exempt.

**e**
**Alternative labeling of Artificial Wetlands**

**The label AW/W or AW/FW should be used for wetland determinations when no manipulation is proposed, and where it is difficult to distinguish between irrigation induced or enhanced wetlands and natural wetlands or farmed wetlands. A determination of the extent of W, FW, and AW must be made at the time manipulation is proposed.**

## 514.34    Converted Wetland Technical Error (CWTE)

**a**
**Criteria for CWTE**

A person shall not be ineligible for USDA program benefits as the result of producing an agricultural commodity on a converted wetland, or for the conversion of a wetland, if the action was based on an incorrect wetland determination which is documented on form **SCS-CPA-026 or NRCS-CPA-026E.**

**Exception:  CWTE does not apply to obvious wetlands (See Note in 514.34c) and may not apply to incorrect information from the person (519.70).**

**b**
**Definition of CWTE**

A converted wetland technical error (CWTE), occurs if NRCS makes a wetland determination that is incorrect **or a misinformed decision is rendered from FSA and results in a person taking action that would be considered a violation.  To evaluate whether the determination is incorrect, evaluate using the process set forth in Part 519.13.**

Failure of **NRCS** to make a determination does not constitute CWTE.  For example, if a person checks "yes" on an AD-1026 and **NRCS** fails to respond with a determination in an appropriate time period, CWTE cannot be used to exempt the person from actions taken while waiting for **NRCS** to respond.

**A CWTE can only be approved at or above the state level.**

## 514.34

**c**
**Correction of Errors**   Incorrect wetland determinations made by **NRCS** officials will **only be corrected upon request of the person** at any time such incorrect determinations become known. Determinations become effective **on the date the NRCS representative signs the NRCS-CPA-026E**; however, no person shall be adversely affected by actions based on a prior incorrect determination, unless the exception in 514.34(a) applies.

Promptly notify the person of the corrected determination.

| IF... | THEN... |
|---|---|
| the person has taken no action to convert the wetland, FW, or FWP | label the area W, FW, or FWP as appropriate, and restrictions of **the 1985 Act** apply. complete a revised **NRCS-CPA-026E**. |
| wetlands, FW, or FWP are converted as the result of reliance on misinformation from **NRCS** or if conversion was commenced before the corrected determinations were received | label the area **as per 514.34g**. the person shall be granted relief for actions taken as the result of an incorrect determination. |
| further conversion activity occurs after the person has been notified that the area is a wetland, FW, or FWP | label the area CW+year. the person will be ineligible for USDA benefits. |
| the person knew or should have known that the **NRCS** determination was in error, or the area was an obvious wetland.  (see note) | label the area CW+year. the person will be ineligible for USDA benefits. |
| **the person provided incorrect information** | **handle as per 520.43** |

**NOTE:** An obvious wetland, as described in 7 CFR Part 12.6 (c)(4)(iv) is an area that is continuously inundated, or saturated for long periods of time during the growing season to such an extent that access by foot to make a determination of predominance of hydric soils or prevalence of hydrophytic vegetation is not feasible. **Additionally, wetland sites that are** cropped or **have had** forage harvested by mechanical means less than 5 out of 10 years because of wet conditions **are obvious wetlands**.

010829

**514.34**

| | |
|---|---|
| **d**<br>**Documentation of**<br>**Misinformation** | The misinformation from **NRCS** must:<br><br>• be documented on SCS-CPA-026 or **NRCS-CPA-026E**,<br>• have preceded the action, and<br>• have been directly relied upon by the person in the decision to take the action.<br><br>**The misinformation from FSA must:**<br><br>• **have preceded the action, and**<br>• **have been directly relied upon by the person in the decision to take the action** |
| **e**<br>**Required**<br>**Documentation** | Documentation by NRCS must include a reviewable record consisting of:<br><br>• **AD-1026 showing person's intent**<br>• **corresponding CPA-026 or CPA-026E, including on-site documentation sheets**<br>• data supporting incorrect information provided to person<br>• date conversion was started<br>• date conversion was completed<br>• total cost of conversion<br>• total amount spent on conversion as of date correct determination was provided to a person<br>• explanation of the events and circumstances leading to the error<br>• statement of actions taken to correct the error and prevent reoccurrences, and<br>• **documentation from the COE on the applicability of the CWA** |

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

**514.34**

**f**
**CWTE Approval**

NRCS:

Complete the following and forward to the State Conservationist for CWTE consideration:

- documentation as per Subparagraph d
- documentation as per Subparagraph e
- determine extent of relief and potential label from 514.34g, and draft a letter to the person (514.34h)

FSA:

All requests for misinformation decisions will be considered by the Deputy Administrator for Farm Programs.

**514.34**

g
**Extent of Relief**    Determine the extent of relief that will be provided to persons who were misinformed according to this table.

| IF conversion or commenced conversion of a wetland... | AND... | THEN... |
|---|---|---|
| was the direct result of an error by NRCS | a small investment was made to convert a "W" or "FWP" site in the project area | the person shall be exempt for past violations that were the result of **this** action<br><br>future planting of an agricultural commodity on the area will be considered a violation<br><br>the area can be used for forage production<br><br>label the area CW. |
| | **a small investment was made to convert FW's in the project area** | **the person shall be exempt for past violations that were the result of this action.**<br><br>**future planting of agricultural commodities on the area will be permitted.**<br><br>**label the area FW.** |
| | a substantial investment was made to convert **any wetland (W) in the project area** | the person shall be exempt from past violations that were the result of **this** action<br><br>future planting of agricultural commodities on the area will be permitted<br><br>label the area CWTE.<br><br>if conversion is not completed at the time the error is corrected, allow the person to complete that portion of the manipulation necessary to function as intended.  Document in an agreement what may be done.<br><br>if additional manipulation is initiated:<br>• the person will be ineligible for USDA benefits<br>• label the area CW+year. |
| was the result of the person's own misunderstanding or misinterpretation of information from NRCS, was the result of wrong information provided by person, or was an obvious wetland | | the area will not be eligible for CWTE<br><br>the person will be determined ineligible for USDA benefits<br><br>label area CW or CW+year as applicable<br><br>person may request good faith exemption from FSA.<br><br>the site is eligible for mitigation |

**514.34**

---

**h**
**Notification and Reports**

**After approval:**

- **Inform the person by letter of approval, including restrictions of use per 514.34g.**

- Inform the person **of the COE response relating to applicability of CWA as well as any** state and local permits **which** may still be required.

**NOTE: CWTE's will be reviewed periodically by the MOA agencies during the quality oversight process. Develop a plan that includes corrective actions per 519.13(c)**

---

**i**
**Effective Date of CWTE**

The effective date of the CWTE exemption is the date of the determination as shown on form **NRCS-CPA-026E**.

---

## 514.35     Third Party Conversion (TP)

**a**
**Who Determines Third Party Exemption**

Third party exemptions apply where wetlands are converted after December 23, 1985, by actions of persons other than the person applying for USDA program benefits.

**FSA**, in consultation with **FWS**, **COE** and **NRCS**, will determine whether a third party is responsible for converting a wetland. **The third party exemption should be filed before planting an agricultural commodity on the wetland converted by the third party.**

NOTE: If **FSA** determines the conversion was part of a scheme or device to avoid wetland provisions **of the 1985 Act, FSA** will not grant the third party exemption.

**b**
**Documenting Scope and Effect**

When third party exemptions are requested by a person, **FSA** will refer the request to **NRCS**. The **NRCS representative** shall:

- make a wetland determination for the area

- determine the scope and effect of third party activity for which the request is made

- **request technical assistance from FWS and COE when necessary.**

- maintain the documentation in the case file

- notify **FSA with a recommendation.**

NOTE: Person requesting exemption is responsible for providing information on extent to which the third party modified the hydrology or vegetation of the wetland.

**c**
**Approved Third Party Exemptions**

**FSA** will notify **NRCS** when third party requests are approved. **NRCS** will issue a revised **NRCS-CPA-026E** and **mark the FSA and NRCS base maps** with TP label.

010834

**514.36**

---

**d**
**Actively Pursued**

To be eligible for a commenced conversion determination, a person must have pursued completion of the drainage on a regular basis since initiation of the conversion, except for delays because of circumstances beyond the person's control. The following restrictions also apply:

- commenced conversions must be completed by January 1, 1995, or the exemption will be lost, unless there are justifiable circumstances

- only those wetlands for which construction was begun or materials and supplies purchased qualify for the commenced conversion exemption.

---

**e**
**District or Project**
**Drainage Activities**

The conversion of wetlands by a county, drainage district or similar entity is considered commenced if before December 23, 1985, all of the following conditions are met:

- a detailed project drainage plan has been officially adopted

- the county, district or entity started installation or legally committed substantial funds toward conversion by entering into a contract

- the person can show that the conversion, which the person is associated with, was the basis of a financial obligation to the county, district or other entity, and

- a specific assessment was made for the person's land prior to December 23, 1985.

---

## 514.36

**f**
**Federally Assisted Projects**

Federally assisted projects started before December 23, 1985, which convert or provide outlets to convert wetlands require a commenced determination in order for the exemption to apply. In some cases, a third party exemption may apply.

**NOTE:** In addition to the commenced determination for the project, individuals within the project area must request separate commenced and/or third party determinations for their land.

**g**
**NRCS Determinations**

For each request **FSA** receives for a commenced determination **that meets the conditions in paragraphs c, d, e, and f,** they will request **NRCS** to:

- make a wetland determination for the affected area

- if wetlands are present, make an assessment of the scope and effect of the proposed activity based on the following:

  - extent of work completed before December 23, 1985
  - contracts signed before December 23, 1985
  - supplies and materials purchased before December 23, 1985.

**h**
**Label the CC Site**

The wetlands that are determined to be commenced according to Paragraph b, shall be labeled CC on **FSA and NRCS base maps**.

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

## 514.37          Non-Wetland (NW)

| | |
|---|---|
| **a**<br>**Definition of Non-Wetlands (NW)** | Non-wetland (NW) is land that under natural conditions does not meet wetland criteria (sometimes called an upland). Nonwetland also includes wetlands which were converted to the extent that wetland criteria was not present prior to December 23, 1985, but were not cropped. When appropriate, non-wetland is labeled NW on **FSA and NRCS base maps.** |

**b**
**Criteria for a NW Determination**

Non-wetland (NW) areas:

- under natural conditions did not and currently do not meet wetland criteria, <u>or</u>

- were converted wetland that did not meet wetland criteria as of December 23, 1985, and

  - were not cropped, before 12/23/85, and,
  - wetland criteria has not returned and,
  - area has not been abandoned.

**NOTE:** Non-wetland areas are not subject to any wetland restrictions <u>except</u> abandonment. NW may be used on **FSA and NRCS base maps** to differentiate fields or parts of fields that are upland, from parts of fields that are wetland types (i.e., W, FW, FWP or PC.)

**514.38**   **Wetlands That Have Been Manipulated But Production Not Made Possible (WX)**

**a**
**Definition of Wetland (WX)**

WX are wetlands that have been manipulated after December 23, 1985, **and** the manipulation **was not for the purpose of, and** did not make production **of an agricultural commodity possible** (See Part 514.20). WX areas may or may not meet wetland criteria depending on type and degree of manipulation.

**WX also includes wetlands and abandoned wetlands through which drainage systems have been manipulated, via a drainage maintenance agreement (see Part 515.21d and e), for the purpose of maintaining the outlet for PC, FW, or FWP.**

**b**
**Use of WX**

If an agricultural commodity is **ever** produced on the wetland, or **if** production is **later** made possible, change the determination from WX to CW+year.

Examples of WX:

- An open ditch constructed through a forested wetland removed the hydrology, but the trees were not removed and the **manipulation does not make production possible.**

- Trees cut with stumps left in place, no manipulation of hydrology, and **manipulation of** the area **does not make production possible.**

- Piles of trees, stumps, and soil covered areas which is not cropable without added land clearing activities.

**NOTE:** If an area was previously labeled a CW because of manipulation after 12/23/85 but production was not made possible, the CW label should be changed to WX.

**c**
**Coordination**

**NRCS will seek a decision from the COE as to whether the activity violated the CWA and advise the person of the COE decision.**

## 514.39     Good Faith Exemptions for Wetland Violations

**a**
**Good Faith Relief**
**for WC Violations**

The 1985 Act was amended by the 1996 Act to provide that persons who violate WC requirements shall not be ineligible and a payment reduction will not apply if conversion of wetland or planting an agricultural commodity on a converted wetland was in good faith and without intent to violate. Requests for Good Faith exemptions are acted on by FSA.

A person who meets this requirement shall be allowed a reasonable period of time, not to exceed 1 year during which to implement the measures and practices necessary to be considered to be actively restoring the wetland.

Restoration, enhancement, or creation of wetland functions values in the same general area of the watershed as the converted wetland will be considered.

**b**
**Requesting Good**
**Faith**

All persons determined to be ineligible because of a wetland violation may request relief by completing an AD-1069 at the FSA office.

**514.40**          **Information Required from NRCS for Making Good Faith Determinations**

**a**
**Purpose**

This part provides the basic provisions for a GFW determination, which will be made by FSA and instructions for providing information to FSA for making the determination.

**b**
**Information**
**Provided by NRCS**

NRCS provides the following information to FSA on Form AD-1069 (522.51):

- any facts about the case that **NRCS or the Conservationist District has that** may affect the county committee determination
- whether the person was officially informed of the wetland   determination made by NRCS on Form **NRCS-CPA-026E**
- whether there was any direct consultation with the person concerning the wetland before the violation occurred
- whether NRCS has knowledge that the person was involved in a previous wetland conversion violation.

**NOTE:  NRCS should advise FSA that the person should contact the COE for CWA permit needs.**

## 514.41        Providing Wetland Determinations to Other Agencies

**a**
**Information to**
**Provide to USDA**
**Agencies**

For all wetland determinations, provide to **FSA**:

- a copy of **NRCS-CPA-026E**, and
- **mark the FSA and NRCS base maps** with delineation's and appropriate wetland labels.

Also provide copies to **FSA-Farm Credit** if appropriate.

**b**
**Make Information**
**Available to Other**
**Agencies**

All wetland determinations made by **NRCS** are available upon request to:

- US Environmental Protection Agency (EPA)
- US Army Corps of Engineers (COE)
- US Fish and Wildlife Service (FWS)
- any other federal, state, or local agencies for use in resource conservation programs.  (GM 120-402, Privacy Act)

**NOTE**:  FSA maintains the official record of all **NRCS** wetland determinations.  **All wetland determinations will be recorded in FOCS.**

**c**
**Project Areas**

**In project-type areas, or for requests from other agencies where no determinations or certified determinations have been completed, NRCS should:**

- **Complete a wetland inventory per current determination guidelines**
- **provide these results to the agency or use them in project development**
- **not provide certified determination to the person unless requested.**

| Subpart D | Certification of Wetland Determinations |
|---|---|

| **514.50** | **Overview** |
|---|---|

| **a**<br>**Purpose** | This part provides guidelines for **certification of** wetland determinations. |
|---|---|

**514.51**          **Certifying Wetland Determinations**

**a**
**Purpose**

**SPECIAL NOTE:  The Federal Agricultural Improvement and Reform Act of 1996 amended the provisions concerning certification of wetland determinations.  The final rule and subsequent amendments to this manual will provide additional guidance.**

**The 1990 amendments to the Act** include a certification requirement for all wetland determinations.  The certification procedures to be used on wetland determinations completed before November 28, 1990, and the certification procedures to be used on wetland determinations completed after November 28, 1990, are both described in this part.

The MOA provides that all certifications done after January 6, 1994, will be conducted with mapping conventions agreed on by the signatory agencies (513.30).  These certified determinations will be used for the 1985 Act as amended and the CWA.

**Procedures and guidelines for review and quality assurance of wetland determinations is contained in Part 519.13 and 519.14.**

**NOTE:  It is the goal to have all wetland determinations certified to the quality standards set forth in the jointly agreed upon (MOA) wetland mapping conventions.**

**514.51**

**b**
**Applicability of Certified Wetland Determinations/ Delineation's**

Follow this table to determine if **determinations**/delineations are accepted for both **the 1985 Act** and CWA purposes.

| Initial Determination done (date) | Determination Certified if | Accepted for the 1985 Act | Accepted for CWA |
|---|---|---|---|
| a) Prior to MOA mapping conventions on <u>agricultural land</u> | - meets quality criteria in MOA mapping conventions<br>- reflects up-to-date and current situation on the landscape<br>- was appealed at least one level | Yes | Yes, unless questions about the quality were raised by two or more of the MOA signatory agencies |
| | - meets quality criteria in MOA mapping conventions<br>- reflects up-to-date and current situation on the landscape<br>- was not appealed | Yes, after appeal rights expire or upon final decision | |
| b) After MOA mapping conventions on <u>agricultural land</u> | - meets quality criteria in MOA mapping conventions.<br>- reflects up-to-date and current situation on the landscape | | |
| c) Non-agricultural land | COE/EPA makes final wetland determination | Yes | Yes |
| | NRCS makes determinations on narrow bands immediately adjacent to or small pockets interspersed among agricultural land using COE-87 Manual | | |
| | NRCS makes determination on non-agricultural lands owned or operated by a USDA program participant at their request using COE 87 Manual in coordination with COE | | |

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

010844

514.51

c
**Priority Setting for Certification**

NRCS provides wetland certification on a whole tract basis (wetland labels include, "NI" -- Part 522.24).  Priority and timing is:

| Priority | Timing |
|---|---|
| Potential violations (discovered during use of MOA conventions, complaint, witnessed by staff, etc.) | Within 30 days of discovery |
| Planned manipulation per referred AD-1026 and a valid determinations exists. | Within 30 days of receipt of AD-1026 |
| Planned manipulation or determination exists, and NRCS-CPA-38 is also received | Within 30 days of receipt of NRCS-CPA-38 |
| Quality Assurance (errors as per 519.13c) | Within 30 days of assurance report |
| Conflict between Swampbuster and CWA | Within 30 days of conflict resolution |
| Upon person request | Within 30 days of request of NRCS-CPA-38 request form |

NOTE: **NRCS** will **also** give priority to certifying those wetland determinations where at least two of the four signatory agencies agree that **wetland** determinations in a given area, or a generic class of wetland determinations in a particular area, raise issues regarding their accuracy.

Identification of high priority certification needs will be done at the level of the State Conservationist, FWS Regional Director, EPA Regional Administrator, and the COE District Engineer.

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

**514.51**

d
**Procedures for
Certification**

**NRCS will provide certified** wetland determinations **on tracts for which a
NRCS-CPA-38  has been received** using the following procedures:

1. Review existing **tract** determinations to determine if they were made
   according to mapping conventions approved by interagency oversight
   Team.  (See 513.**30 and 519.13.**)

2. Notify the person **that the** determination has been certified as correct.

3. Notify the person that the determination is sufficient for determining
   eligibility for USDA programs and:

4. Provide form **NRCS-CPA-026E and mark the NRCS and FSA base
   maps**  showing the location of all wetland **labels** on the tract.

   **NOTE: NRCS will assure that the NRCS and FSA base maps are
   correctly labeled and marked.  NRCS will assure the appropriate
   resource inventory data fields in FOCS are populated.**

5. If the initial determination was given to the person between 11/28/90 and
   the date of the certification letter and was not appealed, or if the decision
   (either before or after 11/28/90) was  appealed to at least one level, the
   person does not have additional appeal rights unless the decision is
   changed.  For all others offer appeal rights.

**514.51**

**e
Notification**

All determinations **and certifications** will be based on mapping conventions approved by the interagency oversight team **or by use of on-site procedures in 527.4 and will be completed on a tract basis (522.24)**.

**Certified wetland determinations become effective when the person is notified on form NRCS-CPA-026 with copies of appropriate maps.** NRCS will notify **the** person and **FSA** that **the** determination will be certified **30** days after the determination is issued.

Persons who have already appealed decision will not have appeal rights unless determination is changed **or revised**.

**See example letters in 526.**

**FSA will provide mailing labels for all current owners, operators, and tenants for every tract on which an AD-1026 has been completed.**

Other cooperating agencies will be notified of wetland certifications upon request.



United States
Department
of Agriculture

Natural
Resources
Conservation
Service

Conservation and
Ecosystem Assistance
Division

# NATIONAL FOOD SECURITY ACT MANUAL
## 3RD EDITION

## PART 514 – MAKING WETLAND DETERMINATIONS
## ON AGRICULTURAL LAND

## TABLE OF CONTENTS

Part 514    Making Wetland Determinations on Agricultural Land .......................................... 514-1
514.0       Overview ................................................................................................................ 514-1

Subpart A   General Provisions For Making Agricultural Land Wetland Determinations ......... 514-3
514.10      Overview ................................................................................................................ 514-3
514.11      Applicability and Scope of Wetland Determinations ............................................. 514-4
514.12      Off-site and On-Site Determinations ..................................................................... 514-8

Subpart B   Identifying Wetlands Where the 1985 Act Restrictions Apply ............................... 514-9
514.20      Overview ................................................................................................................ 514-9
514.21      Wetlands (W) ......................................................................................................... 514-11
514.22      Farmed Wetland (FW) .......................................................................................... 514-12
514.23      Farmed Wetland Pasture or Hayland (FWP) ........................................................ 514-16
514.24      Converted Wetland (CW and CW+year) ............................................................. 514-20
514.25      FW, or FWP That is Abandoned ........................................................................... 514-26
514.26      Other Waters (OW) ............................................................................................... 514-30

Subpart C   Identifying Wetlands with FSA Exemptions .......................................................... 514-31
514.30      Overview ................................................................................................................ 514-31
514.31      Prior Converted Cropland (PC) ............................................................................ 514-32
514.32      Converted Wetlands for Non-Agricultural Purposes (CWNA) ............................ 514-35
514.33      Artificial and Irrigation-Induced Wetlands (AW) ................................................. 514-41
514.34      Converted Wetland Technical Error (CWTE) ....................................................... 514-43
514.35      Third Party Conversion (TP) ................................................................................ 514-49
514.36      Commenced Conversion Exemption Determinations (CC) .................................. 514-51
514.37      Non-Wetland (NW) ............................................................................................... 514-54
514.38      Wetlands That Have Been Manipulated But Production
            Not Made Possible (WX) ....................................................................................... 514-55
514.39      Good Faith Determinations for Wetland Violations .............................................. 514-56

(180-V-NFSAM, Third Ed., Amend 2, Nov. 1996)

PEER 010415

## 514.51

**b**

**Applicability of Certified Wetland Determinations/ Delineation's**

Follow this table to determine if **determinations**/delineations are accepted for both **the 1985 Act** and CWA purposes.

| Initial Determination done (date) | Determination Certified if | Accepted for the 1985 Act | Accepted for CWA |
|---|---|---|---|
| a) Prior to MOA mapping conventions on <u>agricultural land</u> | - meets quality criteria in MOA mapping conventions<br>- reflects up-to-date and current situation on the landscape<br>- was appealed at least one level | Yes | Yes, unless questions about the quality were raised by two or more of the MOA signatory agencies |
| | - meets quality criteria in MOA mapping conventions<br>- reflects up-to-date and current situation on the landscape<br>- was <u>not</u> appealed | Yes, after appeal rights expire or upon final decision | |
| b) After MOA mapping conventions on <u>agricultural land</u> | - meets quality criteria in MOA mapping conventions.<br>- reflects up-to-date and current situation on the landscape | | |
| c) Non-agricultural land | COE/EPA makes final wetland determination | Yes | Yes |
| | NRCS makes determinations on narrow bands immediately adjacent to or small pockets interspersed among agricultural land using COE-87 Manual | | |
| | NRCS makes determination on non-agricultural lands owned or operated by a USDA program participant at their request using COE 87 Manual in coordination with COE | | |

PEER 010480

## 514.51    Certifying Wetland Determinations

**d**
**Procedures for**
**Certification**

NRCS will provide certified wetland determinations on tracts for which a NRCS-CPA-38 has been received using the following procedures:

1. Review existing tract determinations to determine if they were made according to mapping conventions approved by interagency oversight team (See 513.30 and 519.13.)
2. Notify the person that the determination has been certified as correct.
3. Notify the person that the determination is sufficient for determining eligibility for USDA programs.
4. Provide form NRCS-CPA-026E and mark the NRCS and FSA base maps showing the location of all wetland labels on the tract.

   NOTE: NRCS will assure that the NRCS and FSA base maps are correctly labeled and marked. NRCS will assure the appropriate resource inventory data fields in FOCS are populated.
5. If the initial determination was given to the person between November 28, 1990 and the date of the certification letter, and was not appealed, or if the decision (either before or after November 28, 1990) was appealed, the person does not have additional appeal rights unless the decision is changed. For all others, offer appeal rights.
6. It is policy that all wetland determinations/delineations be conducted and/or verified on-site using all appropriate tools including methodologies in the approved mapping conventions by properly trained staff.

*Continued on next page*

PEER 010482

United States
Department of Agriculture

Conservation Service

Washington, D.C.
2001

AUG 1 6 1999

SUBJECT: CPA – South Dakota Wetlands Quality Review

TO:      Dean F. Fisher                                    FILE CODE: 190-13-14
         State Conservationist
         NRCS, Huron, South Dakota

Attached are the final review report and recommendations resulting from the wetland review in
South Dakota held during the week of July 12-16, 1999. Please implement the recommendations
and provide the progress reports accordingly. The report date in recommendation 11 is changed
to September 10, 1999.

THOMAS A. WEBER              LAWRENCE E. CLARK         MAURICE J. MAUSBACH
Deputy Chief for Programs    Deputy Chief for Science  Deputy Chief for Soil Survey
                             and Technology            and Resource Assessment

Attachments

cc:
Pearlie S. Reed, Chief, NRCS, Washington, D.C.
Danny D. Sells, Associate Chief, NRCS, Washington, D.C.
Linda A. Delgado, Executive Assistant to the Deputy Secretary, Washington, D.C.
James R. Lyons, Under Secretary, Natural Resources and Environment, Washington, D.C.
Glenda L. Humiston, Deputy Under Secretary, Natural Resources and Environment,
  Washington, D.C.
Judith K. Johnson, Regional Conservationist, Northern Plains, NRCS, Washington, D.C.
Tia G. Young, Director, Legislative Affairs Staff, NRCS, Washington, D.C.
David C. White, Director, Conservation Communication Staff, NRCS, Washington, D.C.
Jane E. Hardisty, Acting Director, Watersheds and Wetlands Division, NRCS, Washington, D.C.
Victor Cole, Resource Conservationist, Watersheds and Wetlands Division, NRCS,
  Washington, D.C.
Bruce A. Julian, National Policy Coordinator, Watersheds and Wetlands Division, NRCS,
  Washington, D.C.

The Natural Resources Conservation Service (NRCS),
formerly the Soil Conservation Service, is an agency of the
Department of Agriculture                                 An Equal Opportunity Employer

APPENDIX 2 – SOUTH DAKOTA WETLAND DETERMINATIONS
PRELIMINARY ESTIMATE OF THE IMPACT ON DUCK POPULATIONS
July 27, 1999

## Background

The Prairie Pothole Region of South Dakota, North Dakota and Minnesota provide essential nesting and migratory habitat for waterfowl. The abnormally high rainfall in the past few years has brought to light concerns about NRCS's wetland determination procedures in South Dakota. To addresses these concerns, South Dakota made procedural changes in May 1999 in order to comply with national policy. Criticism of these changes resulted in some News Releases that claimed that the changes could result in the loss of 90% of South Dakota's agricultural wetlands contributing to the loss of up to 5.1 million ducks from the annual fall flight.

This past spring, the South Dakota duck population was estimated to be 4,000,000, which is about the twice the average duck population for the state. The reason for the expanded duck population appears to be closely tied to the increase in wetland habitat associated with abnormally high rainfall (e.g., The Fish and Wildlife Service May Pond Survey indicated a 57 percent increase in ponds between 1998 and 1999). In the early 1990s, NRCS and the Fish and Wildlife Service independently surveyed South Dakota wetlands. Their estimates were relatively close, with the F&WS identifying 2,222,000 acres and NRCS inventorying 2,144,000 acres. About 35 percent of South Dakota's wetlands have been lost since the Europeans settled in the state.

## South Dakota New Determination Sample

In an effort to determine the effects of the revised wetland mapping convention, South Dakota assessed seventy-two tracts where new wetland determinations were made between May 1999 and July 1999. The following table summarizes the effects of the revised determination criteria. Although the revised criteria resulted in reducing the non-depressional acreage by 232 acres (57 percent), the depressional acreage or potholes increased by 40 acres (14 percent).

### Comparison of South Dakota and National Wetland Determination Methods

| Item | South Dakota Method | | National Method | | Difference | | Percentage Change | |
|---|---|---|---|---|---|---|---|---|
| | Depressional | Non-Depressional | Depressional | Non-Depressional | Depressional | Non-Depressional | Depressional | Non-Depressional |
| Acres | 280 | 404 | 320 | 172 | 40 | -232 | 14% | -57% |
| Number | 145 | 87 | 139 | 48 | -6 | -39 | -4% | -45% |

The following cautions should be used in interpreting the new determination data.
- The "sample" is very small (0.02 percent) of the wetlands in South Dakota.
- The "sample" is not random since it is comprised solely of farmers seeking new determinations
- Self-certification of prior manipulation determinations were made on up to 20 percent of the tracts

## Estimated Effect of the Wetland Revised Criteria

The following table outlines the computations used to estimate the effect of the revised wetland determination criteria on duck populations in South Dakota[1]. The estimated effect ranges from gaining 500,000 ducks to potentially losing 100,000 ducks. Both of these estimates are instantaneous and are not distributed over time. They also ignore the dominating influence of weather as well as other determinants of duck population such as diseases, predation, hunting, etc.

. With worst case scenario assumptions, the revised wetland identification procedures would affect up to an estimated 100,000 ducks. This is based on an estimated increase of 117,000 acres that could be subject to manipulation with the application of national Swampbuster criteria. The analysis uses a conservative assumption that half of the 234,000 acres with potential for manipulation would not be modified because of the agricultural economy. In reality, there is little incentive for farmers to expand production. Experience in North Dakota under more favorable economic conditions indicates that few such manipulations will occur. Moreover, in some cases, manipulation can actually improve wildlife values by improving upland habitat with enhanced cover. In addition, producers often manipulate areas to make the passage of equipment possible, not for crop production, and these areas may provide nesting habitat.

With best case scenario assumptions the estimated impact of using nationally consistent wetland determination criteria is a potential increase of 500,000 ducks. This assumes that depressional areas are constraining and that existing wetland protection programs will be focused in the area.

---

[1] Since there have been several changes in wetland determination criteria since the 1985 Farm Bill (e.g., changes in self-certification rules, abandonment provisions, and mapping conventions), the specific effects observed in new determinations will depend on the date of the original determination.

National Wetland Determination Criteria
Effect On South Dakota Duck Populations

| ITEM | AMOUNT |
|---|---|
| Sample Depressional (National Method) Wetland Acreage | 320 |
| Sample Non-Depressional (National Method) Acreage Classified as a FW | 172 |
| Sample Total Wetland Acreage | 492 |
| Sample Proportion of Depressional Acres | 65% |
| Sample Proportion of Non-Depressional Acres | 35% |
| Sample Change in Depressional Wetland Acres | 40 |
| Sample Change in Non-Depressional Acreage | -232 |
| | |
| Estimated Total Agricultural Wetland Acres in South Dakota (1992 NRI) | 2,144,000 |
| Estimated Depressional Acres in State (NRI Acres Times Sample %) | 1,394,000 |
| Estimated Non-Depressional Acres in State (NRI Acres Times Sample %) | 750,000 |
| | |
| Estimated Spring Duck Population in South Dakota | 4,000,000 |
| Number of Ducks per Depressional Acre | 2.87 |
| Number of Ducks per Non-Depressional Acre | 0.82 |
| | |
| Adjustment Factors Which Constrain Manipulation | |
| F&WS Easements or Ownership | 24% |
| 404 Permits | 10% |
| WRP or EWRP Enrollment | 5% |
| CRP Enrollment | 5% |
| Estimated Proportion of Farmers that Would not Seek New Determinations | 25% |
| Economics | 50% |
| | |
| Adjustments to Non-Depressional Acreage | |
| F&WS Easements or Ownership | 180,000 |
| 404 Permits | 75,000 |
| WRP or EWRP Enrollment | 37,000 |
| CRP Enrollment | 37,000 |
| Estimated Proportion of Farmers that Would not Seek New Determinations | 187,000 |
| Acreage with potential for Manipulation | 234,000 |
| Acres not Profitable to Convert to Cropland | 117,000 |
| | |
| Estimated Acres with Potential for Manipulation | 117,000 |
| | |
| Estimated Change in Duck Population | |
| Estimated Number of Ducks Affected on Non-Depressional Acreage | -100,000 |
| Percentage Change in Duck Population | -2.5% |
| Estimated Number of Ducks Affected on Depressional Areas | 500,000 |
| Percentage Change in Duck Population | 12.5% |

## Findings

- The effect of the policy revisions, based on existing information, appears to be minimal and ranges between increasing duck populations by 500,000 to reducing duck populations by 100,000. The expected outcome depends on habitat constraints and the use of existing wetland protection programs.
- A number of forces are in place to protect wetlands in South Dakota.
  - WRP
  - CRP
  - 404 Permit requirements
  - Elimination of Self-Certification
  - Swampbuster
  - Fish and Wildlife Service
  - Low commodity prices
  - State Laws
- Because of a variety of factors such as abnormally high rainfall and increases in nesting areas related to CRP the South Dakota duck population is about twice its average level. Changes in the duck population will be affected not only by changes in conditions in South Dakota like rainfall but also by environmental factors throughout the Mississippi Flyway which stretches from Alaska to the Gulf of Mexico. Therefore assessing the effect of the revised wetland determination criteria on duck populations will be difficult at best.
- This analysis does not take into account the rate at which farmers will seek new determinations. Any changes due to new mapping conventions will be spread over several years.

## APPENDIX 3 – REVIEW TEAM MEMBERS

|  | Team 1 | Team 2 | Team 3 |
|---|---|---|---|
| Team Leader | L. Pete Heard<br>Dir., WHMI | Mike W. Anderson<br>Natl. WL Bio., NHQ | Billy Teels<br>Dir., WSI |
| Hydrologist | Gary Conaway<br>WCC, OR | Don Woodward<br>NHQ | Paul Rodrique<br>WSI, MS |
| Program Specialist | Bruce Julian<br>NHQ | Gary Wooten<br>NHQ | Vic Cole<br>NHQ |
| Soil Scientist | Nathan McCaleb<br>SSS, NE | Russ Pringle<br>WSI, LA | Mike Whited<br>WSI, MA |

Appendix 3 - 1

# NATURAL RESOURCES CONSERVATION SERVICE (NRCS) MAPPING CONVENTIONS FOR DETERMINING WETLANDS AND POTENTIAL WETLANDS IN SOUTH DAKOTA AND NORTH DAKOTA

For the Food Security Act of 1985, as amended by the Food, Agriculture, Conservation, and Trade Act of 1990 and the Federal Agriculture Improvement and Reform Act of 1996.

We, the undersigned, hereby adopt this document as the technical basis for the identification of wetlands and potential wetlands by the NRCS.

_____     4/1/11
South Dakota Natural Resources Conservation Service     Date

_____     3/24/11
North Dakota Natural Resources Conservation Service     Date

_____     3-31-11
South Dakota United States Fish and Wildlife Service     Date

_____     3/24/11
North Dakota United States Fish and Wildlife Service     Date

## INTRODUCTION

The intent of this document is to outline the procedure that the Natural Resources Conservation Service (NRCS) could use to identify wetlands when adequate information currently exists for a site(s) and will use to identify potential wetlands when additional field information is necessary for portions and/or all of the project area. These mapping conventions are separate from, but must be used in conjunction with, the National Food Security Act Manual (NFSAM) and the approved onsite procedures document(s). The approved onsite procedures document(s) are based on the most current versions of the NFSAM, the 1987 United States Army Corps of Engineers (USACE) Wetland Delineation Manual, Technical Report Y-87-1 ('87 Manual), and/or USACE Regional Supplements.

The mapping convention signatory agencies have reached consensus on the mapping convention procedure. These mapping conventions take into account the regional, state, and local wetland characteristics unique to North Dakota (ND) and South Dakota (SD). This document adheres to regulations and policies in effect as of the date of this document but may be subject to change. If changes are proposed to the mapping conventions the changes must first receive the concurrence of the signatory agencies before their adoption by the SD and ND NRCS. If such modifications are necessitated by a change in statute, regulation, and/or national policy the signatory agencies will review the external changes and concur on any needed changes to the mapping convention procedure necessary to bring the procedure in line with statute, regulation, and/or national policy.

Persons identifying potential wetlands and conducting wetland determinations must have the appropriate "Wetland Job Approval Authority(s)" delegated and documented in accordance with current NRCS policy (Section III of the state Technical Guide). The NRCS decision-maker is reminded that size of an area is not part of the wetland criteria therefore, areas large enough to display evidence of potential wetlands on inventory tools and/or that are noted in the field will be considered.

There are two unique and distinct decisions required of the NRCS wetland decision-makers. First, a decision must be rendered regarding the presence or absence of a wetland. Second, a decision must be rendered regarding the appropriate NFSAM wetland label, based on the eligibility of the site to exemptions provided in the 1985 Food Security Act (the "Act"), as amended, and the Code of Federal Regulations (CFR). Exemptions can be full (i.e., Non-Wetland, Prior Converted Cropland, Artificial Wetland) or with conditions (i.e., Farmed Wetland, Farmed Wetland Pasture). Refer to the CFR and the NFSAM for specific definitions.

## PROCEDURE

The following section outlines the steps the SD and ND NRCS will use to determine if adequate information currently exists for a site(s) and when onsite inspection may be necessary for a site(s). Identified sites are called "potential wetlands" in this procedure until the user determines if an on-site inspection is necessary (e.g. identifies if adequate information is not currently available for the site or if the site meets any of the conditions in Step 4. *If adequate information is currently available then "potential wetlands" will either be wetland or nonwetland (see step 4).*

Step 1: Preplanning and Remote Sensing
Step 2: Selection of the Determination Method
Step 3: Determine if Normal Circumstances Exists
Step 4: Determining if Adequate Information Exists
Step 5: Determine the Predominance of Hydric Soils
Step 6: Determination of the Prevalence of Hydrophytic Vegetation
Step 7: Determination of Wetland Hydrology
Step 8: Making a Wetland Determination
Step 9: Wetland Delineation

2

**Step 1: Preplanning and Remote Sensing**
To complete this step, the reviewer may choose to begin with one or more resources noted below to maximize the information on the location of potential wetlands. The NRCS policy, manual, and regulations do not limit the resources used.

**ACTION:**

A. Review the soil survey and the state Technical Guide county hydric soils list to identify areas that may be potential wetlands. Identify listed hydric soil map units, map units with hydric soils as part of their name, or soils with hydric inclusions, and map units with conventional wetland symbols as evidence of potential wetlands.

B. Review the NRCS wetland inventory maps and official determinations, if available, to identify previously mapped wetlands as evidence of a potential wetland.

C. Review the National Wetland Inventory (NWI) maps to identify previously mapped wetlands as evidence of potential wetlands.

D. Based on knowledge of local conditions, review the appropriate Farm Service Agency (FSA) slide or slides selected from all available slides (regardless of annual precipitation), to identify evidence of potential wetlands. Any of the following signatures present on one or more slides would be considered as evidence of potential wetlands:
   - Hydrophytic vegetation
   - Surface water
   - Saturated conditions
   - Flooded or drowned-out crops
   - Stressed crops due to wetness
   - Differences in vegetation due to different planting dates
   - Inclusion of wet areas as set-aside or idled
   - Circular or irregular areas of unharvested crops within a harvested field
   - Isolated areas that are not farmed with the rest of the field
   - Areas of greener vegetation (especially during dry years)

E. Review all other inventory tools (where available) for evidence of potential wetlands.

F. Review the United States Geological Survey (USGS) NED 1/9 Arc Second LIDAR data if available for your county. This data provides 0.5-, 1-, 5-foot contours that may assist delineators in identifying manipulations and potential wetland geomorphic position.

➢ Proceed to the next step.

**Step 2: Selection of the Determination Method**
**ACTION:** Choose either Option A or Option B.
   ➢ Option A – Conduct onsite determination with offsite tool review.
      ○ Identify potential wetlands from Step 1 then review 1986 and prior year aerial photography and existing case file scope and effect documentation to determine if any manipulation occurred prior to December 23, 1985. Document findings and proceed to Step 5.

   ➢ Option B – Potentially conduct offsite determination. Proceed to Step 3.

3

**Step 3: Determine if *Normal Circumstances Exist***
**ACTION:** Review the 1986 and prior year slides to determine if any manipulation occurred prior to December 23, 1985. Review existing case file scope and effect documentation.

➢ If *normal circumstances* remain, then proceed to Step 4.
➢ If the site has been disturbed such that *normal circumstances* do not exist, then you must go onsite. A comparison reference site may be used. The use of a reference site can be made in the field either after or during the site visit. Proceed to Step 5.

**Step 4: Determining if Adequate Information Exists**
**ACTION:** Determine if the site is a pothole or playa, follow the flow chart below and document the findings. A site field visit **is not** required if the site **meets the "offsite"** conditions; however, a site field visit is always an **option** to the wetland delineator. A field visit is required for any sites that are **appealed** or if a site **does not meet "offsite"** conditions.

➢ If all sites are determined to have adequate information and meet the offsite conditions then proceed to Step 8, otherwise proceed to Step 5 for potential wetlands not meeting offsite conditions.



**Step 5: Determine the Predominance of Hydric Soils**
**ACTION:** Refer to the approved onsite procedures document(s).
  - If the site meets the hydric soils requirements, then document the findings (per form instructions). Proceed to Step 6.
  - If the site fails to meet the hydric soil requirements, the area is not a wetland. No further investigation is required. Document the findings (per form instructions). Proceed to Step 8.

**Step 6: Determination of the Prevalence of Hydrophytic Vegetation**
**ACTION:** Refer to the approved onsite procedures document(s).
  - If the site meets the hydrophytic vegetation requirement, then the vegetation is hydrophytic. Document the findings (per form instructions) and proceed to Step 7.
  - If the site fails all of the hydrophytic vegetation tests, then hydrophytic vegetation is absent. Document the findings (per form instructions). Proceed to the Step 8.

**Step 7: Determination of Wetland Hydrology**
**ACTION:** Refer to the approved onsite procedures document(s).
  - If the site meets the wetland hydrology requirements, then document the findings (per form instructions) and proceed to the Step 8.
  - If the site fails the wetland hydrology requirements, then wetland hydrology is absent. Document the findings (per form instructions). Proceed to Step 8.

**Step 8: Making a Wetland Determination**
**ACTION:** Sites determined to be a wetland will be assigned the appropriate wetland label as determined by any applicable exemptions found in the current version of the NFSAM.
  - Additional analysis (i.e., duration of ponding or saturation, cropping history, if production is possible) might be required to determine the appropriate label. Refer to 7 CFR, Part 12; Section 12.5 (b), *Wetland Exemptions*, and Parts 514.10 through 514.60 of the NFSAM (current edition), for further guidance assigning FSA wetland labels.
  - Verify and document the scope and effect for all manipulated sites.
  - If the site is a potential converted wetland then also conduct a minimal effect analysis prior to labeling the site CW or CW + year.
  - Proceed to next Action or to Step 9.

*The following two Step 8 actions apply only to SD NRCS.*

**ACTION:** Large rangeland tracts, or portions thereof, that are not inventoried (NI) for potential wetlands will be outlined and labeled with an "NI." Proceed to next Action.

**ACTION:** Determine if indicators of potential waters of the United States (U.S.) exist on your determination area. The indicators of potential waters of the U.S. are:
  - Open water, dry lake/pond beds, or mud flats on photos.
  - Drainage patterns evident on available inventory tools.
  - Blue lines or similar designations on USGS topographic maps and other maps.
  - Features on maps labeled as stream, lake, river, creek, gulch, arroyo, etc.
  - Potential waters of the U.S. should be labeled "NI." Verify in the field if the NI channel has adjacent associated wetlands and map accordingly (e.g., NI/W, NI/PC).
  - Proceed to Step 9.

**Step 9: Wetland Delineation**
**ACTION:** Refer to the procedures found in the NFSAM and approved onsite procedures document(s) to complete the wetland map and Highly Erodible Land and Wetland Conservation Determination (NRCS-CPA-026E).

5

# Wetland Compliance Talking Points

**Listening Sessions**
**Summer 2014**

**1.    What procedures does NRCS use to make certified wetland determinations?**

The NRCS uses the U. S. Army Corps of Engineers (Corps) wetland delineation procedures (1987 Manual and Regional Supplements) when making wetland determinations under the WCC provisions. The Corps procedures contain both onsite and offsite wetland identification methods. In 2010 NRCS established various exceptions to the Corps procedures due to unique WCC statutory and regulatory requirements. These exceptions and further guidance are detailed in the "NRCS Food Security Act Wetland Identification Procedures" (FSA Procedures), issued as Circular 6 to the National Food Security Act Manual, Part 527, Appendix. NRCS staff can consult four different sources of information when making a decision whether an area would, under normal circumstances, meet the Food Security Act definition of a wetland, including;

- Food Security Act Procedures,
  - States may supplement the FSA Procedures by developing State Off-Site Methods
- 1987 Corps of Engineers Wetland Delineation Manual,
- Regional Supplements to the Corp Manual,
- National Food Security Act Manual

**2.    Why does NRCS use the Corps procedures to conduct wetland determinations?**

The Corps procedures have been developed through a rigorous technical review and testing process. Although the wetlands they have been designed to identify (Clean Water Act Wetlands) are different than USDA wetland compliance wetlands, the principles behind the Corps procedures are technically sound – the identification of sampling units and the testing for each of the three wetland factors for each sampling unit.

**3.    What is a State Offsite Method?**

A State Offsite Method (SOSM) is a procedure for making wetland determinations using offsite resources. These methods utilize principles identified in the Army Corps methods for the identification of wetlands using offsite resources. The NRCS technical specialist responsible for making a wetland determination is only required to make an on-site determination when they determine that insufficient off-site information exists to make an accurate determination. In addition NRCS staff are required to conduct an onsite visit or investigation when:

1) a producer appeals an offsite wetland determination and/or;
2) prior to NRCS making a determination of ineligibility for USDA program benefits based upon a violation of the W wetland conservation provisions.

For most agriculture cropland sites, NRCS will utilize an offsite procedure to identify wetlands. These determinations are made using methods developed at the State level based upon references and information available within that State. Each State defines their procedures in a SOSM document which is posted for public information in their State's Field Office Technical Guide (FOTG). The development process also includes a review by each states State Technical Committee w following a notice and comment period in the Federal Register. NRCS is planning on posting SOSM's for the Prairie Pothole states of MN, SD, ND and IA for notice and comment in the Federal Register in later this summer. Other States will be posting SOSM's for notice and comment in the near future.

**4.    Explain the NRCS wetland determination process**

NRCS procedures for making a wetland determination follow a basic three-step process:

1

Step 1    Wetland Identification.  In the first step of a wetland determination, NRCS must decide whether the site meets the 1985 Act's definition of a wetland "under normal circumstances." Normal circumstances are those conditions (vegetation, soil, and hydrologic conditions) that would occur in the absence of any post-1985 drainage actions, without regard to whether the vegetation has been removed or significantly altered, and during the wet portion of the growing season under normal climatic conditions.

Step 2 – Determination of Food Security Act Exemptions/Labels.  In this step the agency technical specialist takes the wetland/non-wetland "Base Map" produced from Step 1 (wetland identification) and labels each of the areas based on Food Security Act exemptions.  Each exemption has specific "conditions," many of which tie back to the date of enactment of its various provisions, December 23, 1985, and November 29, 1990.

Step 3 – Determination of Size.  Size of the wetland/non-wetland areas and the areas meeting FSA exemptions is determined.

**5.     How does this affect the 2014 Farm Bill compliance changes for Crop Insurance?**
Changing a state's offsite procedure doesn't have an effect on the changes recoupling conservation compliance to crop insurance premium support benefits.

**6.     What's the time table for changes?**
- Crop insurance and compliance: The Interim Final Rule, containing the 2014 Farm Bill provisions linking crop insurance to compliance and providing flexibility for mitigation banking has a planned publishing date of November 2014.
- Changing State Offsite Methods:  The provisions which involve changing the agency's wetland determination procedures will be reviewed by each sate at a future State Technical Committee Meeting, and published as a Federal Register Notice seeking public comment later this summer.

**7.     What options are available for wetland mitigation?**
The WCC provisions provide producers with a wetland mitigation option to remain in compliance or regain compliance when they convert or plan to convert a wetland.  The mitigation provision essentially allows producers to replace a converted or planned converted wetland and its associated functions and values through the restoration of a previously converted wetland, the enhancement of an existing wetland, or the creation of a new wetland. Wetland mitigation banks have been developed as a tool to assist producers meet wetland mitigation requirements under various legal requirements.  However, these banks have been developed largely for non-agricultural conversions, and significant limitations exist that prevent mitigation of agricultural wetlands using mitigation banks from being a viable option for producers wishing to comply with the WCC provisions.

The 2014 Farm Bill revised language specifying that USDA hold the easement on mitigated acres for mitigation banks.  Removing this provision should help streamline the mitigation process.  In addition NRCS will take several actions to proactively promote the development and use of agricultural wetland mitigation banks, utilizing dedicated funding provided for in the 2014 Farm Bill.  Procedures will also be considered to streamline the agricultural wetland mitigation process.

**8.     How will NRCS implement the new Farm Bill provisions for wetland mitigation banking?**
The Agricultural Act of 2014 provides $10,000,000 for NRCS to operate or work with third parties to pilot the establishment of wetland mitigation banks to assist producers with complying with the WCC provisions, while mitigating lost wetland functions and values.  The statute language also waives the requirement that USDA hold the easement for land in a mitigation bank.  USDA is currently assessing

2

## INTRODUCTION

This document outlines the procedures and methods the Natural Resources Conservation Service (NRCS) will use in Minnesota to conduct off-site wetland determinations for FSA purposes. These method supplement the offsite methodology found in the Corps of Engineers Wetlands Delineation Manual and approved Regional Supplements to that manual. These methods replace the Minnesota Wetland Mapping Conventions of August, 1994.

All pertinent information shall be reviewed before determining that a site is or is not a wetland. Decisions and the supporting material will be documented according to the requirements of these offsite methods. Size of an area is not part of the wetland criteria. Therefore, sites large enough to detect will be considered.

NRCS personnel conducting certified wetland determinations must have appropriate Wetland Job Approval Authority as documented in the Field Office Technical Guide (eFOTG), Section III.

Non-agency personnel and/or private consultants may collect and submit to NRCS both onsite and offsite data for consideration in a determination. Qualified NRCS personnel will review all submissions for technical adequacy and completeness. Only designated NRCS personnel will issue a certified wetland determination via the NRCS-CPA-026E.

## PROCEDURE

This section outlines the steps to be used in Minnesota to complete a wetland determination using off-site methods and when on-site inspection may be necessary for a site(s). Identified sites are called <u>potential</u> wetlands in this procedure until the user determines if the preponderance of evidence supports an off-site determination.

       Step 1. Inventory and Remote Sensing
       Step 2. Complete Aerial Imagery Review and Analysis
       Step 3. Determine if a Field Visit is Required per NFSAM Policy
       Step 4. On-Site Determination of Soils/Vegetation/Hydrology
       Step 5. Making a Wetland Determination
       Step 6. Wetland Delineation

### Step 1. Inventory and Remote Sensing:

The reviewer may use any or all of the actions below to maximize the information on the <u>potential</u> wetland(s). The NRCS policy, manual, and regulations do not limit the resources used.

A. Review the soil survey and the State Technical Guide county hydric soils list to identify areas that may be potential wetlands. Identify listed hydric soil map units, map units with hydric soils as part of their name, or soils with hydric inclusions, and map units with conventional wetland symbols as evidence of potential wetlands.

B. Review the NRCS wetland inventory maps and official determinations, if available, to identify previously mapped wetlands as potential wetlands.

October 2011                                                                                                1

011736

State Offsite Methods and Mitigation Listening Session
July 28, 2014
Ankeny, Iowa

Jay Mar, State Conservationist, opened the listening session with an outline for today's session. He told the participants that the note cards were for their comments. If they didn't have a chance to speak, there were baskets at the back labeled with the two different topics and they were to place their comment in the appropriate basket. Jay told the participants that even if they did speak that it would be a good idea to still write their comments down and place them in the basket. With doing that we would be able to really capture what they are thinking.

Jay mentioned that the Chief for NRCS really wants input from the states. There are quite a few questions about the new Farm Bill and about wetland compliance. What I really want you folks to know is that we are going to be speaking about two topical areas. One is what you call the State Offsite Methods (SOSM) for wetland determinations. It is utilizing all the aerial photography and aerial digital to help us to be more efficient and consistent in terms of identifying the wetlands.

Mr. Paul Flynn, NRCS Wetland Compliance Program Manager, will be covering both the SOSM and Mitigation Banking. He will talk first about a little about SOSM, you will get your chance to learn about it, and then at the very end it will be open for comments. Then when Paul has done his best in covering your comments he will move on to the next subject of Mitigation banking. Again, at the very end of that presentation will be your chance to make your comments. We will be capturing all your comments. Paul will then close the session, drop off your cards, and he will then take all this information back to Chief Weller. Paul will inform me as to what will happen next.

With that being said I'm going to welcome Mr. Paul Flynn. If you have any questions that I may be able to answer when the comment time comes, I have members of my staff here and we will do our best to answer your questions. But if you will, please remember that this is for comments.

Good afternoon everyone and thank you for your participant today. As Jay indicated that this is a listening session today and we are basically looking at a couple very specific topics that we would like to cover under our wetland compliance provisions.

Topics today are Sate Offsite Methods. Then I'm going to give a quick demonstration on how we apply the offsite methods. State Offsite Methods meaning that we are identifying wetlands from the office, showing you how we do that. At that time we will take a break and let you comment on what you have seen, pro or con or anything in between. Then we will go on and discuss new provisions, new opportunities that we have related to Wetland Mitigation Banking.

We have a few wetland background slides related to wetland compliance. Wetland compliance came into existence in the summer of 1985 when Congress passed the 1985 Farm Bill. Since 1985, Congress has passed the Farm Bill in 1990, 1996, 2002, 2008, and as recently as February 2014. And, each time they have reauthorized the Farm Bill. Congress had to reauthorize conservation compliance. So with conservation compliance provisions dating back to 1985 we are approaching 30 years of history when it comes to compliance.

So when it comes to wetland compliance, it is the agency's responsibility to identify wetlands. Recently, National Office sent out a directive to all states to look at the procedures that they use to determine wetlands from the office and to review and evaluate those procedures in making a determination if those need to be updated.

The offsite procedures currently used in Iowa date back to the late 1990s. Iowa is one of the states that are looking at redoing their offsite methods.

I have done a little research over the last couple of months. The offsite process that we use to determine wetlands has been used in some form or fashion since the late 1980s. I found a technical publication from our Tech Center, at that time was in Lincoln, Nebraska, where the prairie pothole states had identified offsite methods for wetland identification that dates back to 1988. So we are not talking about something that we haven't done in the past.

Even though this is a National updating of wetland procedures, we are out in the Prairie Pothole Region this week doing listening sessions specifically involving wetland because wetlands in the Prairie Pothole have been in recent history a fairly contentious issue. A lot of that is because of the changes that we have seen in agriculture throughout the Prairie Pothole region. The Prairie Pothole region is this region right here, basically from Canada, northern North Dakota all the way down to what we call the Des Moines Lobe (eastern North Dakota, eastern South Dakota, western Minnesota, and northern Iowa.)



011974

# Part 512 - Wetland Conservation

## Subpart A - General

512.00  Requirements of the law.
512.01  Definitions.
512.02  Wetland determinations.
512.03  Technical changes.
512.04  Wetland certification.
512.05  Periodic reviews and updates of wetland delineations.

## Subpart B - Wetland Criteria

512.10  Wetland criteria.
512.11  Hydric soil criteria.
512.12  Criteria for wetland hydrology.
512.13  Prevalence of hydrophytic vegetation.
512.14  Criteria for identifying converted wetland (CW) after
          December 23, 1985.
512.15  Criteria for identifying prior converted croplands (PC)
          converted prior to December 23, 1985.
512.16  Criteria for identifying converted wetlands (CW+year)
          after November 28, 1990.
512.17  Criteria for converted wetlands for non-agricultural
          purposes  (CWNA).
512.18  Criteria for Converted Wetland Technical Error (CWTE)
512.19  Criteria for abandonment.

## Subpart C - Wetland Exemptions, Mitigation, Restoration, and Replacement

512.20  Wetland exemptions determined by SCS.
512.21  Minimal effect determination (MW).
512.22.  Mitigation (MIW).
512.23  Restoration on wetlands converted after November 28, 1990
          that are not in good faith ("RVW+year").
512.24  Restoration on wetlands converted between
          December 23, 1985 and November 28, 1990 (RSW).
512.25  Replacement of wetland values (RPW).
512.26  Good Faith Exemptions (GFW+year).
512.27  Restoration plans.
512.28  Wetland exemptions determined by ASCS.

(180-V-NFSAM, Second Ed., Amend. 6, May 1991)

Part 512 - Wetland Conservation

512.02(g)(2)

The STC will ensure that quality control reviews of wetland determinations are made in accordance with 510.70 for each field office before wetland determinations are sent to producers.

(h)  Appeal rights.  Inform the person who signed the AD-1026 that the person has 45 days to appeal the determination.

(i)  Correcting determinations.  If information is obtained by SCS from outside sources (other agencies, organizations, or private individuals) or from internal reviews (quality control or appeals) that indicate that wetland determinations were incorrect, conduct a review to determine if applicable policy and procedures were followed. Determinations are subject to review and revision if SCS policy and procedures were not followed.

(1)  Consider the following factors to determine if SCS policies and procedures were followed:
- Were the tools adequate?
- Were all available tools used?
- Were approved mapping conventions used?
- Did the inventories (if used) and determination process have appropriate prior approval?
- Were determinations made for entire fields?
- If the same tools and mapping conventions used for the initial determination were applied, would the determination be the same?

(2)  If the answer to all of the above questions is yes, SCS will correct the determination if needed, and revisions to final wetland determinations on other tracts are not necessary.  If not, then a revision must be made of the subject tract and other tracts in the area must be reviewed.  The revised wetland determination becomes effective when the new decision is made.  The producer may appeal the portion of the determination that has been revised.

(j)  Required training.  Only SCS employees who have completed approved wetland training may make wetland determinations.  Each state conservationist will maintain a list of employees who are qualified to make wetland determinations.

(k)  Consultation with FWS.  SCS will consult with the Fish & Wildlife Service (FWS) on development of wetland mapping conventions, and will involve FWS in quality control procedures to ensure accuracy of wetland identification at the state, regional, and national levels. Allow FWS to participate on wetland inventory teams

Part 512 - Wetland Conservation

512.05

(512.05  Periodic reviews and updates of wetland delineations.

Periodic reviews will be made of wetlands to correct delineations, and
to reflect conditions that might have changed since the last
delineation, such as abandonment or conversions.  NHQ will provide
additional guidance on conducting periodic reviews.

512-8


# Rules and Regulations

Federal Register

Vol. 85, No. 168

Friday, August 28, 2020

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents.

## NATIONAL LABOR RELATIONS BOARD

### 5 CFR Part 7101

**RIN 3209–AA57**

### Supplemental Standards of Ethical Conduct for Employees of the National Labor Relations Board; Correction

**AGENCY:** National Labor Relations Board.

**ACTION:** Final rule; correction.

**SUMMARY:** The National Labor Relations Board ("NLRB" or "Board"), with the concurrence of the U.S. Office of Government Ethics (OGE), is correcting a final rule that appeared in the **Federal Register** on July 20, 2020. This final procedural rule amends the Supplemental Standards of Ethical Conduct for Employees of the National Labor Relations Board (NLRB Supplemental Ethics Regulations) to eliminate an out-of-date and unnecessary reference to the identity of its Designated Agency Ethics Official (DAEO) and Alternate Designated Agency Ethics Official (ADAEO) from its regulations.

**DATES:** Effective August 28, 2020.

**FOR FURTHER INFORMATION CONTACT:** Roxanne Rothschild, Executive Secretary, National Labor Relations Board, 1015 Half Street SE, Washington, DC 20570–0001, (202) 273–1940 (this is not a toll-free number), 1–866–315–6572 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:** In FR Doc. 2020–14544 appearing on page 43681 in the **Federal Register** of Monday, July 20, 2020, the following correction is made:

**§7101.101 [Amended]**

■ 1. Amend newly redesignated §7101.101(b) by removing the words "Agency designees" and adding in their place "Agency designee."

Dated: July 28, 2020.

**Roxanne L. Rothschild,**

*Executive Secretary, National Labor Relations Board.*

[FR Doc. 2020–16666 Filed 8–27–20; 8:45 am]

**BILLING CODE 7545–01–P**

## DEPARTMENT OF AGRICULTURE

### Office of the Secretary

### 7 CFR Part 12

**[Docket ID NRCS–2018–0010]**

**RIN 0578–AA65**

### Highly Erodible Land and Wetland Conservation

**AGENCY:** Office of the Secretary, USDA.

**ACTION:** Final rule.

**SUMMARY:** The United States Department of Agriculture (USDA) is issuing a final rule for the Highly Erodible Land and Wetland Conservation provisions of the Food Security Act of 1985, as amended (the 1985 Farm Bill). USDA published an interim rule, with request for comments, on December 7, 2018, to clarify how USDA delineates, determines, and certifies wetlands located on subject land in a manner sufficient for making determinations of ineligibility for certain USDA program benefits. USDA received comments from 65 commenters who provided 354 comments in response to the interim rule. Additionally, one of the 65 comments was submitted by an organization that submitted a spreadsheet of 15,094 substantially identical comments. This rule makes permanent many of the changes made in the interim rule, responds to comments received, and makes further adjustments in response to some of the comments received.

**DATES:** This rule is effective August 28, 2020.

**FOR FURTHER INFORMATION CONTACT:** For specific questions about this rulemaking, please contact Jason Outlaw, (202) 720–7838, or by email at *jason.outlaw@usda.gov.* Persons with disabilities who require alternative means for communication should contact the USDA Target Center at (202) 720–2600 (voice).

**SUPPLEMENTARY INFORMATION:**

### Background

Title XII of the 1985 Farm Bill, encourages participants in USDA programs to adopt land management and conservation measures by linking eligibility for USDA program benefits to farming practices on highly erodible land and wetlands. In particular, the highly erodible land conservation (HELC) provisions of the 1985 Farm Bill provide that after December 23, 1985, a program participant is ineligible for certain USDA program benefits for the production of an agricultural commodity on a field in which highly erodible land is predominant, unless such production is in compliance with an approved conservation system. Additionally, the wetland conservation (WC) provisions of the 1985 Farm Bill provide that after December 23, 1985, a program participant is ineligible for certain USDA program benefits for the production of an agricultural commodity on a converted wetland, or after November 28, 1990, for the conversion of a wetland that makes the production of an agriculture commodity possible, unless an exemption applies. The Agricultural Act of 2014 amended the 1985 Farm Bill to expand the HELC/ WC requirements to encompass crop insurance benefits, and thus, USDA program participants obtaining Federally reinsured crop insurance must be in compliance with an Natural Resources Conservation Service (NRCS)- approved conservation plan for all highly erodible land; not plant or produce an agricultural commodity on a wetland converted after February 7, 2014; and not have converted a wetland after February 7, 2014, to make possible the production of an agricultural commodity. The 1985 Farm Bill, however, affords relief to program participants who meet certain conditions identified under the 1985 Farm Bill by exempting certain actions from the ineligibility provisions. The USDA regulations implementing the HELC and WC provisions of the 1985 Farm Bill are found at 7 CFR part 12.

On December 7, 2018, USDA published in the **Federal Register** (83 FR 63046–63052) an interim rule that amended 7 CFR part 12 to provide transparency to USDA program participants and stakeholders concerning how USDA delineates, determines, and certifies wetlands. The interim rule also provided information

to program participants to better understand whether their actions may result in ineligibility for USDA program benefits. The interim rule made the following changes to 7 CFR part 12:

• Added definitions, for "Best drained condition," "Normal climatic conditions," "Playa," "Pocosin," "Pothole," and "Wetland hydrology;"

• Revised the definition for "Wetland determination" with respect to farmed wetland, farmed wetland pasture, and prior-converted cropland (PC);

• Revised the provision related to potentially highly erodible land to encompass the use of light detection and ranging (LiDAR) or other elevation data of an adequate resolution to make slope length and steepness measurements;

• Identified that if a person disagrees with an offsite determination on potentially highly erodible soils, NRCS would make an onsite determination;

• Clarified that wetland determinations will be done on a field or sub-field basis;

• Confirmed that wetland determinations made after November 28, 1990, and before July 3, 1996, are certified wetland determinations if the determination was issued on the June 1991 version of Forms NRCS–CPA–026 or SCS–CPA–026, the person was notified that the determination had been certified, and that the map document was of sufficient quality to determine ineligibility for program benefits;

• Identified that in order for a wetland determination map to be of sufficient quality to determine ineligibility for program benefits, the map document must be legible to the extent that areas that are determined wetland can be discerned in relation to other ground features;

• Clarified that:

○ The wetland determination process includes three distinct steps,

○ Wetland hydrology consists of inundation or saturation by surface or ground water during a growing season at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation,

○ When a wetland is affected by drainage manipulations that occurred prior to December 23, 1985, wetland hydrology will be identified on the basis of the best drained condition resulting from such drainage manipulations, and

○ Wetland hydrology determination will be made in accordance with the current Federal wetland delineation methodology in use by NRCS at the time of the determination; and when making a decision on wetland hydrology, NRCS will utilize a fixed precipitation date range of 1971 through 2000 for

determining normal climatic conditions; and

• Identified that minimal effect determinations will be based upon a functional assessment of functions and values of the subject wetland through an onsite evaluation and that an assessment of related wetlands in the area may be made based on an onsite evaluation or through a general knowledge of wetland conditions in the area.

**Summary of Public Comments**

The interim rule had a 60-day comment period ending February 6, 2019. USDA received 65 timely responses to the rule. Additionally, one organization submitted 15,094 substantively identical responses which were also considered.

USDA received some comments that were either not relevant to the interim rule or lacked a direct connection to any specific component of the interim rule. Some of these comments cited the various benefits of wetlands. Others cited the benefits to humanity of increased drainage. Several alleged a lack of due process. Some wanted the Fourth Amendment to the U.S. Constitution to apply to onsite wetlands determinations. A few comments suggested specific testing criteria and alleged that NRCS carried an evidentiary burden. USDA also received comments that expressed support for the interim rule in general and comments that expressed a general lack of support for the interim rule.

USDA also received comment that provided the commenters' understanding about the history of the WC provisions, representations about Congressional intent, the nature of NRCS implementation of the WC provisions, and an overview of the purposes of particular Federal legislation, including the Administrative Procedure Act (APA), the Endangered Species Act (ESA), and the National Environmental Policy Act (NEPA). USDA does not respond to the commenters' characterization of these Federal statutes or representations about NRCS intent as far as its past implementation efforts, but has responded to comment where appropriate when this legal framework and prior NRCS implementation relates to the interim rule or this final rule.

USDA appreciates the level of public interest that comes with wetlands. They are an important resource. NRCS follows the appropriate process for issuing rules consistent with statutory language in section 1246 of the 1985 Farm Bill. Onsite wetland determinations and aerial imagery do

not constitute an unreasonable search or seizure. Wetland determinations conducted for eligibility in voluntary USDA programs is not a part of a criminal law proceeding. A USDA program participant or applicant consents to the review of his or her land for HELC/WC purposes by applying for assistance from USDA. USDA appreciates the comments in support of the interim rule. For any comments that lacked a direct application to the interim rule and were not addressed in this preamble, USDA appreciates the consideration with which such comments were developed and provided, and, to the extent practicable, will consider those comments in the development of future rulemakings or applicable policies.

In this preamble, the comments have been organized alphabetically by topic. The topics include:

• Abandonment;
• APA;
• Appeals;
• Area of request for certified wetland determinations;
• Best drained condition;
• Certification map quality;
• Certification status of pre-1996 wetland determinations;
• Climate references in rulemaking;
• Commenced conversion;
• Definitions;
• Endangered Species Act consultation;
• Farmed under natural conditions;
• Mitigation;
• National Environmental Policy Act;
• Navigable Waters Protection Rule applicability;
• Normal climatic conditions;
• Offsite analysis of potentially highly erodible land;
• Offsite analysis of wetland minimal effect;
• Seasonal wetlands;
• Setback distances; and
• Wetland hydrology indicators.

The topics that generated the greatest response include the certification status of wetland determinations between 1990 through 1996, wetland hydrology indicators, normal climatic conditions, and the offsite analysis of wetland minimal effect. This final rule responds to comments received during the public comment period and incorporates changes, as determined appropriate by USDA.

**Abandonment of Farmed Wetland and Farmed Wetland Pasture**

*Comment:* USDA received comment expressing concern that a person has a right to maintain hydrologic conditions on farmed wetland and farmed wetland pasture that was converted to crop

production prior to the 1985 Farm Bill, regardless of abandonment.

*Response:* No changes were made in the interim rule with respect to abandonment of farmed wetlands and farmed wetland pasture (7 CFR 12.33(c)). Abandonment applies to farmed wetland and farmed-wetland pasture when wetland conditions return after December 23, 1985, unless certain conditions are met. This is a part of long-standing policy and regulation. USDA also affirms that USDA program participants may continue to farm farmed wetlands and farmed wetland pasture under natural conditions without risk of losing their eligibility for USDA program benefits, as long as additional hydrological manipulations do not occur.

## Administrative Procedure Act (APA)

*Comment:* USDA received comment related to the applicability of the APA to USDA implementation of the highly erodible land and wetland conservation provisions.

*Response:* USDA is not required by any statute to promulgate 7 CFR part 12 pursuant to notice and comment rulemaking under the APA. Section 1246 of the Food Security Act of 1985, as amended by the Agricultural Act of 2014, specified that the promulgation of regulations and administration of programs under this title shall be made as an interim rule effective on publication with an opportunity for notice and comment. The APA requirements for notice and comment, 5 U.S.C. 553, do not apply to a matter relating to public property, loans, grants, benefits, or contracts (5 U.S.C. 553(a)(2)). The matters identified in the December 2018 interim rule relate to USDA program grants and other benefits and thus notice and comment rulemaking under the APA even without the specific statutory exemption.

*Comment:* USDA received comment that wished to remind NRCS that NRCS must respond in a reasoned manner to comments that raise significant issue with rules, and that failure to do so would be arbitrary and capricious.

*Response:* USDA has reviewed the comment received to the interim rule, summarizes the significant comment, and responds to such herein.

## Appeals

*Comment:* USDA received comment concerned with which delineation methodology for wetland determinations would be used following a successful appeal. USDA also received comment that sought a right for taxpayers other than the USDA program

participants to have a right to appeal wetlands determinations by NRCS.

*Response:* As detailed in the NRCS appeal procedures at 7 CFR part 614, an initial certified wetland determination is issued as a preliminary technical determination which is made using the delineation methodology in place at the time it is issued. If the preliminary wetland determination is appealed, then it may remain unchanged or be revised by NRCS and issued as a final technical determination. If any changes are made between the preliminary and final technical determinations, the original delineation methodology is used even if procedures have changed. However, if the final technical determination is appealed to the USDA National Appeals Division and is remanded to NRCS due to agency error, a new preliminary determination would be conducted following the current delineation methodology (assuming any changes in methodology had occurred). The same principle would apply to any wetland determination remanded to NRCS through Federal court proceedings.

With respect to taxpayer appeals, taxpayers (aside from the affected producer) are not party to wetland determinations. The entire framework of 7 CFR part 12 relates to the eligibility of persons to receive USDA program benefits. As such, there is no right set forth in either statute or case law for someone other than the affected person to challenge final agency action on an administrative decision such as a wetlands determination. The administrative appeal procedures are predicated upon review of an adverse decision that affects persons as USDA program participants, and taxpayers in general do not have standing for purposes of the appeal procedures.

## Area of Request for Certified Wetland Determinations

*Comment:* USDA received comment identifying that a USDA program participant should be able to request a certified wetland determination for their entire tract. Comment also raised concern that the interim rule implied that the reference to field/subfield meant that NRCS would apply this scope of a certified wetland determination retroactively.

*Response:* USDA confirms that a certified wetland determination may be conducted for an entire tract if requested to do so by the USDA program participant. The change in the interim rule of identifying that certified wetland determinations would be made on a field or subfield basis was made in order to remove the strict "whole tract" requirement. Due to limited resources,

NRCS has commonly prioritized certified wetland determination requests to those fields on which USDA program participants are planning to conduct, or have already conducted, land manipulations which may affect their eligibility, and this practice is expected to continue. USDA did not intend to imply that the scope of a certified wetland determination would be applied retroactively. Therefore, this final rule adds language to § 12.30(a)(3) to clarify that wetland determinations, delineations, and certifications may be done on a tract, field, or sub field basis, and has adjusted the language in § 12.30(c)(1) accordingly.

## Best Drained Condition

*Comment:* USDA received comment related to the definition and use of the term "best drained condition," including comments that expressed: General support for the definition; concerns that identification of the best drained condition be based on sound documentation; that the benefit of the doubt should be given to the USDA program participant; and concern that the interim rule preamble reference to abandonment contradicts the statutory interpretation that once land is identified as PC, it remains always as PC, "once PC, always PC." The comment further recommended that USDA clarify this principle and that under the rule that PC is no longer considered wetland.

*Response:* The interim rule introduced and defined the term "best drained condition" to provide clarity regarding a long-standing and practiced statutory concept that is fundamental to the identification of wetlands that experienced drainage manipulations prior to enactment of the 1985 Farm Bill, and to meet congressional intent to provide certainty to persons concerning the status of such land and its future use. This long-standing concept provides that a person has the statutory right to maintain those hydrologic conditions that existed on wetlands that were converted to crop production prior to the 1985 Farm Bill to the extent that those conditions existed on or before December 23, 1985, due to drainage in its "as-built" condition.

Regarding the identification of the best drained condition, NRCS makes this decision based upon the best available evidence, which can include remote resources such as historical aerial imagery or other evidence such as drainage records found in USDA records or provided by a USDA program participant.

Section 12.31(c) is clarified as to the limited instance when abandonment

occurred before and existed as of December 23, 1985; in such instance, NRCS will not consider best drained condition. NRCS will not identify wetland hydrology based on the best drained condition when a wetland supported woody vegetation such that production of an agricultural commodity was not possible on December 23, 1985. This is in keeping with the definitions of "prior-converted cropland" and "farmed wetland" established in the interim rule published on September 6, 1996, (61 FR 47019–47038), which specifies that PC and farmed wetland cannot support woody vegetation as of December 23, 1985. By excluding the consideration of best drained condition on such lands, section 12.31(c) ensures that they are properly identified as wetland in step one of the wetland identification process described at 7 CFR 12.30(c)(7), and thus outside the definition of either "prior-converted cropland" or "farmed wetland".

This final rulemaking is not intended to change past implementation of the "once PC, always PC" concept and provides a narrow scope to which abandonment applies to the consideration of best drained condition which is consistent with the September 6, 1996 interim rule and which was not affected by the December 2018 interim rule. NRCS understands the desire to simplify regulatory criteria utilizing short-hand language that seems to explain a concept more readily, such as "once PC, always PC". However, the statutory structure identifies particular actions that will either result in a person being determined ineligible for USDA program benefits or result in them being determined exempt from ineligibility. The regulation reflects this structure. However, NRCS can confirm that as long as land remains in agricultural use, lands identified as PC in an NRCS certified wetland determination will not be considered converted wetlands for purposes of determining program ineligibility under the WC provisions.

Regarding the concern that PC is no longer wetland, USDA agrees that this is the case in the majority of situations, but a blanket statement as such cannot be made. Even so, as the WC provisions do not impose ineligibility with respect to the use of PC, there is no reason for USDA to identify whether PC is any longer a wetland.

**Certification Status of Pre-1996 Wetland Determinations**

*Comment:* USDA received comment related to the certification status of wetland determinations conducted before July 3, 1996. These comments:

• Expressed concern over the quality of data used to make determinations before 1996 and that such determinations are thus inaccurate, and that any action to accept as certified any pre-1996 "inventory maps" was contrary to Congressional intent;

• Suggested that NRCS should deem pre-November 28, 1990 determinations as certified as well or consider criteria for which a determination conducted prior to 1990 could be considered certified;

• Expressed concern that the interim rule failed to provide clarity on the commenters' understanding of the impetus for the rulemaking, namely the status of pre-1996 "official" wetland determinations; and

• Expressed support for the interim rule on this issue. Several comments simply sought further clarification.

*Response:* As a reminder, this rulemaking is intended as a codification and clarification of existing practice rather than a substantive change of overall regulatory framework or policy with regard to the certification status of wetland determinations. The interim rule did not change the legal status of any certified wetland determination made between 1990 and 1996, nor does NRCS have discretion to change any previously issued certified wetland determinations except under the limited circumstances identified in the regulations.

Certification of wetland determinations was initiated in the Food Agriculture Conservation and Trade Act of 1990 (1990 Farm Bill), which made all determinations completed after the 1990 Farm Bill's enactment date that were provided with a certification statement by a USDA official and appeal rights certified as a matter of law. The 1990 Farm Bill defined certification by directing, upon providing notice to affected owners or operators, the Secretary shall certify each such map as sufficient for the purpose of making determinations of ineligibility for program benefits and shall provide an opportunity to appeal such delineations to the Secretary prior to making such certification final. Further, the conference report to accompany the 1990 Farm Bill provided that the Managers agree that the certification process is to provide farmers with certainty as to which of their lands are to be considered wetlands for purposes of Swampbuster. On April 23, 1991, USDA issued regulations implementing the changes to the WC provisions in the 1990 Farm Bill. Language on certification was contained in § 12.30(c) which stated, the wetland determination and wetland

delineation shall be certified as final by the SCS official 45 days after providing the person notice or, if appeal is filed with SCS, after a final appeal decision is made by SCS. Beginning in June 1991, certification was accomplished by completion of the SCS–CPA–026 form. This form required that the District Conservationist certify by signature that "I certify that the above determination is correct and adequate for use in determining eligibility for USDA program benefits . . ." and provided appeal rights on the back side of the "Person Copy" of the form.

The Federal Agriculture Improvement and Reform Act of 1996 (1996 Farm Bill) further clarified certification by, among other items, providing that a final certification . . . shall remain valid and in effect as long as the area is devoted to an agricultural use or until such time as the person affected by the certification requests review of the certification by the Secretary. In turn, these 1996 Farm Bill clarifications were codified in the September 6, 1996 interim rule in 7 CFR 12.30(c)(1). The 1996 interim rule specified that all wetland determinations made after July 3, 1996, will be done on a tract basis and will be considered certified wetland determinations. The 1996 interim rule also specified that determinations made prior to July 3, 1996 were subject to the regulations in place at the time of the determination, and the preamble emphasized that if NRCS certified a wetland determination prior to July 3, 1996, the certification will remain valid.

The language in the 2018 interim rule with respect to the certification status of pre-1996 wetland determinations simply clarified their status as it exists and has existed under the regulations in place at the time the wetland determinations were originally conducted and certified, irrespective of any hindsight determination as to the quality of data upon which those determinations were made. Unlike the assumption by commenters, one of the purposes of the interim rule was to correct misunderstandings regarding the certification status of pre-1996 wetland determinations and was not to change the legal status of wetland determinations conducted prior to 1996. Certified wetland determinations conducted today, as well as those that have been certified since 1990, are completed using the methods and data required at the time of issuance, and any subsequent judgement as to their sufficiency as certified wetland determinations solely based on these methods or data is not authorized under the applicable legal framework.

This principle applies even when the Soil Conservation Service (SCS) or NRCS issued a certified wetland determination which may have been supported by a "wetland inventory" prepared prior to 1996. The process for conducting wetland inventories began in the late 1980's as a means for USDA to better meet the workload demand and assure timely response to requests for wetland determinations and was only completed in some States. The primary sources of information used to develop wetland inventory maps were USDA soil survey and hydric soils lists, United States Fish and Wildlife Service (USFWS) National Wetland Inventory maps, United States Geological Survey Topographic maps, and aerial imagery. Following the 1990 Farm Bill amendments, when the SCS or later the NRCS received a wetland determination request, the agency would review wetland inventory maps, if available, for completeness and accuracy. The Agency could use a wetland inventory map as the basis for preparing a certified wetland determination, after adjusting the depiction of the presence of potential wetlands based on additional information such as a field visit, evidence provided by the farmer such as drainage records, and other information such as new aerial imagery or updated soil surveys. It is clear that Congress was aware of this process from the conference report to accompany the 1990 Farm Bill.

The Managers note that the current USDA wetland delineation process involves the use of substantial materials to make an initial determination in the field office, developed in consultation with other appropriate Federal and State agencies. Wetlands identified in this process are delineated on maps which are then mailed to producers for review. If the producer finds such map to be in error, and the USDA agrees that an error has been made, then the map is corrected. If the USDA does not agree that there is an error in the map, and the producer continues to believe so, then the producer may appeal such determination. The Managers find that this process is adequate for certification of any new maps delineated after the date of enactment of this Act.

Rather than rejecting this process in 1996, Congress confirmed that a producer could rely upon prior certified determinations regardless if they were supported by wetland inventory maps or onsite data collected during a field visit. In fact, section 1222(a) as amended by the 1996 Farm Bill stated explicitly that no person shall be adversely affected because of having taken an action based on a previous certified

wetland delineation by the Secretary. The delineation shall not be subject to a subsequent wetland certification or delineation by the Secretary, unless requested by the person. Further, in the 1996 Farm Bill, Congress also removed the previous requirement for periodic review and update of wetland delineations, demonstrating Congressional support for the concept of certification first enacted in the 1990 Farm Bill.

The interim rule was silent with respect to the certification status of pre-1990 wetland determinations. The certification of wetland determinations requirement was established in the Food, Agriculture, Conservation, and Trade Act of 1990 (1990 Farm Bill). When conducting new certified wetland determinations, NRCS considers all available information, including pre-1990 wetland determinations and the documentation associated with any field visits that occurred associated with any appeal and onsite review.

*Comment:* USDA received comment that expressed concern over whether NRCS followed NEPA in 2013 for an alleged policy change, identified in a March 2013 Decision Memorandum, to deem these determinations as certified.

*Response:* NRCS developed the March 2013 Decision Memorandum to obtain Secretarial approval to: (1) Update immediately NRCS internal agency policy to describe more fully, but not change, the wetland determination methods as they were being implemented by staff across the Nation; and (2) develop an interim rule for the Secretary's consideration. There was no basis in law to prepare NEPA documentation for the preparation of a decision memorandum about whether to conduct rulemaking or to clarify existing policy. The 2013 Decision Memorandum made clear that NRCS was only clarifying the long-standing national policy instituted under the statutory mandate of certification so plainly provided in the 1990 Farm Bill and revised in the 1996 Farm Bill.

*Comment:* USDA received comment that suggested that NRCS not decertify and conduct revised determinations based on new mapping technology unless the USDA program participant raises the issue;

*Response:* The interim rule did not make any changes regarding potential revision of determinations that are considered certified. NRCS confirms that certified wetland determinations are subject to revision only under limited circumstances, namely if the land in question has been removed from agricultural use, upon request of the USDA program participant, or when a

violation of the WC provisions has occurred.

*Comment:* USDA received comment that the WC provisions provided that only those actions taken based on previous certified determinations would be exempt from adverse agency action under 16 U.S.C. 3822(a)(6) and that actions taken based upon previous "final" or "official" determinations were not so exempted.

*Response:* As discussed above, USDA does not agree that 1990 through 1996 determinations are "final" or "official" or any other designation other than "certified" or not. USDA concurs that the WC provisions specify that no person can be adversely affected because of having taken an action based on a previous certified wetland delineation by the Secretary. However, the interim rule did not change the ability of a producer who has a non-certified determination to seek equitable relief under 7 CFR 12.11. A producer's ability to seek equitable relief under 7 CFR 12.11 was first established in the April 23, 1991 regulations which provided that an action of a person which would form the basis of any ineligibility under this part was taken by such person in good-faith reliance on erroneous advice, information, or action of any other authorized representative of USDA, the appropriate agency may make such benefits available to the extent that similar relief would be allowed under 7 CFR part 718.

*Comment:* USDA received comment that the interim rule restates NRCS's established policy that pre-1996 determinations are considered certified if the person was notified that the determination had been certified, and the map document was of sufficient quality to determine ineligibility for program benefits, but fails to identify the requirement that the producer must have been given notice of their appeal rights when the determination was issued. The comment also opined that any policy NRCS would consider implementing that would allow the agency to accept as certified pre-1996 wetland determinations without additional evidence of their accuracy or that appeal rights were given at the time the determination was made would be contrary to Congress' intent.

*Response:* USDA did not fail to identify the requirement that a producer had been given notice of their appeal rights. In particular, as explained in the interim rule preamble, USDA issued in June 1991 a revised CPA–026 form that included certification language in the agency signature block and contained the applicable appeal rights on the back side of the producer's copy. Section

12.30(c)(1), as amended by the interim rule, then identified that determinations made after November 28, 1990, and before July 3, 1996, are certified wetland determinations if the determination was issued on the June 1991 version of form NRCS–CPA–026 or SCS–CPA–026, which, given the forms' content, confirms that a producer was provided their appeal rights. The interim rule then also specifies that if the wetland determination was issued on a different version of the form, that wetland determination is certified if there is other documentation that the person was notified of the certification, provided appeal rights, and the map document was of sufficient quality to make the determination. The interim rule did not certify any of these pre-1996 wetland determinations that were not already certified pursuant to the procedures under the 1991 final rule, nor is NRCS considering adopting any policy with respect to certification of wetland determinations contrary to Congressional intent.

*Comment:* USDA received comment asserting that when pre-1996 wetland determinations are not considered certified, there are no circumstances consistent with statute that NRCS could use outdated wetland delineation methods to review and certify an old determination and specified that NRCS should remove the provision from the interim rule and instead make clear that determinations of wetland hydrology will be made in accordance with the wetland delineation methodology currently in use by NRCS.

*Response:* USDA generally agrees with the comment; however, no revisions to the rule are necessary. The interim rule established that in order for a wetland determination made after November 28, 1990, and before July 3, 1996 to be considered certified, the determination must have been formally issued by NRCS, certifying the determination was of sufficient quality to determine ineligibility for program benefits, along with all appeal rights. The only exception is in situations where the previously issued certified wetland determination map document maintained by the producer or in the NRCS case file is now of such poor quality to render it impossible to locate wetlands on the farm. In these situations, a new certified wetland determination map, utilizing current methods, will be provided with appeal rights. Further, specific to 1991 through 1996 determinations, the amendments provided in the 1990 Farm Bill, as supported by the 1991 rule, directed NRCS to certify, at the time of issuance, the wetland determination meets all quality and administrative mandates in effect at the time of issuance and certification. The interim rule did not certify any pre-1996 wetland determinations, and NRCS policy has always been, and remains, that wetland determinations are made and certified as accurate and sufficient in accordance with the wetland delineation methods in effect at the time of certification, with the minor exception that is explained above under wetland determinations which have been appealed.

*Comment:* USDA received comment that NRCS statements contemporaneous with the 1996 interim rule demonstrate that the agency understood its statutory mandate to require a review of previous wetland determinations to ensure their "accuracy" and that NRCS was considering establishing a specific time frame for completing the evaluation of existing wetland determinations.

*Response:* The comment does not provide the full context under which such statements were made in the 1996 interim rule. In particular, as explained in the preamble of the 1996 interim rule, NRCS was considering conducting a review of wetland determinations in collaboration with other agencies who had entered into the Wetlands Memorandum of Agreement (MOA) in 1994. The 1994 MOA was to facilitate the use of NRCS wetland determinations for the Clean Water Act. The "certification" under the MOA aimed to ensure the accuracy of wetland delineations conducted prior to November 28, 1990 for the purposes of the WC provisions, as well as providing a useful basis for establishing reliance on wetland delineations for Clean Water Act purposes. It was in this context that the MOA agencies recognized the importance of providing certainty for the agricultural community as to the status of their wetland determinations which have not been certified for use for both the WC provisions and the Clean Water Act, and that the Agencies were considering the establishment of a specific time frame for completing the evaluation of existing wetland determinations, and that based on the evaluation landowners would be notified whether their current wetland determinations are acceptable for both the WC provisions and the Clean Water Act. (61 FR 47025). It is important to note that the discussion on the MOA and evaluation of existing wetland determinations in the 1996 rule preamble follows the statement, If NRCS certified a wetland determination prior to July 3, 1996, the certification will remain valid (61 FR 47025). As such, it is clear that the evaluation applied to wetland determinations conducted prior to 1990.

This evaluation was limited to portions of five states in the prairie pothole region of the United States and was not a comprehensive study of the WC program for purposes of WC certification. The purpose of the evaluation was to apply the different off-site wetland determination methods used in the different states at the time and to determine the consistency, not the accuracy, of the findings. The evaluation team did not review the quality of any previously issued certified wetland determinations or any older non-certified determinations. After the 1996 Farm Bill amendments definitively closed any opportunity for review and update of previously issued certified determinations, the Agency remained challenged on how to treat pre-1990 non-certified wetland determinations. Following the findings from the evaluation and facing the 1995 moratorium on wetland determinations which had been imposed by Secretary Glickman in response to bi-partisan Congressional legislation, the Agency recommended to the Department to end the practice of reviewing and updating previously completed wetland determinations. In a 1997 Informational Memorandum, the Agency proposed that wetland determinations would be conducted only on request, when a manipulation is planned, or in cases of potential violations, adhering to the 1996 statutory changes. Thereafter, the Secretary lifted the moratorium on wetland determinations.

At no point in the preamble or the regulation part of the 1996 rule did the Secretary provide NRCS the authority to review and update proactively any certified wetland determination, including those determinations issued and certified by the Agency prior to 1996. In fact, the practice was explicitly prohibited in the statement in the preamble if NRCS certified a wetland determination prior to July 3, 1996, the certification will remain valid. The certainty discussed in length in the 1990 Conference Report, enacted into law in the 1990 Amendments, and strengthened in the 1996 amendments, provided assurance to USDA program participants that once certified, a wetland determination would never be changed by USDA except for limited circumstances identified above. The clarification provided in the 2017 amendment to the NRCS National Food Security Act Manual (NFSAM), as codified in regulation in the 2018 interim rule, supports this assurance.

## Certified Wetland Determination Map Quality Concerns

*Comment:* USDA received comment concerning the quality of wetland determination maps and requesting that NRCS clarify what constitutes a map of sufficient quality for making determinations of ineligibility benefits.

*Response:* In the interim rule, USDA identified that in order for a 1990 through 1996 wetland determination to be considered certified, the map document must be of sufficient quality to determine ineligibility for program benefits. The purpose of the wetland determination map is so that the USDA program participant can accurately self-certify that they are in compliance with the WC provisions, and USDA can respond to questions regarding eligibility. There are rare situations where certified wetland determination maps produced prior to development of computer map production capabilities and quality document reproduction technologies are of such poor quality that neither the person, nor USDA can accurately discern the location of wetlands on the map. As explained in the language in the interim rule, such a map would not be considered of sufficient quality for eligibility determination purposes.

## Climate References in Rulemaking

*Comment:* USDA received comment suggesting that reference to climate and environment not be used in rulemaking.

*Response:* USDA will continue to use terminology that is necessary or facilitates the implementation of its responsibilities in concert with the scientific understanding of meteorological, atmospheric, hydrological, and soil health issues facing USDA program participants and agricultural operations of the United States.

## Commenced Conversion

*Comment:* USDA received comment related to commenced conversion wetlands, identifying that it appears that the interim rule changed the original statutory commenced conversion language as the interim rule uses the term "occurred" when referencing wetland conversions prior to December 23, 1985, while the statute uses the term commenced.

*Response:* USDA did not make any change in the interim rule that affected the treatment of commenced conversion wetlands under 7 CFR part 12. As specified in the September 6, 1996, interim rule, a person seeking a commenced conversion exemption must have completed the conversion activity

on or before January 1, 1995. As the commenced conversion exemption is no longer available, USDA uses the term "occurred" to simplify explanation of the WC provisions.

## Definitions

*Comment:* USDA received comment seeking surety that the term "farmed wetland" meets all three criteria for wetland. USDA also received comment about the definitions of pothole, playa, and pocosin, which sought to expand the definition of potholes to cover the Great Plains; or to clarify the definition of a pothole. Comment on certain definitions or their aspects, such as hydrology criteria for farmed wetlands, are addressed in their own sections of this preamble.

*Response:* The definition of wetland is a general term, whereas farmed wetland and farmed wetland pasture are specific types of wetlands identified as having been manipulated prior to December 23, 1985, but still retaining wetland characteristics. USDA affirms that farmed wetland and farmed wetland pasture must meet all three wetland criteria: Soil, vegetation under normal circumstances, and the hydrology criteria identified in regulation. USDA does not agree that additional specificity in their definitions is needed, as each definition starts out with the requirement that they are a wetland. As described in the wetland determination process in § 12.30(c)(7), wetland type is identified in step 2, which is after the determination of the three wetland criteria, and the definition of wetland in both statute and regulation require all three criteria.

USDA appreciates the support it has received for adding definitions of potholes, playas, and pocosins. As provided in the preamble to the interim rule, the definitions of pothole, playa, and pocosin provided in the interim rule were unchanged from definitions provided in agency policy since the early 1990s. There is no scientific basis to amend the definitions set forth in the interim rule and USDA does not wish to alter the long-standing scope of protections for these types of wetlands at this time.

In order to gain consistency in the construction of the definitions of farmed wetland, farmed wetland pasture, and PC, minor adjustments are being made in § 12.2. The phrase, at least once before December 23, 1985, is added in reference to the frequency that an agricultural commodity must have been produced on farmed wetland to be consistent with the definition of PC. USDA affirms that only one instance of

agricultural commodity crop production prior to December 23, 1985, is and has always been needed in order to qualify for either the farmed wetland or PC designations. Similarly, although the definition for farmed wetland pasture has always specified that it must have been managed for pasture or hayland, clarification is added that it also was not used to produce an agricultural commodity at least once before December 23, 1985, which allows USDA and the public an easier juxtaposition between this and the farmed wetland designation, and is consistent with long-standing application of these definitions. Finally, the phrase, prior to December 23, 1985, is relocated in the definition of farmed wetland pasture to be consistent with its location in the definition of farmed wetland.

## Endangered Species Act Consultation

*Comment:* USDA received comment that USDA must undertake consultation under the ESA with respect to the potential impacts to listed species and their habitat before implementing the interim rule and alleging that USDA is currently in ongoing violation of the ESA and its implementing regulations.

*Response:* USDA disagrees consultation under section 7 of the ESA was required for its rulemaking action. ESA section 7(a)(2) requires agencies, in consultation with either the Secretary of the Interior or Commerce, to ensure that any action authorized, funded, or carried out by an agency is not likely to jeopardize species listed under the Act or designated critical habitat (16 U.S.C. 1536(a)(2)). As discussed further below, the procedural and substantive requirements of the Act are not triggered here because: (1) Wetland determinations are not an "action" that "authorizes, funds, or carries out" activities by producers impacting protected species or critical habitat; (2) neither the interim rule nor this final rulemaking are an affirmative "agency action" for the purposes of the ESA, only a clarification of long-standing policy; and (3) even if the interim rule or this final rule were an affirmative agency action, USDA does not have discretion to deviate from the requirements set forth by Congress. For these reasons, the requirements of ESA section 7(a)(2) are not triggered here.

First, NRCS provides technical assistance to USDA program participants in the form of wetland determinations to assist them to comply with the WC provisions. Producers choose whether to comply with the WC provisions based on their desire to participate voluntarily in covered USDA programs and other factors. NRCS can

neither prohibit nor permit USDA program participants from converting wetlands potentially used by ESA-listed species to agricultural production; therefore, NRCS' technical determinations are not agency actions that trigger the consultation requirements of ESA section 7(a)(2). Further, as established by a memorandum (FWS/AES/DCHR/007178) dated April 2, 2001 from the USFWS's Acting Deputy Director to the Regional Directors, "consultation under section 7(a)(2) of the Endangered Species Act is not required when the Natural Resources Conservation Service conducts official wetland determinations or delineations on private lands under the Food Security Act of 1985, as amended." Additionally, section 1223 of the 1985 Farm Bill previously required consultation with USFWS on the identification of wetlands and the determination of exemptions, but such consultation was specifically removed in the 1996 Farm Bill. While the consultation referenced previously in section 1223 was not specific to ESA consultation, its removal identifies that Congress did not believe consultation with USFWS was needed on any wetland determination related concerns. Thus, wetland determinations themselves are not "agency actions" that trigger the requirements of ESA section 7(a)(2).

Second, because wetland determinations themselves are not agency actions that trigger the requirements of ESA Section 7(a)(2), guidance or clarification from USDA is also not an agency action that triggers the Act's requirements. Neither the interim rulemaking, this final rulemaking, nor the technical methods by which NRCS makes wetland determinations have the potential to adversely impact protected species or critical habitat. Additionally, the interim rule and this final rule are codifying long-standing policy and this codification does not alter the status quo. Thus, NRCS has determined that the rule would have no effect on any listed species. When an action will have "no effect" on listed species, consultation requirements are not triggered.

Third, ESA only applies to actions over which the agency has discretionary control sufficient to impose measures for the benefit of protected species. Most of rule implements statutory requirements prescribed by Congress, such that NRCS has no discretionary control. Further, NRCS' provision of technical assistance to agricultural producers in the form of a wetland determination carries no authority to

prevent producers for converting wetlands to agricultural production. Where an agency is required to act in particular manner, there is no utility in ESA consultation and the requirement is not triggered.

*Comment:* USDA received comment that stated that by permitting producers to certify inaccurate wetland determinations and convert improperly delineated wetlands to agricultural use without penalty, NRCS's actions at the very least "may affect" listed species by facilitating the destruction of important habitat for endangered migratory birds and other animals that frequent agricultural wetlands. The comment also asserts that the interim rule, as a change in policy, reversed the incentive to preserve such wetlands and thus necessarily affects listed species.

*Response:* As described above, the interim rule and this final rule do not facilitate the destruction of habitat or otherwise affect listed species because USDA is not authorizing producers to take any activities, these rulemakings are only a clarification of long-standing policy and not a change in policy, and USDA does not have discretion to deviate from the requirements set forth by Congress. The comment mischaracterizes the certification process as the producer does not "certify" wetland determinations, whether the commenter considers such wetland determination accurate or not. Comment may be based upon misinterpretation of the internal 2013 Decision Memorandum that made reference to producer review of pre-1996 certified wetland determinations (discussed above). NRCS certifies wetland determinations in accordance with statutory, regulatory, and policy guidance. The 2013 Decision Memorandum simply reflected this legal framework where prior certified wetland determinations remain certified unless a new determination is requested by the producer; however, the new determination process that follows any such request is conducted by the agency and such review does not in any way mean that the producer is certifying the wetland determination.

Further, as previously noted above, a memorandum (FWS/AES/DCHR/007178) dated April 2, 2001 from the USFWS's Acting Deputy Director to the Regional Directors stated, "consultation under section 7(a)(2) of the Endangered Species Act is not required when the Natural Resources Conservation Service conducts official wetland determinations or delineations on private lands under the Food Security Act of 1985, as amended." Additionally, as described elsewhere in this preamble,

the interim rule did not effect a change in policy, and therefore does not meet the definition of "action" under ESA section 7.

For all these reasons, the agency has not taken an action that would affect listed species and trigger the consultation requirements of ESA section 7(a)(2). USDA thus has determined that the rule will have no effect on listed species.

**Farmed Under Natural Conditions**

*Comment:* USDA received comment related to farmed under natural conditions requesting that NRCS reiterate that farming under natural conditions is allowed.

*Response:* USDA affirms that USDA program participants may continue to farm wetlands under natural conditions without risk of losing their eligibility for USDA program benefits. As first stated in the 1986 interim rule and still existing in § 12.32(b)(1), destruction of herbaceous hydrophytic vegetation shall not be considered an action that destroys a natural wetland characteristic.

**Mitigation**

*Comment:* USDA received comment urging NRCS to encourage mitigation efforts, and in doing so, amend its regulations generally not to require more than a one-to-one ratio for mitigation.

*Response:* In the Agriculture Improvement Act of 2018 (2018 Farm Bill), Congress reauthorized the availability of funding for NRCS to support wetland mitigation banks, and such funds have been made available. USDA believes the availability of wetland mitigation banks for WC mitigation purposes will greatly encourage wetland mitigation efforts. The WC statutory provisions identify that wetland and the wetland values, acreage, and functions must be mitigated, and that a person can appeal any ratio greater than a one-to-one. No changes were made in response to this comment.

**Navigable Waters Protection Rule**

*Comment:* USDA received comment expressing confusion about the wetland conservation provisions of the 1985 Farm Bill and the Federal Clean Water Act.

*Response:* It should be emphasized that this final rule, in part, governs the identification of wetlands for the purpose of implementing the wetland conservation provisions of the 1985 Farm Bill. This rulemaking does not affect the identification of waters subject to the Federal Clean Water Act or the

implementation of any other Federal, State, or local provision protecting or regulating wetlands or any other land or water resources. At times, NRCS wetland determinations may encompass wetlands that are also subject to Clean Water Act regulations, including Clean Water Act section 404 discharge of dredged or fill material permitting requirements. However, due to the unique statutory provisions of the 1985 Farm Bill, while NRCS wetland determinations may identify certain areas as exempt under the 1985 Farm Bill, those same areas may have the potential to be jurisdictional under the Clean Water Act.

The U.S. Environmental Protection Agency (EPA) and the Department of the Army (Army) have recently revised the definition of "waters of the United States" in the Navigable Waters Protection Rule, which establishes the scope of Federal jurisdiction under the Clean Water Act. See 85 FR 22250–22342 (April 21, 2020). In the rulemaking to revise the definition of "waters of the United States," the EPA and the Army have retained their long-standing definition of "wetlands" and have defined "prior-converted cropland" for purposes of the Clean Water Act, including when these lands would no longer be excluded from the definition of "waters of the United States." NRCS notes that this rule defines "prior-converted cropland" differently for 1985 Farm Bill purposes than the definition that is identified in the EPA and the Army "waters of the United States" rulemakings for Clean Water Act purposes. Further, NRCS also notes that this final rule for 1985 Farm Bill purposes is entirely separate from the EPA and the Army "waters of the United States" rulemakings.

USDA recognizes that USDA program participants may be confused between the sometimes-differing requirements of the 1985 Farm Bill and the Clean Water Act. To avoid confusion, NRCS clearly informs USDA program participants that NRCS wetland determinations are for purposes of implementing the 1985 Farm Bill's wetland conservation provisions only, and that the participant should contact the U.S. Army Corps of Engineers for clarification about whether a particular activity will require a Clean Water Act section 404 permit.

## National Environmental Policy Act (NEPA) Compliance

*Comment:* USDA received comment on the Environmental Assessment (EA) for the interim rule that it had failed to meet its NEPA responsibilities by not identifying sufficient alternatives,

failing to conduct an Environmental Impact Statement (EIS) due to several factors the commenters' identified that should have triggered such analysis, failure to provide a "hard" look, and failing to meet other NEPA requirements.

*Response:* Much of this criticism rests upon the mischaracterization of the interim rule. The provisions of the rule regarding certification of wetland determinations made between 1990 and 1996, only clarify existing policy that itself implements statutory language that NRCS lacks discretion to change. The remainder of the rule clarifies and codifies existing NRCS policy and procedures with regard to the methods NRCS uses to identify wetlands and does not change the status quo. Thus, NRCS properly prepared an EA and reached a Finding of No Significant Impact (FONSI).

In the 1990 Amendments to the Farm Bill, Congress directed USDA to establish a process for certifying wetlands determinations. To implement this mandate, SCS developed the process of certification through completion of the SCS–CPA–026 form, which certifies that the maps are sufficient for determination of ineligibility and notifies the farmer of his or her appeal rights. In 1996, Congress expressly circumscribed NRCS's discretion to revise prior determinations, providing that a previous certified wetland delineation shall not be subject to a subsequent wetland certification or delineation by the Secretary unless requested by the person.

While NRCS had some initial discretion to establish a process for certifying wetland determinations in the wake of the 1990 Amendments—discretion it used to develop the SCS–CPA–026 form process—Congress expressly removed any discretion to revisit those certifications in the 1996 Amendments. Thus, if a determination was certified between 1990 and 1996 under the criteria applicable at that time, the 1996 Amendments left the NRCS with no discretion except to continue recognizing those determinations as certified.

One discretionary addition made in the interim rule is for NRCS to continue to use the 1971 through 2000 precipitation dataset in its decisions on whether wetland hydrology criteria are met under normal circumstances rather than begin to use the currently available 1981 through 2010 precipitation dataset and establish a precedent to continue to update the dataset used every 10 years. Because the 1971 through 2000 precipitation dataset has been the one

NRCS has used since it began making certified wetland determinations, codifying the continued use of that dataset also does not represent a change from the status quo. Further, because the term "normal circumstances" as used in the 1985 Farm Bill includes hydrology manipulations that occurred before the date of enactment, NRCS must have enough years of pre-1985 precipitation data available to use in making decisions on wetland hydrology.

NRCS was not required to prepare an EIS because the interim rule only clarified and did not change existing NRCS policy and procedures and because NRCS lacks discretion to change policy in a manner that would revisit certifications made between 1990 and 1996. Further, NEPA has no specific requirement regarding the number of alternatives an agency must develop and analyze; at a minimum, an agency must carry forward one action alternative and the no-action alternative. An agency is not required to consider alternatives that have substantially similar consequences. As described in the EA, a 1991 National Resources Inventory (NRI) completed a wetlands survey that confirmed wetland conversions to agriculture had slowed compared to those occurring before the 1985 Farm Bill and noted that agricultural activities seemingly had less impact on wetland conversions than expected (Schnepf 2008). The EA also cites the 2010 NRI Summary Report (Sucik and Marks 2014) analysis of data showing the status and recent trends of wetlands in four regions of the U.S. The report documents wetland losses in the northeast and southeast, primarily resulting from urban development, not conversion to agriculture. Further, the central and western regions have experienced a gain in wetland acres, primarily on agricultural lands.

Because conversion to agriculture is only one cause of wetland losses, and NRCS has no information indicating conversion to agriculture is currently a primary cause, NRCS does not expect the precipitation dataset used to help make determinations on the presence or absence of wetland hydrology to make a significant difference in the amount of wetlands identified as subject to the wetland conservation provisions. Because an alternative that considered decadal updates to the precipitation dataset would have substantially similar environmental consequences as the proposed action retaining use of the 1971 through 2000 dataset, the no action and proposed action alternatives were sufficient.

**Normal Climatic Conditions and Precipitation Data**

*Comment:* USDA received comment on the information that NRCS uses to determine "normal circumstances" to meet the hydrology component of the wetland definition that the land "under normal circumstances" does support a prevalence of hydrophytic vegetation. In particular, USDA received comment related to:

• Support for the definition of normal climatic conditions in § 12.2(a);

• Requesting a change from hydrologic inputs to precipitation;

• Increased clarity as to when to seek information in Climate Analysis for Wetlands (WETS Tables) as opposed to the Field Office Technical Guide (FOTG);

• Concern about how NRCS uses data collected by the National Oceanic and Atmospheric Administration in establishing normal climatic condition for the WETS Tables.

• Concern about maintaining current precipitation data, including—

○ Support for NRCS using the 1971 through 2000 data set;

○ Recommendation to use only pre-1985 data, including only normal rainfall data from years prior to 1985;

○ Recommendations about how to use the existing data set situationally;

○ Recommendation to use the 1981 through 2010 data set since the 1971 through 2000 data set was associated with a drier time period;

○ Use 1971 through 2000 data set for wetland determinations with pre-1985 manipulations and current precipitation data for new land being brought into production;

○ Limiting use of the 1971 through 2000 data set to only those situations where the producer can demonstrate the existence of special circumstances, such as where the use of the new dataset would create a demonstrably unfair result.

• Seeking a connection between the definitions of normal climatic conditions and normal circumstances;

• Conduct an analysis of the hydrologic conditions that occurred prior to 1985;

• Clarify how the precipitation data dates were chosen and how they will be applied.

*Response:* USDA appreciates the support it has received for the definition of "normal climatic conditions" as defined in the interim rule and will retain that language in this final rule. NRCS understands the comment about focusing on precipitation but hydrologic inputs can include other sources of water such as floodwater from an adjacent stream that may require consideration in the FOTG.

The definition of normal climatic conditions does not itself provide guidance as to when WETS Tables or the FOTG is appropriate. The determination of normal climatic conditions will typically be determined with the use of WETS Table data as provided in the NRCS Engineering Field Handbook. If other methods are used, such as those to account for hydrologic inputs other then precipitation, that data and methods for its use will be provided in the FOTG. This flexibility is necessary to assure the accuracy of wetland determinations being issued across the highly diverse ecoregions contained within the United States.

The term "normal circumstances" is part of the statutory wetland definition but is not defined itself in statute or in 7 CFR part 12. Agency policy explains that there are two considerations in the determination of normal circumstances. One is consideration of pre and post December 23, 1985, disturbance and the other is consideration of climate. The term "normal climatic conditions" is applied to the latter, and specifically requires that wetland identification be based on conditions that are present under normal climate, not those conditions which are present due to abnormally wet or dry conditions.

USDA appreciates the concerns expressed by the commenters critical of NRCS' continued use of the 1971 through 2000 data set. NRCS' National Water and Climate Center (NWCC) has prepared WETS Tables to help assess normal climatic conditions. The WETS Tables display monthly rainfall data as the monthly average (50th percentile), and the values at which there is a 30 percent chance that the rainfall will be less or more than those values (30th and 70th percentiles). The range between the 30th and 70th percentiles defines normal monthly rainfall. Rainfall records from a defined period preceding the date of onsite or remotely sensed (for example, aerial photograph) evidence can be compared with these values to determine if observed conditions were reflective of what would be expected under "normal climatic conditions." This data is stored in the Agricultural Applied Climate Information System (AgACIS) which is a public repository for data collected at stations in the National Weather Service (NWS) Cooperative Network. Data and several standard summary reports are available. Historically, the most common summary reports used in NRCS are Temperature and Precipitation Summary, Frost-Free Days, Growing Season, and WETS Tables.

AgACIS brings historical climate information (used for the 1971 through 2000 WETS Tables and other historical datasets) and near real-time data together under one umbrella system where they are fused into quality products to assess historical climate trends, enhance daily operational decisions, or assist with any number of climate dependent activities. USDA believes that the data quality and control processes used by the NWS are adequate and that the NWS Cooperative Network encompasses enough geographic coverage to fully represent the agricultural landscape.

For data sets that are used to document local climatic conditions, such as daily rainfall and temperature records, climatologists recognize a 30-year period of record as a minimum for statistical accuracy. Because NRCS must consider best drained conditions that existed on or before December 23, 1985, it must use the 1971 through 2000 data set to have enough years of data to evaluate observations of hydrology indicators. The 1981 through 2010 data set would not allow for enough years prior to December 23, 1985, to be able to assess normal climatic conditions for many determinations. To assure fair and consistent application of this process and predictability for USDA program participants, NRCS has maintained its use of the 1971 through 2000 data set. NRCS received comment that use of a 30-year average was reasonable, and NRCS agrees that such an average is accurate while not being influenced by shorter term climatic variability. Regarding the use of a more contemporary dataset for the evaluation of land currently being brought into production, USDA appreciates this comment but feels that providing consistency in the process and predictability for USDA program participants, correlated to the statutory date of December 23, 1985, is an important aspect of implementation of the WC provisions, and that the continued use of the 1971 through 2000 data set is appropriate in all situations.

**Office of Inspector General Audit Report in 2017**

*Comment:* USDA received comment asserting that the interim rule failed to address the 2017 Office of Inspector General (OIG) Audit Report, "USDA Wetland Conservation Provisions in the Prairie Pothole Region." Some of the comment concerning the content of the OIG Report is addressed in the Certification Status of pre-1996 Wetland Determinations section of this preamble. The remainder are addressed below.

*Response:* As documented in the NRCS response contained in the report, USDA disagrees with much of the content of the 2017 OIG report and the report's characterizations of NRCS actions taken. As is common to all audits, matters are identified as needing improvement and if significant, warrant a recommendation. The 2017 OIG report only issued two recommendations. The first recommendation was for the Agency to issue clarity on certification. The agency agreed to release "additional policy clarification providing specific guidance to evaluate the certification status of determinations issued prior to 1996." In good-faith, NRCS released its clarification in a 2017 amendment to the NFSAM, and in the December 2018 interim rule. NRCS was not required to reference the OIG report itself in the interim rule.

As noted above, NRCS has long recognized that determinations made between 1990 and 1996 on a properly completed CPA–026 form are certified. In 2010 through 2012, however, NRCS realized that staff in the four prairie pothole States were incorrectly applying national policy and not recognizing certified determinations made between 1990 and 1996. Between 2012 and 2013, NRCS National Office staff worked with these four States to better explain the statute, regulations, and policy regarding certification. In 2013, NRCS leadership in those states asked staff to align the application of certification in support of the statute and the 1991 and 1996 regulations. In 2013, NRCS proposed, in a Decision Memorandum to the Secretary of Agriculture, that the certification issue be clarified in the preamble of an upcoming proposed rule. However, in the wake of the Agricultural Act of 2014, the proposed clarification of certification policy in a rule was not made due to other priorities—namely the recoupling of crop insurance benefits to the highly erodible land and wetland conservation provision requirements.

In March 2014, OIG received a complaint alleging that NRCS officials were improperly directing officials in the prairie pothole states to treat wetland determinations from 1990 through 1996 as certified rather than making new wetland determinations. During OIG's investigation, NRCS explained to the OIG auditors the 28-year history of certification, including the initiation of certification subsequent to enactment of the 1990 Farm Bill, the amendments on certification in the 1996 Farm Bill, and the 1991 and 1996 implementing regulations. In 2017 OIG issued a report which concluded that NRCS policy had been to consider

wetland determinations made between 1990 through 1996 as not certified "unless the determination was appealed and upheld," and that NRCS's 2013 instructions to the prairie pothole states, that 1990 through 1996 determinations were certified if the producer had been notified of its right to appeal, represented a change in policy. While NRCS disputed the OIG's characterization of its policy, it accepted OIG's recommendation that NRCS eliminate confusion regarding certification, by issuing clarifying guidance: "Recommendation 1—Issue official guidance reinforcing correct and current rules and clarifying procedures for making wetland determinations and certification, including the status of pre-1996 determinations."

The report's recommended management action was not to correct erroneous agency policy, or to change agency policy. The management action was for NRCS to issue guidance clarifying that two rules (the 1991 final rule and the 1996 interim rule), apply to certified determinations. To determine the certification status of any previously issued determination, NRCS must use the rule in force at the time of the previously issued determination. NRCS acted on the OIG recommendation and issued a clarifying amendment to the NFSAM in 2017 and the interim rule in 2018; both of which met the recommendation of clarifying certification, including the status of pre-1996 determinations.

## Off-Site Analysis of Potentially Highly Erodible Land

*Comment:* NRCS received comment related to potentially highly erodible land (PHEL), concerning the establishment of this designation, defining the resolution of the elevation data that NRCS may use, and identifying that NRCS should emphasize offsite determinations involving PHEL can be appealed.

*Response:* NRCS identifies highly erodible land based upon the predominant soil map unit in a field. Where soil map units have a range of slope and steepness factors that could result in a soil map unit being determined either highly erodible or not for water erosion, NRCS gives that soil map unit a designation of potentially highly erodible land, following a process first described in the 1986 interim rule and still existing in § 12.21(c). The final erodibility of a particular field that contains potentially highly erodible soil map units has been determined through onsite measurements of slope and steepness. However, USDA identified in the

interim rule that NRCS could also make a determination of erodibility using new technological tools, including the use of LiDAR or other elevational data in lieu of an onsite measurement. The availability and type of elevational data varies across the United States, and NRCS has developed procedures to evaluate its use. Additionally, NRCS specifically added that if a person disagrees with an offsite determination on potentially highly erodible soils, a determination will be made onsite. No changes were made in response to these comments.

## Offsite Analysis of Wetland Minimal Effect

*Comment:* USDA received comment related to the offsite analysis of wetland minimal effect, including the role of States in minimal effect analysis, recommending NRCS only conduct onsite minimal effect analysis, recommending NRCS conduct minimal effect analysis even after commencement of potential conversion activities, questioning how many minimal effect determinations have been issued, suggesting NRCS use yield records as evidence for offsite analysis, suggesting that any burden of establishing minimal effect post-conversion should not be on the person while other comment insisted that such burden remain with the person, recommending NRCS develop a list of categorical minimal effect activities, and suggesting that the interim rule left too much to agency discretion. Comment also asserted that NRCS could not remove the on-site evaluation requirement simply to make it easier to offer this exemption to USDA program participants and that the Agency must adopt specific criteria for when off-site methods can be used.

*Response:* USDA appreciates the attention and support this issue has received. NRCS considers all useful evidence in analyzing whether an activity will result in a minimal effect. While onsite analysis of minimal effect to the wetlands in the area might provide more robust data, it is not always a practicable option, as NRCS may not have the authority to visit wetlands in the area outside the site under consideration of the minimal effect request. The interim rule clarifies that offsite analysis is an option to determine the impacts of the action on wetlands in the area, while an onsite visit is required to the site under consideration of a minimal effect exemption. Minimal effect analysis must happen on a case-by-case basis and the language of the interim rule, which is not changed in this final rule,

provides a reasonable balance between clarity and discretion to allow for case-by-case analysis. Once a potential conversion activity has commenced, an accurate and fair minimal effect determination is made more difficult because of disturbance which is why the burden is on the USDA program participant to demonstrate minimal effect in that situation. While NRCS will not be adopting any list of categorical minimal effects in this rule, the option to create such a list exists for future rulemakings and States would play a role in the development of any list.

**PC Any Land With Pre-1985 Drainage**

*Comment:* USDA received comment related to land with pre-1985 drainage, identifying that if conversion had been commenced prior to 1985, including lands identified as farmed wetlands, they should not be subject to the WC provisions.

*Response:* Farmed wetlands have been subject to the WC provisions since 1987 and were formally defined in regulation in 1996. Congress has not altered NRCS administration of farmed wetlands since first described in regulation. Conversely, Congress has embraced farmed wetland terminology in its own explanations of the WC provisions and eligibility for conservation programs under Title XII of the Food Security Act of 1985, such as the Wetlands Reserve Program originally authorized in the 1990 Farm Bill. There have also been specific criteria for identification of commenced conversion wetlands and whether such wetlands are considered exempt or not from the wetland conservation provisions as described above. No changes have been made in response to these comments.

**Seasonal Wetlands**

*Comment:* USDA received comment that the interim rule should be withdrawn because it systematically imposes several changes to NRCS's wetlands identification policies that, when considered cumulatively with existing practices, result in the exclusion of seasonal wetlands in wetlands determinations. The comment identifies that seasonal wetlands have been excluded through the wetland maps that form the basis for producer compliance, asserting that the rule certified pre-1996 wetland determinations and that these consistently excluded seasonal wetlands. Additionally, the comment also claims that the older determinations utilize precipitation data from a historically dry period (1990 through 2000) that limits the number

and size of seasonal wetlands subject to the wetland conservation compliance requirements and that there is no scientific analysis of the impact of the use of such information.

*Response:* As explained above, the interim rule did not make any changes, and thus does not have an impact, cumulatively or otherwise, on seasonal wetlands. Additionally, the interim rule did not certify any pre-1996 wetland determinations but simply clarified the certification status of wetland determinations made prior to 1996. With respect to the precipitation dataset used, this comment is addressed in the NEPA compliance section. In particular, because the 1971 through 2000 precipitation dataset has been the one NRCS has used since it began making certified wetland determinations, codifying the continued use of that dataset also does not represent a change from the status quo. Further, because the term "normal circumstances" as used in the 1985 Farm Bill includes hydrology manipulations that occurred before the date of enactment, NRCS must have enough years of pre-1985 precipitation data available to use in making decisions on wetland hydrology.

*Comment:* USDA received comment asserting that the interim rule unduly relies on satellite imagery from the hottest time of the year when seasonal wetlands have likely dried out. The comment recommended that any NRCS wetland determination should account for the use of summer imagery and promote investments in more accurate spring imagery to ensure that identification of seasonal wetlands which fill early in the spring, which is when they provide their most important flood storage and wildlife benefits, particularly for migrating and nesting waterfowl.

*Response:* Neither the interim rule nor this final rule addresses the specific timing of aerial imagery used for making wetland determinations. NRCS utilizes all available data including data collected with new technologies. While spring imagery is helpful in identifying seasonal wetlands, it does not always exist. Aerial imagery taken in the summer months is often available and used, and indicators of spring wetness are commonly evident on imagery taken later in the growing season. Guidance on interpretation of these indicators is provided in technical methods such as State Off-Site Methods for wetland identification and the U.S. Army Corps of Engineers Wetlands Delineation Manual (Corps Manual) regional supplements.

**Setback Distance Concerns**

*Comment:* USDA received comment related to setback distance concerns, recommending that NRCS adopt a system that avoids site-specific analysis to provide better notice and consistency to USDA program participants.

*Response:* When a USDA program participant wishes to install drainage tile in a field, NRCS provides technical assistance regarding the appropriate distance from a wetland or farmed wetland that they may install the drainage tile without risk of violating the WC provisions. Site-specific analysis is sometimes unavoidable due to the variations of soils, hydrology, and geographic position of wetlands on the landscape. While NRCS will continue to evaluate many requests using a site-specific analysis, NRCS is also currently pursuing improvements to the methods which are used to provide setback distances to USDA program participants and will consider this comment in their development.

**Wetland Hydrology Indicators**

*Comment:* USDA received comment on wetland hydrology indicators and other methods used to identify farmed wetland, farmed wetland pasture, and PC. In particular, NRCS received comment related to:
• General support for wetland hydrology indicators and criteria added to the definitions of farmed wetland and farmed wetland pasture in § 12.2(a);
• Concern that the farmed wetland definition was expanded, and conversely results in the reduction of PC;
• Concern that the use of hydrology indicators is arbitrary, and hydrology should not be determined based on a single site visit;
• Concern on the use of hydrology indicators from the U.S. Army Corps of Engineers Wetlands Delineation Manual regional supplements;
• Suggesting clarification on the analytic techniques used to identify farmed wetland and farmed wetland pasture hydrology criteria;
• Suggesting analytical techniques or scientific modeling be the only method used to identify farmed wetland or farmed wetland pasture hydrology;
• Supporting the indicator approach as scientifically sound and consistent with the statutory definition of wetland only if in practice, determinations are capturing the full range of relevant "observable conditions resulting from inundation or saturation," during both the growing season, and the wet portion of the growing season to capture actual wetland hydrology;

• Suggesting the inundation criteria for pothole farmed wetlands be removed.

*Response:* USDA described in the interim rule how NRCS has long-determined hydrology requirements for farmed wetland and farmed wetland pasture and the methods used in order to bring transparency to USDA program participants. Additionally, USDA simplified the definition of "prior-converted cropland" in the interim rule by removing the previous "was less than" farmed wetland hydrology and stating that prior-converted cropland fails to meet the farmed wetland hydrology criteria. USDA appreciates support for the changes made by the interim rule and the expressed concerns. In response, USDA is making changes in this final rule as explained below.

The September 6, 1996, interim rule established hydrology criteria for determinations of farmed wetland and farmed wetland pasture, which were based strictly on the quantification of the number of days that the subject land experienced inundation or saturation during the growing season. Basing the identification of farmed wetland and farmed wetland pasture hydrology solely on the measurement of a number of days is both inefficient and cost prohibitive. The agency does not routinely implement long-term hydrology monitoring protocols for wetland determinations, nor was the reference to the number of days expected at the time of the 1996 interim rulemaking to be based upon such long-term hydrology monitoring protocols.

Rather, as supported by wetland science and long-standing application, NRCS predominantly used and continues to use the indicator-based approach to wetland identification. Accordingly, the agency commonly relies upon criteria that are based on observable conditions that result from such duration of inundation or saturation. Therefore, the changes made in the interim rule do not constitute an expansion of the identification of farmed wetland or farmed wetland pasture, nor a reduction in the identification of PC, but rather better describe how the agency makes decisions on the wetland hydrology criteria associated with farmed wetland, farmed wetland pasture, and PC.

In particular, the use of indicators for the identification of farmed wetland and farmed wetland pasture hydrology is one of the observable conditions that the agency has long used. Other Federal agencies with responsibilities for wetland identification also use indicators as readily observable and easily quantifiable criteria that an area supports wetland hydrology. The agency recognizes the potential challenges when using hydrology indicators observed during a single site visit that may be outside of the growing season, and emphasizes caution in the use of indicators in agency training efforts, including reference to Federal guidance documents which offer helpful guidance in the use of indicators. Even so, wetland hydrology indicators remain a reliable and readily observable method for accurately and efficiently documenting the presence of wetland hydrology, and the criteria unique to each WC label such as farmed wetland or farmed wetland pasture. In contrast to long-term onsite hydrology monitoring, this process allows for a timely and accurate response to USDA program participants.

The agency recognizes the concern raised by the use of wetland hydrology indicators as identified in other Federal guidance such as regional supplements to the Corps Manual, which may be modified in the future without consideration to its impact to the identification of farmed wetland and farmed wetland pasture hydrology. This final rule removes the required use of hydrology indicators in the regional supplements to the Corps Manual, and instead identifies that hydrology indicators used for the identification of farmed wetland that is not considered a playa, pocosin, or pothole, will be identified in the local NRCS FOTG. NRCS FOTG's contain local information such as County level soils and climate data. As such, farmed wetland and farmed wetland pasture hydrology indicators may vary be County within a State due to local conditions. The identification of hydrology indicators in the local NRCS FOTG will provide local input, through consultation with the NRCS State technical committee, transparency to the public, and allow the indicators to be reflective of local conditions which meet the required inundation for 15 consecutive days or more during the growing season or 10 percent of the growing season, whichever is less, in most years. Until such time as the updates to the NRCS FOTGs have been published and public notice provided, NRCS will continue to use Group B (Evidence of Recent Inundation) hydrology indicators from the regional supplements to the Corps Manual, as specified in the interim rule. NRCS expects to issue the local level hydrology indicators for notice and comment in the **Federal Register** on a State basis within six months of the publishing of this final rule. As detailed in the interim rule preamble, NRCS will continue to use the Corps Manual, the regional supplements to the Corps Manual, and the Food Security Act Wetland Identification Procedures located in the NFSAM, Part 514, to make wetland identification decisions as identified in Step 1 of the wetland determination process described in § 12.30(c)(7). The use of hydrology indicators for farmed wetland and farmed wetland pasture occurs in Step 2 of that process, determination of wetland type (or exemption).

When observation of wetland hydrology indicators is not reliable or possible due to disturbance or other factors, it may be necessary to use alternative information such as analytic techniques like drainage equations or the evaluation of monitoring data. Wetlands and the conditions which influence wetland hydrology are variable across the landscape and there are several methods which may be used, such as those that are provided in the NRCS Engineering Field Handbook. As previously discussed, wetland hydrology field indicators are a valid and reliable method for the identification of wetland hydrology, and it would not be an efficient use of resources to require the use of analytic techniques or onsite hydrology monitoring in every farmed wetland determination when other valid methods exist.

In response to concerns raised on the identification of farmed wetland and farmed wetland pasture hydrology, this final rule provides the means by which playa, pocosin and pothole farmed wetland and all farmed wetland pasture hydrology are identified. As established first in the September 6, 1996, interim rule, playa, pocosin, and pothole farmed wetlands and all farmed wetland pasture have required periods of inundation, ponding, or saturation. Particularly with the inclusion of the saturation requirement, almost exclusively, all playa, pocosin, and pothole farmed wetlands and farmed wetland pasture hydrology criteria evaluations have been based on whether the area in question simply meets the wetland hydrology factor. The final rule change brings transparency and codifies the method by which these determinations have been made since the establishment of the farmed wetland and farmed wetland pasture designations, by stating that areas manipulated prior to December 23, 1985, but which retained wetland hydrology, as determined through step 1 of the wetland determination process in § 12.30(c)(7) and application of the procedures described in § 12.31(c), meet

the required hydrology criteria for playa, pocosin, and pothole farmed wetlands and farmed wetland pasture.

Both inundation and saturation criteria for pothole farmed wetlands were established in the September 6, 1996, interim rule and USDA does not agree that there is a need to modify these criteria.

### The 2018 Farm Bill

The 2018 Farm Bill made two modifications which affect implementation of the WC provisions. Section 2101, Duty of the Secretary, provides that no person shall become ineligible if it is determined that an exemption to the WC provisions applies, and section 2102, On-Site Inspection Requirement, provided that a reasonable effort must be made to include the affected person in an onsite visit which must be conducted prior to any determination of ineligibility. The December 2018 interim rule established in the wetland determination process in § 12.30(c)(7) that step 2 includes the determination of whether any exemptions apply, and no further modification in this final rule is needed in support of section 2101. Section 12.30(c)(4) is being amended to clarify that NRCS will continue to make a reasonable effort to include the affected person in the onsite investigation prior to making any determination of ineligibility.

### Effective Date, Notice and Comment, and Paperwork Reduction Act

In general, the APA (5 U.S.C. 553) requires a notice of proposed rulemaking be published in the **Federal Register** and interested persons be given an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation, except when the rule involves a matter relating to public property, loans, grants, benefits, or contracts. This rule involves matters relating to USDA program benefits and therefore is exempt from the APA requirements. Further, the regulations to implement the programs of chapter 58 of title 16 of the U.S.C., as specified in 16 U.S.C. 3846, and the administration of those programs, are:

• To be made as an interim rule effective on publication, with an opportunity for notice and comment,

• Exempt from the Paperwork Reduction Act (44 U.S.C. chapter 35), and

• To use the authority under 5 U.S.C. 808 related to congressional review and any potential delay in the effective date.

For major rules, the Congressional Review Act requires a delay in the effect date of 60 days after publication to allow for congressional review. This rule is not major under the Congressional Review Act, as defined by 5 U.S.C. 804(2). The authority in 5 U.S.C. 808 provides that when an agency finds for good cause that notice and public procedure are impracticable, unnecessary, or contrary to the public interest, the rule may take effect at such time as the agency determines. This rule is a not major rule for purposes of the Congressional Review Act, and therefore USDA is not required to delay the effective date for 60 days from the date of publication to allow for congressional review. Therefore, this rule is effective on the date of publication in the **Federal Register**.

### Executive Orders 12866, 13563, 13771, and 13777

Executive Order 12866, "Regulatory Planning and Review," and Executive Order 13563, "Improving Regulation and Regulatory Review," direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasized the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The requirements in Executive Orders 12866 and 13573 for the analysis of costs and benefits apply to rules that are determined to be significant. Executive Order 13777, "Enforcing the Regulatory Reform Agenda," established a Federal policy to alleviate unnecessary regulatory burdens on the American people.

The Office of Management and Budget (OMB) designated this rule as not significant under Executive Order 12866 and therefore, OMB has not reviewed this rule.

Executive Order 13771, "Reducing Regulation and Controlling Regulatory Costs," requires that, in order to manage the private costs required to comply with Federal regulations, for every new significant or economically significant regulation issued, the new costs must be offset by the savings from deregulatory actions. As this rule is designated not significant, it is not subject to Executive Order 13771. In general response to the requirements of Executive Order 13777, USDA created a Regulatory Reform Task Force, and USDA agencies were directed to remove barriers, reduce

burdens, and provide better customer service both as part of the regulatory reform of existing regulations and as an on-going approach. NRCS reviews regulations and makes changes to improve any provision that was determined to be outdated, unnecessary, or ineffective.

### Regulatory Flexibility Act

The Regulatory Flexibility Act (5 U.S.C. 601–612), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), generally requires an agency to prepare a regulatory analysis of any rule whenever an agency is required by APA or any other law to publish a proposed rule, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. This rule is not subject to the Regulatory Flexibility Act because no law requires that a proposed rule be published for this rulemaking initiative. Despite the Regulatory Flexibility Act not applying to this rule, the action only affects those entities who voluntarily participate in USDA programs and in doing so receive its benefits. Compliance with the provisions of 7 CFR part 12 is only required for those entities who choose to participate in these voluntary programs.

### Environmental Analysis

NRCS conducted an EA of the interim rule and the assessment determined there would not be a significant impact to the human environment and as a result, an EIS was not required to be prepared (40 CFR 1508.13). NRCS reviewed the comments it received to the EA and has responded to them in this preamble. NRCS has also reviewed the changes being made in this final rule, and determined that the changes do not alter the determinations that NRCS made in its original EA. Therefore, NRCS has made a finding that this final rule will not have a significant impact. A copy of the FONSI may be obtained from either of the following websites: *www.regulations.gov* or *https:// www.nrcs.usda.gov/wps/portal/nrcs/ detail/national/technical/ecosciences/ ec.* A hard copy may also be requested in one of the following ways:

• *Via mail: karen.fullen@usda.gov* with "Request for FONSI" in the subject line; or

• *A written request:* Karen Fullen, Environmental Compliance Specialist, Natural Resources Conservation Service, 9173 W Barnes Dr., Suite C, Boise, ID 83709.

## Executive Order 12372

Executive Order 12372, "Intergovernmental Review of Federal Programs," requires consultation with State and local officials that would be directly affected by proposed Federal financial assistance. The objectives of the Executive order are to foster an intergovernmental partnership and a strengthened Federalism, by relying on State and local processes for State and local government coordination and review of proposed Federal financial assistance and direct Federal development. For reasons specified in the final rule-related notice regarding 7 CFR part 3015, subpart V (48 FR 29115, June 24, 1983), the programs and activities in this rule are excluded from the scope of Executive Order 12372.

## Executive Order 12988

This rule has been reviewed under Executive Order 12988, "Civil Justice Reform." This rule will not preempt State or local laws, regulations, or policies unless they represent an irreconcilable conflict with this rule. Before any judicial actions may be brought regarding the provisions of this rule, the administrative appeal provisions of 7 CFR part 11 are to be exhausted.

## Executive Order 13132

This rule has been reviewed under Executive Order 13132, "Federalism." The policies contained in this rule do not have any substantial direct effect on States, on the relationship between the Federal Government and the States, or on the distribution of power and responsibilities among the various levels of government, except as required by law. Nor does this rule impose substantial direct compliance costs on State and local governments. Therefore, consultation with the States is not required.

## Executive Order 13175

This rule has been reviewed in accordance with the requirements of Executive Order 13175, "Consultation and Coordination with Indian Tribal Governments." Executive Order 13175 requires Federal agencies to consult and coordinate with Tribes on a Government-to-Government basis on policies that have Tribal implications, including regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

The USDA has assessed the impact of this rule on Indian Tribes and determined that this rule may have substantial direct Tribal implication that may require Tribal consultation under Executive Order 13175. Tribal consultation for this rule was included in the two 2018 Farm Bill Tribal consultations held on May 1, 2019, at the National Museum of the American Indian, in Washington, DC, and on June 26 through 28, 2019, in Sparks, NV. For the May 1, Tribal consultation, the portion of the Tribal consultation relative to this rule was conducted by Bill Northey, USDA Under Secretary for the Farm Production and Conservation mission area, as part of the Title II session. There were no specific comments from Tribes on the matter related to this rule during the Tribal consultation. If a Tribe requests additional consultation, NRCS will work with the USDA Office of Tribal Relations to ensure meaningful consultation is provided where changes, additions, and modifications identified in this rule are not expressly mandated by legislation.

## Unfunded Mandates

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA) (Pub. L. 104–4), requires Federal agencies to assess the effects of their regulatory actions on State, local, and Tribal Governments or the private sector. Agencies generally must prepare a written statement, including cost benefits analysis, for proposed and final rules with Federal mandates that may result in expenditures of $100 million or more in any 1 year for State, local or Tribal Governments, in the aggregate, or to the private sector. UMRA generally requires agencies to consider alternatives and adopt the more cost-effective or least burdensome alternative that achieves the objectives of the rule. This rule contains no Federal mandates, as defined under Title II of UMRA, for State, local, and Tribal Governments or the private sector. Therefore, this rule is not subject to the requirements of UMRA.

## E-Government Act Compliance

USDA is committed to complying with the E-Government Act, to promote the use of the internet and other information technologies to provide increased opportunities for citizen access to Government information and services, and for other purposes.

## List of Subjects in 7 CFR Part 12

Administrative practice and procedure, Coastal zone, Crop insurance, Flood plains, Loan programs—agriculture, Price support programs, Reporting and recordkeeping requirements, Soil conservation.

Accordingly, the interim rule amending 7 CFR part 12, which was published on December 7, 2018 (83 FR 63046–63052), is adopted as a final rule with the following changes:

## PART 12—HIGHLY ERODIBLE LAND CONSERVATION AND WETLAND CONSERVATION

■ 1. The authority citation for part 12 continues to read as follows:

**Authority:** 16 U.S.C. 3801, 3811–12, 3812a, 3813–3814, and 3821–3824.

■ 2. In § 12.2, in paragraph (a) designate the definition for "Wetland determination" in proper alphabetical order and revise paragraphs (4) and (5) to read as follows:

### § 12.2 Definitions.

(a) * * *

*Wetland determination* * * *

(4) *Farmed wetland* is a wetland that prior to December 23, 1985, was manipulated and used to produce an agricultural commodity at least once before December 23, 1985, and on December 23, 1985, did not support woody vegetation, and met the following hydrologic criteria:

(i) If not a playa, pocosin, or pothole, experienced inundation for 15 consecutive days or more during the growing season or 10 percent of the growing season, whichever is less, in most years (50 percent chance or more), which requisite inundation is determined through:

(A) Observation of wetland hydrology indicators as identified in the local NRCS Field Office Technical Guide;

(B) Procedures identified in State Off-Site Methods for wetland identification set forth in the local NRCS Field Office Technical Guide; or

(C) The use of analytic techniques, such as the use of drainage equations or the evaluation of monitoring data.

(ii) If a playa, pocosin, or pothole experienced ponding for 7 or more consecutive days during the growing season in most years (50-percent chance of more) or saturation for 14 or more consecutive days during the growing season in most years (50-percent chance or more). Wetlands which are found to support wetland hydrology through Step 1 of the wetland determination process in § 12.30(c)(7) and application of the procedures described in § 12.31(c) will be determined to meet the requisite criteria.

(5) *Farmed-wetland pasture* is a wetland that prior to December 23,

1985, was manipulated and managed for pasture or hayland, was not used to produce an agricultural commodity at least once before December 23, 1985, and on December 23, 1985, experienced inundation or ponding for 7 or more consecutive days during the growing season in most years (50-percent chance or more) or saturation for 14 or more consecutive days during the growing season in most years (50-percent chance or more). Wetlands which are found to support wetland hydrology through step 1 of the wetland determination process in § 12.30(c)(7) and application of the procedures described in § 12.31(c) will be determined to meet the requisite criteria.

* * * * *

■ 3. Amend § 12.30 by revising paragraphs (a)(3) and (c)(1) and (4) to read as follows:

§ 12.30    NRCS responsibilities regarding wetlands.

(a) * * *

(3) Make or approve wetland determinations, delineations and certifications, functional assessments, mitigation plans, categorical minimal effects, and other technical determinations relative to the implementation of the wetland conservation provisions of this part. Wetland determinations, delineations and certifications will be done on a tract, field, or sub-field basis;

* * * * *

(c) * * *

(1) Certification of a wetland determination means that the wetland determination is of sufficient quality to make a determination of ineligibility for program benefits under § 12.4. In order for a map to be of sufficient quality to determine ineligibility for program benefits, the map document must be legible to the extent that areas that are determined wetland can be discerned in relation to other ground features. NRCS may certify a wetland determination without making a field investigation. NRCS will notify the person affected by the certification and provide an opportunity to appeal the certification prior to the certification becoming final. All wetland determinations made after July 3, 1996, will be considered certified wetland determinations. Determinations made after November 28, 1990, and before July 3, 1996, are considered certified if the determination was issued on the June 1991 version of form NRCS–CPA–026 or SCS–CPA–026, the person was notified that the determination had been certified, and the map document was of sufficient quality to determine ineligibility for program benefits. If

issued on a different version of the form, a determination will be considered certified if there is other documentation that the person was notified of the certification, provided appeal rights, and the map document was of sufficient quality to make the determination.

* * * * *

(4) Before any benefits are withheld, an on-site investigation of a potential wetland violation will be made by NRCS. NRCS will make a reasonable effort to include the affected person in the on-site investigation. The affected person will be provided an opportunity to appeal the on-site determination to USDA if the on-site determination differs from the original determination. Such action by NRCS shall be considered a review of the prior determination and certification of the delineation. If the prior determination was a certified wetland determination, an appeal of the NRCS on-site determination shall be limited to the determination that the wetland was converted in violation of this part.

* * * * *

■ 4. Amend § 12.31 by revising paragraph (c)(2) to read as follows:

§ 12.31    Wetland identification procedures.

* * * * *

(c) * * *

(2) When a wetland is affected by drainage manipulations that occurred prior to December 23, 1985, and did not support woody vegetation on December 23, 1985, such that production of an agricultural commodity on that date was possible, wetland hydrology shall be identified on the basis of the best-drained condition resulting from such drainage manipulations.

* * * * *

Stephen L. Censky,
*Deputy Secretary, U.S. Department of Agriculture.*
[FR Doc. 2020–18626 Filed 8–27–20; 8:45 am]
BILLING CODE 3410–16–P

# DEPARTMENT OF TRANSPORTATION

## Federal Aviation Administration

### 14 CFR Part 39

[Docket No. FAA-2020-0201; Product Identifier 2020-NM-007-AD; Amendment 39-21208; AD 2020-17-03]

RIN 2120-AA64

### Airworthiness Directives; Airbus SAS Airplanes

AGENCY: Federal Aviation Administration (FAA), Department of Transportation (DOT).

ACTION: Final rule.

SUMMARY: The FAA is adopting a new airworthiness directive (AD) for certain Airbus SAS Model A318–111, –112, –121, and –122 airplanes; Model A319–111, –112, –113, –114, –115, –131, –132, and –133 airplanes; Model A320–211, –212, –214, –216, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. This AD was prompted by reports of fatigue cracks on continuity fittings at the lower framing of the front windshield on airplanes on which a certain production modification has been embodied. Additional analysis showed that certain certification requirements for damage tolerance and fatigue are not met on airplanes in a certain post-production modification configuration. This AD requires repetitive high frequency eddy current (HFEC) inspections of the central node windshield area for cracking, and applicable corrective actions if cracking is found, as specified in a European Union Aviation Safety Agency (EASA) AD, which is incorporated by reference. The FAA is issuing this AD to address the unsafe condition on these products.

DATES: This AD is effective October 2, 2020.

The Director of the Federal Register approved the incorporation by reference of a certain publication listed in this AD as of October 2, 2020.

ADDRESSES: For material incorporated by reference (IBR) in this AD, contact the EASA, Konrad-Adenauer-Ufer 3, 50668 Cologne, Germany; telephone +49 221 8999 000; email ADs@easa.europa.eu; internet www.easa.europa.eu. You may find this IBR material on the EASA website at https://ad.easa.europa.eu. You may view this IBR material at the FAA, Airworthiness Products Section, Operational Safety Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195.

**FINDING OF NO SIGNIFICANT IMPACT
FROM FINAL REGULATIONS IMPLEMENTING THE
HIGHLY ERODIBLE LAND CONSERVATION AND WETLAND CONSERVATION
PROVISIONS OF THE FOOD SECURITY ACT OF 1985, AS AMENDED**

The National Environmental Policy Act (NEPA) requires Federal agencies to prepare an Environmental Impact Statement (EIS) for major Federal actions significantly affecting the quality of the human environment. To determine whether the impact of a proposed federal action will be significant enough to warrant an EIS, the agency may prepare an Environmental Assessment (EA). If, based on the EA, the agency concludes that the proposed action will not significantly impact the environment, it issues a Finding of No Significant Impact (FONSI) in lieu of an EIS.

In 2018, the Natural Resources Conservation Service (NRCS) prepared an EA assessing the environmental effects of its promulgation of an interim rule revising the Highly Erodible Land Conservation (HELC) and Wetland Conservation (WC) regulations at 7 CFR Part 12. The interim rule made the following clarifying amendments to the regulations at 7 CFR Part 12:

1. **Precipitation data used in wetland determinations**: The WC provisions define "wetland" in reference to normal circumstances, but wetlands are dynamic systems that can vary based on changing climatic conditions. NRCS uses a precipitation data set based on U.S. Climate Normals during the 1971-2000 period in reference to determining "normal circumstances." NRCS believes the use of this specific precipitation dataset ensures the consistency of determinations over time and represents normal climatic conditions at enactment of the 1985 Act, especially when evaluating the scope and effect of any drainage features that were installed prior to 1985. Previously, the regulation did not identify the use of any particular precipitation dataset. However, the 1971-2000 precipitation data set has been used by NRCS for nearly 20 years and in the interim rule, USDA identified that it is the data set used for determining normal climatic conditions.

2. **Definitions of pothole, playa, pocosin and other terms**: Due to their residual function, unique hydrology criteria are applied to depressional wetlands identified as potholes, playas, and pocosins that were manipulated prior to 1985, though such wetland landforms were not defined in regulation. In the interim rule, USDA put into regulation the definitions that were established in policy in 1996, which provided increased consistency in their identification and greater transparency and predictability for the public.

   USDA also added definitions of the terms "best drained condition," "normal climatic conditions," and "wetland hydrology" to clarify how these terms have long been used in policy, training, and application; and revised the definition of "wetland determination" to clarify how hydrology indicators are used in assigning WC provision labels of Prior Converted Cropland, Farmed Wetland, and Farmed Wetland Pasture.

3. **Certification of wetland determinations:** NRCS began making wetland determinations in 1986, but the Food, Agriculture, Conservation, and Trade Act of 1990 (1990 Act) required NRCS to certify wetland determinations. The 1990 Act directs USDA to delineate wetlands on a map, provide notice to affected producers, certify each map as sufficient evidence to determine ineligibility, and provide producers an opportunity to appeal the mapped delineation prior to the certification becoming final. As stated in the 1990 Act's Conference Report, the certification process was "to provide farmers with certainty as to which of their lands are to be considered wetlands" for purposes of the WC provisions. These 1990 Act requirements were incorporated into the April 23, 1991 version of 7 CFR Part 12. As required by The Federal Agriculture

1

Improvement and Reform Act of 1996 (1996 Act), certified wetland determinations remain valid and in effect as long as the land is in agricultural use or until the producer makes a valid request for review of the determination.

The 1996 interim rule at §12.3 identified that "[a]ctions taken and determinations made prior to July 3, 1996, are subject to regulations set forth in this part as of July 2, 1996, except as otherwise provided in this part." While the 1996 interim rule in §12.30(c) specified that wetland determinations made after July 3, 1996 would be considered certified, it did not specifically identify the certification status of pre-July 3, 1996 wetland determinations. However, under the pre-July 3, 1996 version of the regulations, a wetland determination was certified if it was delineated on a map, notice was provided to the producer that such determination was sufficient for determining ineligibility, and the producer was given an opportunity to appeal the determination. In the interim rule, USDA updated the regulations to clarify that wetland determinations completed between November 28, 1990 and July 3, 1996 under the regulations in effect from April 23, 1991 through July 2, 1996 are certified if they meet the requirements for certification in the 1990 Act and associated regulation. This additional language in §12.30(c) is for clarification purposes and does not change the legal status of any wetland determination made between November 28, 1990 and July 3, 1996, nor does NRCS have discretion to change certified wetland determinations except under the limited circumstances identified in the current regulations. Thus, the clarifying language in the interim rule did not change in any way how NRCS administers the certified wetland determination portion of the WC provision, the regulatory basis for certified wetland determinations, nor how such determinations are certified as a matter of law.

4.  **Simplification of hydrology criteria:** Previous regulatory language provides hydrology criteria with reference to the "number of days" of inundation or soil saturation for the wetland types of farmed wetland, farmed wetland pasture, and prior converted cropland. The wetland scientific community has moved away from establishing any such "number of days" standard which cannot reasonably be applied over broad geographic regions. In the interim rule, USDA provided greater technical detail on the indicators used to determine if hydrology criteria are met when assigning WC provision labels for Prior Converted Cropland, Farmed Wetland, and Farmed Wetland Pasture. As documenting a certain number of days of inundation or saturation is a difficult and seldom-used practical standard, this change was not expected to affect the number or extent of wetlands identified as farmed wetlands and farmed wetland pasture.

5.  **Wetland minimal effect exemption:** The 1985 Act provides for an exemption for wetland conversions which have only a minimal effect on the functional hydrological and biological value of the wetland and other wetlands in the area. Previous regulatory language required the minimal effect determination be based upon a functional assessment made during an on-site evaluation, even for other wetlands in the area. This requirement was overly burdensome and on-site evaluations could not always be made on property not controlled by the subject person. The interim rule removed this requirement which better allows USDA to provide this statutory exemption to USDA program participants but was not expected to provide a substantially different decision than the previous language, as effective functional assessments can also be conducted remotely.

6.  **Other minor technical corrections**. Other minor technical corrections were made, such as adjusting the tense of hydrology terms in the definition of wetland determination at §12.2 and providing a more descriptive title to §12.31.

Based on the analysis in the EA, NRCS Chief, the responsible Federal official, determined there would

2

not be a significant impact to the human environment from the interim rule and issued a FONSI. The 2018 EA, together with other assessments prepared for to analyze the impacts of implementing the HELC and WC provisions in 1986, 1990, and 1996, are incorporated herein by reference.

NRCS reviewed public comment on the interim rule, including comment received on the EA, and responded to all comment in the preamble of the final rule.

The final rule adopts the interim rule published on December 7, 2018 amending 7 CFR part 12 with few changes: 1) minor changes to the definitions of farmed wetland and farmed-wetland pasture in §12.2 to provide clarification to their hydrology criteria; 2) relocates an interim rule clarification in §12.30 that wetland determinations may be made on a tract, field, or sub-field basis; 3) incorporates a non-discretionary amendment from the Agricultural Improvement Act of 2018 that requires USDA to make a reasonable effort to include the affected person in an on-site investigation made prior to a determination of ineligibility; and 4) clarifies in §12.31 that consideration of best-drained conditions in NRCS' wetland identification procedures requires the site did not support woody vegetation on December 23, 1985, such that production of an agricultural commodity was possible.

NRCS considered the minor changes being made in the final rule and determined that they will not result in substantially different environmental impacts from those described in the 2018 EA As detailed in the final rule preamble, the changes to the definition of non-playa, pocosin or pothole farmed wetlands are simply to replace the use of hydrology indicators of inundation from the regional supplements to the U.S. Army Corps of Engineers Wetlands Delineation Manual with indicators identified in the local NRCS Field Office Technical Guide (FOTG). Because the local NRCS FOTG will still identify hydrology indicators representing inundation, the slight change in the definition will not result in notable changes in the determinations made by NRCS. The changes to the definitions of farmed wetland and farmed-wetland pasture including saturation requirements are consistent with long-standing NRCS practice that these wetlands simply meet the wetland hydrology factor. The relocation of the clarification regarding wetland determinations being made on a tract, field, or sub-field basis is entirely administrative in nature. Similarly, the incorporation of the provision requiring the inclusion of the affected person in an on-site investigation does not have the potential to have any environmental effect. Finally, the clarification to the consideration of best-drained conditions is in keeping with the long-standing definition of prior-converted cropland and farmed wetland, in that both have always required the absence of woody vegetation on December 23, 1985.

As stated in 7 CFR §12.1(b), the purposes of the provisions are to remove certain incentives for persons to produce agricultural commodities on highly erodible land or converted wetland and to thereby—

      (1) Reduce soil loss due to wind and water erosion;
      (2) Protect the Nation's long-term capability to produce food and fiber;
      (3) Reduce sedimentation and improve water quality; and
      (4) Assist in preserving the values, acreage, and functions of the Nation's wetlands.

The NRCS Chief, as the responsible Federal official, must make a finding on whether promulgation of this final rule, as determined to be substantially similar to that described in Alternative B of the EA for the interim rule, constitutes a major Federal action significantly affecting the quality of the human environment such that an EIS should be prepared.

The EA accompanying the interim rule has provided the analysis needed to assess the significance of the impacts of the proposed action. I have determined, for the reasons outlined below, that there will be no significant individual or cumulative impacts on the quality of the human environment as a result of implementing the HELC and WC provisions or the clarifications to the HELC and WC provisions made by the final rule. Therefore, neither an EIS nor an additional EA is required.

1. The final rule will not result in significant adverse effects on public health or safety. The application of the HELC and WC provisions is expected to discourage USDA program participants from converting sensitive lands to agricultural production which will tend to reduce soil loss from wind erosion that can result in airborne particulate matter and improve water quality.

2. NRCS has no evidence indicating there will be any significant adverse effects to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas from the final rule, particularly on a national basis. Implementation of the HELC and WC provisions has been shown to benefit soil and water resources, including wetlands. As cited in the interim rule EA, the 1991 National Resources Inventory (NRI) completed a wetlands survey that confirmed wetland conversions to agricultural commodity crop production had slowed compared to those occurring before the 1985 Farm Bill and noted that agricultural activities seemingly had less impact on wetland conversions than expected (Schnepf 2008). The EA also cites the 2010 NRI Summary Report (Sucik and Marks 2014) analysis of data showing the status and recent trends of wetlands in four regions of the U.S. The report documents wetland losses in the northeast and southeast, primarily resulting from urban development, not conversion to agriculture. Further, the central and western regions have experienced a gain in wetland acres, primarily on agricultural lands. In addition, the U.S. Fish and Wildlife Service's Status and Trends of Wetlands in the Conterminous United States 2004 to 2009 Report to Congress showed a net gain of 100,020 acres of wetland in the agriculture land use category.

3. The effects of the HELC and WC provisions on the quality of the human environment are not controversial. The EA and the public comments received demonstrate that there is no substantial dispute as to the size, nature or effects of the interim rule, and therefore it is not highly controversial for purposes of NEPA. While there may be public opposition and controversy regarding HELC and WC provisions because they relate to wetlands and potential eligibility for USDA benefits, that public opposition does not rise to a controversy over the effects of the final rule, and does not affect the expected environmental effects of the rule. As stated above, NRI reports and other sources have consistently demonstrated the effectiveness of the HELC and WC provisions in reducing soil erosion and discouraging producers from converting wetlands to make production of agricultural commodities possible. These effects are widely recognized and are not controversial.

4. The effects of the final rule are not considered highly uncertain and do not involve unique or unknown risks. USDA was first authorized to implement the HELC and WC provisions by the Food Security Act of 1985 (1985 Act). As previously mentioned, NRI data collected in 1991 showed the WC provisions slowed the conversion of wetlands to commodity crop production after the 1985 Act as intended by Congress. In addition, the NRI Summary Report from 2015 shows soil erosion rates on cropland decreased 34 percent between 1982 and 2015. The final rule does not substantially change the procedures by which USDA identifies wetlands subject to the WC provisions according to long-standing internal agency policy; it merely clarifies and codifies those procedures in the regulations, therefore it will not result in a significant difference in the acreage of highly erodible land or wetlands subject to the HELC and WC provisions.

5. The final rule will not establish a precedent for future actions with significant adverse effects, nor does it represent a decision in principle about future considerations. The final rule makes minor changes to the interim rule's updates to the regulations to codify the wetland determination procedures used by NRCS and make minor administrative changes. Future updates to the regulations may result from changes Congress makes to the HELC and WC provisions or another decision by USDA that further clarifications are needed.

4

The final rule provides the public with transparency, provides certainty to USDA program participants, and improves the consistency of how the WC provisions are implemented by USDA in all 50 States, including the Caribbean and Pacific Island Areas. Publication of the interim rule provided comments to help USDA better explain the wetland identification procedures used by NRCS. The final rule is not expected to substantially change the extent of agricultural lands subject to the HELC and WC provisions over time, and will not have any significant direct, indirect, or cumulative impact on the environment, particularly when focusing on the significant adverse impacts that NEPA is intended to help decisionmakers avoid, minimize, or mitigate.

6. The final rule will not adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or cause loss or destruction of significant scientific, cultural, or historical resources. Historic properties are not affected by USDA's implementation of the HELC and WC provisions. HELC and WC conservation is voluntary on the part of agricultural producers who wish to be eligible for USDA program benefits, and as such is not an undertaking with the potential to affect historic properties.

7. The final rule is not related to other actions with individually insignificant but cumulatively significant impacts. NRCS uses the procedures described in the rule to make technical determinations regarding the presence or absence of highly erodible land or wetlands subject to the HELC and WC provisions on lands owned or operated by producers participating in USDA programs and whether exemptions to the HELC and WC provisions apply. Much of the determination work is done in the office using remote sources of data. When on-site data collection is necessary, it is limited to pedestrian surveys of subject land to identify plants and indicators of hydrology and hydric soils. The only ground-disturbing activity associated with technical determinations is the taking of small soil samples from a few representative observation points using hand tools. Actions taken by producers subsequent to NRCS' technical determinations are not federal actions under the control of NRCS, as compliance with the HELC and WC provisions is voluntary and NRCS has no authority to either permit or prohibit producer's actions.

8. The final rule will have no effect on endangered or threatened species or critical habitat. Species and habitat protected under the Endangered Species Act are not affected by USDA's implementation of the HELC and WC provisions. Conservation compliance is voluntary on the part of agricultural producers who wish to be eligible for USDA program benefits, and as such is not a federal action with the potential to affect protected species or habitat. Further, as established by a memorandum (FWS/AES/DCHR/007178) dated April 2, 2001 from the U. S. Fish and Wildlife Service's Acting Deputy Director to the Regional Directors, "consultation under section 7(a)(2) of the Endangered Species Act is not required when the Natural Resources Conservation Service conducts official wetland determinations or delineations on private lands under the Food Security Act of 1985, as amended." The proposed action would indirectly, by continuing to discourage conversion of wetlands to commodity crop production, aid in the conservation of endangered and threatened species that use wetland habitats. Additionally, the interim and final rule are codifying long-standing policy and this codification does not alter the status quo. Thus, NRCS has determined that the rule would have no effect on any listed species.

9. The final rule does not threaten the violation of Federal, State, or local requirements imposed for protection of the environment. HELC and WC conservation is voluntary on the part of agricultural producers who wish to be eligible for USDA program benefits and no federal action results from an agricultural producer's decision to comply. Compliance with other Federal, State, or local requirements remains the responsibility of individual agricultural producers.

012011

8/19/2020

Date

Kevin D. Norton
Acting Chief, Natural Resources Conservation Service
U.S. Department of Agriculture