## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**NATIONAL WILDLIFE FEDERATION**,

Plaintiff,

v.

**MATTHEW LOHR; SONNY PERDUE**,

Defendants.

Civil Action No. 19-cv-2416 (TSC)

## <u>MEMORANDUM OPINION</u>

Plaintiff National Wildlife Federation ("NWF") challenges a 2020 Final Rule from the Natural Resource Conservation Service ("NRCS") regarding certification of maps delineating wetlands. NRCS is charged with carrying out a wetland conservation program that incentivizes farmers not to use wetlands for agricultural purposes by tying eligibility for certain Department of Agriculture benefits to their preservation of certified wetlands. Congress authorized NRCS to certify wetlands in 1990 on the premise that those certifications would be updated over time, but in 1996, Congress amended the statute and NRCS issued a regulation providing that all wetlands so designated after the regulation went into effect would be considered "certified" going forward. This left NRCS to decide whether wetlands it determined between 1990 and 1996 should be considered "certified" going forward on a case-by-case basis.

NWF claims that from 1996 to 2013, NRCS decided whether pre–1996 maps delineating wetlands should be considered "certified" wetland determinations based on the map's accuracy, but has since considered those determinations certified if the map is legible, rather than accurate, as formalized in its 2020 Final Rule. NRCS, however, claims that the Final Rule clarified, rather

than changed, its policy regarding whether pre–1996 wetland determinations should be considered "certified."

In response to the 2020 Final Rule, Plaintiff filed this action, claiming that NRCS changed its policy regarding pre–1996 wetland certifications without exercising reasoned decision-making in violation of the Administrative Procedure Act ("APA"), without consulting with Fish and Wildlife Service ("FWS") in violation of the Endangered Species Act ("ESA"), and without taking a hard look at the environmental impacts of its action in violation of the National Environmental Policy Act ("NEPA").  Defendants, in turn, contend that Plaintiff lacks standing, and the 2020 Final Rule complies with the APA, the ESA, and the NEPA.  Plaintiff moved for summary judgment on December 1, 2020, ECF No. 27, and Defendants cross-moved on January 29, 2021, ECF No. 28.

Having considered the parties' briefing and the record, the court will GRANT Plaintiff's Motion for Summary Judgment and DENY Defendants' Cross Motion for Summary Judgment. The court concludes that Plaintiff has standing, and that the 2020 Final Rule violates the APA because NRCS changed its policy regarding the certification of pre–1996 wetland determinations without providing a reasoned explanation.[1]

## I.      BACKGROUND

### A.     Legal and Factual Background

*i.      The wetland conservation program, the statutory scheme, and NRCS regulations*

In 1985, Congress initiated a conservation program aimed at protecting agricultural wetlands.  *See* Food Security Act of 1985, Pub. L. No. 99-198, 99 Stat. 1354 (1985).  The

---

[1] Because the court holds that the 2020 Final Rule violates the APA, it does not reach Plaintiff's alternative arguments that the 2020 Final Rule violates the ESA and the NEPA.

program is designed to preserve agricultural wetlands by eliminating certain agricultural benefits

for those who use wetlands for agricultural purposes or who convert those wetlands.  *See* 16

U.S.C. § 3821; 7 C.F.R. § 12.1.  "The term 'converted wetland' means wetland that has been

drained, dredged, filled, leveled, or otherwise manipulated . . . for the purpose or to have the

effect of making the production of an agricultural commodity possible."  AR000010.  NRCS—

previously known as the Soil Conservation Service—is the component of the Department of

Agriculture tasked with administering the wetland conservation program.  *See* AR010520.

Congress amended the 1985 Food Security Act in the 1990 and 1996 Farm Bills.  In the

1990 Farm Bill, Congress required NRCS to "delineate wetlands on wetland delineation maps,"

"certify each such map as sufficient for the purpose of making determinations of ineligibility for

program benefits," and periodically "review and update" the certifications.  Food, Agriculture,

Conservation, and Trade Act of 1990, Pub. L. No. 101-624, 104 Stat. 3359, 3573 (1990).  This

certification process was intended "to provide farmers with certainty as to which of their lands

are to be considered wetlands" for benefits purposes.  AR000176.  In response, NRCS

promulgated regulations in 1991 specifying that wetland determinations "made prior to

November 28, 1990" would be certified "if they were made according to" a set of certification

requirements.  AR000231–32.

The four agencies with jurisdiction over wetlands—the Department of Agriculture, the

Environmental Protection Agency, the Department of the Interior, and the Department of the

Army—entered into a Memorandum of Agreement ("MOA") in 1994 to set uniform mapping

conventions to be used in implementing the Food Security Act's and the Clean Water Act's

wetland preservation requirements.  AR000376.  With respect to pre–1990 wetland

determinations, the MOA provided that NRCS would review and certify the determinations

using the agreed-upon mapping conventions. AR000381. But for determinations issued between 1990 and 1994, NRCS was to "establish priorities to certify [the] wetland delineations" in compliance with the MOA. *Id.* The MOA also provided that post–1994 wetland certifications would be updated on a five-year cycle. AR000378.

Subsequently, in the 1996 Farm Bill, Congress directed NRCS to "delineate, determine, and certify all wetlands located on subject land on a farm." Federal Agriculture Improvement and Reform Act of 1996, Pub. L. No. 104-127, 110 Stat. 888, 987 (1996). The statute also was amended to provide that certifications "shall not be subject to a subsequent wetland certification" to prevent prejudice to farmers, who are likely to rely on those certifications in making business decisions. *Id.* at 988.

In implementing the 1996 Farm Bill, NRCS passed regulations providing that "[a]ll wetland determinations made after July 3, 1996, . . . will be considered certified wetland determinations," AR000501, and "[i]f NRCS certified a wetland determination prior to July 3, 1996, the certification will remain valid," AR 000490. The regulations further noted that NRCS would continue to evaluate "existing wetland determinations" that had not been certified under the MOA. *Id.*

NRCS's 1997 quality assessment and other contemporaneous reports found that most pre–1996 wetland determinations "fail[ed] to meet the current quality criteria" necessary to be treated as certified. AR000551; *accord* AR000540; AR000513–23; AR000542–43. Thus, in practice, NRCS only considered pre–1996 wetland determinations to be certified if they met quality mandates and farmers had been informed of their appeal rights. AR001345.

> ii.     *Post–2013 practice of certifying pre–1996 wetland determinations*

In the years leading up to 2013, NRCS experienced a surge in requests for certified wetland determinations from the Prairie Pothole region because of increased demand for corn and soybeans.  AR000950.  State-level NRCS offices, however, were not taking a uniform approach to these requests regarding pre–1996 certifications.  AR001359.  Accordingly, in early 2013, NRCS proposed making "procedural changes and clarifications" to its implementation of the wetland conservation program.  AR000952.

A Department of Agriculture's Inspector General's report ("OIG Report") indicated that, in 2013, NRCS began treating pre–1996 determinations as certified so long as they included legible maps and informed farmers of their appeal rights.  AR001345–48.  The OIG Report concluded that NRCS made this change to clear a backlog by focusing on the legibility of the pre–1996 maps instead of accuracy or compliance with quality criteria.  AR001342–43.  When the OIG Report was issued in 2017, it documented that NRCS's change in practice had already caused an increase in wetland destruction.  AR001347.  NRCS disputed OIG's conclusion that it changed its policy, explaining that OIG misconstrued its efforts to clarify the policy, incorrectly interpreted prior studies of wetland determinations, and incorrectly characterized NRCS's motivation to clear a backlog of requests for wetland determinations.  AR001355–60.

The change identified in the OIG Report was implemented in four steps.  First, NRCS issued a decision memorandum in 2013 instructing state NRCS offices to implement this new policy.  AR000953–56.  The memorandum provided that state offices in the Prairie Pothole region should accept pre–1996 determinations as certified so long as "documentation exist[ed] to show that [farmers] were provided appeal rights."  AR000955.  According to the OIG Report, state agency officials were directed to "go forward with the proposed change of accepting [pre–

1996] wetland determinations . . . while waiting for" written and formal guidance on the issue. AR001343–44.  Second, in 2017 NRCS updated its manual to expand the policy "clarifi[cation]" nationwide.  AR001375.  This amendment stated that NRCS may certify pre–1996 wetland determinations so long as the map is "legible."  AR001363.  Third, in 2018 NRCS issued an Interim Rule formalizing this legibility policy but noting that it was a clarification, rather than a change.  AR001426–27.  The Interim Rule provided that pre–1996 wetland determinations were deemed certified if they were issued on Form CPA-026, which provided appeal rights; the farmer had been notified of the determination; and "the map document was of sufficient quality to determine ineligibility for program benefits."  AR001427–28.  The rule, however, defined "sufficient quality" as the map being "legible."  AR001427.  Interested parties, including Plaintiff, submitted comments raising concerns about the change in policy.  *See* AR001710–45; AR001812; AR009319–20.  NRCS prepared an Environmental Assessment under the NEPA to evaluate the Interim Rule's environmental effects, and found that it would not have significant environmental effects.  AR001401–19.

Finally, in 2020 NRCS issued a Final Rule codifying this policy change with only minor changes.  The Final Rule again stated that all determinations conducted between 1990 and 1996 are considered certified so long as they are legible.  AR012005.  In the preamble, NRCS stated that the 2020 Final Rule was a "codification and clarification of existing practice rather than a substantive change of overall regulatory framework or policy."  AR011993.  It further noted that NRCS disagreed with the OIG Report.  AR12000.  NRCS did not find it necessary to consult with FWS under the ESA, *see* AR011996–97, or issue an updated Environmental Impact Statement under the NEPA in connection with the Final Rule, but it did issue a new finding of no significant impact under the NEPA, AR012006–10.

**B.      Procedural Background**

Plaintiff initially brought this lawsuit on August 9, 2019, following the NRCS's Interim Rule, naming as Defendants Matthew Lohr, Chief of the NRCS, and Sonny Perdue, Secretary of the Department of Agriculture.  *See* Compl., ECF No. 1.  Once Defendants informed the court that NRCS planned to issue a Final Rule on the matter, the court granted a stay.  *See* Mot. to Stay Briefing, ECF No. 19; Min. Order, July 15, 2020.  The stay was lifted when the Final Rule was issued.  *See* Min. Order, July 15, 2020; Am. Min. Order, Oct. 5, 2020.

Plaintiff subsequently filed an Amended Complaint challenging the 2020 Final Rule as violating the APA, the ESA, and the NEPA.  Am. Compl., ECF No. 24 at 61–66.  Plaintiff seeks declaratory and injunctive relief prohibiting NRCS from "certifying pre-1996 wetland determinations without rigorous evidence of their accuracy," requiring NRCS "to comply with the ESA by a date certain on a schedule set by the Court and to avoid or remediate harm to listed species until such time as consultation is complete" and to ensure that precautionary measures have been implemented, along with attorneys' fees and costs.  *Id.* at 66–68.

## II.      LEGAL STANDARD

Federal Rule of Civil Procedure 56(a), which typically supplies the legal standard on summary judgment, does not apply to motions for summary judgment seeking APA review "because of the court's limited role in reviewing the administrative record."  *Coe v. McHugh*, 968 F. Supp. 2d 237, 239 (D.D.C. 2013).  Instead, the court must decide as a matter of law "whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Id.* at 240.  The APA standard of review similarly applies to the ESA and NEPA claims.  *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 686 (D.C. Cir. 1982) (ESA); *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010) (NEPA).

This court is "highly deferential" to agency action, *Envt'l. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981), only setting it aside if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2).  The court may not "substitute its judgment for that of the agency," but instead must consider whether "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*Motor Vehicle Mfrs.*").  The plaintiff bears the burden of establishing that the agency's action is invalid.  *Fulbright v. McHugh*, 67 F. Supp. 3d at 81, 89 (D.D.C. 2014).

## III.   ANALYSIS

### A.   Article III Standing

It is an "essential and unchanging part of the case-or-controversy requirement" that a plaintiff must establish Article III standing to sue in federal court.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish standing at summary judgment, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *accord Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592 (D.C. Cir. 2023).

The associational standing doctrine allows environmental organizations to establish standing by demonstrating that "(a) its members [or any one of them] would otherwise have standing to sue in their own right; (b) the interests [the entity] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Defendants do not dispute the second and third elements of associational standing, only the first—whether any of Plaintiff's individual members would have standing to sue in their own right.  But, as explained below, three of Plaintiff's members have standing.  Each has aesthetic and recreational interests in the wetlands and wetland-dependent-wildlife in the Prairie Pothole region; harm to those interests is traceable to the procedural deficiencies Plaintiff alleges in the NRCS's change in policy regarding wetland determinations; and a favorable decision from this court is likely to redress Plaintiff's members' injuries because NRCS would revisit the change in agency policy with additional procedural safeguards and could come to a different conclusion. That is all Article III requires.

        *i.*     *Injury in fact*

Defendants do not contest Plaintiff's injury in fact.  *See* Defs.' Reply to Opp'n to Mot. for Summ. J., ECF No. 33 at 2 ("Defs.' Reply").  This court, however, has "an independent obligation to ensure [its] jurisdiction."  *Muthana v. Pompeo*, 985 F.3d 893, 901 (D.C. Cir. 2021). "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions."  *TransUnion LLC*, 141 S. Ct. at 2205.  "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court."  *Id.*

In the environmental context, that means that care and concern for the aesthetics or the well-being of the environment alone does not suffice to establish injury in fact.  *See id.* Typically, a plaintiff challenging the effect of a ruling or decision on the environment alleges

injury in fact based on their "geographic proximity to the action challenged." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267 (D.C. Cir. 2002). In other words, plaintiffs may establish standing to challenge environmental harms by alleging "that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *accord Housatonic River Initiative v. U.S. EPA*, 75 F.4th 248, 265 (1st Cir. 2023) (post–*TransUnion LLC*).

The D.C. Circuit has found an injury in fact in several cases where plaintiffs have aesthetic and recreational interests in specific areas of land or species that may be harmed by agency action. *E.g.*, *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 593 (D.C. Cir. 2019) (aesthetic and recreational interest in observing whooping cranes); *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017) ("recreational, scientific, aesthetic, educational, moral, spiritual and conservation interests" in "observing the Valley Elderberry Longhorn Beetle in its natural California habitat"); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305–06 (D.C. Cir. 2013) (members had aesthetic interests in the land surrounding West Antelope II tracts, where an agency had authorized mining that would increase "local air, water and land pollution"). So too have other appellate courts. *See, e.g.*, *Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1188 (9th Cir. 2023) ("Petitioners have undertaken efforts to preserve the populations of salmon and steelhead in the Basin, and their members assert individual aesthetic and other interests in the fish populations."). This case is no different.

Plaintiff identifies three individual members with injuries in fact: William Antonides, Michael McEnroe, and Allyn Sapa. Antonides declares that he resides in the "heart of the 'Prairie Potholes' region—an area marked by shallow depressions left behind by receding

glaciers that today form an elaborate network of wetlands" and the destruction of wetlands has impaired his use and enjoyment of his property.  Antonides Decl., ECF No. 27-4 ¶¶ 2, 12.  He further avers that he "derive[s] deep personal gratification from viewing these areas and teaching [his] children and grandchildren about the flora and fauna found" there, *id.* ¶ 2, goes hunting multiple times per year in the area, *id.* ¶ 8, and enjoys birdwatching in the "unique ecology" of the wetlands, *id.* ¶¶ 9–11.  McEnroe declares that he hunts waterfowl, such as ducks, regularly, is an "avid birdwatcher" and wildlife photographer, and enjoys seeing "the numerous bird species that rely on wetlands in the Prairie Pothole region."  McEnroe Decl., ECF No. 31-2 ¶¶ 6–7. Finally, Sapa declares he has a "strong personal . . . interest in" the public and private wetlands in North Dakota and "especially the wildlife that depends on wetlands for habitat" because he regularly hunts duck and geese and is a "recreational birdwatcher."  Sapa Decl., ECF No. 31-1 ¶ 5.  Antonides, McEnroe, and Sapa have sufficiently stated injuries, and therefore Plaintiff has an injury in fact.

      *ii.*    *Traceability*

Because Plaintiff alleges "archetypal procedural injur[ies]," the second element of standing—known as traceability or causation—bears particular importance.  *Am. Fuel & Petrochemical Mfrs.*, 937 F.3d at 592.  In the procedural injury context, a plaintiff "need not show that a harm to a member 'has in fact resulted from the [agency's] procedural failures,'" but rather that "there is a 'substantial probability'" that the challenged agency action caused the plaintiff's injury.  *Id.* (citation omitted).  This inquiry requires two causal links: one connecting the procedural deficiency to the substantive agency action, and another connecting that substantive agency action to the plaintiff's injury.  *Ctr. for Biological Diversity*, 861 F.3d at 184.

Regarding the first link, "[a]ll that is necessary is to show that the procedural step was connected to the substantive result." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (citation omitted).

In cases where the alleged injury flows from independent actions of third parties, courts "require only a showing that 'the agency action is at least a substantial factor motivating the third parties' action.'" *Tozzi v. U.S. Dep't of Health and Hum. Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001) (citation omitted).  Indeed, the Supreme Court recently found standing in a civil rights case involving an independent actor, holding that the "practical consequence" of a court ordering a "change in legal status" "'would amount to a significant increase in the likelihood'" that the independent actor would make the choice that would allow the plaintiff to "'obtain relief that directly redresses the injury suffered.'" *Reed v. Goertz*, 589 U.S. 230, 234 (2023) (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

Plaintiff has shown causation because (1) the procedural deficiencies Plaintiff alleges are connected to the agency action it challenges, and (2) the challenged action is linked to Plaintiff's member's injuries.  First, Plaintiff connects the substantive action it challenges—NRCS's change in its "policies implementing the wetland conservation program"—to the procedural deficiencies it identifies: that in changing its policies, NRCS failed to "acknowledge[e] that it has altered its approach or provid[e] any reasoned basis for this new approach," as well as "evaluat[e] its impacts on listed species or the environment more broadly."  Pl.'s Mem. in Supp. of Mot. for Summ. J., ECF No. 27-1 at 3 ("Pl.'s Mot.").  Plaintiff's arguments are supported by the audit that resulted in the OIG Report, which concluded that there was an undocumented change in agency policy that "replaced its backlog of pending [wetlands] determinations with inaccurate determinations."  *See* AR001336–52.

Second, the record supports a significant likelihood that farmers would not convert wetlands if the determinations were revised.  For example, Sapa declared that "[f]ederal incentives to conserve wetlands are critically important, due to the fact that farmers do not otherwise receive direct financial benefits from wetlands on their private lands, and instead otherwise have an incentive to fill, drain, or destroy wetlands to maximize the efficient production of crops on private lands."  Sapa Decl. ¶ 10.  Indeed, the Farm Bureau has made a similar point: "the conservation compliance programs operate fundamentally as regulatory programs," because farmers "stand to lose vital payments, loans, and crop insurance benefits in the event of adverse determinations."  AR001812.  Plaintiff has therefore established a "significant likelihood" that farmers would choose to act in accordance with the economic incentives of agency action.

Defendants press several arguments to the contrary.  First, they contend that Plaintiff fails to "tie its interest in wildlife to a specific place used by the plaintiff and . . . show that the policy it challenges is the cause of the negative impacts in that place."  Defs.' Reply at 2; *accord* Mem. in Opp'n to Mot. for Summ. J., ECF No. 29 at 24 ("Defs.' Opp'n").  Defendants argue that Plaintiff's members' declarations must "identify . . . specific wetland areas where drainage or fill of wetlands would harm their interests" and "demonstrate that the draining or filling of those specific areas is caused by" the agency action "they challenge."   Defs.' Reply at 3.  But Defendants' argument is premised on a stricter standard than Article III requires.  Plaintiff's members need not tie their aesthetic and recreational interests in wetlands and wetland-dependent wildlife to any specific wetland, because Plaintiff does not challenge an agency action affecting any specific wetland.  *Contra Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, No. 22-cv-1716, 2023 WL 7182041, at *3–4 (D.D.C. Nov. 1, 2023) (requiring the plaintiffs to tie

their injuries to specific drilling permits because the plaintiffs challenged individual drilling approvals). Plaintiff challenges a change in agency policy regarding wetland determinations, and Plaintiff's members declare aesthetic and recreational interests in the Prairie Pothole region, which contains an "elaborate network of wetlands." Antonides Decl. ¶ 2; *accord* McEnroe Decl. ¶ 9; Sapa Decl. ¶ 7. Plaintiff "need not show that harm to a member 'has in fact resulted from'" the change in agency policy.

Defendants contend that *Public Employees for Environmental Responsibility v. Bernhardt*, No. 18-cv-1547, 2020 WL 601783 (D.D.C. Feb. 7, 2020), supports their argument. *See* Defs.' Reply at 3. In *Bernhardt*, the court concluded that plaintiffs' members' declarations were filled with conclusory assertions that removing species of black bears from the endangered species list would make it more difficult for plaintiffs' members to view the bears. 2020 WL 601783, at *5–6. Plaintiffs did not include any facts to support the causal links, merely asserting them to be true, which was insufficient to demonstrate standing at the summary judgment stage. *See id.* Not so here.

Second, Defendants contend that there are "numerous reasons unrelated to the policy at issue that wetlands could be filled or drained," so the court should not "assume" causation. Defs.' Reply at 4. Defendants note, for example, that the areas may have been drained or filled because they were determined to be "prior converted" wetlands that are exempt from the prohibition on drainage; because they were authorized by Corps of Engineers permits; because they were artificially created wetlands; or because the owner opted to drain them despite the risk of losing benefits. Defs.' Opp'n at 25. Even so, Plaintiff's allegations suffice to show a "substantial likelihood" that farmers would drain fewer wetlands throughout the Prairie Pothole region if they faced losing federal benefits for doing so.

Third, Defendants argue that the OIG Report does not support traceability because it is not clear if the wetlands reviewed correspond with the wetlands Plaintiff's members use, and the report relied on a "narrow, non-statistically drawn sample."  Defs.' Reply at 4–5.  But Defendants "slice[] the salami too thin."  *WildEarth Guardians*, 738 F.3d at 307.  The OIG audit covered the Prairie Pothole region, AR001351—the same region Plaintiff's members use and enjoy.  The Report also notes that the audit was performed "with generally accepted government auditing standards."  AR001352.  Moreover, the OIG Report is just one ingredient in Plaintiff's traceability argument.

Finally, Defendants contend that the causal chain is speculative because it requires the court to assume that farmers faced with revised determinations would decide not to convert those wetlands, citing *Clapper v. Amnesty International USA*, 568 U.S. 398, 413 (2013).  Defs.' Opp'n at 27.  *Clapper* does not prohibit a traceability finding whenever redress depends on an independent actor's choices.  Rather, in *Clapper*, plaintiffs' standing argument rested on a "highly attenuated chain of possibilities" that required executive agencies to make a series of decisions to set new agendas, the Foreign Intelligence Surveillance Court to find the agencies' methods lawful, and the agencies to succeed in carrying out those agendas.  568 U.S. at 410–13.  The *combination* of these several independent actions created the traceability problem; not the mere fact that an independent actor was involved.  This case is quite different, as connecting the injury to the redress requires only a substantial likelihood that one independent actor—the farmers—will act in the way the government incentivizes them to.  Because the causal chain is far less attenuated than in *Clapper*, Plaintiff has established causation.

iii.     *Redressabilty*

The final standing requirement—redressability—is "relaxed" in cases involving

procedural injuries.  *Ctr. for Biological Diversity*, 861 F.3d at 185.  A plaintiff need only show

that the agency revisiting its action "*could*" lead to "a different conclusion."  *Id.*; *accord*

*WildEarth Guardians*, 738 F.3d at 306.  The D.C. Circuit has found this requirement met where

"[t]here 'remains at least the possibility that the [agency] could set a different standard[].'"  *Am.*

*Fuel & Petrochemical Mfrs.*, 937 F.3d at 595 (citation omitted).  Plaintiff's members' injuries

are redressable because, by revisiting the change in agency policy and rectifying the alleged

procedural deficiencies in its decision-making, NRCS could choose to return to its pre–2013

policy.  *See* Pl.'s Mem. in Opp'n to Cross Mot. for Summ. J., ECF No. 31 at 9.

Defendants contend that "Plaintiff requires the Court to assume that if NRCS did revisit

the 1990-1996 determination, the agency would find more wetlands" to be certified, when, in

reality, "revisiting 1990-1996 determinations would likely result in wetland decreases in some

situations, increases in others, and, in some, no change at all."  Defs.' Opp'n at 26–27.  Again,

Defendants set the bar too high.  It may be that revisiting determinations results in no change at

all or fewer wetlands.  But the law does not require Plaintiff to show that the agency "would"

find more wetlands if it revisited the change in agency policy.  Instead, it requires only the

*possibility* that the agency could find more wetlands.  And Defendants' own argument

acknowledges such a possibility.  *See id.*

Because at least one of Plaintiff's members can establish an injury in fact, causation, and

redressability, Plaintiff has associational standing.

**B.**     **APA Claim**

Plaintiff first contends that NRCS violated the APA by changing its policy regarding pre–1996 wetland determinations without giving a reasoned explanation.  Although Defendants contend NRCS did not change its policy, a review of the text of its 1996 regulations contrasted with its 2020 Final Rule, as well as agency practice over the interim period, shows that NRCS did change its policy to be far more lenient towards certifying wetland maps, informally beginning around 2013 and formally in the 2020 Final Rule.  Because NRCS did not give a reasoned explanation for that change in agency policy, it violated the APA.

       *i.*     *Change in agency policy*

As a threshold matter, the parties dispute whether NRCS changed its policy at all. *Compare* Pl.'s Mot. at 25–28, *with* Defs.' Opp'n at 28–41.  In Plaintiff's view, the OIG Report reflects that NRCS changed its policy regarding its criteria for certifying pre–1996 wetland determinations in 2013.  Pl.'s Mot. at 27 (citing AR001345).  Defendants, by contrast, argue that there never was any change in agency policy, but rather, there was a period of "state-level confusion in policy," Defs.' Opp'n at 40–41, that was clarified by the 2018 Interim Rule and later the 2020 Final Rule, *id.* at 30–32.

A change in policy need not be the result of an "official policy" formalized by the agency.  *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 924–29 (D.C. Cir. 2017).  In determining whether agency practice has changed, the court "independently review[s] the administrative record."  *Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 26 (D.D.C. 2019).  Official agency action, statements by agency officials, and agency correspondence may inform that inquiry.  *See Am. Wild Horse Pres. Campaign*, 873 F.3d at 924–29; *Am. Bar Ass'n*, 370 F. Supp. 3d at 26–33.

Applying that framework, the court finds that the record reflects a change in agency policy, both in writing and in practice. The 1996 regulations did not express a view either way on pre–1996 determinations, instead insisting that NRCS would "evaluat[e]" them for "accuracy" in accordance with the MOA, AR000487, whereas the 2020 Final Rule provides for pre–1996 determinations to be "considered certified if the determination was issued on the June 1991 version" of two specific forms, "the person was notified" of the certification, and "the map document was . . . legible." AR012005. The MOA, moreover, did not contain a legibility requirement. *See* AR000376–83.

The record also reflects a change in practice between the 1996 Rule and the 2020 Final Rule. From 1997 to 2013, NRCS repeatedly told farmers that "[m]ost wetland determinations completed prior to July 3, 1996, are not considered 'certified.'" AR010627; AR010615. Around 2013, however, "NRCS made significant changes in its process for wetland determinations that allowed producers to drain and farm more wetlands." AR001334. As the OIG Report explains, "agency officials directed the States [in the Prairie Pothole region] to go forward with the proposed change of accepting wetland determinations made prior to July 3, 1996" despite no official agency action on this front. AR001344. "Senior-level NRCS officials" also "acknowledged" the inconsistency in the way states were implementing wetland policy, but "did not . . . indicate that they would instruct the prairie pothole States to stop using the pre-1996 determinations and argued that their continued use of the pre-1996 determinations complied with current NRCS policy." AR001349. Moreover, in responding to the OIG Report, NRCS itself acknowledged that its staff played a role in the states' treatment of wetland certifications. *See* AR001350.

Defendants' counterarguments do not move the needle.  First, they contend that NRCS's interpretation of the Food Security Act and its own regulations are entitled to deference.  Defs.' Opp'n at 28–30.  As an initial matter, Defendants do not explain what, if any, interpretation of the Food Security Act is entitled to deference.  In addition, NRCS's interpretation of its own regulations is not entitled to deference because the regulations are not "genuinely ambiguous." *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019).  As the Supreme Court explained in *Kisor*, "when we use that term, we mean it—genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation." *Id.*  Even then, if the traditional justifications favoring deference do not apply or are outweighed, "courts should not give deference to an agency's reading, except to the extent it has the 'power to persuade.'" *Id.* (citation omitted).  The plain language of the 1996 regulations and 2020 Final Rule contain different criteria for certifying pre–1996 wetland determinations.  *Supra* at 18.  No genuine ambiguity exists, and thus no deference is warranted.

Second, Defendants argue that NRCS began the process of issuing clarifying guidance about its policy and instructing state offices on the correct policy when it "discover[ed]" that state offices were not following its policy.  Defs.' Opp'n at 31–32 (citing AR000955; AR000922–32).  The OIG Report, however, claims that NRCS officials "directed" states to go forward with a change in policy, rather than states changing their approach on their own and NRCS finding out after the fact.  *See* AR001344.  Even so, NRCS did not merely "clarify" its guidance in response to the OIG Report; the 2020 Final Rule provides a substantively different requirement (legibility) than the 1996 regulations, which focused on quality criteria.

Third, Defendants claim that Plaintiff improperly references the OIG Report and other materials "seek[ing] to replace clear statutory and regulatory language."  Defs.' Opp'n at 32–40.

But the court's inquiry into agency policy is not limited to the text of statutory and regulatory language; agency practice is properly considered. *See Am. Wild Horse Pres. Campaign*, 873 F.3d at 924–29; *Am. Bar Ass'n*, 370 F. Supp. 3d at 26–33. And again, the language of the agency's regulations does not support Defendants' contentions that agency policy did not change.

Finally, Defendants argue that the "legibility" language in the 2020 Final Rule did not alter agency policy, but rather clarifies that older maps must still be readable to remain certified. Defs.' Reply at 8–9. This argument fails to address the plain language of the 2020 Final Rule, which purports to define "sufficient quality" differently from the agency's definition in the 1996 regulations and subsequent agency practice. Indeed, an informational memorandum regarding the quality of existing wetland determinations concluded that there was a "high error rate" in the pre–1996 maps because the photos were "inferior" in quality, and the "wetland delineation was inadequate," resulting in "incorrect determinations." AR000542–43. Agency practice shows the NRCS understood its policy post–1996 to conflict with its policy stated in the 2020 Final Rule.

    ii.    *Reasoned decision-making*

NRCS was required to comply with the APA in changing its policy regarding the certification of pre–1996 wetland determinations. The APA provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action" if it is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). "The requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result." *Jost v. Surface Transp. Bd.*, 194 F.3d 79, 85 (D.C. Cir. 1999) (citation omitted). Procedurally, a reasoned explanation enables the court to "discern" the "path" the agency took. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citation omitted); *accord Jost*, 194 F.3d at 85. Substantively, this requirement "is

meant to ensure that agencies offer genuine justifications for important decisions." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

An agency provides reasoned decision-making when it "'display[s] awareness that it is changing position and 'show[s] that there are good reasons for the new policy.'" *Encino Motorcars*, 579 U.S. at 221 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). To fulfill this requirement, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (citation omitted); *accord Encino Motorcars*, 579 U.S. at 221. And in reviewing the agency's justification, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (citation omitted). Agency action may be arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Defendants concede that if NRCS changed its policy, it violated the APA. They contend instead that NRCS acted reasonably in *clarifying* agency policy, not *changing* agency policy. Defs.' Opp'n at 30–32. The court disagrees that NRCS merely clarified agency policy. And because the NRCS does not acknowledge the change in its policy, it gives no explanation for that change, much less a reasoned explanation. *See, e.g.*, *Encino Motorcars*, 579 U.S. at 221; *Motor Vehicle Mfrs.*, 463 U.S. at 43; *Am. Wild Horse Pres. Campaign*, 873 F.3d at 927. The 2020 Final Rule therefore violates the APA.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment will be GRANTED and Defendants' Cross Motion for Summary Judgment will be DENIED.  Accordingly, the 2020 Final Rule will be vacated and the case remanded to NRCS for further consideration consistent with this decision.  An Order will accompany this Memorandum Opinion.

Date: February 22, 2024

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge